Robert L. Brace, State Bar No. 122240
rlbrace@rusty.lawyer
1807 Santa Barbara Street
Santa Barbara, CA 93101
Telephone: (805) 845-8211

Michael P. Denver, State Bar No. 199279
mpdenver@hbsb.com
HOLLISTER & BRACE,
a Professional Corporation
1126 Santa Barbara Street
Santa Barbara, CA 93101
Telephone: (805) 963-6711
Facsimile: (805) 965-0329

Robert A. Curtis, State Bar No. 203870
rcurtis@foleybezek.com
Aaron L. Arndt, State Bar No. 290748
aarndt@foleybezek.com
FOLEY BEZEK BEHLE & CURTIS, LLP
15 West Carrillo Street
Santa Barbara CA 93101
Telephone: (805) 962-9495
Facsimile: (805) 962-0722

Attorneys for Plaintiffs and all others similarly situated

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD C. EVANS, an individual; JOAN M. EVANS, an individual; DENNIS TREADAWAY, an individual; and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ZB, N.A., a national banking association, dba California Bank & Trust,<br><br>Defendant. | Case No._____<br><br>**COMPLAINT FOR:**<br><br>1. **AIDING AND ABETTING FRAUD;**<br>2. **SECURITIES FRAUD;**<br>3. **CONSPIRACY TO COMMIT FRAUD;**<br>4. **AIDING AND ABETTING CONVERSION;**<br>5. **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;**<br>6. **INTENTIONAL INTERFERENCE WITH CONTRACT;**<br>7. **NEGLIGENCE; AND**<br>8. **PENAL CODE VIOLATION**<br>9. **CONSPIRACY TO VIOLATE PENAL CODE**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

---

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION.............................................................................1

II.   JURISDICTION AND VENUE ......................................................................2

IV.   AGENCY ALLEGATIONS.............................................................................4

V.    INFORMATION ALLEGATIONS.................................................................5

VI.   DELAYED DISCOVERY BY PLAINTIFFS AND ESTOPPEL .........................5

    A.   IMG's Business Model. ......................................................................6

    B.   CB&T's Unusual and Intimate Banking Relationship with IMG.......................7

    C.   CB&T Learns of the IMG's Fraud After It Accepts the JHMS SLOC as Collateral
        for No-Risk Financing. ......................................................................8

      (i)    The Creation of an Entity to Obtain BIA-Backed Financing.....................9

      (ii)   The BofA SLOC ...........................................................................10

      (iii)  CB&T Financing of Purported Sales from IMG to JHMS ......................11

      (iv)  CBT Recognized the Obvious Conflict of Interest with IMG and JHMS ...................14

      (v)   CB&T Understood the Documents It Possessed Evidenced IMG's "Wholesale"
            Business Was a Sham ...................................................................15

      (vi)  The Loan Advances CB&T Provided Revealed There Were no "Import Sales" .........16

      (vii) CBT Knew IMG's Financial Condition Was Dire and that the "Sales" Invoices
            Were Bogus...................................................................................17

      (viii)CBT Was Otherwise Aware That IMG's Sales Were Bogus .....................19

      (ix)  CB&T Continually Extended IMG's Repayment Deadlines and CB&T Accepted
            "Loan Repayments" it Knew IMG Made With Misappropriated Investor Money.......20

      (x)   Despite the Ballooning Balance on the JHMS Line, And the Obvious IMG Fraud,
            CB&T Continued to Provide IMG With Additional Liquidity....................21

      (xi)  CBT Knew the JHMS Financials Were Bogus .....................................22

      (xii) The Unraveling of the BofA Credit Facility and JHMS Line....................23

      (xiii)The Litigation...............................................................................26

D. CB&T Understood That Investors' Promissory Notes and Cash Investments Were Intended to Fund the Purchase of Overseas Inventory for Importation And Sale by IMG ...................................................................................26

E. CB&T Provided Further Financing to IMG's Scheme Based on Eight Additional SLOC's in its Favor ..................................................................27

VIII.   CLASS ACTION ALLEGATIONS ..........................................................33

IX.   CLAIMS ..........................................................................................35

X.   PRAYER FOR RELIEF ........................................................................42

XI.   JURY DEMAND ..............................................................................42

## I.    NATURE OF THE ACTION

1.     This is a Class Action brought by Plaintiffs on behalf of over 50 people against defendant ZB, N.A. doing business as California Bank & Trust (hereinafter referred to as "CB&T"), for knowingly providing substantial assistance to a $125 million fraudulent scheme initiated by International Manufacturing Group, Inc. ("IMG"). At all relevant times, the agent acting on behalf of IMG was Deepal Wannakuwatte ("Wannakuwatte"). IMG and Wannakuwatte have each filed for bankruptcy so the automatic stay currently prevents claims from being prosecuted against them in this Court.

2.     CB&T's knowing assistance included making millions of dollars in loans to IMG, which enabled the fraudulent scheme to grow and caused innocent investors, including the class members, to entrust their money to IMG. No later than October 2009, CB&T discovered IMG was operating a fraud on investors and could not repay the loans issued to IMG by CB&T. CB&T discovered that IMG had been misrepresenting to its investors that it had a legitimate wholesale import business in which it purchased actual product. IMG, however, was not actually in the business of purchasing actual product. IMG had no income from its purported wholesale import business. CB&T had actual knowledge that IMG had no income from its purported wholesale import business. Instead of terminating the banking relationship and taking an underwriting loss on the debt owed to CB&T by IMG, CB&T conspired with IMG, and substantially assisted IMG, taking affirmative actions to ensure that the scheme to lull additional investors based on the fraud survived long enough for CB&T to be repaid its principal, and to make over $2.5 million in profit.

3.     CB&T's knowing and physical assistance in the scheme included its knowing receipt of money—based on fraudulent misrepresentations and omissions—into IMG's accounts at CB&T after October 2009 until IMG's collapse on May 31, 2014 - - money CB&T knew had been paid by Plaintiffs and other class members to IMG based on false promises, false representations, and material omissions. CB&T also physically disbursed funds received from investors as lulling payments to older investors. CB&T now claims that any money it received

Clients:C:CB&T (IMG):Complaint 052617.doc

through the IMG scheme does not have to be returned to the IMG bankruptcy trustee because CB&T had a security interest in these funds pursuant to its loan agreements with IMG.

4.    IMG's scheme collapsed, and all investors were injured, on May 31, 2014 when IMG filed for bankruptcy.  Prior to the collapse, IMG investors were receiving returns on what they believed to be legitimate investments, and thus, had not yet suffered an injury on their investment.  Wannakuwatte pled guilty to Federal crimes and was sentenced to twenty years in prison.

5.    This action seeks to recover money to benefit the defrauded investors whose money was deposited in IMG's accounts at CB&T after October 2009 - - after CB&T obtained knowledge IMG was operating a fraudulent scheme - - by imposing liability on CB&T as a co-conspirator, a knowing aider and abettor, a recipient of investors' funds, and a negligent bank. Plaintiffs understand that a bank owes no duty to police a depositor for the benefit of non-depositors. However, once a bank acquires actual knowledge that a depositor is using the bank to steal from non-depositors it has a duty to non-depositors to, among other things, terminate the banking relationship with the defalcating depositor. At a minimum, a reasonably prudent bank must refrain from assisting in the fraud, which is foreseeably injuring non-depositors.

## II.    JURISDICTION AND VENUE

6.    This Federal District Court may exercise jurisdiction over this Class Action pursuant to 28 U.S.C. § 1332 because the Plaintiffs are residents of California and CB&T is a resident of the state of Utah.   The matter is a complex Class Action.

This Court has personal jurisdiction over the Defendant named in this Complaint because CB&T conducted business in California and it participated in a California based fraudulent scheme that injured Californians. Venue is proper in this District because the conduct at issue took place and had an effect in this District and CB&T regularly conducted and still regularly conducts substantial banking business in this District.

## III.    PARTIES

7.    **Plaintiff Ronald C. Evans ("Ron Evans")** is an individual living and doing business in El Dorado County, California who invested $50,000 in IMG on January 21, 2014 to

**CLASS ACTION COMPLAINT**

be repaid by IMG on May 31, 2014 the same day IMG filed for bankruptcy protection. The investment in IMG by Ron Evans was evidenced by a Promissory Note, the same type of Promissory Note that was used by IMG to solicit other investors in the fraudulent scheme. Ron Evans $50,000 was deposited into the IMG account at CB&T. As described in more detail below, IMG represented to Ron Evans that Ron Evans's investment funds will be used to purchase actual product overseas. IMG never disclosed to Ron Evans that his investment funds would be used to pay back other investors. Had Ron Evans known the truth that his investments funds would not be used to purchase product overseas, he would not have invested his money with IMG. Had Ron Evans known the truth that his investments would be used to pay back other investors, he would not have invested his money with IMG.

8. **Plaintiff Joan M. Evans ("Joanie Evans")** is an individual living and doing business in El Dorado County, California and the wife of Ron Evans. Joanie Evans invested in the same Promissory Note issued by IMG to her husband Ron Evans. Ron and Joanie Evans lost $50,000. As described in more detail below, IMG represented to Joanie Evans that her investment funds will be used to purchase actual product overseas. IMG never disclosed to Joanie Evans that her investment funds would be used to pay back other investors. Had Joanie Evans known the truth that her investments funds would not be used to purchase product overseas, she would not have invested her money with IMG. Had Joanie Evans known the truth that her investments would be used to pay back other investors, she would not have invested her money with IMG.

9. **Plaintiff Dennis Treadaway ("Treadaway")** is an individual living and doing business in Sacramento County, California who invested over $2 million in IMG in a series of transactions from 2007 to 2014. Treadaway invested in IMG by way of Standby Letters of Credit ("SLOCs") and Promissory Notes, the same type of Promissory Notes that were used by IMG to solicit other investors in the fraudulent scheme. Treadaway lost approximately $950,000, the exact amount to be proven at trial. Treadaway's cash investments in IMG were deposited into the IMG account at CB&T. As described in more detail below, IMG represented to Treadaway that his investment funds will be used to purchase actual product overseas. IMG

**CLASS ACTION COMPLAINT**

never disclosed to Treadway that his investment funds would be used to pay back other investors. Had Treadway known the truth that his investments funds would not be used to purchase product overseas, he would not have invested his money with IMG. Had Treadway known the truth that his investments would be used to pay back other investors, he would not have invested his money with IMG.

10.     Plaintiffs Ron Evans, Joanie Evans, and Treadway will collectively be referred to herein as "Plaintiffs".

11.     **Defendant ZB, N.A., a national banking association, doing business as California Bank & Trust (hereinafter referred to as "CB&T" or "Defendant")** is incorporated and headquartered in Utah and does substantial business throughout California.

12.     During the relevant time period the following non-parties were employees and agents of CB&T, who, at all relevant times, were acting within their course and scope of employment and agency for CB&T:

•       Jun Enkoji was a Vice President and Commercial Banking Officer at CB&T associated with the Central Valley Region, and the Fresno Commercial Loan Office;

•       Dawn Satow worked at the Sacramento Regional Commercial division of CB&T;

•       Heddy Chiang was a Manager at CB&T's Arden Way, California branch;

•       Royal "Buzz" Minson was a Director of International Business Development at CB&T's San Francisco, California office;

•       Kerrie Kinsey-Alexander was a financial service representative and loan specialist at the Arden Way, California branch of CB&T.

IV.     <u>AGENCY ALLEGATIONS</u>

13.     Plaintiffs allege that the actions of the Defendant were done in collaboration and collusion with the IMG while acting in furtherance of their agreement to perpetuate the unlawful scheme. CB&T's agents working with IMG were acting in the course and scope of their employment and agency with CB&T and the Defendant authorized or ratified the acts of its agents as alleged herein.

Clients:C:CB&T (IMG):Complaint 052617.doc

## V. INFORMATION ALLEGATIONS

14.     Allegations made in this Complaint have been based on information and belief, except those allegations that pertain directly to Plaintiffs, which are based on Plaintiffs' personal knowledge. Plaintiffs' information and belief is based on, *inter alia*, the investigation conducted by Plaintiffs and Plaintiffs' attorneys after their retention. Each and every allegation and factual contention contained in this Complaint has evidentiary support or, alternatively, is likely to have evidentiary support after reasonable opportunity for further investigation or discovery by Plaintiffs or their counsel.

## VI. DELAYED DISCOVERY BY PLAINTIFFS AND ESTOPPEL

15.     The Plaintiffs and Class Members only recently discovered the Defendant's misconduct giving rise to this civil complaint due to, among other things: (i) the Defendant's effort to conceal the fraudulent scheme, its role in the fraud and its other misconduct; (ii) the Plaintiffs' inability to discover the misconduct due to the inability to access the evidence of CB&T's participation in the possession of the Bankruptcy Trustee of IMG; and (iii) the fact that Plaintiffs' were barred from suing IMG directly because of the bankruptcy stay. Plaintiffs discovered the role played by CB&T after reading the factual allegations in the trustee's fraudulent conveyance complaint against CB&T in the adversary proceeding filed on May 6, 2016. Despite diligent investigation of the circumstances of the injury, before May 6, 2016 it was not reasonably possible for the Plaintiffs to obtain facts or possession and control over the CB&T confidential banking documents for IMG which established (i) the ongoing financial relationship between IMG and CB&T and (ii) CB&T's obvious knowledge that IMG was operating a fraud.

16.     Because of the Defendant's effort to conceal from investors that IMG was defrauding them and its role in the fraud, Defendant is estopped from contending that any of Plaintiffs' claims are barred by the statutes of limitations or repose.

///

///

///

**CLASS ACTION COMPLAINT**

## VII.  CB&T DISCOVERED THE IMG FRAUD NO LATER THAN OCTOBER 2009 WHEN IT STOPPED LOANING ADDITIONAL MONEY TO IMG

### A.  IMG's Business Model.

17.     IMG's business allegedly consisted of the importation of latex surgical gloves and related medical products manufactured in Asia for re-sale in the United States.  IMG's business purportedly involved two distinct divisions, a "retail" division and a "wholesale" division.

18.     IMG's "retail" business, which provided gloves to medical offices and other small businesses, was relatively small and it generally lost money or broke even.

19.     IMG's "wholesale" business purportedly comprised IMG's true revenue stream, which IMG claimed to exceed $100 million annually.  However, IMG's "wholesale" division had no employees, no accounts payable, and no accounts receivable.   In short, IMG's "wholesale" division was a complete sham.  It was the faux front for the $125 million fraudulent scheme IMG initiated in or around 2004.

20.     At the outset of the fraudulent scheme, IMG solicited investors to provide cash for purported wholesale shipments of latex surgical gloves from Asian manufacturers to IMG's purported customers, primarily the U.S. Department of Veterans Affairs (the "VA").  The cash was paid in exchange for promissory notes issued by IMG.

21.     IMG investors were promised that their money would fund the purchase of such shipments, and that in so doing, they were financing IMG's highly profitable wholesale inventory purchases.  In exchange for investing cash, investors were provided promissory notes reflecting short-term repayment with returns of 12% or more.  The investor funds were not used as represented.   Instead investor funds deposited at CB&T were used to pay back prior investors.  IMG ran a classic Ponzi scheme.

22.     Throughout the long-term fraudulent scheme, the funds that IMG received from investors were deposited into account xxxxxx4841 at CB&T (the "Wholesale Account").  IMG used the Wholesale Account to pay interest and principal payments on promissory notes.  Accordingly, the lulling payments to IMG's investors were made out of CB&T's accounts with

money recently deposited therein by new investors. The Plaintiffs in the case had their money deposited into the IMG account at CB&T and then disbursed for purposes other than to buy medical supplies for re-sale, contrary to what was represented to them in lulling them to invest in IMG.

23.     In addition to soliciting cash investors, IMG convinced certain investors to obtain standby letters of credit ("SLOC"s) in favor of CB&T, so that CB&T could purportedly finance IMG's overseas purchases of "wholesale" inventory. CB&T knew and understood the intent of the investor SLOCs and CB&T accepted the investor SLOCs as collateral for advances CB&T made to IMG despite also having actual knowledge that: (i) IMG did **not** use investor cash to purchase wholesale product overseas; (ii) CB&T did **not** pay overseas suppliers or for wholesale product; and (iii) CB&T did **not** issue any letters of credit in favor of overseas wholesale suppliers or their banks. CB&T simply deposited cash into IMG's accounts, where it was immediately disbursed by IMG to pay lulling payments to investors in the local area, or to repay CB&T's own prior advances to IMG.

**B. CB&T's Unusual and Intimate Banking Relationship with IMG.**

24.     CB&T's actions in relation to IMG strayed far outside customary and standard banking practices.  CB&T's banking relationship with IMG was unusual, intimate, and openly perpetrated the scheme whereby investors were lulled in based on the false representations and material omissions regarding whether IMG was engaged in a legitimate wholesale business that purchased actual product.  IMG and Wannakuwatte had in excess of thirty different checking accounts established with CB&T and well over ten substantial lines of credit or loans with CB&T. CB&T made over $2.5 million on the relationship.

25.     Many of the IMG accounts reflected highly irregular banking activity that could never have been tolerated by an institution following customary practices.  Excessive numbers of overdraft and Non-Sufficient Fund ("NSF") notices were commonplace. Cash transactions involving huge dollar amounts were the norm, **although nothing was ever bought or sold**. There were thousands of dollars of transactions involving the purchase or deposits of cashier's checks and rapid clearing of large checks for millions of dollars despite low, zero, or negative

**CLASS ACTION COMPLAINT**

fund balances in the IMG and Wannakuwatte accounts at CB&T. This irregular banking activity came to CB&T's attention through its standard banking and lending practice (e.g., determining creditworthiness) and was seen in documents created in the ordinary course of bank business (e.g., transactional and account documents, wire transfers, statements, checks, and deposit slips).

26. CB&T's departure from reasonable, acceptable and prudent banking was readily apparent in many ways, including the manner CB&T encouraged at least two people to "invest" in IMG's "wholesale" business by providing the two individuals with home equity lines of credit from CB&T, which lines were specifically provided so that the proceeds of the loans could fund IMG's non-existent "import" business.

27. As early as May 2006, CB&T was aware that the IRS had issued a bank levy on the unpaid personal taxes of IMG's agent, Wannakuwatte, who was very well known at the bank as being the person in control of IMG. That knowledge did not cause CB&T to even pause its actions in support of Wannakuwatte and IMG. Despite the obvious scheme being run through the bank, CB&T went out of its way to actively assist IMG, its depositor and borrower.

28. In addition to encouraging investors to deposit, arranging for investor loans to fund IMG and participating in the investor SLOC model, for over a decade, CB&T regularly received and accommodated requests from IMG and Wannakuwatte for immediate and unusual assistance with banking issues. CB&T cooperated in order to keep IMG investor money, as well as CB&T loan interest and banking fees pouring into CB&T.

**C. CB&T Learns of the IMG's Fraud After It Accepts the JHMS SLOC as Collateral for No-Risk Financing.**

29. A federally-backed loan program related to the Bureau of Indian Affairs (the "BIA"), called the Indian Loan Guaranty, Insurance and Interest Subsidy Program ("the BIA Guaranteed Loan Program"), allows the BIA to guarantee up to 90% of the commercial loan balances owed to businesses that are majority owned (at least 51%) by a federally recognized native American Indian tribe. The guarantee encourages and enables lenders to provide financing to a tribal owned business in situations where lenders might not otherwise do so.

**CLASS ACTION COMPLAINT**

Clients:C:CB&T (IMG):Complaint 052617.doc

30.     Wayne Smith ("Smith") is a person with a very public record of misconduct.  In 2002, amid allegations of serious corruption, Smith was fired from his post as Deputy Assistant Secretary for the BIA.  After Smith was fired, he and Wannakuwatte became closely associated and began to conspire to use the BIA Guaranteed Loan Program to obtain liquidity for IMG's fraudulent scheme.

31.     Smith and Wannakuwatte agreed to create an entity eligible for the BIA Guaranteed Loan Program which would do business with IMG, thereby allowing IMG access to levels of financing that it could not otherwise obtain under traditional lending and underwriting practices.

32.     Wannakuwatte knew that a BIA guarantee could cause certain lenders to overlook credit risks and conduct inadequate underwriting.  CB&T had already proven its willingness to provide liquidity to IMG's scheme with virtually no questions asked so long as CB&T was protected by SLOCs from individual IMG investors.  Wannakuwatte knew that if he had a BIA backed entity that could provide CB&T with a SLOC many times greater than the individual IMG investors, CB&T would **still** be willing to provide IMG with complete liquidity for the BIA backed, and much larger SLOC, because CBT viewed the arrangement as a risk-free way to make substantial money on interest and fees, irrespective of CB&T's knowledge that IMG was not actually importing goods.

33.     In other words, Wannakuwatte knew that if he controlled an entity owned 51% by a tribe, and if he convinced a lender to provide the tribal "owned" entity with a credit facility, including a massive SLOC in favor of CB&T, CB&T would accept the massive SLOC as collateral, and CB&T would infuse millions into the IMG scheme.

**(i)  The Creation of an Entity to Obtain BIA-Backed Financing**

34.     Through Smith, Wannakuwatte was introduced in 2004 to W. Ron Allen, Tribal Chairman/Executive Director of the Jamestown Tribe ("Allen").  In June 2005, Allen, on behalf of the tribe, agreed to create an entity and business with Wannakuwatte for the importation of wholesale shipment of surgical gloves and related medical supplies, which would be owned 51% by the Jamestown Tribe and 49% by Wannakuwatte.  To that end, the Jamestown Health

9

and Medical Supply Company, LLC ("JHMS") was formed and executed an Operating Agreement in October 2005.

35.     Pursuant to the JHMS Operating Agreement, Wannakuwatte was to serve as chief executive officer (CEO) and control all JHMS affairs.

36.     JHMS, under the control of CEO Wannakuwatte, immediately signed a Distribution Agreement with IMG, also controlled by Wannakuwatte. The Distribution Agreement, which was attached as an exhibit to the JHMS Operating Agreement, provided that IMG was the exclusive distributor of "all of the inventory…for such period of time that [JHMS] shall continue to conduct active business operations." Under the Distribution Agreement, IMG was to be paid: (i) IMG's direct cost and expenditures "sufficient to reimburse IMG for its actual financial costs in respect of the purchase and/or importation of Gloves and Other Products"; (ii) plus $5 per case of gloves; and (iii) "5.0% of the landed importation cost to IMG's warehouse facility" for each case of other (non-glove) products.

37.     Based on the JHMS Operating Agreement, JHMS was in essence, a pass through entity. IMG was to purchase gloves and other overseas product for sale to JHMS, which JHMS would then "resell" domestically without JHMS ever taking physical possession of the product. According to a sworn declaration of Diane Gange, the Tribe's chief financial officer, dated October 27, 2010, JHMS never took possession of any inventory from IMG during 2007, 2008, and 2009.

38.     In accord with Wannakuwatte's plan, the Jamestown Tribe agreed to serve as IMG's financial partner, JHMS was created, and the JHMS Operating Agreement provided the Jamestown Tribe would obtain BIA guaranteed financing so that JHMS could issue a SLOC in favor of CB&T. The JHMS Operating Agreement expressly provided at Section 8.2, that a SLOC facility of at least $20 million would be obtained.

**(ii) The BofA SLOC**

39.     Having created an entity owned 51% by a Federally recognized tribe and having put Wannakuwatte in control of that entity, all Wannakuwatte needed to do to monetize the BIA program and obtain millions of dollars for the scheme was to arrange for a lender to provide

**CLASS ACTION COMPLAINT**

JHMS with a credit facility and a SLOC in favor of CB&T.

40.     In April 2006, JHMS entered into a loan agreement with Bank of America ("BofA") for a 3-year term revolving line of credit in the amount of $10 million (the "BofA Credit Facility").  At the end of the 3-year term in April 2009, all outstanding principal would be due and payable.  The JHMS loan documents for the BofA Credit Facility were signed for by both its CEO Wannakuwatte and also by Allen.

41.     In accord with IMG's plan, the BofA Credit Facility was blessed by the BIA in April 2006, such that the BIA (the US taxpayers) provided a 90% guaranty for the loan. Additionally, the Jamestown Tribe also guaranteed the full amount of the BofA Credit Facility.

42.     Having established the BofA Credit Facility, Wannakuwatte of IMG went to work to obtain a SLOC in favor of CB&T, which occurred in May 2006, when BofA issued a $9 million SLOC specifically for the benefit of CB&T (the "BofA SLOC").

43.     The BofA SLOC provided that payment under the letter would require: (i) CB&T's written notice to BofA that IMG had defaulted on credit extended by CB&T for a specified amount; and (ii) BofA's receipt of purchase orders demonstrating sales of imported wholesale medical supplies from IMG to JHMS.

44.     The BofA SLOC had an original expiration date in May 2007, but it further provided for automatic extensions in one-year increments unless BofA issued written notice to CB&T that it would **not** extend the BofA SLOC.

**(iii) CB&T Financing of Purported Sales from IMG to JHMS**

45.     Once in place, the BofA SLOC became the vehicle for IMG to monetize the BIA Guarantee, which served as the indirect, but ultimate collateral for the $9 million line of credit that IMG obtained from CB&T.

46.     IMG and CB&T entered into Loan No. 168068-0004 in May 2006, in the original amount of $1,500,000.00 (the "JHMS Line").  The BofA SLOC served as collateral for the JHMS Line, such that CB&T was in a position to earn substantial fee and interest income on the JHMS Line, essentially risk-free.

47.     Just a few weeks later, in June 2006, CB&T and IMG modified the JHMS Line

**CLASS ACTION COMPLAINT**

to increase the loan amount from $1,500,000.00 to $9,000,000.00. As part of the modification (the "Change in Terms Agreement"), the "Acceptance Subline" was also increased to $9 million, which allowed IMG's draws on the JHMS Line (termed "acceptances") could total $9 million.

48.    The JHMS Line was expressly for the "purchase of inventory relating to purchases by Jamestown Health and Medical Supply Company. LLC, under Distribution Agreement dated October 26, 2005, and supported by copies of purchase orders submitted pursuant to each advance requested."

49.    IMG fabricated invoices and sent them to CB&T in order to obtain funds to fuel the scheme from the JHMS line.

50.    The first sixteen purported JHMS purchase orders provided by IMG to CB&T were as follows:

| PO Number | Date | Amount |
|-----------|------|--------|
| PO0000001 | 5/15/2006 | $1,014,200.00 |
| PO0000002 | 6/5/2006 | $55,200.00 |
| PO0000003 | 6/15/2006 | $408,243.00 |
| PO0000004 | 6/28/2006 | $1,853,799.50 |
| PO0000005 | 8/16/2006 | $1,582,284.00 |
| PO0000006 | 8/29/2006 | $411,542.00 |
| PO0000007 | 9/28/2006 | $321,120.00 |
| PO0000008 | 10/19/2006 | $262,548.00 |
| PO0000009 | 11/29/2006 | $974,490.00 |
| PO0000010 | 12/21/2006 | $1,765,759.50 |
| PO0000011 | 1/25/2007 | $925,540.00 |
| PO0000012 | 2/20/2007 | $732,662.00 |
| PO0000013 | 4/9/2007 | $420,200.00 |
| PO0000014 | 6/4/2007 | $670,758.00 |
| PO0000015 | 8/2/2007 | $262,548.00 |
| PO0000016 | 1/18/2008 | $405,900.00 |

(collectively, the "Initial JHMS Purchase Orders"). Each of the Initial JHMS Purchase Orders was signed by Smith, purportedly acting on behalf of JHMS.

51.    The JHMS Operating Agreement, at Section 8.2, required the Distribution

Clients:C:CB&T (IMG):Complaint 052617.doc

Agreement, which was an attachment to the JHMS Operating Agreement. CB&T possessed a copy of the JHMS Operating Agreement. Further, CB&T's other documentation for the JHMS Line expressly referred to the JHMS Operating Agreement. Accordingly, pursuant to the terms of the documents CB&T possessed, CB&T knew and understood that IMG was to use funds advanced by CB&T on the JHMS Line (backed by the BofA SLOC) to purchase wholesale shipment of surgical gloves and related product overseas for import and domestic re-sale.

52. However, the Initial JHMS Purchase Orders were completely inconsistent with the importation of wholesale shipments imported and sold on 180-day terms. In fact, the Initial JHMS Purchase Orders had nothing to do with importing goods at all. The invoices identified the "vendor" as IMG at its Sacramento address and identified the purchaser as JHMS at its address in Washington State. The shipping method on each invoice was described as "ground" which is entirely inconsistent with importing goods from Asia.

53. Despite knowing that IMG was supposed to be purchasing Asian inventory, and despite being presented with materials demonstrating that IMG was **not** doing so, CB&T provided financing on the JHMS Line as if IMG had been importing goods on 180-day payment terms.

54. CB&T's election to provide import financing when the documents it possessed informed CB&T that nothing was actually being imported, is entirely inconsistent with acceptable lending practice and an indication of knowledge of the fraud being committed at IMG.

55. In addition, the certifications for the Initial Purchase Orders, which were required by CB&T for IMG to obtain bankers acceptance financing, were in clear conflict with the purchase orders themselves. In fact, **each** such certification included inconsistent required information, or completely omitted required information, regarding "the underlying transaction being financed by the drafts," including: (i) "Place of Origin;" (ii) "Destination;" and (iii) "Date of Shipment."

56. CB&T reviewed the conflicting and incomplete IMG certifications documents it possessed in relation to its own underwriting process in relation to its infusions of liquidity to

**CLASS ACTION COMPLAINT**

IMG.  The incomplete and inconsistent information provided by IMG in relation to the JHMS Line constituted facts which CB&T knew indicated fraud being committed by IMG against investors in IMG.  CB&T elected to ignore the obvious conflicts between the documents it possessed which demonstrated, as CB&T already knew, that IMG was not actually importing surgical gloves or other "wholesale" goods.  CB&T was focused on making money for itself, which CB&T's underwriting showed it could do virtually risk-free, despite the fact nothing was being imported, so long as CB&T was the beneficiary of SLOCs that met or exceeded the amounts CB&T loaned to IMG.

57.    CBT's decision to ignore the missing and/or inconsistent information required of its own forms was a departure from its own policies and procedures, not to mention prudent banking practices. Such a gross departure is consistent with knowledge and inconsistent with lack of knowledge of the fraud.

**(iv)    CBT Recognized the Obvious Conflict of Interest with IMG and JHMS**

58.    CB&T was keenly aware of the conflicts of interest and the related party nature of the "transactions" between JHMS and IMG.  CB&T knew that Wannakuwatte controlled IMG's "wholesale" division, and CB&T communicated almost exclusively with Wannakuwatte regarding IMG's various accounts and loans with CB&T.

59.    CB&T possessed the JHMS Operating Agreement so it knew that Wannakuwatte was the CEO and that he controlled JHMS even though he held a "minority" (49%) membership interest in JHMS.  The Operating Agreement further informed CB&T that JHMS had an office in Sacramento, at 879 F Street, Suite 120, which was also IMG's principal place of business.

60.    CB&T's knowledge that Wannakuwatte fully controlled JHMS, was underscored by Wannakuwatte' s June 2006 letter to CB&T's Heddy Chiang, stating: "I have been given full authority to sign on behalf of Jamestown Health & Medical Supply Company LLC in any legal capacity.  All purchase orders will be signed by one of the Board Members other than me.  We all have the legal capacity to sign these purchase orders."  Wannakuwatte signed the letter on behalf of JHMS as its "President/CEO."

61.    CB&T's knowledge of the related party transactions between JHMS and IMG,

**CLASS ACTION COMPLAINT**

coupled with Wannakuwatte's ability to control both entities called for a heightened degree of scrutiny and due diligence based on ordinary banking and lending practices (e.g., determining creditworthiness). CB&T did not engage in increased due diligence based on ordinary banking and lending practices. CB&T ignored the conflict because CB&T was only concerned with making risk-free money for itself.

**(v) CB&T Understood the Documents It Possessed Evidenced IMG's "Wholesale" Business Was a Sham**

62.     CB&T knew that the purported "sales" from JHMS to IMG conflicted with the Distribution Agreement appended to and specifically referred to at Section 8.2 of the Operating Agreement, which CB&T possessed. Distribution Agreement (Section 4.1) required payment within sixty (60) days from the invoice date, yet: (i) the Initial JHMS Purchase Orders were silent as to payment term; and (ii) CB&T provided financing on 180-day terms. Moreover, the Initial JHMS Purchase Orders bore no connection to the pricing formula set forth in the Distribution Agreement, including: (i) importation costs; and (ii) $5.00 per case of gloves or 5% of the cost of other products; and (iii) reimbursement of financing expenses incurred.

63.     In addition to the obvious nature of the scam described in documents in CB&T's possession evidencing that the Initial JHMS Invoices did **not** relate to any importation of wholesale goods, CB&T also knew that: (i) the dollar amount and glove quantities ordered by JHMS conflicted with the documents CB&T possessed and reviewed in its underwriting process; and, (ii) shipment information and payment terms were in conflict with the terms of the Distribution Agreement and the letters of credit and bankers acceptances possessed by CB&T and reviewed in its underwriting process.

64.     CB&T was aware of numerous indicia of fraud early on in its involvement with the JHMS Line, which CB&T disregarded because its due diligence gave CB&T confidence that, irrespective of the reality that IMG was not importing wholesale goods as it was representing to investors, the SLOCs in CB&T's favor allowed CB&T to make substantial risk-free income in fees and interest.

Clients:C:CB&T (IMG):Complaint 052617.doc

**(vi)    The Loan Advances CB&T Provided Revealed There Were no "Import Sales"**

65.    As time went on, CB&T was presented with even more indicia of fraud at IMG, but continued the banking relationship with IMG, which supports that CB&T already had actual knowledge of the fraud. CB&T knew that IMG could not come close to covering CB&T's financing with JHMS "sale" proceeds. Repeatedly, IMG drew down on the JHMS Line in order to obtain funds to cover bankers' acceptances issued six months earlier. The repeated practice, which CB&T monitored to ensure repayment evidenced the glaring reality that there were no "sales" proceeds. The CB&T loan advances were as follows:

| Invoice Date | JHMS Purchase Order Number | Date of Bank Acct. Advance | Amount | Loan Advance & Bank Acct. |
|---|---|---|---|---|
| 5/15/2 | PO000000 | 5/26/2006 | $1,014,200. | 11/20/200 |
| 6/15/2 | PO000000 | 6/20/2006 | $408,243.00 | 12/18/200 |
| 6/28/2 | PO000000 | 6/29/2006 | $1,853,799. | 12/26/200 |
| 8/16/2 | PO000000 | 8/17/2006 | $1,582,284. | 2/13/2007 |
| 9/28/2 | PO000000 | 10/2/2006 | $321,120.00 | 3/30/2007 |
| 10/19/ | PO000000 | 10/20/200 | $262,548.00 | 4/18/2007 |
| 11/29/ | PO000000 | 12/1/2006 | $974,490.00 | 5/30/2007 |
| 12/21/ | PO000001 | 12/24/200 | $1,765,759. | 6/20/2007 |
| 1/25/2 | PO000001 | 1/29/2007 | $925,540.00 | 7/28/2007 |
| 2/20/2 | PO000001 | 2/26/2007 | $732,662.00 | 8/24/2007 |
| 4/9/20 | PO000001 | 4/11/2007 | $420,200.00 | 10/5/2007 |
| 6/4/20 | PO000001 | 6/5/2007 | $670,758.00 | 11/30/200 |
| 8/2/20 | PO000001 | 8/6/2007 | $262,548.00 | 2/1/2008 |
| 1/18/2 | PO000001 | 1/23/2008 | $405,900.00 | 4/22/2008 |
| 6/18/2 | PO000003 | 6/22/2009 | $878,605.40 | 8/6/2009 |

As each of the bankers' acceptances came due, CB&T simultaneously credited to IMG account number XXXXXXX7631 at CB&T (the "<u>IMG General Account</u>") a "loan advance" in the amount of the bankers' acceptance and debited the IMG General Account in the very same amount as a payment on the related letter of credit.

66.    Had IMG actually imported wholesale product generating "sales" even remotely near the level represented in the IMG/JHMS invoices, then there would have been **substantial** sale proceeds and CB&T would not need to lend on the JHMS Line in relation to each and

**CLASS ACTION COMPLAINT**

every bankers acceptance.

**(vii)    CBT Knew IMG's Financial Condition Was Dire and that the "Sales" Invoices Were Bogus**

67.    As a result of CB&T's repeated simultaneous credits and debits to the IMG General Account, CB&T had actual knowledge that IMG lacked sufficient funds to cover the bankers acceptances, meaning the "sales" were not occurring, and the documents IMG presented to evidence the "sales" were fraudulent.

68.    CB&T's knowledge of IMG's dire financial condition was memorialized in writing. For example, as the 2nd above-noted $408,243 bankers acceptance was set to mature in December 2006, CB&T's Jun Enkoji e-mailed Wannakuwatte (copying CB&T's Dawn Satow and CB&T's Heddy Chiang) stating: "International Banking Group will debit the account for that amount…Please make sure you will have a sufficient/collected funds available in the account." Wannakuwatte responded that the line of credit would need to be temporarily drawn down to pay the bankers' acceptance. CB&T understood that IMG's "sales" were not generating cash as they would if the "sales" were real rather than fraudulent.

69.    Moreover, the eventual payment Wannakuwatte scraped together for this particular loan advance further revealed to CB&T the fraudulent nature of the "sales".

70.    On December 18, 2006, Wannakuwatte made a deposit into the IMG General Account in the amount of $409,870.12 comprised of: (i) a December 18th IMG check in the amount of $375,000 from an account at Golden State Bank; and (ii) a December 18th JHMS check in the amount of $34,870.12. CB&T, as part of its standard banking and lending practice, monitored these checks and the deposit, and placed copies of the deposit slip and both checks in its loan file for the JHMS Line. The circumstances surrounding the December 18th bankers' acceptance of $408,243 and the related deposit provided CB&T with further evidence of fraud: (i) the $34,870.12 JHMS check was less than 10% of the purported $408,243 "sale" to JHMS and there was no explanation for the small amount of such a payment; (ii) the JHMS check reflected **IMG's** Sacramento address of 879 F. St. Ste. 120, and was signed by **IMG's** chief financial officer, Ursula Klein; (iii) the JHMS check was cut out of a CB&T bank account,

**CLASS ACTION COMPLAINT**

CB&T frequently performed inquiries into CB&T accounts based on its standard and ordinary banking and lending practice, and such an inquiry into the JHMS account had to reconfirm CB&T's existing understanding that JHMS had no hope of ever paying for the purported "sales"; and (iv) if the volume of IMG's purported business were anywhere near that which was represented, IMG would never need to obtain funds from a non-CB&T account to pay the bulk of the advance.

71.     Despite its knowledge surrounding the bogus "sales", CB&T continued to make simultaneous credits as loan advances and debits to cover the financing of the JHMS Purchase Orders so that CB&T could continue to pocket risk-free income in fees and interest.

72.     The obvious effect of IMG's continued non-collection of any "sales" proceeds, and CB&T's continuous loan advances to cover bankers' acceptances as they matured, was a ballooning balance on the JHMS Line, follows:

| Date | Outstanding | Outstanding Loan | Total Line |
|---|---|---|---|
| May 26, 2006 | $1,014,200.00 | $0.00 | **$1,014,200.** |
| June 8, 2006 | $1,069,400.00 | $0.00 | **$1,069,400.** |
| June 20, 2006 | $1,477,643.00 | $0.00 | **$1,477,643.** |
| June 29, 2006 | $3,331,442.00 | $0.00 | **$3,331,442.** |
| August 17, 2006 | $4,913,726.00 | $0.00 | **$4,913,726.** |
| August 17, 2006 | $4,858,526.00 | $0.00 | **$4,858,526.** |
| August 30, 2006 | $5,270,068.00 | $0.00 | **$5,270,068.** |
| October 2, 2006 | $5,591,188.00 | $0.00 | **$5,591,188.** |
| October 20, 2006 | $5,853,736.00 | $0.00 | **$5,853,736.** |
| November 20, 2006 | $4,839,536.00 | $1,014,200.00 | **$5,853,736.** |
| November 27, 2006 | $4,839,536.00 | $0.00 | **$4,839,536.** |
| December 1, 2006 | $5,814,026.00 | $0.00 | **$5,814,026.** |
| December 18, 2006 | $5,405,783.00 | $408,243.00 | **$5,814,026.** |
| December 20, 2006 | $5,405,783.00 | $0.00 | **$5,405,783.** |
| December 24, 2006 | $7,171,542.00 | $0.00 | **$7,171,542.** |
| December 26, 2006 | $5,317,743.00 | $1,853,799.00 | **$7,171,542.** |
| January 22, 2007 | $5,317,743.00 | $753,799.00 | **$6,071,542.** |
| January 29, 2007 | $6,243,283.00 | $753,799.00 | **$6,997,082.** |
| February 12, 2007 | $6,243,283.00 | $503,799.00 | **$6,747,082.** |
| February 13, 2007 | $4,660,999.00 | $2,086,083.00 | **$6,747,082.** |
| February 26, 2007 | $4,982,119.00 | $2,072,625.00 | **$7,054,744.** |
| March 30, 2007 | $4,660,999.00 | $2,393,845.00 | **$7,054,744.** |

**CLASS ACTION COMPLAINT**

| April 10, 2007 | $4,660,999.00 | $2,293,745.00 | **$6,954,744.** |
| April 11, 2007 | $5,081,199.00 | $2,293,745.00 | **$7,374,944.** |
| April 18, 2007 | $4,818,651.00 | $2,556,293.00 | **$7,374,944.** |
| May 30, 2007 | $3,844,161.00 | $3,530,783.00 | **$7,374,944.** |
| June 1, 2007 | $3,844,161.00 | $3,130,783.00 | **$6,974,944.** |
| June 5, 2007 | $4,514,919.00 | $3,130,783.00 | **$7,645,702.** |
| June 20, 2007 | $2,749,160.00 | $4,896,542.00 | **$7,645,702.** |
| July 28, 2007 | $1,823,620.00 | $5,822,082.00 | **$7,645,702.** |
| August 6, 2007 | $2,086,168.00 | $5,822,082.00 | **$7,908,250.** |
| August 24, 2007 | $1,353,506.00 | $6,554,744.00 | **$7,908,250.** |
| October 5, 2007 | $933,306.00 | $6,974,945.00 | **$7,908,251.** |
| November 30, 2007 | $262,548.00 | $7,645,703.00 | **$7,908,251.** |
| January 23, 2008 | $668,448.00 | $7,645,703.00 | **$8,314,151.** |
| February 1, 2008 | $405,900.00 | $7,908,251.00 | **$8,314,151.** |
| April 22, 2008 | $0.00 | $8,314,151.00 | **$8,314,151.** |
| January 30, 2009 | $0.00 | $8,084,151.00 | **$8,084,151.** |
| June 22, 2009 | $878,605.40 | $8,084,151.00 | **$8,962,756.** |
| August 6, 2009 | $0.00 | $8,962,756.40 | **$8,962,756.** |

73.     The outstanding bankers' acceptances purportedly used to obtain inventory for JHMS were repeatedly refinanced through the JHMS Line. Had IMG's "sales" to JHMS been real, they would have eliminated, or at least greatly reduced this practice. CB&T understood that simple truth that there were no real "sales", but chose to involve itself in order to make risk-free interest and fees.

**(viii)   CBT Was Otherwise Aware That IMG's Sales Were Bogus**

74.     Underscoring CB&T's knowledge of the obvious implications of IMG's repeated borrowings, CB&T was also fully aware of the lack of any meaningful JHMS payments to IMG on the purported "sales". CB&T's undeniable knowledge in this regard flows not only from IMG's repeated borrowing, and the obviously bogus "sales" invoices CB&T possessed, but further, from a document CB&T executed entitled, Agreement for Assignment of Payments, Proceeds and Distributions dated May 17, 2007 (the "Assignment of JHMS Payments"), pursuant to which: (i) CB&T was irrevocably assigned any and all "rights to receive payments, proceeds and other distributions" from JHMS; (ii) IMG was required to irrevocably instruct JHMS and its Managing Member or other authorized party, to pay to CB&T any such

payments; and (iii) IMG promised CB&T that "any payment, proceeds or other distribution" received would be deposited into a CB&T controlled account.

75.     The Assignment of JHMS Payments was signed by Wannakuwatte on behalf of IMG.  Wannakuwatte also signed an "Acknowledgement and Consent" to the assignment on behalf of JHMS as its CEO.

76.     The Assignment of JHMS Payments mandated that all payments owed from JHMS to IMG were to be deposited in an account controlled by CB&T.  CB&T was undeniably aware of the lack of incoming payments from JHMS into its own account in connection with the purported "sales" from IMG to JHMS because they did not happen.

77.     Despite CB&T's actual knowledge of the complete lack of any actual importation of goods by IMG and the many other obvious indications of fraud CB&T was aware of, CB&T routinely processed loan advances and repayments related to the JHMS Line. CB&T did so because it knew the ultimate lending risk was borne by IMG's other creditors (i.e. SLOC investors), so CB&T could pocket risk-free income despite the fact that no wholesale products were being imported or sold.

**(ix)     CB&T Continually Extended IMG's Repayment Deadlines and CB&T Accepted "Loan Repayments" it Knew IMG Made With Misappropriated Investor Money**

77.     CB&T accepted payments from IMG on the JHMS Line even when CB&T knew that such payments could not have come from JHMS for legitimate sales to JHMS.  For example, CB&T debited the IMG General Account: (i) on June 1, 2007 in the amount of $400,000 and (ii) on January 30, 2009 in the amount of $230,000 (collectively, the "JHMS Line Transfers") as purported repayments on the JHMS Line.  IMG did not make the JHMS Line Transfers with payments received from JHMS, but rather with other funds deposited into IMG's account and CB&T knew it because CB&T monitored the collection of funds for its own repayment.

78.     Due to IMG's inability to timely re-pay CB&T's advances, CB&T repeatedly extended the maturity date of the JHMS Line.  Upon the initial maturity date (May 31, 2007), the outstanding balance was roughly $7.4 million.  Despite the rapid build up of that balance

**CLASS ACTION COMPLAINT**

and IMG's clear inability to re-pay it, CB&T executed a Change in Terms Agreement to extend the maturity date by a year.

79.     By April 22, 2008, the outstanding JHMS Line balance had grown to more than $8.3 million.  All outstanding bankers' acceptances had been refinanced through loan advances under the JHMS Line and not income from the sale of surgical gloves or other medical supplies.

80.     Accordingly, by April 2008, CB&T knew that the lack of outstanding bankers' acceptances coupled with the high loan balance demonstrated, at a minimum, extreme financial difficulties for IMG, especially in light of the complete lack of JHMS deposits into the disbursement account controlled by CB&T in accordance with the Assignment of JHMS Payments.

81.     CB&T's knowledge that there were no "sales" and IMG was financially unable to meet its obligations, was further underscored by the fact that the frequency and amount of JHMS "purchase orders" declined rapidly as the JHMS Line maxed-out.  CB&T knew that the drastic decline in "sales" despite the ballooning loan balance meant that the money advanced was not used to cover increased business expenses, such as increased inventory purchases, which would then be re-sold and income received from the sale.  The decreased "sales" in the face of the ballooning JHMS Line, at a minimum, underscored CB&T's awareness of IMG's dire financial condition and, the lack of any real "sales".

82.     Nonetheless, as the already extended maturity date approached in May 2008, a second Change in Terms Agreement was executed to again extend the maturity date by another year, to May 2009.

**(x) Despite the Ballooning Balance on the JHMS Line, And the Obvious IMG Fraud, CB&T Continued to Provide IMG With Additional Liquidity**

83.     As 2008 progressed, advances on the JHMS Line ceased and there were no repayments.  IMG's cessation of borrowing on the JHMS Line was not indicia that its financial health was improving and CB&T knew that because CB&T was providing IMG with other separate lines of credit.  In other words, CB&T's knowledge of IMG's poor financial health was deepened by IMG's non-payment on the JHMS Line, and, by IMG's concurrent borrowings on

**CLASS ACTION COMPLAINT**

Clients:C:CB&T (IMG):Complaint 052617.doc

alternative CB&T credit lines.

84.     After six months of no activity on the JHMS Line from April through October 2008, CB&T sent Wannakuwatte an inquiry. The response provided by Wannakuwatte reinforced CB&T's knowledge that IMG's business was a fraud on its investors because there was no business.

85.     Wannakuwatte provided CB&T a letter dated November 23, 2008 addressed to IMG and purportedly signed by Allen as "Chairman" of JHMS stating:

> Dear Deepal:
>
> This is to confirm that Jamestown Health & Medical Supply currently owes IMG, Inc. approximately $9,147,685.50.  The Government receivable makes it very difficult to collect funds on a 60 day term.  The indebtedness is secured to your company by a standby letter of credit from Bank of America.  We will honor this commitment, even though there is a 60 day invoice clause in your standby letter of credit.
>
> We are also aware that you have a difficulty in keeping the 60 day clause on the letter of credit.  We will try to resolve this matter to satisfy your needs at our next board meeting which is scheduled for the end of January, 2009.

86.     This November 23, 2008 letter was more than suspicious.  It was bogus on its face: (i) the header had the JHMS logo and purportedly came from Allen of the Jamestown Tribe, but the footer had the RelyAid logo and the IMG address; (ii) the reference to 60 day terms was in direct conflict with the "sales" invoices provided to CB&T which all provided for the 180 day terms (if any term was even specified); and (iii) the purported VA contract, especially one of the magnitude IMG claimed to have, was 100% irreconcilable with the paltry and sporadic activity under the JHMS Line and a mere $3 million in "purchases" for all of 2007. The obvious conflict between the letter, the other documents and knowledge CB&T possessed, and the previous financing provided by CB&T served only to underscore, yet again, CB&T's knowledge of the poor position of IMG, the bogus nature of the "sales" invoices, and the lack of any real "sales" of imported wholesale goods.

**(xi)     CBT Knew the JHMS Financials Were Bogus**

87.     CB&T was also provided with a JHMS income statement for the nine months

**CLASS ACTION COMPLAINT**

ending September 30, 2008, which reflected year-to-date net sales revenue of roughly $6.4 million, roughly $5.3 million in costs of goods sold, and a gross margin of approximately $1.1 million, or 17.83%. This statement was, again, in direct conflict with CB&T's financing of the JHMS Line and other information provided to CB&T by IMG. The obviously bogus statement reinforced CB&T's knowledge that no wholesale goods were being imported and the "sales" were not occurring as represented by IMG.

88.     Additionally, the $5.3 million in year-to-date cost of goods sold bore absolutely no relationship with the much smaller amounts advanced under the JHMS Line during that same time period. Moreover, CB&T **knew** that CB&T had not received $5.3 million from JHMS into the disbursement account created in connection with the Assignment of JHMS Proceeds.

89.     As a result of these glaring inconsistencies, CB&T knew that the JHMS income statement and the "sales" were fraudulent, **or** that IMG and JHMS were breaching their contractual arrangements to deposit funds in an account controlled by CB&T. The fact that CB&T did not accuse anyone of a breach demonstrates CB&T knew the JHMS income statement and the "sales" were fraudulent.

**(xii)    The Unraveling of the BofA Credit Facility and JHMS Line**

90.     CB&T agreed to the JHMS Line, because it was backed by the BofA SLOC, which was backed by the 90% guarantee under the BIA of the United States of America. Accordingly, CB&T was not bothered by its actual knowledge of IMG's fraud, regardless of the possible harm to IMG creditors, as long as CB&T was fully protected by the BofA SLOC. The problem with this approach was that while CB&T gained knowledge of IMG's fraud it continued to receive the deposits of new investors in IMG, which constitutes substantial assistance as a matter of law. The law does not impose a duty on a bank to police a depositor's business for the benefit of clients' of the depositor. However, once it is discovered that the depositor is operating a fraud on others—e.g., lulling investors based on misrepresentations that IMG is operating a legitimate business importing actual product, and omitting material facts that investors funds will not be used to purchase actual product—the bank must terminate the relationship and stop receiving deposits from investors it knows are derived from unlawful and

**CLASS ACTION COMPLAINT**

criminal activity.

91.     CB&T recognized that, **without** the BIA guaranty, the BofA SLOC would not be renewed and CB&T's JHMS Line would necessarily unravel because CB&T was not willing to take on the risks presented by IMG's fraudulent "import business."

92.     The unraveling began in early 2009 when the BIA declined to extend its 90% guarantee. Upon being informed that the BIA guarantee would not be extended, BofA immediately informed JHMS (and Wannakuwatte, as its CEO), that JHMS would need to seek alternative financing.

93.     In February 2009, BofA also informed CB&T in writing that BofA would not be renewing the credit facility "and consequently, the credit will ultimately expire on May 17, 2009."

94.     Fearing that the termination of the BofA SLOC would require IMG to actually repay CB&T, which everyone involved knew it could not do, and thereby, cause the scheme to collapse, IMG instructed CB&T to immediately draw down on the BofA SLOC for the benefit of CB&T.  On March 27, 2009, Wannakuwatte wrote to Jun Enkoji to inform her that efforts were underway "to get BofA to change the [SLOC] verbiage" and that BofA would extend the SLOC "for another three months" if such a change could not be accomplished.  However, Wannakuwatte also wrote, "I want to be clear that if this is not accomplished, I will forward you **all the new purchase orders** on April 20, 2009 and I want the bank to draw down on the letter of credit as per the advice of my attorneys." (Emphasis added).   This letter was beyond suspicious because: (i) Wannakuwatte's claim that he would forward "all the new purchase orders" made no sense as simply there were no "new purchase orders" and the JHMS Line had been completely dormant; (ii) the amounts outstanding under the JHMS Line were all for old purchase orders; and (iii) no funds had been deposited in the account under CB&T's control to receive "sales" proceeds.

95.     Miraculously, BofA provided CB&T with an amendment to the BofA SLOC just days before it was to expire, which extended the maturity date to August 31, 2009.

96.     As time marched forward, CB&T became more and more concerned with the

**CLASS ACTION COMPLAINT**

forthcoming termination of the JHMS-BofA Credit Facility. CB&T discussed with Wannakuwatte CB&T's intent to protect itself from that occurrence by drawing down against the JHMS-BofA SLOC before it expired. In May 2009, a copy of the original SLOC was faxed to CB&T's Jun Enkoji, on which CB&T wrote: **"any p/o ok per Buzz."** CB&T was preparing itself to use any and all "purchase orders" it could get from Wannakuwatte of IMG to draw-down on the BofA SLOC the instant it became clear the SLOC would, in fact, expire. CB&T pushed Wannakuwatte to provide additional "sales" invoices for IMG sales to the tribe so that CB&T could use them to document its forthcoming draw-down. CB&T and Wannakuwatte did not want to have CB&T draw-down before it was certain the SLOC would expire, as that would unnecessarily disrupt IMG's cash flow, but CB&T needed to be able to draw-down in an instant to immediately shift the risk of IMG's fraud from CB&T to BofA and ultimately the tax payers of the United States. In that regard, CB&T convinced Wannakuwatte to provide a stack of bogus "sales" invoices (from any and all time periods) to paper its draw down against the BofA SLOC.

97. In July 2009, BofA repeated its intent to not renew its credit facility, meaning it would, in fact, expire in August 2009.

98. Knowing for certain that the BofA SLOC was about to expire, CB&T immediately presented BofA with a notice of default, copies of JHMS "purchase orders" totaling roughly $9 million, and drew upon the full amount available under the BofA SLOC, $9,010,671.68 (inclusive of fees). The massive and sudden draw down made CB&T whole in connection with the JHMS Line, and shifted the risk of loss to BofA, the Jamestown Tribe and the US taxpayer on the BIA 90% guarantee.

99. Both the Jamestown Tribe and BofA were immediately suspicious that CB&T had submitted bogus "sales" invoices to support the $9 million draw down and shift the risk away from CB&T. The tribe's CFO, Diane Gange, e-mailed Wannakuwatte requesting copies of the "purchase orders" used to support the draw down. Wannakuwatte responded that he would "get the copies of the purchase orders, which were provided to CB&T at the start of our business venture to build inventory to supply JHMS customers on time." Diane Gange

**CLASS ACTION COMPLAINT**

forwarded this e-mail to Don Schulke of BofA, who replied: "**This is BS**." (emphasis added). Gange wrote back: "**You think!! He's trying to cover his … because he knows I'm going to question the dates when he sends them.**" (emphasis added). Shulke then responded: "**you need to get your auditors in the door**." (emphasis added).

### (xiii) The Litigation

100. On October 21, 2010, BofA filed suit against JHMS and the Jamestown Tribe in the Superior Court of Washington for King County (the "Superior Court"), Case Number 10-2-37091-SEA.

101. On May 12, 2011, the Jamestown Tribe filed a third-party complaint against IMG and Wannakuwatte, including claims for civil conspiracy. These claims were based on the Tribe's understanding that IMG and Wannakuwatte had "misappropriated" funds causing JHMS to incur debt so that Wannakuwatte could "divert" the funds for IMG's benefit. The allegations also challenged the validity of the JHMS "purchase orders" used to support the $9 million drawdown at CB&T on the BofA SLOC, alleging the "purchase orders" were inconsistent with any outstanding accounts payable balance. CBT was aware JHMS claimed the "sales" and corresponding invoices IMG provided to CB&T were bogus.

## D. CB&T Understood That Investors' Promissory Notes and Cash Investments Were Intended to Fund the Purchase of Overseas Inventory for Importation And Sale by IMG

102. Due to its intimate connections with IMG, as well as its underwriting and diligence in relation to its own financing of IMG's affairs, CB&T had actual knowledge that IMG was not actually importing latex gloves, or any other goods in relation to its "wholesale" business. Further, CB&T also had actual knowledge that IMG was offering promissory notes and high rates of return to individuals who provided IMG with cash earmarked for its alleged importation of "wholesale" shipments of medical supplies. In fact, CB&T took steps to facilitate IMG's solicitation of cash from such individuals because CB&T knew IMG needed that money to pay down the advances from CB&T.

103. CB&T's actual knowledge of IMG's fraud on promissory note and cash

**CLASS ACTION COMPLAINT**

Clients:C:CB&T (IMG):Complaint 052617.doc

investors is exemplified by CBT's direct role in the victimization of two individual cash investors. In or around late 2005, CB&T was informed by IMG that it needed help from the bank to obtain cash from two specific investors. Specifically, CB&T was instructed by IMG to arrange for home equity lines for the two individuals, with the proceeds of both loans going, **not** to the homeowner investors, but instead to IMG. Wannakuwatte of IMG further instructed CB&T to open two joint accounts, so that he could control the repayment of CB&T's two loans and the interest payments to the two investors. Finally, IMG made it clear that CB&T was to instruct the two investors to show up at CB&T, sign the paperwork and thereafter stand aside, stay out of the transaction, and allow CB&T and IMG to handle everything, including the repayment of CB&T's two loans secured by two homes.

104. CB&T did exactly as IMG instructed. Without input from the two homeowners, CB&T prepared all of the paperwork to allow CB&T to lend against their homes with the proceeds earmarked to go to IMG for IMG's purchase and importation of wholesale goods for domestic sale. CB&T opened the joint accounts IMG wanted so that the investors could simply sign the paperwork and then sit on the sidelines. CB&T instructed the investors to allow IMG to handle the loan payments due CB&T out of the joint accounts and further instructed that the investors they were not to interfere with the account, or the loan repayment process IMG had set up. CB&T even arranged for any payments of late charges on the loans to be covered by IMG to fully convince the two investors that they should not meddle with the loans secured by their own homes. In short, CB&T, for the benefit of IMG, monetized the investors' homes so that IMG could use the money in its scheme. CB&T did so because it was secured by the two investors' homes and it could earn risk-free income on the loan fees and interest despite the fact that CBT knew that IMG was not using investor cash to purchase any goods overseas.

## E. CB&T Provided Further Financing to IMG's Scheme Based on Eight Additional SLOC's in its Favor

105. CB&T was not simply a depository institution for Wannakuwatte and IMG. CB&T was intimately involved in underwriting risks associated with Wannakuwatte and IMG in order to protect itself as a source of financing for Wannakuwatte and IMG. In the course of

**CLASS ACTION COMPLAINT**

its due diligence as part of its standard lending and banking practice, and other underwriting activities, CB&T knew and understood the IMG "business" model and CB&T used that knowledge to protect itself from risks therein by requiring Wannakuwatte to obtain SLOC's in CB&T's favor which CBT carefully monitored to ensure their enforceability. The BofA SLOC was just one example of a SLOC that protected CB&T. CB&T financed Wannakuwatte's fraudulent schemes through a number of additional loans and revolving lines of credit. In fact, there were eight additional credit lines, which, like the JHMS Line, were each collateralized by a SLOC naming CB&T as the beneficiary.

106.    The eight other credit facilities provided by CB&T were highly suspicious in a number of respects: (i) advances made on these 8 credit facilities were in round, even amounts, in no way linkable to any purchases of product; (ii) in several instances, multiple loans were drawn down virtually simultaneously which made no sense for legitimate purchases of product; and (iii) an importer of cheap tangible goods would never need eight separate credit facilities in addition to the massive JHMS Line.

107.    Again, CB&T ignored the fraud and repeatedly made advances at IMG's instruction without obtaining supporting documentation or verifying that IMG used advanced proceeds appropriately.  CB&T did not obtain supporting documentation or verify that IMG used advanced proceed appropriately because CB&T already knew that IMG did not use the advanced funds appropriately.

108.    Because of its understanding of IMG's "business" and its close connections to Wannakuwatte, CB&T knew that the SLOCs in favor of CB&T were issued by investors who believed that CB&T's associated credit facilities would be utilized solely in relation to IMG's purchase of product from its overseas suppliers.  The investors' belief that CB&T would be providing import financing directly to IMG's suppliers (or the banks of IMG's suppliers) is the only reasonable explanation for why the investors would elect to provide SLOCs in favor of CB&T.

109.    Nonetheless, CB&T treated the investor SLOCs in the same fashion it treated the JHMS BofA SLOC, as a firewall protecting CB&T from risk while allowing CB&T to make

**CLASS ACTION COMPLAINT**

money risk-free, even though CB&T knew that no wholesale goods were being imported. Backed by investor SLOC's, CB&T routinely made loan advances directly to IMG's checking accounts at CB&T. As with the JHMS Line, amounts advanced by CB&T in reliance on the investor SLOCs bore no relation whatsoever to any purchase of wholesale product, nor did CB&T ever obtain supplier invoices, bills of lading, customs records, or any documentation that would evidence that IMG actually used loan proceeds to acquire such product. Further, based on CB&T's monitoring of IMG accounts that it performed as part of its standard banking and lending practice (e.g., determining creditworthiness), CB&T also knew that IMG was not sending money overseas to purchase inventory for its "wholesale" business.

110. In knowingly electing to make the loan advances, CB&T played an active and key role in the fraudulent scheme. The funds CB&T advanced directly into IMG's checking accounts provided the liquidity IMG needed to perpetuate and rapidly grow the fraudulent scheme. As a result of CB&T's willingness to advance funds at IMG's beck and call, CB&T allowed IMG to monetize the investors' SLOCs intended solely to finance the purchase and importation of oversea product. Moreover, CB&T's acceptance of the investors' SLOCs along with CB&T's other activities provided IMG with substantial assistance as it created and perpetuated the illusion of legitimacy and deceived investors into believing that IMG was actually importing and selling wholesale product.

111. In this manner, the JHMS Line and each of the other CB&T credit facilities was an integral part of IMG's fraud. But for CB&T's knowing and substantial assistance, the fraudulent scheme never would have grown so fast, or so large.

112. CB&T was paid handsomely for its role in assisting IMG without taking on any material risk to itself. In fact, CB&T was paid over $2.5 million in interest and fees. Additionally, CB&T ultimately received repayment of every principal dollar it advanced in furtherance of the fraudulent scheme as follows:

///

///

///

**CLASS ACTION COMPLAINT**

| Credit Line Principle | Date | Amount |
|---|---|---|
| JHMS Line Transfers | 6/1/2007<br>1/1/2009 | $400,000.00<br>$230,000.00 |
| Loan 168068-0001 Transfer | 2/14/2011 | $886,565.92 |
| Line 168068-9001 Transfer | 3/15/2010 | $3,230,358.16 |
| Line 168068-9002 Transfers | 4/27/2010<br>5/4/2010 | $1,464,355.00<br>$1,470,851.88 |
| Loan 181803-0001 Transfer | 2/17/2009 | $245,306.25 |
| December 2008 Line 181803-0003 Transfer | 12/29/2008 | $136,610.97 |
| January Line 181803-0003 Transfer | 1/26/2010 | $1,951,592.27 |
| Loan 181803-0004 Transfer | 12/27/2009 | $295,522.39 |
| Loan 181803-9001 Pay-down Transfers | 10/19/2009<br>to<br>8/18/2010 | $137,124.69<br>(total) |
| Loan 181803-9001 Transfer | 11/17/2010 | $490,417.36 |
| Line 181803-9003 Transfer | 11/4/2009 | $1,981,171.88 |
| **TOTAL** | | **$12,782,752.08** |

113.    Based on CB&T's knowledge of IMG's "business", its knowledge that no "wholesale" goods were being imported, and its knowledge that JHMS was not paying for any purported "sales" (because, among other things, the CB&T account into which "sale" proceeds were to be deposited to repay CB&T remained empty), CB&T **knew** the funds utilized to make the payments to CB&T were **not** the proceeds of any successful sale of imported goods, but instead were funds obtained from IMG investors.

114.    The overwhelming majority of such transfers were made between November 2009 and February 2011.  During this time period, Wannakuwatte and IMG were embroiled in a dispute with BofA and the Jamestown Tribe over the drawdown of the BofA SLOC.  CB&T was well aware of the dispute because CB&T helped Wannakuwatte create it when CB&T drew down $9 million on the BofA SLOC based on bogus invoices.

115.    CB&T's actions provided IMG with substantial assistance which was rewarded with the payment to CB&T of the loans made to IMG by CB&T.

116.    IMG's failure to make meaningful pay downs of its various CB&T credit facilities was indicative of both fraud and its financial difficulties.  In the nine fiscal quarters from July 1, 2007 through September 30, 2009, IMG made little more than $600,000 in

repayments, even though the total balance of 9 of the credit facilities ballooned to more than $21 million during this time period. The lack of repayments on what were supposed to be revolving credit facilities was yet another obvious indicator to CB&T that IMG was not actually selling product.

117. CB&T's actual knowledge that IMG could not meet its financial obligations was part of CB&T's explanation for terminating its banking relationship with IMG. CB&T's October 2009 letter to Wannakuwatte and IMG, stated:

> Although all facilities are secured, either by cash or letters of credit, **there has been little to no revolving of the outstanding balances and we have determined not to renew the facilities as they mature**.

> We are providing this notice of our intent to disengage from the Lending relationship…

> (emphasis added).

118. IMG was repeatedly unable to repay its various CB&T loans from 2007 onward. Although several of these facilities were short-term facilities, IMG obtained extensions of the maturity dates year after year. In many instances, CB&T extended and re-extended the credit facilities well after the maturity dates had passed and IMG was in default. CB&T had to do so as IMG's aider and abettor, or co-conspirator, because CB&T could not sue IMG or Wannakuwatte because discovery would reveal it knew about the fraud.

119. In the spring of 2008, CB&T obtained IMG's income statement for the period ending December 31, 2007. These financial statements reflected gross revenue of approximately $33.7 million, cost of goods sold of approximately $30.3 million, and a gross profit (or margin) of $3.4 million, or 10.17%. Curiously, IMG did not report any interest expense on its income statement. Given the substantial IMG borrowings from CB&T and related interest payments, the failure to include any interest expense on IMG's income statement was irreconcilable, absent fraud. IMG's lack of reported interest expense was especially alarming given that more than two dozen other expense categories were itemized in painstaking detail, far beyond what would be expected in any CPA compiled financial statement (*e.g.*,

$2,730.00 for "Janitorial Service," $578.40 for "Conventions & Shows," $1,069.00 for "Security," etc.).

120.    The timing and pattern of the IMG payments to CB&T illustrates CB&T's actual knowledge of IMG's fraud in several other respects.  In particular: (i) virtually none of the transfers that CB&T received were readily linkable to any particular sales, but rather consisted of lump sum payments of the entire amount of the loan; (ii) after making virtually no repayments and obtaining over a dozen loan extensions in previous years, and nearly on the eve of default, IMG suddenly transferred over $10 million to CB&T from November 2009 to May 2010; and (iii) whether based on communications with Wannakuwatte over its own electronic inquiries into IMG's accounts as performed during its standard banking and lending practice, CB&T actually knew that CB&T loan repayments were dependent upon large same day transfers from other IMG accounts.

121.    In fact, CB&T traced the source of funds deposited into the IMG General Account in order to make transfers to CB&T, in November 2009, providing additional direct knowledge that IMG and Wannakuwatte had used and were willing to use funds obtained from investors in order to make the CB&T payments to CB&T.  Specifically, CB&T traced the source of a $1.98 million transfer on Line 181803-9003 to an incoming investor wire into CB&T's account for IMG and corresponding transfer to the Wholesale Account, which CB&T circled on an electronic transaction inquiry CB&T ran on the Wholesale Account on November 4, 2009.

122.    No later than November 2009, CB&T had actual knowledge that investor funds had been diverted to make the IMG loan repayments to CB&T.

123.    Despite CB&T's actual knowledge that investors were misled into believing their money or SLOCs were being used to fund IMG's importation and sale of wholesale medical supplies, despite CB&T's actual knowledge that IMG was **not** using investor funds to purchase wholesale product, and despite terminating its lending to IMG after recovering $9 million from the BofA SLOC, CB&T continued to physically receive new investor funds and disburse them as lulling payments to older investors until this fraudulent scheme collapsed on May 31, 2014.

**CLASS ACTION COMPLAINT**

CB&T did so to allow the scheme to survive so that CB&T could be fully repaid on all CB&T lines of credit and so CB&T could continue to collect fees and interest.

124.     IMG defrauded investors by falsely promising to purchase overseas inventory with investors' funds, including Class Members' funds, and using the funds for other purposes. By October 2009 when it stopped lending additional money to IMG, CB&T had actual knowledge of the primary wrong of fraud being committed by IMG—misrepresentations / omissions regarding whether investors' funds were used to purchase overseas inventory.

## VIII.    CLASS ACTION ALLEGATIONS

125.     Plaintiffs bring this action on their own behalf and also as Class representatives pursuant to Federal Rules of Civil Procedure, Rule 23. The Class is defined, for now, as:

> Those persons that suffered net loss damages by providing money to IMG for IMG's alleged purchase of wholesale medical goods overseas for importation and domestic resale after CB&T acquired knowledge that IMG was not acquiring medical goods overseas for importation and domestic resale (herein referred to as the "Members of the Class" or the "Class Members").

Excluded from the definition of the Class are the Defendant and any person, corporation, or other entity related to, controlled by or affiliated with the Defendant. Also excluded from the class are persons who invested money in IMG and were repaid by IMG principal or interest, and the total amount repaid exceeds the total amount invested. Included in the term "Persons" in the definition of the Class are entities, representatives of these entities and assignees.

126.     The members of the Class are so numerous that joinder of all of them is impracticable.  There are dozens of Class Members residing in California and elsewhere.  At present, it is believed that there are over 50 Class Members.

127.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class Member.  The common questions include, *inter alia*, the following:

a.     Did IMG commit fraud on the persons investing in IMG?

b.     Did IMG misrepresent to investors that the investors' funds would be used to purchase actual product as part of a wholesale business?

**CLASS ACTION COMPLAINT**

c.      Did IMG disclose to investors that their money would not be used to purchase product, but instead, would be used to pay back other investors?

d.      Did CB&T know that IMG was committing fraud on persons investing in IMG?

e.      The date CB&T acquired knowledge that IMG was committing fraud on persons investing in IMG?

f.      Did the Class Members purchase unregistered securities from IMG?

g.      Did CB&T knowingly provide substantial assistance to the fraud committed by IMG by physically accepting and dispersing the investors' money derived from false pretenses?

h.      Did CB&T knowingly provide substantial assistance to IMG in the sale of unregistered securities to the persons investing in IMG?

i.      Did CB&T violate Penal Code section 496?

127.      The claims of the Plaintiffs are typical of the claims of the Class as a whole. The Plaintiffs are members of the Class and have suffered harm and are likely to continue to suffer harm due to the misconduct alleged herein.

128.      Plaintiffs will fairly and adequately protect the interests of the Class.   The interests of Plaintiffs are consistent with and not antagonistic to the interests of the Class. Plaintiffs have sought out and retained counsel experienced in complex class actions in an effort to recover their damages.  Plaintiffs have agreed to act for the benefit of all persons similarly situated and not to put their individual interest ahead of any member of the Class.

129.      The prosecution of a multitude of separate actions by individual members may establish incompatible standards of conduct for the parties opposing the Class, may substantially impair or impede the interests of other members of the Class to protect their interests, and will result in waste.

130.      The acts and actions of the Defendant applicable to the Plaintiffs apply generally to the Class, thereby making the final relief granted by the Court to the Plaintiffs applicable to the Class as a whole.

131.      This Class Action would be superior to other available methods for the fair and efficient adjudication of the controversy between the parties.  The interest of most members of

**CLASS ACTION COMPLAINT**

the Class in individually controlling the prosecution of separate actions appears low, due to the complexity of the case. Most members would be unable or unwilling to individually prosecute an action without joining their claims with other claimants which is generally difficult. Separate suits would be impractical because of the number of victims and the dollar amount at stake for each victim. Concentrating litigation in this forum will also promote judicial efficiency.

132. This proposed Class Action is very manageable because the issues at stake for each Class Member are the same, the Class Members lost enough to want to participate, the number of Class Members make prosecution of the collective claims efficient, the documents establishing liability and the loss amounts are in Sacramento with CB&T and the bankruptcy trustee, and the criminal prosecution of Wannakuwatte took place in Sacramento.

## IX. CLAIMS

### FIRST CLAIM

#### Aiding and Abetting Fraud

133. Plaintiffs incorporate paragraphs 1-132 as if fully set forth herein.

134. IMG defrauded investors by falsely promising to purchase overseas inventory with investors' funds, including Class Members' funds, and using the funds for other purposes. By October 2009 when it stopped lending additional money to IMG, CB&T had actual knowledge of the primary wrong of fraud being committed by IMG—misrepresentations / omissions regarding whether investors' funds were used to purchase overseas inventory—and notwithstanding this knowledge it provided substantial assistance to the intentional tort committed by the primary wrongdoer by, among other things, continuing to accept defrauded investor deposits and then disbursing these investments to lull payments as returns to investors.

135. As the direct and proximate result of Defendant's aiding and abetting the fraud, the scheme ensnared Plaintiffs and the other Class Members causing them to be damaged in amounts to be proven at trial. The conduct of CB&T was intentional, willful, malicious, and oppressive, by virtue of which Plaintiffs pray for an award of exemplary and punitive damages.

///

///

---

**CLASS ACTION COMPLAINT**

## SECOND CLAIM

### Misrepresentation in the Sale of Securities
### Violations of Cal. Corp. Code §§ 25110, 25401 & 25504.1

136.    Plaintiffs incorporate paragraphs 1-132 as if fully set forth herein.

137.    California Corporations Code section 25401 provides that it is unlawful for any person, in connection with the offer or sale of a security to directly or indirectly employ a scheme to defraud by making untrue statements of material fact or to omit to state a material fact necessary to make the statements made not misleading, or to engage in a course of business that operates as a fraud or deceit upon another person.

138.    IMG developed a scheme in violation of Section 25401, by offering or selling securities in the form of Promissory Notes to investors, including Plaintiffs, by making untrue statements of material fact and by omitting to state material facts necessary to make the statements made not misleading, or to engage in a course of business that operates as a fraud or deceit upon another person.

139.    California Corporations Code section 25110 provides that it is unlawful for any person to offer or sell in California any security unless such security has been qualified/registered or unless such security is exempted from such qualification/registration. The Promissory Notes issued by IMG were unlicensed Securities.

140.    IMG, in violation of Section 25110, offered or sold to investors, including Plaintiffs, securities in the form of Promissory Notes that were not qualified/registered and that were not exempt from such qualification/registration.

141.    Corporations Code section 2550.1 provides that any person who materially assists in any violation of Corporations Code sections 25401 or 25110, with the intent to deceive or defraud, is jointly and severally liable with any other person liable for a violation of sections 25401 or 25110.

142.    CB&T materially assisted IMG and IMG's violation of Section 25401 by, among other things:

          (a)     accepting investor deposits paid to IMG pursuant to the Promissory Notes

**CLASS ACTION COMPLAINT**

intended specifically to fund purchases of wholesale medical supplies overseas which CB&T knew was not actually happening;

(b) Conspiring with CB&T to draw down $9 million on the BofA SLOC to keep the fraudulent scheme alive and defraud additional investors;

(c) Using irregular banking procedures by, among other things, lending huge sums to IMG knowing full well that IMG was insolvent and its "import" business, deceiving investors;

(d) Allowing IMG checks to clear despite insufficient funds, which, had CB&T **not** done so, would have exposed the existence of the fraudulent representations and terminated the deception on investors;

(e) Referring investors to IMG and preparing documents to obtain cash for IMG from defrauded investors.

143. CB&T, at all relevant times, knew that IMG was a fraudulent scheme and that IMG had been offering and selling to potential investors (such as Plaintiffs) unregistered/unqualified securities that were based on material representations or omissions of material fact. CB&T knew at all relevant times that securities sold by IMG were unregistered/unqualified securities that were not exempt/qualified from registration.

144. The aforementioned acts by CB&T were done intentionally in order to, among other things, continue the relationship with IMG, which had been generating fees, interest and the repayment of principal to CB&T.

145. Pursuant to Section 25504.01, CB&T is jointly and severally liable with non-defendant IMG to Plaintiffs in amounts according to proof at time of trial.

146. CB&T possessed actual knowledge that IMG was a fraudulent scheme and was selling and offering securities to investors, including Plaintiffs, that were not registered and that were based on material omissions and material misrepresentations. CB&T's material assistance of IMG caused people, including Plaintiffs, to invest money with IMG and to keep their money in IMG once invested.

**CLASS ACTION COMPLAINT**

## THIRD CLAIM

### Conspiracy to Commit Fraud

147.    Plaintiffs incorporate paragraphs 1-132 as if fully set forth herein.

148.    Armed with actual knowledge of IMG's fraud, CB&T formed and operated a conspiracy with IMG to perpetuate IMG's fraudulent scheme to allow CB&T to be repaid on the loans it made to IMG. CB&T agreed with IMG that CB&T would remain the depository institution for the deposit of the investors' funds so it could claim in foreseeable claw-back litigation that IMG's repayments to CB&T were not fraudulent transfers because CB&T maintained a security interest in those investors' funds on deposit with CB&T. Overt acts in furtherance of this conspiracy continue today. CB&T engaged in wrongful conduct in furtherance of the conspiracy, and Plaintiffs were damaged as a result of such wrongful conduct.

## FOURTH CLAIM

### Aiding and Abetting Conversion

149.    Plaintiffs incorporate paragraphs 1-132 as if fully set forth herein.

150.    Plaintiffs have the right to possess the money transferred to IMG for the specific purpose of funding the purchase and sale of product. IMG converted Plaintiff's money by a wrongful act—e.g., misrepresentation that the funds would be used for a wholesale import business.  CB&T knew that IMG was converting Plaintiffs' and other class members' money based on such misrepresentations.  Plaintiffs were injured when IMG filed for bankruptcy on May 31, 2014.   CB&T, with actual knowledge, provided substantial assistance to IMG's conversion by a wrongful act.

151.    As the direct and proximate result of Defendant's aiding and abetting conversion, Plaintiffs and the Class Members have been damaged in amounts to be proven at trial.

## FIFTH CLAIM

### Aiding and Abetting Breach of Fiduciary Duty

152.    Plaintiffs incorporate paragraphs 1-132 as if fully set forth herein.

153.    The money transferred by the Plaintiffs to IMG was to be held and used by IMG solely to fund the purchase of product for resale, and for no other purpose, creating a fiduciary

Clients:C:CB&T (IMG):Complaint 052617.doc

duty on the part of IMG in favor of Plaintiffs. CB&T knew the money deposited into its IMG account was specifically earmarked to be used to purchase medical products and for no other purpose. The agreement between IMG and each Plaintiff created a fiduciary relationship of trust and confidence between the parties arising out of IMG's duty to collect, account and then remit to Plaintiffs proceeds from the sale of product acquired by their loans. CB&T knew the terms and conditions of the agreements and understood that the money was being entrusted to IMG for a specific purpose which CB&T knew would not happen because the money was not being used to purchase product.

154.    CB&T had actual knowledge that IMG was breaching fiduciary duties owed to each Plaintiff by not using the money in the manner it was specifically earmarked and by fabricating documents. CB&T substantially assisted IMG's breaches of fiduciary duty by paying the Plaintiffs lulling payments based on fabricated transactions with money specifically earmarked to acquire additional product from newer investors.

155.    Plaintiffs were injured when IMG filed for bankruptcy on May 31, 2014.

156.    As the direct and proximate result of CB&T's aiding and abetting the breaches of fiduciary duties owed to Plaintiffs by IMG, Plaintiffs have been damaged in amounts to be proven at trial.

## SIXTH CLAIM

### Intentional Interference with Contract

157.    Plaintiffs incorporate paragraphs 1-132 as if fully set forth herein.

158.    IMG had a contractual relationship with each Plaintiff and CB&T knew the specific terms, conditions and obligations articulated in each contract entered into between each Plaintiff and IMG.

159.    CB&T induced, promoted, facilitated and assisted IMG in breaching each contract with each Plaintiff by knowingly using the investors' money deposited for the specific purpose of funding the acquisition and sale of product to pay other investors in breach of each contract.

160.    Plaintiffs were injured when IMG filed for bankruptcy on May 31, 2014.

**CLASS ACTION COMPLAINT**

161.   CB&T's knowing, tortious and unprivileged interference of the business relationship between IMG and each Plaintiff damaged Plaintiffs by the breach of IMG's contractual obligations in an amount to be proven at trial.

## SEVENTH CLAIM

### Negligence

162.   Plaintiffs incorporate paragraphs 1-132 as if fully set forth herein. save and except those that plead intentional conduct on the part of CB&T.

163.   CB&T owed a duty of care to all Plaintiffs to act as a reasonably prudent bank under the same or similar circumstances.

164.   After CB&T obtained the actual knowledge that IMG was defrauding innocent investors, it had the duty to act like a reasonably prudent bank.

165.   A reasonably prudent bank that obtains actual knowledge that a customer is using it as the vehicle to defraud its investors would immediately terminate its banking relationship with that wrongdoing customer. CB&T breached its legal duty when it failed to terminate IMG as a depositor as soon as it discovered IMG was defrauding investors. Instead, CB&T unreasonably maintained a banking relationship with IMG, which proximately caused the foreseeable harm suffered by Plaintiffs.

166.   CB&T failed to act as a reasonably prudent bank, which caused Plaintiffs to suffer losses in an amount to be shown at trial**.**

## EIGHTH CLAIM

### Violation of California Penal Code § 496

165.   Plaintiffs incorporate paragraphs 1-132 as if fully set forth herein.

166.   Penal Code section 496(c) permits "any" person who has been injured by a violation of section 496(a) to recover three times the amount of actual damages, costs of suit and attorney's fees in a civil suit.  Penal Code section 496(a) creates an action against "any" person who (1) receives "any" property that has been obtained in any manner constituting theft, knowing the property to be so obtained, or (2) conceals, withholds, or aids in concealing or withholding "any" property from the owner, knowing the property to be so obtained.

**CLASS ACTION COMPLAINT**

167.    Under Penal Code § 1.07(a)(38), "person" means "an individual, corporation, or association."  CB&T, as a national banking association, is a "person" capable of violating section 496(a).

168.    As set forth herein, the investors' funds were obtained by IMG's theft, under Penal Code section 484, by false or fraudulent representation or pretenses, in that, among other things, investors were falsely informed their funds would be used to import medical supplies for domestic resale.

169.    CB&T, knowing that investors were falsely informed their funds would be used to import medical supplies for domestic resale, aided in IMG's concealment of such property by accepting the defrauded investors funds and disbursing it to earlier investors.

170.    Additionally, CB&T, itself, has concealed and withheld property, and continues to conceal and withhold property, from Plaintiffs and other class members, property that was obtained by false or fraudulent representations or pretenses.

171.    As a direct and proximate result of the acts and omissions described above, the Plaintiffs were injured by the Defendant's violations of section 496(a).  Pursuant to California Penal Code section 496(c), Plaintiffs seek statuary treble damages, costs of suit, and reasonable attorney's fees.

## <u>NINTH CLAIM</u>

### Conspiracy to Violate California Penal Code § 496

165.    Plaintiffs incorporate paragraphs 1-132 and 165-171 as if fully set forth herein.

166.    Armed with actual knowledge of IMG's fraud, CB&T formed and operated a conspiracy with IMG to perpetuate IMG's fraudulent scheme to allow CB&T to be repaid on the loans it made to IMG. CB&T agreed with IMG that CB&T would remain the depository institution for the deposit of the investors' funds so it could claim in foreseeable claw-back litigation that IMG's repayments to CB&T were not fraudulent transfers because CB&T maintained a security interest in those investors' funds on deposit with CB&T. Overt acts in furtherance of this conspiracy continue today. CB&T engaged, and continues to engage, in wrongful conduct in furtherance of the conspiracy,

Clients:C:CB&T (IMG):Complaint 052617.doc

and Plaintiffs were damaged as a result of such wrongful conduct.

## X.     **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for Judgment against the Defendants as follows:

1.     For certification of the Class as defined;

2.     For the appointment of Plaintiffs as the Class Representatives and Plaintiffs' counsel as counsel for the Class;

3.     For special and consequential damages to Plaintiffs and Class members measured, in part, by the net loss of their investments;

4.     For rescission, to the extent applicable;

5.     For treble damages;

6.     For relief consistent with Cal. Probate Code § 859;

7.     For relief consistent with Cal. Civ. Code § 3345;

8.     For exemplary and/or punitive damages, as applicable;

9.     For pre-judgment interest;

10.    For costs of this action, including reasonable attorneys' fees as afforded by any applicable law; and

11.    For all other relief the Court deems just and proper.

## XI.    **JURY DEMAND**

Plaintiffs demand a jury trial.


Dated: May 26, 2017                    Respectfully submitted,


                                       FOLEY BEZEK BEHLE & CURTIS, LLP


                                       By   /s/ Aaron L. Arndt
                                          Robert A. Curtis
                                          Aaron L. Arndt
                                          Attorneys for Plaintiffs
                                          and all others similarly situated

**CLASS ACTION COMPLAINT**

Clients:C:CB&T (IMG):Complaint 052617.doc