1  Robert L. Brace, State Bar No. 122240
   rlbrace@rusty.lawyer
2  1807 Santa Barbara Street
   Santa Barbara, CA 93101
3  Telephone: (805) 845-8211

4
   Michael P. Denver, State Bar No. 199279
5  mpdenver@hbsb.com
   HOLLISTER & BRACE,
6  a Professional Corporation
   1126 Santa Barbara Street
7  Santa Barbara, CA 93101
   Telephone: (805) 963-6711
8  Facsimile: (805) 965-0329

9

10  Attorneys for Plaintiffs and all others similarly situated

11

12              **UNITED STATES DISTRICT COURT**

13          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

14  RONALD C. EVANS, an individual; JOAN M.       **Case No. 2:17-cv-01123-WBS-DB**
    EVANS, an individual; DENNIS
15  TREADAWAY, an individual; and all others      **FIRST AMENDED CLASS ACTION**
    similarly situated,                           **COMPLAINT FOR:**
16
                    Plaintiffs,                    1.  **AIDING AND ABETTING**
17                                                     **FRAUD;**

18  vs.                                            2.  **SECURITIES FRAUD;**

19  ZIONS BANCORPORATION, N.A., successor-        3.  **CONSPIRACY TO COMMIT**
    in-interest to ZB, N.A., a national banking       **FRAUD;**
20  association, dba California Bank & Trust,
                                                   4.  **AIDING AND ABETTING**
21                  Defendant.                         **BREACH OF FIDUCIARY**
                                                       **DUTY;**
22
                                                   5.  **INTENTIONAL**
23                                                     **INTERFERENCE WITH**
                                                       **CONTRACT; AND**
24
                                                   6.  **PENAL CODE VIOLATION**
25
                                                   **A CLASS ACTION WITH A JURY**
26                                                 **TRIAL DEMANDED**

27

28

---
**FIRST AMENDED CLASS ACTION COMPLAINT**              Case No. 2:17-cv-01123-WBS-DB

1

**TABLE OF CONTENTS**

2

Page(s)

3

I.   SUMMARY OF THE ACTION ................................................................... 1

4

II.   JURISDICTION AND VENUE ................................................................ 8

5

III.   PARTIES ................................................................................................... 8

6

IV.   AGENCY ALLEGATIONS ..................................................................... 17

7

V.   INFORMATION ALLEGATIONS .......................................................... 17

8

VI.   DELAYED DISCOVERY OF ROLE PLAYED BY CB&T AND ESTOPPEL .......... 18

9
10

VII.   CB&T DISCOVERED THE IMG PONZI SCHEME NO LATER THAN OCTOBER 2009 AND MOST LIKELY MUCH EARLIER. ........................................ 20

11

    A.   IMG's Business Model and the Loans from CBT to IMG ................................. 21

12

    B.   The Audits for the Extensions of the Loans Granted IMG by CB&T Revealed a Ponzi Scheme. ................................................................. 23

13

14

    C.   CB&T's Foreclosure on the Indian Tribe's SLOC Gave CB&T Knowledge that IMG was a Ponzi scheme. ................................................. 25

15
16

    D.   CB&T's Knowledge of the Ponzi Scheme is Also Evidenced by Its Anticipation of the IMG Bankruptcy and the Trustee's Effort to Recover Fraudulent Transfers From IMG to CB&T. ........................................ 30

17

18

VIII.   CLASS ACTION ALLEGATIONS ........................................................ 30

19

IX.   CLAIMS .................................................................................................. 33

20

X.   PRAYER FOR RELIEF .......................................................................... 39

21

XI.   JURY DEMAND ..................................................................................... 39

22

SUMMARY OF EXHIBITS ............................................................................. 40

23

24

25

26

27

28

i

1  **I.      SUMMARY OF THE ACTION**

2        1.      This is a class action for over $100 million in damages. It is brought against a

3  national bank (Zions Bancorporation, N.A.) for knowingly aiding and abetting a Ponzi scheme.

4  International Manufacturing Group, Inc. ("IMG") was owned by Deepal Wannakuwatte

5  ("Deepal"). Deepal and IMG ran a Ponzi scheme whereby investors invested money to help

6  fund IMG's purchase of medical gloves in Asia. The medical gloves were to be shipped to the

7  USA and resold by IMG to the Veterans Administration ("VA") and other governmental

8  agencies in the United States.

9        2.      Deepal claimed that IMG had yearly $100 million contracts with the VA. IMG

10  had only a $25,000 per year contract with the VA. The Ponzi scheme injured roughly 100

11  citizens, primarily from the Sacramento area. The scheme was promoted by word of mouth

12  between family, friends and early victims of the scheme. The investment was not sold on the

13  internet or through brokerage houses. The Ponzi lasted from approximately 2002 to 2014. As

14  do all Ponzi schemes, it grew exponentially at the end.

15        3.      During the scheme, IMG and Deepal banked primarily at a subsidiary of Zions

16  Bancorporation, which was California Bank & Trust ("CB&T").[1] Hundreds of millions in stolen

17  money flowed through CB&T. From 2005 to 2011, CB&T loaned the Ponzi scheme over $21

18  million in at least nine separate loans.  CB&T also loaned money directly to Deepal.  Zions

19  Bank loaned money to Wannas Enterprises, LLC ("Wannas") which was guaranteed by IMG.

20  Wannas was owned by Deepal.

21        4.      Plaintiffs do not presently believe and therefore do not allege that CB&T was

22  aware of the Ponzi scheme at the outset of the lending relationship.  Rather, Plaintiffs allege that

23  CB&T initiated its lending and then discovered the fraud as the result of its lending activities,

24  no later than October 2009 when CB&T informed IMG that there would be no more loans.

25  _____

26  [1]  Effective December 31, 2015, California Bank & Trust, a California banking corporation, merged its banking
charter into ZB, N.A. and it ("CB&T") no longer exists as a separate California banking corporation.  ZB, N.A. is
27  wholly owned by Zion Bancorporation, N.A. The facts recited herein will refer to "California Bank & Trust" or
"CB&T" because the documentary evidence generated between 2002 and 2014 refers to and uses the name of the
28  predecessor entity. However, the requested judgment to be entered shall be against Zion Bancorporation, N.A. and
ZB, N.A.

**FIRST AMENDED CLASS ACTION COMPLAINT**                     Case No. 2:17-cv-01123-WBS-DB

1      5.     When making any loan, a regulated national bank must know the use of the loan

2  proceeds by the debtor and the source of funds for the debtor's anticipated repayments to the

3  bank. 12 C.F.R. § 1.5(b). CB&T claimed on appeal that it satisfied the statute. Therefore,

4  CB&T knew the use of the loan proceeds by IMG and the sources of IMG's repayment.

5      6.     Deepal and IMG could not pay CB&T its interest, principal or fees without

6  stealing the money from innocent investors to make the payments, which they did. IMG could

7  not pay CB&T with legitimate money on time, or ever, because it was a Ponzi scheme that

8  earned no money in its wholesale business from importing medical gloves from Asia. IMG did

9  not resell gloves made in Asia to the Veterans Administration or other governmental agencies as

10  was represented to the investors in the scheme; and as was represented by Deepal to CBT in

11  2005 as the source of repayment at the inception of the loans from CB&T to IMG.

12      7.     CB&T discovered IMG was a Ponzi scheme no later than 2009 when CB&T's

13  lawyers foreclosed on $9 million in security pledged by another bank (Bank of America) for a

14  Seattle investor. The Seattle investor in IMG was a federally recognized American Indian tribe

15  whose debts were guaranteed by the Bureau of Indian Affairs ("BIF"). The tribe was called the

16  Jamestown S'Klallam Tribe and it provided security to CB&T for one of the nine loans. After

17  CB&T discovered IMG was operating a Ponzi scheme, CB&T ceased further lending, but

18  allowed IMG to continue to operate the scheme inside the four corners of the bank. CB&T

19  maintained the depository relationship with IMG until 2014 so its $21 million could be repaid

20  with money stolen from other investors ensnared in the scheme.

21      8.     No later than 2009, CB&T knew and understood that helping IMG steal the

22  money from other investors was, literally, the only way CB&T could get repaid the $21 million

23  it had invested into IMG. The potential loss of $21 million created the motive for CB&T to help

24  IMG. CB&T, as a corporation, knowingly and intentionally assumed the legal risks (articulated

25  in this complaint) of allowing Deepal to operate a financial criminal enterprise inside the bank

26  in order to recover its $21 million that it had loaned to the Ponzi scheme. CB&T also made a $3

27  million profit while the unknowing and innocent investors lost over $100 million.

28  ///

<center>2</center>

**FIRST AMENDED CLASS ACTION COMPLAINT**               **Case No. 2:17-cv-01123-WBS-DB**

9.     CB&T was the only investor in IMG that possessed 24/7 access to the personal financial records of IMG and Deepal. The bank's records in CB&T's possession showed the use of loan proceeds and the source of funds for repayment. A cursory review of those records would reveal to any person with 2 IQ points that IMG was a Ponzi scheme. CB&T looked, knew, realized the scope of its potential loss, engineered a perceived exit, executed on its plan and, but for this litigation and the Ninth Circuit, nearly profited from assisting Deepal's scheme.

10.    The Plaintiffs invested in the Ponzi scheme after CB&T knew it was a Ponzi scheme. Ron and Joan Evans invested as late as January 2014. Based on false pretenses, the Plaintiffs had their money deposited in IMG's "Wholesale Account" # 4841 at CB&T and then misappropriated out of the account by IMG with the physical help of CB&T.

11.    It was Royal W. Minson, II ("Buzz"), a senior executive at CB&T, who established the lending relationship with IMG, helped to underwrite and then administered the $21 million in loans. According to Buzz, Deepal told him the proceeds of the loans were intended to be used by IMG to buy glove inventory manufactured in Asia. According to Buzz, Deepal told him early on that the source of repayment of the loans by IMG to CB&T was to come from IMG's resale of the glove inventory to federal agencies with whom he contracted, including an alleged $100 million contract with the Veterans Administration. However, Buzz subsequently learned there was little to no wholesale inventory purchased directly by IMG in Asia and there were little to no gloves sold to the Veterans Administration. Buzz was being paid by Deepal while working at CB&T. Plaintiffs presently believe Buzz did not broadly discuss his knowledge about or involvement with IMG, as that could result in his immediate termination from CB&T. Employees are prohibited from receiving payments from a customer and debtor of the bank. However, CB&T otherwise understood that IMG was defrauding investors whose funds were being used to pay IMG's debts to CB&T.

12.    After Buzz discovered IMG was a Ponzi scheme, he still promoted IMG to CB&T and approved of numerous loan repayment date extensions granted IMG by CB&T ("Maturity Date Extensions"). Over the course of the nine CB&T loans, IMG was granted 20 Maturity Date Extensions, which were needed more by CB&T than by IMG. IMG was in

**FIRST AMENDED CLASS ACTION COMPLAINT**                    **Case No. 2:17-cv-01123-WBS-DB**

1   default and could never pay off the loans because it had no income. It did not benefit IMG to

2   stay in business in order to owe more money.  The only entity that benefited financially from

3   IMG's continued existence was CB&T because it got repaid and made a profit.

4        13.    Buzz promoted extraordinary leniency for IMG, the debtor, by CB&T, the

5   creditor, while flying on Deepal's private jet. The money paid to Buzz on the side by Deepal

6   violated 18 U.S.C. §215.

7        14.    No innocent bank grants a defaulting debtor, with no obvious source of income,

8   20 extensions of time to pay off past due secured loans. The only plausible business reason for

9   the 20 Maturity Date Extensions was the bank's belief that repayment with investors' money

10  deposited over time was safer for the bank.

11       15.    CB&T ensured that its loans to IMG were collateralized to protect against

12  default.  IMG was continually in default.  CB&T overlooked the defaults.  No innocent bank

13  refuses to foreclose on security pledged by third parties unless to do so would cause the loss of

14  the security, the termination of the business of the debtor, and the ultimate failure of the

15  debtor's repayment on the loans.

16       16.    IMG had both cash investors as well as investors who provided Standby Letters

17  of Credit ("SLOC"s) in favor of CB&T.  Some investors did both.  Despite continued defaults

18  by IMG, CB&T refused to foreclose on the security pledged by local Sacramento area SLOC

19  investors.  CB&T did foreclose on the SLOC pledged by the non-local Jamestown S'Klallam

20  Tribe because the government decided to discontinue the 90% loan guarantee for Indians

21  making the Bank of America the standby deep pocket for CB&T to pick for repayment.

22       17.    CB&T did not foreclose on the 8 SLOCs pledged by local investors because: (i)

23  the security was clearly rescindable as being obtained by the fraud of both IMG and CB&T; (ii)

24  upon foreclosure the local investors would tell the other Sacramento investors that IMG was a

25  Ponzi scheme; and (iii) these local SLOC investors were customers of the bank with privity to

26  CB&T. With privity, CB&T owed them the obligation to avoid misrepresenting what was

27  occurring with IMG at their own bank.

28  ///

4

18.    When CB&T was named as the beneficiary of the SLOCs created by the local investors' other banks, it failed to disclose to the local investors, as customers of CB&T, that: (i) CB&T was not financing the manufacture of gloves in Asia for IMG; and (ii) CB&T was giving IMG the loan proceeds without any restrictions on the use of the funds.

19.    It was known to CB&T that the purpose of each SLOC was for CB&T to finance and thereby monitor the manufacturing of medical gloves in Asia being purchased by IMG as part of IMG's "Wholesale" business.   The investors' purpose of naming CB&T as the beneficiary of each SLOC did not include CB&T transferring $21 million in cash directly to IMG which is what CB&T did. If direct loan payments to IMG had been the purpose of the SLOCs, the investors would not have incurred the SLOC-related acceptance and interest fees (approximately 8% per year on $21 million).   Instead of SLOCs, the investors would have simply given their cash directly to IMG in exchange for IMG's promissory notes which is what IMG was giving to most of its investors.

20.    Starting in 2008, CB&T made efforts to preclude the local SLOC investors from attending meetings between Deepal and CB&T when the topics discussed included their pledged security naming CB&T as the beneficiary, the risks they were assuming, and the terms of the SLOCs naming CB&T as the beneficiary.  See **Exhibit 14**.

21.    The local SLOC investors were precluded by CB&T's employees from meeting with Deepal and CB&T at the same time, because it was represented to these local investors by CB&T that CB&T was providing IMG with a financing bridge to secure the debt owed by IMG to the glove manufactures in Asia. The bridge was to cover the time period between the manufacture and shipment of the gloves to IMG, the payment to IMG by the Veterans Administration after the gloves had arrived by container ship in the USA, and the payment of the manufacturers in Asia by IMG after IMG had gotten paid by the VA.

22.    CB&T intentionally excluded the Sacramento investors from attending meetings with Deepal and CB&T because CB&T knew that it was transferring the loan proceeds directly to Deepal, Deepal was using the loan proceeds to pay investors, and the funds were not used for their intended purpose of financing the purchase of inventory in Asia as all of the investors were

5

1  lead to believe was the role played by CB&T.

2         23.    CB&T could not foreclose on the Sacramento investors' SLOCs without

3  destroying IMG and alerting the local investors.  The only alternative safe source of repayment

4  was the defrauded investors' money being deposited each month by Deepal into the IMG

5  Wholesale Account at CB&T.

6         24.    CB&T knew that IMG was repaying the $21 million in loans from CB&T to

7  IMG with investor deposits because CB&T, on a daily basis, was monitoring the deposits of

8  investor money into IMG's accounts to repay the loans.  It may be inferred that CB&T decided

9  "just to relax", monitor the flow of investor funds through the bank, and let the pay-back happen

10  over time by way of the continued operation of IMG by Deepal.  It may be inferred this was

11  CB&T's plan because that is exactly what happened.

12         25.    At the inception of the loans, the monthly interest was to be paid out of the IMG

13  General Account #7631 with automatic debits.  The auto debit process did not work because

14  there were insufficient funds on deposit, or Deepal would fail to transfer investor funds from the

15  Wholesale Account #4841 to the General Account #7631 to effectuate the auto debit process.

16  Over time, IMG experienced millions in overdrafts at CB&T in a business that was represented

17  to be sophisticated enough to generate $100 million per year in the sales of medical gloves.

18         26.    Heddy Chiang, the branch manager of CB&T at the Arden Way Branch, was

19  constantly monitoring the IMG accounts and informing Deepal of the amounts due CB&T and

20  the amounts available for Deepal to pay CB&T. Attached as **Exhibit 1** is a typical and

21  reoccurring loan monitoring email from Heddy to Deepal. The June 17, 2010 email reflects their

22  intimate working relationship and reads as follows:

23              **"Hi Deepal, thanks for your deposit yesterday and today!!!**
               **Can I help you do transfer into the -87631 acct for the loan**
24              **payments too please!! From which account and how much?**
               **Thank you!! Heddy 600-4902" (see Exhibit 1).**
25

26         27.    Attached as **Exhibit 2** is a copy of a CB&T Transaction Inquiry dated November

27  4, 2009 for the IMG Wholesale Account.  **Exhibit 2** shows the wire into CB&T of an

28  investment by JTS Communities, Inc. ("JTS") of $2,700,000 which was circled by CB&T.

6

1   CB&T knew that JTS Communities was a local Sacramento investor in IMG and that it was JTS

2   depositing the money. CB&T created its own internal files on many IMG investors, including

3   JTS.

4          28.     Attached as **Exhibit 3** are copies of two deposit slips for the #4841 account dated

5   July 7, 2008 for $65,000 and July 8, 2008 for $110,000. Both slips have the notation that the

6   deposits were approved by Heddy Chiang with a "No Hold Per Heddy." On a constant basis

7   starting in or about 2006, Heddy Chiang would allow the deposits of investors' personal checks

8   to be cleared without the expiration of the required hold period which enabled IMG to make

9   needed lulling payments to perpetuate the Ponzi scheme. Funding bounced checks and clearing

10  checks before the required hold period equates to a regulated bank loaning additional monies to

11  perpetuate a Ponzi scheme.

12         29.     In October of 2009, after CB&T fully understood the fraud, CB&T gave notice

13  to IMG that it was terminating further secured lending but would still allow IMG to deposit new

14  investors' money into IMG's Wholesale Account # 4841 at CB&T. The only beneficiary of this

15  joint decision was CB&T. IMG did not benefit; IMG just owed more money to more defrauded

16  investors.

17         30.     CB&T claims as a defense that maintaining the depository relationship with IMG

18  for three years after February 2011 would not be consistent with the bank's knowledge of the

19  Ponzi scheme because CB&T was repaid in full by February 2011. However, terminating IMG

20  as a customer immediately after repayment in full in 2011 would have caused IMG's instant

21  collapse, provided the obvious evidentiary link between repayment and knowledge, and

22  subjected the bank to preference and fraudulent conveyance claims upon IMG's bankruptcy.

23  Letting sleeping dogs lie from 2011 to 2014 was the perceived path to financial safety pursued

24  by CB&T.

25         31.     CB&T also contends that pure luck is the more likely explanation for CB&T's

26  "innocent" exit from the IMG Ponzi scheme in 2014 with a minimum $3 million profit.

27  However, being dumb and lucky at the same time while having possession of all the relevant

28  financial evidence is not a viable explanation for this bank.

**FIRST AMENDED CLASS ACTION COMPLAINT**               **Case No. 2:17-cv-01123-WBS-DB**

1   **II.    JURISDICTION AND VENUE**

2          32.    This Federal District Court may exercise jurisdiction over this Class Action

3   pursuant to 28 U.S.C. § 1332 because the Plaintiffs are residents of California and CB&T is a

4   resident of the state of Utah.    The matter is a complex Class Action. This Court has personal

5   jurisdiction over the Defendants named in this Complaint because CB&T conducted business in

6   California and it participated in a California-based fraudulent scheme that injured Californians.

7   Venue is proper in this District because the conduct at issue took place and had an effect in this

8   District and CB&T regularly conducted and still regularly conducts substantial banking

9   business in this District.

10  **III.    PARTIES**

11         33.    **Plaintiff Ronald C. Evans ("Ron Evans")** is an individual living and doing

12  business in El Dorado County, California. Ron Evans invested $50,000 in IMG on January 21,

13  2014. He and his wife's personal check payable to IMG for $50,000 is attached as **Exhibit 4.**

14  **Exhibit 4** was deposited by IMG into the Wholesale account #4841 at CB&T with the physical

15  approval of the deposit by CB&T.  Most of the investors made their investments in IMG with

16  personal checks, and many of these indicated on the face of the check that it was for an

17  investment in IMG.

18         34.    As testified to by FBI Special Agent Paul S. Artley (page 130 of 167 at Dkt. 26-

19  1), account #4841 was Deepal's account at CB&T that was used for the IMG "VA contracts"

20  like Evan's contract. The "vast majority" of the IMG investors' deposits, like Evan's deposit,

21  flowed into and out of the Wholesale Account. According to Agent Artley, from March 2006 to

22  August 2013, $205 million of deposits and withdrawals took place inside account #4841 with an

23  ending balance of approximately $1,000 on August 30, 2013 and  no "incoming wire transfers

24  were noted from the VA …" (page 131 of 167 at Dkt. 26-1).

25         35.    Attached as **Exhibit 5** are the CB&T prepared Account Summary Statements for

26  the IMG Wholesale Account #4841 for the months of July 2006, 2007, 2008, 2009, 2010, 2011,

27  2012 and 2013. **Exhibit 5** shows the deposits by investors and the withdrawals by Deepal to pay

28  interest to the investors.  The Plaintiffs picked July just as an example. **Exhibit 5** also shows the

8

1  first account statement being mailed to IMG's business address at 879 F Street.  Starting in

2  2007, Deepal directed CB&T to mail the statements only to Deepal's home at 5231 Pleasant

3  Drive. As agent Artley said, such an address change is obvious evidence of subterfuge which

4  CB&T had to participate in order for the change to occur.

5      36.   **Exhibit 5** shows that IMG was a Ponzi scheme with millions deposited each

6  month of each year by investors, monthly fund outflows equaling or exceeding the deposits and

7  the ending balance each month at below zero or close to zero. For instance, IMG had a negative

8  balance of $357,939.65 on July 3, 2008, a negative balance of $6,385.10 on July 17, 2008, a

9  negative balance of $8,395.27 on July 18, 2008, a negative balance of $9,091.66 on July 25,

10  2008 and another negative balance of $4,853.81 on the 30th of July in the year of 2008. This is

11  just one month in 2008 of bounced checks by IMG at CB&T totaling over $384,000.

12      37.   Over time, IMG bounced millions of dollars in bad checks.  The Court can take

13  judicial notice that, generally, banks do not like bounced checks or negative balances. A

14  negative balance is a loan to the depositor to cover the deficit because the books of the bank

15  must always balance. Generally, banks terminate their relationships with customers who write

16  checks with insufficient funds.  CB&T did not terminate its relationship with IMG and Deepal

17  because it wanted to get repaid the money it had loaned to IMG. Terminating IMG's deposit

18  accounts would not promote the goal of getting repaid.

19      38.   IMG was an obvious Ponzi scheme.  **Exhibit 6** is an email dated August 28,

20  2008 from Diana Garside, the Compliance Officer at North Valley Bank in Sacramento where

21  Deepal opened accounts for IMG to obtain an investor's SLOC from North Valley Bank.  In

22  2008, it only took North Valley Bank a couple of months of doing business with Deepal to

23  conclude he was kitting checks. The 2008 email reads:

> **FYI…. Significant kiting activity has been noted for the
> customer (International Manufacturing Group, Inc. and
> Deepal Wannakuwatte) involving multiple accounts and
> multiple financial institutions. (See Exhibit 6).**

27      39.   FBI Special Agent Paul S. Artley (page 132 of 167 at Dkt. 26-1), said his review

28  of account #4841 documents, including Account Summary Statements, revealed that IMG was

FIRST AMENDED CLASS ACTION COMPLAINT                Case No. 2:17-cv-01123-WBS-DB

operated by Deepal as a Ponzi scheme. The scheme was egregious to agent Artley because Deepal had the temerity to pay back investors for old investments with their own money deposited with IMG for a new investment. Artley said in his declaration that:

> **… it appears investors were paid "profit/interest" payments from principal investments made by other investors, or, as indicated below from their own investment**.

40.     Evans invested $50,000 with the promise he would earn $3,203.33 or 6% interest repaid by IMG on May 31, 2014 - one day after IMG filed for bankruptcy protection. Evan's investment was evidenced by a form Promissory Note issued by IMG which is attached as **Exhibit 7**. Attached as **Exhibit 8** are other examples of the form Promissory Notes used by IMG.  **Exhibit 8** shows the uniformity of the representations in the writings used to document the investments. Uniformity of the written misrepresentations is key to class certification in a fraud case.  The presumption of reliance may be established by the Plaintiffs parting of money based on uniform false promises. *Vasquez v. Superior Court*, 4 Cal. 3d 800 (1971).

41.     A form Investment Agreement between Evans and IMG is attached as **Exhibit 9**. Examples of other Form Investment Agreements used to solicit other investors are attached as **Exhibit 10**.  The representations in all the agreements were the same - IMG will be obtaining bids for gloves from the Federal Government and the investor, like Evans, will lend IMG the amount invested for IMG to fulfill the bid with the Federal Government.

42.     Evans, a dentist, met Deepal at a tennis game.  Evans hosted the crook for brunch at his home. Deepal was the owner of the Sacramento Capitals, a tennis team. Deepal held himself out to Evans and the others to be a person who acted in a fiduciary capacity to his investors.  CB&T admitted that by 2007 it knew Deepal sold his investments to close friends based on trust and confidence.  See, page 5 of **Exhibit 14**.

43.     Deepal mentioned the IMG investment opportunity to Evans based on IMG's business model. Deepal transmitted the Form Agreement to Evans. Evans reasonably relied on the truth of the representations made by IMG in the Form Agreement and parted with his money. Evan's reliance was reasonable given the stature of Deepal as a fiduciary in the community, the amount invested, the rate of return and the longevity of the business model in

1    Sacramento.

2    44.    Ron Evans' $50,000 was deposited into the IMG Wholesale Account #4841 at

3    CB&T and then dissipated by IMG with the help of CB&T. CB&T knew that the $50,000

4    invested by Evans and physically deposited by CB&T into the IMG Wholesale Account was

5    intended by Evans to be used by IMG to help IMG to purchase medical gloves manufactured in

6    Asia to sell to the Federal Government to satisfy bids awarded to IMG.

7    45.    CB&T knew the purpose of Evans' $50,000 investment (as well as that of all the

8    other investors writing personal checks for thousands of dollars) because: (i) it knew IMG's

9    purported business model because it loaned IMG $21 million based on IMG's purported

10   business model; (ii) CB&T was the beneficiary of SLOCs drafted by CB&T based on IMG's

11   business model; (iii) CB&T had foreclosed on the $9 million BofA SLOC issued based on

12   IMG's business model; (iv) CB&T traced investors deposits to pay off the loans made to IMG

13   based on the Asian glove business model; (v) CB&T did not issue SLOCs to Asia for glove

14   manufacturers for millions of dollars for inventory and it did not receive payments from the VA

15   for gloves sold based on bids awarded to IMG; and (vi) CB&T accepted as deposits hundreds of

16   millions of dollars from individual investors writing personal checks for even amounts to IMG.

17   Those checks, like Evans' check, could only be construed as an unregistered security

18   investment into IMG because these people were not buying medical gloves with their money.

19   46.    Banks are trained to identify unregistered securities and CB&T knew the IMG

20   investment contract was an illegal unregistered security because it obviously was a passive

21   investment – profit from the work of others.

22   47.    Had Ron Evans known that his investment would not be used to help IMG to

23   purchase gloves in Asia to resell to the VA in the USA, he would not have invested his money

24   with IMG.

25   48.    **Plaintiff Joan M. Evans ("Joanie Evans")** is an individual living and doing

26   business in El Dorado County, California and the wife of Ron Evans. Joanie Evans invested in

27   the same Promissory Note issued by IMG pursuant to the same Form Investment Agreement.

28   Ron and Joanie Evans discussed the risks and rewards of the investment and both decided

**FIRST AMENDED CLASS ACTION COMPLAINT**                              Case No. 2:17-cv-01123-WBS-DB

1   together that it was reasonable to proceed. Joanie Evans reasonably relied on the false

2   representations in the form Investment Agreement to her detriment.

3          49.    **Plaintiff Dennis Treadaway ("Treadaway")** is an individual living and doing

4   business in Sacramento County, California who invested over $2 million in IMG in a series of

5   transactions from 2007 to 2014. Treadaway invested in IMG by way of Promissory Notes and

6   Standby Letters of Credit ("SLOCs").   **Exhibit 13** is a copy of a SLOC.

7          50.    Treadaway executed similar form Promissory Notes as executed by Evans and

8   similar Form Investment Agreements.  Treadaway's personal checks were deposited into the

9   IMG Wholesale Account at CB&T, just like Evans and everyone else.

10         51.    Treadaway understood IMG's business model. Treadaway believed that his

11  investment funds would be used to purchase actual glove product overseas to sell to the VA and

12  other agencies.   IMG never disclosed to Treadaway that his investment would be used to pay

13  back other investors.  Treadaway reasonably relied on the representations in the Investment

14  Agreements. Treadaway's reliance was reasonable based on the constant returns IMG paid to

15  Treadaway to gain his trust.  Had Treadaway known the truth, he would not have invested his

16  money with IMG.  Treadaway is a net loser of approximately $950,000, the exact amount to be

17  proven at trial.

18         52.    Plaintiffs Ron Evans, Joanie Evans, and Treadaway, along with the Class

19  Members, will collectively be referred to herein as "Plaintiffs".

20         53.    **Defendant Zions Bancorporation, N.A.** is the parent to **Defendant ZB, N.A.,**

21  and the successor to the liabilities of CB&T.   Both corporations are incorporated and

22  headquartered in Utah and do substantial business throughout California. Effective December

23  31, 2015, California Bank & Trust, a California banking corporation, merged its banking charter

24  into ZB, N.A.  Therefore, CB&T no longer exists as a separate California banking corporation.

25  The liabilities of CB&T have been assumed by Zions Bancorporation and ZB, N.A.  The facts

26  recited herein will refer to "California Bank & Trust" or "CB&T" as if it were still an entity

27  because the documentary evidence generated refers to and uses that name.  However, the

28  requested money judgment to be entered shall be against Zions Bancorporation, N.A. and ZB,

12

N.A.

54.     During the relevant time period of this case the following **non-parties** were employees and agents of CB&T, who, at all relevant times, were acting within the course and scope of their employment and agency for CB&T:

55.     **Royal W. Minson, II ("Buzz"),** deceased, was the Director of International Business Development at CB&T in charge of financing overseas transactions for customers in the USA.  Deepal paid Buzz money on the side for his work for IMG while Buzz was employed at CB&T.  Deepal paid Buzz on the side while CB&T was loaning $21 million to IMG based on the recommendations by Buzz that CB&T should loan the money to IMG.

56.     Buzz was involved in the IMG loan approval process, reviewing and approving the language of the SLOCs naming CB&T as the beneficiary, and drafting Commercial Letters of Credit and other documents supported by the investors SLOCs.  Buzz formed a company with his wife called Sourcing Services International, Inc. and actually imported 2 containers of gloves from China which Deepal was forced to accept for delivery to IMG in the USA.

57.     Buzz acquired significant knowledge about all aspects of the business of IMG.  As early as September 19, 2007 Buzz informed Deepal that he wanted $225,000 per year plus a percentage of the profits.  In **Exhibit 11**,  Buzz declared his financial loyalty and commitment to Deepal's business which reads as follows:

> **"I think you know me well enough by now that by committing to work with you, I am committing my complete loyalty and dedication to achieving increasing economic success for you and your entities. The *quid pro quo* will be my ability to participate in those successes." (See Exhibit 11).**

58.     Buzz advised CB&T to make the 9 loans to IMG.  Buss then advised CB&T to grant Maturity Date Extensions (at least 20 times) because IMG did not have the money to pay.  Buzz also advised CB&T to agree to substitute security pledged by investors in IMG (at least 21 times) to avoid having CB&T declare IMG in default and institute foreclosures. The Maturity Dates on the 9 Notes had to be extended to avoid foreclosures.  The existing security pledged for some of the Notes had to be exchanged because some banks were not renewing their

**FIRST AMENDED CLASS ACTION COMPLAINT**          Case No. 2:17-cv-01123-WBS-DB

1   SLOCs, or CB&T was rejecting SLOCs issued by certain weak banks during the Great
2   Recession.

3        59.    Buzz accommodated IMG and Deepal even after Buzz knew that IMG did not
4   have the funds to repay the loans as promised. IMG did not have the funds to repay the loans as
5   promised because IMG did not have any business to generate income to repay the loans as
6   promised.  All of the needed information for CB&T was reflected in the Account Summary
7   Statements in CB&T's possession as set out in **Exhibit 5**.  The debits and credits in **Exhibit 5**
8   told Buzz and the other employees at CB&T that the loans could only be repaid, if at all, from
9   new investors' money deposited in the Wholesale Account #4841 for IMG at CB&T, an
10  account which was monitored daily by CB&T. See **Exhibits 1, 2** and **3**.

11       60.    **Alex Fukui ("Fukui")** was and still is a senior lawyer for CB&T who was
12  assigned the task by his employer in or about 2007 to conduct legal work on the IMG loans and
13  accounts at CB&T. Fukui graduated from UC Berkley and then the UCLA school of law before
14  working as a licensed lawyer for CB&T. CB&T contends that all communications, between
15  Fukui and Buzz regarding Deepal and IMG were not business decision communications but
16  were privileged attorney-client communications regarding facts juxtaposed against the law. The
17  Plaintiffs do not presently contest CB&T's designation, or its description of the Fukui
18  relationship to the IMG file.

19       61.    The Plaintiffs do allege that the IMG matter was referred to Fukui in the legal
20  department of CB&T no later than 2008. Such a referral to a highly trained lawyer would have
21  resulted in CB&T's actual knowledge that it had loaned money to a Ponzi scheme. If Diana
22  Garside of North Valley Bank can see check kiting with only a brief business relationship with
23  IMG (**see Exhibit 6**) and FBI agent Artley can observe a Ponzi scheme by a cursory review of
24  IMG's Wholesale Account activity (see Dkt. 26-1), then CB&T knew IMG was a Ponzi in 2008
25  after Fukui focused his legal mind on this problematic customer.

26       62.    **Jun Enkoji ("Enkoji")** was a Vice President and Commercial Banking Officer
27  at CB&T associated with the Central Valley Region and the Fresno Commercial Loan Office.
28  Jun Enkoji approved all 9 loans, the 20 loan extensions, and the 21 collateral swaps granted to

IMG by CB&T. After Enkoji learned that the BIA would no longer guarantee the Bank of America's loan to the Indian tribe, he helped IMG and CB&T to defraud the Jamestown S'Klallam Indian Tribe and the Bank of America out of $9 million.

63.     To get the $9 million, Jun Enkoji directed CB&T to foreclose on the 2006 BofA SLOC (**Exhibit 13**) obtained by the Jamestown Health & Medical Supply, Inc. ('JHMS") from BofA for CB&T.

64.     Enkoji knew that JHMS and IMG had the same address in Sacramento which was at 879 F. Street because both entities banked at CB&T. Enkoji knew that money was constantly transferred between IMG and JHMS. Enkoji knew that Deepal controlled both IMG and JHMS. Deepal said in **Exhibit 12** – "I have been given full authority to sign on behalf of Jamestown Health & Medical Supply Company LLC in any legal capacity."

65.     In 2006 and 2007 CB&T gave $8 of the $9 million loan proceeds directly to IMG to operate the Ponzi scheme based on phony Purchase Orders from JHMS to IMG submitted by Deepal. Enkoji was informed in late 2008 (over two years after transferring the loan proceeds to IMG), that JHMS still owed IMG $9,147,685.50 for gloves JHMS had ordered and IMG had manufactured, shipped, and sold to JHMS in 2006 and 2007. In late 2008, Enkoji knew that the $9 million CB&T had loaned IMG on the Indian tribe SLOC was missing.

66.     The $9 million BofA SLOC, number 3082234, is attached as **Exhibit 13**. As described in **Exhibit 13**, the letter of credit could be triggered only after CB&T declared a default for non-payment by IMG and transmitted to BofA copies of operative Purchase Orders made by JHMS, **fulfilled by IMG**, and paid by CB&T to be manufactured.

67.     Prior to 2008, IMG had been in default on the tribal loan. In response, Enkoji created a lock box account at CB&T in which JHMS and IMG were supposed to deposit payments by JHMS to IMG for the millions in gloves already purchased by JHMS. No deposits were ever made into the lock box account set up by CB&T to protect CB&T. In addition, JHMS had its own checking account at CB&T. The JHMS checking account revealed check kiting between IMG and JHMS, that JHMS had no money to pay IMG investors and that deposits from IMG were funding JHMS.

15

68.     In or about late 2008, the BIA gave notice to BofA it was no longer guaranteeing the tribe's loan and BofA gave notice to Enkoji at CB&T it was not renewing SLOC #3082234.  In response, Enkoji authorized the submission of fabricated Purchase Orders to BofA to collect the $9 million before the BofA SLOC expired.

69.     The Purchase Orders used to foreclose were fabricated by Deepal based on the instructions from Buzz to Enkoji on **Exhibit 13** that **"any P/O ok per Buzz."** CB&T was not concerned with submitting to BofA **"the"** Purchase Orders which actually created the $9 million in debt because CB&T knew there were no bone fide Purchase Orders reflecting actual financial transactions between IMG and JHMS.

70.     In February of 2009, Enkoji prepared solicitation materials for Deepal to use to convince new investors to invest in IMG to secure loans made by CB&T to IMG.

71.     Attached as **Exhibit 14** is a factual summary of Jun Enkoji' s involvement in the IMG Ponzi scheme prepared by Ian Craig, the attorney for JTS Communities. JTS lost over $25 million in the IMG scheme.  **Exhibit 14** details the activities of Buzz Minson, Dawn Satow, and other employees in 2008 and 2009 which establish CB&T's knowledge of the IMG.

72.     **Dawn Satow** worked at the Sacramento Regional Commercial division of CB&T and filed a declaration attesting to the authenticity of the nine Promissory Notes, 20 extensions on the due dates for repayment, and 20 plus swaps of collateral entered into between IMG and CB&T. Her declaration is submitted as **Exhibit 18** to this complaint. As noted in **Exhibit 14**, Dawn Satow also played a critical role in the management of the IMG accounts at CB&T, including monitoring investor deposits to force Deepal to make interest and principal payments. For example on December 29, 2008, Satow emailed Jun Enkoji that she was monitoring IMG's deposits and account balances to force Deepal's payment to CB&T:

> **Hi Jun…I think we need the approval documents asap, to officially tie in the JTS CD to this loan. I am planning to make that paydown of $136,610.97 today, although there is not enough money in the acct. right now. Deepal says he is expecting funds today. Will keep checking.**

///

**FIRST AMENDED CLASS ACTION COMPLAINT**                    Case No. 2:17-cv-01123-WBS-DB

73.   **Heddy Chiang** was the branch manager at CB&T's Arden Way, California branch where IMG and Deepal did their banking business. Heddy met with Deepal at the branch almost every day, sometimes twice a day when Deepal was depositing investors' money. Heddy and Deepal had a very close, intimate and unusual relationship, as demonstrated by the banter in their emails (i.e. on 4/18/06, Heddy emailed Deepal "I am all rejuvenated from sun in San Diego, even got a tan!"). She introduced Deepal to investors as CB&T's "best customer." Heddy Chiang would approve of loans to IMG to cover overdrafts and approve of waiving the "hold" time on Deepal's deposits so taht IMG could make lulling payments to perpetuate the scheme. Heddy convinced customers of the bank to invest in IMG and assisted in documenting their transactions. Heddy promoted IMG to the public.

74.   **Kerrie Kinsey-Alexander** was a financial service representative and loan specialist at the Arden Way, California branch of CB&T. Kerrie worked for Deepal on the side and received money from Deepal at the Arden Way Branch.

## IV.   AGENCY ALLEGATIONS

75.   Plaintiffs allege that the actions of the Defendant were done in collaboration and collusion with the IMG while acting in furtherance of their agreement to perpetuate the unlawful scheme. CB&T's agents working with IMG were acting in the course and scope of their employment and agency with CB&T and the Defendants authorized or ratified the acts of its agents as alleged herein.

## V.   INFORMATION ALLEGATIONS

76.   Allegations made in this First Amended Complaint have been based on information and belief, except those allegations that pertain directly to the Plaintiffs, which are based on the Plaintiffs' personal knowledge. Plaintiffs' information and belief is based on, *inter alia*, the investigation conducted by Plaintiffs and Plaintiffs' attorneys after their retention. Each and every allegation and factual contention contained in this Complaint has evidentiary support or, alternatively, is likely to have evidentiary support after reasonable opportunity for further investigation or discovery by Plaintiffs or their counsel.

///

17

**FIRST AMENDED CLASS ACTION COMPLAINT**                    **Case No. 2:17-cv-01123-WBS-DB**

1  **VI.   DELAYED DISCOVERY OF ROLE PLAYED BY CB&T AND ESTOPPEL**

2      77.    The original complaint in this case was filed on May 26, 2017 before the 3 year

3  anniversary of IMG's bankruptcy filed on May 30, 2014, and, within 1 year and 20 days of

4  learning the facts about CB&T's role as an aider and abettor of the primary tort feasors by

5  reading McFarland's fraudulent conveyance complaint filed on May 6, 2016.

6      78.    Deepal was arrested in February of 2014 and pled guilty to running a large Ponzi

7  scheme on May 8, 2014. On May 30, 2014 IMG and Deepal both declared bankruptcy. Beverly

8  McFarland ("McFarland") was appointed the trustee of IMG.  Since 2014, she has distributed

9  less than a penny per dollar of claims to the creditors of IMG. CB&T filed a creditor's claim in

10  the Deepal bankruptcy on or about June 25, 2014.  CB&T did not file a creditor's claim in the

11  IMG bankruptcy.

12      79.    On or about April 6, 2015, CB&T received a copy of McFarland's Subpoena for

13  Rule 2004 Examination (the "Subpoena") issued in the bankruptcy case designated as *In re*

14  *International Manufacturing Group, Inc.*, Case No. 14-25820-D-11 (Bankr. E.D. Cal.). The

15  subpoena issued by McFarland demanded CB&T to produce all documents related to the

16  banking relationship between CB&T and IMG which would have included the intimate

17  communications between Buzz Minson and Deepal contained in Buzz's lap top computer.

18  CB&T did not produce to McFarland the emails between Deepal and Buzz or other relevant

19  information contained on Buzz's computer.

20      80.    Buzz Minson used a lap top to conduct business at CB&T with IMG from no

21  later than 2005 to 2014. The hard drive on the lap top contained his communications with

22  Deepal regarding the operations of IMG and his knowledge it was a Ponzi scheme. Buzz's lap

23  top contained critical evidence relevant to the date that CB&T discovered that IMG was

24  operating a Ponzi scheme.

25      81.    Buzz Minson died in or about February of 2016. Buzz's wife, Sherrie Minson,

26  transferred Buzz's lap top computer to CB&T soon after he passed. At some undisclosed date

27  after mid-March of 2016, CB&T destroyed Buzz's computer and the data contained therein.

28  CB&T wiped the hard drive clean. The data destruction injured the Plaintiffs ability to

**FIRST AMENDED CLASS ACTION COMPLAINT**        Case No. 2:17-cv-01123-WBS-DB

prosecute CB&T, proves the ratification of Buzz's intent to assist Deepal's scheme, and estopps

CB&T from claiming the Plaintiffs complaint is untimely because Plaintiffs had ready access to

the information identifying and implicating CB&T as an aider and abettor between May 8, 2014

and May 30, 2014. CB&T's admission it destroyed critical evidence is contained in the

discovery files of the litigation entitled *JTS Communities, Inc., et al., v. ZB, N.A., dba CB&T*,

case No. 34-2017-0213368 pending the Sacramento County Superior Court before the

Honorable Christopher E. Krueger. The admission by CB&T is as follows:

**REQUEST NO. 44 by the JTS Plaintiffs:**

> Requesting Party hereby demands that YOU produce for inspection and forensic imaging the original laptop computer used by MINSON during his employment with YOU.

**RESPONSE TO REQUEST NO. 44 by CB&T:**

> …. ZIONS has conducted a diligent search and reasonable inquiry for Royal Minson, II's original ZIONS issued laptop, and has discovered that it no longer exists. Specifically, upon information and belief, Royal Minson, II's laptop was returned to ZIONS's Walnut Creek branch located at 1277 Treat Blvd #120, Walnut Creek, CA 94597 in mid-March 2016, shortly after his death in February 2016. From there, Mr. Minson's ZIONS issued laptop was delivered ZIONS's IT department. Following its normal procedure, ZIONS's IT department transported Mr. Minson's ZIONS issued laptop off-site to a ZIONS warehouse and **extracted the original hard drive to be wiped and repurposed, which ZIONS believes occurred. Mr. Minson's ZIONS issued laptop was returned to ZIONS and its hard drive was removed and processed for repurposing** before any actions arising from Deepal Wannakuwatte's purported Ponzi Scheme were filed against ZIONS. (Emphasis Added).

82.    IMG and Deepal both filed for bankruptcy on May 30, 2014. The May 30, 2014 filing by IMG was the first communication by IMG to Plaintiffs that it would not honor the terms of the Promissory Notes it issued to investors and notice that there were insufficient funds inside the IMG bankruptcy estate to pay the principal owed each creditor on the outstanding Promissory Notes.

83.    The section 362 stays entered in the bankruptcies of IMG and Deepal disabled the Plaintiffs from suing the primary tort feasors, including doe allegations in their complaints, and conducting formal discovery to identify aiders and abettors of the primary tort feasors. After May 30, 2014, the Plaintiffs discovery of the identity of CB&T as an aider and abettor required

19

1  the diligent investigation by McFarland who was charged with the responsibility of acting at the

2  behest of IMG's creditors, including these named Plaintiffs.  To date, CB&T has refused to

3  produce to Plaintiffs any documents, despite the fact that it already made productions to the

4  Trustee and to certain individual investors' non-class claims in California State Court.

5         84.      After May 30, 2014 the statute against the primary tort feasors was tolled.  After

6  May 30, 2014 the Plaintiffs' were unable to discover the elements of their causes of action

7  against CB&T until the factual allegations contained in the trustee's fraudulent conveyance

8  complaint against CB&T were filed on May 6, 2016. Despite diligent investigation of the

9  circumstances of their injury, before May 6, 2016 it was not reasonably possible for the

10  Plaintiffs to obtain facts about CB&T's confidential relationship with IMG to establish CB&T's

11  obvious knowledge and conscious decision to assists IMG.

12  **VII.**    **CB&T DISCOVERED THE IMG PONZI SCHEME NO LATER THAN**

13          **OCTOBER 2009 AND MOST LIKELY MUCH EARLIER**

14         85.      Deepal was arrested on February 21, 2014, entered a guilty plea on May 8, 2014

15  and is currently serving 20 years in Federal Prison in Lompoc.  See *USA v. Deepal*

16  *Wannakuwatte*, Case No. 2:14-cr-067 TLN and Deepal's plea agreement with Factual Basis for

17  Plea at Docket No. 21-2 in this case. The Plaintiffs incorporate the facts attested to by Deepal in

18  his signed Factual Basis for Plea as if set forth herein.

19         86.      As stated by the primary tort feasor, Deepal ran a Ponzi scheme from 2002 to

20  2014 telling investors he had yearly $100 million contracts with the VA that simply needed

21  investor funding for him to satisfy. It was all a lie.  There was no real income.  The defrauded

22  investors' money was the financial universe of the IMG wholesale business.  With such a

23  limited universe, money would not be created but simply rearranged – **it was all investor**

24  **money paying CB&T**.

25         87.      The Plaintiffs contend that the available evidence construed with common sense

26  leads to the reasonable conclusion that CB&T knowingly allowed the Ponzi scheme to be run

27  through its bank long enough to be repaid the $21 million it had loaned to IMG and long enough

28  to make a $3 million profit; while all of the other investors with no access to the financial

**FIRST AMENDED CLASS ACTION COMPLAINT**        Case No. 2:17-cv-01123-WBS-DB

1 | records lost $100 million.

2 |      **A.**    **IMG's Business Model and the Loans from CB&T to IMG**

3 |      88.    IMG's business allegedly consisted of the importation of latex surgical gloves

4 | and related medical products manufactured in Asia for re-sale in the United States.  IMG's

5 | business purportedly involved two distinct divisions, a "retail" division and a "wholesale"

6 | division.

7 |      89.    IMG's "retail" business, which provided gloves to medical offices and other

8 | small businesses, was relatively small and it generally lost money or broke even each year it

9 | operated. The existence of the retail business gave investors and the employees at CB&T the

10 | physical observation that IMG was, at a minimum, dealing in medical gloves which were seen

11 | on shelves in the IMG office locate at 879 F Street in Sacramento.  The CB&T employees

12 | identified in the complaint visited the IMG office on F Street on multiple occasions.

13 |      90.    IMG's "wholesale" business purportedly comprised IMG's true revenue stream,

14 | which IMG claimed to exceed $100 million annually.  However, IMG's "wholesale" division

15 | had no employees, no accounts payable, and no accounts receivable. IMG's "wholesale"

16 | division was a complete sham.  It was the faux front.

17 |      91.    At the outset of the fraudulent scheme, IMG solicited investors to provide cash

18 | for purported wholesale shipments of latex surgical gloves from Asian manufacturers to IMG's

19 | purported customers, primarily to the Veterans Affairs (the "VA").  The cash was paid in

20 | exchange for promissory notes issued by IMG. Copies of these notes are set out in **Exhibits 7**

21 | **and 8.** The Plaintiffs received the notes in exchange for cash paid by personal checks written to

22 | IMG and deposited into account #4841 as set out in **Exhibits 4 and 5**.

23 |      92.    IMG investors were promised that their money would fund the purchase of such

24 | shipments, and that in so doing, they were financing IMG's highly profitable wholesale

25 | inventory purchases.  In exchange for investing cash, investors were provided promissory notes

26 | reflecting short-term repayment with annual returns of 12% or more.

27 |      93.    No later than 2005, CB&T understood that the cash investors intended their

28 | funds to be used solely to purchase latex gloves in Asia.  No later than 2005, at the request of

**FIRST AMENDED CLASS ACTION COMPLAINT**          **Case No. 2:17-cv-01123-WBS-DB**

1   IMG, CB&T actually solicited its own banking clients to invest in IMG. At least two bank

2   customers invested because of the recommendations by Heddy Chiang. The stated purpose for

3   the investments was the financing of IMG's purchase of latex gloves in Asia. CB&T handled all

4   of the investment paperwork and the bank served as the source of the investors' fund, by

5   loaning them money secured by their homes. As instructed by IMG, CB&T transferred control

6   over the home-loan proceeds, not to the investors, but directly to IMG. Heddy Chiang assured

7   these customers of CB&T that Deepal was trustworthy and the bank would monitor their

8   investments.

9        94.    CB&T claims that this evidence created in 2005 is evidence of lack of

10   knowledge of the IMG fraud. Plaintiffs do not content that CB&T's solicitation of its own

11   customers to invest in gloves in 2005 is evidence of the bank's knowledge of the Ponzi scheme

12   in 2005. Plaintiffs contend it is evidence of CB&T's knowledge, acquired no later than 2005

13   that IMG was soliciting investors and that investor money was the source of the funds being

14   deposited at CB&T.  The Plaintiffs do allege that the banks relationship with these two

15   customers did establish knowledge of the fraud by 2009 because the debt owed them by IMG

16   was never repaid so their loans from CB&T secured by their homes could not be repaid as was

17   promised by Heddy.

18        95.    In addition to CB&T and IMG soliciting cash investors, IMG convinced certain

19   investors to obtain SLOCs in favor of CB&T to fund IMG's wholesale inventory. CB&T knew

20   and understood the intent of the investor SLOCs and CB&T accepted the investor SLOCs as

21   collateral for over $21 million in nine loans CB&T made to IMG from 2005 to 2011. The loans

22   are summarized in **Exhibit 15** and are identified as follows:

23        (i)    Loan No. 168068-001 in the amount of **$897,000** issued with a Promissory Note

24   dated 8/12/05.

25        (ii)   Loan No. 168068-0004 in the amount of **$1,500,000** was issued with a

26   Promissory Note dated 5/17/06 with a Maturity Date of 5/31/07.  On 6/26/06, a Change in

27   Terms was issued to increase the line from $1,500,000 to **$9,000,000** and the change of

28   collateral to include the $9,000,000 BofA Letter of Credit.

**FIRST AMENDED CLASS ACTION COMPLAINT**                    Case No. 2:17-cv-01123-WBS-DB

(iii)   Loan No. 168068-9001 for **$3,278,121** was issued with a Promissory Note dated 4/2/08 with a Maturity Date of 4/1/09.

(iv)   Loan No. 168068-9001 for **$2,961,804** was issued with a Promissory Note dated 6/13/08 with a Maturity Date of 5/8/09.

(v)   Loan No. 168068-9003 for **$2,000,000** was issued with a Promissory Note dated 10/29/08 with a Maturity Date of 11/5/09.

(vi)   Loan No. 181803-0001 for **$250,000** was issued with a Promissory Note dated 7/14/06 with a Maturity Date of 3/5/07

(vii)   Loan No. 181803-0003 for **$2,000,000** was issued via a Promissory Note dated 2/17/06 with a Maturity Date of 1/31/07.

(viii)   Loan No. 181803 for **$300,000** was issued via a Promissory Note dated 1/17/07 with a Maturity Date of 12/4/07.  The collateral included a $100,000 Zion Bank Letter of Credit

(ix)   Loan No. 181803-9001 for **$600,000** was issued via a Promissory Note dated 9/12/07 with a Maturity Date of 9/5/08.

<div align="center">

**Total Loans from CB&T to IMG: $21,286,925**

</div>

**B.      The Audits for the Extensions of the Loans Granted IMG by CB&T Revealed a Ponzi Scheme**

96.     Plaintiffs do not contend that CB&T discovered IMG was operating a fraud as early as 2005.  Plaintiffs contend that CB&T's knowledge of the fraud came later, but no later than 2009.  As IMG failed to repay CB&T and its security appeared suspect, CB&T investigated IMG out of self-preservation.  It was self-preservation that caused the bank to cease further lending to IMG.  It was also self-preservation that keep IMG's depository accounts open until 2014 so CB&T could be repaid all of its loans and pocket a $3 million profit.

97.     CB&T's 9 loans to IMG totaling $21,286,925 are graphically depicted in **Exhibit 15**.  **Exhibit 15** is based on **Exhibit 18** which is the Declaration of Dawn Satow containing all of the IMG loan documents.  Dawn Satow worked for CB&T.

98.     In credit reports generated at the inception of CB&T's loans to IMG, CB&T concluded that Deepal and IMG were not credit worthy, but it would lend the money anyway.

<div align="center">23</div>

1   CB&T made the nine loans based solely on the value of the security being pledged and not on

2   IMG's perceived ability to repay the loans from ongoing business operations. The 9 loans were

3   made with the bank's conscious conclusion in 2005 that it was more probable than not that the

4   ultimate repayment would come from foreclosure on the collateral and not from IMG buying

5   and selling gloves, or the personal guarantee of Deepal Wannakuwatte.  At the end, CB&T did

6   not foreclose on the Sacramento SLOC's and instead it was repaid from IMG's business

7   operations and IMG's business operation was running a Ponzi scheme.

8          99.     The graphic depiction of the loans in **Exhibit 15** demonstrate that CB&T

9   continually extended the life of the loans that were near default, if not already in default.

10         100.    The lending relationship between IMG and CB&T morphed from loan-to-own by

11  foreclosure to avoiding foreclosure at all costs.  CB&T ignored IMG's defaults and waived late

12  charges and interest penalties.  CB&T continually juggled its collateral (over 20 times), issued

13  Changes in Terms (over 27 times), issued loan Maturity Date Extensions (over 20 times),

14  adjusted loan rates of interest (over 20 times), and accepted or altered Personal Guarantees from

15  Wannakuwatte (at least 7 times).  Why?

16         101.    Each contractual modification in the lending relationship between IMG and

17  CB&T set out in **Exhibit 18** required CB&T to make conscious decisions intended to benefit

18  itself.  The loan modifications were deliberate, intended by CB&T to steer the bank onto the

19  safest route to receive repayment.   The surest route was repayment from newly defrauded

20  investors in IMG.

21         102.    By statute, each loan modification required the bank to identify where its loan

22  proceeds went and the source of the money used by IMG to pay CB&T.  Each loan modification

23  was made and based on CB&T's conclusion that IMG had defrauded CB&T, that CB&T could

24  avoid injury only by shifting its loss onto others, and to shift the loss to others IMG had to

25  remain active with deposit accounts operational at CB&T.

26         103.    As set out in **Exhibit 17**, CB&T's affiliate Zions Bank loaned money to Wannas

27  with the loan guaranteed by IMG.  In 2007, Zions Bank demanded evidence of IMG's solvency.

28  In 2009, Zions Bank repeated the demand and threatened default.  IMG's refusal to provide that

**FIRST AMENDED CLASS ACTION COMPLAINT**                    Case No. 2:17-cv-01123-WBS-DB

information, including financials "reviewed" by an independent CPA, was an admission by silence of IMG's insolvency known to Zions Bank no later than January 8, 2009. See **Exhibit 17**.

C.   **CB&T's Foreclosure of the Indian Tribe's SLOC Gave CB&T Knowledge that IMG was a Ponzi scheme.**

104.   CB&T refused to foreclose on the 8 SLOCs pledged as security by the local Sacramento investors for $12 million.   CB&T was forced however, to foreclose on the $9 million SLOC issued by the BofA for the non-local Seattle area Indian tribe because the BIF decided to terminate the government guarantee.

105.   Loan No. 168068-0004 was the loan from CB&T to IMG secured by the assets of the Jamestown S'Klallam Tribe. The documents evidencing the loan are attached as **Exhibit 18**.   The loan was first given in the amount of $1,500,000 and then increased to $9,000,000. The collateral was the $9,000,000 BofA SLOC which is attached as **Exhibit 13**.

106.   **Exhibit 13** provided that payment under the SLOC would require: (i) CB&T's written notice to BofA that IMG had defaulted on credit extended by CB&T for a specified amount; and (ii) BofA's receipt of purchase orders ("Purchase Orders") demonstrating imported supplies sold by IMG to JHMS.

107.   The "JHMS Loan" from CB&T to IMG of $9 million was expressly for the "purchase of inventory relating to purchases by Jamestown Health and Medical Supply Company. LLC, under Distribution Agreement dated October 26, 2005, and supported by copies of purchase orders submitted pursuant to each advance requested."

108.   The first sixteen purported JHMS Purchase Orders provided by IMG to CB&T were as follows:

///

///

///

///

///

**FIRST AMENDED CLASS ACTION COMPLAINT**                           **Case No. 2:17-cv-01123-WBS-DB**

| PO Number | Date | Amount |
|-----------|------|--------|
| PO0000001 | 5/15/2006 | $1,014,200.00 |
| PO0000002 | 6/5/2006 | $55,200.00 |
| PO0000003 | 6/15/2006 | $408,243.00 |
| PO0000004 | 6/28/2006 | $1,853,799.50 |
| PO0000005 | 8/16/2006 | $1,582,284.00 |
| PO0000006 | 8/29/2006 | $411,542.00 |
| PO0000007 | 9/28/2006 | $321,120.00 |
| PO0000008 | 10/19/2006 | $262,548.00 |
| PO0000009 | 11/29/2006 | $974,490.00 |
| PO0000010 | 12/21/2006 | $1,765,759.50 |
| PO0000011 | 1/25/2007 | $925,540.00 |
| PO0000012 | 2/20/2007 | $732,662.00 |
| PO0000013 | 4/9/2007 | $420,200.00 |
| PO0000014 | 6/4/2007 | $670,758.00 |
| PO0000015 | 8/2/2007 | $262,548.00 |
| PO0000016 | 1/18/2008 | $405,900.00 |

109.    CB&T transferred the loan proceeds to IMG's General Account based on the above JHMS Purchase Orders as they were received.   By the middle of 2007, IMG's loan balance was $6.5 million and by the middle of 2008 it was $8.3 million.

110.    CB&T knew that IMG was not paying interest or principal to CB&T with JHMS "sale" proceeds paid to IMG because there were minimal payments from JHMS to IMG. Repeatedly, IMG drew down on the JHMS Loan in order to obtain funds to cover the interest and principal owed on draws taken six months earlier.   IMG was barrowing money from CB&T to pay for loans from CB&T. The repeated practice of borrowing to pay for prior borrowing, which CB&T monitored to ensure repayment, evidenced the reality that there were no "sales" proceeds paid to IMG by JHMS.

111.    CB&T's knowledge of IMG's lack of income from JHMS, other than investor deposits, was memorialized in writing. For example, a $408,243 bankers' acceptance was set to mature in December 2006 requiring IMG to pay CB&T $408,243. CB&T's Jun Enkoji e-mailed Wannakuwatte (copying CB&T's Dawn Satow and CB&T's Heddy Chiang) stating: "International Banking Group will debit the account for that amount ($408,243)…**Please make sure you will have a sufficient/collected funds available in the account**" to pay CB&T.

26

Wannakuwatte responded that the CB&T line of credit would need to be temporarily drawn down to pay the CB&T bankers' acceptance. In substance, CB&T would have to loan money to IMG for IMG to pay back CB&T.

112.   On May 17, 2007 CB&T forced IMG to create a lock box account to protect itself. CB&T had Deepal of IMG sign an Agreement for Assignment of Payments, Proceeds and Distributions (the "Assignment of JHMS Payments"). The assignment or lock box agreement irrevocably assigned to CB&T any and all "rights to receive payments, proceeds and other distributions" from JHMS. It required IMG to irrevocably instruct JHMS to pay to CB&T any payments owed IMG for gloves while IMG promised CB&T that "any payment, proceeds or other distribution" received would be deposited into a CB&T controlled lock box account.

113.   CB&T was aware of the lack of incoming payments from JHMS to IMG because there were no payments into its own controlled account. There were no deposit because there were no sales because there were no gloves – it was all a big scam.

114.   As 2008 progressed, advances on the JHMS Loan ceased and there were no repayments. After six months of no activity CB&T sent Deepal an inquiry asking when JHMS would pay IMG so IMG could pay CB&T. In response, Deepal provided CB&T a letter dated November 23, 2008, addressed to IMG, stating:

Dear Deepal:

This is to confirm that Jamestown Health & Medical Supply currently owes IMG, Inc. approximately $9,147,685.50. The Government receivable makes it very difficult to collect funds on a 60 day term. The indebtedness is secured to your company by a standby letter of credit from Bank of America. We will honor this commitment, even though there is a 60 day invoice clause in your standby letter of credit.

We are also aware that you have a difficulty in keeping the 60 day clause on the letter of credit. We will try to resolve this matter to satisfy your needs at our next board meeting which is scheduled for the end of January, 2009.

115.   The November 23, 2008 letter from IMG to Deepal transmitted to CB&T disclosed to CB&T that the $9 million in loans to IMG by CB&T were missing which must have caused CB&T some anxiety because JHMS had failed to make any payments into the lock

27

1  box account pursuant to the Assignments of JHMS Payments. For JHMS to admit that it still

2  owed IMG $9,147,685.50 in late 2008 for gloves sold to JHMS in 2006 meant that the $9

3  million loaned to IMG to manufacture the gloves was missing. $9 million was loaned by CB&T

4  to IMG to buy gloves in Asia to sell to JHMS and JHMS had not paid IMG $9 million for the

5  Asian gloves or any gloves. Again, Ponzi schemes do not make money, the money is simply

6  rearranged.

7     116.   CB&T recognized that without the BIA guaranty the BofA SLOC would not be

8  renewed and CB&T's JHMS Loan would necessarily unravel because CB&T was not willing to

9  take on the risks presented by IMG's fraudulent "import business.  The unraveling began in

10  early 2009 when the BIA declined to extend its 90% guarantee.

11     117.   On March 27, 2009, Deepal wrote to Jun Enkoji to inform him that efforts were

12  underway to get the BofA to extend the SLOC "for another three months." However,

13  Wannakuwatte also wrote, "I want to be clear that if this is not accomplished, I will forward you

14  **all the new purchase orders** on April 20, 2009 and I want the bank to draw down on the letter

15  of credit as per the advice of my attorneys." (Emphasis added).

16     118.   This March 27, 2009 letter to CB&T's Jun Enkoji must have been written by

17  Buzz Minson working for Deepal because: (i) Deepal's claim that he would forward "all the

18  new purchase orders" made no sense as simply there were no "new purchase orders." The

19  JHMS Loan had sat dormant for 6 months and the amounts outstanding under the JHMS Loan

20  were for ancient Purchase Orders. In addition, no funds had been deposited into the lock box

21  account under CB&T's control to receive "sales" proceeds so that further loans could be

22  extended to cover new Purchase Orders.

23     119.   There was close to $900,000 left to be loaned to IMG on the $9 million JHMS

24  loan.  The balance owed on January 30, 2009 was $8,084,151.00 so there was approximately

25  $900,000 remaining on the BofA SLOC in CB&T's favor.  Recognizing that it was going to

26  foreclose on the tribe's security, CB&T knew that once it did, IMG's debt on the other 8 loans

27  would total over $13 million, but that amount could be reduced by an additional $900,000 if

28  CB&T drew down the total $9 million from the BofA SLOC rather than only $8.1 million.

**FIRST AMENDED CLASS ACTION COMPLAINT**            Case No. 2:17-cv-01123-WBS-DB

120.    CB&T had Deepal send a "new" Purchase Order in the summer of 2009 for $878,605.40 which enabled CB&T to foreclose on the full BofA SLOC, effectively forcing BofA to pay additional funds which reduced IMG's overall debt to CB&T or, the money was used by IMG as lulling payments to investors.   By fraud, BofA was forced to pay CB&T $9,010,571.68, including fees.

121.    Both the Jamestown Tribe and BofA were immediately suspicious that CB&T had submitted bogus "sales" invoices to support the $9 million draw down and shift the risk away from CB&T. The tribe's CFO, Diane Gange, e-mailed Wannakuwatte requesting copies of the "Purchase Orders" used to support the CB&T draw down.   Deepal responded that he would "get the copies of the purchase orders, which were provided to CB&T at the start of our business venture to build inventory to supply JHMS customers on time."   Diane Gange forwarded this e-mail to Don Schulke of BofA, who replied: **"This is BS**." Gange wrote back: **"You think!! He's trying to cover his … because he knows I'm going to question the dates when he sends them."** Schulke then responded: "**you need to get your auditors in the door**." Litigation between IMG, BofA and the Tribe followed.

122.    On October 21, 2010, BofA filed suit against JHMS and the Jamestown Tribe in the Superior Court of Washington for King County (the "Superior Court"), Case Number 10-2-37091-SEA.  On May 12, 2011, the Jamestown Tribe filed a third-party complaint against IMG and Wannakuwatte, including claims for civil conspiracy.   CB&T monitored the litigation which contended that the Purchase Orders submitted by CB&T were bogus.

123.    In October 2009, CB&T's terminated its lending relationship but maintained its depository relationship with IMG in a letter to Wannakuwatte and IMG, which stated:

> Although all facilities are secured, either by cash or letters of credit, **there has been little to no revolving of the outstanding balances and we have determined not to renew the facilities as they mature**.

> We are providing this notice of our intent to disengage from the Lending relationship…

(emphasis added).

///

**FIRST AMENDED CLASS ACTION COMPLAINT**                    Case No. 2:17-cv-01123-WBS-DB

**D.    CB&T's Knowledge of the Ponzi Scheme Is Also Evidenced By Its Anticipation of the IMG Bankruptcy and the Trustee's Effort To Recover Fraudulent Transfers From IMG to CB&T**

124.    The loan documents in **Exhibit 18** provided that CB&T had a security interest in the IMG General Account and the IMG Wholesale Account.  So long as investors' deposits were deposited into the Wholesale Account and then transferred to the General Account to be transferred to CB&T as the repayment by IMG of the debt owed to CB&T, then CB&T could argue in bankruptcy that there were no fraudulent transfers because there were no transfers.

125.    CB&T filed pleadings stating that funds in account #4841 transferred to CB&T to repay the $12.2 million in loans to IMG were not "transfers" so they could not be fraudulent transfers because CB&T had a security interest in those funds on deposit prior to repayment. The argument was made by CB&T in its motion to dismiss Trustee McFarland's complaint in August 2016. See **Exhibit 16** which contains the Pleading caption sheet and the Motion's Table of Contents summarizing CB&T's argument.

126.    CB&T filed **Exhibit 18**, the Declaration of Dawn Satow in support of its transfer argument.  The documents attached to the Sadow Declaration demonstrates CB&T's knowledge that the money in which CB&T claimed a "security interest" was known to the bank to be investor deposits.

## VIII.   CLASS ACTION ALLEGATIONS

127.    Plaintiffs bring this action on their own behalf and also as Class representatives pursuant to Federal Rules of Civil Procedure, Rule 23. The Class is defined, for now, as:

> Those persons that suffered net loss damages by providing money to IMG for IMG's alleged purchase of wholesale medical goods overseas for importation and domestic resale after CB&T acquired knowledge that IMG was not acquiring medical goods overseas for importation and domestic resale (herein referred to as the "Members of the Class" or the "Class Members").

Excluded from the definition of the Class are the Defendants and any person, corporation, or other entity related to, controlled by or affiliated with the Defendants. Also excluded from the class are persons who invested money in IMG and were repaid by IMG principal or interest,

30

such that the total amount repaid exceeds the total amount invested. Included in the term "Persons" in the definition of the Class are entities, representatives of these entities and assignees.

128.    The members of the Class are so numerous that joinder of all of them is impracticable.  There are dozens of Class Members residing in California and elsewhere.  At present, it is believed that there are between 50 and 100 Class Members.

129.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class Member.  The common questions include, *inter alia*, the following:

a.    Did IMG commit fraud on the persons investing in IMG?

b.    Did IMG misrepresent to investors that the investors' funds would be used to purchase actual product as part of a wholesale business?

c.    Did IMG disclose to investors that their money would not be used to purchase product, but instead, would be used to pay back other investors?

d.    Did CB&T know that IMG was committing fraud on persons investing in IMG?

e.    The date CB&T acquired knowledge that IMG was committing fraud on persons investing in IMG?

f.    Did the Class Members purchase unregistered securities from IMG?

g.    Did CB&T knowingly provide substantial assistance to the fraud committed by IMG by physically accepting and dispersing the investors' money derived from false pretenses?

h.    Did CB&T knowingly provide substantial assistance to IMG in the sale of unregistered securities to the persons investing in IMG?

i.    Did CB&T violate Penal Code section 496?

130.    The claims of the Plaintiffs are typical of the claims of the Class as a whole. The Plaintiffs are members of the Class and have suffered harm and are likely to continue to suffer harm due to the misconduct alleged herein.  The class claims based upon uniform

31

misrepresentation are properly certifiable. *Vasquez v. Superior Court*, 4 Cal. 3d 800 (1971). The named Plaintiffs and other Class Members were informed of their injury by IMG's bankruptcy filing on May 30, 2014.

131.   Plaintiffs will fairly and adequately protect the interests of the Class.   The interests of Plaintiffs are consistent with and not antagonistic to the interests of the Class. Plaintiffs have sought out and retained counsel experienced in complex class actions in an effort to recover their damages.  Plaintiffs have agreed to act for the benefit of all persons similarly situated and not to put their individual interest ahead of any member of the Class.

132.   The prosecution of a multitude of separate actions by individual members may establish incompatible standards of conduct for the parties opposing the Class, may substantially impair or impede the interests of other members of the Class to protect their interests, and will result in waste.

133.   The acts and actions of the Defendants applicable to the Plaintiffs apply generally to the Class, thereby making the final relief granted by the Court to the Plaintiffs applicable to the Class as a whole.

134.   This Class Action would be superior to other available methods for the fair and efficient adjudication of the controversy between the parties.  The interest of most members of the Class in individually controlling the prosecution of separate actions appears low, due to the complexity of the case.  Most members would be unable or unwilling to individually prosecute an action without joining their claims with other claimants which is generally difficult. Separate suits would be impractical because of the number of victims and the dollar amount at stake for each victim. Concentrating litigation in this forum will also promote judicial efficiency.

135.   This proposed Class Action is very manageable because the issues at stake for each Class Member are the same, the Class Members lost enough to want to participate, the number of Class Members make prosecution of the collective claims efficient, the documents establishing liability and the loss amounts are in Sacramento with CB&T and the bankruptcy trustee, and the criminal prosecution of Wannakuwatte took place in Sacramento. In IMG's

bankruptcy, CB&T claims that it does not have to disgorge the transfers made by IMG to CB&T because the money came from IMG's Wholesale Account and General Account. Both accounts were pledged as security for the loans made by CB&T to IMG. According to CB&T, as a secured lender receiving after-acquired property deposited into an account which was previously pledged as collateral, there were no "transfers", so there cannot be any fraudulent transfers subject to disgorgement.  See **Exhibit 16**.

136.   CB&T made roughly $3 million in profit on its lending relationship with IMG. IMG owes over $100 million to the not so lucky and defrauded investors. The Plaintiffs have sued CB&T for knowingly aiding and abetting the fraud of IMG for roughly 5 years - from at the latest 2009 going forward into 2014 - by allowing IMG to continue to operate account # 4841 at CB&T to receive and disburse stolen money. CB&T's knowledge of IMG's fraud acquired no later than 2009 is not just plausible, the bank's scienter is beyond a reasonable person's doubt.

## IX.   CLAIMS

### FIRST CLAIM

### Aiding and Abetting Fraud

137.   Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

138.   IMG defrauded investors by falsely promising to purchase overseas inventory with the investors' funds, including Class Members' funds, and instead used the funds for other purposes. By October 2009, when CB&T stopped lending additional money to IMG, CB&T had actual knowledge of the primary wrong of fraud being committed by IMG-misrepresentations and omissions regarding whether investors' funds were used to purchase overseas inventory— and notwithstanding this knowledge, CB&T provided substantial assistance to the intentional tort committed by the primary wrongdoer by, among other things, continuing to accept defrauded investor deposits and then disbursing these investments as "returns", or lulling payments to investors.  Plaintiff were injured when IMG filed for bankruptcy on May 30, 2014.

139.   As the direct and proximate result of Defendant's aiding and abetting the fraud, the scheme continued and ensnared Plaintiffs causing them to be damaged in amounts to be

33

1 | proven at trial.  CB&T tried to save itself by intentionally injuring the Plaintiffs and each
2 | member of the class. The conduct of CB&T was intentional, willful, malicious, and oppressive,
3 | by virtue of which Plaintiffs pray for, and should be awarded exemplary and punitive damages.

4 | ### SECOND CLAIM

5 | **Misrepresentation in the Sale of Securities**

6 | **Violations of Cal. Corp. Code §§ 25110, 25401 & 25504.1**

7 | 140.    Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

8 | 141.    California Corporations Code section 25401 provides that it is unlawful for any
9 | person, in connection with the offer or sale of a security to directly or indirectly employ a
10 | scheme to defraud by making untrue statements of material fact or to omit to state a material
11 | fact necessary to make the statements made not misleading, or to engage in a course of business
12 | that operates as a fraud or deceit upon another person.

13 | 142.    IMG developed a scheme in violation of Section 25401, by offering or selling
14 | securities in the form of Promissory Notes to investors, including Plaintiffs, by making untrue
15 | statements of material fact and by omitting to state material facts necessary to make the
16 | statements made not misleading, or to engage in a course of business that operates as a fraud or
17 | deceit upon another person.

18 | 143.    California Corporations Code section 25110 provides that it is unlawful for any
19 | person to offer or sell in California any security unless such security has been
20 | qualified/registered or unless such security is exempted from such qualification/registration.

21 | 144.    IMG, in violation of Section 25110, offered or sold to investors, including
22 | Plaintiffs, securities in the form of Promissory Notes that were not qualified/registered and that
23 | were not exempt from such qualification/registration.  The Promissory Notes issued by IMG
24 | were unlicensed Securities.

25 | 145.    Corporations Code section 2550.1 provides that any person who materially
26 | assists in any violation of Corporations Code sections 25401 or 25110, with the intent to
27 | deceive or defraud, is jointly and severally liable with any other person liable for a violation of
28 | sections 25401 or 25110.

34

---

**FIRST AMENDED CLASS ACTION COMPLAINT**                    Case No. 2:17-cv-01123-WBS-DB

146.     CB&T materially assisted IMG and IMG's violation of Section 25401 by, among other things:

(a)     accepting investor deposits paid to IMG pursuant to the Promissory Notes intended specifically to fund purchases of wholesale medical supplies overseas which CB&T knew was not actually happening;

(b)     Conspiring with CB&T to draw down $9 million on the BofA SLOC to keep the fraudulent scheme alive and defraud additional investors;

(c)     Using irregular banking procedures by, among other things, lending huge sums to IMG knowing full well that IMG was insolvent and its "import" business was a fraud used to deceive investors;

(d)     Allowing IMG checks to clear despite insufficient funds, which, had CB&T **not** done so, would have exposed the existence of the fraudulent representations and terminated the deception on investors; and

(e)     Referring investors to IMG and preparing documents to obtain cash for IMG from defrauded investors.

147.     CB&T, at all relevant times, knew that IMG was a fraudulent scheme and that IMG had been offering and selling to potential investors (such as Plaintiffs) unregistered/unqualified securities that were based on material representations or omissions of material fact.   CB&T knew at all relevant times that securities sold by IMG were unregistered/unqualified securities that were not exempt/qualified from registration.

148.     CB&T possessed actual knowledge that IMG was a fraudulent scheme and was selling and offering securities to investors, including Plaintiffs, that were not registered and that were based on material omissions and material misrepresentations. CB&T's material assistance of IMG caused people, including Plaintiffs, to invest money with IMG and to keep their money in IMG once invested.

149.     The aforementioned acts by CB&T were done intentionally in order to, among other things, continue the relationship with IMG, which had been generating fees, interest and the repayment of principal to CB&T.

35

150.   As a direct and proximate result of the Defendant's misconduct, Plaintiffs have been damaged in amounts to be proven at trial.  Pursuant to Section 25504.01, CB&T is jointly and severally liable with non-defendant IMG to Plaintiffs in amounts according to proof at time of trial.

### THIRD CLAIM

#### Conspiracy to Commit Fraud

151.   Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

152.   Armed with actual knowledge of IMG's fraud, CB&T formed and operated a conspiracy with IMG to perpetuate IMG's fraudulent scheme to allow CB&T to be repaid on the loans it made to IMG. CB&T agreed with IMG that CB&T would remain the depository institution for the deposit of the investors' funds so that, in the future, it could claim in the foreseeable claw-back litigation that IMG's repayments to CB&T were not fraudulent transfers because CB&T maintained a security interest in those investors' funds on deposit with CB&T. Overt acts in furtherance of this conspiracy continue today. CB&T engaged in wrongful conduct in furtherance of the conspiracy.

153.   Plaintiffs were directly and proximately damaged as a result of such wrongful conduct in amounts to be proven at trial.

### FOURTH CLAIM

#### Aiding and Abetting Breach of Fiduciary Duty

154.   Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

155.   The money transferred by the Plaintiffs to IMG was to be held and used by IMG solely to fund the purchase of overseas product for domestic resale, and for no other purpose, creating a fiduciary duty on the part of IMG in favor of Plaintiffs. CB&T knew the money deposited into its IMG account was specifically earmarked to be used to purchase medical products and for no other purpose. The agreement between IMG and each Plaintiff created a fiduciary relationship of trust and confidence between the parties arising out of IMG's duty to collect, account and then remit to Plaintiffs the proceeds from the sale of product acquired by their loans. CB&T knew the terms and conditions of the agreements and understood that the

36

1 money was being entrusted to IMG for a specific purpose which CB&T knew would not happen

2 because the money was not being used to purchase product.

3      156.    Moreover, the bank knew the solicitation of IMG investors was not issued to

4 strangers through brokerages or internet solicitations, but was all word of mouth in the tight

5 local community based on the community's clear substantive belief that "Deepal can be trusted

6 to act as a fiduciary for our investments." The bank knew IMG was defrauding Deepal's

7 friends in the community and people who looked up to Deepal as a respected 'elder' and trusted

8 pillar of the community. (See Exhibit 14 containing an email stating an investor was a close

9 friend of Deepal, which the bank knew in 2008). The bank, as part of the community, was

10 aware of the common belief that that Deepal was a senior statesman and leader of the tennis

11 community – a trusted 'elder'. A community must have elders who protect members of the

12 community without an arm's length agreement. Deepal was one of those trusted 'elders' and

13 CB&T knew it. Buzz Minson of CB&T pledged his loyalty to the 'elder'. The bank employees

14 held Deepal out to the community as a fiduciary and trusted 'elder'. Accordingly, CB&T knew

15 investors believed Deepal was a fiduciary and when CB&T discovered the Ponzi they knew

16 they were helping Deepal steal from beneficiaries of the fiduciary relationship which the bank

17 itself promoted to the community.

18      157.    As the direct and proximate result of CB&T's aiding and abetting the breaches of

19 fiduciary duties owed to Plaintiffs by IMG, Plaintiffs have been damaged in amounts to be

20 proven at trial.

21 <div align="center">**FIFTH CLAIM**</div>

22 <div align="center">**Intentional Interference with Contract**</div>

23      158.    Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

24      159.    IMG had a contractual relationship with each Plaintiff and CB&T knew the

25 specific terms, conditions and obligations articulated in each contract entered into between each

26 Plaintiff and IMG.

27      160.    CB&T induced, promoted, facilitated and assisted IMG in breaching each

28 contract with each Plaintiff by knowingly using the investors' money deposited for the specific

**FIRST AMENDED CLASS ACTION COMPLAINT**        Case No. 2:17-cv-01123-WBS-DB

1  purpose of funding the acquisition and sale of product to pay other investors in breach of each
2  contract.

3      161.   CB&T's knowing, tortious and unprivileged interference of the business
4  relationship between IMG and each Plaintiff damaged Plaintiffs by the breach of IMG's
5  contractual obligations in an amount to be proven at trial.

6                                  **SIXTH CLAIM**

7                 **Violation of California Penal Code § 496**

8      162.   Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

9      163.   Penal Code section 496(c) permits "any" person who has been injured by a
10 violation of section 496(a) to recover three times the amount of actual damages, costs of suit
11 and attorney's fees in a civil suit.  Penal Code section 496(a) creates an action against "any"
12 person who (1) receives "any" property that has been obtained in any manner constituting theft,
13 knowing the property to be so obtained, or (2) conceals, withholds, or aids in concealing or
14 withholding "any" property from the owner, knowing the property to be so obtained.  Under
15 Penal Code § 1.07(a)(38), "person" means "an individual, corporation, or association."  CB&T,
16 as a national banking association, is a "person" capable of violating section 496(a).

17     164.   As set forth herein, the investors' funds were obtained by IMG's theft, under
18 Penal Code section 484, by false or fraudulent representation or pretenses, in that, among other
19 things, investors were falsely informed their funds would be used to purchase and import
20 medical supplies for domestic resale.

21     165.   CB&T, knowing that investors were falsely informed their funds would be used
22 to purchase and  import medical supplies for domestic resale, aided in IMG's concealment of
23 such property by accepting the defrauded investors funds and disbursing it to earlier investors.

24     166.   Additionally, CB&T, itself, has concealed and withheld property, and continues
25 to conceal and withhold property from Plaintiffs and other class members, property that was
26 obtained by false or fraudulent representations or pretenses.  Authority for the viability of this
27 cause of action is found in *Bell v. Feibush* 212 Cal.App.4th 1041, 1044-1047 (2013) and *City of*
28 *Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal.App.4th 445 (1998).

38

**FIRST AMENDED CLASS ACTION COMPLAINT**          Case No. 2:17-cv-01123-WBS-DB

1    167.    As a direct and proximate result of the acts and omissions described above, the

2  Plaintiffs were injured by the Defendant's violations of section 496(a).  Pursuant to California

3  Penal Code section 496(c), Plaintiffs seek statuary treble damages, costs of suit, and reasonable

4  attorney's fees.

5  **X.    PRAYER FOR RELIEF**

6    WHEREFORE, Plaintiffs pray for Judgment against the Defendants as follows:

7    1.    For certification of the Class as defined;

8    2.    For the appointment of Plaintiffs as the Class Representatives and Plaintiffs'

9    counsel as counsel for the Class;

10   3.    For special and consequential damages to Plaintiffs and Class members

11   measured, in part, by the net loss of their investments;

12   4.    For rescission, to the extent applicable;

13   5.    For treble damages;

14   6.    For relief consistent with Cal. Probate Code § 859;

15   7.    For relief consistent with Cal. Civ. Code § 3345;

16   8.    For exemplary and/or punitive damages, as applicable;

17   9.    For pre-judgment interest;

18   10.   For costs of this action, including reasonable attorneys' fees as afforded by any

19   applicable law; and

20   11.   For all other relief the Court deems just and proper.

21  **XI.    JURY DEMAND**

22    Plaintiffs demand a jury trial.

23  Dated: October 15, 2019                Respectfully submitted,

24                                          HOLLISTER & BRACE
                                            A Professional Corporation
25

26

27  By _____       By _____
        Robert L. Brace                    Michael P. Denver
28      Attorneys for Plaintiff            Attorneys for Plaintiff

39

**FIRST AMENDED CLASS ACTION COMPLAINT**          Case No. 2:17-cv-01123-WBS-DB

1

**SUMMARY OF EXHIBITS**

2

| No. | Date | Description |
|-----|------|-------------|
| 1. | 6/17/2010 | Heddy Chiang Constant Account Monitoring |
| 2. | 11/4/1009 | Transaction Inquiry $2.7 Million JTS Deposit |
| 3. | 7/7/2008 | Notations Regarding "No Hold Per Heddy" |
| 4. | 1/22/2014 | Evans Check for $50,000 |
| 5. | 2006 to 2013 | Wholesale Account #4841 Account Statements |
| 6. | 8/28/2008 | NVB Easily Spots Check Kiting by Deepal |
| 7. | 1/21/2014 | Evans Promissory Note for $50,000 |
| 8. | N/A | Other Form Promissory Notes |
| 9. | 1/21/2014 | Evans Form Investment Agreements |
| 10. | N/A | Other Form Investment Agreements |
| 11. | 9/19/2007 | Buzz Minson's Dedication of Love to Deepal |
| 12. | 6/8/2006 | Deepal Controls Both IMG and JHMS |
| 13. | 5/22/2006 | BofA SLOC |
| 14. | 1/30/209 | Ian Craig's 23 Page Letter Outlining in Detail the Fraud by CB&T Against JTS – Filed by CB&T as Exhibit K |
| 15. | N/A | Plaintiff's Summary of Loans From CB&T to IMG |
| 16. | 11/6/2017 | CB&T's Argument "No Transfers" From #4841 |
| 17. | 2007-2009 | Zions Bank Demanding CPA "Review" IMG Financials |
| 18. | 2010 | Declaration of Dawn Sadow with Loan Documents between IMG and CB&T |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

40

FIRST AMENDED CLASS ACTION COMPLAINT                    Case No. 2:17-cv-01123-WBS-DB

# EXHIBIT 1

From: Heddy Chiang <Heddy.Chiang@calbt.com>
Subject: RE: Scan from Sacramento Bizhub - IMG payments
Date: June 17, 2010 5:15:56 PM PDT
To: Dawn Satow <Dawn.Satow@calbt.com>, Jun Enkoji <Jun.Enkoji@calbt.com>, "wannas@comcast.net"
     <wannas@comcast.net>
Cc: Gene Bell <Gene.Marcucci-Bell@calbt.com>

Hi Deepal, thanks for your deposit yesterday and today!!!  Can I help you do transfer into the -87631 acct for the
loan payments too please!!  From which account and how much?     Thank you!!  Heddy  600-4902

---

**From:** Dawn Satow
**Sent:** Wednesday, June 16, 2010 12:12 PM
**To:** Jun Enkoji
**Cc:** Heddy Chiang
**Subject:** FW: Scan from Sacramento Bizhub - IMG payments

Hi Jun

IMG is due for the following payments:

168068-1
$4,045.08
(payment of 5/31/10)

181803-9001
$12,217.36
(payment of 6/5/10)

Can you call Deepal to make a transfer to -0087631 checking acct.

Thank you
Dawn

"Messaging Security" made the following
 annotations on 06/17/10, 18:16:27
---------------------------------------------------------------------------
----------------------------------------------------------------

THIS ELECTRONIC MESSAGE, INCLUDING ANY ACCOMPANYING DOCUMENTS, IS CONFIDENTIAL,
intended for the sole use of the addressee(s), and may contain information
that is privileged and exempt from disclosure under applicable law. If you
are neither the intended recipient nor responsible for delivering the message
to the intended recipient, please note that any dissemination, distribution,
copying or the taking of any action in reliance upon the message is strictly
prohibited. If you have received this communication in error, please notify the
sender immediately.  Thank you.

----------------------------------------------------------------
================================================================

# EXHIBIT 2

```
DPTRANI   Z009417           Transaction Inquiry           140   11-04-2009
                                                              More: - +
Func: H Account: 1250094841  Appl: DDA  Short Name: INTERNATIONAL M Pg Adv 000
Prev-Stm Stm-Date Previous----Bal Total-Credits Total---Debits Current-Balance
09-30-09 10-30-09    282902.13    6402405.50    4123514.17    2561793.46
Proc  Eff      Serial-Nbr TC    Amount DC Srce Time  Init  Reference  L D
10-21 10-21      3123 0751    2594.19 DR 0000 00-00 10-21 5380225350
10-21 10-21      3124 0751    1625.00 DR 0000 00-00 10-21 5380496310
                 PROCESSING DATE 10-21-09 ENDING BALANCE        795,564.78
10-22 10-22      3105 0751   11840.70 DR 0000 00-00 10-22 5380169310
10-22 10-22      3115 0751    5883.33 DR 0000 00-00 10-22 5380327290
10-22 10-22      3122 0751    4585.00 DR 0000 00-00 10-22 538040888D
10-22 10-22      3151 0751    8665.60 DR 0000 00-00 10-22 5380169300
                 PROCESSING DATE 10-22-09 ENDING BALANCE        764,590.15
10-23 10-23      1021 0537  2700000.00 CR 0000 00-00 10-23 1301401024
         WIRE/IN-2009102300003133 ORG J        TB COMMUNITIES INC
         INCOMING WIRE
10-23 10-23      3127 0751  200961.92 DR 0000 00-00 10-23 5380481680
                 PROCESSING DATE 10-23-09 ENDING BALANCE      3,263,628.23


COMMAND====> DPTRANI,H,1250094841,DDA,
F1=Help   F2=Begin   F3=Exit   F4=Next    F7=Backward   F8=Forward
F11=Break   F12=Cancel
```

CBT 209

IMGC_0050084
KS0094854

# EXHIBIT 3



Date:07/07/08 Seq #:11008350 Account:1250094841 Serial #:- Amount:$65,000.00 Dep Seq #:11008350

REX Previewer

Page 4 of 11

Case 2:17-cv-01123-WBS-DB   Document 42   Filed 10/15/19   Page 49 of 481



Date:07/08/08 Seq #:11001284 Account:1250094841 Serial #:- Amount:$110,000.00 Dep Seq #:11001284

https://rex.cs.zionsbank.com/TreXWorkspaceWeb/previewer.jsp

4/21/2015
IMGC_0071582

# EXHIBIT 4

# Chase Online

PREMIER PLUS CKG (...5488)

| Check Number: 1315 | Post Date: 01/22/2014 | Amount of Check: $50,000.00 |
|---|---|---|



Need help printing or saving this check?

Need help printing or saving this check?

© 2014 JPMorgan Chase & Co.

# EXHIBIT 5

##XXH1401DPCSTM          07310601250094841

Statement of Account
Last statement: June 30, 2006
This statement: July 31, 2006

12-500948-41Page 1 of 2

Direct inquiries to:
24 Hour Service Call, 800 400-6080

California Bank & Trust
1800 Arden Way
Sacramento CA 95815

INTERNATIONAL MANUFACTURING GROUP INC
WHOLESALE ACCT
879 F ST
WEST SACRAMENTO CA 95605-2313

                                                    23

## Summary of Account Balance

| Account | Number | Ending Balance |
|---|---|---|
| Analysis Checking | 12-500948-41 | $8,035.83 |

## Analysis Checking

Account number
12-500948-41   Beginning balance     $1,930.70
               Average balance      $63,005.61     Avg collected balance $43,650.00
23 Enclosures  Total additions     $525,000.00     Total subtractions  $-518,894.87

| Number | | Date | Amount | Control |
|---|---|---|---|---|
| 1054 | | 07-10 | 12,833.50 | 00000012019903 |
| 1055 | | 07-10 | 12,833.50 | 00000012019902 |
| 1060 | * | 07-06 | 8,713.69 | 00000012007214 |
| 1061 | | 07-07 | 16,073.21 | 00000012009120 |
| 1063 | * | 07-14 | 56,250.00 | 00000033033713 |
| 1064 | | 07-14 | 656.25 | 00000033033714 |
| 1065 | | 07-03 | 150,000.00 | 00000013009152 |
| 1066 | | 07-07 | 117,368.50 | 00000012000482 |
| 1068 | * | 07-11 | 2,092.02 | 00000033056594 |
| 1069 | | 07-10 | 7,432.26 | 00000012019978 |
| 1070 | | 07-10 | 1,064.24 | 00000012019977 |
| 1071 | | 07-21 | 1,000.00 | 00000011012361 |
| 1072 | | 07-21 | 5,000.00 | 00000011003549 |
| 1073 | | 07-20 | 3,238.72 | 00000011000073 |
| 1075 | * | 07-10 | 5,327.79 | 00000012000868 |
| 1077 | * | 07-10 | 2,083.33 | 00000012016625 |
| 1078 | | 07-10 | 1,666.66 | 00000012000867 |
| 1079 | | 07-20 | 3,887.75 | 00000011012127 |
| 1080 | | 07-26 | 3,887.75 | 00000012011696 |

##### 401DPCSTM                07310601250094841

July 31, 2006
International Manufacturing Group Inc
Page 2 of 2
12-500948-41

| | | | |
|---|---|---|---|
| 1082 * | 07-18 | 216.67 | 00000011020224 |
| 1083 | 07-12 | 4,483.46 | 00000012004641 |
| 1084 | 07-19 | 1,661.45 | 00000033023912 |
| 1085 | 07-24 | 892.86 | 00000012017657 |

* Skip in check sequence

| Date | Description | CTRL #/Serial # | Additions | Subtractions |
|---|---|---|---|---|
| 07-03 | #Deposit | 00000013057389 | 175,000.00 | |
| 07-05 | #Teleph Trans Cr | 00000013031984 | 150,000.00 | |
| 07-07 | #Deposit | 00000013026383 | 200,000.00 | |
| 07-10 | #Domestic Wire Out | 20061910159000 | | -50,000.00 |
| | Bnf International Manufacturing Grou | | | |
| 07-14 | #Domestic Wire Out | 20061950176100 | | -50,000.00 |
| | Bnf International Manufacturing Grou | | | |
| 07-18 | #Maintenance Fee | 00000000000000 | | -231.26 |

Analysis Loss/Chg For 06/30/06

Daily balances

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 06-30 | 1,930.70 | 07-10 | 141,534.02 | 07-19 | 25,942.91 |
| 07-03 | 26,930.70 | 07-11 | 139,442.00 | 07-20 | 18,816.44 |
| 07-05 | 176,930.70 | 07-12 | 134,958.54 | 07-21 | 12,816.44 |
| 07-06 | 168,217.01 | 07-14 | 28,052.29 | 07-24 | 11,923.58 |
| 07-07 | 234,775.30 | 07-18 | 27,604.36 | 07-26 | 8,035.83 |

IMGC_0071334

##XXH1401DPCSTM          07310701250094841

Statement of Account
Last statement: June 30, 2007
This statement: July 31, 2007

12-500948-41Page 1 of 3

Direct inquiries to:
24 Hour Service Call, 800 400-6080

California Bank & Trust
1800 Arden Way
Sacramento CA 95815

INTERNATIONAL MANUFACTURING GROUP INC
WHOLESALE ACCT
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

20

Summary of Account Balance

| Account | Number | Ending Balance |
|---|---|---|
| Analysis Checking | 12-500948-41 | $18,398.98 |

Analysis Checking

Account number
12-500948-41   Beginning balance      $19,485.74
               Average balance        $20,158.76     Avg collected balance  $7,094.00
20 Enclosures  Total additions       $477,000.00     Total subtractions  $-478,086.76

| Number | Date | Amount | Control |
|---|---|---|---|
| 1253 | 07-17 | 9,916.40 | 00000011016704 |
| 1254 | 07-11 | 18,612.00 | 00000011017107 |
| 1255 | 07-11 | 2,115.00 | 00000011017106 |
| 1257 * | 07-19 | 7,000.76 | 00000011013934 |
| 1259 * | 07-11 | 5,000.00 | 00000011018571 |
| 1260 | 07-11 | 3,000.00 | 00000011030304 |
| 1261 | 07-17 | 30,000.00 | 00000011018892 |
| 1262 | 07-17 | 20,000.00 | 00000011018891 |
| 1263 | 07-18 | 20,000.00 | 00000011015647 |
| 1264 | 07-19 | 10,000.00 | 00000011014612 |
| 1265 | 07-20 | 10,000.00 | 00000011011898 |
| 1266 | 07-24 | 20,000.00 | 00000011017336 |
| 1270 * | 07-26 | 10,000.00 | 00000011012121 |
| 1271 | 07-27 | 15,000.00 | 00000011010862 |
| 1272 | 07-30 | 10,000.00 | 00000011016914 |
| 1273 | 07-31 | 35,000.00 | 00000011018995 |
| 1275 * | 07-19 | 2,500.00 | 00000011012830 |
| 1276 | 07-16 | 5,974.49 | 00000011003465 |
| 1278 * | 07-17 | 7,468.11 | 00000011014688 |

##¥ʸᵐ¹401DPCSTM          07310701250094841

```
                                          July 31, 2007
                                          International Manufacturing Group Inc
                                          Page 2 of 3
                                          12-500948-41
```

```
1279                07-13          30,000.00          00000011012160
* Skip in check sequence
```

| Date | Description | CTRL #/Serial # | Additions | Subtractions |
|------|-------------|-----------------|-----------|--------------|
| 07-02 | #Deposit | 00000011029969 | 125,000.00 | |
| 07-02 | #Direct Bus Tsfr Dr | 939000701115654 | | -18,000.00 |
| | Ref 1821156L Funds Transfer To Dep 1250095811 From | | | |
| 07-02 | #Direct Bus Tsfr Dr | 939000702234733 | | -37,500.00 |
| | Ref 1832347L Funds Transfer To Dep 1250095811 From | | | |
| 07-02 | #Direct Bus Tsfr Dr | 939000702234601 | | -86,000.00 |
| | Ref 1832346L Funds Transfer To Dep 1250087631 From | | | |
| 07-10 | #Direct Bus Tsfr Cr | 939000710213021 | 32,000.00 | |
| | Ref 1912130L Funds Transfer Frm Dep 1250087631 From | | | |
| 07-11 | #Deposit | 00000011030382 | 130,000.00 | |
| 07-11 | #Direct Bus Tsfr Dr | 939000711092503 | | -12,500.00 |
| | Ref 1920925L Funds Transfer To Dep 1250095811 From | | | |
| 07-11 | #Direct Bus Tsfr Dr | 939000711225720 | | -30,000.00 |
| | Ref 1922257L Funds Transfer To Dep 1250095811 From | | | |
| 07-17 | #Direct Bus Tsfr Cr | 939000717155758 | 10,000.00 | |
| | Ref 1981557L Funds Transfer Frm Dep 1250087631 From | | | |
| 07-18 | #Deposit | 00000011019666 | 40,000.00 | |
| 07-23 | #Direct Bus Tsfr Cr | 939000722132130 | 10,000.00 | |
| | Ref 2031321L Funds Transfer Frm Dep 1250087631 From | | | |
| 07-24 | #Deposit | 00000011031253 | 50,000.00 | |
| 07-31 | #Direct Bus Tsfr Cr | 939000731104621 | 5,000.00 | |
| | Ref 2121046L Funds Transfer Frm Dep 1250095811 From | | | |
| 07-31 | #Deposit | 00000011039352 | 75,000.00 | |

IMGC_0071369

##*``401DPCSTM        07310701250094841

July 31, 2007
International Manufacturing Group Inc
Page 3 of 3
12-500948-41

| Date | Description | CTRL #/Serial # | Additions | Subtractions |
|------|-------------|-----------------|-----------|--------------|
| 07-31 | #Direct Bus Tsfr Dr | 939000731224347 | | -10,000.00 |
| | Ref 2122243L Funds Transfer To | | | |
| | Dep 1250095811 From | | | |
| 07-31 | #Direct Bus Tsfr Dr | 939000731224258 | | -12,500.00 |
| | Ref 2122242L Funds Transfer To | | | |
| | Dep 1250087631 From | | | |

Daily balances

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|
| 06-30 | 19,485.74 | 07-17 | 399.74 | 07-26 | 20,898.98 |
| 07-02 | 2,985.74 | 07-18 | 20,399.74 | 07-27 | 5,898.98 |
| 07-10 | 34,985.74 | 07-19 | 898.98 | 07-30 | -4,101.02 |
| 07-11 | 93,758.74 | 07-20 | -9,101.02 | 07-31 | 18,398.98 |
| 07-13 | 63,758.74 | 07-23 | 898.98 | | |
| 07-16 | 57,784.25 | 07-24 | 30,898.98 | | |

IMGC_0071370

**Statement of Accounts**
Page 1 of 2
Statement Date: July 31, 2008
Last Statement: June 30, 2008

Account 1250094841

**DIRECT INQUIRIES TO:**
Customer Service  1 (800) 400-6080

0030088          4214-06-0200-CBT-PC0020-00075

INTERNATIONAL MANUFACTURING GROUP INC
WHOLESALE ACCT
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 1250094841 | $235,146.19 | |

## ANALYSIS CHECKING 1250094841                                          103  75

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| -8,265.93 | 1,228,000.00 | 202,000.00 | 782,587.88 | 235,146.19 |

### 19 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 07/01 | 75,000.00 | DEPOSIT 5111025370 |
| 07/01 | 15,000.00 | INTERNET XFER FROM DDA ***7631 ID: 183103020  2302401048 |
| 07/07 | 250,000.00 | INTERNET XFER FROM DDA ***7631 ID: 186124508  2302400426 |
| 07/07 | 65,000.00 | DEPOSIT 5111008350 |
| 07/07 | 50,000.00 | DEPOSIT 5111005342 |
| 07/07 | 42,500.00 | INTERNET XFER FROM DDA ***0181 ID: 188225653  2302401728 |
| 07/07 | 27,500.00 | INTERNET XFER FROM DDA ***7631 ID: 188225456  2302401726 |
| 07/08 | 110,000.00 | DEPOSIT 5111001284 |
| 07/09 | 20,000.00 | DEPOSIT 5111014014 |
| 07/10 | 25,000.00 | DEPOSIT 5111011999 |
| 07/18 | 8,000.00 | INTERNET XFER FROM DDA ***5811 ID: 200084050  2302600446 |
| 07/21 | 50,000.00 | DEPOSIT 5111017096 |
| 07/21 | 10,000.00 | INTERNET XFER FROM DDA ***5811 ID: 203083433  2302901432 |
| 07/22 | 80,000.00 | DEPOSIT 5111013324 |
| 07/23 | 20,000.00 | DEPOSIT 5111010072 |
| 07/28 | 125,000.00 | DEPOSIT 5111014171 |
| 07/28 | 15,000.00 | INTERNET XFER FROM DDA ***5811 ID: 210081833  2302701410 |
| 07/31 | 235,000.00 | DEPOSIT 5111010834 |
| 07/31 | 5,000.00 | INTERNET XFER FROM DDA ***5811 ID: 213080716  2303000362 |

### 8 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 07/08 | 2,000.00 | INTERNET XFER TO DDA ***7631 ID: 190102506  2302300805 |
| 07/10 | 42,500.00 | INTERNET XFER TO DDA ***5811 ID: 192024346  2302400083 |
| 07/10 | 20,000.00 | DEBIT MEMO 5111011779 |
| 07/14 | 10,000.00 | INTERNET XFER TO DDA ***5811 ID: 194104631  2302400325 |
| 07/15 | 7,500.00 | INTERNET XFER TO DDA ***5811 ID: 197210013  2302503507 |
| 07/23 | 20,000.00 | INTERNET XFER TO DDA ***5811 ID: 205082336  2302800301 |
| 07/29 | 90,000.00 | INTERNET XFER TO DDA ***5811 ID: 211081232  2302800221 |
| 07/30 | 10,000.00 | AMERICAN EXPRESS ELEC R *******515009REF # 031201469834066  1102023036 |



MEMBER FDIC

0030088-0000001-0036306

IMGC_0071575

Page 2 of 2
INTERNATIONAL MANUFACTURING GROUP INC
1250094841

## 74 CHECKS PROCESSED

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|---|---|---|
| 1742 | 07/10 | 3,000.00 | 1811 | 07/09 | 3,000.00 | 1839 | 07/18 | 5,625.00 |
| 1772* | 07/09 | 843.00 | 1812 | 07/10 | 3,000.00 | 1840 | 07/18 | 2,708.50 |
| 1779* | 07/01 | 2,187.00 | 1813 | 07/15 | 300.00 | 1841 | 07/18 | 1,016.67 |
| 1780 | 07/01 | 2,500.00 | 1814 | 07/15 | 2,812.00 | 1842 | 07/21 | 3,219.99 |
| 1782* | 07/03 | 22,010.84 | 1815 | 07/10 | 4,687.00 | 1843 | 07/23 | 625.00 |
| 1783 | 07/03 | 22,010.84 | 1816 | 07/09 | 4,160.82 | 1844 | 07/23 | 625.00 |
| 1786* | 07/28 | 1,725.80 | 1817 | 07/11 | 1,583.93 | 1845 | 07/24 | 1,250.00 |
| 1787 | 07/03 | 13,708.00 | 1818 | 07/11 | 9,274.66 | 1846 | 07/21 | 2,187.00 |
| 1788 | 07/03 | 13,708.00 | 1819 | 07/15 | 1,500.00 | 1847 | 07/24 | 2,500.00 |
| 1789 | 07/08 | 3,079.38 | 1820 | 07/15 | 1,500.00 | 1848 | 07/23 | 625.00 |
| 1790 | 07/08 | 1,895.00 | 1821 | 07/15 | 1,666.66 | 1849 | 07/23 | 4,000.00 |
| 1791 | 07/01 | 2,812.00 | 1822 | 07/15 | 2,083.00 | 1850 | 07/24 | 1,875.00 |
| 1793* | 07/01 | 2,708.34 | 1823 | 07/16 | 3,750.00 | 1851 | 07/25 | 625.00 |
| 1794 | 07/01 | 2,875.00 | 1824 | 07/16 | 878.00 | 1852 | 07/25 | 843.00 |
| 1795 | 07/07 | 2,447.54 | 1827* | 07/09 | 666.66 | 1853 | 07/22 | 1,785.00 |
| 1798* | 07/09 | 10,000.00 | 1828 | 07/15 | 2,718.00 | 1854 | 07/22 | 1,187.50 |
| 1802* | 07/02 | 5,154.00 | 1830* | 07/07 | 38,000.00 | 1855 | 07/21 | 11,342.00 |
| 1803 | 07/09 | 5,154.00 | 1831 | 07/25 | 9,929.00 | 1856 | 07/25 | 5,154.00 |
| 1804 | 07/15 | 5,154.00 | 1832 | 07/03 | 350,000.00 | 1857 | 07/24 | 1,583.90 |
| 1805 | 07/17 | 13,433.25 | 1833 | 07/10 | 20,000.00 | 1858 | 07/29 | 4,124.20 |
| 1806 | 07/17 | 2,479.00 | 1834 | 07/22 | 44,022.00 | 1859 | 07/29 | 5,769.69 |
| 1807 | 07/08 | 473.00 | 1835 | 07/22 | 22,767.00 | 1861* | 07/30 | 5,154.00 |
| 1808 | 07/24 | 1,324.00 | 1836 | 07/22 | 23,227.00 | 1862 | 07/30 | 13,512.11 |
| 1809 | 07/09 | 375.00 | 1837 | 07/18 | 660.00 | 1863 | 07/30 | 5,476.35 |
| 1810 | 07/09 | 1,250.00 | 1838 | 07/17 | 5,281.25 | | | |

*Not in check sequence

## DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 07/01 | 68,651.73 | 07/14 | 44,670.06 | 07/23 | 15,992.24 |
| 07/02 | 63,497.73 | 07/15 | 19,436.40 | 07/24 | 7,459.34 |
| 07/03 | -357,939.95 | 07/16 | 14,808.40 | 07/25 | -9,091.66 |
| 07/07 | 36,612.51 | 07/17 | -6,385.10 | 07/28 | 129,182.54 |
| 07/08 | 139,165.13 | 07/18 | -8,395.27 | 07/29 | 29,288.65 |
| 07/09 | 133,715.65 | 07/21 | 34,855.74 | 07/30 | -4,853.81 |
| 07/10 | 65,528.65 | 07/22 | 21,867.24 | 07/31 | 235,146.19 |
| 07/11 | 54,670.06 | | | | |



MEMBER FDIC

0030088-0000002-0038307

IMGC_0071577

C|B  CALIFORNIA BANK
TRUST
& TRUST

P.O. Box 489, Lawndale, CA  90260-0489

**Statement of Accounts**
Page 1 of 2
This Statement: July 31, 2009
Last Statement: June 30, 2009

Account 1250094841

**DIRECT INQUIRIES TO:**
Customer Service  1 (800) 400-6060

0033466          4213-06-1000-C8T-PG0020-00099

INTERNATIONAL MANUFACTURING GROUP INC
WHOLESALE ACCT
5231 PLEASANT DR
SACRAMENTO CA  95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

In compliance with a prohibition of the Unlawful Internet Gambling Act and pursuant to regulations
California Bank & Trust will not process transactions derived from internet bets or wagers.

California Bank & Trust wishes to not offer accounts to organizations that offer or sponsor internet gambling.
Commercial accounts involving or processing internet gaming transactions are subject to closure.

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 1250094841 | $1,803,736.44 | |

### ANALYSIS CHECKING 1250094841                                              103    99

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| -127,039.65 | 3,397,362.19 | 270,000.00 | 1,196,606.10 | 1,803,736.44 |

### 12 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 07/01 | 175,000.00 | INTERNET XFER FROM DDA ***7631 ID: 182012552  2302500126 |
| 07/02 | 10,000.00 | INTERNET XFER FROM DDA ***7631 ID: 183015958  2302400140 |
| 07/06 | 150,000.00 | INTERNET XFER FROM DDA ***7631 ID: 187021243  2302701252 |
| 07/08 | 100,000.00 | INTERNET XFER FROM DDA ***7631 ID: 189003629  2302300084 |
| 07/08 | 248,162.50 | WIRE/IN-2009070800002044;ORG CEMO DEEPAL HOLDINGS LLC;OBI BL  1301300674 |
| 07/10 | 231,167.49 | DEPOSIT 5113015735 |
| 07/16 | 225,000.00 | DEPOSIT 5113002121 |
| 07/20 | 75,000.00 | DEPOSIT 5113000033 |
| 07/22 | 10,000.00 | INTERNET XFER FROM DDA ***5811 ID: 203073513  2302100232 |
| 07/22 | 150,000.00 | DEPOSIT 5112004510 |
| 07/23 | 294,452.20 | WIRE/IN-2009072300004655;ORG CEMO DEEPAL HOLDINGS LLC;OBI BL  1301201376 |
| 07/29 | 1,728,600.00 | WIRE/IN-2009072900004273;ORG JTS COMMUNITIES INC MAIN ACCOUN  1301101254 |

### 7 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 07/14 | 60,000.00 | INTERNET XFER TO DDA ***5811 ID: 195000708  2302300095 |
| 07/17 | 50,000.00 | INTERNET XFER TO DDA ***5811 ID: 198212019  2302003273 |
| 07/21 | 30,000.00 | INTERNET XFER TO DDA ***5811 ID: 201235344  2302400063 |
| 07/24 | 20,000.00 | INTERNET XFER TO DDA ***5811 ID: 205010735  2302300061 |
| 07/27 | 30,000.00 | INTERNET XFER TO DDA ***5811 ID: 205224104  2302400031 |
| 07/28 | 30,000.00 | INTERNET XFER TO DDA ***5811 ID: 209094652  2302200773 |
| 07/29 | 50,000.00 | INTERNET XFER TO DDA ***5811 ID: 210005143  2302200105 |



MEMBER FDIC

0033466-0000001-0055961

IMGC_0072716

CALIFORNIA BANK & TRUST

INTERNATIONAL MANUFACTURING GROUP INC
1250094841

P.O. Box 489, Lawndale, CA 90260-0489

## 99 CHECKS PROCESSED

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|---|---|---|
| 2727 | 07/07 | 2,000.00 | 2850 | 07/06 | 2,875.00 | 2889 | 07/17 | 1,250.00 |
| 2783* | 07/02 | 2,500.00 | 2851 | 07/06 | 2,872.00 | 2891* | 07/17 | 2,801.31 |
| 2802* | 07/08 | 12,000.00 | 2852 | 07/07 | 2,000.00 | 2892 | 07/13 | 64,230.06 |
| 2803 | 07/16 | 15,000.00 | 2853 | 07/07 | 2,447.54 | 2893 | 07/13 | 14,819.69 |
| 2805* | 07/16 | 20,700.00 | 2855* | 07/03 | 5,593.66 | 2894 | 07/21 | 105,614.12 |
| 2806 | 07/22 | 1,583.90 | 2857* | 07/10 | 5,000.00 | 2895 | 07/20 | 5,000.00 |
| 2807 | 07/21 | 625.00 | 2858 | 07/08 | 1,625.00 | 2896 | 07/17 | 2,594.19 |
| 2808 | 07/20 | 100,000.00 | 2859 | 07/21 | 2,718.00 | 2897 | 07/17 | 1,625.00 |
| 2809 | 07/20 | 660.00 | 2860 | 07/13 | 1,583.90 | 2899* | 07/17 | 36,844.68 |
| 2810 | 07/29 | 2,708.00 | 2861 | 07/22 | 7,729.00 | 2900 | 07/29 | 2,500.00 |
| 2811 | 07/20 | 5,625.00 | 2862 | 07/21 | 777.29 | 2901 | 07/22 | 4,851.04 |
| 2812 | 07/22 | 1,785.00 | 2863 | 07/08 | 2,110.26 | 2902 | 07/21 | 2,500.00 |
| 2813 | 07/23 | 6,582.00 | 2864 | 07/08 | 3,414.75 | 2903 | 07/21 | 1,062.50 |
| 2814 | 07/29 | 4,166.66 | 2866* | 07/10 | 5,154.00 | 2904 | 07/28 | 10,875.80 |
| 2816* | 07/21 | 4,585.00 | 2867 | 07/14 | 307,699.19 | 2905 | 07/23 | 2,640.36 |
| 2817 | 07/27 | 5,791.66 | 2868 | 07/13 | 4,166.66 | 2906 | 07/23 | 2,640.36 |
| 2818 | 07/21 | 2,187.00 | 2869 | 07/16 | 4,166.66 | 2907 | 07/23 | 2,153.79 |
| 2819 | 07/21 | 1,250.00 | 2870 | 07/01 | 30,000.00 | 2908 | 07/29 | 5,154.00 |
| 2820 | 07/21 | 5,000.00 | 2871 | 07/03 | 3,457.00 | 2909 | 07/27 | 81,720.00 |
| 2832* | 07/28 | 5,000.00 | 2872 | 07/07 | 6,000.00 | 2910 | 07/28 | 7,831.13 |
| 2834* | 07/01 | 20,000.00 | 2873 | 07/06 | 4,000.00 | 2911 | 07/30 | 5,593.66 |
| 2836* | 07/03 | 12,500.00 | 2876* | 07/20 | 1,172.01 | 2912 | 07/23 | 2,500.00 |
| 2837 | 07/03 | 3,266.29 | 2877 | 07/17 | 15,317.49 | 2913 | 07/23 | 250.00 |
| 2839* | 07/03 | 3,266.29 | 2878 | 07/17 | 2,839.17 | 2914 | 07/28 | 12,437.33 |
| 2840 | 07/03 | 2,083.00 | 2879 | 07/09 | 5,000.00 | 2916* | 07/30 | 22,684.00 |
| 2841 | 07/03 | 1,500.00 | 2880 | 07/03 | 11,840.00 | 2917 | 07/28 | 2,463.53 |
| 2842 | 07/03 | 1,500.00 | 2881 | 07/06 | 62.00 | 2918 | 07/28 | 6,574.90 |
| 2843 | 07/03 | 1,666.66 | 2882 | 07/02 | 4,000.62 | 2919 | 07/28 | 6,331.16 |
| 2844 | 07/06 | 7,810.14 | 2883 | 07/08 | 9,486.59 | 2920 | 07/28 | 2,500.00 |
| 2845 | 07/03 | 6,248.11 | 2884 | 07/08 | 10,020.87 | 2921 | 07/28 | 6,310.70 |
| 2847* | 07/03 | 6,310.70 | 2886* | 07/13 | 966.98 | 2924* | 07/28 | 6,418.75 |
| 2848 | 07/10 | 5,154.00 | 2887 | 07/22 | 5,154.00 | 2927* | 07/30 | 4,500.00 |
| 2849 | 07/10 | 6,801.99 | 2888 | 07/15 | 1,968.00 | 2928 | 07/30 | 8,260.00 |

* Not in check sequence

## DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 07/01 | -2,039.65 | 07/13 | 489,956.58 | 07/22 | 137,272.03 |
| 07/02 | 1,459.73 | 07/14 | 122,257.39 | 07/23 | 414,957.72 |
| 07/03 | -57,771.98 | 07/15 | 120,289.39 | 07/24 | 394,957.72 |
| 07/06 | 74,608.88 | 07/16 | 305,422.73 | 07/27 | 277,446.06 |
| 07/07 | 62,161.34 | 07/17 | 192,150.89 | 07/28 | 180,702.76 |
| 07/08 | 371,666.37 | 07/20 | 154,693.88 | 07/29 | 1,844,774.10 |
| 07/09 | 366,666.37 | 07/21 | -1,625.03 | 07/30 | 1,803,736.44 |
| 07/10 | 575,723.87 | | | | |

MEMBER FDIC

# CALIFORNIA BANK

P.O. Box 489, Lawndale, CA  90260-0489

Case 2:17-cv-01123-WBS-DB   Document 42   Filed 10/15/19   Page 62 of 481

**DIRECT INQUIRIES TO:**
Customer Service  1 (800) 400-6080

0045350          4212-06-0230-CBT-PG0020-00095

INTERNATIONAL MANUFACTURING GROUP INC
WHOLESALE ACCT
5231 PLEASANT DR
SACRAMENTO CA  95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 1250094841 | $128,394.52 | |

## ANALYSIS CHECKING 1250094841                                                    103  95

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 6,689.45 | 1,951,045.15 | 308,149.38 | 1,521,190.70 | 128,394.52 |

### 10 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 07/01 | 75,000.00 | TELLER XFER FROM DDA ***8679 ID: 000002139 2302405032 |
| 07/02 | 75,000.00 | TELLER XFER FROM DDA ***8679 ID: 000007695 2301804448 |
| 07/02 | 1,277.04 | DEPOSIT 5160145530 |
| 07/07 | 573,475.60 | DEPOSIT 5150105670 |
| 07/08 | 109,884.41 | WIRE/IN-201007080000030011;ORG CEMO DEEPAL HOLDINGS LLC;OBI BI 1301500954 |
| 07/13 | 30,000.00 | TELLER XFER FROM DDA ***8679 ID: 000008027 2302601350 |
| 07/13 | 261,408.10 | DEPOSIT 5150088960 |
| 07/19 | 400,000.00 | DEPOSIT 5160147800 |
| 07/20 | 300,000.00 | DEPOSIT 5150010440 |
| 07/30 | 125,000.00 | TELLER XFER FROM DDA ***8679 ID: 000009837 2302503280 |

### 16 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 07/01 | 1,500.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000001187 2302400817 |
| 07/02 | 35,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000002412 2301800717 |
| 07/06 | 48,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000002959 2302500037 |
| 07/09 | 23,235.00 | WIRE/OUT-2010070900004870;BNF COMFORT RUBBER GLOVES 1301001515 |
| 07/13 | 4,346.35 | CITICARDS PYMT PHONE PY **** REF # 010193007814847 1101706645 |
| 07/13 | 6,729.78 | AMERICAN EXPRESS ELEC R *******518369REF # 010193007713808 1101701756 |
| 07/13 | 22,838.25 | AMERICAN EXPRESS ELEC R 100711051841614REF # 010193007713900 1101701876 |
| 07/14 | 10,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000002935 2302800441 |
| 07/14 | 14,000.00 | INTERNET XFER TO DDA ***7631 ID: 000002836 2302800435 |
| 07/14 | 34,000.00 | INTERNET XFER TO DDA JAMESTOWN ID: 000002269 2302800439 |
| 07/15 | 20,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000001158 2302200019 |
| 07/16 | 3,500.00 | INTERNET XFER TO DDA ***7631 ID: 000001322 2302800647 |
| 07/20 | 15,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000000153 2302300491 |
| 07/22 | 30,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000001187 2302504137 |
| 07/28 | 30,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000001616 2302700145 |
| 07/30 | 10,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000000260 2302500109 |



MEMBER FDIC

C B T CALIFORNIA BANK & TRUST

P.O. Box 489, Lawndale, CA 90260-0489

INTERNATIONAL MANUFACTURING GROUP INC
1250094841

## 95 CHECKS PROCESSED

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|---|---|---|
| 0 | 07/27 | 2,262.48 | 3758 | 07/12 | 1,068.95 | 3791 | 07/21 | 1,062.50 |
| 3706* | 07/06 | 5,791.66 | 3759 | 07/26 | 9,274.66 | 3792 | 07/27 | 3,750.00 |
| 3725* | 07/01 | 3,400.00 | 3760 | 07/16 | 10,126.91 | 3793 | 07/23 | 1,785.00 |
| 3726 | 07/06 | 53,974.92 | 3761 | 07/12 | 4,000.00 | 3794 | 07/20 | 2,187.00 |
| 3727 | 07/13 | 3,167.00 | 3762 | 07/12 | 80,000.00 | 3795 | 07/20 | 2,500.00 |
| 3728 | 07/02 | 735.41 | 3764* | 07/15 | 25,059.79 | 3797* | 07/21 | 4,851.00 |
| 3729 | 07/02 | 833.33 | 3765 | 07/15 | 6,906.55 | 3798 | 07/23 | 11,342.00 |
| 3730 | 07/02 | 311.68 | 3766 | 07/15 | 1,134.21 | 3799 | 07/29 | 5,791.66 |
| 3731 | 07/12 | 5,154.00 | 3767 | 07/15 | 15,317.49 | 3804* | 07/29 | 10,924.61 |
| 3732 | 07/12 | 6,801.99 | 3768 | 07/15 | 18,766.32 | 3805 | 07/23 | 3,925.63 |
| 3734* | 07/06 | 654.80 | 3769 | 07/15 | 14,177.79 | 3806 | 07/29 | 5,495.92 |
| 3735 | 07/06 | 1,000.00 | 3770 | 07/15 | 11,840.70 | 3807 | 07/23 | 7,803.30 |
| 3736 | 07/13 | 11,860.00 | 3771 | 07/16 | 1,114.93 | 3808 | 07/30 | 450.00 |
| 3737 | 07/15 | 1,479.17 | 3772 | 07/15 | 6,179.28 | 3809 | 07/21 | 4,000.00 |
| 3738 | 07/07 | 3,266.29 | 3773 | 07/16 | 1,966.08 | 3810 | 07/22 | 5,000.00 |
| 3739 | 07/07 | 3,266.29 | 3774 | 07/14 | 7,399.30 | 3811 | 07/21 | 6,582.00 |
| 3742* | 07/07 | 4,666.66 | 3775 | 07/19 | 30,000.00 | 3814* | 07/30 | 18,000.00 |
| 3743 | 07/07 | 3,583.00 | 3776 | 07/19 | 35,410.65 | 3815 | 07/21 | 3,500.00 |
| 3744 | 07/12 | 166,574.98 | 3777 | 07/14 | 5,550.00 | 3816 | 07/21 | 87,889.77 |
| 3745 | 07/12 | 174,487.99 | 3778 | 07/14 | 22,500.00 | 3819* | 07/30 | 311.68 |
| 3746 | 07/08 | 26,984.13 | 3779 | 07/27 | 2,718.00 | 3822* | 07/22 | 22,638.86 |
| 3747 | 07/08 | 20,917.02 | 3780 | 07/21 | 10,308.00 | 3824* | 07/21 | 195,189.94 |
| 3748 | 07/08 | 142,414.00 | 3781 | 07/23 | 10,308.00 | 3825 | 07/21 | 23,330.63 |
| 3749 | 07/19 | 1,430.00 | 3782 | 07/19 | 4,000.00 | 3826 | 07/21 | 4,004.00 |
| 3750 | 07/13 | 1,000.00 | 3783 | 07/19 | 4,585.00 | 3827 | 07/20 | 20,000.00 |
| 3751 | 07/12 | 3,750.00 | 3784 | 07/19 | 2,594.19 | 3828 | 07/20 | 2,000.00 |
| 3752 | 07/12 | 878.00 | 3785 | 07/20 | 1,625.00 | 3829 | 07/30 | 833.33 |
| 3753 | 07/12 | 5,833.33 | 3786 | 07/20 | 625.00 | 3831* | 07/29 | 10,406.67 |
| 3754 | 07/22 | 4,166.66 | 3787 | 07/20 | 5,625.00 | 3832 | 07/29 | 14,583.33 |
| 3755 | 07/13 | 5,000.00 | 3788 | 07/27 | 2,708.00 | 3833 | 07/27 | 2,500.00 |
| 3756 | 07/13 | 4,160.00 | 3789 | 07/22 | 1,250.00 | 3875* | 07/30 | 3,920.28 |
| 3757 | 07/14 | 4,687.00 | 3790 | 07/28 | 6,000.00 | | | |

*Not in check sequence*

## INSUFFICIENT FUNDS (NSF) & OVERDRAFT (OD) FEE TOTALS

| | This Statement Period | Year-to-Date |
|---|---|---|
| Total OD & NSF - Items Pd | $0.00 | $0.00 |
| Total NSF- Items Rt | $0.00 | $0.00 |

## DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 07/01 | 76,789.45 | 07/13 | 245,549.79 | 07/22 | 181,989.07 |
| 07/02 | 116,186.07 | 07/14 | 147,413.49 | 07/23 | 146,825.14 |
| 07/06 | 6,764.69 | 07/15 | 26,552.19 | 07/26 | 137,550.48 |
| 07/07 | 565,458.05 | 07/16 | 9,844.27 | 07/27 | 123,612.00 |
| 07/08 | 485,027.31 | 07/19 | 331,824.43 | 07/28 | 87,612.00 |
| 07/09 | 461,792.31 | 07/20 | 584,762.43 | 07/29 | 40,409.81 |
| 07/12 | 13,243.07 | 07/21 | 245,044.59 | 07/30 | 128,394.52 |

MEMBER FDIC

CB CALIFORNIA BANK & TRUST

P.O. Box 489, Lawndale, CA 90260-0489

**DIRECT INQUIRIES TO:**
Customer Service 1 (800) 400-6080

0056509          4211-06-0200-CBT-PC0020-00080

INTERNATIONAL MANUFACTURING GROUP INC
WHOLESALE ACCT
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 1250094841 | -$26,238.22 | |

## ANALYSIS CHECKING 1250094841

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 40,990.56 | 4,176,542.47 | 2,038,605.11 | 2,205,166.14 | -26,238.22 |

### 13 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 07/01 | 575,000.00 | INTERNET XFER FROM DDA WANNAS ENTER ID: 000000261 2303200042 |
| 07/01 | 805,136.50 | DEPOSIT 5160103840 |
| 07/13 | 127,150.50 | INTERNET XFER FROM DDA WANNAS ENTER ID: 000002614 2302704696 |
| 07/14 | 65,428.40 | DEPOSIT 5160070350 |
| 07/18 | 48,642.50 | DEPOSIT 5160071670 |
| 07/20 | 56,645.40 | DEPOSIT 5160057020 |
| 07/21 | 182,110.43 | DEPOSIT 5160062030 |
| 07/22 | 30,000.00 | INTERNET XFER FROM DDA WANNAS ENTER ID: 000002150 2302300748 |
| 07/22 | 76,210.60 | WIRE/IN-2011072200005593;ORG CEMO DEEPAL HOLDINGS LLC;OBI BI 1301101752 |
| 07/22 | 958,841.10 | WIRE/IN-2011072200005960;ORG CIMG JV, LLC;OBI LOAN 1301101878 |
| 07/22 | 1,000,000.00 | WIRE/IN-2011072200005918;ORG CIMG JV, LLC;OBI LOAN 1301101860 |
| 07/26 | 250,000.00 | INTERNET XFER FROM DDA WANNAS ENTER ID: 000001801 2302503096 |
| 07/26 | 1,377.04 | DEPOSIT 5150052410 |

### 7 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 07/05 | 50,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000002509 2302303997 |
| 07/08 | 5,708.32 | AMERICAN EXPRESS ELEC R ******512697REF # 011188002368710 1101617946 |
| 07/08 | 32,977.14 | AMERICAN EXPRESS ELEC R 11070705126043 5REF # 011188002369279 1101618093 |
| 07/08 | 25,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000002366 2302300951 |
| 07/11 | 13,896.00 | WIRE/OUT-2011071100005948;BNF COMFORT RUBBER GLOVES INDUSTRI 1301102221 |
| 07/18 | 11,023.65 | PRUDENTIAL INS PREM *L******10111REF # 011199005697070 1101414511 |
| 07/22 | 1,900,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000002781 2302303223 |



MEMBER FDIC

0056509-0000001-0113019

IMGC_0075104

CALIFORNIA BANK
TRUST

INTERNATIONAL MANUFACTURING GROUP INC
1250094841

P.O. Box 489, Lawndale, CA 90260-0489

## 80 CHECKS PROCESSED

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|---|---|---|
| 5023 | 07/13 | 625.00 | 5073 | 07/13 | 4,160.00 | 5103 | 07/27 | 6,000.00 |
| 5043* | 07/08 | 11,342.00 | 5074 | 07/14 | 1,500.00 | 5104 | 07/20 | 1,062.50 |
| 5044 | 07/01 | 450.00 | 5075 | 07/13 | 3,000.00 | 5105 | 07/22 | 5,074.00 |
| 5045 | 07/01 | 605,110.10 | 5076 | 07/13 | 3,500.00 | 5106 | 07/21 | 2,187.00 |
| 5046 | 07/01 | 41,308.82 | 5077 | 07/13 | 1,185.63 | 5108* | 07/20 | 4,851.00 |
| 5049* | 07/01 | 5,400.00 | 5078 | 07/13 | 11,000.00 | 5110* | 07/22 | 6,582.00 |
| 5050 | 07/05 | 735.41 | 5079 | 07/27 | 9,274.66 | 5111 | 07/21 | 6,906.05 |
| 5051 | 07/15 | 833.33 | 5080 | 07/13 | 4,585.00 | 5112 | 07/21 | 188,429.42 |
| 5052 | 07/01 | 311.68 | 5081 | 07/27 | 6,000.00 | 5113 | 07/26 | 21,197.63 |
| 5053 | 07/08 | 4,500.00 | 5083* | 07/22 | 5,339.17 | 5114 | 07/26 | 3,120.94 |
| 5054 | 07/08 | 5,562.00 | 5084 | 07/22 | 15,317.49 | 5115 | 07/25 | 11,840.70 |
| 5056* | 07/06 | 64,968.26 | 5085 | 07/12 | 1,000.00 | 5117* | 07/26 | 7,803.30 |
| 5057 | 07/01 | 4,861.80 | 5086 | 07/13 | 11,160.27 | 5118 | 07/28 | 3,925.65 |
| 5059* | 07/05 | 183,476.48 | 5087 | 07/13 | 3,645.83 | 5119 | 07/29 | 10,924.16 |
| 5060 | 07/11 | 12,395.12 | 5089* | 07/15 | 10,000.00 | 5120 | 07/29 | 5,495.92 |
| 5061 | 07/08 | 25,000.00 | 5090 | 07/21 | 204,097.16 | 5123* | 07/27 | 450.00 |
| 5062 | 07/08 | 150,000.00 | 5091 | 07/13 | 65,410.65 | 5124 | 07/29 | 5,400.00 |
| 5063 | 07/13 | 22,384.18 | 5092 | 07/19 | 20,000.00 | 5126* | 07/28 | 37,199.14 |
| 5064 | 07/15 | 10,255.15 | 5093 | 07/21 | 35,170.59 | 5128* | 07/27 | 735.41 |
| 5065 | 07/12 | 3,000.00 | 5094 | 07/19 | 1,125.04 | 5130* | 07/27 | 311.68 |
| 5066 | 07/20 | 1,250.00 | 5095 | 07/18 | 2,619.47 | 5133* | 07/29 | 2,334.00 |
| 5067 | 07/12 | 1,000.00 | 5096 | 07/20 | 5,154.00 | 5137* | 07/29 | 250,000.00 |
| 5068 | 07/12 | 1,000.00 | 5097 | 07/21 | 2,718.00 | 5141* | 07/26 | 3,000.00 |
| 5069 | 07/13 | 7,000.00 | 5098 | 07/22 | 1,785.00 | 5142 | 07/29 | 812.50 |
| 5070 | 07/14 | 4,166.66 | 5099 | 07/22 | 2,594.19 | 5143 | 07/27 | 850.00 |
| 5071 | 07/14 | 5,000.00 | 5100 | 07/20 | 8,958.00 | 5144 | 07/29 | 500.00 |
| 5072 | 07/15 | 4,687.00 | 5102* | 07/21 | 1,250.00 | | | |

* Not in check sequence

## AGGREGATE OVERDRAFT AND RETURNED ITEM FEES

| | Total for This Period | Total Year-to-Date |
|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 |

To learn more about our other products and services that may lower the cost of managing account overdrafts or to discuss removing overdraft coverage from your account, please contact Customer Service or visit your local branch.

## DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 07/01 | 763,684.66 | 07/14 | 216,379.61 | 07/22 | 109,560.43 |
| 07/05 | 529,472.77 | 07/15 | 190,604.13 | 07/25 | 97,719.73 |
| 07/06 | 464,504.51 | 07/18 | 225,603.51 | 07/26 | 321,778.20 |
| 07/08 | 204,415.05 | 07/19 | 204,478.47 | 07/27 | 298,156.45 |
| 07/11 | 178,123.93 | 07/20 | 239,848.37 | 07/28 | 249,228.36 |
| 07/12 | 172,123.93 | 07/21 | -18,799.42 | 07/29 | -26,238.22 |
| 07/13 | 161,617.87 | | | | |

MEMBER FDIC

0056509-0000002-0113020

IMGC_0075106

**C|B | CALIFORNIA BANK**
**TRUST**

P.O. Box 489, Lawndale, CA 90260-0489

This Statement: July 31, 2012
Last Statement: June 29, 2012

Account 1250094841

**DIRECT INQUIRIES TO:**
Customer Service 1 (800) 400-6080

0031997          4214-06-0000-CBT-PG0023-00087

INTERNATIONAL MANUFACTURING GROUP INC
WHOLESALE ACCT
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

CBT Business Mobile Banking will soon be available to businesses! Effective July 18, you will be able to view and manage your accounts, and make bill payments from your mobile device. Look for more information coming soon on calbanktrust.com/bizmobile! Standard text messaging and data fees may apply.

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 1250094841 | $412,368.95 | |

## ANALYSIS CHECKING 1250094841

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 274,460.23 | 2,078,015.68 | 455,724.19 | 1,484,382.77 | 412,368.95 |

**14 DEPOSITS/CREDITS**

| Date | Amount | Description |
|---|---|---|
| 07/02 | 71,000.00 | WIRE/IN-2012070200004950;ORG CEMO DEEPAL HOLDINGS LLC;OBI BI 1300301420 |
| 07/03 | 1,277.04 | DEPOSIT 9595014233 |
| 07/03 | 200,000.00 | DEPOSIT 9494910962 |
| 07/06 | 10,966.12 | WIRE/IN-2012070600002745;ORG CEMO DEEPAL HOLDINGS LLC;OBI BI 1300300818 |
| 07/06 | 43,967.50 | WIRE/IN-2012070600006723;ORG CEMO DEEPAL HOLDINGS LLC;OBI BI 1300302063 |
| 07/11 | 15,000.00 | DEPOSIT 9494740010 |
| 07/12 | 100,000.00 | DEPOSIT 9494662210 |
| 07/13 | 208,133.68 | WIRE/IN-2012071300004521;ORG CEMO DEEPAL HOLDINGS LLC;OBI BI 1300301379 |
| 07/17 | 285,000.00 | DEPOSIT 9494843990 |
| 07/20 | 125,000.00 | DEPOSIT 9494554064 |
| 07/25 | 249,714.30 | DEPOSIT 9494576932 |
| 07/25 | 250,000.00 | WIRE/IN-2012072500005357;ORG RELYAID GLOBAL HEALTHCARE;OBI B 1300301504 |
| 07/26 | 500,000.00 | DEPOSIT 9494586369 |
| 07/31 | 17,957.04 | DEPOSIT 9494892866 |

**18 CHARGES/DEBITS**

| Date | Amount | Description |
|---|---|---|
| 07/03 | 37,740.00 | WIRE/OUT-2012070300007144;BNF GLOBAL GLOVE SOLUTIONS SDN BHD 1300302253 |
| 07/03 | 10,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000007288 2301800211 |
| 07/05 | 30,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000003105 2301106479 |
| 07/09 | 10,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000006734 2301900811 |
| 07/10 | 75,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000000072 2301900959 |
| 07/11 | 20,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000000716 2301300973 |
| 07/17 | 5,880.16 | AMEX EPayment ACH PMT V**** REF # 012199000270525 1100926373 |
| 07/17 | 11,023.65 | PRUDENTIAL INS PREM *L******10121REF # 012198010210757 1100915124 |
| 07/18 | 60,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000000939 2302100091 |
| 07/19 | 3,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000005346 2301701407 |



MEMBER FDIC

0031997-0000001-0075903

IMGC_0076369

CB CALIFORNIA BANK & TRUST

P.O. Box 489, Lawndale, CA 90260-0489

INTERNATIONAL MANUFACTURING GROUP INC
1250094841

Continued ...

| Date | Amount | Description |
|------|--------|-------------|
| 07/23 | 510.38 | ANALYSIS SERVICE FEE |
| 07/23 | 54,450.00 | WIRE/OUT-2012072300002896;BNF JIANGSU UNIVERSAL GLOVE 1300300905 |
| 07/23 | 45,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000001626 2301400645 |
| 07/25 | 23,000.00 | WIRE/OUT-2012072500004743;BNF MERRILL LYNCH;OBI FURTHER CRED 1300301314 |
| 07/26 | 30,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000002976 2301300627 |
| 07/27 | 30,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000001516 2301400065 |
| 07/27 | 5,120.00 | AMEX EPayment ACH PMT V**** REF # 012209004664624 1100926152 |
| 07/30 | 5,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000000944 2301803585 |

## 78 CHECKS PROCESSED

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|--------|------|--------|--------|------|--------|--------|------|--------|
| 6141 | 07/05 | 60,000.00 | 6194 | 07/12 | 1,500.00 | 6523 | 07/19 | 2,000.00 |
| 6163* | 07/02 | 10,924.61 | 6195 | 07/12 | 7,000.00 | 6525* | 07/24 | 14,167.56 |
| 6164 | 07/02 | 5,495.92 | 6196 | 07/12 | 750.00 | 6526 | 07/24 | 5,000.00 |
| 6165 | 07/10 | 7,803.30 | 6197 | 07/16 | 4,166.66 | 6527 | 07/26 | 2,500.00 |
| 6166 | 07/10 | 3,925.65 | 6198 | 07/16 | 5,000.00 | 6528 | 07/20 | 2,500.00 |
| 6172* | 07/02 | 4,400.00 | 6199 | 07/12 | 4,000.00 | 6529 | 07/24 | 23,343.66 |
| 6173 | 07/13 | 4,500.00 | 6200 | 07/12 | 3,500.00 | 6530 | 07/25 | 9,562.86 |
| 6174 | 07/16 | 5,826.00 | 6201 | 07/12 | 4,585.00 | 6531 | 07/25 | 6,134.25 |
| 6175 | 07/11 | 2,334.00 | 6203* | 07/13 | 1,000.00 | 6532 | 07/25 | 52,555.57 |
| 6176 | 07/03 | 10,499.43 | 6204 | 07/13 | 1,000.00 | 6533 | 07/25 | 601.86 |
| 6177 | 07/16 | 4,166.66 | 6205 | 07/12 | 11,000.00 | 6534 | 07/26 | 1,068.00 |
| 6178 | 07/05 | 1,000.00 | 6206 | 07/13 | 1,000.00 | 6535 | 07/24 | 30,000.00 |
| 6180* | 07/10 | 13,597.36 | 6207 | 07/12 | 1,185.63 | 6536 | 07/31 | 15,317.49 |
| 6181 | 07/02 | 42,999.96 | 6501* | 07/16 | 56,462.65 | 6537 | 07/31 | 12,485.19 |
| 6182 | 07/09 | 4,166.66 | 6502 | 07/16 | 26,584.21 | 6538 | 07/31 | 6,622.50 |
| 6183 | 07/09 | 5,000.00 | 6503 | 07/16 | 17,586.81 | 6539 | 07/27 | 6,250.00 |
| 6184 | 07/09 | 6,250.00 | 6504 | 07/18 | 6,162.50 | 6541* | 07/31 | 2,500.00 |
| 6185 | 07/09 | 10,020.87 | 6505 | 07/18 | 4,597.78 | 6542 | 07/30 | 2,718.00 |
| 6186 | 07/09 | 100,000.00 | 6508* | 07/17 | 8,823.30 | 6544* | 07/30 | 219,871.92 |
| 6187 | 07/11 | 6,250.00 | 6512* | 07/17 | 33,190.48 | 6545 | 07/30 | 46,318.64 |
| 6188 | 07/11 | 7,291.67 | 6513 | 07/24 | 7,500.00 | 6546 | 07/31 | 6,906.05 |
| 6189 | 07/06 | 5,833.33 | 6514 | 07/17 | 183,476.48 | 6547 | 07/31 | 38,125.00 |
| 6190 | 07/10 | 1,042.00 | 6515 | 07/20 | 3,000.00 | 6549* | 07/31 | 56,462.66 |
| 6191 | 07/09 | 37,199.14 | 6516 | 07/16 | 500.00 | 6550 | 07/31 | 35,410.65 |
| 6192 | 07/16 | 37,582.13 | 6517 | 07/18 | 57,175.16 | 6551 | 07/31 | 22,316.39 |
| 6193 | 07/10 | 3,000.00 | 6522* | 07/31 | 11,339.17 | 6554* | 07/31 | 450.00 |

* Not in check sequence

## AGGREGATE OVERDRAFT AND RETURNED ITEM FEES

|  | Total for This Period | Total Year-to-Date |
|--|----------------------|--------------------|
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 |

To learn more about our other products and services that may lower the cost of managing account overdrafts or to discuss removing overdraft coverage from your account, please contact Customer Service or visit your local branch.

## DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 07/02 | 281,639.74 | 07/12 | 151,376.36 | 07/23 | 123,345.03 |
| 07/03 | 424,677.35 | 07/13 | 352,010.04 | 07/24 | 43,333.81 |
| 07/05 | 333,677.35 | 07/16 | 194,134.92 | 07/25 | 451,193.57 |
| 07/06 | 382,777.64 | 07/17 | 236,740.85 | 07/26 | 917,625.57 |
| 07/09 | 210,140.97 | 07/18 | 108,805.41 | 07/27 | 876,255.57 |
| 07/10 | 105,772.66 | 07/19 | 103,805.41 | 07/30 | 602,347.01 |
| 07/11 | 84,896.99 | 07/20 | 223,305.41 | 07/31 | 412,368.95 |



MEMBER FDIC

0031997-0000002-0075904

IMGC_0076371

# CALIFORNIA BANK TRUST

P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**
Page 1 of 16
This Statement: July 31, 2013
Last Statement: June 28, 2013

Account 1250094841

**DIRECT INQUIRIES TO:**
Customer Service  1 (800) 400-6080

0027403          4213-06-0000-CBT-PG0023-00114

INTERNATIONAL MANUFACTURING GROUP INC
WHOLESALE ACCT
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Business Analyzed Account | 1250094841 | -$36,362.17 | |

## BUSINESS ANALYZED ACCOUNT 1250094841                                  IP3  114

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 61,450.93 | 1,827,112.09 | 297,552.72 | 1,627,372.47 | -36,362.17 |

### 26 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 07/01 | 15,000.00 | DEPOSIT 5353166489 |
| 07/02 | 20,000.00 | DEPOSIT 5353081521 |
| 07/02 | 10,000.00 | WIRE/IN-2013070200002731;ORG ROBERT E LEFLER  1301900798 |
| 07/02 | 150,000.00 | WIRE/IN-2013070200005025;ORG MERIT HOMES INC;OBI LOAN FROM M  1301901542 |
| 07/05 | 13,000.00 | ONLINE XFER FROM DDA WANNAS ENTER ID: 000005879  2304601710 |
| 07/08 | 5,000.00 | ONLINE XFER FROM DDA WANNAS ENTER ID: 000003599  2309503972 |
| 07/09 | 27,000.00 | ONLINE XFER FROM DDA WANNAS ENTER ID: 000009883  2306200516 |
| 07/10 | 31,000.00 | ONLINE XFER FROM DDA WANNAS ENTER ID: 000008467  2304100650 |
| 07/10 | 28,961.40 | DEPOSIT 5353106611 |
| 07/11 | 13,000.00 | ONLINE XFER FROM DDA WANNAS ENTER ID: 000007048  2304100822 |
| 07/12 | 9,500.00 | ONLINE XFER FROM DDA WANNAS ENTER ID: 000003802  2307200954 |
| 07/15 | 40,000.00 | ONLINE XFER FROM DDA WANNAS ENTER ID: 000007875  2307101966 |
| 07/15 | 15,000.00 | DEPOSIT 5353122893 |
| 07/16 | 20,000.00 | ONLINE XFER FROM DDA WANNAS ENTER ID: 000008842  2306200530 |
| 07/16 | 1,277.04 | DEPOSIT 5353111973 |
| 07/17 | 70,000.00 | ONLINE XFER FROM DDA WANNAS ENTER ID: 000004187  2304400520 |
| 07/17 | 35,000.00 | WIRE/IN-2013071700004806;ORG DEEPAL S WANNAKUWATTE  1301501418 |
| 07/18 | 11,023.65 | RETURN PRUDENTIAL INS PREM |  1701202578 |
| 07/18 | 19,000.00 | DEPOSIT 5353108221 |
| 07/18 | 100,000.00 | DEPOSIT 5353108537 |
| 07/19 | 1,050,000.00 | WIRE/IN-2013071900004852;ORG INTERNATIONAL MANUFACTURING GR  1302201516 |
| 07/24 | 26,600.00 | ONLINE XFER FROM DDA WANNAS ENTER ID: 000005914  2304600226 |
| 07/25 | 6,000.00 | ONLINE XFER FROM DDA WANNAS ENTER ID: 000008778  2304900138 |
| 07/26 | 250.00 | ONLINE XFER FROM DDA ***7631 ID: 000003075  2304702088 |
| 07/30 | 84,000.00 | ONLINE XFER FROM DDA WANNAS ENTER ID: 000005503  2305200612 |
| 07/31 | 26,500.00 | ONLINE XFER FROM DDA WANNAS ENTER ID: 000004292  2304500716 |

### 10 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 07/02 | 5,000.00 | ONLINE XFER TO DDA WANNAS ENTER ID: 000001563  2304700731 |
| 07/03 | 120,000.00 | ONLINE XFER TO DDA WANNAS ENTER ID: 000006297  2304600773 |
| 07/17 | 11,023.65 | PRUDENTIAL INS PREM *L******10131REF # 013197003983410  1103919413 |
| 07/22 | 2,196.72 | ANALYSIS SERVICE FEE |
| 07/22 | 37,000.00 | ONLINE XFER TO DDA WANNAS ENTER ID: 000007177  2308706055 |



MEMBER FDIC

0027403-0000001-0061134

IMGC_0077946

C|B CALIFORNIA BANK
&
T R U S T

P.O. Box 489, Lawndale, CA 90260-0489

Page 2 of 15
July 31, 2013
INTERNATIONAL MANUFACTURING GROUP INC
1250094841

Continued ...

| Date | Amount | Description |
|---|---|---|
| 07/23 | 40,000.00 | ONLINE XFER TO DDA ***7631 ID: 000006538  2305900415 |
| 07/23 | 19,000.00 | ONLINE XFER TO DDA WANNAS ENTER ID: 000002691  2305902907 |
| 07/23 | 11,023.65 | PRUDENTIAL RDP INS PR *L******10131REF # 013203006062416  1105303163 |
| 07/29 | 25,074.20 | AMEX EPayment ACH PMT R****MSP REF # 01320700812368  1104003899 |
| 07/31 | 27,234.50 | WIRE/OUT-2013073100004714;BNF GLOBAL GLOVE SOLUTIONS SDN BHD  1302001356 |

## 107 CHECKS PROCESSED

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|---|---|---|
| 7435 | 07/02 | 5,974.81 | 7596 | 07/03 | 3,457.00 | 7640* | 07/11 | 3,000.00 |
| 7436 | 07/02 | 4,644.66 | 7597 | 07/08 | 4,000.00 | 7641 | 07/11 | 6,453.55 |
| 7490* | 07/02 | 3,000.00 | 7598 | 07/08 | 3,000.00 | 7642 | 07/16 | 10,499.13 |
| 7540* | 07/01 | 5,000.00 | 7599 | 07/12 | 6,622.50 | 7643 | 07/16 | 10,416.00 |
| 7541 | 07/01 | 4,166.66 | 7600 | 07/05 | 1,000.00 | 7644 | 07/16 | 6,250.00 |
| 7545* | 07/15 | 1,250.00 | 7602* | 07/05 | 2,000.00 | 7645 | 07/16 | 12,500.00 |
| 7548* | 07/05 | 300.00 | 7603 | 07/09 | 2,000.00 | 7646 | 07/17 | 6,249.99 |
| 7549 | 07/08 | 8,823.00 | 7604 | 07/05 | 1,000.00 | 7647 | 07/15 | 1,000.00 |
| 7550 | 07/03 | 7,500.00 | 7605 | 07/09 | 5,826.00 | 7648 | 07/15 | 1,500.00 |
| 7554* | 07/09 | 2,083.33 | 7606 | 07/22 | 4,500.00 | 7649 | 07/16 | 13,333.33 |
| 7561* | 07/01 | 11,852.08 | 7607 | 07/08 | 11,755.50 | 7650 | 07/16 | 5,789.81 |
| 7563* | 07/02 | 4,125.00 | 7608 | 07/10 | 2,500.00 | 7651 | 07/15 | 2,334.00 |
| 7564 | 07/02 | 4,125.00 | 7609 | 07/10 | 1,000.00 | 7652 | 07/16 | 7,750.00 |
| 7565 | 07/03 | 816.00 | 7610 | 07/10 | 2,500.00 | 7654* | 07/15 | 3,885.00 |
| 7566 | 07/03 | 816.00 | 7611 | 07/12 | 6,250.00 | 7655 | 07/15 | 1,185.63 |
| 7568* | 07/17 | 625.00 | 7612 | 07/09 | 6,162.50 | 7656 | 07/15 | 1,000.00 |
| 7569 | 07/17 | 7,217.00 | 7613 | 07/09 | 4,597.78 | 7657 | 07/15 | 1,000.00 |
| 7573* | 07/02 | 1,562.00 | 7614 | 07/15 | 6,250.00 | 7658 | 07/22 | 1,250.00 |
| 7574 | 07/02 | 2,443.45 | 7619* | 07/12 | 10,432.95 | 7659 | 07/16 | 11,000.00 |
| 7575 | 07/03 | 2,443.45 | 7620 | 07/12 | 3,266.29 | 7661* | 07/16 | 7,500.00 |
| 7576 | 07/02 | 450.00 | 7621 | 07/12 | 3,266.29 | 7662 | 07/16 | 8,125.00 |
| 7580* | 07/02 | 2,718.00 | 7622 | 07/12 | 9,974.00 | 7663 | 07/23 | 14,076.56 |
| 7581 | 07/02 | 5,000.00 | 7623 | 07/19 | 2,812.00 | 7664 | 07/22 | 4,900.00 |
| 7582 | 07/01 | 26,970.59 | 7624 | 07/19 | 300.00 | 7665 | 07/19 | 21,277.97 |
| 7583 | 07/10 | 17,608.07 | 7625 | 07/18 | 1,625.00 | 7667* | 07/29 | 6,339.17 |
| 7584 | 07/10 | 6,906.05 | 7626 | 07/12 | 1,333.20 | 7668 | 07/29 | 15,317.49 |
| 7585 | 07/01 | 6,250.00 | 7627 | 07/12 | 10,902.54 | 7672* | 07/26 | 100.00 |
| 7587* | 07/08 | 312.58 | 7628 | 07/10 | 6,242.00 | 7673 | 07/22 | 705,380.00 |
| 7588 | 07/02 | 6,653.55 | 7629 | 07/10 | 2,777.35 | 7674 | 07/22 | 250,000.00 |
| 7589 | 07/12 | 1,250.00 | 7630 | 07/12 | 1,500.00 | 7675 | 07/19 | 45,000.00 |
| 7590 | 07/17 | 5,399.45 | 7631 | 07/16 | 3,750.00 | 7676 | 07/19 | 3,500.00 |
| 7591 | 07/10 | 735.41 | 7632 | 07/23 | 3,000.00 | 7677 | 07/23 | 9,765.53 |
| 7592 | 07/01 | 5,000.00 | 7633 | 07/24 | 3,000.00 | 7687* | 07/29 | 30,000.00 |
| 7593 | 07/09 | 10,020.87 | 7634 | 07/24 | 3,000.00 | 7689* | 07/31 | 38,824.74 |
| 7594 | 07/02 | 17,700.00 | 7636* | 07/17 | 500.00 | 7691* | 07/29 | 6,250.00 |
| 7595 | 07/02 | 11,500.00 | 7638* | 07/16 | 9,274.66 | | | |

* Not in check sequence

## AGGREGATE OVERDRAFT AND RETURNED ITEM FEES

| | Total for This Period | Total Year-to-Date |
|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 |

To learn more about our other products and services that may lower the cost of managing account overdrafts or to discuss removing overdraft coverage from your account, please contact Customer Service or visit your local branch.

EQUAL HOUSING LENDER

MEMBER FDIC

0027403-0000002-0061135

IMGC_0077948

Page 1 of 16
July 31, 2019
INTERNATIONAL MANUFACTURING GROUP INC
1250094841
California Bank & Trust

**DAILY BALANCES**

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 07/01 | 17,211.60 | 07/12 | -54,657.68 | 07/23 | -26,572.07 |
| 07/02 | 122,315.13 | 07/15 | -19,062.31 | 07/24 | -5,972.07 |
| 07/03 | -12,717.32 | 07/16 | -103,973.20 | 07/25 | 27.93 |
| 07/05 | -4,017.32 | 07/17 | -29,968.29 | 07/26 | 177.93 |
| 07/08 | -26,908.40 | 07/18 | 98,410.36 | 07/29 | -82,802.93 |
| 07/09 | -30,598.88 | 07/19 | 1,075,520.39 | 07/30 | 1,197.07 |
| 07/10 | -12,906.36 | 07/22 | 70,293.67 | 07/31 | -36,362.17 |
| 07/11 | -9,359.91 | | | | |

EQUAL HOUSING LENDER   MEMBER FDIC

0027403-0000002-0061135

IMGC_0077949

# EXHIBIT 6

## Diana Garside

**From:** Diana Garside
**Sent:** Thursday, August 28, 2008 4:50 PM
**To:** Margie West; Vicki Whetten
**Cc:** Toni Falk
**Subject:** KITING

FYI.....

Significant kiting activity has been noted for the customer (below) involving multiple accounts and multiple financial institutions.  Dollar amounts of monies being moved between institutions over 3 months total in excess of $800,000.   Additionally, the commercial LOCs are almost fully advanced and will mature in November.

You may want to address this sooner rather than later.

Diana Garside
VP/Compliance Officer
North Valley Bank
dgarside@novb.com
PH.  (530) 226-2908
FAX (530 243-1069

| Portfolio 2027835 - All Names | | Rel | Birthdate | Phone | Tax Identification |
|---|---|---|---|---|---|
| [1] INTERNATIONAL MANUFACTURING | | * | | [B] (916) 431-8046 | EIN 68-0248920 |
| [2] GROUP, INC | | * | | | EIN 68-0248920 |
| [3] DEEPAL WANNAKUWATTE | | | Nov 18, 1950 | [H] (916) 447-8018 | SSN 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 |
| | | | | [B] (916) 431-8046 | |
| 879 F STREET, SUITE 120-A | | | | | |
| WEST SACRAMENTO CA 95605 | | | | | |
| See Names | | | | | |

### Demand Deposit Summary

| | Names | Rel | Ledger | Rate | Memo Ledger |
|---|---|---|---|---|---|
| 4302004169 - Positively Free Business | *1,2 | | $186,952.09 | 0.0000% | $121,952.09 |

### Loan Summary

| | Names | Rel | Principal | Rate | Maturity Date |
|---|---|---|---|---|---|
| 430000764 - Commercial Secured LOC | *1,2 | | $1,170,000.00 | 5.0000% | Nov 21, 2008 |
| Collateral: WHOLE LIFE INSURANCE POLICY#JP5446075 | | | | | |
| 430000765 - Commercial Secured LOC | *1,2 | | $730,000.00 | 5.0000% | Nov 21, 2008 |
| Collateral: LIFE INSURANCE POLICY#JP5444571 | | | | | |
| **Total Loans:** | | | **$1,900,000.00** | **5.0000%** | |

### Line Summary

| | Names | Rel | Principal | Maximum Credit | Available |
|---|---|---|---|---|---|
| 2027835 | *1,2,3 | | $1,900,000.00 | $0.00 | $0.00 |
| **Total Lines:** | | | **$1,900,000.00** | **$0.00** | **$0.00** |

8/28/2008

# EXHIBIT 7

# PROMISSORY NOTE

$50,000.00                                                        January 21, 2014

FOR VALUE RECEIVED, the undersigned promises to pay to the Dr. Ron and Joanie Evans, of Placerville, California 95667, (hereinafter referred to as "Payee") the sum of Fifty Thousand Dollars & no/100 ($50,000.00). Principal payment of $50,000.00 and a single profit payment in the amount of $3,203.33 shall be due on May 31, 2014. This note can be automatically renewed at the option of the Payee.

If action be instituted on this note, the undersigned promises to pay such sums as the Court may fix as attorney fees.

INTERNATIONAL MANUFACTURING
GROUP, INC.

_____ 01|21|14
Deepal S. Wannakuwatte
President and Chief Executive Officer

_____ 01|21|14
Deepal S. Wannakuwatte
Individually

# EXHIBIT 8

# PROMISSORY NOTE

$740,000.00                                                    January 1, 2004

For value received, the undersigned promises to pay to ~~International Manufacturing Group~~,
Sacramento, California, the sum of Seven Hundred Forty Thousand Dollars
($740,000.00).  The Promissory Note will bear interest at Prime + 4% and will be due
and payable on December 31, 2005 (agreement signed on July 1, 2001).

If litigation arises on this note, the prevailing party shall be entitled to attorney's fees
determined by the court.

Executed in Sacramento, California on January 1, 2004.

MAKER

Deepal S. Wannakuwatte          011104
Individually

International Manufacturing Group, Inc.

Deepal S. Wannakuwatte          011104
President and Chief Executive Officer

# PROMISSORY NOTE

$500,000.00*                                          January 20, 2011

For value received, the undersigned promises to pay to ███████████████
Waterglen Circle, Sacramento, California  95826, the sum of Five Hundred Thousand
Dollars & no/100 ($500,000.00).  The Promissory Note will be due and payable on
January 20, 2013.

If litigation arises on this note, the prevailing party shall be entitled to attorney's fees
determined by the court.

Executed in Sacramento, California on January 20, 2011.

                    MAKER

                    INTERNATIONAL MANUFACTURING
                    GROUP, INC.

                    _____ 1/20/11
                    Deepal S. Wannakuwatte
                    President and Chief Executive Officer

*This note replaces the note dated January 20, 2010

# PROMISSORY NOTE

$258,628.10                                                     October 4, 2012

For value received, the undersigned promises to pay to ~~Chester Schwartz~~ of Sacramento, California, the sum of Two Hundred Fifty-Eight Thousand Six Hundred Twenty-Eight Dollars & 10/100 ($258,628.10). A single profit payment will be made in the amount of $18,276.38.  Principal and profit will be due and payable on February 11, 2013.

If litigation arises on this note, the prevailing party shall be entitled to attorney's fees determined by the court.

Executed in Sacramento, California on October 4, 2012.

MAKER

INTERNATIONAL MANUFACTURING GROUP, INC.

_____ 10/4/12
Deepal S. Wannakuwatte
President and Chief Executive Officer

_____ 10/4/12
Deepal S. Wannakuwatte
Individually

# EXHIBIT 9

## AGREEMENT

This Agreement is made on January 21, 2014 between International Manufacturing Group, Inc., a California corporation, and Deepal S. Wannakuwatte (herein collectively referred to as "IMG/RelyAid") and Dr. Ron and Joanie Evans (herein referred to as "Evans").

## RECITALS

1.      IMG/RelyAid will be obtaining bids from the Federal or State Government for 130 days, beginning January 21, 2014.

2.      IMG/RelyAid will deliver goods and get paid in 130 days.

## THE PARTIES AGREE AS FOLLOWS

1.      Evans will lend IMG/RelyAid the sum of $50,000.00 to fulfill the bid.

2.      IMG/RelyAid will pay to Evans one payment of $3,203.33, plus the above referenced sum of $50,000.00 pursuant to the terms and conditions of that certain promissory note dated January 21, 2014, which is attached hereto, and incorporated herein by reference.

3.      In the event of litigation, the prevailing party shall be entitled to reasonable costs and attorney fees.

4.      California law shall govern this Agreement.

5.      This Agreement shall inure to the benefit and bind the successors, heirs, executors and administrators of the parties hereto.

6.      Deepal S. Wannakuwatte will guarantee all liability of IMG/RelyAid unconditionally.

7.      Evans is strictly a lender to this transaction and will not be liable for any product failures on this transaction.

Agreed this 21st day of January, 2014.

INTERNATIONAL MANUFACTURING GROUP, INC.

_____ 01/21/14
Deepal S. Wannakuwatte, President & Chief Executive Officer

_____ 01/21/14
Deepal S. Wannakuwatte, Individually

# EXHIBIT 10

## AGREEMENT

This Agreement is made on October 4, 2012 between International Manufacturing Group, Inc., a California corporation, and Deepal S. Wannakuwatte (herein called "IMG Wholesale") and ▮▮▮▮▮▮▮▮▮▮ of Sacramento, California (herein called "Deloney").

## RECITALS

1.      IMG Wholesale will be obtaining bids from the Federal Government for 120 days, beginning October 4, 2012.

2.      IMG Wholesale will deliver goods and get paid in 130 days.

## THE PARTIES AGREE AS FOLLOWS

1.      ▮▮▮▮▮ will lend IMG Wholesale $258,628.10 to fulfill the bid.

2.      IMG Wholesale will pay ▮▮▮▮▮ one payment of $18,276.38, plus the principal payment of $258,628.10 on February 11, 2013.

3.      In the event IMG Wholesale fails to make the payment, it shall pay an interest rate of 12% per annum until paid in full.

4.      In the event of litigation, the prevailing party shall be entitled to reasonable costs and attorney fees.

5.      California law shall govern this Agreement.

6.      This Agreement shall inure to the benefit and bind the successors, heirs, executors and administrators of the parties hereto.

7.      Deepal S. Wannakuwatte will guarantee all liability of IMG Wholesale unconditionally.

Agreed this 4th day of October, 2012.

INTERNATIONAL MANUFACTURING GROUP, INC.

_Deepal S. Wannakuwatte_   10/4/12

Deepal S. Wannakuwatte, President & Chief Executive Officer

_Deepal S. Wannakuwatte_   10/4/12

Deepal S. Wannakuwatte, Individually

## AGREEMENT

This Agreement is made on January 20, 2011 between International Manufacturing Group, Inc., a California corporation, and Deepal S. Wannakuwatte (herein called "IMG") and ▓▓▓▓▓▓▓▓▓▓ of ▓▓▓▓▓▓▓▓ Circle, Sacramento, California 95826 (herein called "William").

## RECITALS

1. IMG will obtain a bid to the Department of Health & Human Services.

2. IMG will deliver goods and get paid monthly from the letter of credit.

## THE PARTIES AGREE AS FOLLOWS

1. ▓▓▓▓▓ will lend IMG $500,000.00 to fulfill the bid.

2. IMG will pay ▓▓▓▓▓ the sum of $6,562.50 monthly until completion of cycles, plus the principal payment of $500,000.00 on January 20, 2013.

3. In the event IMG fails to make the payment, it shall pay an interest rate of 10% per annum until paid in full.

4. In the event of litigation, the prevailing party shall be entitled to reasonable costs and attorney fees.

5. California law shall govern this Agreement.

6. This Agreement shall inure to the benefit and bind the successors, heirs, executors and administrators of the parties hereto.

7. Deepal S. Wannakuwatte will guarantee all liability of IMG unconditionally.

Agreed this 20th day of January, 2011.

INTERNATIONAL MANUFACTURING GROUP, INC.


_____     1/20/11
Deepal S. Wannakuwatte, President & C.E.O.     Date


_____     1-20-2011
William G. Henderson     Date

# EXHIBIT 11

**Royal W Minson, II**
2976 Santos Lane, B307
Walnut Creek, CA 94597

September 19, 2007

Mr. Deepal Wannakuwate
c/o International Manufacturing Group
879 F Street, Suite 120
West Sacramento, CA

**By e-mail**

Dear Deepal,

As you requested at last week's meeting, I am providing a summary of some of our discussion, as well as my thoughts concerning our working together. We have known each other for some time now and have had ample time to get to know one another. I have long admired your entrepreneurial spirit and creative, "outside the box" thinking. I believe that my broad based financial, sales and marketing and executive management experience within both the financial arena and in the private sector will add significant value to your future efforts to diversify and expand your business. In addition to making money, I also think that we'll have a lot of fun doing it!

I think you know me well enough by now that by committing to work with you, I am committing my complete loyalty and dedication to achieving increasing economic success for you and your entities. The *quid pro quo* will be my ability to participate in those successes. As I am sure you can appreciate, the decision to come to work with you is not one which I take lightly, and is one that will be my final career move. We've talked about a time horizon of probably 10 years. Given that, the structure which we put in place to enable us to move forward together is important to me in terms of both financial security as well as the opportunities it affords for me to participate meaningfully in the economic rewards afforded by our mutual efforts to successfully grow the scope of your business interests, and enhance the profitability of each of its components.

From my perspective there are two related opportunities we have discussed which make this an attractive venture:

1. The first opportunity involves working for you in a capacity of (for lack of a better term) "Advisor at Large", vis a vis the DDS acquisition and integration into IMG/Jamestown, as well as the acquisition and development of the medical products company and other undefined opportunities in the future. Under your direction, overall duties as I understand them will initially include:

BW_014944

Deepal Wannakuwatte
September 19, 2007
Draft Employment Terms
Page 2 of 4

- Arranging of appropriate financing to support the short and long term acquisition/expansion goals of Deepal Wannakuwatte ("DW") related entities including IMG, DDS and the medical products company.

- Performing the role of Chief Financial Officer for Wannakuwatte controlled entities including

  o oversight of finance and accounting functions;

  o development of interactive, excel based business models for management use in assessing the impact of differing business strategies;

  o management of relations with the financial community;

  o advising as to optimal financial structure for IMG and DW related entities.

- Oversight as a representative to the Board of the medical products company with ongoing responsibilities to evaluate and manage progress towards milestone achievement, tracking actual results against budget, and seeking, identifying and evaluating potential investor exit strategy scenarios;

- Evaluation of opportunities to acquire or expand into other lines of business;

- Oversight and execution of identified acquisition/expansion activities;

2. The second part of the relationship which is of interest to me is the establishment of a formalized arms length relationship between Sourcing Services International (SSI) and IMG/DW. The purpose of the SSI relationship is to utilize the human capital I have organized for effectively managing the key issues in reliably and consistently sourcing products from the Peoples Republic of China and Southeast Asia. The goal of this alliance is to:

   - Reduce overall product cost to IMG, thereby enhancing company profitability.

   - Reduce supply chain risk through the establishment of multiple suppliers to ensure lowest cost and acceptable product quality levels, as well as provide additional risk insulation by reducing geographic and political risks.

We should deal with opportunity 2 in more depth next week as a follow-on to this letter since there are a myriad of issues I think we need to address, and I don't want us to lose momentum in building consensus for opportunity 1. Suffice it to say that, to me, this is an important component of our overall business relationship. I see it, however, as one which affords us both ample rewards, providing you with the opportunity to increase your overall profitability and competitiveness substantially, without experimenting with an incremental investment in unproven "human capital".

BW_014945

Deepal Wannakuwatte
September 19, 2007
Draft Employment Terms
Page 3 of 4

Regarding opportunity 1, below are some suggested parameters of a compensation package which you requested I prepare for your consideration:

1. Reporting Relationship:  Deepal Wannakuwatte

2. Title:  To be determined

3. Salary:  $225,000 per year payable twice monthly.  Salary to cover management activities related to IMG/DDS/------- Company, and such special projects as may be engaged in from time to time on behalf of DW.

4. Ownership:  _____% of the common voting shares of DDS, the Medical Products Company, or such other new DW related entities that we mutually agree I should be involved with.

5. Performance incentives:  _____% of DDS EBITDA, adjusted for any major shareholder compensation or perquisites, and transfer pricing adjustments between DDS and IMG or other entities with a material ownership interest by DW or members of his immediate family, but otherwise computed in accordance with generally accepted accounting principals.

6. Expenses:  Reimbursement for all normal and customary out of pocket business expenses including travel, meals, lodging, cell phone, laptop computer and accessories, and office supplies.

7. Benefits:  Participation in a benefits package including major medical insurance (Kaiser Permanente) and Dental insurance.

8. Initial Employment Contract Term:  5 Years, renewable for an additional 5 years upon agreement of both parties.

9. Vacation:  4 Weeks of paid vacation accrued on the basis of the contract year. Contract year shall commence as of the effective date of the contract.

10. D & O Insurance:  In the event I am appointed to any Board positions, company shall maintain levels of insurance as are prudent and customary for companies in their respective industry.

11. Severance Provision:  If termination of employment occurs during the first 3 years of employment, 2 Years of base salary plus 2 years of the historical average incentive compensation (if any); if termination occurs after 3 years, then severance shall be equal to the remaining term of the contract.

12. Compensation upon Sale of IMG:  In the event of the sale of stock or assets of IMG/DDS during my employment or that negotiations to sell these entities commences during my employment and is consummated within 24 months of the end of my employment, a sum equal to _____% of the *increase in valuation* of the company over its current value, computed on the same basis as the sale price valuation, shall be due and payable at the closing of the transaction unless otherwise agreed.

BW_014946

# EXHIBIT 12

JME

JAMESTOWN HEALTH & MEDICAL SUPPLY COMPANY, L.L.C.
*A Jamestown S'Klallam Tribally Owned Enterprise*

June 8, 2006

Ms. Heddy Chiang
Branch Manager
California Bank & Trust
1800 Arden Way
Sacramento, CA  95815

Dear Heddy:

I have been given full authority to sign on behalf of Jamestown Health & Medical
Supply Company LLC in any legal capacity.  All purchase orders will be signed by one
of the Board Members other than me.  We all have the legal capacity to sign these
purchase orders.

Sincerely,

JAMESTOWN HEALTH & MEDICAL SUPPLY COMPANY LLC

Deepal S. Wannakuwatte
President/CEO

cc:    Ron Allen, Chairman
        Clark & Trevithick

IMGCBT_0138214

# EXHIBIT 13

**Bank of America** 💳

*ATTN: Jon Enkati*
*559-938-2699*

BANK OF AMERICA - CONFIDENTIAL                        PAGE: 1

DATE: MAY 22, 2006

IRREVOCABLE STANDBY LETTER OF CREDIT NUMBER: 3082234

| BENEFICIARY | APPLICANT |
|---|---|
| CALIFORNIA BANK & TRUST | JAMESTOWN HEALTH AND |
| 550 S. HOPE ST. #300 | MEDICAL SUPPLY, INC. LLC |
| LOS ANGELES, CA 90071 | 1033 OLD BLYN HIGHWAY |
| ATTN: L. SHUM | SEQUIM, WA 98382 |

AMOUNT
NOT EXCEEDING USD 9,000,000.00
NOT EXCEEDING NINE MILLION AND
00/100'S US DOLLARS

EXPIRATION
MAY 17, 2007
AT OUR COUNTERS

WE HEREBY ESTABLISH IN YOUR FAVOR OUR IRREVOCABLE STANDBY LETTER OF
CREDIT NO. 3082234 WHICH IS AVAILABLE WITH BANK OF AMERICA, N.A. BY
PAYMENT AGAINST PRESENTATION OF THE ORIGINAL OF THIS LETTER OF CREDIT
AND YOUR DRAFTS AT SIGHT DRAWN ON BANK OF AMERICA, N.A., ACCOMPANIED
BY THE FOLLOWING DOCUMENT(S):

(1) BENEFICIARY'S SIGNED STATEMENT AS FOLLOWS: "INTERNATIONAL
MANUFACTURING GROUP, INC IS IN DEFAULT UNDER THE BANKING FACILITIES
EXTENDED BY CALIFORNIA BANK & TRUST. THE AMOUNT CLAIMED HEREIN
REPRESENTS THE OUTSTANDING BALANCE DUE AS OF DATE"

(2) COPY OF PURCHASE ORDER(S) FROM JAMESTOWN HEALTH AND MEDICAL
SUPPLY COMPANY, L.L.C. TO INTERNATIONAL MANUFACTURING GROUP, INC.

A PURCHASE ORDER PRESENTED IN EXCESS OF THE DRAFT AMOUNT AND THE
AVAILABLE AMOUNT OF THIS LETTER OF CREDIT IS ACCEPTABLE, HOWEVER
PAYMENT WILL NOT EXCEED THE DRAFT AMOUNT AND THE AVAILABLE AMOUNT
UNDER THIS LETTER OF CREDIT.

PARTIAL DRAWINGS ARE PERMITTED.

THIS LETTER OF CREDIT SHALL BE DEEMED AUTOMATICALLY EXTENDED WITHOUT
AMENDMENT FOR A PERIOD OF ONE (1) YEAR FROM THE PRESENT OR ANY FUTURE
EXPIRATION DATE, UNLESS AT LEAST SIXTY (60) DAYS PRIOR TO ANY
EXPIRATION DATE, WE NOTIFY YOU BY REGISTERED MAIL OR OVERNIGHT
COURIER SERVICE AT THE ABOVE ADDRESS, THAT WE ELECT NOT TO EXTEND
THIS LETTER OF CREDIT.

                              ORIGINAL

Bank of America, N.A. Trade Operations
CA9-705-07-05
1000 W. Temple St., Los Angeles, CA 90012-45140

00-35-4201/FSB 14-2005

CBT

# EXHIBIT 14



# IWC

## LAW OFFICES OF IAN W. CRAIG, PC

January 30, 2019

**VIA EMAIL (josbornerevis@buchalter.com)**

Jarrett Osborne-Revis, Esq.
BUCHALTER
500 Capitol Mall, Suite 1900
Sacramento, CA 95814

*Re:*   *JTS Communities, Inc., et al., v. ZB, N.A., a National Banking Association dba*
        *California Bank & Trust, et al.,*
        Continued Meet and Confer RE: Clawback Documents

Dear Jarrett:

This correspondence is a further attempt to meet and confer regarding the Bank's assertion
of the attorney-client privilege regarding certain documents involving Alex Fukui
("Clawback Documents").

As you are aware, we first brought the Clawback Documents to your attention on
November 21st, the day after the meeting attended by all counsel at your office. During
that meeting, we discussed possible deponents. When we mentioned that we intended to
depose Bank employee Alex Fukui, you stated that he was in-house counsel for the Bank, a
fact of which we were not aware.

On December 3, 2018, you responded to our notice, seeking the return of the Clawback
Documents. On December 10, 2018, we responded to your letter. Among other questions,
we asked the following: why were some of the Fukui emails that were contained in the
Bank production redacted in whole or in part, and others were not? Was the "dominant
purpose" of Mr. Fukui's communications business or legal advice?

Your December 17, 2018 letter attempted to address these issues. However, based on our
review of not only the Clawback Documents, but—**more importantly**--the
communications and other documents surrounding the Clawback Documents, we
respectfully disagree with your position that the Clawback Documents are subject to
privilege.

In addition to the other issues we have raised, it is our position that the Clawback
Documents are not subject to the attorney-client privilege based on the crime-fraud
exception. Further, we believe the Clawback Documents are subject to an implied waiver

Jarrett Osborne-Revis, Esq.
January 30, 2019
Page 2

of the attorney-client privilege, which occurs where the party claiming the privilege has placed the privileged communication "directly at issue and . . .disclosure is **essential for a fair adjudication of the action**".

In order to determine whether or not the Clawback Documents themselves are subject to privilege, it is necessary to do a thorough review of <u>all documents</u> that are related to the Clawback Documents.  This is an exceedingly difficult—if not impossible—task based on the following:

     (1)    The Bank has produced a <u>small portion</u> of the documents that are responsive to Plaintiffs' RFPDs and relevant to the Clawback documents (we know this based on documents obtained from third party sources);

     (2)    Of the documents it has produced, the Bank has deliberately and improperly redacted and withheld documents that directly relate to the Clawback Documents and Plaintiffs' claims, including our causes of action for Fraud, Aiding & Abetting and violation of B&P Code §17200;

     (3)    The Bank has failed and refused to produce documents in their native format and/or in a format with reliable metadata, and failed to even respond to our efforts to agree on a suitable production format;

     (4)    The Bank has **destroyed** critical evidence; namely, the hard drive from the laptop of Royal "Buzz" Minson, a senior Bank executive and key player who violated the Federal Bank Bribery Act while aiding and abetting Wannakuwatte in his scheme, and who was a party to numerous communications directly relevant to the Clawback Documents.

**Crime-Fraud Exception**

Under Evidence Code §956, there is no attorney-client privilege where a lawyer's services are sought "to enable or aid" anyone to commit a crime or fraud.

As stated by Judges Weil and Brown in their Treatise, *Civil Procedure Before Trial*:

> The attempt to defraud is all that need be shown to avoid the privilege. *i.e.*, the other party need not have been deceived: (B)ecause section 956 applies where an attorney's services are sought to enable a party to plan to commit a fraud", the party seeking discovery need not show justifiable reliance or damages. *BP Alaska Exploration, Inc. v. Sup. Ct. (Nahama)* (1988) 199 Cal.App.3d 1240, 1262.  See Weil & Brown, *Civil Procedure Before Trial*, at 8:152.

In this action, Plaintiffs can set forth a prima facie case that the actions taken by Alex Fukui were to enable the Bank to defraud Plaintiffs.  At a minimum, his advice was sought to enable Bank employees to plan or commit a fraud.

Jarrett Osborne-Revis, Esq.
January 30, 2019
Page 3

Based on the discovery we have conducted to date, the fraud perpetrated by the Bank commenced in 2005 when Wannakuwatte became a borrower of the Bank, and continued while Wannakuwatte remained a Bank customer and borrower of Zions Bank when he was arrested in 2014.

## Wannakuwatte's Relationship With Royal Minson

Soon after Wannakuwatte became a Borrower of the Bank in August 2005, he attended a meeting with Minson--the Bank's Director of International Business Development-- and Branch Manager Heddy Chiang.

With Minson's help, Wannakuwatte was able to rapidly generate the cash he needed to perpetrate his scheme. While Wannakuwatte's first loan—secured by Plaintiff Larry Carter's Standby Letter of Credit (SLC) -- was for only $897,000, both Minson and Wannakuwatte saw an opportunity to profit even more. By the end of 2008—only three years' time-- Wannakuwatte had over **$20 million** in outstanding loans with the Bank.

Minson's relationship with Wannakuwatte had numerous benefits. First, Minson would benefit financially based on his position in the Bank's International Banking Group (IBG). Since Wannakuwatte's company, International Manufacturing Group, was purportedly a large-scale importer of medical gloves and other products, Minson saw an opportunity for IBG (and himself) to achieve substantial profits. These profits were primarily based on fees generated from Wannakuwatte' use of Commercial Letters of Credit (L/C-Cs) to import product. As acknowledged by Minson, these L/C-Cs were supported by Plaintiffs' SLCs. In other words, as with IMG's Revolving Lines of Credit, the Bank eliminated its risk of loss in issuing the LC-Cs. Instead, the Bank shifted the risk of loss to Plaintiffs.[1]

Minson also saw the opportunity to profit personally from his relationship with Wannakuwatte. To achieve this, he parlayed the contacts he obtained from his work for the Bank, as well as the knowledge he obtained in international finance, and was paid tens of thousands of dollars by Wannakuwatte, in direct violation of the Bank Bribery Act, Title 18 U.S.C. 215.

Minson did substantial work for Wannakuwatte. Minson was intimately involved in the loan approval process, reviewing and approving the language of SLCs submitted by Plaintiffs, and drafting Commercial Letters of Credit and other documents that were supported by Plaintiffs' SLCs.

Through his relationship with Wannakuwatte and his employment with the Bank, Minson was well aware of Plaintiffs Larry Carter, JTS and Bristol. Minson, like Wannakuwatte, had a vested interest in defrauding Plaintiffs; Wannakuwatte could continue to obtain cash and Minson would continue to profit.

---

[1] In addition, B of A issued a $9 million SLC to Wannakuwatte's Jamestown Health & Supply Co. (JHMS), used as collateral for a $9 million line of credit.

Email: Ian@IWC-Law.com
2023 N Street, Suite 200, Sacramento, CA 95811 • Office: 916.277.8580 • Fax: 916.914.1803

Jarrett Osborne-Revis, Esq.
January 30, 2019
Page 4

### JTS and Larry Carter's Relation to Loan No. 0003

Minson—and other Bank employees, including Alex Fukui-- played key roles in IMG loan no. 181803-0003 ("loan no. 0003"). Minson and other Bank employees were well aware of JTS and Carter, in particular their relation to loan no. 0003.

Loan no. 0003, in the approximate amount of $2 million[2], was first obtained by Wannakuwatte in February 2006. The collateral for loan no. 0003 was a $2 million SLC obtained by JTS.

On February 1, 2006, Wannakuwatte pledged the JTS SLC as collateral for the loan. At the time Wannakuwatte signed the 2006 Pledge Agreement, the Bank was fully aware that: (a) Wannakuwatte had no relationship with JTS; (b) JTS had no knowledge of Wannakuwatte's pledge or the use of its SLC as "cash collateral" for a revolving line of credit; and (c) no one from the Bank had contacted JTS.

When JTS's Bank provided its notice not to renew the JTS SLC, Wannakuwatte, Minson and other Bank employees devised a plan for replacement collateral: an SLC for $2 million issued on behalf of Larry Carter.

As with the JTS SLC, on January 8, 2007, **Wannakuwatte pledged Carter's SLC** as collateral for loan no. 0003. And, once again (a) the Bank failed to contact Carter to obtain his authority; (b) the Bank knew that Wannakuwatte had no authority to act on behalf of Carter; and (c) the Bank knew that Carter had no knowledge of Wannakuwatte's pledge or the use of his SLC as "cash collateral" for a revolving line of credit.

Minson acknowledged the need for the Bank to meet with Carter. In a July 2007 email, Minson told Wannakuwatte, among other things, the following:

> I am starting a general write-up for Jun [Enkoji] to use in getting his approvals for [your] credit facilities at CBT. . .We probably need to discuss this. . **vis a vis the new credit facility/facilities, Ben Bryce and Flo Dunn would like to meet with Larry [Carter] prior to doing this deal**. . . does that seem feasible?[3]

In August 2007, Enkoji—apparently after receiving the "write up" from Minson-- advised Senior VP Ben Bryce of Wannakuwatte's desire for new credit facilities.

> Ben, Per Flo [Dunn's] recommendation, I am preparing to set up a luncheon with Deepal Wannakuwatte, owner/president of IMG in near future. As you are aware we are anticipating receiving an additional credit

---

[2] We use "approximate" because the amount of loan no. 0003 fluctuated depending on the amount of Plaintiffs' collateral.
[3] Dunn was Regional Manager for the Bank; Bryce was Chief Credit Officer.

Jarrett Osborne-Revis, Esq.
January 30, 2019
Page 5

request for IMG in the amount of about $8.0MM.  The credit will be used
for a proposed business acquisition, additional working capital for a
contract recently awarded by State of New Mexico and an expansion of
their janitorial supply business. [4] **The proposed credit will be secured by
an assignment of cash value of life insurance, which will be pledged by
Deepal's personal friend [Carter].**" (CBT 16)

Dunn's August 10th email response to Enkoji is also instructive:

> **Jun, [you will] want to include the gentlemen that is going to pledge
> the Life Insurance Policy [Carter]**

And on August 10th Enkoji responded to the group (including Minson):

> I am planning to meet with Deepal next week **and will ask him again if
> his friend, Larry Carter, would join us for the luncheon.**

On August 11th (a Saturday) Minson reached out to Wannakuwatte through Minson's
personal email:

> Hi Deepal. . . Jun Enkoji will probably be visiting you on Tuesday.  I have
> been asked to attend by our international credit administrator.  **Lets go
> over this sometime over the weekend or Monday so I can brief you
> appropriately.**

Despite the Bank's stated desire to include Carter in the discussion regarding the loans—
and despite the fact that Carter's SLC had been pledged by Wannakuwatte as collateral for
loan no. 0003—Carter was not contacted by the Bank or included in any of the meetings.
Instead, Minson, Enkoji and Wannakuwatte apparently met without him.

Carter's SLC had an expiration date of early 2008.  Unfortunately for the Bank, in
November 2007 Carter's issuing bank decided not to renew the SLC and sent its non-
renewal notice to the Bank's International Banking Group (including Minson) in late 2007.

During the latter half of 2007, Minson continued his work for Wannakuwatte.  For
example, Wannakuwatte paid Minson for his "consulting" work in performing due
diligence work in connection with Wannakuwatte's purported purchase of Dental Design
Supply Co. (DDS)[5].

---

[4] Naturally, Minson's "side projects" for Wannakuwatte included the proposed business acquisition [Dental
Design Supply Co.] and the janitorial supply business.  Minson was paid by Wannakuwatte for these services
in direct violation of the Bank Bribery Act.

[5] Not surprisingly, the DDS acquisition never came to fruition.  Nonetheless, Wannakuwatte was able to
obtain from the Bank a $3.2 million loan for the transaction.  The fact that the DDS transaction was
terminated before the $3.2 million loan funded was apparently irrelevant to the Bank; after all, Plaintiffs' cash
collateral (an SLC) was in place.

Jarrett Osborne-Revis, Esq.
January 30, 2019
Page 6

And in early 2008, Minson was involved as the Bank and Wannakuwatte scrambled to find replacement collateral for Carter's SLC. Naturally, Wannakuwatte and the Bank wanted a third party's SLC as collateral. Carter and Sweigart's private, captive insurance company, Bristol, was willing to issue an SLC, but on its own terms. Instead of going through a Bank (and incurring the associated fees), Sweigart and Carter wanted Bristol itself to directly issue the SLC.

Wannakuwatte took the idea of a Bristol-issued SLC to Minson. On January 7, 2008, Minson sent an email to Wannakuwatte through Minson's CBT email:

> Deepal, as we discussed, a Standby Letter of Credit issued by an insurance company [Bristol] is a "rare bird"...
> However, I don't practice law, and you should probably refer to Larry [Carter] for his take on which is better for you. If CBT is requested to take such a document as support for the extension of credit, we would want the document to be covered by either of those two referenced [International] codes, as well as being **subject to our review and approval of the overall language** of the instrument. Should you wish, **I'd be happy to work with you/Larry [Carter] on crafting an appropriate document to suit your transaction.**

On January 15, 2008, Wannakuwatte faxed to Minson a draft Standby Letter of Credit from Bristol Insurance Company. Wannakuwatte handwrote on the fax cover sheet: **"Buzz, let me know whether this works."**

The Bristol-issued SLC—the "rare bird" as described by Minson—was not acceptable to the Bank.

This caused Wannakuwatte and the Bank to again scramble to find replacement collateral. The Bank knew that to protect itself as to Wannakuwatte--a non-creditworthy borrower—it needed a third party guarantee, whether it be an SLC (the equivalent of cash) or cash. The fact that IMG claimed to have a $90+ million contract with the Veterans Administration and that Deepal and Betsy Wannakuwatte (who claimed a net worth of tens of millions) personally guaranteed the loans was not enough. The Bank needed real security. However, time was running short on the expiration of Carter's SLC.

But Minson, Enkoji and others at the Bank did not want CBT to draw down the Carter SLC, as that would shed light on the fraudulent nature of the transaction. Enkoji desperately pled with IBG not to draw against any of Plaintiffs' SLCs. The Bank and Enkoji knew that a draw down on Plaintiffs' SLC would be devastating to Wannakuwatte as it would reveal: (a) that the SLC was being used as collateral for loans so that Wannakuwatte could generate cash and the Bank could generate fees; (b) the cash was being used to make lulling payments to Plaintiffs and other investors; and (c) that Wannakuwatte himself had pledged Plaintiffs' collateral for the loans without their

Jarrett Osborne-Revis, Esq.
January 30, 2019
Page 7

knowledge or consent.  Had Plaintiffs known of these facts, they would have known that
Wannakuwatte was a fraud and they would have avoided tens of millions in losses.

On January 17, 2008, Plaintiffs wired $2,122,346 to IMG's account at CBT.  Plaintiffs
understood the funds would be used for government bids in connection with IMG's import
business.  Wannakuwatte transferred Plaintiffs' funds from one CBT account to another,
the newly formed account called "Business Money Plus Account".  Thereafter, the Bank
and Wannakuwatte decided to use Plaintiffs' funds (now in IMG's account at CBT) as
temporary collateral for loan no. 0003.

On January 18, 2008, Minson sent an email to Linda Shum of CBT's International Banking
Group regarding the expiration of Carter's SLC and Wannakuwatte's receipt of funds.  The
email, copied to Enkoji, Satow, and other key CBT employees, stated the following:

> Linda, confirming our discussion as follows:
> - $2MM in IMG funds have been deposited in Arden Way Money
>   Market account
> - Hold has been placed on these funds by Arden Way Office
> - Security Agreement and Collateral substitution agreements are
>   being ordered by Dawn Satow, for execution by borrower on
>   Tuesday to complete collateral perfection
> - Jun Enkoji is preparing the credit presentation and has spoken with
>   Kevin McQuiston concerning modification to collateral on the line
>   **and we do not have to draw on the Standby today**
> - If loan documents are not executed on Tuesday [1/22], we shall
>   then draw under the Standby.  Sufficient time remains to effect a
>   valid draw by ISP 98 guidelines under these circumstances.

On January 18, 2008, Enkoji prepared a new Credit Presentation Report for loan no. 0003
(signed by other credit officers).  After acknowledging that Carter's Bank issued a notice of
non-renewal in November 2007, the CPR continued as follows:

> the borrower has been requested to provide us with a replacement LC if
> they wish to renew the line for another term.  The borrower was also
> informed that CB&T will draw on the existing LC to retire the outstanding
> balance if they fail to submit a replacement by 1/17/08.  **After a
> discussion with an insurance company [BRISTOL] for the issuance of
> new standby LC, they immediately realized they are not able to meet the
> deadline set by us.  The Borrower then submitted a new proposal to
> temporary (sic) replace the existing LC with $2.0MM cash in the bank
> account.  The money was wired in yesterday and was place in newly
> established Business Money Plus Account at Arden Way Office.  The**
> subject credit line will be secured by the deposit **until we receive a new
> standby letter of credit issued by a major bank.**

Jarrett Osborne-Revis, Esq.
January 30, 2019
Page 8

Despite the deadlines imposed by the Bank, Wannakuwatte did not sign the necessary loan documents until January 23rd.

As noted, the Bank wanted an SLC in place as collateral. On February 15, 2008, Plaintiffs' funds were used to establish an SLC through ABN AMRO in the amount of $2,122,346. On February 19, 2008, Wannakuwatte faxed the SLC to Heddy Chiang: "Enclosed is the SBLC for $2 million. I need you to release my $2 million that is on hold [in the Money Plus Account] ASAP".

The IBG (and Minson) needed to review and approve the ABN AMRO SLC before agreeing to release the hold on Wannakuwatte's account, which was being used as cash collateral for loan no. 0003.

On February 21, 2008, Valerie Tracy of IBG sent an email to Ben Bryce, also copied to Minson and other key players.

> International Manufacturing Group -- Deepal the glove importer-- will substitute ABN Amro (Chicago office) SBLC for his current cash collateral with CBT for $2.1MM that supports issuance of LCs and BA refinancing to import gloves. . . the cash collateral replaced the [Carter] SBLC issued by American Security Bank which expired in January, **and he needs the money next week to commit to IMG's upcoming acquisition of another company.** Financing for the acquisition will be supported by another $3.5MM ABN Amro LC slated to arrive next week, **as I understand from Buzz.** . .[6] I understand Kevin has been kept abreast by Jun on this new transaction.

On February 25, 2008, Minson forwarded Ben Bryce's email confirmation of the release of Wannakuwatte's account as collateral for loan no. 0003 to Enkoji, Satow and Chiang. The ABN AMRO SBLC was formally in place as collateral for the loan.

In the meantime, Minson's work for Wannakuwatte continued to expand. In March and April 2008, Minson arranged for two large international transactions on behalf of Wannakuwatte. The shipments consisted of importing containers of medical gloves from China to Wannakuwatte's warehouse in West Sacramento. Minson used his contacts and expertise in trade finance to facilitate the transaction, and was paid handsomely by Wannakuwatte.

---

[6] The "acquisition" refers to Wannakuwatte's failed acquisition of Dental Design & Supply that "Buzz" consulted on and was paid by Wannakuwatte in violation of the Bank Bribery Act. Obviously, the money released to Wannakuwatte was not used toward the acquisition. Instead, as noted, Wannakuwatte secured a $3.2 million loan from CBT to "acquire" DDS, using a different ABN AMRO SLC issued on behalf of Plaintiffs as collateral. Although Enkoji and Minson knew that the DDS acquisition never occurred, Wannakuwatte kept the $3.2 million.

Jarrett Osborne-Revis, Esq.
January 30, 2019
Page 9

The glove orders arranged by Minson totaled approximately $200,000, and included over **5 million gloves.** The shipments not only benefited Minson personally, but CBT as well, as Commercial Letters of Credit—and their associated fees for IBG—were issued by CBT and used in the transactions.

During 2008, Wannakuwatte-- with the assistance of Minson and his other bank insiders--added over **$8 million in cash** to his arsenal through revolving lines of credit backed by Plaintiffs.

As noted, in April 2008, Wannakuwatte obtained a loan for $3,278,121 for the express purpose of acquiring Dental Design & Supply Co. (Loan no. 9001). This loan was backed by a Bristol SLC in the same amount, issued by B of A.

On April 1, 2008, Linda Shum sent an email to Minson and Satow regarding loan no. 9001.

> Buzz, good news! We rec'd the $3MM L/C [Bristol], pls see below.
> Terms are okay with me. Val [Tracy], please approve this bank.

The Bank, including Minson, knew that the DDS deal had been terminated at the time the loan was issued, yet the loan was funded regardless. Minson's motivations were clear. During April 2008, Minson was feverishly working to arrange the importation of the 5 million gloves for Wannakuwatte through Minson's illegal side business, Sourcing Services International.

Minson was also continuing his work with Wannakuwatte soliciting business from Native American Tribes, such as Jamestown (for which Wannakuwatte had $9 million in outstanding loans). In July 2008, Minson sent Wannakuwatte a proposal which included finding "alternative suppliers for IMG/Jamestown". Minson said:

> we are proposing a long term relationship to manage your glove sourcing.
> The key elements are . . .Monthly retainer of $20,000 per month. . .plus a
> percentage of the cost of goods purchased on a sliding scale

In addition to the $3.2 million loan for the fictitious DDS acquisition, during 2008 Wannakuwatte obtained two additional loans relating to the fictitious contract with the Department of Veterans Affairs, which Enkoji claimed was worth nearly $100 million annually. In fact, Wannakuwatte's VA contract was worth less than one-tenth of one percent of that amount.[7]

But the Bank—including Wannakuwatte's insiders--were not concerned with verifying the amount of the VA contract. They were incentivized by two primary factors: (1) personal financial gain and (2) the shift of the risk of loss away from the Bank and to Plaintiffs.

---

[7] Loan 9002, in the amount of $2,961,804, was secured by two Bristol SLCs, issued by B of A. Loan no. 9003 for $2 million was secured by an IMG CD that was opened using funds provided by Larry Carter.

Email: Ian@IWC-Law.com
2023 N Street, Suite 200, Sacramento, CA 95811 • Office: 916.277.8580 • Fax: 916.914.1803

Jarrett Osborne-Revis, Esq.
January 30, 2019
Page 10

In November 2008, the Bank received a notice of non-renewal of the ABN AMRO SLC for
$2,122,346, used to secure loan no. 0003. The SLC would expire in January 2009.
Once again, Wannakuwatte and the Bank had to scramble to find substitute collateral. But
this time, the Bank took matters even a step further.

**JTS Becomes a Bank Customer, and The Bank Perpetuates The Fraud**

By December 2008, the Bank knew, among other things, the following: (1) JTS had
provided an SLC totaling over $2 million, and Wannakuwatte had pledged the SLC as
collateral for loan no. 0003; (2) JTS was a local homebuilder, and Wannakuwatte had no
interest in JTS; (3) Carter and Sweigart were owners of JTS; (4) Carter, JTS and their
entity Bristol Insurance Company were investors in IMG; and (5) Carter, JTS and Bristol
were being defrauded by Wannakuwatte and the Bank.

The Bank had also accumulated approximately $20 million in outstanding loans to
Wannakuwatte/IMG, the proverbial "house of cards". Among these loans was the $9
million loan to the Jamestown Tribe. Despite the staggering amount, the Bank admittedly
did not understand the nature of the business relationship between IMG and Jamestown.[8]

The Bank had a more immediate problem: how to replace the collateral for loan no. 0003
before the ABN AMRO SLC expired in January.

On December 3, 2008, Jean Rafols from the IBG emailed several CBT employees
regarding the January 18th expiration of the ABN AMRO SLC, saying "if there is a need to
draw on the L/C, please advise us one month prior [12/18]."

In response, Val Tracy from IBG emailed Enkoji and Minson stating: "Jun, what are
Deepal's plans for replacing this LC?"

Apparently, the plan hatched by Wannakuwatte and the Bank involved continuing to
protect the Bank's interests while concealing material facts from JTS.

On December 18, 2008, Enkoji sent an email to Valerie Tracy, copying Minson and other
CBT employees. Enkoji stated:

> Val, I had a meeting with the Borrower, Deepal Wannakuwatte, this
> afternoon to discuss the expiring standby letter of credit. He plans to
> establish a CD at Arden Way Office to replace the expiring LC. The
> funds for CD should be wired to the branch next week.

---

[8] In a December 5, 2008 email from Enkoji to Wannakuwatte (copy to Minson), Enkoji asked for financial
information concerning Jamestown, which he said "will certainly assist me to fully understand the business
between Jamestown and IMG".

Email: Ian@IWC-Law.com
2023 N Street, Suite 200, Sacramento, CA 95811 • Office: 916.277.8580 • Fax: 916.914.1803

Jarrett Osborne-Revis, Esq.
January 30, 2019
Page 11

In this email Enkoji does not mention *whose* CD was to be established. However, in an email not produced by CBT it was clearly known that—once again—the Bank intended for JTS to bear the risk and establish the CD.

A December 18th email from Heddy Chiang to Wannakuwatte stated the following:

> Hi Deepal, I gather **your meeting with Jun went very well….he is already asking for this for the new JTS CD:**
> From Jun:
> We will need the list of corporate officers [from JTS] who are authorized to sign loan documents for the company. The company must designate a signer who signs the loan documents pledging the collateral.[9]

Also on December 18th, Enkoji sent an email to Satow, attaching a document that appears to be a corporate resolution prepared by JTS. We use "appears" because the Bank did not include the attachment in its production (one of numerous instances of the Bank withholding key documents).

In an email from Satow to Tracy and others, she states:

> Hi Val. Per our conversation, here is the corp. resolution prepared by JTS Communities, Inc. Shall I forward to Alex Fukui for review too? Also, if you can forward that pledge agreement that Alex prepared, I would like to take a look at it.
> Thank you. Also, thank you for your/Linda's agreement to wait until Monday on the ABN-Amro L/C. Jun will be back on Monday and we will take any necessary action to resolve this issue then.[10]

On December 19, 2008, JTS opened a Certificate of Deposit with CBT in the sum of $1,948,710.55. JTS believed that, similar to its SLCs, the CD was to be used to secure IMG's overseas transactions.

Regardless, in establishing the CD JTS became a Bank customer. With that came all of the respective duties owed by the Bank to its customers, including a duty that was paramount in 2008: **"Know Your Customer"**.

The Bank's idea of knowing its customer did not involve having any contact with JTS. Instead, the Bank apparently chose to know its customer only through Wannakuwatte.

Based on documents produced by the Bank, the Bank printed portions of JTS Communities' website. The website showed the officers and key employees of JTS, and the nature of JTS's business as a successful regional homebuilder. Obviously, JTS's

---

[9] Notably, the Bank failed to produce the email from Chiang to Wannakuwatte, and the email "from Jun" in which Enkoji discusses the need for a list of JTS corporate officers and a designated signer.
[10] This email—produced by the Bank-- is not only undated, the attachment was withheld by the Bank.

Jarrett Osborne-Revis, Esq.
January 30, 2019
Page 12

website made no mention of Wannakuwatte since, as the Bank already knew, he had no involvement whatsoever in the operation of the business.

Even though the Bank knew it had an obligation to contact JTS, it never did, as that would expose the fraud that had been ongoing since 2005, when Wannakuwatte pledge Carter's SLC as collateral for Wannakuwatte's first line of credit with the Bank.

Since the Bank wanted nothing to do with JTS, the Bank blatantly violated banking regulations with regard to the JTS CD. For example, when the CD was established on December 19th, the Bank failed to collect a valid signature card from JTS or obtain a corporate resolution signed by JTS. Moreover, internal banking documents indicate the Bank put a "hold" on the JTS CD (with no authority from JTS) and referred to the JTS CD as "collateral CD". However, there was no documentation in place permitting the CD to be put on "hold", the CD to be used as "collateral" or any other actions with regard to the JTS CD.

Since the Bank did not want to contact JTS for fear of its discovery of the fraud, the Bank allowed Wannakuwatte to take actions as to the JTS CD, even without the necessary documentation permitting it. For example, Wannakuwatte established the account where the interest for the CD would be deposited.

The interest account—opened December 19th, nearly a month **before** JTS executed the Fukui-prepared Resolution, was titled as follows: JTS Communities, Inc. **c/o Deepal Wannakuwatte**, and listed Wannakuwatte's F Street address. This JTS account remained open until October 6, 2014 (8 months after Wannakuwatte's arrest).

On December 23, 2008, Val Tracy sent an email to Enkoji: "Hi Jun, I understand that the cash arrived deposited to the account of JTS Communities, Inc. Please let Linda (Shum) and me know as soon as the collateral switch is approved **and CBT obtains a pledge of the cash by JTS**".

On December 23rd, Enkoji responded to Tracy's email: "Val, the CD under the name of JTS Communities, Inc. has been established, but Deepal needs to pay down the line to match the CD balance. He will be making the paydown this Friday [12/26]."[11]

On December 24th, Tracy emailed Shum and Enkoji: "Jun, the LC matures on Jan 18 and we need to draw well in advance of that—like the first week of January at the latest".

However, Enkoji desperately wanted to avoid a draw on the ABN AMRO SLC. On December 24th, Enkoji sent an email to Tracy, Minson and other CBT employees:

> Upon reducing the line to match the CD at Arden Way Office, we will
> freeze the line until the line is renewed with reduced amount. The CD

---

[11] The amount of the CD balance ($1,948,710) was less than the amount commitment balance of loan no. 0003 ($2,122,346).

Jarrett Osborne-Revis, Esq.
January 30, 2019
Page 13

> under the name of JTS Communities, Inc. (#4923) will replace the LC-S
> by ABN AMRO, which is expiring 1/18/08. The current outstanding
> balance of the line is $2,085,321.52 (commitment balance 2,122,136)...
> IMG will pay down the balance to match this CD by Friday [12/26]. As
> long as the line balance is reduced to match the CD, **we do not need to
> draw on the LC"**

Also on December 24th, Minson sent an email to the group regarding JTS's involvement:

> Jun... I would think we would want to document our perfected security
> position in this *third party collateral* with some sort of "Lent Collateral
> Agreement"...forgive me if I'm "preaching to the choir". I presume JTS
> Communities, Inc. is a California Corporation and that the ownership by
> the Jamestown Indians does not subject the deposit to any of the
> "sovereign immunity" issues vis a vis perfection of collateral?

Satow, in an email responding to Minson and others at CBT, said: "Buzz, Jun is out of the
office, but JTS Communities, Inc. is actually a California Home builder that Carter is/was
involved in".

By December 29th, the International Banking Group started to increase the pressure on
Enkoji, Satow and others to get executed documents in place, with the implied threat that
they would draw against the ABN AMRO SLC.

In a December 29th email only between the International Banking Group executives
(including Minson), Val Tracy said: "Let's wait for something in writing from Dawn
[Satow] that the paydown has occurred, the [JTS] CD has been properly secured (I don't
know that it has properly occurred yet) before we release the LC".

Satow sensed the IBG group's impatience, and the need for proper documentation. On
December 29th, Satow sent an email to Enkoji (only):

> **Hi Jun... I think we need the approval documents asap, to officially
> tie in the JTS CD to this loan.** I am planning to make that paydown of
> $136,610.97 today, although there is not enough money in the acct.
> **right now.** Deepal says he is expecting funds today. Will keep checking.

On December 31st, Val Tracy emailed the CBT group (including Minson): **"please verify
that CB&T has a security interest in this account. Has that documentation been
signed?"**

The simple answer to Tracy's question: No. However, in response Enkoji sent an email to
the group on the 31st, as follows:

Jarrett Osborne-Revis, Esq.
January 30, 2019
Page 14

> Val, Per our earlier phone conversation, **the only thing we have done so
> far is to place a hold on the CD and also to freeze the subject credit line.
> No, we do not have a security interest on the account nor signed
> document at this moment. Deepal Wannakuwatte is one of authorized
> signers on the account (CD) and he has requested that we place a hold
> on the account and also to freeze the credit line until the line is
> renewed in [an] attempt to stop you (International Banking Group)
> from drawing on AMRO Bank's standby letter of credit,** which is
> scheduled to expire on 1/18/09.  I will complete the renewal CP. . .as soon
> as I return from my vacation on 1/5/09.

Enkoji's email is instructive for a number of reasons.  First, he acknowledges that there
was a hold on the JTS CD without any signed documentation.  Second, he says that Deepal
Wannakuwatte is one of the authorized signers on the JTS CD account even though there
was no JTS Corporate Resolution in place giving him any such authority.  Third, without
any of the required documentation Enkoji acknowledges that Wannakuwatte was
requesting the hold on the JTS CD and a freeze on loan no. 0003 to stop "you" (the
International Banking Group) from drawing on the ABN AMRO SLC.

Shum clearly was growing frustrated at the lack of results from Enkoji.  On December 31st
she emailed Enkoji and the group: **"Jun, IBG operations just wants to know that we
definitely do not need to draw on ABN Amro's $2.1MM L/C.  Please confirm."**[12]

Val Tracy acknowledged to Shum the absurdity of the situation—including the clear
impropriety in Wannakuwatte as a "signer" as both a borrower and as to the purported
collateral, the JTS CD.  In her December 31st email sent only to Shum she stated:

> Linda, they [Enkoji, et al] need to let us know that they have all the
> documentation signed to give CBT security interest in the deposit [JTS
> CD].  **Deepal is the Borrower and is also here the signer on the
> account—so having him ask us for a "lock" on the deposit is sort of
> ridiculous!**

By January 1st, Regional Manager Dunn was growing increasingly concerned regarding the
failure to document the transaction replacing the ABN AMRO SLC with the JTS CD as
collateral for loan no. 0003.  She emailed the group:

> **Pls make sure we complete all the documentation needed to protect
> our Bank interest.**  No leeway or we need to draw on the L/C [ABN
> AMRO SLC].  Val or Linda, when is last day we can draw on L/C?

---

[12] Enkoji tersely responded to Shum's request in an email dated January 1st:  "Linda, you know I don't have
the authority to release the LC-S [ABN AMRO SLC].  I am sorry that I am not going to cancel my vacation
to work on the credit presentation.  I [had] told the customer to take care of the problem a month before my
scheduled vacation, but they decided to act on it during my vacation."

Jarrett Osborne-Revis, Esq.
January 30, 2019
Page 15

On January 2nd, Shum responded as follows:

> According to our IBG's policy, the last day to draw [was] **supposed to be 12/29/08** which is 15 working days prior to the L/C expiration date (1/28/09). Now we only have 10 working days left. If you folks decide to make the draw, we may try to draw on today or latest next Monday (1/5/09). **If the required documentation on the deposit is still not complete or provided, we should draw on the subject L/C.**

On January 5th, the "latest" date for a draw on the SLC, Val Tracy wrote the following email to Enkoji, Satow and Minson.[13] The email said the following:

> **RE: JTS'S ROLE IN IMG**
> Hi Jun Welcome back. . . .**What exactly is JTS's relationship with IMG?  It should have a business purpose in guaranteeing IMG.  And why is Deepal a signator for both firms?**

Tracy's question—what was the business purpose in Plaintiffs' guarantee IMG's loan-- goes to the heart of this Action. And the question arose when Wannakuwatte first pledged Carter's SLC in 2005, to his pledge of the JTS SLC, the Bristol SLCs, etc.

Enkoji's January 5th response only raised more issues.

> Larry Carter, who has been a primary investor and has been supporting IMG's business growth for a number of years, is the founder and primary partner of JTS. **Yes, JTS is getting a financial benefit from the transaction.** Larry Carter has made an arrangement to add Deepal on the signature card for the newly established CD at Arden Way Office so that Deepal can do whatever he wants with the funds. I have contacted Deepal. . . who is currently flying back from the east coast this afternoon, and have informed him of what the IBG's intention on AMRO Bank's LC. **He has strongly requested not to draw on the LC and has given me the authorization to liquidate the CD to retire the loan, if necessary.** I told him we will proceed with the renewal process, using the CD replacing the AMRO LC, but if the renewal process is not acceptable to IBG, we will liquidate the CD and retire the subject line. Deepal will be back tonight, and if necessary, he will go to Sacramento office tomorrow morning to take care of the transaction. . . the CP is currently being reviewed by Chuck (Rigsbee). **Please do not draw on the AMRO LC.**

---

[13] The fact that Minson and Satow were copied on Tracy's email to Enkoji demonstrates their "insider" status with Wannakuwatte.

Email: Ian@IWC-Law.com
2023 N Street, Suite 200, Sacramento, CA 95811 • Office: 916.277.8580 • Fax: 916.914.1803

Jarrett Osborne-Revis, Esq.
January 30, 2019
Page 16

Among other issues, Enkoji failed to answer the most basic question: JTS's role in the transaction. Instead, he concluded, with no details: "Yes, JTS is getting a financial benefit from the transaction."

Enkoji's real concern was simply stated: Don't draw on the SLC. Otherwise, the "house of cards" that the Bank and Wannakuwatte had built for the past four years could crumble.

Enkoji was so concerned with the draw on the SLC that he stated that Wannakuwatte gave him the authorization to "liquidate the CD to retire the loan". As the Bank was fully aware, Wannakuwatte had absolutely no authority to do anything with regard to the JTS CD.

Moreover, Enkoji's email continued his pattern of untruths. He said "Larry Carter has made an arrangement to add Deepal on the signature card for the newly established CD at Arden Way Office so that Deepal can do whatever he wants with the funds". But Enkoji never spoke with Carter, and Carter's name does not appear on the JTS CD, or any JTS signature card or Corporate Resolution.

Although the Bank had given itself a deadline of January 5th to document the transaction, it was clear that was unrealistic.

On January 5th, Dunn sent the following email to the CBT group:

> Jun, 1. Pls make sure that Deepal has the authority to liquidate the CD no later than Wednesday. [1/7] In other words, updated sig card signed. 2. Hopefully, we can get loan documents signed by Wednesday. Val, what is the absolute drop dead date that we can draw on the LC?

Dunn again verifies what the Bank already knew: that Wannakuwatte had no authority of any kind over the JTS CD, even though the Bank put a "hold" on the account with no notice to JTS.

On January 5th, Commercial Loan Manager Rigsbee emailed to Tracy and the group as follows:

> Val, Deepal is in route from the East Coast...Jun is going to get financial information on JTS, to give us a comfort level with them and or convert the CD into the name of IMG, which Deepal indicated was also a possibility. I know that time is of the essence, and I understand your concerns as to BK and possible funds transfers issues. . . not sure what the last possible day to draw on the L/C, but hopefully we can resolve no later than Wed." [Wed. is 1/7/09]

Jarrett Osborne-Revis, Esq.
January 30, 2019
Page 17

On January 5th (at 5:35 pm) Satow emailed the group the following:

> Everyone, Here is the approval, just received [Credit Presentation Report]
> Docs are on order and will be here shortly.  I will be reviewing docs to
> make sure 3rd party pledge/corporate resolution to pledge is ok.  Deepal is
> out of town today, but is available to sign off on documentation tomorrow.
> Necessary signatures from JTS will be obtained.

In other words, Satow confirms that: (a) JTS hadn't signed any documentation as of
January 5th; (b) Wannakuwatte hadn't signed any documentation; and (c) the "pledge/
corporate resolution" had been drafted by her to review, but had not been finalized.

According to the Clawback Documents, the "pledge/corporate resolution" was drafted by
Alex Fukui, as discussed below.

The January 5, 2009 Credit Presentation Report, prepared by Enkoji and approved by Bank
officials including Kevin McQuiston and Flo Dunn, is very instructive.  It provides an
overview of loan no. 0003, how the Bank came to its predicament regarding the collateral
"switch", and further addresses the "role" of JTS Communities, Inc. in this transaction.

However, the Credit Presentation Report starts with a falsehood.  Under "Description of
Collateral" it references the JTS CD, and adds "The above CD has been pledged by JTS
Communities, Inc.".

Of course, no one from JTS **ever** pledged the CD; further, at this time, January 5th, JTS had
not signed the "JTS Corporate Resolution" prepared by Fukui and Wannakuwatte had not
signed any documentation.

The "NARRATIVE/SYNOPSIS" in the Credit Presentation Report provides as follows:

> The borrower was informed that the bank will draw on the LC if they fail
> to present the bank the replacement collateral by the end of December.
> After the negotiation with an insurance company [Bristol] for the issuance
> of new standby letter of credit, the borrower realized that the placement of
> new LC in time was impossible and immediately suggested a proposal to
> replace the LC with a deposit account to be held at this bank.  The money
> was wired to our office on December 19, and the CD (1,948,711) in the
> name of **JTS Communities, Inc.** was established.  **JTS Communities,
> Inc. is not an affiliate or related entity of the borrower, but Mr. Larry
> Carter, a major investor to International Manufacturing Group, is
> the founder and the majority partner of the company.**

Email: Ian@IWC-Law.com
2023 N Street, Suite 200, Sacramento, CA 95811 • Office: 916.277.8580 • Fax: 916.914.1803

Jarrett Osborne-Revis, Esq.
January 30, 2019
Page 18

On January 6th, the Bank still did not have the documentation signed necessary to use the JTS CD as collateral. Dawn Satow—who said she would be reviewing the "pledge/corporate resolution"—sent an email to McQuiston and Tracy (copy to Minson):

> Kevin and Val, attached is the corporate resolution to grant collateral (for JTS Communities, Inc.) which will be used for the pending IMG transaction. **This document is currently under review with JTS's attorney. Heddy Chiang will be arranging to meet with JTS on Wednesday 1/7/09, however one of the authorized signers, Jack Sweigart is out of town until next week.** All other signators (Tim Weir, Vikki Holt and Deepal) will be obtained with the corporate resolution returned to us on Wednesday. It is my/Heddy's intent to follow up for Jack's signature on a duplicate copy of the corporate resolution next week. Also, Jun will be following up with Deepal for JTS Communities and Larry Carter's financial information. Just need to confirm that you are all ok with this process and this is sufficient to alleviate our collateral concerns so that **we can forego making a demand on the Ambro (sic) standby L/C.**

Satow's email is notable for a few reasons.[14] Satow says that the draft resolution is "currently under review with JTS's attorney". A reasonable inference is that the Bank was communicating with JTS's attorney. I was JTS's attorney in 2009. I was never contacted by the Bank.

Satow also says that one of the signatories, Jack Sweigart, cannot sign until the following week. That is significant, as Sweigart is the President of JTS. In fact, "JTS" refers to Jack T. Sweigart. Satow also says it is hers and Heddy's intent to follow up with Sweigart regarding his signature. That never happened.

Satow says that Jun would be following up to obtain JTS and Carter's financial information. That too never happened. Enkoji never spoke with, or met with, JTS or Carter.

Finally, Satow again follows the established company line of using any means necessary to avoid a draw on the ABN AMRO SLC.

On January 7th, Tracy emailed the group the following:

> Our Corp Res states that any 1 person may enter into an Agreement with Lender. **Deepal is one of the signers and he has apparently signed the Assignment of Deposit.** Now, there could be a problem if JTS comes back with a signed Resolution stating that two or more people are required, in which case Deepal's one sign would be insufficient"

---

[14] It should be noted that the Bank failed to produce the attached Draft Resolution, which is consistent with the Bank's document production practices.

Jarrett Osborne-Revis, Esq.
January 30, 2019
Page 19

> (REDACTED, then....)  Bottom line: **without an adequately approved
> and signed Resolution we don't have a valid security interest on the
> deposit.**  Therefore **we need the attorneys for JTS to revert (sic) to us
> TODAY** with their OK on the language and with the fully signed
> Resolution.  Val[15]

Tracy's email is notable, in that she indicates that Wannakuwatte had already signed an
Assignment of the JTS CD as collateral for loan no. 0003, "**without an adequately
approved and signed Resolution**".  Further, Tracy understood that the holdup in the
approval was with the review by JTS's attorney, which is simply untrue.

Enkoji also added to the mistaken (and fraudulent) notion that JTS's attorney was involved.
Enkoji's January 7th email to the CBT group states, in pertinent part:

> **The attorney for JTS has informed us that he has a problem with the
> verbiage of the "Grant Security" section of the corp. resolution
> prepared by the Bank.**  It seems that the resolution is requesting JTS to
> pledge all of the corporation's personal properties (tangible and
> intangible) as security. . .He wants to make sure that JTS is pledging only
> the certificate of deposit at Arden Way Office.  We instructed the attorney
> to prepare an "Addendum" to the resolution, which would specifically
> state the collateral.  Upon receipt of the addendum, we will forward it to
> you and to our legal dept. for review.

Again, Enkoji is simply misrepresenting facts by claiming that JTS's attorney was involved
in any discussions with the Bank, not to mention the Corporate Resolution.

On January 12, 2009, JTS executed the Corporate Resolution to Grant Collateral.

Unbeknownst to JTS, on or about January 7, 2009, Wannakuwatte executed an Assignment
of Deposit Account As Collateral.

**Fukui Pours Gasoline on the Fire By Attempting to Cover Up The Bank's Conduct
with Fraudulent Documents**

Among other things, Fukui drafted two critical documents that Plaintiffs allege were used
in furtherance of and/or to conceal the fraud: (1) the JTS Corporate Resolution; and (2) the
Assignment of Deposit Account.

The JTS Corporate Resolution was (a) substantially deleted by JTS and (b) intended to be
exceedingly limited in scope, yet it was approved by Fukui and the Bank.

Most importantly, the drafts of the Resolution came at a time when JTS was already a
**customer** of the Bank.

---

[15] Tracy's January 7th email was improperly redacted by the Bank.

Jarrett Osborne-Revis, Esq.
January 30, 2019
Page 20

In a January 7th email to Fukui, Satow sent to Fukui JTS's revisions to the CBT-prepared JTS Corporate Resolution. The revisions to the Resolution are notable, since (a) the revisions were handwritten by **Wannakuwatte**, not JTS; and (b) the revisions indicate wholesale deletions of the Corporate Resolution, the acceptance of which violates industry standards.

Satow's January 7th email states that "JTS has requested the attached change(s) to our corporate resolution for the purpose of limiting this authorization to the specific CD collateral which is to be held for this one credit facility." Satow is stating what JTS's intent is, but never contacted JTS, despite the fact that JTS was a CBT **account holder**. Instead, she relied on Wannakuwatte who, as we know, had no authority to act on behalf of JTS.

Satow's January 7th email concludes with: "Please let me know if these proposed changes work for us or how we can accommodate JTS's need to limit this authorization to our CD collateral/this one loan".

Again, it is unclear how Satow and the Bank could have known JTS's intentions without communicating with JTS. Further, Fukui apparently saw no need to communicate with its customer JTS, or with "the attorney for JTS" repeatedly mentioned in these emails.

Instead, Fukui relied on Satow (and Wannakuwatte's) proposed revisions to the CBT-prepared Resolution. However, not satisfied with simply deleting the language of the Resolution, Fukui added more language.

The additional language drafted by Fukui will be explored in more detail in the deposition of Mr. Fukui, discussed below. Suffice it to say that the language the language added by Fukui was wholly inconsistent with (a) the language deleted by JTS, (b) the "intention" of JTS (as relayed by Satow). Further, Fukui was obviously fully aware that JTS was a customer of the Bank (otherwise there was no need for the Resolution), but made no effort to communicate with JTS (or its counsel) regarding their intent.

There are numerous other "red flags" with regard to the Resolution. Most obviously, Wannakuwatte was listed under the heading "Officers". Yet, the Bank knew full well that he was not an Officer of JTS. Further, there is no title next to his name, as with the other officers of JTS.

The draft Resolution also references an Assignment of Deposit Account ("Assignment"). However, the Assignment was executed by Wannakuwatte <u>prior</u> to the time the Resolution was executed on January 12th.

The Assignment was prepared by Fukui. It is notable for a few obvious reasons, which will be more fully explored during Mr. Fukui's deposition.

Jarrett Osborne-Revis, Esq.
January 30, 2019
Page 21

First, the Assignment was signed by Wannakuwatte on behalf of both (a) JTS
Communities, as "Grantor" and (b) IMG, as "Borrower". This only furthered the fraud and
was in violation of standard banking practices.

Second, the address listed for JTS Communities, Inc. on the Assignment is IMG's main
office at 879 F Street, West Sacramento. Based on the Corporate Resolution (and
numerous other documents), the Bank (and Fukui) knew that JTS did not maintain its
office in West Sacramento; its office was 401 Watt Avenue, Sacramento. However, using
Wannakuwatte's address for JTS in the Assignment assured that the Assignment and any
documents associated with the Assignment would never be sent to JTS, only to
Wannakuwatte.

The Bank knew that Wannakuwatte would sign any document they put in front of him.
Otherwise, the Bank would (a) have to draw on the ABN AMRO SLC, which would reveal
to Plaintiffs the fraud perpetrated on them; or (b) Wannakuwatte would have to pay off
loan no. 0003. Since Wannakuwatte did not even have the approximate $100,000 in his
account to pay down the line, the Bank knew that a payoff of the $2.1 million loan was not
in the cards.

With Wannakuwatte as the signatory on the 5-page Assignment, the Bank (and Fukui) went
to great lengths to add onerous provisions JTS would never have agreed to, including broad
limitations on the Bank's liability to JTS. Further, the document that was completely at
odds with JTS's intent (as relayed by Wannakuwatte through Satow).

Examples of the fraudulent nature of the Assignment include the following:

(a)    the JTS CD is used as "cross-collateral"; i.e., Wannakuwatte and the Bank
       assigned the JTS CD as collateral not just for loan no. 0003, but for "all
       obligations of Borrower", which at that time totaled approximately $20
       million;

(b)    the Assignment contains numerous "Representations and Warranties" made
       by JTS (as Grantor) as to Borrower (IMG), including:
       (i)    "Grantor has established adequate means of
              obtaining from Borrower. . .information about
              Borrower's financial condition" and
       (ii)   "Lender has made no representation to Grantor
              about Borrower or Borrowers' creditworthiness";

(c)    the Assignment contains broad "Waivers" by Grantor (JTS) against CBT;

(d)    the Assignment states: "Grantor further and agrees that this Agreement is a
       separate and independent contract between Grantor and Lender, given for
       full and ample consideration, and is enforceable on its own terms"; the

Jarrett Osborne-Revis, Esq.
January 30, 2019
Page 22

Assignment provides that it will remain in effect until "Grantor, in writing, has requested from Lender a release of this Agreement";

(e)     Under "Limitations of Liability", it states: "Lender shall have no responsibility. . .for informing the Grantor about any of the above";

(f)     "Grantor covenants and agrees to maintain a minimum balance of $1,948,710.55 in the Account at all times so long as any Indebtedness[16] remains due and outstanding from Borrower to Lender"

(g)     "All obligations of Borrower and Grantor under this Agreement shall be joint and several"; and

(h)     "Grantor herby appoints Lender as its true and lawful attorney-in-fact".

**Effect of Waiver of Attorney-Client Privilege; Plaintiffs' Request for Un-Redacted Documents Relating to Fukui**

In sum, Plaintiffs' position is that Fukui not only assisted the fraudulent conduct committed by Bank personnel, but he was fully aware that (a) Wannakuwatte was not an officer of JTS; (b) Wannakuwatte had no authority to sign the Assignment on behalf of JTS; and (c) no one from the Bank contacted JTS.  Further, the evidence will show that the Fukui-drafted Assignment included attempts to limit the Bank's past and future liability to JTS, and to use the JTS CD not just as collateral for a $2 million loan, but to use it as cross-collateral for approximately $20 million in outstanding IMG loans.

Since Fukui was aware that no one at the Bank had spoken directly with JTS or any of its officers or agents (hence the need for the Resolution), any information provided by Satow, Enkoji, Minson or others at the Bank regarding JTS's "intent" in agreeing to the terms of the documents came from only one source: Wannakuwatte himself.  Fukui was also aware that the reason behind the Bank's rush to do the "bait and switch" with regard to the JTS Resolution and Assignment was that Plaintiffs' Bank had notified CBT that it was not renewing Plaintiffs' SLC.  Had CBT drawn against the SLC, JTS would have been alerted to how the SLCs were really being used; to provide cash to Wannakuwatte, not to provide security for overseas transactions.  Had JTS known this, it would have terminated its relationship with Wannakuwatte and avoided tens of millions of losses.  Enkoji, Satow, Minson and others knew this, which is why they repeatedly requested not to draw on the SLC.

In other words, Plaintiffs' position is that Fukui not only enabled the Bank, but was a vital cog in the Bank's scheme to defraud Plaintiffs, thereby negating any claim of privilege under Evid. Code §956.  Although we believe Mr. Fukui was fully aware of and knowingly participated in the fraud, I must stress that under § 956, we are not required to prove that.  The lawyer does not have to be aware of the fraud for the crime-fraud exception to apply.

---

[16] "Indebtedness" includes all of IMG's loans, which in 2009 totaled approximately $20 million.

Jarrett Osborne-Revis, Esq.
January 30, 2019
Page 23

Instead, the application of § 956 turns only on the client's intent. *See People v. Clark*, 50 Cal.3d 583 (1990). We believe that the foregoing facts are sufficient to meet the required standard; i.e., a prima facie case. A prima facie case is one that "suffice[s] for proof of a particular fact until contradicted and overcome ... by other evidence. In other words, [a prima facie case is made by] evidence from which reasonable inferences can be drawn to establish the fact asserted, i.e., the fraud." (*People v. Van Gorden* (1964) 226 Cal.App.2d 634, 636–637.) I invite you to respond with whatever information you believe is sufficient to contradict or overcome the waiver.

Moreover, Based on the Bank's reliance on the JTS Corporate Resolution and/or Assignment in its defense, there is also an implied waiver of the privilege. See Weil & Brown, *Civil Procedure Before Trial* ("an implied waiver of the privilege may occur where the party claiming the privilege has placed the privileged communication "directly at issue and...disclosure is essential for a fair adjudication of the action"). Weil & Brown, at 8:203.

Further, based on the foregoing, it is Plaintiffs' position that not only are Plaintiffs entitled to all of Fukui's communications (unredacted), but that they are entitled to depose Mr. Fukui based on his status as a critical witness in Plaintiffs' fraud claims.

Please contact me at your earliest convenience to further discuss this matter.

Very truly yours,

Ian W. Craig,

IWC:jam
53545

EXHIBIT 15

| Loan | Date - Originals & Renewals | Amount | Agreement Type (Promissory Note, Change In Terms, Business Loan Agreement) | Rate | Default Rate | End of Term - Original & Extensions | # of Loans & Extensions | Original & Changed Collateral | Source of Re-Payment |
|---|---|---|---|---|---|---|---|---|---|
| 168068-0001 | 8/12/2005 | $897,000.00 | PN | 7 | | 7/31/2006 | 1 | 1 | |
| 168068-0001 | 9/30/2005 | $897,000.00 | CIT | 7.25 | | 7/31/2006 | | 1 | |
| 168068-0001 | 2/5/2007 | $897,000.00 | CIT | 8.75 | | 2/8/2008 | 1 | | |
| 168068-0001 | 2/20/2007 | $897,000.00 | CIT | 8.75 | | 2/8/2008 | | 1 | |
| 168068-0001 | 3/5/2008 | $897,000.00 | CIT | 6.5 | | 2/8/2009 | 1 | | |
| 168068-0001 | 2/17/2009 | $897,000.00 | BLA | | | 2/8/2010 | 1 | 1 | |
| 168068-0001 | 2/17/2009 | $897,000.00 | CIT | 5 | | 2/8/2010 | 1 | 1 | |
| 168068-0001 | 2/14/2011 | PAYOFF | | | | | 1 | 1 | 2/14/11 $887k investor funds moved from Money Market Account ("MMA") to General Account ("GA", which was otherwise dormant for a month) then the investor funds paid to CBT - prior GA balance = $2,328 |
| 168068-0004 | 5/17/2006 | $1,500,000.00 | PN | 8.5 | 5 | 5/31/2007 | 1 | | |
| 168068-0004 | 6/26/2006 | $9,000,000.00 | CIT | 8.5 | 5 | 5/31/2007 | 1 | | |
| 168068-0004 | 2/20/2007 | $9,000,000.00 | CIT | 8.75 | | 5/31/2007 | 1 | 1 | |
| 168068-0004 | 5/31/2007 | $9,000,000.00 | CIT | 8.75 | | 5/17/2008 | 1 | 1 | |
| 168068-0004 | 5/23/2008 | $9,000,000.00 | BLA | | | 5/17/2009 | 1 | 1 | |
| 168068-0004 | 5/23/2008 | $9,000,000.00 | CIT | 5.5 | | 5/17/2009 | 1 | | |
| 168068-0004 | 5/15/2009 | $9,000,000.00 | CIT | 5.5 | | 8/17/2009 | 1 | | Bank of America Standby Letter of Credit ("BofA SLOC") |
| 168068-9001 | 8/30/2009 | PAYOFF | PN | | | 4/1/2009 | 1 | | |
| 168068-9001 | 4/2/2008 | $3,278,121.00 | PN | 5.75 | 5 | 4/1/2009 | 1 | 1 | |
| 168068-9001 | 4/7/2008 | $3,278,121.00 | BLA | | | 4/1/2010 | 1 | 1 | |
| 168068-9001 | 4/7/2009 | $3,278,121.00 | CIT | | | 4/1/2010 | 1 | | |
| 168068-9001 | 3/15/2010 | PAYOFF | | | | | 1 | | MMA check for $3,230,358, traced to to deposits into Wholesale Account ("WA") from 3/2 ($2.2M) and 3/8 ($1.1M) |
| 168068-9002 | 6/13/2008 | $2,961,804.00 | PN | 5.5 | 5 | 5/8/2009 | 1 | 1 | |
| 168068-9002 | 6/13/2008 | $2,961,804.00 | BLA | | | 5/8/2009 | 1 | 1 | |
| 168068-9002 | 5/15/2009 | $2,961,804.00 | CT | | | 5/8/2010 | 1 | | |

| Account | Date | Amount | Type | Rate | Date | | | Notes |
|---|---|---|---|---|---|---|---|---|
| 168068-9002 | 5/20/2010 | PAYOFF | | | | | 1 | $1,464,355 taken by CB&T from GA on 4/27/10 traced to $1.5M transfer from WA to MMA to GA, & $1,470,851 from WA to GA - pre-transfer GA balance =$1,539 |
| 168068-9003 | 10/29/2008 | $2,000,000.00 | CIT | 4.5 | 11/5/2009 | | 1 | |
| 168068-9003 | 11/11/2008 | $2,000,000.00 | CIT | 5 | 11/5/2009 | | 1 | |
| 168068-9003 | 11/11/2008 | $2,000,000.00 | BLA | | 11/5/2009 | | 1 | |
| 168068-9003 | 11/2/2009 | $2,000,000.00 | CIT | | 2/6/2010 | 1 | | |
| 168068-9003 | 11/4/2009 | PAYOFF | | | | | | GA balance = $3,237 on 11/4/09 - then $2,025M transferred to GA from WA and CBT paid same day from GA |
| 181803-0001 | 2/17/2009 | PAYOFF | CIT | 6.5 | 3/5/2009 | | 1 | On 2/17/09 CBT paid $245,306 from GA consisting of $141,447 transfer from WA and $103,859 Investor Funds deposited directly into GA |
| 181803-0001 | 3/5/2008 | $250,000.00 | BLA | | 3/5/2008 | | 1 | |
| 181803-0001 | 3/5/2008 | $250,000.00 | CIT | 8.75 | 3/5/2007 | | | |
| 181803-0001 | 2/20/2007 | $250,000.00 | CIT | 8.75 | 3/5/2007 | | 1 | |
| 181803-0001 | 2/20/2007 | $250,000.00 | BLA | | 3/5/2007 | | 1 | |
| 181803-0001 | 7/14/2006 | $250,000.00 | PN | 8.75 | 3/5/2007 | 1 | | |
| 181803-0003 | 2/1/2006 | $2,000,000.00 | PN | 8 | 1/31/2007 | 1 | | |
| 181803-0003 | 1/8/2007 | $2,000,000.00 | PN | 8.75 | 1/31/2008 | 1 | | |
| 181803-0003 | 2/20/2007 | $2,000,000.00 | CIT | 8.75 | 1/31/2008 | | 1 | |
| 181803-0003 | 1/22/2008 | $2,000,000.00 | CIT | 7.75 | 1/31/2008 | | 1 | |
| 181803-0003 | 2/22/2008 | $2,122,346.00 | CIT | 6.5 | 1/18/2009 | | | |
| 181803-0003 | 1/5/2009 | $1,948,710.55 | CIT | | 1/18/2009 | 1 | | |
| 181803-0003 | 2/22/2008 | $1,948,710.55 | CIT | | 1/18/2010 | 1 | | |
| 181803-0003 | 3/12/2009 | $1,948,710.55 | BLA | | 1/18/2010 | | 1 | |
| 181803-0003 | 3/12/2009 | $1,948,710.55 | CIT | | 1/18/2010 | | 1 | |
| 181803-0003 | 1/26/2010 | PAYOFF | CIT | | 1 | | 1 | $1,951,592 transferred from WA to GA - prior GA balance was just $3,183 - CBT paid same day (1/26/10) |
| 181803-0004 | 1/17/2007 | $300,000.00 | PN | 8.75 | 12/4/2007 | 1 | 1 | |
| 181803-0004 | 2/20/2007 | $300,000.00 | CIT | 7.75 | 12/4/2007 | 1 | 1 | |
| 181803-0004 | 12/12/2007 | $300,000.00 | CIT | | 12/4/2008 | 1 | 1 | |
| 181803-0004 | 12/16/2008 | $300,000.00 | BLA | 7.75 | 12/4/2009 | | 1 | |

| Account | Date | Amount | Type | Rate | Action Date | Loans & Ext. | Collateral | Rate |
|---|---|---|---|---|---|---|---|---|
| 181803-0004 | 12/16/2008 | $300,000.00 | CIT | | 12/4/2009 | 1 | 1 | 1 |
| 181803-0004 | 12/17/2009 | PAYOFF | | | | | | |
| 181803-9001 | 9/12/2007 | $600,000.00 | PN | 8.75 | 9/5/2008 | 1 | 1 | |
| 181803-9001 | 9/12/2007 | $600,000.00 | BLA | 5 | 9/5/2008 | 1 | 1 | |
| 181803-9001 | 9/15/2008 | $600,000.00 | CIT | | 9/5/2009 | | 1 | 1 |
| 181803-9001 | 9/9/2009 | $600,000.00 | CIT | | 9/5/2010 | | 1 | 1 |
| 181803-9001 | 9/13/2010 | $600,000.00 | CIT | | 11/5/2010 | 1 | 1 | 1 |
| 181803-9001 | 11/17/2010 | PAYOFF | CIT | | | | | |

**Total Loan Amount:**  ###########

**Total Loans & Extensions:** 31

**Total Collateral Actions:** 30

**Total Rate Actions:** 30

$350k "teller" transfer from MMA to GA on 12/16/09 when balance had been $1,857

$500k wired from WA to GA on 11/17/10 and CBT paid same day - prior to transfer GA balance = $506

1.     **Loan No. 168068-001** in the amount of $897,000 was issued via a Promissory Note dated 8/12/05, with a Maturity Date of 7/31/06.  On 9/30/05, a Change in Terms was issued which altered the loan collateral (substituted one letter of credit for another) and increased the interest rate from 7% to 7.25%.  On 2/5/07, six months after the 7/31/06 Maturity Date had passed, a Change in Terms was issued to increase the rate to 8.75% and to extend the Maturity Date to 2/8/08.  On 2/20/07, a Change in Terms was issued (referring to a Business Loan Agreement of even date) to change collateral to include Deepal Wannakuwatte's Personal Guarantee in the amount of $12,809,813.

On 3/5/08, after the already extended Maturity Date of 2/8/09 had passed, a Change in Terms was issued to re-extend the Maturity Date by an additional year to 2/8/09.  On 2/17/09, a Business Loan Agreement was executed to increase Wannakuwatte's Personal Guarantee to $21,409,271.  Also on 2/17/09, a Change in Terms was issued to extend, for a third time, the Maturity Date for yet an additional year, to 2/8/10.  On 2/14/11, over a full year after the thrice-extended Maturity Date had passed, the loan was finally paid off when $877,000 in investor funds was moved from the Money Market Account to the General Account.  Prior to the movement of $887,000 to the General Account, the General Account had been dormant for a month, with a balance of just $2,328.  Nonetheless, CBT accepted re-payment of the loan with misappropriated investor funds.

2.     **Loan No. 168068-0004** in the amount of $1,500,000 was issued via a Promissory Note dated 5/17/06, with a Maturity Date of 5/31/07.  On 6/26/06, a Change in Terms was issued to increase the line from $1,500,000 to $9,000,000 and to change collateral to include the $9,000,000 Bank of America ("BofA") Standby Letter of Credit ("SLOC") obtained by an IMG investor for the benefit of CB&T.  On 2/20/07, a Change in Terms was issued (referring to a Business Loan Agreement of even date) to change collateral to include Wannakuwatte's Personal Guarantee of $12,809,813.  On the Maturity Date of 5/31/07, a Change in Terms was issued to extend the Maturity Date by a year to 5/17/08. After the already extended Maturity Date had expired, on 5/23/08, a

Business Loan Agreement was issued which increased Wannakuwatte's Personal Guarantee to $16,447,467. Also on 5/23/08, a Change in Terms was issued to re-extend the already expired Maturity Date by an additional year, to 5/17/09. On 5/15/09, a Change in Terms was issued to again re-extend the Maturity Date to 8/17/09. Two weeks after the thrice-extended Maturity Date expired, on 8/30/09, the loan was paid-off when CBT drew down on the full $9,000,000 BofA SLOC in CBT's favor. As such, CBT was repaid with investor funds.

3.      **Loan No. 168068-9001** for $3,278,121 was issued via a Promissory Note dated 4/2/08, with a Maturity Date of 4/1/09. After the Maturity Date had already passed, on 4/7/09, a Change in Terms was issued to extend the Maturity Date by a year to 4/1/10. Also on 4/7/09, a Business Loan Agreement was issued to increase Wannakuwatte's Personal Guarantee to $21,409,271. On 3/15/10, the Loan was paid off with a $3,230,358 Money Market Account check written on two recent investor deposits into the Wholesale Account: $2.2M on 3/2; and $1.1M on 3/8. As such, CBT was repaid with investor funds.

4.      **Loan No. 168068-9001** for $2,961,804 was issued via a Promissory Note dated 6/13/08, with a Maturity Date of 5/8/09. A Business Loan Agreement dated 6/13/08 included collateral of Wannakuwatte's Personal Guarantee of $19,409,271. After the Maturity Date had already passed, on 5/15/09, a Change in Terms was issued to extend the Maturity Date by a year to 5/8/10. The Loan was paid off with two payments: (i) $1,464,355 on 4/27/10 from the General Account (which arrived into the General Account via a transfer of $1.5M from the Wholesale Account, to the Money Market Account, then to the General Account); and (ii) a 5/4/10 transfer of $1,470,851 from the Wholesale Account to the General Account. Prior to the transfers of $1.5M and $1,470,851 to the General Account, the balance of the General Account had been just $1,539. As such, CBT was repaid with investor funds.

5.      **Loan No. 168068-9003** for $2,000,000 was issued via a Promissory Note dated 10/29/08, with a Maturity Date of 11/5/09. On 11/11/08, a Business Loan

Agreement was issued that reflected collateral of Certificate of Deposit ("CD") Account No. 1250004573. Also on 11/11/08, a Change in Terms was issued to add collateral including Wannakuwatte's Personal Guarantee of $21,409,271. On 11/2/09, a Change of Term was issued extending the Maturity Date to 2/6/10. On 11/4/09, the loan was paid off via a $2,025,000 transfer to the General Account from the Wholesale Account. Prior to the transfer, the General Account balance had been just $3,237. As such, CBT was repaid with investor funds.

6.    **Loan No. 181803-0001** for $250,000 was issued via a Promissory Note dated 7/14/06, with a Maturity Date of 3/5/07. On 2/20/07, a Business Loan Agreement was issued including collateral of Wannakuwatte's Personal Guarantee of $12,809,813. Also on 2/20/07, a Change in Terms was issued to reflect the change in collateral. On the Maturity Date of 3/5/07, a Change in Terms was issued to extend the Maturity Date by a year to 3/5/08. On the already extended Maturity Date on 3/5/08, a Business Loan Agreement was issued to increase Wannakuwatte's Personal Guarantee to $13,169,346. Also on that already extended Maturity Date of 3/5/08, a Change in Terms was issued to re-extend the Maturity Date by an additional year to 3/5/09. On 2/17/09, the Loan was paid off with a $245,000 transfer to the General Account, consisting of $141,447 from the Wholesale Account and an investor deposit made directly into the General Account in the amount of $103,859. As such, CBT was repaid with investor funds.

7.    **Loan No. 181803-0003** for $2,000,000 was issued via a Promissory Note dated 2/17/06, with a Maturity Date of 1/31/07. On 1/8/07, a Second Promissory Note was issued which extended the Maturity Date to 1/31/08. On 2/20/07, a Change in Terms was issued (referring to a Business Loan Agreement of even date) to change collateral to include Wannakuwatte's Personal Guarantee of $12,809,813. On 1/22/08, a Change in Terms was issued to add collateral of the Money Market Account with a $2M balance. On 2/22/08, a Change in Terms was issued to re-extend the already extended Maturity Date by a year to 1/18/09. On 1/5/09, a Change in Terms was issued to extend the Maturity Date for a third time, for yet an additional year, to 1/18/10. On

3

3/12/09, a Business Loan Agreement was issued to increase Wannakuwatte's Personal Guarantee to $21,409,271. Also on 3/12/09, a Change in Terms was issued to add collateral of CD Account No. 1250004923. After the thrice-extended Maturity Date expired on 1/26/10, the loan was paid off via a transfer of $1,951,592 from the Wholesale Account to the General Account. Prior to the transfer needed to pay CBT, the General Account balanced had been just $3,183. As such, CBT was repaid with investor funds.

8.     **Loan No. 181803** for $300,000 was issued via a Promissory Note dated 1/17/07, with a Maturity Date of 12/4/07. The collateral included a $100,000 Zion Bank Letter of Credit. On 2/20/07, a Change in Terms was issued (referring to a Business Loan Agreement of even date) to add collateral including Wannakuwatte's Personal Guarantee of $12,809,813. After the Maturity Date had already passed, on 12/12/07, a Change in Terms was issued to extend the Maturity Date by a year to 12/4/08. After the already extended Maturity Date had expired on 12/16/08, a Change in Terms was issued to re-extend the Maturity Date by another year to 12/4/09. Also on 12/16/08, a Business Loan Agreement was issued to increase Wannakuwatte's Personal Guarantee to $21,409,271. After the thrice-extended Maturity Date had already passed on 12/17/09, the Loan was finally paid off using funds from a $350,000 "teller" transfer from the Money Market Account to the General Account. Prior to the "teller" transfer, the General Account balance had been just $1,857. As such, CBT was repaid with investor funds.

9.     **Loan No. 181803-9001** for $600,000 was issued via a Promissory Note dated 9/12/07, with a Maturity Date of 9/5/08. Also on 9/12/07, a Business Loan Agreement was issued reflecting collateral including Wannakuwatte's Personal Guarantee of $13,047,000. After the Maturity Date had expired, on 9/15/08 a Change of Terms was issued to extend the Maturity Date to 9/5/09. After the already re-extended Maturity Date had expired, another Change in Terms was issued on 9/9/09 to re-extend the Maturity Date for an additional year to 9/5/10. After the thrice-extended Maturity Date has expired for a third time, on 9/13/10 yet another Change of Terms was

issued to extend, for a fourth time, the Maturity Date to 11/5/10.  After the Maturity Date had already expired for a fourth time, on 11/17/10 the Loan was finally repaid using a same-day wire of $500,000 from the Wholesale Account to the General Account.  Prior to the $500,000 wire, the General Account Balance had been just $506.  As such, CBT was repaid with investor funds.

EXHIBIT 16

42

1   PETER G. BERTRAND (SBN: 87883)
    pbertrand@buchalter.com
2   BUCHALTER NEMER, A Professional Corporation
    55 Second Street, Suite 1700
3   San Francisco, CA 94105-3493
    Telephone: (415) 227-0900
4   Facsimile: (415) 227-0770

5   JOEL G. SAMUELS (SBN: 115264)
    jsamuels@buchalter.com
6   ANTHONY J. NAPOLITANO (SBN: 227691)
    anapolitano@buchalter.com
7   BUCHALTER NEMER, A Professional Corporation
    1000 Wilshire Boulevard, Suite 1500
8   Los Angeles, CA 90017-2457
    Telephone: (213) 891-0700
9   Facsimile: (213) 896-0400

10   Attorneys for ZB, N.A., a national banking
    association, dba California Bank & Trust

11

12             UNITED STATES BANKRUPTCY COURT

13             EASTERN DISTRICT OF CALIFORNIA

14                 SACRAMENTO DIVISION

15   In re                         Case No. 14-25820

16   INTERNATIONAL MANUFACTURING    Chapter 11
    GROUP, INC.,

17

18          Debtor.

19   BEVERLY N. MCFARLAND, Chapter 11    Adv. Proc. No. 16-02090
    Trustee, International Manufacturing Group,
20   Inc.,                           BN-1

21             Plaintiff,        ZB, N.A.'S MEMORANDUM OF
                              POINTS AND AUTHORITIES IN
22      vs.                    SUPPORT OF MOTION TO DISMISS
                              COMPLAINT TO AVOID AND
23   CALIFORNIA BANK & TRUST, a California  RECOVER FRAUDULENT
    corporation; BANK OF AMERICA, N.A., a   TRANSFERS
24   Delaware corporation; and JAMESTOWN
    S'KLALLAM TRIBE,             Date:       September 7, 2016
25                           Time:      10:00 a.m.
            Defendants.          Ctrm.:     Department D
26                           Place:     U.S. Bankruptcy Court
                               501 I Street, 6th Floor
27                                Courtroom 34
                                Sacramento, CA 95814
28                         Judge:    Hon. Robert S. Bardwil

EVA00340

# TABLE OF CONTENTS

|  | | | Page |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | JURISDICTION | | 4 |
| III. | STATEMENT OF RELEVANT FACTS | | 5 |
| | A. | The Trustee Only Asserts Actual Fraudulent Transfer Claims Against CB&T Under the California Uniform Fraudulent Transfer Act. | 5 |
| | B. | CB&T's Loans to IMG Were Fully Secured by IMG's Deposit Accounts that Were Held at CB&T. | 6 |
| | C. | The Payments that the Trustee Seeks to Avoid and Recover Are Payments on CB&T's Secured Loans with Funds from Accounts in Which CB&T Held a Valid, First-Priority, Perfected Security Interest. | 8 |
| IV. | ARGUMENT | | 10 |
| | A. | The Legal Standards Applicable to a Motion to Dismiss | 10 |
| | B. | This Court May Consider the Relevant Loan Documents that the Trustee Failed to Attach to the Complaint Under the "Incorporation by Reference" Doctrine. | 12 |
| | C. | The Loan Payments to CB&T that the Trustee Seeks to Avoid and Recover Do Not Constitute Avoidable Fraudulent Transfers as a Matter of California Law. | 14 |
| | | 1. At all relevant times, CB&T had a valid, perfected, first-priority security interest in the IMG accounts from which the loan repayments were made. | 15 |
| | | 2. Under CUFTA, each loan payment made to CB&T from IMG's deposit accounts is not an avoidable fraudulent transfer, and in fact is not a "transfer" at all. | 17 |
| | | 3. The leading bankruptcy treatise also recognizes that the repayment of a secured loan from the lender's collateral is not an avoidable transfer under the Uniform Fraudulent Transfer Act. | 19 |
| | D. | The Ninth Circuit Has Held that Loan Repayments to a Secured Creditor from that Creditor's Collateral Do Not Constitute Avoidable Fraudulent Transfers. | 20 |
| | | 1. The Ninth Circuit's decision in *First Alliance Mortgage Company* is dispositive in this case. | 20 |
| | | 2. Several other courts have adopted the Ninth Circuit's rationale in *First Alliance* in holding that there can be no fraudulent transfer liability for payments on account of secured loans. | 23 |

EVA00341

Filed 08/04/16                                                                                     Doc 37

1        E.      The Policy Behind Fraudulent Transfer Law Would Not Be Served by
                 Allowing Debtors or Trustees to Avoid Payments on Account of Secured
2                Debts from a Secured Lender's Collateral. ..................................................... 29

3        F.      In Bringing a Claim Under Section 544(b), the Trustee Has No Greater Rights
                 than a Creditor Would Have in Bringing a Fraudulent Transfer Claim Under
4                Applicable State Law. ..................................................................................... 30

5        G.      The Trustee's Fraudulent Transfer Claims Against CB&T Are Factually
                 Dissimilar to the Claims Asserted by the Trustee Against GE Capital ............... 32
6
         H.      The Trustee's Objection to CB&T's Proofs of Claim Filed in Wannakuwatte's
7                Bankruptcy Case Should Also Be Dismissed with Prejudice. ........................... 33

8        I.      Dismissal of the Complaint Should Be with Prejudice, As the Factual and
                 Legal Defects in the Complaint Cannot Be Cured by Amendment. .................... 34
9
    V.   CONCLUSION ........................................................................................................ 34
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 21393859V1

ZB, N.A.'S MOTION TO DISMISS COMPLAINT

EVA00342

EXHIBIT 17

**ZIONS BANK** 

ZIONS First National Bank
National Real Estate Department
One South Main, Suite 1400
Salt Lake City, Utah 84133-1109
1-888-524-4761

CERTIFIED MAIL

January 08, 2009

DEEPAL S. & BETSY K. WANNAKUWATTE
WANNAS ENTERPRISES, LLC AND INTERNATIONAL MANUFACTURING GROUP, INC.
5231  PLEASANT DRIVE
SACRAMENTO, CA  95822

RE: Financial Statement Reporting Requirements on Account #: 94705499001

Dear Deepal S. & Betsy K. Wannakuwatte:

Your year end  December 31, 2007 financial reporting information is seriously past due. You have not
responded to prior requests for this information.  This information is needed so Zions Bank can determine
whether or not you comply with the terms and conditions of your Loan Agreement and other loan documents.

The attached list indicates the financial statements required by Zions Bank and the due dates for each statement.
These statements are due no later than  February 07, 2009   to Zions First National Bank.

Per your Business Loan Agreement, page  5,  paragraph 4:
"FAILURE TO PROVIDE ACCEPTABLE FINANCIAL STATEMENTS WITHIN THE TIME PERIOD
AS SET FORTH BELOW SHALL CONSTITUTE AN EVENT OF DEFAULT UNDER THE NOTE
AND THIS BUSINESS LOAN AGREEMENT".
"...failure of Borrower/Guarantor to provide financial statements and other information as required by the terms
of this Agreement, the Interest Rate applicable to the Note, for a period beginning three (3) days after written
notice of such event of default is given and ending upon the curing of such default, shall at Bank's option, be
increased by one quarter of one percent (.25%) for the first 30-days of said event of default and by an
additional one quarter of one percent (.25%) during each 30-day period thereafter during which such event of
default continues." Effective February 07, 2009   your interest rate will increase by 0.25% and then every
30-days will increase by 0.25% until the requested  December 31, 2007  financial information is received.

If you have any questions regarding your loan, please contact me at the number referenced below.

Please Note:   If a separate business owns the asset financed by Zions Bank, we need a copy of that business
financial statement, be it a Limited Liability Corporation, a Partnership, or carried on a personal financial statement,
along with the above requested financial statements.  This enables us to verify and track funds that are used to make
the monthly payments.

Very Truly Yours,

Steven C. Schettler
Vice President
Zions First National Bank

# ZIONS BANK

## Statement of Financial Statements Due

ZIONS First National Bank
National Real Estate Department
One South Main, Suite 1400
Salt Lake City, Utah 84111
1-888-524-4761

Statement Date:

| Account #: | 94705499001 | Financial Year Ending: | December 31, 2007 |
|---|---|---|---|

BORROWER:   Wannas Enterprises, LLC

---

**Borrowers Financial Statements**

Borrower:   Wannas Enterprises, LLC                              Due Date: 4/30/2007

Year-end Financial Statements compiled by an independent Certified Public Accountant (CPA) in accordance with generally accepted accounting principles, due within 120 days of FYE.

---

**Borrowers Federal Income Tax Returns**

Borrower::   Wannas Enterprises, LLC                             Due Date:  4/30/2007

Year-end federal income tax returns, due within 30 days of filing

---

**Corporate Guarantors Financial Statements**

Guarantor - Corporate:  International Manufacturing Group, Inc.         Due Date: 4/30/2007

Year-end Financial Statements reviewed by an independent Certified Public Accountant (CPA) in accordance with generally accepted accounted principles, due within 120 days of fiscal year end.

---

**Individual Guarantors Financial Statements and Federal Income Tax Returns**

Guarantor - Individual: Deepal S. Wannakuwatte                   Due Date  4/30/2007

Signed personal financial statements, certified by the individual as being true and correct. Signed federal income tax returns certified by the individuals as being true and correct, due within 30 days of filing.

DM_HD0015005

# EXHIBIT 18

**14**

PETER G. BERTRAND (SBN: 87883)
   pbertrand@buchalter.com
BUCHALTER NEMER, A Professional Corporation
55 Second Street, Suite 1700
San Francisco, CA  94105-3493
Telephone: (415) 227-0900
Facsimile: (415) 227-0770

JOEL G. SAMUELS (SBN: 115264)
   jsamuels@buchalter.com
ANTHONY J. NAPOLITANO (SBN: 227691)
   anapolitano@buchalter.com
BUCHALTER NEMER, A Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA  90017-2457
Telephone: (213) 891-0700
Facsimile: (213) 896-0400

Attorneys for ZB, N.A., a national banking
association, dba California Bank & Trust

### UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| In re<br><br>INTERNATIONAL MANUFACTURING GROUP, INC.,<br><br>Debtor. | Case No. 14-25820<br><br>Chapter 11 |
| BEVERLY N. MCFARLAND, Chapter 11 Trustee, International Manufacturing Group, Inc.,<br><br>Plaintiff,<br><br>vs.<br><br>CALIFORNIA BANK & TRUST, a California corporation; BANK OF AMERICA, N.A., a Delaware corporation; and JAMESTOWN S'KLALLAM TRIBE,<br><br>Defendants. | Adv. Proc. No. 16-02090<br><br>BN-2<br><br>**DECLARATION OF DAWN SATOW IN SUPPORT OF ZB, N.A.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date:       October 19, 2016<br>Time:      10:00 a.m.<br>Dept.:      Department D<br>Place:      U.S. Bankruptcy Court<br>              501 I. Street, 6th Floor<br>              Courtroom 34<br>              Sacramento, California 95814<br>Judge:     Hon. Robert S. Bardwil |

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 21610607v1

# DECLARATION OF DAWN SATOW

I, Dawn Satow, declare as follows:

1.      I am a Vice President and Commercial Banker for defendant ZB, N.A., a national banking association dba California Bank & Trust ("CB&T"). The following facts are true to the best of my own personal knowledge, except where stated on information and belief, and as to those facts, I believe them to be true.  If called as a witness, I could and would testify competently to the facts set forth herein. I am over 18 years of age.

2.      I submit this declaration in support of CB&T's concurrently filed motion to dismiss the *First Amended Complaint* [Adv. Docket No. 54] (the "Amended Complaint") filed by Beverly N. McFarland, the chapter 11 trustee appointed in the above-captioned bankruptcy case (the "Trustee").

3.      I have been employed by CB&T and its predecessor entities since April 1973. My current position with CB&T is Vice President and Commercial Banker. I have previously served as a Loan Officer, Relationship Banker/Officer and Commercial Banker.  As it relates to International Manufacturing Group, Inc., (the "Debtor"), I am one of CB&T's personnel responsible for overseeing and managing the recordkeeping for the Debtor's loans with CB&T, ordering loan documents, obtaining signatures on loan documents as needed, keeping records of loan transactions, and maintaining the loan files for IMG.

4.      Additionally, as part of my duties at CB&T, I am one of the custodians of the books, correspondence, agreements, records, files and other banking-related documents maintained at CB&T as they pertain to the Debtor.

5.      In the ordinary course of CB&T's business and consistent with its policies and procedures, a record of all contracts and agreements to which CB&T is a party is maintained by CB&T, along with written and computerized records of all sums loaned or advanced to customers, payments made by customers on account, interest and other charges of the balance owing, and all deposit account records for accounts held at CB&T by its customers (collectively, the "Records"). I am informed and believe that (i) the Records constitute writings taken or made and kept in the course of the regularly conducted business activity of CB&T; (ii) it is the regular

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 21610607v1

2

DECLARATION OF DAWN SATOW IN SUPPORT OF
ZB, N.A.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

1   practice of CB&T to have these Records made, kept, and preserved; (iii) such Records are made

2   at or near the time of the acts or events recorded, by employees or contractors of CB&T with a

3   business duty to do so; and (iv) the Records are made by, or are made from information

4   transmitted by, employees or contractors of CB&T who have personal knowledge of the acts and

5   events recorded in such Records and with a business duty to so record such acts and events.

6   CB&T operates in reliance upon these procedures.

7       6.      In the ordinary course of its business, CB&T maintains the Records of all sums

8   loaned and advanced to customers, payments made by customers on account, interest and

9   charges of the balance owing. This information is maintained by and retrieved from computers

10  which are programmed for the above purposes. On or about the date any sum is loaned or

11  advanced to a customer, a written record is made of the amount of the loan and its terms by

12  CB&T's employees who act pursuant to CB&T's normal operating procedures. Further, it is the

13  practice of these employees to make a computerized record on or near the date any payment is

14  received from a customer and to credit the same against the amounts due and owing under the

15  particular loan agreement with that customer. CB&T operates in reliance upon this procedure

16  and the accuracy of the written records generated thereby.

17      7.      I have access to CB&T's Records, either through CB&T's computer systems or in

18  hard-copy files maintained in my office or in the offices of bank personnel from whom I can

19  obtain the business records. To the best of my abilities and resources, I have reviewed CB&T's

20  applicable books, documents, and records relating to the Debtor. I am familiar with the ordinary

21  and customary method and manner of the preparation and maintenance of financial institution

22  business records, and I am sufficiently acquainted with the method and manner of preparation

23  and maintenance of CB&T's business records pertaining to the Debtor.

24      8.      Based upon my employment at CB&T and my duties and responsibilities as Vice

25  President of CB&T, I am sufficiently acquainted with the method and manner of preparation and

26  maintenance of the business records of CB&T for the relevant time period. As of the date of this

27  Declaration, I have reviewed the Records relating to CB&T's dealings with the Debtor. By

28  virtue of my personal involvement in this matter and with the transactions at issue, and in

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 21610607v1

3

DECLARATION OF DAWN SATOW IN SUPPORT OF
ZB, N.A.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

reviewing the documents and correspondence by, between and among CB&T and the Debtor, I

affirm the documents referred to herein and attached as exhibits to be authentic business records

of CB&T, and I know the following to be true.

### The Loan Agreements

9.    The documentation for the Debtor's loans included the following loan documents:

a Promissory Note, a Business Loan Agreement, and one or more Change in Terms Agreements.

10.    Each of the loan documents attached to the Satow Exhibits includes a provision

substantially similar to the following provision granting CB&T a security interest in the Debtor's

deposit accounts:

> **DEPOSIT AGREEMENT SECURITY.**  Borrower [defined in each case
> as IMG] hereby grants a security interest to Lender [defined in each case
> as CB&T] in any and all deposit accounts (checking, savings, money
> market or time) of Borrower at Lender, now existing or hereinafter
> opened, to secure its indebtedness hereunder.  This includes all deposit
> accounts Borrower holds jointly with someone else.[1]

11.    Each of the nine loans referenced in the Trustee's Amended Complaint and their

relevant loan documents are summarized in relevant part as follows:

**A.    Loan No. 168068-0001[2]**

12.    On August 12, 2005, the Debtor, as borrower, executed a Promissory Note in the

principal amount of $897,000.00 payable to CB&T, as lender (the "168068-0001 Note"), a true

and complete copy of which is attached to the concurrently filed Exhibits to the Declaration of

Dawn Satow (the "Satow Exhibits") as **Exhibit A-1**.

13.    On September 30, 2005, the Debtor, as borrower, and CB&T, as lender, entered

into a Change in Terms Agreement with respect to the 168068-0001 Note, a true and complete

copy of which is attached to the Satow Exhibits as **Exhibit A-2**.

---

[1]  In some instances, the heading for this provision was entitled "Deposit Account Security" rather than "Deposit Agreement Security."  Notwithstanding the variation in heading, the operative text of the provision is identical. *See, e.g.*, Satow Exh. B-7 at p. 50, Satow Exh. C-2 at p. 59, Satow Exh. C-3 at p. 64, Satow Exh. D-3 at p. 78, Satow Exh. E-4 at p. 94, Satow Exh. G-7 at p. 145, Satow Exh. G-8 at p. 150, Satow Exh. I-4 at p. 184, and Satow Exh. I-5 at p. 186.

[2]  The 168068-0001 loan was initially given the Loan No. 9125000150-1. This loan was subsequently renumbered as Loan No. 168068-0001 in connection with the March 5, 2008 Change in Terms Agreement. *See* Satow Exhibit A-4.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 21610607v1                                        4

DECLARATION OF DAWN SATOW IN SUPPORT OF
ZB, N.A.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

14.     On February 5, 2007, the Debtor, as borrower, and CB&T, as lender, entered into a Change in Terms Agreement with respect to the 168068-0001 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit A-3**.

15.     On February 20, 2007, the Debtor, as borrower, and CB&T, as lender, entered into a Change in Terms Agreement with respect to the 168068-0001 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit A-4**.

16.     On March 5, 2008, the Debtor, as borrower, and CB&T, as lender, entered into a Change in Terms Agreement with respect to the 168068-0001 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit A-5**.

17.     On February 17, 2009, the Debtor, as borrower, and CB&T, as lender, entered into a Business Loan Agreement with respect to the 168068-0001 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit A-6**.

18.     On February 17, 2009, the Debtor, as borrower, and CB&T, as lender, entered into a Change in Terms Agreement with respect to the 168068-0001 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit A-7**.

19.     For the convenience of the Court, the following chart provides a summary of the loan documents related to Loan 168068-0001:

| Loan Doc. | Doc. Date | Deposit Security Language | Satow Decl. Exhibit |
|---|---|---|---|
| Promissory Note | 08/12/2005 | Yes. *See* Satow Exh. p. 5 | Exh. A-1 |
| Change in Terms | 09/30/2005 | Yes. *See* Satow Exh. p. 8 | Exh. A-2 |
| Change in Terms | 02/05/2007 | Yes. *See* Satow Exh. p. 10 | Exh. A-3 |
| Change in Terms | 02/20/2007 | Yes. *See* Satow Exh. p. 12 | Exh. A-4 |
| Change in Terms | 03/05/2008 | Yes. *See* Satow Exh. p. 14 | Exh. A-5 |
| Business Loan Agmt. | 02/17/2009 | Yes. *See* Satow Exh. p. 19 | Exh. A-6 |
| Change in Terms | 02/17/2009 | Yes. *See* Satow Exh. p. 24 | Exh. A-7 |

BUCHALTER NEMER
A Professional Corporation
San Francisco

BN 21610607v1

5

DECLARATION OF DAWN SATOW IN SUPPORT OF
ZB, N.A.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

1  **B.     Loan No. 168068-0004[3]**

2       20.    On May 17, 2006, the Debtor, as borrower, executed a Promissory Note in the

3  principal amount of $1,500,000.00 payable to CB&T, as lender (the "168068-0004 Note"), a true

4  and complete copy of which is attached to the Satow Exhibits as **Exhibit B-1.**

5       21.    On June 26, 2006, the Debtor, as borrower, and CB&T, as lender, entered into a

6  Change in Terms Agreement with respect to the 168068-0004 Note, a true and complete copy of

7  which is attached to the Satow Exhibits as **Exhibit B-2.**

8       22.    On February 20, 2007, the Debtor, as borrower, and CB&T, as lender, entered into

9  a Change in Terms Agreement with respect to the 168068-0004 Note, a true and complete copy

10  of which is attached to the Satow Exhibits as **Exhibit B-3.**

11       23.    On May 31, 2007, the Debtor, as borrower, and CB&T, as lender, entered into a

12  Change in Terms Agreement with respect to the 168068-0004 Note, a true and complete copy of

13  which is attached to the Satow Exhibits as **Exhibit B-4.**

14       24.    On May 23, 2008, the Debtor, as borrower, and CB&T, as lender, entered into a

15  Business Loan Agreement with respect to the 168068-0004 Note, a true and complete copy of

16  which is attached to the Satow Exhibits as **Exhibit B-5.**

17       25.    On May 23, 2008, the Debtor, as borrower, and CB&T, as lender, entered into a

18  Change in Terms Agreement with respect to the 168068-0004 Note, a true and complete copy of

19  which is attached to the Satow Exhibits as **Exhibit B-6.**

20       26.    On May 15, 2009, the Debtor, as borrower, and CB&T, as lender, entered into a

21  Change in Terms Agreement with respect to the 168068-0004 Note, a true and complete copy of

22  which is attached to the Satow Exhibits as **Exhibit B-7.**

23       27.    The following chart provides a summary of the loan documents related to Loan

24  168068-0004:

25

| Loan Doc. | Doc. Date | Deposit Security Language | Satow Decl. Exhibit |
|-----------|-----------|---------------------------|---------------------|

26

27

28  [3] The 168068-0004 loan was initially given the Loan No. 9125000150-4. The loan was renumbered as Loan No. 168068-0004 in connection with the May 23, 2008 Business Loan Agreement. *See* Satow Exhibit B-5.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 21610607v1

6

DECLARATION OF DAWN SATOW IN SUPPORT OF
ZB, N.A.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

| Promissory Note | 05/17/2006 | Yes. *See* Satow Exh. p. 27 | Exh. B-1 |
| Change in Terms | 06/26/2006 | Yes. *See* Satow Exh. p. 31 | Exh. B-2 |
| Change in Terms | 02/20/2007 | Yes. *See* Satow Exh. p. 34 | Exh. B-3 |
| Change in Terms | 05/31/2007 | Yes. *See* Satow Exh. p. 36 | Exh. B-4 |
| Business Loan Agmt. | 05/23/2008 | Yes. *See* Satow Exh. p. 42 | Exh. B-5 |
| Change in Terms | 05/23/2008 | Yes. *See* Satow Exh. p. 48 | Exh. B-6 |
| Change in Terms | 05/15/2009 | Yes. *See* Satow Exh. p. 50 | Exh. B-7 |

C.     **Loan No. 168068-9001**

28.     On April 2, 2008, the Debtor, as borrower, executed a Promissory Note in the principal amount of $3,278,121.00 payable to CB&T, as lender (the "168068-9001 Note"), a true and complete copy of which is attached to the Satow Exhibits as **Exhibit C-1**.

29.     On April 7, 2009, the Debtor, as borrower, and CB&T, as lender, entered into a Business Loan Agreement with respect to the 168068-9001 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit C-2**.

30.     On April 7, 2009, the Debtor, as borrower, and CB&T, as lender, entered into a Change in Terms Agreement with respect to the 168068-9001 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit C-3**.

31.     The following chart provides a summary of the loan documents related to Loan 168068-9001:

| Loan Doc. | Doc. Date | Deposit Security Language | Satow Decl. Exhibit |
|---|---|---|---|
| Promissory Note | 04/02/2008 | Yes. *See* Satow Exh. p. 53 | Exh. C-1 |
| Business Loan Agmt. | 04/07/2009 | Yes. *See* Satow Exh. p. 59 | Exh. C-2 |
| Change in Terms | 04/07/2009 | Yes. *See* Satow Exh. p. 64 | Exh. C-3 |

D.     **Loan No. 168068-9002**

32.     On June 13, 2008, the Debtor, as borrower, executed a Promissory Note in the principal amount of $2,961,804.00 payable to CB&T, as lender (the "168068-9002 Note"), a true and complete copy of which is attached to the Satow Exhibits as **Exhibit D-1**.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 21610607v1

7

DECLARATION OF DAWN SATOW IN SUPPORT OF
ZB, N.A.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

33.     On June 13, 2008, the Debtor, as borrower, and CB&T, as lender, entered into a Business Loan Agreement with respect to the 168068-9002 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit D-2**.

34.     On May 15, 2009, the Debtor, as borrower, and CB&T, as lender, entered into a Change in Terms Agreement with respect to the 168068-9002 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit D-3**.

| Loan Doc. | Doc. Date | Deposit Security Language | Satow Decl. Exhibit |
|---|---|---|---|
| Promissory Note | 06/13/2008 | Yes. *See* Satow Exh. p. 67 | Exh. D-1 |
| Business Loan Agmt. | 06/13/2008 | Yes. *See* Satow Exh. p. 73 | Exh. D-2 |
| Change in Terms | 05/15/2009 | Yes. *See* Satow Exh. p. 78 | Exh. D-3 |

**E.      Loan No. 168068-9003**

35.     On October 29, 2008, the Debtor, as borrower, executed a Promissory Note in the principal amount of $2,000,000.00 payable to CB&T, as lender (the "168068-9003 Note"), a true and complete copy of which is attached to the Satow Exhibits as **Exhibit E-1**.

36.     On November 11, 2008, the Debtor, as borrower, and CB&T, as lender, entered into a Business Loan Agreement with respect to the 168068-9003 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit E-2**.

37.     On November 11, 2008, the Debtor, as borrower, and CB&T, as lender, entered into a Change in Terms Agreement with respect to the 168068-9003 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit E-3**.

38.     On November 2, 2009, the Debtor, as borrower, and CB&T, as lender, entered into a Change in Terms Agreement with respect to the 168068-9003 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit E-4**.

39.     The following chart provides a summary of the loan documents related to Loan 168068-9003:

**DECLARATION OF DAWN SATOW IN SUPPORT OF ZB, N.A.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**

| Loan Doc. | Doc. Date | Deposit Security Language | Satow Decl. Exhibit |
|---|---|---|---|
| Promissory Note | 10/29/2008 | Yes. *See* Satow Exh. p. 81 | Exh. E-1 |
| Business Loan Agmt. | 11/11/2008 | Yes. *See* Satow Exh. p. 87 | Exh. E-2 |
| Change in Terms | 11/11/2008 | Yes. *See* Satow Exh. p. 92 | Exh. E-3 |
| Change in Terms | 11/02/2009 | Yes. *See* Satow Exh. p. 94 | Exh. E-4 |

F.     **Loan No. 181803-0001**[4]

40.     On July 14, 2006, the Debtor, as borrower, executed a Promissory Note in the principal amount of $250,000.00 payable to CB&T, as lender (the "181803-0001 Note"), a true and complete copy of which is attached to the Satow Exhibits as **Exhibit F-1**.

41.     On February 20, 2007, the Debtor, as borrower, and CB&T, as lender, entered into a Business Loan Agreement with respect to the 181803-0001 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit F-2**.

42.     On February 20, 2007, the Debtor, as borrower, and CB&T, as lender, entered into a Change in Terms Agreement with respect to the 181803-0001 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit F-3**.

43.     On March 5, 2007, the Debtor, as borrower, and CB&T, as lender, entered into a Change in Terms Agreement with respect to the 181803-0001 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit F-4**.

44.     On March 5, 2008, the Debtor, as borrower, and CB&T, as lender, entered into a Business Loan Agreement with respect to the 181803-0001 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit F-5**.

45.     On March 5, 2008, the Debtor, as borrower, and CB&T, as lender, entered into a Change in Terms Agreement with respect to the 181803-0001 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit F-6**.

---

[4]  The 181803-0001 loan was initially given the Loan No. 9163000288-1. The loan was renumbered as Loan No. 181803-0001 in connection with the March 5, 2008 Business Loan Agreement. *See* Satow Exhibit F-5.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 21610607v1

9

DECLARATION OF DAWN SATOW IN SUPPORT OF
ZB, N.A.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

46.  The following chart provides a summary of the loan documents related to Loan 181803-0001:

| Loan Doc. | Doc. Date | Deposit Security Language | Satow Decl. Exhibit |
|---|---|---|---|
| Promissory Note | 07/14/2006 | Yes. *See* Satow Exh. p. 97 | Exh. F-1 |
| Business Loan Agmt. | 02/20/2007 | Yes. *See* Satow Exh. p. 103 | Exh. F-2 |
| Change in Terms | 02/20/2007 | Yes. *See* Satow Exh. p. 108 | Exh. F-3 |
| Change in Terms | 03/05/2007 | Yes. *See* Satow Exh. p. 110 | Exh. F-4 |
| Business Loan Agmt. | 03/05/2008 | Yes. *See* Satow Exh. p. 115 | Exh. F-5 |
| Change in Terms | 03/05/2008 | Yes. *See* Satow Exh. p. 120 | Exh. F-6 |

G.  **Loan No. 181803-0003**[5]

47.  On February 1, 2006, the Debtor, as borrower, executed a Promissory Note in the principal amount of $2,000,000.00 payable to CB&T, as lender (the "181803-0003 Note"), a true and complete copy of which is attached to the Satow Exhibits as **Exhibit G-1**.

48.  On January 8, 2007, the Debtor, as borrower, executed a Promissory Note in the principal amount of $2,000,000.00 payable to CB&T, as lender (amending the "181803-0003 Note"), a true and complete copy of which is attached to the Satow Exhibits as **Exhibit G-2**.

49.  On February 20, 2007, the Debtor, as borrower, and CB&T, as lender, entered into a Change in Terms Agreement with respect to the 181803-0003 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit G-3**.

50.  On January 22, 2008, the Debtor, as borrower, and CB&T, as lender, entered into a Change in Terms Agreement with respect to the 181803-0003 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit G-4**.

51.  On February 22, 2008, the Debtor, as borrower, and CB&T, as lender, entered into a Change in Terms Agreement with respect to the 181803-0003 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit G-5**.

---

[5] The 181803-0003 loan was initially given the Loan No. 9125000150-3 and then Loan No. 9163000280-3. The loan was renumbered as Loan No. 181803-0003 in connection with the January 22, 2008 Change in Terms Agreement. *See* Satow Exhibit G-4.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 21610607v1

10

DECLARATION OF DAWN SATOW IN SUPPORT OF
ZB, N.A.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

52.     On January 5, 2009, the Debtor, as borrower, and CB&T, as lender, entered into a Change in Terms Agreement with respect to the 181803-0003 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit G-6**.

53.     On March 12, 2009, the Debtor, as borrower, and CB&T, as lender, entered into a Business Loan Agreement with respect to the 181803-0003 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit G-7**.

54.     On March 12, 2009, the Debtor, as borrower, and CB&T, as lender, entered into a Change in Terms Agreement with respect to the 181803-0003 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit G-8**.

55.     The following chart provides a summary of the loan documents related to Loan 181803-0003:

| Loan Doc. | Doc. Date | Deposit Security Language | Satow Decl. Exhibit |
|---|---|---|---|
| Promissory Note | 02/01/2006 | Yes. *See* Satow Exh. p. 123 | Exh. G-1 |
| Promissory Note | 01/08/2007 | Yes. *See* Satow Exh. p. 127 | Exh. G-2 |
| Change in Terms | 02/20/2007 | Yes. *See* Satow Exh. p. 130 | Exh. G-3 |
| Change in Terms | 01/22/2008 | Yes. *See* Satow Exh. p. 132 | Exh. G-4 |
| Change in Terms | 02/22/2008 | Yes. *See* Satow Exh. p. 135 | Exh. G-5 |
| Change in Terms | 01/05/2009 | Yes. *See* Satow Exh. p. 140 | Exh. G-6 |
| Business Loan Agmt. | 03/12/2009 | Yes. *See* Satow Exh. p. 145 | Exh. G-7 |
| Change in Terms | 03/12/2009 | Yes. *See* Satow Exh. p. 150 | Exh. G-8 |

**H.     Loan No. 181803-0004[6]**

56.     On January 17, 2007, the Debtor, as borrower, executed a Promissory Note in the principal amount of $300,000.00 payable to CB&T, as lender (the "181803-0004 Note"), a true and complete copy of which is attached to the Satow Exhibits as **Exhibit H-1**.

---

[6] The 181803-0004 loan was initially given the Loan No. 9163000288-4. The loan was renumbered as Loan No. 181803-0004 in connection with the December 12, 2007 Change in Terms Agreement. *See* Satow Exhibit H-3.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

DECLARATION OF DAWN SATOW IN SUPPORT OF
ZB, N.A.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

57.     On February 20, 2007, the Debtor, as borrower, and CB&T, as lender, entered into a Change in Terms Agreement with respect to the 181803-0004 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit H-2**.

58.     On December 12, 2007, the Debtor, as borrower, and CB&T, as lender, entered into a Change in Terms Agreement with respect to the 181803-0004 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit H-3**.

59.     On December 16, 2008, the Debtor, as borrower, and CB&T, as lender, entered into a Business Loan Agreement with respect to the 181803-0004 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit H-4**.

60.     On December 16, 2008, the Debtor, as borrower, and CB&T, as lender, entered into a Change in Terms Agreement with respect to the 181803-0004 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit H-5**.

61.     The following chart provides a summary of the loan documents related to Loan 181803-0004:

| Loan Doc. | Doc. Date | Deposit Security Language | Satow Decl. Exhibit |
|---|---|---|---|
| Promissory Note | 01/17/2007 | Yes. *See* Satow Exh. p. 153 | Exh. H-1 |
| Change in Terms | 02/20/2007 | Yes. *See* Satow Exh. p. 156 | Exh. H-2 |
| Change in Terms | 12/12/2007 | Yes. *See* Satow Exh. p. 158 | Exh. H-3 |
| Business Loan Agmt. | 12/16/2008 | Yes. *See* Satow Exh. p. 163 | Exh. H-4 |
| Change in Terms | 12/16/2008 | Yes. *See* Satow Exh. p. 168 | Exh. H-5 |

**I.     Loan No. 181803-9001**

62.     On September 12, 2007, the Debtor, as borrower, executed a Promissory Note in the principal amount of $600,000.00 payable to CB&T, as lender (the "181803-9001 Note"), a true and complete copy of which is attached to the Satow Exhibits as **Exhibit I-1**.

63.     On September 12, 2007, the Debtor, as borrower, and CB&T, as lender, entered into a Business Loan Agreement with respect to the 181803-9001 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit I-2**.

**DECLARATION OF DAWN SATOW IN SUPPORT OF
ZB, N.A.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**

64.     On September 15, 2008, the Debtor, as borrower, and CB&T, as lender, entered into a Change in Terms Agreement with respect to the 181803-9001 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit I-3**.

65.     On September 9, 2009, the Debtor, as borrower, and CB&T, as lender, entered into a Change in Terms Agreement with respect to the 181803-9001 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit I-4**.

66.     On September 13, 2010, the Debtor, as borrower, and CB&T, as lender, entered into a Change in Terms Agreement with respect to the 181803-9001 Note, a true and complete copy of which is attached to the Satow Exhibits as **Exhibit I-5**.

67.     The following chart provides a summary of the loan documents related to Loan 181803-0004:

| Loan Doc. | Doc. Date | Deposit Security Language | Satow Decl. Exhibit |
|---|---|---|---|
| Promissory Note | 09/12/2007 | Yes. *See* Satow Exh. p. 171 | Exh. I-1 |
| Business Loan Agmt. | 09/12/2007 | Yes. *See* Satow Exh. p. 177 | Exh. I-2 |
| Change in Terms | 09/15/2008 | Yes. *See* Satow Exh. p. 182 | Exh. I-3 |
| Change in Terms | 09/09/2009 | Yes. *See* Satow Exh. p. 184 | Exh. I-4 |
| Change in Terms | 09/13/2010 | Yes. *See* Satow Exh. p. 186 | Exh. I-5 |

### The "CBT Income Transfers"

68.     I have reviewed Exhibit A to the Amended Complaint, which sets forth numerous interest and fee payments (defined in the Amended Complaint as "CBT Income Transfers") made by the Debtor to CB&T with respect to the foregoing loans that the Trustee seeks to avoid and recover from CB&T. Attached to the Satow Exhibits as **Exhibit J** is a compilation of true and complete copies of the Commercial Loans Transaction History reports obtained from CB&T's Records for the relevant time periods that correlate to the CB&T Income Transfers set forth in Exhibit A to the Amended Complaint.

69.     Attached to the Satow Exhibits as **Exhibit K** is a compilation of true and complete copies of the relevant monthly account statements for (1) the Debtor's Demand Deposit Account

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

13

DECLARATION OF DAWN SATOW IN SUPPORT OF
ZB, N.A.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

1  held at CB&T and designated as Account No. xxxxx7631 (defined in the Amended Complaint as

2  the "IMG General Account") obtained from CB&T's Records for the period from January 1, 2008

3  through February 28, 2011, and (2) the Debtor's deposit account held at CB&T and designated as

4  Account No. xxxxx4841 (defined in the Amended Complaint as the "Wholesale Account")

5  obtained from CB&T's Records for March 2010 and May 2010.

6      I declare under penalty of perjury under the laws of the State of California that the

7  foregoing is true and correct.

8      Executed on the 21st day of September, 2016, in Sacramento, California.

9

10  _____

11  DAWN SATOW

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 21610607v1

14

DECLARATION OF DAWN SATOW IN SUPPORT OF
ZB, N.A.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

334

1   PETER G. BERTRAND (SBN: 87883)
        pbertrand@buchalter.com
2   BUCHALTER NEMER, A Professional Corporation
    55 Second Street, Suite 1700
3   San Francisco, CA  94105-3493
    Telephone: (415) 227-0900
4   Facsimile: (415) 227-0770

5   JOEL G. SAMUELS (SBN: 115264)
        jsamuels@buchalter.com
6   ANTHONY J. NAPOLITANO (SBN 227691)
        anapolitano@buchalter.com
7   BUCHALTER NEMER, A Professional Corporation
    1000 Wilshire Boulevard, Suite 1500
8   Los Angeles, CA  90017-2457
    Telephone: (213) 891-0700
9   Facsimile: (213) 896-0400

10  Attorneys for ZB, N.A., a national banking
    association, dba California Bank & Trust

11

## UNITED STATES BANKRUPTCY COURT

12

## EASTERN DISTRICT OF CALIFORNIA

13

## SACRAMENTO DIVISION

14

| | |
|---|---|
| 15  In re | Case No. 14-25820 |
| 16  INTERNATIONAL MANUFACTURING GROUP, INC., | Chapter 11 |
| 17      Debtor. | |
| 18  | |
| 19  BEVERLY N. MCFARLAND, Chapter 11 Trustee, International Manufacturing Group, Inc., | Adv. Proc. No. 16-02090 |
| 20  | BN-2 |
| 21      Plaintiff, | **EXHIBITS TO THE DECLARATION OF DAWN SATOW IN SUPPORT OF ZB, N.A.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT** |
| 22      vs. | |
| 23  CALIFORNIA BANK & TRUST, a California corporation; BANK OF AMERICA, N.A., a Delaware corporation; and JAMESTOWN S'KLALLAM TRIBE, | Date:      October 19, 2016 |
| 24  | Time:      10:00 a.m. |
| 25      Defendants. | Dept.:     Department D |
| | Place:     U.S. Bankruptcy Court |
| 26  | 501 I. Street, 6th Floor |
| | Courtroom 34 |
| 27  | Sacramento, California 95814 |
| | Judge:     Hon. Robert S. Bardwil |
| 28  | |

# EXHIBIT LIST FOR DECLARATION OF DAWN SATOW

ZB, N.A., a national banking association, dba California Bank & Trust ("CB&T"),[1] respectfully submits this Exhibit List for its concurrently filed *Declaration of Dawn Satow in Support of ZB, N.A.'s Motion to Dismiss First Amended Complaint*.

| Exhibit | Title | Page No. |
|---|---|---|
| A-1 | Loan No. 168068-0001: Promissory Note dated 8/12/2005 | 3 |
| A-2 | Loan No. 168068-0001: Change in Terms dated 9/30/2005 | 7 |
| A-3 | Loan No. 168068-0001: Change in Terms dated 2/5/2007 | 9 |
| A-4 | Loan No. 168068-0001: Change in Terms dated 2/20/2007 | 11 |
| A-5 | Loan No. 168068-0001: Change in Terms dated 3/5/2008 | 13 |
| A-6 | Loan No. 168068-0001: Business Loan Agreement dated 2/17/2009 | 15 |
| A-7 | Loan No. 168068-0001: Change in Terms dated 2/17/2009 | 23 |
| B-1 | Loan No. 168068-0004: Promissory Note dated 5/17/2006 | 25 |
| B-2 | Loan No. 168068-0004: Change in Terms dated 6/26/2006 | 29 |
| B-3 | Loan No. 168068-0004: Change in Terms dated 2/20/2007 | 33 |
| B-4 | Loan No. 168068-0004: Change in Terms dated 5/31/2007 | 35 |
| B-5 | Loan No. 168068-0004: Business Loan Agreement dated 5/23/2008 | 38 |
| B-6 | Loan No. 168068-0004: Change in Terms dated 5/23/2008 | 47 |
| B-7 | Loan No. 168068-0004: Change in Terms dated 5/15/2009 | 49 |
| C-1 | Loan No. 168068-9001: Promissory Note dated 4/2/2008 | 51 |
| C-2 | Loan No. 168068-9001: Business Loan Agreement dated 4/7/2009 | 55 |
| C-3 | Loan No. 168068-9001: Change in Terms dated 4/7/2009 | 63 |
| D-1 | Loan No. 168068-9002: Promissory Note dated 6/13/2008 | 65 |
| D-2 | Loan No. 168068-9002: Business Loan Agreement dated 6/13/2008 | 69 |
| D-3 | Loan No. 168068-9002: Change in Terms dated 5/15/2009 | 77 |
| E-1 | Loan No. 168068-9003: Promissory Note dated 10/29/2008 | 79 |
| E-2 | Loan No. 168068-9003: Business Loan Agreement dated 11/11/2008 | 83 |
| E-3 | Loan No. 168068-9003: Change in Terms dated 11/11/2008 | 91 |
| E-4 | Loan No. 168068-9003: Change in Terms dated 11/2/2009 | 93 |
| F-1 | Loan No. 181803-0001: Promissory Note dated 7/14/2006 | 95 |

[1] Effective December 31, 2015, Defendant California Bank & Trust, a California banking corporation, merged its banking charter into ZB, N.A., a national banking association, and no longer exists as a separate California banking corporation. Accordingly, California Bank & Trust's name has been changed to "ZB, N.A., a national banking association, dba California Bank & Trust."

BN 31685813v1

| F-2 | Loan No. 181803-0001: Business Loan Agreement dated 2/20/2007 | **99** |
|---|---|---|
| F-3 | Loan No. 181803-0001: Change in Terms dated 2/20/2007 | **107** |
| F-4 | Loan No. 181803-0001: Change in Terms dated 3/5/2007 | **109** |
| F-5 | Loan No. 181803-0001: Business Loan Agreement dated 3/5/2008 | **111** |
| F-6 | Loan No. 181803-0001: Change in Terms dated 3/5/2008 | **119** |
| G-1 | Loan No. 181803-0003: Promissory Note dated 2/1/2006 | **121** |
| G-2 | Loan No. 181803-0003: Promissory Note dated 1/8/2007 | **125** |
| G-3 | Loan No. 181803-0003: Change in Terms dated 2/20/2007 | **129** |
| G-4 | Loan No. 181803-0003: Change in Terms dated 1/22/2008 | **131** |
| G-5 | Loan No. 181803-0003: Change in Terms dated 2/22/2008 | **133** |
| G-6 | Loan No. 181803-0003: Change in Terms dated 1/5/2009 | **137** |
| G-7 | Loan No. 181803-0003: Business Loan Agreement dated 3/12/2009 | **141** |
| G-8 | Loan No. 181803-0003: Change in Terms dated 3/12/2009 | **149** |
| H-1 | Loan No. 181803-0004: Promissory Note dated 1/17/2007 | **151** |
| H-2 | Loan No. 181803-0004: Change in Terms dated 2/20/2007 | **155** |
| H-3 | Loan No. 181803-0004: Change in Terms dated 12/12/2007 | **157** |
| H-4 | Loan No. 181803-0004: Business Loan Agreement dated 12/16/2008 | **159** |
| H-5 | Loan No. 181803-0004: Change in Terms dated 12/16/2008 | **167** |
| I-1 | Loan No. 181803-9001: Promissory Note dated 9/12/2007 | **169** |
| I-2 | Loan No. 181803-9001: Business Loan Agreement dated 9/12/2007 | **173** |
| I-3 | Loan No. 181803-9001: Change in Terms dated 9/15/2008 | **181** |
| I-4 | Loan No. 181803-9001: Change in Terms dated 9/9/2009 | **183** |
| I-5 | Loan No. 181803-9001: Change in Terms dated 9/13/2010 | **185** |
| J | Commercial Loans Transaction History reports | **187** |
| K | Bank Account Statements (IMG General Account 1/08 to 2/11 and Wholesale Account 3/10 & 5/10) | **213** |

2

# EXHIBIT A-1

# PROMISSORY NOTE

*# 1680680001*

| Principal | Loan Date | Maturity | Loan No. | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|----------|-------------|---------|---------|----------|
| $897,000.00 | 08-12-2005 | 07-31-2006 | 9125000150-3 | | | 68631 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  International Manufacturing Group, Inc.
879 F Street
West Sacramento, CA  95605

**Lender:**  California Bank & Trust
Arden Way Branch
1800 Arden Way
Sacramento, CA  95815

---

**Principal Amount:  $897,000.00**          **Initial Rate:  7.000%**          **Date of Note:  August 12, 2005**

**PROMISE TO PAY.** International Manufacturing Group, Inc. ("Borrower") promises to pay to California Bank & Trust ("Lender"), or order, in lawful money of the United States of America, the principal amount of Eight Hundred Ninety-seven Thousand & 00/100 Dollars ($897,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on July 31, 2006. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning August 31, 2005, with all subsequent interest payments to be due on the last day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. The annual interest rate for this Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an index which is the rate of interest set from time to time by Bank as its Prime Rate. California Bank & Trust Prime Rate is determined by Bank as a means of pricing credit extensions to some customers and is neither tied to any external rate of interest or index nor is it necessarily the lowest rate of interest charged by Bank at any given time for any particular class of customers or credit extensions (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each Day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 6.500%. The interest rate to be applied to the unpaid principal balance of this Note will be at a rate of 0.500 percentage points over the Index, resulting in an initial rate of 7.000%. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**PREPAYMENT; MINIMUM INTEREST CHARGE.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a minimum interest charge of $200.00. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to:  California Bank & Trust, Arden Way Branch, 1800 Arden Way, Sacramento, CA  95815.

**LATE CHARGE.** If a payment is 15 days or more late, Borrower will be charged 6.000% of the regularly scheduled payment or $500.00, whichever is less.

**INTEREST AFTER DEFAULT.** Upon default, the variable interest rate on this Note shall immediately increase to 5.500 percentage points over the Index, if permitted under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Exhibit A-1, Page 000004

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness

# PROMISSORY NOTE
## (Continued)

Loan No: 9125000150-1                                                                                                   Page 2

assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Borrower deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance on this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento County, State of California.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instrument listed herein: a letter of credit described in a Commercial Pledge Agreement dated August 12, 2005.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following persons currently are authorized, except as provided in this paragraph, to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of their authority: Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.; and Betsy Wannakuwatte, Secretary of International Manufacturing Group, Inc. Under no circumstances shall Lender be required to make any advances in an amount less than $300.00. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial information includes, but is not limited to all Business Financial Statements (including interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**BORROWER'S FINANCIAL STATEMENT.** Furnish Lender with, as soon as available, on an annual basis, required only if line is to be renewed, Borrower's balance sheet and income statement for the year ended, compiled by a certified public accountant satisfactory to Lender. All financial reports required to be provided under this Agreement shall be prepared in accordance with generally accepted accounting principles, applied on a consistent basis, and certified by Borrower as being true and correct.

**GUARANTOR FINANCIAL INFORMATION.** Borrower covenants and agrees with Lender that, while this Agreement is in effect, Borrower will furnish Lender with Guarantor's personal financial statement, on California Bank & Trust form, as soon as available, on an annual basis, required only if line is to be renewed and; a signed copy of Guarantor's filed Federal Income Tax Return, as soon as available, on an annual basis, required only if line is to be renewed.

**BORROWER FEDERAL INCOME TAX RETURN.** Borrower covenants and agrees with Lender that, while this Agreement is in effect, Borrower shall furnish Lender with a signed copy of Borrower's filed Federal Income Tax Return, as soon as available, on an annual basis, required only if line is to be renewed.

**TERMINATION OF AUTOMATIC PAYMENTS.** If at any time and for any reason, Borrower or Lender terminates the Automatic Payment feature of this Note, Lender may increase the variable interest rate applied to the unpaid balance of said Note by an additional one-half percentage point.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

# PROMISSORY NOTE
## (Continued)

Loan No: 9125000150-1                                                                                          Page 3

---

presentment, demand for payment, and notice of dishonor.  Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability.  All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone.  All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made.  The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS.  BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____         By: _____
Deepal    Wannakuwatte,    President/CEO    of         Betsy  Wannakuwatte,  Secretary  of  International
International  Manufacturing Group, Inc.                    Manufacturing Group, Inc.

---

LASER PRO Lending, Ver. 5.36.00.005  Copr. Harland Financial Solutions, Inc. 1997, 2008.  All Rights Reserved.  - CA  L:\CFI\LPL\D20.FC  TR-18378  PR-1

# EXHIBIT A-2

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No. | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $897,000.00 | 09-30-2005 | 07-31-2006 | 9125000150-1 | | | 8631 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:** California Bank & Trust
Arden Way Branch
1800 Arden Way
Sacramento, CA 95815

**Principal Amount: $897,000.00**        **Initial Rate: 7.250%**        **Date of Agreement: September 30, 2005**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**

The Promissory Note dated August 12, 2005, in the original amount of $897,000.00, from International Manufacturing Group, Inc. to Lender.

**DESCRIPTION OF COLLATERAL.**

Irrevocable Standby Letter of Credit, Number NZS550779, dated August 10, 2005, issued by Wells Fargo Bank in the amount of $897,000.00.

**DESCRIPTION OF CHANGE IN TERMS.**

1) A Letter of Credit Subline in the amount of $897,000.00 is hereby added to this Revolving Line of Credit. An Exhibit titled "Letter of Credit Subline Exhibit" is hereby attached to this agreement and made part of this agreement.

All other terms and conditions shall remain the same.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all subsequent actions.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**LETTER OF CREDIT SUBLINE EXHIBIT.** An exhibit, titled "Letter of Credit Subline Exhibit," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

**PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.**

**BORROWER:**

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal Wannakuwatte,    President/CEO    of
International Manufacturing Group, Inc.

By: _____
Betsy Wannakuwatte, Secretary of International
Manufacturing Group, Inc.

LASER PRO Lending, Ver. 6.26.00.003 Copr. Harland Financial Solutions, Inc. 1997, 2005. All Rights Reserved. - CA L:\CFI\LPL\D20C.FC TR-10300 PR-7

Exhibit A-2, Page 000008

# EXHIBIT A-3

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No. | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $897,000.00 | 02-05-2007 | 02-08-2008 | 9125000150-1 | | | 2217 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing " **** " has been omitted due to text length limitations.

| Borrower: | International Manufacturing Group, Inc.<br>879 F Street, Suite 120<br>West Sacramento, CA 95605 | Lender: | California Bank & Trust<br>Central Valley Sacramento Region Corporate Banking<br>1331 Broadway<br>Sacramento, CA 95818 |
|---|---|---|---|

**Principal Amount: $897,000.00**          **Initial Rate: 8.750%**          **Date of Agreement: February 5, 2007**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**

The Business Loan Agreement dated July 14, 2006 and the Promissory Note dated August 12, 2005, in the original amount of $897,000.00, as amended by those certain Change In Terms Agreements dated September 30, 2005 and July 14, 2006, from International Manufacturing Group, Inc. to Lender.

**DESCRIPTION OF COLLATERAL.**

Irrevocable Letter of Credit, Number NZS550779, Dated August 10, 2005, Issued by Wells Fargo Bank.

**DESCRIPTION OF CHANGE IN TERMS.**

1) The Maturity date is hereby amended from February 8, 2007 to February 8, 2008.

2) The Letter of Credit Subline is hereby amended. See Letter of Credit Subline Exhibit attached.

3) The Commercial Guarantees executed by Deepal Wannakuwatte and Betsy Wannakuwatte are hereby amended from $12,147,000.00 to $12,447,000.00 each.

4) This note is subject to the terms and conditions of the Business Loan Agreement executed by the Borrower in favor of Lender on February 5, 2007.

All other terms and conditions shall remain the same.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**LETTER OF CREDIT SUBLINE EXHIBIT.** An exhibit, titled "Letter of Credit Subline Exhibit," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal Wannakuwatte, President/CEO of
International Manufacturing Group, Inc.

# EXHIBIT A-4

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| 897,000.00 | 02-20-2007 | 02-08-2008 | 9125000150-1 | | | 22171 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

**Principal Amount: $897,000.00**    **Initial Rate: 8.750%**    **Date of Agreement: February 20, 2007**

DESCRIPTION OF EXISTING INDEBTEDNESS.

The Business Loan Agreement dated February 5, 2007 and the Promissory Note dated August 12, 2005, in the original principal amount of $897,000.00, as amended by those certain Change In Terms Agreements dated September 30, 2005, July 14, 2006 and February 5, 2007 from International Manufacturing Group, Inc. to Lender.

DESCRIPTION OF COLLATERAL.

Irrevocable Letter of Credit, Number NZS550779, dated August 10, 2005, issued by Wells Fargo Bank.

DESCRIPTION OF CHANGE IN TERMS.

1) The Note is subject to the terms and conditions of that Business Loan Agreement executed by Borrower in favor of Lender, as amended and restated on February 20, 2007.

All other terms and conditions shall remain the same.

CONTINUING VALIDITY. Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

FINANCIAL STATEMENT CERTIFICATIONS. The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

DEPOSIT AGREEMENT SECURITY. Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its Indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal    Wannakuwatte,    President/CEO    of
International Manufacturing Group, Inc.

LASER PRO Lending, Ver. 5.34.00.003 Copr. Harland Financial Solutions, Inc. 1997, 2007. All Rights Reserved. - CA L:\CFI\LPL\D20C.FC TR-24118 PR-1

Exhibit A-4, Page 000012

# EXHIBIT A-5

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No. | Call/Coll | Account | Officer | Initials |
|-----------|-----------|----------|----------|-----------|---------|---------|----------|
| 97,000.00 | 03-05-2008 | 02-08-2009 | 0168068-0001 | | | 08728 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

| Borrower: | International Manufacturing Group, Inc.<br>879 F Street, Suite 120<br>West Sacramento, CA 95605 | Lender: | California Bank & Trust<br>Central Valley Sacramento Region Corporate Banking<br>1331 Broadway<br>Sacramento, CA 95818 |
|-----------|---|---|---|

**Principal Amount: $897,000.00**   **Initial Rate: 6.500%**   **Date of Agreement: March 5, 2008**

**DESCRIPTION OF EXISTING INDEBTEDNESS.** The Business Loan Agreement dated February 20, 2007 and the Promissory Note dated August 12, 2005, in the original principal amount of $897,000.00, as amended by those certain Change In Terms Agreements dated September 30, 2005, July 14, 2006, February 5, 2007 and February 20, 2007, from International Manufacturing Group, Inc. to Lender.

**DESCRIPTION OF COLLATERAL.**
Irrevocable Letter of Credit, Number NZS550779, issued by Wells Fargo Bank.

**DESCRIPTION OF CHANGE IN TERMS.**

1. The maturity date is hereby amended from February 8, 2008 to February 8, 2009

2. The Guarantees executed by Deepal Wannakuwatte and Betsy Wannakuwatte, are each hereby amended from $13,047,000.00 to $13,169,346.00

3. A Letter of Credit Subline in the amount of $897,000.00, is hereby amended. See Letter of Credit Subline Exhibit attached to this agreement and made part of this agreement

4. The Note is subject to the terms and conditions of that Business Loan Agreement executed by Borrower in favor of Lender, as amended and restated on March 5, 2008

All other terms and conditions shall remain the same.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or dorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation es not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**LETTER OF CREDIT SUBLINE EXHIBIT.** An exhibit, titled "Letter of Credit Subline Exhibit," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

**PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.**

**BORROWER:**

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal    Wannakuwatte,    President/CEO    of
International Manufacturing Group, Inc.

Exhibit A-5, Page 000014

# EXHIBIT A-6

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| 97,000.00 | 02-17-2009 | 02-08-2010 | 0168068-0001 | | | 0B728 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

---

THIS BUSINESS LOAN AGREEMENT dated February 17, 2009, is made and executed between International Manufacturing Group, Inc. ("Borrower") and California Bank & Trust ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of February 17, 2009, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY.** The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.; and Betsy Wannakuwatte, Secretary of International Manufacturing Group, Inc.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

    **Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) guaranties; (3) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

    **Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

    **Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

    **Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

    **No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

    **Organization.** Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 879 F Street, Suite 12D, West Sacramento, CA 95605. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

    **Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

    **Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

    **Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

    **Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

    **Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

Exhibit A-8, Page 000016

# BUSINESS LOAN AGREEMENT
## (Continued)

Loan No: 0168068-0001              Page 2

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than one-hundred-eighty (180) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, compiled by a certified public accountant satisfactory to Lender.

**Interim Statements.** As soon as available, but in no event later than sixty (60) days after the end of each Half-year, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower.

**Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

**Additional Requirements.**

**Guarantor Financial Information.** Borrower covenants and agrees with Lender that, while this Agreement is in effect, Borrower will furnish Lender with Guarantor's personal financial statement, on California Bank & Trust form, as soon as available, but no later than November 30th, on an annual basis; and a signed copy of Guarantor's filed Federal Income Tax Return, as soon as available, but in no event later than thirty (30) days from date of filing on an annual basis.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Deepal Wannakuwatte | $21,409,271.00 |
| Betsy Wannakuwatte | $21,409,271.00 |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially effect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) pay any dividends on Borrower's stock (other than dividends payable in its stock), provided, however that notwithstanding the foregoing, but only so long as no Event of Default has occurred and is continuing or would result from the payment of dividends, if Borrower is a "Subchapter S Corporation" (as defined in the Internal Revenue Code of 1986, as

BUSINESS LOAN AGREEMENT
(Continued)

Loan No: 0168068-0001

Page 4

amended), Borrower may pay cash dividends on its stock to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated income tax payments to satisfy their liabilities under federal and state law which arise solely from their status as Shareholders of a Subchapter S Corporation because of their ownership of shares of Borrower's stock, or purchase or retire any of Borrower's outstanding shares or alter or amend Borrower's capital structure.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Borrower will not enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure the Indebtedness. This includes all deposit accounts Borrower holds jointly with someone else.

**JURY WAIVER; JUDICIAL REFERENCE.** Borrower and Lender each waive their respective rights to a trial before a jury in connection with any disputes related to this Agreement, any of the Related Documents and the transactions contemplated hereby and thereby. Such disputes include without limitation any claim by Borrower or Lender, claims brought by Borrower as a class representative on behalf of others and claims by a class representative on Borrower's behalf as a class member (so-called "class action" suits). This provision shall not apply if, at the time

**BUSINESS LOAN AGREEMENT**
**(Continued)**

Loan No: 0168068-0001              Page 5

n action is brought, Borrower's loan is funded or maintained in a state where this jury trial waiver is not permitted by law.

If a jury trial waiver is not permitted by applicable law and a dispute arises between Borrower and Lender with respect to this Agreement, any of the Related Documents, the enforcement hereof or thereof or the transactions contemplated hereby or thereby, either of Borrower or Lender may require that it be resolved by judicial reference in accordance with California Code of Civil Procedure, Sections 638, et seq., including without limitation whether the dispute is subject to a judicial reference proceeding. The referee shall be a retired judge, agreed upon by the parties, from either the American Arbitration Association (AAA) or Judicial Arbitration and Mediation Service, Inc. (JAMS). If the parties cannot agree on the referee, the party who initially selected the reference procedure shall request a panel of ten retired judges from either AAA or JAMS, and the court shall select the referee from that panel. The referee shall be appointed to sit with all of the powers provided by law. The parties agree that time is of the essence in conducting the judicial reference proceeding set forth herein. The costs of the judicial reference proceeding, including the fee for the court reporter, shall be borne equally by the parties as the costs are incurred, unless otherwise awarded by the referee. The referee shall hear all pre-trial and post-trial matters (including without limitation requests for equitable relief), prepare an award with written findings of fact and conclusions of law and apportion costs as appropriate. The referee shall be empowered to enter equitable relief as well as legal relief, provide all temporary or provisional remedies, enter equitable orders that are binding on the parties and rule on any motion that would be authorized in a trial, including without limitation motions for summary judgment or summary adjudication. Judgment upon the award shall be entered in the court in which such proceeding was commenced and all parties shall have full rights of appeal. This provision will not be deemed to limit or constrain Lender's right of offset, to obtain provisional or ancillary remedies, to interplead funds in the event of a dispute, to exercise any security interest or lien Lender may hold in property or to comply with legal process involving Borrower's accounts or other property.

**INCREASED COSTS.** If any change in a law, rule or regulation, or the interpretation or application thereof, or Lender's compliance with any request, guideline or directive (whether or not having the force of law) of any governmental authority (collectively, a "Change in Law") shall (i) impose, modify or deem applicable any reserve, special deposit or similar requirement against or with respect to the assets of, deposits with or for the account of or credit extended by Lender or (ii) impose on Lender any other condition affecting this Agreement or the loans hereunder or any letter of credit or participation therein and the result of any of the foregoing shall be to increase the cost to Lender of making or maintaining any loan (or its commitment to make any such loan) or to increase the cost to Lender of issuing or maintaining any letter of credit or to reduce the amount of any sum received or receivable by Lender hereunder, then Borrower will pay to Lender such additional amount as will compensate Lender for such additional costs or reduction.If Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on the capital of Lender or Lender's holding company from this Agreement or the loans or letters of credit made or issued by Lender to a level below that which Lender or Lender's holding company could have achieved but for such Change in Law (taking into consideration Lender's policies and the policies of Lender's holding company with respect to capital adequacy), then from time to time Borrower will pay to Lender such additional amount as will compensate Lender or Lender's holding company for any such reduction, as set forth in a certificate of Lender describing in reasonable detail the amount or amounts necessary to compensate Lender or its holding company. The amounts and description in such certificate shall be conclusive absent manifest error, and Borrower agrees to pay to Lender the amount shown in such certificate within ten (10) business days after receipt thereof.Failure or delay on the part of Lender to demand compensation pursuant to this section shall not constitute a waiver of Lender's right to demand such compensation.

JSINESS LOAN AGREEMENT. THIS BUSINESS LOAN AGREEMENT AMENDS AND RESTATES THE PRIOR BUSINESS LOAN AGREEMENT ˍATED MARCH 5, 2008, AS AMENDED FROM TIME TO TIME.

**ADDITIONAL INFORMATION.** In addition to the covenants and agreements of Borrower set forth under "AFFIRMATIVE COVENANTS" above, Borrower further covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower shall continuously maintain in full force and effect an irrevocable standby letter of credit (the "L/C") with a major bank or financial institution ("L/C Issuer") with a term expiring no later than the maturity of the Note in an amount at least equal to the amount of the Note, plus one year's anticipated interest on such amount, if any (unless otherwise agreed to by Lender), and in a form and on any other necessary or appropriate terms, all as are acceptable to Lender in its sole discretion and which shall name Lender as the beneficiary for the purpose of securing the Indebtedness and Borrower's other obligations hereunder and under the Related Documents. Lender's receipt of any notice of L/C Issuer's election not to extend or renew the L/C or as to the termination of the L/C for any other reason, or L/C Issuer's dishonor of any draw by Lender under the L/C, shall constitute an Event of Default. Borrower covenants and agrees to immediately notify Lender upon its receipt of any notice of non-extension, non-renewal or termination of the L/C. Notwithstanding anything to the contrary herein, Borrower shall not be entitled to a right to cure under the section entitled "DEFAULT - Right to Cure" hereunder with respect to any Event of Default under this section, unless agreed to by Lender in its sole discretion.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the

**BUSINESS LOAN AGREEMENT**
**(Continued)**

Loan No: 0168068-0001      Page 6

laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento County, State of California.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means International Manufacturing Group, Inc. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

Exhibit A-6, Page 000021

**BUSINESS LOAN AGREEMENT**
(Continued)

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means California Bank & Trust, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note executed by International Manufacturing Group, Inc. in the original principal amount of $897,000.00 dated August 12, 2005, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the Note or Credit Agreement or any other subsequent Notes evidencing further Indebtedness.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED FEBRUARY 17, 2009.**

**BORROWER:**

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.

**LENDER:**

CALIFORNIA BANK & TRUST

By: _____
Authorized Signer

# EXHIBIT A-7

# IANGE IN TERMS AGREEME

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| 97,000.00 | 02-17-2009 | 02-08-2010 | 0168068-0001 | | | 08728 | IV |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

**Principal Amount: $897,000.00**                    Date of Agreement: February 17, 2009

**DESCRIPTION OF EXISTING INDEBTEDNESS.** The Business Loan Agreement dated March 5, 2008 and the Promissory Note dated August 12, 2005, in the original amount of $897,000.00, as amended by those certain Change in Terms Agreements dated September 30, 2005, July 14, 2006, February 5, 2007, February 20, 2007 and March 5, 2008, from International Manufacturing Group, Inc. to Lender.

**DESCRIPTION OF COLLATERAL.**

Irrevocable Letter of Credit, Number NZS550779, issued by Wells Fargo Bank.

**DESCRIPTION OF CHANGE IN TERMS.**

1. The maturity date is hereby amended from February 8, 2009 to February 8, 2010.

2. Floor Rate. Under no circumstances will the interest rate on the Note be less than 5.000% per annum or more than the maximum rate allowed by law.

3. The Letter of Credit Subline in the amount of $897,000.00 is hereby deleted in its entirety.

4. This Note is subject to the terms and conditions of that Business Loan Agreement executed by Borrower in favor of Lender, as amended and restated on February 17, 2009.

5. The Guaranties executed by Deepal Wannakuwatte and Betsy Wannakuwatte, are each hereby amended from $13,169,346.00 to $21,409,271.00.

All other terms and conditions shall remain the same.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and 'orsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or orser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**REAFFIRMATION OF GUARANTY OBLIGATIONS.** An exhibit, titled "REAFFIRMATION OF GUARANTY OBLIGATIONS," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

**BORROWER:**

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal Wannakuwatte, President/CEO of
International Manufacturing Group, Inc.

# EXHIBIT B-1

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No. | Call/Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| 1,500,000.00 | 05-17-2006 | 05-31-2007 | 9125000150-4 | | | 68631 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:** California Bank & Trust
Arden Way Branch
1800 Arden Way
Sacramento, CA 95815

---

**Principal Amount: $1,500,000.00**      **Initial Rate: 8.500%**      **Date of Note: May 17, 2006**

**PROMISE TO PAY.** International Manufacturing Group, Inc. ("Borrower") promises to pay to California Bank & Trust ("Lender"), or order, in lawful money of the United States of America, the principal amount of One Million Five Hundred Thousand & 00/100 Dollars ($1,500,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on May 31, 2007. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning June 30, 2006, with all subsequent interest payments to be due on the last day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. The annual interest rate for this Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an index which is the rate of interest set from time to time by Bank as its Prime Rate. California Bank & Trust Prime Rate is determined by Bank as a means of pricing credit extensions to some customers and is neither tied to any external rate of interest or index nor is it necessarily the lowest rate of interest charged by Bank at any given time for any particular class of customers or credit extensions (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each Day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 8.000%. The interest rate to be applied to the unpaid principal balance during this Note will be at a rate of 0.500 percentage points over the Index, resulting in an initial rate of 8.500%. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**PREPAYMENT; MINIMUM INTEREST CHARGE.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a minimum interest charge of $200.00. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: California Bank & Trust, Arden Way Branch, 1800 Arden Way, Sacramento, CA 95815.

**LATE CHARGE.** If a payment is 15 days or more late, Borrower will be charged 6.000% of the regularly scheduled payment or $500.00, whichever is less.

**INTEREST AFTER DEFAULT.** Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by adding a 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Exhibit B-1, Page 000026

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness

**PROMISSORY NOTE**
**(Continued)**

Loan No: 9125000150-4                                                                                     Page 2

---

evidenced by this Note. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** To the extent permitted by applicable law, Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento County, State of California.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instrument listed herein: a letter of credit described in a Commercial Pledge Agreement dated May 17, 2006.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following persons urrently are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's .ddress shown above, written notice of revocation of their authority: Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.; and Betsy Wannakuwatte, Secretary. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its Indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees, to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**LOAN AGREEMENT.** The Note is subject to the terms and conditions of that Business Loan Agreement executed by Borrower in favor of Lender, as amended and restated on May 17, 2006.

**ADVANCES.** Borrower covenants and agrees with Lender that, while this Agreement is in effect, Advances under this line will be made by Bankers Acceptance under conditions as set forth under the Acceptance Subline attached and shall bear interest at the Bankers acceptance rate matching the anticipated repayment term for the underlying transaction plus 3.0 percent. Should any advance not be repaid in accordance with the Bankers acceptance term provided for under the advance, then the interest rate will default to the variable interest rate as defined within the Promissory Note dated May 17, 2006.

**LETTER OF CREDIT SUBLINE EXHIBIT.** An exhibit, titled "Letter of Credit Subline Exhibit," is attached to this Note and by this reference is made a part of this Note just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Note.

**ACCEPTANCE SUBLINE.** An exhibit, titled "ACCEPTANCE SUBLINE," is attached to this Note and by this reference is made a part of this Note just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Note.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo nforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses .nis Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PROMISSORY NOTE**
**(Continued)**

Loan Nő: 9125000150-4                                                                                    Page 3

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal   Wannakuwatte,   President/CEO   of
International Manufacturing Group, Inc.

LASER PRO Lending, Ver. 8.21.00.004 Copr. Harland Financial Solutions, Inc. 1997, 2006.   All Rights Reserved.   - CA  LnCFILPL\D20.FC  TR-21200  PR-1

# EXHIBIT B-2

## CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| ,000,000.00 | 06-26-2006 | 05-31-2007 | 9125000150-4 | | | 68631 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:** California Bank & Trust
Arden Way Branch
1800 Arden Way
Sacramento, CA 95815

---

**Principal Amount: $9,000,000.00**          **Initial Rate: 8.500%**          **Date of Agreement: June 26, 2006**

**DESCRIPTION OF EXISTING INDEBTEDNESS.** The Business Loan Agreement and Promissory Note each dated May 17, 2006, in the original amount of $1,500,000.00, from International Manufacturing Group, Inc. to Lender.

**DESCRIPTION OF COLLATERAL.**

Irrevocable Letter of Credit, Number 3082234, Dated 05-22-2006, issued by Bank of America.

**DESCRIPTION OF CHANGE IN TERMS.**

1) The loan amount is hereby increased from $1,500,000.00 to $9,000,000.00.

2) The Commercial Guaranties executed by Betsy Wennakuwette and Deepal Wannakuwatte are hereby amended from $4,397,000.00 to $11,897,000.00 each.

3) The Note is subject to the terms and conditions of that Business Loan Agreement executed by Borrower in favor of Lender, as amended and restated on June 26, 2006.

4) The Letter of Credit Subline and acceptance Subline exhibits are hereby amended. See Letter of Credit Subline Exhibit and Acceptance Subline Exhibit attached.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on May 31, 2007. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning July 31, 2006, with all subsequent interest payments to be due on the last day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. Interest on this loan is computed on a 365/360 simple interest basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay interest at Lender's address shown above or at such other place as Lender may designate in writing.

ARIABLE INTEREST RATE. The interest rate on this loan is subject to change from time to time based on changes in an index which is the ate of interest set from time to time by Bank as its Prime Rate. California Bank & Trust Prime Rate is determined by Bank as a means of pricing credit extensions to some customers and is neither tied to any external rate of interest or index nor is it necessarily the lowest rate of interest charged by Bank at any given time for any particular class of customers or credit extensions (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each Day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 8.000% per annum. The interest rate to be applied to the unpaid principal balance during this loan will be at a rate of 0.500 percentage points over the Index, resulting in an initial rate of 8.500% per annum. NOTICE: Under no circumstances will the interest rate on this loan be more than the maximum rate allowed by applicable law.

**PREPAYMENT; MINIMUM INTEREST CHARGE.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. In any event, even upon full prepayment of this Agreement, Borrower understands that Lender is entitled to a minimum interest charge of $200.00. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: California Bank & Trust, Arden Way Branch, 1800 Arden Way, Sacramento, CA 95815.

**LATE CHARGE.** If a payment is 15 days or more late, Borrower will be charged 6.000% of the regularly scheduled payment or $500.00, whichever is less.

**INTEREST AFTER DEFAULT.** Upon default, the interest rate on this loan shall, if permitted under applicable law, immediately increase by adding a 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to perform Borrower's obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

Exhibit B-2, Page 000030

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a

# CHANGE IN TERMS AGREEMENT
## (Continued)

receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

Creditor or Forfeiture Proceedings. Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Events Affecting Guarantor. Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness evidenced by this Note. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

Change in Ownership. Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

Adverse Change. A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

Insecurity. Lender in good faith believes itself insecure.

Cure Provisions. If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

LENDER'S RIGHTS. Upon default, Lender may declare the entire unpaid principal balance under this Agreement and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

ATTORNEYS' FEES; EXPENSES. Lender may hire or pay someone else to help collect this Agreement if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

JURY WAIVER. To the extent permitted by applicable law, Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

GOVERNING LAW. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

CHOICE OF VENUE. If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento County, State of California.

COLLATERAL. Borrower acknowledges this Agreement is secured by the following collateral described in the security instrument listed herein:

(a) Irrevocable Letter of Credit, Number 3082234, Dated 05-22-2006, issued by Bank of America.

LINE OF CREDIT. This Agreement evidences a revolving line of credit. Advances under this Agreement may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following persons currently are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of their authority: Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.; and Betsy Wannakuwatte, Secretary. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Agreement at any time may be evidenced by endorsements on this Agreement or by Lender's internal records, including daily computer print-outs.

CONTINUING VALIDITY. Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

FINANCIAL STATEMENT CERTIFICATIONS. The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

DEPOSIT AGREEMENT SECURITY. Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its Indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.                                                                 Exhibit B-2, Page 000031

LETTER OF CREDIT SUBLINE EXHIBIT. An exhibit, titled "Letter of Credit Subline Exhibit," is attached to this Agreement and by this reference

is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

ACCEPTANCE SUBLINE. An exhibit, titled "ACCEPTANCE SUBLINE," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

SUCCESSORS AND ASSIGNS. Subject to any limitations stated in this Agreement on transfer of Borrower's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Borrower, Lender, without notice to Borrower, may deal with Borrower's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Borrower from the obligations of this Agreement or liability under the Indebtedness.

MISCELLANEOUS PROVISIONS. If any part of this Agreement cannot be enforced, this fact will not affect the rest of the Agreement. Lender may delay or forgo enforcing any of its rights or remedies under this Agreement without losing them. Borrower and any other person who signs, guarantees or endorses this Agreement, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, no party who signs this Agreement, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Agreement are joint and several.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal Wannakuwatte, President/CEO of
International Manufacturing Group, Inc.

Exhibit B-2, Page 000032

# EXHIBIT B-3

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $9,000,000.00 | 02-20-2007 | 05-31-2007 | 9125000150-4 | | | 22171 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

**Principal Amount: $9,000,000.00** **Initial Rate: 8.750%** **Date of Agreement: February 20, 2007**

DESCRIPTION OF EXISTING INDEBTEDNESS.

The Business Loan Agreement dated June 26, 2006 and the Promissory Note dated May 17, 2006, in the original principal amount of $1,500,000.00, as amended by that certain Change In Terms Agreement dated June 26, 2006 from International Manufacturing Group, Inc. to Lender.

DESCRIPTION OF COLLATERAL.

Irrevocable Letter of Credit, Number 3082234, dated May 22, 2006, issued by Bank of America.

DESCRIPTION OF CHANGE IN TERMS.

1) The Note is subject to the terms and conditions of that Business Loan Agreement executed by Borrower in favor of Lender, as amended and restated on February 20, 2007.

All other terms and conditions shall remain the same.

CONTINUING VALIDITY. Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

FINANCIAL STATEMENT CERTIFICATIONS. The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

DEPOSIT AGREEMENT SECURITY. Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its Indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: ______________________________
Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.

LASER PRO Lending, Ver. 5.34.00.003 Copr. Harland Financial Solutions, Inc. 1997, 2007. All Rights Reserved. - CA L:\CFI\LPL\D20C.FC TR-24121 PR-1

# EXHIBIT B-4

Case 16-02090

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No. | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|----------|-------------|---------|---------|----------|
| 3,000,000.00 | 05-31-2007 | 05-17-2008 | 91250001150-4 | | | 22171 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA  95605

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA  95818

---

**Principal Amount: $9,000,000.00          Initial Rate: 8.750%          Date of Agreement: May 31, 2007**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**

The Business Loan Agreement dated February 20, 2007 and the Promissory Note dated May 17, 2006, in the original principal amount of $1,500,000.00, as amended by those certain Change In Terms Agreements dated June 26, 2006 and February 20, 2007 from International Manufacturing Group, Inc. to Lender.

**DESCRIPTION OF COLLATERAL.**

Irrevocable Letter of Credit, Number 3082234, dated May 22, 2006, issued by Bank of America.

**DESCRIPTION OF CHANGE IN TERMS.**

1) The Maturity Date is hereby extended from May 31, 2007 to May 17, 2008.

2) The Letter of Credit Subline Exhibit and Acceptance Subline Exhibits are each hereby amended as described on the Exhibits titled "Letter of Credit Subline Exhibit" and "Acceptances Subline Exhibit" attached to this agreement and made part of this agreement.

3) Borrower covenants and agrees with Lender that, if we do receive a non-renewal notice of the Stand-By Letter of Credit, then any Bankers Acceptance or Letter of Credit issued must have a maturity date at least 5 days prior to the current expiration date of the Stand-By Letter of Credit (which is not going to be renewed).

All other terms and conditions shall remain the same.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and ~ndorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or ~dorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**LETTER OF CREDIT SUBLINE EXHIBIT.** An exhibit, titled "Letter of Credit Subline Exhibit," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

**ACCEPTANCES SUBLINE EXHIBIT.** An exhibit, titled "ACCEPTANCE SUBLINE," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

**REAFFIRMATION OF GUARANTY OBLIGATIONS EXHIBIT.** An exhibit, titled "REAFFIRMATION OF GUARANTY OBLIGATIONS," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

## CHANGE IN TERMS AGREEMENT
### (Continued)

Loan No: 9125000150-4                                                                    Page 2

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT.  BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal    Wannakuwatte,    President/CEO    of
International Manufacturing Group, Inc.

LASER PRO Lending, Ver. 5.36.00.004  Copr. Harland Financial Solutions, Inc. 1997, 2007.  All Rights Reserved.  - CA  L:\CFI\LPL\D20C.FC  TR-23101  PR-1

Exhibit B-4, Page 000037

# EXHIBIT B-5

Exhibit B-5, Page 000038

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| 9,000,000.00 | 05-23-2008 | 05-17-2009 | 0168068-0004 | | | 08728 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

THIS BUSINESS LOAN AGREEMENT dated May 23, 2008, is made and executed between International Manufacturing Group, Inc. ("Borrower") and California Bank & Trust ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of May 23, 2008, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY.** The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: Deepal Wannakuwatte, President/CEO of International Manuracturing Group, Inc.; and Betsy Wannakuwatte.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) guaranties; (3) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 879 F Street, Suite 120, West Sacramento, CA 95605. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

# BUSINESS LOAN AGREEMENT
## (Continued)

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than one hundred eighty (180) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, compiled by a certified public accountant satisfactory to Lender.

**Interim Statements.** As soon as available, but in no event later than sixty (60) days after the end of each Half-year, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower in form satisfactory to Lender.

**Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

**Additional Requirements.**

**Guarantor Financial Information.** Borrower covenants and agrees with Lender that, while this Agreement is in effect, Borrower will furnish Lender with Guarantor's personal financial statement, as of October 31st, on California Bank & Trust form, as soon as available, but in no event later than November 30th, on an annual basis and; a signed copy of Guarantor's filed Federal Income Tax Return, as soon as available, but in no event later than thirty (30) days from date of filing, on an annual basis

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash

Case 16-02090

# BUSINESS LOAN AGREEMENT
## (Continued)

value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Deepal Wannakuwatte | $16,447,467.00 |
| Betsy Wannakuwatte | $16,447,467.00 |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) pay any dividends on Borrower's stock (other than dividends payable in its stock), provided, however that notwithstanding the foregoing, but only so long as no Event of Default has occurred and is continuing or would

## BUSINESS LOAN AGREEMENT
### (Continued)

Loan No: 0168068-0004                                                                    Page 4

result from the payment of dividends, if Borrower is a "Subchapter S Corporation" (as defined in the Internal Revenue Code of 1986, as amended). Borrower may pay cash dividends on its stock to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated income tax payments to satisfy their liabilities under federal and state law which arise solely from their status as Shareholders of a Subchapter S Corporation because of their ownership of shares of Borrower's stock, or purchase or retire any of Borrower's outstanding shares or alter or amend Borrower's capital structure.

Loans, Acquisitions and Guaranties.  (1)  Loan, invest in or advance money or assets to any other person, enterprise or entity,  (2) purchase, create or acquire any interest in any other enterprise or entity, or  (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

Agreements.  Borrower will not enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

CESSATION OF ADVANCES.  If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender;  (B)  Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt;  (C)  there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or  (D)  any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or  (E)  Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

DEFAULT.  Each of the following shall constitute an Event of Default under this Agreement:

Payment Default.  Borrower fails to make any payment when due under the Loan.

Other Defaults.  Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

Default in Favor of Third Parties.  Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

False Statements.  Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

Insolvency.  The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

Defective Collateralization.  This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

Creditor or Forfeiture Proceedings.  Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender.  However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Events Affecting Guarantor.  Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

Change in Ownership.  Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

Adverse Change.  A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

Insecurity.  Lender in good faith believes itself insecure.

Right to Cure.  If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

EFFECT OF AN EVENT OF DEFAULT.  If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not xclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any rantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

DEPOSIT AGREEMENT SECURITY.  Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure the Indebtedness.  This includes all deposit accounts Borrower holds jointly with someone else.

JURY WAIVER; JUDICIAL REFERENCE.  Borrower and Lender each waive their respective rights to a trial before a jury in connection with any disputes related to this Agreement, any of the Related Documents and the transactions contemplated hereby and thereby.  Such disputes include without limitation any claim by Borrower or Lender, claims brought by Borrower as a class representative on behalf of others, and claims

# BUSINESS LOAN AGREEMENT
## (Continued)

by a class representative on Borrower's behalf as a class member (so-called "class action" suits). This provision shall not apply if, at the time an action is brought, Borrower's loan is funded or maintained in a state where this jury trial waiver is not permitted by law.

If a jury trial waiver is not permitted by applicable law and a dispute arises between Borrower and Lender with respect to this Agreement, any of the Related Documents, the enforcement hereof or thereof or the transactions contemplated hereby or thereby, either of Borrower or Lender may require that it be resolved by judicial reference in accordance with California Code of Civil Procedure, Sections 638, et seq., including without limitation whether the dispute is subject to a judicial reference proceeding. The referee shall be a retired judge, agreed upon by the parties, from either the American Arbitration Association (AAA) or Judicial Arbitration and Mediation Service, Inc. (JAMS). If the parties cannot agree on the referee, the party who initially selected the reference procedure shall request a panel of ten retired judges from either AAA or JAMS, and the court shall select the referee from that panel. The referee shall be appointed to sit with all of the powers provided by law. The parties agree that time is of the essence in conducting the judicial reference proceeding set forth herein. The costs of the judicial reference proceeding, including the fee for the court reporter, shall be borne equally by the parties as the costs are incurred, unless otherwise awarded by the referee. The referee shall hear all pre-trial and post-trial matters (including without limitation requests for equitable relief), prepare an award with written findings of fact and conclusions of law and apportion costs as are appropriate. The referee shall be empowered to enter equitable relief as well as legal relief, provide all temporary or provisional remedies, enter equitable orders that are binding on the parties and rule on any motion that would be authorized in a trial, including without limitation motions for summary judgment or summary adjudication. Judgment upon the award shall be entered in the court in which such proceeding was commenced and all parties shall have full rights of appeal. This provision will not be deemed to limit or constrain Lender's right of offset, to obtain provisional or ancillary remedies, to interpleaad funds in the event of a dispute, to exercise any security interest or lien Lender may hold in property or to comply with legal process involving Borrower's accounts or other property.

**INCREASED COSTS.** If any change in a law, rule or regulation, or the interpretation or application thereof, or Lender's compliance with any request, guideline or directive (whether or not having the force of law) of any governmental authority (collectively, a "Change in Law") shall (i) impose, modify or deem applicable any reserve, special deposit or similar requirement against or with respect to the assets of, deposits with or for the account of or credit extended by Lender or (ii) impose on Lender any other condition affecting this Agreement or the loans hereunder or any letter of credit or participation therein and the result of any of the foregoing shall be to increase the cost to Lender of making or maintaining any loan (or its commitment to make any such loan) or to increase the cost to Lender of issuing or maintaining any letter of credit or to reduce the amount of any sum received or receivable by Lender hereunder, then Borrower will pay to Lender such additional amount as will compensate Lender for such additional costs or reduction.If Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on the capital of Lender or Lender's holding company from this Agreement or the loans or letters of credit made or issued by Lender to a level below that which Lender or Lender's holding company could have achieved but for such Change in Law (taking into consideration Lender's policies and the policies of Lender's holding company with respect to capital adequacy), then from time to time Borrower will pay to Lender such additional amount as will compensate Lender or Lender's holding company for any such reduction, as set forth in a certificate of Lender describing in reasonable detail the amount or amounts necessary to compensate Lender or its holding company. The amounts and description in such certificate shall be conclusive absent manifest error, and Borrower agrees to pay to Lender the amount shown in such certificate within ten (10) business days after receipt thereof.Failure or delay on the part of Lender to demand compensation ursuant to this section shall not constitute a waiver of Lender's right to demand such compensation.



**LINE USAGE PROVISION.** Borrower covenants and agrees with Lender that, while this Agreement is in effect the Line is limited for purchase of inventory relating to purchases by Jamestown Health and Medical Supply, Inc. LLC, under distribution agreement dated October 26, 2005, and supported by copies of purchase orders submitted pursuant to each advance requested.



**ADVANCES.** Borrower covenants and agrees with Lender that, while this Agreement is in effect, Advances under this line will be made by Bankers Acceptance under conditions as set forth under the Acceptance subline attached and shall bear interest at the Bankers acceptance rate matching the anticipated repayment term for the underlying transaction plus 3.0 percent. Should any advance not be repaid in accordance with the bankers acceptance term provided for under the advance, then the interest rate will default to the variable interest rate as defined within the Promissory Note dated May 17, 2006.

**ADDITIONAL PROVISION.** Borrower covenants and agrees with Lender that, if we receive a non-renewal notice of the Stand-By Letter of Credit, then any Bankers Acceptance or Letter of Credit issued must have a maturity date at least 5 days prior to the current expiration date of the Stand-By Letter of Credit (which is not going to be renewed).



**ADDITIONAL PROVISION.** Borrower acknowledges and reaffirms its agreement for assignment of payments, proceeds and distributions made by International Manufacturing Group, Inc. in favor of California Bank & Trust, dated May 17, 2006, and that this agreement remains in full force and effect.

**BUSINESS LOAN AGREEMENT.** THIS BUSINESS LOAN AGREEMENT AMENDS AND RESTATES THE PRIOR BUSINESS LOAN AGREEMENT DATED FEBRUARY 20, 2007, AS AMENDED FROM TIME TO TIME.



**ADDITIONAL INFORMATION.** In addition to the covenants and agreements of Borrower set forth under "AFFIRMATIVE COVENANTS" above, Borrower further covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower shall continuously maintain in full force and effect an irrevocable standby letter of credit (the "L/C") with a major bank or financial institution ("L/C Issuer") with a term expiring no later than the maturity of the Note in an amount at least equal to the amount of the Note, plus one year's anticipated interest on such amount, if any (unless otherwise agreed to by Lender), and in a form and on any other necessary or appropriate terms, all as are acceptable to Lender in its sole discretion and which shall name Lender as the beneficiary for the purpose of securing the indebtedness and Borrower's other obligations hereunder and under the Related Documents. Lender's receipt of any notice of L/C Issuer's election not to extend or renew the L/C or as to the termination of the L/C for any other reason, or L/C Issuer's dishonor of any draw by Lender under the L/C, shall constitute an Event of Default. Borrower covenants and agrees to immediately notify Lender upon its receipt of any notice of non-extension, non-renewal or termination of the L/C. Notwithstanding anything to the contrary herein, Borrower shall not be entitled to a right to cure under the section entitled "DEFAULT - Right to Cure" hereunder with respect to any Event of Default under this section, unless agreed to by Lender in its sole discretion.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

    **Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.



    **Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**BUSINESS LOAN AGREEMENT**
(Continued)

Page 6

---

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento County, State of California.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means International Manufacturing Group, Inc. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a

security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means California Bank & Trust, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note executed by International Manufacturing Group, Inc. in the original principal amount of $1,500,000.00 dated May 17, 2006, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the Note or Credit Agreement or any other subsequent Notes evidencing further Indebtedness.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED MAY 23, 2008.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal  Wannakuwatte,  President/CEO  of
International Manufacturing Group, Inc.

**BUSINESS LOAN AGREEMENT**
**(Continued)**

Loan No: 0168068-0004                                                                 Page 8

LENDER:

CALIFORNIA BANK & TRUST

By: _____
    Authorized Signer   Dawn Satow for Jun Enkoji
        Vice President & Commercial Banking Officer

LASER PRO Lending, Ver. 5.40.00.003 Copr. Harland Financial Solutions, Inc. 1997, 2008.   All Rights Reserved.   - CA  L:\CFI\LPL\C4\LFC  TR-26070  PR-1

# EXHIBIT B-6

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| 9,000,000.00 | 05-23-2008 | 05-17-2009 | 0168068-0004 | | | 08728 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

**Principal Amount: $9,000,000.00** **Initial Rate: 5.500%** **Date of Agreement: May 23, 2008**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**
The Business Loan Agreement dated February 20, 2007 and the Promissory Note dated May 17, 2006, in the original principal amount of $1,500,000.00, as amended by those certain Change in Terms Agreements dated June 26, 2006, February 20, 2007 and May 31, 2007 from International Manufacturing Group, Inc. to Lender.

**DESCRIPTION OF COLLATERAL.**
Irrevocable Letter of Credit Number 3082234, dated May 22, 2006, issued by Bank of America.

**DESCRIPTION OF CHANGE IN TERMS.**
1) The Maturity Date is hereby amended from May 17, 2008 to May 17, 2009.

2) The Note is subject to the terms and conditions of that Business Loan Agreement executed by Borrower in favor of Lender, as amended and restated on May 23, 2008.

3) The Letter of Credit Subline Exhibit and Acceptance Subline are each hereby amended as described on the Exhibits titled "Letter of Credit Subline Exhibit" and "Acceptance Subline" attached to this agreement and made part of this agreement.

All other terms and conditions shall remain the same.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**LETTER OF CREDIT SUBLINE EXHIBIT.** An exhibit, titled "Letter of Credit Subline Exhibit," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

**ACCEPTANCE SUBLINE.** An exhibit, titled "ACCEPTANCE SUBLINE," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

**REAFFIRMATION OF GUARANTY OBLIGATIONS.** An exhibit, titled "REAFFIRMATION OF GUARANTY OBLIGATIONS," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

**PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTODD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.**

**BORROWER:**

**INTERNATIONAL MANUFACTURING GROUP, INC.**

By: ______________________________
Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.

LASER PRO Lending, Ver. 5.40.00.003 Copr. Harland Financial Solutions, Inc. 1997, 2008. All Rights Reserved. - CA L:\CFI\LPL\D20C.FC TR-28079 PR-1

# EXHIBIT B-7

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No. | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|----------|-------------|---------|---------|----------|
| 9,000,000.00 | 05-15-2009 | 08-17-2009 | 0168068-0004 | | | 08728 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**   International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA  95606

**Lender:**   California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA  95818

---

**Principal Amount: $9,000,000.00**                         **Date of Agreement: May 15, 2009**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**
The Business Loan Agreement dated May 23, 2008 and the Promissory Note dated May 17, 2006, in the original amount of $1,500,000.00, as amended by those certain Change in Terms Agreements dated June 26, 2006, February 20, 2007, May 31, 2007 and May 23, 2008 from International Manufacturing Group, Inc. to Lender.

**DESCRIPTION OF COLLATERAL.**
Irrevocable Letter of Credit Number 3082234, dated May 22, 2006, issued by Bank of America.

**DESCRIPTION OF CHANGE IN TERMS.**
1) The maturity date is hereby amended from May 17, 2009 to August 17, 2009.

2) Under no circumstances will the interest rate on the Note be less than 5.00% per annum or more than the maximum rate allowed by applicable law. .

3) The Letter of Credit Subline Exhibit and Acceptance Subline are each hereby amended as described on the Exhibits titled "Letter of Credit Subline Exhibit" and "Acceptance Subline" attached to this agreement and made part of this agreement.

All other terms and conditions shall remain the same.

**CONTINUING VALIDITY.**  Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect.  Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms.  Nothing in this Agreement will constitute a satisfaction of the obligation(s).  It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing.  Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement.  If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it.  This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**FINANCIAL STATEMENT CERTIFICATIONS.**  The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors.  Financial Information includes, but is not limited to all Business Financial Statements (including interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns.  The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned.  The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future.  The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**DEPOSIT ACCOUNT SECURITY.**  Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its Indebtedness hereunder.  This includes all deposit accounts Borrower holds jointly with someone else.

**ACCEPTANCE SUBLINE.**  An exhibit, titled "ACCEPTANCE SUBLINE," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

**LETTER OF CREDIT SUBLINE EXHIBIT.**  An exhibit, titled "Letter of Credit Subline Exhibit," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT.  BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal   Wannakuwatte,   President/CEO   of
International Manufacturing Group, Inc.

LASER PRO Lending, Ver. 5.44.00.002  Copr. Harland Financial Solutions, Inc. 1997, 2009.  All Rights Reserved.  - CA  L:\CFI\LPL\D20C.FC  TR-32608  PR-1

# EXHIBIT C-1

Exhibit C-1, Page 000051

Case 10:02690

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| 3,278,121.00 | 04-02-2008 | 04-01-2009 | 0168068-9001 | | | 08728 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "* * * *" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

---

**Principal Amount: $3,278,121.00**          **Initial Rate: 5.750%**          **Date of Note: April 2, 2008**

**PROMISE TO PAY.** International Manufacturing Group, Inc. ("Borrower") promises to pay to California Bank & Trust ("Lender"), or order, in lawful money of the United States of America, the principal amount of Three Million Two Hundred Seventy-eight Thousand One Hundred Twenty-one & 00/100 Dollars ($3,278,121.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on April 1, 2009. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning May 1, 2008, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. The annual interest rate for this Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an index which is the rate of interest set from time to time by Bank as its Prime Rate. California Bank & Trust Prime Rate is determined by Bank as a means of pricing credit extensions to some customers and is neither tied to any external rate of interest or index nor is it necessarily the lowest rate of interest charged by Bank at any given time for any particular class of customers or credit extensions (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each Day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 5.250%. The interest rate to be applied to the unpaid principal balance during this Note will be at a rate of 0.500 percentage points over the Index, resulting in an initial rate of 5.750%. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**PREPAYMENT; MINIMUM INTEREST CHARGE.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a minimum interest charge of $200.00. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: California Bank & Trust, Central Valley Sacramento Region Corporate Banking, 1331 Broadway, Sacramento, CA 95818.

**LATE CHARGE.** If a payment is 15 days or more late, Borrower will be charged 6.000% of the regularly scheduled payment or $500.00, whichever is less.

**INTEREST AFTER DEFAULT.** Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by adding a 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Exhibit C-1, Page 000052

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any

**PROMISSORY NOTE**
**(Continued)**

Loan No: 0168068-9001          Page 2

Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento County, State of California.

**COLLATERAL.** Borrower acknowledges this Note is secured by Irrevocable Stand-By Letter of Credit #3092585, issued by Bank of America, N.A. dated April 1, 2008.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc. and Betsy Wannakuwatte, Secretary of International Manufacturing Group, Inc. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid incipal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily mputer print-outs.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**JURY WAIVER; JUDICIAL REFERENCE.** Borrower and Lender each waive their respective rights to a trial before a jury in connection with any disputes related to this Note, the loan evidenced hereby and any other loan documents in connection herewith and therewith. Such disputes include without limitation any claim by Borrower or Lender, claims brought by Borrower as a class representative on behalf of others, and claims by a class representative on Borrower's behalf as a class member (so-called "class action" suits). This provision shall not apply if, at the time an action is brought, Borrower's loan is funded or maintained in a state where this jury trial waiver is not permitted by law.

If a jury trial waiver is not permitted by applicable law and a dispute arises between Borrower and Lender with respect to this Note, its enforcement or the transactions contemplated by the related loan documents, either of Borrower or Lender may require that it be resolved by judicial reference in accordance with California Code of Civil Procedure, Sections 638, et seq., including without limitation whether the dispute is subject to a judicial reference proceeding. The referee shall be a retired judge, agreed upon by the parties, from either the American Arbitration Association (AAA) or Judicial Arbitration and Mediation Service, Inc. (JAMS). If the parties cannot agree on the referee, the party who initially selected the reference procedure shall request a panel of ten retired judges from either AAA or JAMS, and the court shall select the referee from that panel. The referee shall be appointed to sit with all of the powers provided by law. The parties agree that time is of the essence in conducting the judicial reference proceeding set forth herein. The costs of the judicial reference proceeding, including the fee for the court reporter, shall be borne equally by the parties as the costs are incurred, unless otherwise awarded by the referee. The referee shall hear all pre-trial and post-trial matters (including without limitation requests for equitable relief), prepare an award with written findings of fact and conclusions of law and apportion costs as appropriate. The referee shall be empowered to enter equitable relief as well as legal relief, provide all temporary or provisional remedies, enter equitable orders that are binding on the parties and rule on any motion that would be authorized in a trial, including without limitation motions for summary judgment or summary adjudication. Judgment upon the award shall be entered in the court in which such proceeding was commenced and all parties shall have full rights of appeal. This provision will not be deemed to limit or nstrain Lender's right of offset, to obtain provisional or ancillary remedies, to interplead funds in the event of a dispute, to exercise any urity interest or lien Lender may hold in property or to comply with legal process involving Borrower's accounts or other property.

**BUSINESS LOAN AGREEMENT. THE NOTE IS SUBJECT TO THE TERMS AND CONDITIONS OF THAT BUSINESS LOAN AGREEMENT EXECUTED BY BORROWER IN FAVOR OF LENDER ON APRIL 2, 2008, AS AMENDED FROM TIME TO TIME.**

**LETTER OF CREDIT SUBLINE EXHIBIT.** An exhibit, titled "Letter of Credit Subline Exhibit," is attached to this Note and by this reference is made a part of this Note just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Exhibit C-1, Page 000053

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives,

# PROMISSORY NOTE
## (Continued)

successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note.  Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them.  Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability.   All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone.  All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made.  The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS.  BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By:_____
Deepal      Wannakuwatte,      President/CEO      of
International Manufacturing Group, Inc.

LASER PRO Lending, Ver. 5.39.00.004  Copr. Harland Financial Solutions, Inc. 1997, 2008.  All Rights Reserved.   - CA  L:\CFI\LPL\D20.FC  TR-28177  PR-1

Exhibit C-1,  Page 000054

# EXHIBIT C-2

Exhibit C-2, Page 000055

# BUSINESS LOAN AGREEMENT (

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| 3,278,121.00 | 04-07-2009 | 04-01-2010 | 0168068-9001 | | | 08728 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing " * * * * " has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

---

THIS BUSINESS LOAN AGREEMENT dated April 7, 2009, is made and executed between International Manufacturing Group, Inc. ("Borrower") and California Bank & Trust ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

TERM. This Agreement shall be effective as of April 7, 2009, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

ADVANCE AUTHORITY. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.; and Betsy Wannakuwatte, Secretary of International Manufacturing Group, Inc.

CONDITIONS PRECEDENT TO EACH ADVANCE. Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

Loan Documents. Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) guaranties; (3) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

Borrower's Authorization. Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

Payment of Fees and Expenses. Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

Representations and Warranties. The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

No Event of Default. There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

REPRESENTATIONS AND WARRANTIES. Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

Organization. Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 879 F Street, Suite 120, West Sacramento, CA 95605. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

Assumed Business Names. Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

Authorization. Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

Financial Information. Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

Legal Effect. This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

Properties. Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

# JSINESS LOAN AGREEMENT
## (Continued)

Loan No: 0168068-9001

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than one-hundred-eighty (180) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, compiled by a certified public accountant satisfactory to Lender.

**Interim Statements.** As soon as available, but in no event later than sixty (60) days after the end of each Half-year, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower.

**Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

**Additional Requirements.**

**Guarantor Financial Information.** Borrower covenants and agrees with Lender that, while this Agreement is in effect, Borrower will furnish Lender with Guarantor's personal financial statement, on California Bank & Trust form, due no later than November 30th, on an annual basis and; a signed copy of Guarantor's filed Federal Income Tax Return, as soon as available, but in no event later than thirty (30) days from date of filing on an annual basis.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

# USINESS LOAN AGREEMENT
## (Continued)

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Deepal Wannakuwatte | $21,409,271.00 |
| Betsy Wannakuwatte | $21,409,271.00 |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, stata, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) pay any dividends on Borrower's stock (other than dividends payable in its stock), provided, however that notwithstanding the foregoing, but only so long as no Event of Default has occurred or would result from the payment of dividends, if Borrower is a "Subchapter S Corporation" (as defined in the Internal Revenue Code of 1986, as

amended), Borrower may pay cash dividends on its stock to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated income tax payments to satisfy their liabilities under federal and state law which arise solely from their status as Shareholders of a Subchapter S Corporation because of their ownership of shares of Borrower's stock, or purchase or retire any of Borrower's outstanding shares or alter or amend Borrower's capital structure.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Borrower will not enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**DEPOSIT ACCOUNT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure the Indebtedness. This includes all deposit accounts Borrower holds jointly with someone else.

**JURY WAIVER; JUDICIAL REFERENCE.** Borrower and Lender each waive their respective rights to a trial before a jury in connection with any disputes related to this Agreement, any of the Related Documents and the transactions contemplated hereby and thereby. Such disputes include without limitation any claim by Borrower or Lender, claims brought by Borrower as a class representative on behalf of others and claims by a class representative on Borrower's behalf as a class member (so-called "class action" suits). This provision shall not apply if, at the time

n action is brought, Borrower's loan is funded or maintained in a state where this jury trial waiver is not permitted by law.

If a jury trial waiver is not permitted by applicable law and a dispute arises between Borrower and Lender with respect to this Agreement, any of the Related Documents, the enforcement hereof or thereof or the transactions contemplated hereby or thereby, either of Borrower or Lender may require that it be resolved by judicial reference in accordance with California Code of Civil Procedure, Sections 638, et seq., including without limitation whether the dispute is subject to a judicial reference proceeding. The referee shall be a retired judge, agreed upon by the parties, from either the American Arbitration Association (AAA) or Judicial Arbitration and Mediation Service, Inc. (JAMS). If the parties cannot agree on the referee, the party who initially selected the reference procedure shall request a panel of ten retired judges from either AAA or JAMS, and the court shall select the referee from that panel. The referee shall be appointed to sit with all of the powers provided by law. The parties agree that time is of the essence in conducting the judicial reference proceeding set forth herein. The costs of the judicial reference proceeding, including the fee for the court reporter, shall be borne equally by the parties as the costs are incurred, unless otherwise awarded by the referee. The referee shall hear all pre-trial and post-trial matters (including without limitation requests for equitable relief), prepare an award with written findings of fact and conclusions of law and apportion costs as appropriate. The referee shall be empowered to enter equitable relief as well as legal relief, provide all temporary or provisional remedies, enter equitable orders that are binding on the parties and rule on any motion that would be authorized in a trial, including without limitation motions for summary judgment or summary adjudication. Judgment upon the award shall be entered in the court in which such proceeding was commenced and all parties shall have full rights of appeal. This provision will not be deemed to limit or constrain Lender's right of offset, to obtain provisional or ancillary remedies, to interplead funds in the event of a dispute, to exercise any security interest or lien Lender may hold in property or to comply with legal process involving Borrower's accounts or other property.

INCREASED COSTS. If any change in a law, rule or regulation, or the interpretation or application thereof, or Lender's compliance with any request, guideline or directive (whether or not having the force of law) of any governmental authority (collectively, a "Change in Law") shall (i) impose, modify or deem applicable any reserve, special deposit or similar requirement against or with respect to the assets of, deposits with or for the account of or credit extended by Lender or (ii) impose on Lender any other condition affecting this Agreement or the loans hereunder or any letter of credit or participation therein and the result of any of the foregoing shall be to increase the cost to Lender of making or maintaining any loan (or its commitment to make any such loan) or to increase the cost to Lender of issuing or maintaining any letter of credit or to reduce the amount of any sum received or receivable by Lender hereunder, then Borrower will pay to Lender such additional amount as will compensate Lender for such additional costs or reduction.If Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on the capital of Lender or Lender's holding company from this Agreement or the loans or letters of credit made or issued by Lender to a level below that which Lender or Lender's holding company could have achieved but for such Change in Law (taking into consideration Lender's policies and the policies of Lender's holding company with respect to capital adequacy), then from time to time Borrower will pay to Lender such additional amount as will compensate Lender or Lender's holding company for any such reduction, as set forth in a certificate of Lender describing in reasonable detail the amount or amounts necessary to compensate Lender or its holding company. The amounts and description in such certificate shall be conclusive absent manifest error, and Borrower agrees to pay to Lender the amount shown in such certificate within ten (10) business days after receipt thereof.Failure or delay on the part of Lender to demand compensation pursuant to this section shall not constitute a waiver of Lender's right to demand such compensation.

BUSINESS LOAN AGREEMENT. THIS BUSINESS LOAN AGREEMENT AMENDS AND RESTATES THE PRIOR BUSINESS LOAN AGREEMENT DATED APRIL 2, 2008, AS AMENDED FROM TIME TO TIME.

ADDITIONAL PROVISION. In addition to the covenants and agreements of Borrower set forth under "AFFIRMATIVE COVENANTS" above, Borrower further covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower shall continuously maintain in full force and effect an irrevocable standby letter of credit (the "L/C") with a major bank or financial institution ("L/C Issuer") with a term no later than the maturity of the Note in an amout at least equal to the amount of the Note, plus one year's anticipated interest on such amount, if any (unless otherwise agreed to by Lender), and in a form and on any other necessary or appropriate terms, all as are acceptable to Lender in its sole discretion and which shall name Lender as the beneficiary for the purpose of securing the Indebtedness and Borrower's other obligations hereunder and under the Related Documents. Lender's receipt of any notice of L/C Issuer's election not to extend or renew the L/C or as to the termination of the L/C for any other reason, or L/C Issuer's dishonor of any draw by Lender under the L/C, shall constitute an Event of Default. Borrower covenants and agrees to immediately notify Lender upon its receipt of any notice of non-extension, non-renewal or termination of the L/C. Notwithstanding anything to the contrary herein, Borrower shall not be entitled to a right to cure under the section entitled "DEFAULT - Right to Cure" hereunder with respect to any Event of Default under this section, unless agreed to by Lender in its sole discretion.

MISCELLANEOUS PROVISIONS. The following miscellaneous provisions are a part of this Agreement:

Amendments. This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Attorneys' Fees; Expenses. Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

Caption Headings. Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

Consent to Loan Participation. Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State

of California.

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento County, State of California.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means International Manufacturing Group, Inc. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan. Exhibit C-2, Page 000061

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the

Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means California Bank & Trust, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note executed by International Manufacturing Group, Inc. in the original principal amount of $3,278,121.00 dated April 2, 2008, together with all renewals of, extensions of, modifications of, consolidations of, and substitutions for the Note or Credit Agreement or any other subsequent Notes evidencing further Indebtedness.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED APRIL 7, 2009.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal    Wannakuwatte,    President/CEO    of
International Manufacturing Group, Inc.

LENDER:

CALIFORNIA BANK & TRUST

By: _____
Authorized Signer        Dawn Satow
Vice President & Commercial Banking Officer

LASER PRO Lending, Ver. 5.43.00.003 Copr. Harland Financial Solutions, Inc. 1997, 2009.  All Rights Reserved.  - CA  L:\CFI\LPL\C40.FC  TR-31554  PR-1

Exhibit C-2, Page 000062

# EXHIBIT C-3

Exhibit C-3, Page 000063

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,278,121.00 | 04-07-2009 | 04-01-2010 | 0168068-9001 | | | 08728 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA  95605

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA  95818

---

**Principal Amount: $3,278,121.00**          **Date of Agreement: April 7, 2009**

DESCRIPTION OF EXISTING INDEBTEDNESS. The Business Loan Agreement and the Promissory Note each dated April 2, 2008, in the original amount of $3,278,121.00, from International Manufacturing Group, Inc. to Lender.

DESCRIPTION OF COLLATERAL.

Irrevocable Letter of Credit Number 3092585, issued by Bank of America, N.A.

DESCRIPTION OF CHANGE IN TERMS.

1. The maturity date is hereby amended from April 1, 2009 to April 1, 2010.

2. This Note is subject to the terms and conditions of that Business Loan Agreement executed by Borrower in favor of Lender, as amended and restated on April 7, 2009.

3. Floor Rate. Under no circumstances will the interest rate on the Note be less than 5.000% per annum or more than the maximum rate allowed by applicable law.

4. The Letter of Credit Subline is hereby deleted in its entirety.

All other terms and conditions shall remain the same.

CONTINUING VALIDITY. Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the presentation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

FINANCIAL STATEMENT CERTIFICATIONS. The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

DEPOSIT ACCOUNT SECURITY. Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter owned, to secure its Indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

REAFFIRMATION OF GUARANTY OBLIGATIONS. An exhibit, titled "REAFFIRMATION OF GUARANTY OBLIGATIONS," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal     Wannakuwatte,    President/CEO    of
International Manufacturing Group, Inc.

LASER PRO Lending, Ver. 5.43.00.003 Copr. Harland Financial Solutions, Inc. 1997, 2008. All Rights Reserved. - CA L:\CFI\LPL\D20C.FC TR-31544 PR-1

Exhibit C-3, Page 000064

# EXHIBIT D-1

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,961,804.00 | 06-13-2008 | 05-08-2009 | 0168068-9002 | | | 08728 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95606

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

---

**Principal Amount: $2,961,804.00** **Initial Rate: 5.500%** **Date of Note: June 13, 2008**

PROMISE TO PAY. International Manufacturing Group, Inc. ("Borrower") promises to pay to California Bank & Trust ("Lender"), or order, in lawful money of the United States of America, the principal amount of Two Million Nine Hundred Sixty-one Thousand Eight Hundred Four & 00/100 Dollars ($2,961,804.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

PAYMENT. Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on May 8, 2009. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning June 30, 2008, with all subsequent interest payments to be due on the last day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. The annual interest rate for this Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

VARIABLE INTEREST RATE. The interest rate on this Note is subject to change from time to time based on changes in an index which is the rate of interest set from time to time by Bank as its Prime Rate. California Bank & Trust Prime Rate is determined by Bank as a means of pricing credit extensions to some customers and is neither tied to any external rate of interest or index nor is it necessarily the lowest rate of interest charged by Bank at any given time for any particular class of customers or credit extensions (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each Day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 5.000%. The interest rate to be applied to the unpaid principal balance during this Note will be at a rate of 0.500 percentage points over the Index, resulting in an initial rate of 5.500%. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

PREPAYMENT; MINIMUM INTEREST CHARGE. Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a minimum interest charge of $200.00. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: California Bank & Trust, Central Valley Sacramento Region Corporate Banking, 1331 Broadway, Sacramento, CA 95818.

LATE CHARGE. If a payment is 15 days or more late, Borrower will be charged 6.000% of the regularly scheduled payment or $500.00, whichever is less.

INTEREST AFTER DEFAULT. Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by adding a 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.

DEFAULT. Each of the following shall constitute an event of default ("Event of Default") under this Note:

Payment Default. Borrower fails to make any payment when due under this Note.

Other Defaults. Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

Default in Favor of Third Parties. Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

False Statements. Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

Insolvency. The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

Creditor or Forfeiture Proceedings. Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Events Affecting Guarantor. Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any

Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento County, State of California.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instrument listed herein:

(a) Irrevocable Standby Letter of Credit, Number 3093349, Dated May 15, 2008, Issued by Bank of America.

(b) Irrevocable Standby Letter of Credit, Number 3093239, Dated May 8, 2008, Issued by Bank of America.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.; Betsy Wannakuwatte, Secretary of International Manufacturing Group, Inc. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**JURY WAIVER; JUDICIAL REFERENCE.** Borrower and Lender each waive their respective rights to a trial before a jury in connection with any disputes related to this Note, the loan evidenced hereby and any other loan documents in connection herewith and therewith. Such disputes include without limitation any claim by Borrower or Lender, claims brought by Borrower as a class representative on behalf of others, and claims by a class representative on Borrower's behalf as a class member (so-called "class action" suits). This provision shall not apply if, at the time an action is brought, Borrower's loan is funded or maintained in a state where this jury trial waiver is not permitted by law.

If a jury trial waiver is not permitted by applicable law and a dispute arises between Borrower and Lender with respect to this Note, its enforcement or the transactions contemplated by the related loan documents, either of Borrower or Lender may require that it be resolved by judicial reference in accordance with California Code of Civil Procedure, Sections 638, et seq., including without limitation whether the dispute is subject to a judicial reference proceeding. The referee shall be a retired judge, agreed upon by the parties, from either the American Arbitration Association (AAA) or Judicial Arbitration and Mediation Service, Inc. (JAMS). If the parties cannot agree on the referee, the party who initially selected the reference procedure shall request a panel of ten retired judges from either AAA or JAMS, and the court shall select the referee from that panel. The referee shall be appointed to sit with all of the powers provided by law. The parties agree that time is of the essence in conducting the judicial reference proceeding set forth herein. The costs of the judicial reference proceeding, including the fee for the court reporter, shall be borne equally by the parties as the costs are incurred, unless otherwise awarded by the referee. The referee shall hear all pre-trial and post-trial matters (including without limitation requests for equitable relief), prepare an award with written findings of fact and conclusions of law and apportion costs as appropriate. The referee shall be empowered to enter equitable relief as well as legal relief, provide all temporary or provisional remedies, enter equitable orders that are binding on the parties and rule on any motion that would be authorized in a trial, including without limitation motions for summary judgment or summary adjudication. Judgment upon the award shall be entered in the court in which such proceeding was commenced and all parties shall have full rights of appeal. This provision will not be deemed to limit or constrain Lender's right of offset, to obtain provisional or ancillary remedies, to interplead funds in the event of a dispute, to exercise any security interest or lien Lender may hold in property or to comply with legal process involving Borrower's accounts or other property.

**LOAN AGREEMENT.** THE NOTE IS SUBJECT TO THE TERMS AND CONDITIONS OF THAT BUSINESS LOAN AGREEMENT EXECUTED BY BORROWER IN FAVOR OF LENDER ON JUNE 13, 2008, AS AMENDED FROM TIME TO TIME.

Exhibit D-1, Page 000067

**PROMISSORY NOTE**
**(Continued)**

Loan No: 0168068-9002                                                                Page 3

**LETTER OF CREDIT SUBLINE EXHIBIT.** An exhibit, titled "Letter of Credit Subline Exhibit," is attached to this Note and by this reference is made a part of this Note just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Note.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.**

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal    Wannakuwatte,    President/CEO    of
International Manufacturing Group, Inc.

LASER PRO Lending, Ver. 5.40.00.003 Copr. Harland Financial Solutions, Inc. 1997, 2008.   All Rights Reserved.   - CA  L:\CFI\LPL\D20.FC  TR-28478  PR-1

# EXHIBIT D-2

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| 7,961,804.00 | 06-13-2008 | 05-08-2009 | 0168068-9002 | | | 08728 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "* * *" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95606

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

THIS BUSINESS LOAN AGREEMENT dated June 13, 2008, is made and executed between International Manufacturing Group, Inc. ("Borrower") and California Bank & Trust ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) In granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

TERM. This Agreement shall be effective as of June 13, 2008, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

ADVANCE AUTHORITY. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.; Betsy Wannakuwatte, Secretary of International Manufacturing Group, Inc.

CONDITIONS PRECEDENT TO EACH ADVANCE. Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

Loan Documents. Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) guaranties; (6) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

Borrower's Authorization. Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

Payment of Fees and Expenses. Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

Representations and Warranties. The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

No Event of Default. There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

REPRESENTATIONS AND WARRANTIES. Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

Organization. Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 879 F Street, Suite 120, West Sacramento, CA 95606. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

Assumed Business Names. Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

Authorization. Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

Financial Information. Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

Legal Effect. This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

Properties. Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements

relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

    **Annual Statements.** As soon as available, but in no event later than one hundred eighty (180) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, compiled by a certified public accountant satisfactory to Lender.

    **Interim Statements.** As soon as available, but in no event later than sixty (60) days after the end of each Half-year, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower.

    **Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns, prepared by Borrower.

    **Additional Requirements.**

    **Guarantor Financial Information.** Borrower covenants and agrees with Lender that, while this Agreement is in effect, Borrower will furnish Lender with Guarantor's personal financial statement, as of October 31st, on California Bank & Trust form, as soon as available, but in no event later than November 30th, on an annual basis and; a signed copy of Guarantor's filed Federal Income Tax Return, as soon as available, but in no event later than thirty (30) days from filing, on an annual basis.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; Exhibit 9-2, Page 0007 (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained,

and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranty.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Deepal Wannakuwatte | $19,409,271.00 |
| Betsy Wannakuwatte | $19,409,271.00 |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell

# BUSINESS LOAN AGREEMENT
## (Continued)

Collateral out of the ordinary course of business, or (3) pay any dividends on Borrower's stock (other than dividends payable in its stock), provided, however that notwithstanding the foregoing, but only so long as no Event of Default has occurred and is continuing or would result from the payment of dividends, if Borrower is a "Subchapter S Corporation" (as defined in the Internal Revenue Code of 1986, as amended), Borrower may pay cash dividends on its stock to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated income tax payments to satisfy their liabilities under federal and state law which arise solely from their status as Shareholders of a Subchapter S Corporation because of their ownership of shares of Borrower's stock, or purchase or retire any of Borrower's outstanding shares or alter or amend Borrower's capital structure.

Loans, Acquisitions and Guaranties. (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

Agreements. Borrower will not enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

CESSATION OF ADVANCES. If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

DEFAULT. Each of the following shall constitute an Event of Default under this Agreement:

Payment Default. Borrower fails to make any payment when due under the Loan.

Other Defaults. Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

Default in Favor of Third Parties. Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

False Statements. Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

Insolvency. The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

Defective Collateralization. This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

Creditor or Forfeiture Proceedings. Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Events Affecting Guarantor. Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

Change in Ownership. Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

Adverse Change. A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

Insecurity. Lender in good faith believes itself insecure.

Right to Cure. If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

EFFECT OF AN EVENT OF DEFAULT. If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

DEPOSIT AGREEMENT SECURITY. Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure the Indebtedness. This includes all deposit accounts Borrower holds jointly with someone else.

JURY WAIVER; JUDICIAL REFERENCE. Borrower and Lender each waive their respective rights to a trial before a jury in connection with any

Exhibit D-2, Page 000073

**BUSINESS LOAN AGREEMENT**
(Continued)

Loan No: 0168068-9002          Page 5

disputes related to this Agreement, any of the Related Documents and the transactions contemplated hereby and thereby. Such disputes include without limitation any claim by Borrower or Lender, claims brought by Borrower as a class representative on behalf of others, and claims by a class representative on Borrower's behalf as a class member (so-called "class action" suits). This provision shall not apply if, at the time an action is brought, Borrower's loan is funded or maintained in a state where this jury trial waiver is not permitted by law.

If a jury trial waiver is not permitted by applicable law and a dispute arises between Borrower and Lender with respect to this Agreement, any of the Related Documents, the enforcement hereof or thereof or the transactions contemplated hereby or thereby, either of Borrower or Lender may require that it be resolved by judicial reference in accordance with California Code of Civil Procedure, Sections 638, et seq., including without limitation whether the dispute is subject to a judicial reference proceeding. The referee shall be a retired judge, agreed upon by the parties, from either the American Arbitration Association (AAA) or Judicial Arbitration and Mediation Service, Inc. (JAMS). If the parties cannot agree on the referee, the party who initially selected the reference procedure shall request a panel of ten retired judges from either AAA or JAMS, and the court shall select the referee from that panel. The referee shall be appointed to sit with all of the powers provided by law. The parties agree that time is of the essence in conducting the judicial reference proceeding set forth herein. The costs of the judicial reference proceeding, including the fee for the court reporter, shall be borne equally by the parties as the costs are incurred, unless otherwise awarded by the referee. The referee shall hear all pre-trial and post-trial matters (including without limitation requests for equitable relief), prepare an award with written findings of fact and conclusions of law and apportion costs as appropriate. The referee shall be empowered to enter equitable relief as well as legal relief, provide all temporary or provisional remedies, enter equitable orders that are binding on the parties and rule on any motion that would be authorized in a trial, including without limitation motions for summary judgment or summary adjudication. Judgment upon the award shall be entered in the court in which such proceeding was commenced and all parties shall have full rights of appeal. This provision will not be deemed to limit or constrain Lender's right of offset, to obtain provisional or ancillary remedies, to interplead funds in the event of a dispute, to exercise any security interest or lien Lender may hold in property or to comply with legal process involving Borrower's accounts or other property.

**INCREASED COSTS.** If any change in a law, rule or regulation, or the interpretation or application thereof, or Lender's compliance with any request, guideline or directive (whether or not having the force of law) of any governmental authority (collectively, a "Change in Law") shall (i) impose, modify or deem applicable any reserve, special deposit or similar requirement against or with respect to the assets of, deposits with or for the account of or credit extended by Lender or (ii) impose on Lender any other condition affecting this Agreement or the loans hereunder or any letter of credit or participation therein and the result of any of the foregoing shall be to increase the cost to Lender of making or maintaining any loan (or its commitment to make any such loan) or to increase the cost to Lender of issuing or maintaining any letter of credit or to reduce the amount of any sum received or receivable by Lender hereunder, than Borrower will pay to Lender such additional amount as will compensate Lender for such additional costs or reduction.If Lender determines that any Change in Law regarding capital requirments has or would have the effect of reducing the rate of return on the capital of Lender or Lender's holding company from this Agreement or the loans or letters of credit made or issued by Lender to a level below that which Lender or Lender's holding company could have achieved but for such Change in Law (taking into consideration Lender's policies and the policies of Lender's holding company with respect to capital adequacy), then from time to time Borrower will pay to Lender such additional amount as will compensate Lender or Lender's holding company for any such reduction, as set forth in a certificate of Lender describing in reasonable detail the amount or amounts necessary to compensate Lender or its holding company. The amounts and description in such certificate shall be conclusive absent manifest error, and Borrower agrees to pay to Lender the amount nown in such certificate within ten (10) business days after receipt thereof.Failure or delay on the part of Lender to demand compensation pursuant to this section shall not constitute a waiver of Lender's right to demand such compensation.

**ADDITIONAL INFORMATION.** In addition to the covenants and agreements of Borrower set forth under "AFFIRMATIVE COVENANTS" above, Borrower further covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower shall continuously maintain in full force and effect an irrevocable standby letter of credit (the "L/C") with a major bank or financial institution ("L/C Issuer") with a term expiring no later than the maturity of the Note in an amount at least equal to the amount of the Note, plus one year's anticipated interest on such amount, if any (unless otherwise agreed to by Lender), and in a form and on any other necessary or appropriate terms, all as are acceptable to Lender in its sole discretion and which shall name Lender as the beneficiary for the purpose of securing the indebtedness and Borrower's other obligations hereunder and under the Related Documents. Lender's receipt of any notice of L/C Issuer's election not to extend or renew the L/C or as to the termination of the L/C for any other reason, or L/C Issuer's dishonor of any draw by Lender under the L/C, shall constitute an Event of Default. Borrower covenants and agrees to immediately notify Lender upon its receipt of any notice of non-extension, non-renewal or termination of the L/C. Notwithstanding anything to the contrary herein, Borrower shall not be entitled to a right to cure under the section entitled "DEFAULT - Right to Cure" hereunder with respect to any Event of Default under this section, unless agreed to by Lender in its sole discretion.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

    **Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

    **Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

    **Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

    **Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

Exhibit D-2, Page 000074

    **Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the

laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento County, State of California.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means International Manufacturing Group, Inc. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

Exhibit D-2, Page 000075

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

# BUSINESS LOAN AGREEMENT
## (Continued)

Loan No: 0168068-9002                                                        Page 7

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means California Bank & Trust, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note executed by International Manufacturing Group, Inc. in the original principal amount of $2,961,804.00, dated June 13, 2008, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the Note or Credit Agreement or any other subsequent Notes evidencing further Indebtedness.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialsmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED JUNE 13, 2008.

**BORROWER:**

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____

Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.

**LENDER:**

CALIFORNIA BANK & TRUST

By: _____
Authorized Signer    Dawn Satow for Jung Enkoji
Vice President & Commercial Banking Officer

LASER PRO Lending, Ver. 5.40.00.007 Copr. Harland Financial Solutions, Inc. 1997, 2008. All Rights Reserved. - CA L:\CFI\LPL\C40.FC TR-38676 PR-1

Case 16-02090

# EXHIBIT D-3

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| 2,961,804.00 | 05-15-2009 | 05-08-2010 | 0168068-9002 | | | 08728 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95606

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

**Principal Amount: $2,961,804.00** **Date of Agreement: May 15, 2009**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**
The Business Loan Agreement and the Promissory Note each dated June 13, 2008, in the original amount of $2,961,804.00 from International Manufacturing Group, Inc. to Lender.

**DESCRIPTION OF COLLATERAL.**
1) Irrevocable Standby Letter of Credit, number 3093349, dated May 15, 2008, issued by Bank of America

2) Irrevocable Standby Letter of Credit, number 3093239, dated May 8, 2008, issued by Bank of America.

**DESCRIPTION OF CHANGE IN TERMS.**
1) The maturity date is hereby amended from May 8, 2009 to May 8, 2010.

2) Under no circumstances will the interest rate on the Note be less than 5.00% per annum or more than the maximum rate allowed by applicable law.

3) The Letter of Credit Subline is hereby deleted in its entirety.

All other terms and conditions shall remain the same.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Financial Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**DEPOSIT ACCOUNT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**REAFFIRMATION OF GUARANTY OBLIGATIONS.** An exhibit, titled "REAFFIRMATION OF GUARANTY OBLIGATIONS," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

**PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.**

**BORROWER:**

**INTERNATIONAL MANUFACTURING GROUP, INC.**

By: [signature]
Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.

LASER PRO Lending, Ver. 5.44.00.002 Copr. Harland Financial Solutions, Inc. 1997, 2009. All Rights Reserved. - CA L:\CFI\LPL\D20C.FC TR-32485 PR-1

# EXHIBIT E-1

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Coll/Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-----------|---------|---------|----------|
| 000,000.00 | 10-29-2008 | 11-05-2009 | 0168068-9003 | | | 08728 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95606

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

**Principal Amount: $2,000,000.00**                     **Date of Note: October 29, 2008**

**PROMISE TO PAY.** International Manufacturing Group, Inc. ("Borrower") promises to pay to California Bank & Trust ("Lender"), or order, in lawful money of the United States of America, the principal amount of Two Million & 00/100 Dollars ($2,000,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on November 5, 2009. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning December 5, 2008, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an index which is the rate of interest set from time to time by Bank as its Prime Rate. California Bank & Trust Prime Rate is determined by Bank as a means of pricing credit extensions to some customers and is neither tied to any external rate of interest or index nor is it necessarily the lowest rate of interest charged by Bank at any given time for any particular class of customers or credit extensions (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each Day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 4.500% per annum. The interest rate to be applied to the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 0.500 percentage points over the Index, resulting in an initial rate of 5.000%. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**PREPAYMENT; MINIMUM INTEREST CHARGE.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a minimum interest charge of $200.00. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance owed. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: California Bank & Trust, Central Valley Sacramento Region Corporate Banking, 1331 Broadway, Sacramento, CA 95818.

**LATE CHARGE.** If a payment is 15 days or more late, Borrower will be charged 6.000% of the regularly scheduled payment or $500.00, whichever is less.

**INTEREST AFTER DEFAULT.** Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by adding a 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or

# PROMISSORY NOTE
## (Continued)

Loan No: 0168068-9003                                                                                      Page 2

a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento County, State of California.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instrument listed herein: certificates of deposit described in an Assignment of Deposit Account dated October 29, 2008.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or ~ersons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's ddress shown above, written notice of revocation of such authority: Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc. and Betsy Wannakuwatte. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its Indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**JURY WAIVER; JUDICIAL REFERENCE.** Borrower and Lender each waive their respective rights to a trial before a jury in connection with any disputes related to this Note, the loan evidenced hereby and any other loan documents in connection herewith and therewith. Such disputes include without limitation any claim by Borrower or Lender, claims brought by Borrower as a class representative on behalf of others, and claims by a class representative on Borrower's behalf as a class member (so-called "class action" suits). This provision shall not apply if, at the time an action is brought, Borrower's loan is funded or maintained in a state where this jury trial waiver is not permitted by law.

If a jury trial waiver is not permitted by applicable law and a dispute arises between Borrower and Lender with respect to this Note, its enforcement or the transactions contemplated by the related loan documents, either of Borrower or Lender may require that it be resolved by judicial reference in accordance with California Code of Civil Procedure, Sections 638, et seq., including without limitation whether the dispute is subject to a judicial reference proceeding. The referee shall be a retired judge, agreed upon by the parties, from either the American Arbitration Association (AAA) or Judicial Arbitration and Mediation Service, Inc. (JAMS). If the parties cannot agree on the referee, the party who initially selected the reference procedure shall request a panel of ten retired judges from either AAA or JAMS, and the court shall select the referee from that panel. The referee shall be appointed to sit with all of the powers provided by law. The parties agree that time is of the essence in conducting the judicial reference proceeding set forth herein. The costs of the judicial reference proceeding, including the fee for the court reporter, shall be borne equally by the parties as the costs are incurred, unless otherwise awarded by the referee. The referee shall hear all pre-trial and post-trial matters (including without limitation requests for equitable relief), prepare an award with written findings of fact and conclusions of law and apportion costs as appropriate. The referee shall be empowered to enter equitable relief as well as legal relief, provide ~ll temporary or provisional remedies, enter equitable orders that are binding on the parties and rule on any motion that would be authorized in a al, including without limitation motions for summary judgment or summary adjudication. Judgment upon the award shall be entered in the .ourt in which such proceeding was commenced and all parties shall have full rights of appeal. This provision will not be deemed to limit or constrain Lender's right of offset, to obtain provisional or ancillary remedies, to interplead funds in the event of a dispute, to exercise any security interest or lien Lender may hold in property or to comply with legal process involving Borrower's accounts or other property.

**BUSINESS LOAN AGREEMENT.** THE NOTE IS SUBJECT TO THE TERMS AND CONDITIONS OF THAT BUSINESS LOAN AGREEMENT EXECUTED BY BORROWER IN FAVOR OF LENDER ON OCTOBER 29, 2008, AS AMENDED FROM TIME TO TIME. Exhibit E-1, Page 000081

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives,

**PROMISSORY NOTE**
(Continued)

successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note.  Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them.  Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability.   All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone.  All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made.  The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS.  BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal   Wannakuwatte,   President/CEO   of
International Manufacturing Group, Inc.

LASER PRO Lending, Ver. 5.45.00.004  Copr. Harland Financial Solutions, Inc. 1997, 2008.  All Rights Reserved.   - CA  L:\CFI\LPL\D20.FC  TR-30076  PR-1

Exhibit E-1, Page 000082

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| 2,000,000.00 | 11-11-2008 | 11-05-2009 | 0168068-9003 | | | 08728 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "* * *" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95606

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

---

THIS BUSINESS LOAN AGREEMENT dated November 11, 2008, is made and executed between International Manufacturing Group, Inc. ("Borrower") and California Bank & Trust ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of November 11, 2008, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY.** The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc. and Betsy Wannakuwatte.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) guaranties; (6) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 879 F Street, Suite 120, West Sacramento, CA 95606. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements

# BUSINESS LOAN AGREEMENT
## (Continued)

relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

    **Annual Statements.** As soon as available, but in no event later than one hundred eighty (180) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, compiled by a certified public accountant satisfactory to Lender.

    **Interim Statements.** As soon as available, but in no event later than sixty (60) days after the end of each Half-year, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower in form satisfactory to Lender.

    **Tax Returns.** As soon as available after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

    **Additional Requirements.**

    **Guarantor Financial Information.** Borrower covenants and agrees with Lender that, while this Agreement is in effect, Borrower will furnish Lender with Guarantor's personal financial statement, on California Bank & Trust form, as soon as available, but in no event later than March 31st, on an annual basis and; a signed copy of Guarantor's filed Federal Income Tax Return, as soon as available, on an annual basis.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained,

Exhibit 25 Page 000083

SINESS LOAN AGREEMENT
(Continued)

and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Deepal Wannakuwatte | $21,409,271.00 |
| Betsy Wannakuwatte | $21,409,271.00 |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the or written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell

Collateral out of the ordinary course of business, or  (3)  pay any dividends on Borrower's stock (other than dividends payable in its stock), provided, however that notwithstanding the foregoing, but only so long as no Event of Default has occurred and is continuing or would result from the payment of dividends, if Borrower is a "Subchapter S Corporation" (as defined in the Internal Revenue Code of 1986, as amended), Borrower may pay cash dividends on its stock to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated income tax payments to satisfy their liabilities under federal and state law which arise solely from their status as Shareholders of a Subchapter S Corporation because of their ownership of shares of Borrower's stock, or purchase or retire any of Borrower's outstanding shares or alter or amend Borrower's capital structure.

Loans, Acquisitions and Guaranties.  (1)  Loan, invest in or advance money or assets to any other person, enterprise or entity,  (2) purchase, create or acquire any interest in any other enterprise or entity, or  (3)  incur any obligation as surety or guarantor other than in the ordinary course of business.

Agreements.  Borrower will not enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

CESSATION OF ADVANCES.  If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if:  (A)  Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender;  (B)  Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt;  (C)  there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or  (D)  any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or  (E)  Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

DEFAULT.  Each of the following shall constitute an Event of Default under this Agreement:

Payment Default.  Borrower fails to make any payment when due under the Loan.

Other Defaults.  Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

Default in Favor of Third Parties.  Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

False Statements.  Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

Insolvency.  The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

Defective Collateralization.  This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

Creditor or Forfeiture Proceedings.  Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender.  However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Events Affecting Guarantor.  Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

Change in Ownership.  Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

Adverse Change.  A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

Insecurity.  Lender in good faith believes itself insecure.

Right to Cure.  If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default:  (1)  cure the default within fifteen (15) days; or  (2)  if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

EFFECT OF AN EVENT OF DEFAULT.  If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional.  In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise.  Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently.  Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

DEPOSIT AGREEMENT SECURITY.  Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure the Indebtedness.  This includes all deposit accounts Borrower holds jointly with someone else.                                                       Exhibit E-2, Page 000087

JURY WAIVER; JUDICIAL REFERENCE. Borrower and Lender each waive their respective rights to a trial before a jury in connection with any

# BUSINESS LOAN AGREEMENT
## (Continued)

disputes related to this Agreement, any of the Related Documents and the transactions contemplated hereby and thereby. Such disputes include without limitation any claim by Borrower or Lender, claims brought by Borrower as a class representative on behalf of others, and claims by a class representative on Borrower's behalf as a class member (so-called "class action" suits). This provision shall not apply if, at the time an action is brought, Borrower's loan is funded or maintained in a state where this jury trial waiver is not permitted by law.

If a jury trial waiver is not permitted by applicable law and a dispute arises between Borrower and Lender with respect to this Agreement, any of the Related Documents, the enforcement hereof or thereof or the transactions contemplated hereby or thereby, either of Borrower or Lender may require that it be resolved by judicial reference in accordance with California Code of Civil Procedure, Sections 638, et seq., including without limitation whether the dispute is subject to a judicial reference proceeding. The referee shall be a retired judge, agreed upon by the parties, from either the American Arbitration Association (AAA) or Judicial Arbitration and Mediation Service, Inc. (JAMS). If the parties cannot agree on the referee, the party who initially selected the reference procedure shall request a panel of ten retired judges from either AAA or JAMS, and the court shall select the referee from that panel. The referee shall be appointed to sit with all of the powers provided by law. The parties agree that time is of the essence in conducting the judicial reference proceeding set forth herein. The costs of the judicial reference proceeding, including the fee for the court reporter, shall be borne equally by the parties as the costs are incurred, unless otherwise awarded by the referee. The referee shall hear all pre-trial and post-trial matters (including without limitation requests for equitable relief), prepare an award with written findings of fact and conclusions of law and apportion costs as appropriate. The referee shall be empowered to enter equitable relief as well as legal relief, provide all temporary or provisional remedies, enter equitable orders that are binding on the parties and rule on any motion that would be authorized in a trial, including without limitation motions for summary judgment or summary adjudication. Judgment upon the award shall be entered in the court in which such proceeding was commenced and all parties shall have full rights of appeal. This provision will not be deemed to limit or constrain Lender's right of offset, to obtain provisional or ancillary remedies, to interplead funds in the event of a dispute, to exercise any security interest or lien Lender may hold in property or to comply with legal process involving Borrower's accounts or other property.

**INCREASED COSTS.** If any change in a law, rule or regulation, or the interpretation or application thereof, or Lender's compliance with any request, guideline or directive (whether or not having the force of law) of any governmental authority (collectively, a "Change in Law") shall (i) impose, modify or deem applicable any reserve, special deposit or similar requirement against or with respect to the assets of, deposits with or for the account of or credit extended by Lender or (ii) impose on Lender any other condition effecting this Agreement or the loans hereunder or any letter of credit or participation therein and the result of any of the foregoing shall be to increase the cost to Lender of making or maintaining any loan (or its commitment to make any such loan) or to increase the cost to Lender of issuing or maintaining any letter of credit or to reduce the amount of any sum received or receivable by Lender hereunder, then Borrower will pay to Lender such additional amount as will compensate Lender for such additional costs or reduction.If Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on the capital of Lender or Lender's holding company from this Agreement or the loans or letters of credit made or issued by Lender to a level below that which Lender or Lender's holding company could have achieved but for such Change in Law (taking into consideration Lender's policies and the policies of Lender's holding company with respect to capital adequacy), then from time to time Borrower will pay to Lender such additional amount as will compensate Lender or Lender's holding company for any such reduction, as set forth in a certificate of Lender describing in reasonable detail the amount or amounts necessary to compensate Lender or its holding company. The amounts and description in such certificate shall be conclusive absent manifest error, and Borrower agrees to pay to Lender the amount shown in such certificate within ten (10) business days after receipt thereof.Failure or delay on the part of Lender to demand compensation pursuant to this section shall not constitute a waiver of Lender's right to demand such compensation.

**BUSINESS LOAN AGREEMENT.** THIS BUSINESS LOAN AGREEMENT AMENDS AND RESTATES THE PRIOR BUSINESS LOAN AGREEMENT DATED OCTOBER 29, 2008, AS AMENDED FROM TIME TO TIME.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento County, State of California.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of

**BUSINESS LOAN AGREEMENT**
(Continued)

Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means International Manufacturing Group, Inc. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

Exhibit E-2, Page 000089

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and

BUSINESS LOAN AGREEMENT
(Continued)

interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means California Bank & Trust, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note executed by International Manufacturing Group, Inc. in the original principal amount of $2,000,000.00 dated October 29, 2008, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the Note or Credit Agreement or any other subsequent Notes evidencing further indebtedness.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED NOVEMBER 11, 2008.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal    Wannakuwatte,    President/CEO    of
International Manufacturing Group, Inc.

LENDER:

CALIFORNIA BANK & TRUST

By: _____
Authorized Signer    D. Satow    for Jun Enkoji
Vice President & Commercial Banking Officer

LASER PRO Lending, Ver. 5.42.00.004  Copr. Harland Financial Solutions, Inc. 1997, 2008.  All Rights Reserved.  - CA  L:\CFI\LPL\C40.FC  TR-30317  PR-1

# EXHIBIT E-3

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| 2,000,000.00 | 11-11-2008 | 11-05-2009 | 0168068-9003 | | | 08728 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

| | |
|---|---|
| **Borrower:** International Manufacturing Group, Inc.<br>879 F Street, Suite 120<br>West Sacramento, CA 95606 | **Lender:** California Bank & Trust<br>Central Valley Sacramento Region Corporate Banking<br>1331 Broadway<br>Sacramento, CA 95818 |

**Principal Amount: $2,000,000.00**         **Date of Agreement: November 11, 2008**

DESCRIPTION OF EXISTING INDEBTEDNESS. The Business Loan Agreement and the Promissory Note each dated October 29, 2008, in the original principal amount of $2,000,000.00, from International Manufacturing Group, Inc. to Lender.

DESCRIPTION OF COLLATERAL.

CD Account Number 1250004673 with Lender

DESCRIPTION OF CHANGE IN TERMS.

1. The Note is subject to the terms and conditions of that Business Loan Agreement executed by Borrower in favor of Lender, as amended and restated on November 11, 2008

All other terms and conditions shall remain the same.

CONTINUING VALIDITY. Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

FINANCIAL STATEMENT CERTIFICATIONS. The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

DEPOSIT AGREEMENT SECURITY. Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its Indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal Wannakuwatte, President/CEO of
International Manufacturing Group, Inc.

LASER PRO Lending, Ver. 5.42.00.004 Copr. Harland Financial Solutions, Inc. 1997, 2008 All Rights Reserved. - CA L:\CFI\LPL\D20C.FC TR-30313 PR-1

# EXHIBIT E-4

## CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No. | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| 2,000,000.00 | 11-02-2009 | 02-05-2010 | 0168068-9003 | | | 08728 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

| | |
|---|---|
| **Borrower:** International Manufacturing Group, Inc.<br>879 F Street, Suite 120<br>West Sacramento, CA 95606 | **Lender:** California Bank & Trust<br>Central Valley Sacramento Region Corporate Banking<br>1331 Broadway<br>Sacramento, CA 95818 |

**Principal Amount: $2,000,000.00**                          **Date of Agreement: November 2, 2009**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**
The Business Loan Agreement dated April 7, 2009 and Promissory Note dated October 29, 2008, in the original amount of $2,000,000.00 as amended by that certain Change In Terms Agreement dated November 11, 2008 from International Manufacturing Group, Inc. to Lender.

**DESCRIPTION OF COLLATERAL.**
CD Account Number 1250004673 with Lender.

**DESCRIPTION OF CHANGE IN TERMS.**
1) The Maturity date is hereby extended from November 5, 2009 to February 5, 2010.

All other terms and conditions shall remain the same.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**DEPOSIT ACCOUNT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its Indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.**

**BORROWER:**

INTERNATIONAL MANUFACTURING GROUP, INC.

By:
Deepal Wannakuwatte, President/CEO of
International Manufacturing Group, Inc.

LASER PRO Lending, Ver. 5.45.00.004 Copr. Harland Financial Solutions, Inc. 1997, 2009. All Rights Reserved. - CA L:\CFI\LPL\D20C.FC TR-32447 PR-1

# EXHIBIT F-1

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $250,000.00 | 07-14-2006 | 03-05-2007 | 9163000288-1 | | | 68631 | |

*References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.*

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:** California Bank & Trust
Arden Way Branch
1800 Arden Way
Sacramento, CA 95815

---

**Principal Amount: $250,000.00**     **Initial Rate: 8.750%**     **Date of Note: July 14, 2006**

**PROMISE TO PAY.** International Manufacturing Group, Inc. ("Borrower") promises to pay to California Bank & Trust ("Lender"), or order, in lawful money of the United States of America, the principal amount of Two Hundred Fifty Thousand & 00/100 Dollars ($250,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on March 5, 2007. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning August 5, 2006, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. The annual interest rate for this Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an index which is the rate of interest set from time to time by Bank as its Prime Rate. California Bank & Trust Prime Rate is determined by Bank as a means of pricing credit extensions to some customers and is neither tied to any external rate of interest or index nor is it necessarily the lowest rate of interest charged by Bank at any given time for any particular class of customers or credit extensions (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current index rate upon Borrower's request. The interest rate change will not occur more often than each Day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 8.250%. The interest rate to be applied to the unpaid principal balance during this Note will be at a rate of 0.500 percentage points over the index, resulting in an initial rate of 8.750%. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**PREPAYMENT; MINIMUM INTEREST CHARGE.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a minimum interest charge of $200.00. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: California Bank & Trust, Arden Way Branch, 1800 Arden Way, Sacramento, CA 95815.

**LATE CHARGE.** If a payment is 15 days or more late, Borrower will be charged 6.000% of the regularly scheduled payment or $500.00, whichever is less.

**INTEREST AFTER DEFAULT.** Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by adding a 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness

# PROMISSORY NOTE
## (Continued)

Loan No: 9163000288-1                                                                                                    Page 2

evidenced by this Note. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Change in Ownership.**  Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.**  A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.**  Lender in good faith believes itself insecure.

**Cure Provisions.**  If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.**  Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.**  Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.**  To the extent permitted by applicable law, Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW.**  This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.

**CHOICE OF VENUE.**  If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento County, State of California.

**COLLATERAL.**  Borrower acknowledges this Note is secured by the following collateral described in the security instrument listed herein:

(a) Irrevocable Letter of Credit, Number 5051, issued by Bank of Sacramento.

**LINE OF CREDIT.**  This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following persons currently are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of their authority: Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.; and Betsy Wannakuwatte, Secretary. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**DEPOSIT AGREEMENT SECURITY.**  Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its Indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**FINANCIAL STATEMENT CERTIFICATIONS.**  The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Aging, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**LOAN AGREEMENT.**  The Note is subject to the terms and conditions of that Business Loan Agreement executed by Borrower in favor of Lender, as amended and restated on July 14, 2006.

**STAND-BY LETTER OF CREDIT SUBLINE.**  An exhibit, titled "Stand-By Letter of Credit Subline," is attached to this Note and by this reference is made a part of this Note just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Note.

**SUCCESSOR INTERESTS.**  The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.**  If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

## PROMISSORY NOTE
### (Continued)

Loan No: 9163000288-1                                                                                   Page 3

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE
INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal    Wannakuwatte,    President/CEO    of
International Manufacturing Group, Inc.

LASER PRO Lending, Ver. 5.31.00.004  Copr. Harland Financial Solutions, Inc. 1997, 2008.  All Rights Reserved.  - CA  L:\CFALPA\D20.FC  TR-31829  PR-1

# EXHIBIT F-2

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| 250,000.00 | 02-20-2007 | 03-05-2007 | 9163000288-1 | | | 2217 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

THIS BUSINESS LOAN AGREEMENT dated February 20, 2007, is made and executed between International Manufacturing Group, Inc. ("Borrower") and California Bank & Trust ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement ("Loan"). Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

TERM. This Agreement shall be effective as of February 20, 2007, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

CONDITIONS PRECEDENT TO EACH ADVANCE. Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

Loan Documents. Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) guaranties; (3) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

Borrower's Authorization. Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

Payment of Fees and Expenses. Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

Representations and Warranties. The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

No Event of Default. There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

REPRESENTATIONS AND WARRANTIES. Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

Organization. Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 879 F Street, Suite 120, West Sacramento, CA 95605. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

Assumed Business Names. Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

Authorization. Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

Financial Information. Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

Legal Effect. This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

Properties. Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

Hazardous Substances. Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no

Exhibit 1, Page 000100

knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

~~Annual Statements.~~ As soon as available, but in no event later than one-hundred-eighty (180) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, compiled by a certified public accountant satisfactory to Lender.

~~Interim Statements.~~ As soon as available, but in no event later than sixty (60) days after the end of each Half-year, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower.

~~Tax Returns.~~ As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

**Additional Requirements.**
~~Guarantor Financial Information.~~ Borrower covenants and agrees with Lender that, while this Agreement is in effect, Borrower will furnish Lender with Guarantor's personal financial statement as of October 31st, on California Bank & Trust form, as soon as available, but in no event later than November 30th, on an annual basis and; a signed copy of Guarantor's filed Federal Income Tax Return, as soon as available, but in no event later than thirty (30) days from date of filing on an annual basis.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

Exhibit F, Page 000101

**BUSINESS LOAN AGREEMENT**
**(Continued)**

Loan No: 9163000288-1                                                                                     Page 3

| Names of Guarantors | Amounts |
|---|---|
| Deepal Wannakuwatte | $12,809,813.00 |
| Betsy Wannakuwatte | $12,809,813.00 |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender.  Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.**  Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.**  Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.**  Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act.  Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized.  Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.**  Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or. Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records.  If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.**  Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.**  Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.**  If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral.  All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower.  All such expenses will become a part of the Indebtedness and, at Lender's option, will  (A)  be payable on demand;  (B)  be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either  (1)  the term of any applicable insurance policy; or  (2)  the remaining term of the Note; or  (C)  be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.**  Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.**  (1)  Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases,  (2)  sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or  (3)  sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.**  (1)  Engage in any business activities substantially different than those in which Borrower is presently engaged, (2)  cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or  (3)  pay any dividends on Borrower's stock (other than dividends payable in its stock), provided, however that notwithstanding the foregoing, but only so long as no Event of Default has occurred and is continuing or would result from the payment of dividends, if Borrower is a "Subchapter S Corporation" (as defined in the Internal Revenue Code of 1986, as amended), Borrower may pay cash dividends on its stock to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated income tax payments to satisfy their liabilities under federal and state law which arise solely from their status as Shareholders of a Subchapter S Corporation because of their ownership of shares of Borrower's stock, or purchase or retire any of Borrower's outstanding shares or alter or amend Borrower's capital structure.     Exhibit F-2, Page 000102

**Loans, Acquisitions and Guaranties.**  (1)  Loan, invest in or advance money or assets to any other person, enterprise or entity,  (2)

purchase, create or acquire any interest in any other enterprise or entity, or  (3)  incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.**  Borrower will not enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.**  If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if:  (A)  Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender;  (B)  Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt;  (C)  there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or  (D)  any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or  (E)  Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**DEFAULT.**  Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.**  Borrower fails to make any payment when due under the Loan.

**Other Defaults.**  Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.**  Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.**  Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.**  The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.**  This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.**  Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender.  However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.**  Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.  In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Change in Ownership.**  Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.**  A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.**  Lender in good faith believes itself insecure.

**Right to Cure.**  If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default:  (1)  cure the default within fifteen (15) days; or  (2)  if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.**  If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional.  In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise.  Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently.  Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**DEPOSIT AGREEMENT SECURITY.**  Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure the Indebtedness.  This includes all deposit accounts Borrower holds jointly with someone else.

**JRY WAIVER; JUDICIAL REFERENCE.**  Borrower and Lender each waive their respective rights to a trial before a jury in connection with any disputes related to this Agreement, any of the Related Documents and the transactions contemplated hereby and thereby.  Such disputes include without limitation any claim by Borrower or Lender, claims brought by Borrower as a class representative on behalf of others, and claims by a class representative on Borrower's behalf as a class member (so-called "class action" suits).  This provision shall not apply if, at the time an action is brought, Borrower's loan is funded or maintained in a state where this jury trial waiver is not permitted by law.

If a jury trial waiver is not permitted by applicable law and a dispute arises between Borrower and Lender with respect to this Agreement, any of the Related Documents, the enforcement hereof or thereof or the transactions contemplated hereby or thereby, either of Borrower or Lender

Exhibit F-2, Page 000103

may require that it be resolved by judicial reference in accordance with California Code of Civil Procedure, Sections 638, et seq., including without limitation whether the dispute is subject to a judicial reference proceeding. The referee shall be a retired judge, agreed upon by the parties, from either the American Arbitration Association (AAA) or Judicial Arbitration and Mediation Service, Inc. (JAMS). If the parties cannot agree on the referee, the party who initially selected the reference procedure shall request a panel of ten retired judges from either AAA or JAMS, and the court shall select the referee from that panel. The referee shall be appointed to sit with all of the powers provided by law. The parties agree that time is of the essence in conducting the judicial reference proceeding set forth herein. The costs of the judicial reference proceeding, including the fee for the court reporter, shall be borne equally by the parties as the costs are incurred, unless otherwise awarded by the referee. The referee shall hear all pre-trial and post-trial matters (including without limitation requests for equitable relief), prepare an award with written findings of fact and conclusions of law and apportion costs as appropriate. The referee shall be empowered to enter equitable relief as well as legal relief, provide all temporary or provisional remedies, enter equitable orders that are binding on the parties and rule on any motion that would be authorized in a trial, including without limitation motions for summary judgment or summary adjudication. Judgment upon the award shall be entered in the court in which such proceeding was commenced and all parties shall have full rights of appeal. This provision will not be deemed to limit or constrain Lender's right of offset, to obtain provisional or ancillary remedies, to interplead funds in the event of a dispute, to exercise any security interest or lien Lender may hold in property or to comply with legal process involving Borrower's accounts or other property.

ADDITIONAL INFORMATION. In addition to the covenants and agreements of Borrower set forth under "AFFIRMATIVE COVENANTS" above, Borrower further covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower shall continuously maintain in full force and effect an irrevocable standby letter of credit (the "L/C") with a major bank or financial institution ("L/C Issuer") with a term expiring no later than the maturity of the Note in an amount at least equal to the amount of the Note, plus one year's anticipated interest on such amount, if any (unless otherwise agreed to by Lender), and in a form and on any other necessary or appropriate terms, all as are acceptable to Lender in its sole discretion and which shall name Lender as the beneficiary for the purpose of securing the Indebtedness and Borrower's other obligations hereunder and under the Related Documents. Lender's receipt of any notice of L/C Issuer's election not to extend or renew the L/C or as to the termination of the L/C for any other reason, or L/C Issuer's dishonor of any draw by Lender under the L/C, shall constitute an Event of Default. Borrower covenants and agrees to immediately notify Lender upon its receipt of any notice of non-extension, non-renewal or termination of the L/C. Notwithstanding anything to the contrary herein, Borrower shall not be entitled to a right to cure under the section entitled "DEFAULT - Right to Cure" hereunder with respect to any Event of Default under this section, unless agreed to by Lender in its sole discretion.

BUSINESS LOAN AGREEMENT. This Business Loan Agreement amends and restates the prior Business Loan Agreement dated February 5, 2007, as amended from time to time.

MISCELLANEOUS PROVISIONS. The following miscellaneous provisions are a part of this Agreement:

Amendments. This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Attorneys' Fees; Expenses. Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

Caption Headings. Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

Consent to Loan Participation. Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

Choice of Venue. If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento County, State of California.

No Waiver by Lender. Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

Notices. Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means International Manufacturing Group, Inc. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means California Bank & Trust, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note executed by International Manufacturing Group, Inc. in the original principal amount of $250,000.00 dated July 14, 2005, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the Note or Credit Agreement or any other subsequent Notes evidencing further Indebtedness.

# BUSINESS LOAN AGREEMENT
## (Continued)

Loan No: 9163000288-1                                                                                    Page 7

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED FEBRUARY 20, 2007.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____

Deepal     Wannakuwatte,     President/CEO     of
International Manufacturing Group, Inc.

LENDER:

CALIFORNIA BANK & TRUST

By: _____
Authorized Signer          D. Satow for Jun Enkoji
                        Vice President & Commercial Banking Officer

# EXHIBIT F-3

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $250,000.00 | 02-20-2007 | 03-05-2007 | 9163000288-1 | | | 22171 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

**Principal Amount: $250,000.00** **Initial Rate: 8.750%** **Date of Agreement: February 20, 2007**

DESCRIPTION OF EXISTING INDEBTEDNESS.

The Business Loan Agreement and Promissory Note each dated July 14, 2006, in the original principal amount of $250,000.00, from International Manufacturing Group, Inc. to Lender.

DESCRIPTION OF COLLATERAL.

Irrevocable Letter of Credit, Number 5051, issued by Bank of Sacramento.

DESCRIPTION OF CHANGE IN TERMS.

1) The Note is subject to the terms and conditions of that Business Loan Agreement executed by Borrower in favor of Lender, as amended and restated on February 20, 2007.

All other terms and conditions shall remain the same.

CONTINUING VALIDITY. Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

FINANCIAL STATEMENT CERTIFICATIONS. The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information "Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial ondition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

DEPOSIT AGREEMENT SECURITY. Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its Indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: ______________________
Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.

LASER PRO Lending, Ver. 5.34.00.003 Copr. Harland Financial Solutions, Inc. 1997, 2007. All Rights Reserved. - CA L:\CFI\LPL\D20C.FC TR-24123 PR-1

# EXHIBIT F-4

Case 16-02090

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Col | Account | Officer | Initials |
|-----------|-----------|----------|---------|------------|---------|---------|----------|
| $250,000.00 | 03-05-2007 | 03-05-2008 | 9163000288-1 | | | 22171 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "* * *" has been omitted due to text length limitations.

| | |
|---|---|
| **Borrower:** International Manufacturing Group, Inc.<br>879 F Street, Suite 120<br>West Sacramento, CA 95605 | **Lender:** California Bank & Trust<br>Central Valley Sacramento Region Corporate Banking<br>1331 Broadway<br>Sacramento, CA 95818 |

| | | |
|---|---|---|
| **Principal Amount: $250,000.00** | **Initial Rate: 8.750%** | **Date of Agreement: March 5, 2007** |

**DESCRIPTION OF EXISTING INDEBTEDNESS.**

The Business Loan Agreement dated February 20, 2007 and Promissory Note dated July 14, 2006, in the original principal amount of $250,000.00, as amended by that certain Change In Terms Agreement dated February 20, 2007 from International Manufacturing Group, Inc. to Lender.

**DESCRIPTION OF COLLATERAL.**

Irrevocable Letter of Credit, Number 5051, issued by Bank of Sacramento.

**DESCRIPTION OF CHANGE IN TERMS.**

1) The Maturity Date is hereby extended from March 5, 2007 to March 5, 2008.

2) The Stand-By Letter of Credit Subline is hereby amended to an expiration date of February 5, 2008. An Exhibit titled "Letter of Credit Subline Exhibit" is hereby attached to this agreement and made part of this agreement.

All other terms and conditions shall remain the same.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**.NANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its Indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**STAND-BY LETTER OF CREDIT SUBLINE EXHIBIT.** An exhibit, titled "Stand-By Letter of Credit Subline Exhibit," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

**BORROWER:**

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Dhepal Wannakuwatte, President/CEO of
International Manufacturing Group, Inc.

LASER PRO Lending, Ver. 5.34.00.003 Copr. Harland Financial Solutions, Inc. 1997, 2007. All Rights Reserved. - CA L:\CFI\APLPL03\DOC.FC TR-24258 PR-1

# EXHIBIT F-5

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $250,000.00 | 03-05-2008 | 03-05-2009 | 0181803-0001 | | | 08728 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

THIS BUSINESS LOAN AGREEMENT dated March 5, 2008, is made and executed between International Manufacturing Group, Inc. ("Borrower") and California Bank & Trust ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of March 5, 2008, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY.** The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc. and Betsy Wannakuwatte, Secretary of International Manufacturing Group, Inc.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) guaranties; (3) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 879 F Street, Suite 120, West Sacramento, CA 95605. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

---

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

    **Annual Statements.** As soon as available, but in no event later than one hundred eighty (180) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, compiled by a certified public accountant satisfactory to Lender.

    **Interim Statements.** As soon as available, but in no event later than sixty (60) days after the end of each Half-year, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower in form satisfactory to Lender.

    **Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

    **Additional Requirements.**

    **Guarantor Financial Information.** Borrower covenants and agrees with Lender that, while this Agreement is in effect, Borrower will furnish Lender with Guarantor's personal financial statement as of October 31st, on California Bank & Trust form, as soon as available, but in no event later than November 30th, on an annual basis and; a signed copy of Guarantor's filed Federal Income Tax Return, as soon as available, but in no event later than thirty (30) days of filing, on an annual basis.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

Filed 09/21/16   Case 2:17-cv-01123-WBS-DB   Document 43   Filed 10/15/19   Page 261 of 481   Doc 90
Case 16-02690
BUSINESS LOAN AGREEMENT
(Continued)

Loan No: 0181803-0001                                                                                           Page 3

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
| --- | --- |
| Deepal Wannakuwatte | $13,169,346.00 |
| Betsy Wannakuwatte | $13,169,346.00 |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) pay any dividends on Borrower's stock (other than dividends payable in its stock), provided, however that notwithstanding the foregoing, but only so long as no Event of Default has occurred and is continuing or would result from the payment of dividends, if Borrower is a "Subchapter S Corporation" (as defined in the Internal Revenue Code of 1986, as

amended), Borrower may pay cash dividends on its stock to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated income tax payments to satisfy their liabilities under federal and state law which arise solely from their status as Shareholders of a Subchapter S Corporation because of their ownership of shares of Borrower's stock, or purchase or retire any of Borrower's outstanding shares or alter or amend Borrower's capital structure.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Borrower will not enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure the Indebtedness. This includes all deposit accounts Borrower holds jointly with someone else.

**JURY WAIVER; JUDICIAL REFERENCE.** Borrower and Lender each waive their respective rights to a trial before a jury in connection with any disputes related to this Agreement, any of the Related Documents and the transactions contemplated hereby and thereby. Such disputes include without limitation any claim by Borrower or Lender, claims brought by Borrower as a class representative on behalf of others, and claims by a class representative on Borrower's behalf as a class member (so-called "class action" suits). This provision shall not apply if, at the time

an action is brought, Borrower's loan is funded or maintained in a state where this jury trial waiver is not permitted by law.

If a jury trial waiver is not permitted by applicable law and a dispute arises between Borrower and Lender with respect to this Agreement, any of the Related Documents, the enforcement hereof or thereof or the transactions contemplated hereby or thereby, either of Borrower or Lender may require that it be resolved by judicial reference in accordance with California Code of Civil Procedure, Sections 638, et seq., including without limitation whether the dispute is subject to a judicial reference proceeding. The referee shall be a retired judge, agreed upon by the parties, from either the American Arbitration Association (AAA) or Judicial Arbitration and Mediation Service, Inc. (JAMS). If the parties cannot agree on the referee, the party who initially selected the reference procedure shall request a panel of ten retired judges from either AAA or JAMS, and the court shall select the referee from that panel. The referee shall be appointed to sit with all of the powers provided by law. The parties agree that time is of the essence in conducting the judicial reference proceeding set forth herein. The costs of the judicial reference proceeding, including the fee for the court reporter, shall be borne equally by the parties as the costs are incurred, unless otherwise awarded by the referee. The referee shall hear all pre-trial and post-trial matters (including without limitation requests for equitable relief), prepare an award with written findings of fact and conclusions of law and apportion costs as appropriate. The referee shall be empowered to enter equitable relief as well as legal relief, provide all temporary or provisional remedies, enter equitable orders that are binding on the parties and rule on any motion that would be authorized in a trial, including without limitation motions for summary judgment or summary adjudication. Judgment upon the award shall be entered in the court in which such proceeding was commenced and all parties shall have full rights of appeal. This provision will not be deemed to limit or constrain Lender's right of offset, to obtain provisional or ancillary remedies, to interpleaded funds in the event of a dispute, to exercise any security interest or lien Lender may hold in property or to comply with legal process involving Borrower's accounts or other property.

INCREASED COSTS. If any change in a law, rule or regulation, or the interpretation or application thereof, or Lender's compliance with any request, guideline or directive (whether or not having the force of law) of any governmental authority (collectively, a "Change in Law") shall (i) impose, modify or deem applicable any reserve, special deposit or similar requirement against or with respect to the assets of, deposits with or for the account of or credit extended by Lender or (ii) impose on Lender any other condition affecting this Agreement or the loans hereunder or any letter of credit or participation therein and the result of any of the foregoing shall be to increase the cost to Lender of making or maintaining any loan (or its commitment to make any such loan) or to increase the cost to Lender of issuing or maintaining any letter of credit or to reduce the amount of any sum received or receivable by Lender hereunder, then Borrower will pay to Lender such additional amount as will compensate Lender for such additional costs or reduction.If Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on the capital of Lender or Lender's holding company from this Agreement or the loans or letters of credit made or issued by Lender to a level below that which Lender or Lender's holding company could have achieved but for such Change in Law (taking into consideration Lender's policies and the policies of Lender's holding company with respect to capital adequacy), then from time to time Borrower will pay to Lender such additional amount as will compensate Lender or Lender's holding company for any such reduction, as set forth in a certificate of Lender describing in reasonable detail the amount or amounts necessary to compensate Lender or its holding company. The amounts and description in such certificate shall be conclusive absent manifest error, and Borrower agrees to pay to Lender the amount shown in such certificate within ten (10) business days after receipt thereof.Failure or delay on the part of Lender to demand compensation pursuant to this section shall not constitute a waiver of Lender's right to demand such compensation.

LOAN AGREEMENT. THIS BUSINESS LOAN AGREEMENT AMENDS AND RESTATES THE PRIOR BUSINESS LOAN AGREEMENT DATED FEBRUARY 20, 2007, AS AMENDED FROM TIME TO TIME.

MISCELLANEOUS PROVISIONS. The following miscellaneous provisions are a part of this Agreement:

Amendments. This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Attorneys' Fees; Expenses. Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

Caption Headings. Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

Consent to Loan Participation. Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

Choice of Venue. If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento County, State of California.

No Waiver by Lender. Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

# BUSINESS LOAN AGREEMENT
## (Continued)

Loan No: 0181803-0001                                                                                      Page 6

---

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not therwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in 'fect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means International Manufacturing Group, Inc. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.                                                                 Exhibit F-5, Page 000117

**Lender.** The word "Lender" means California Bank & Trust, its successors and assigns.

Case 16-02090

## BUSINESS LOAN AGREEMENT
### (Continued)

Loan No: 0181803-0001                                                                                          Page 7

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note executed by International Manufacturing Group, Inc. in the original principal amount of $250,000.00, dated July 14, 2006, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the Note or Credit Agreement or any other subsequent Notes evidencing further Indebtedness.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED MARCH 5, 2008.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal      Wannakuwatte,      President/CEO      of
International Manufacturing Group, Inc.

LENDER:

CALIFORNIA BANK & TRUST

By: _____
Authorized Signer
Dawn Satow for Jun Enkoji
Vice President & Commercial Banking Officer

# EXHIBIT F-6

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $250,000.00 | 03-05-2008 | 03-05-2009 | 0181803-0001 | | | 08728 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  International Manufacturing Group, Inc.          **Lender:**  California Bank & Trust
               879 F Street, Suite 120                                       Central Valley Sacramento Region Corporate Banking
               West Sacramento, CA  95605                                     1331 Broadway
                                                                              Sacramento, CA  95818

---

**Principal Amount:  $250,000.00**        **Initial Rate:  6.500%**        **Date of Agreement:  March 5, 2008**

**DESCRIPTION OF EXISTING INDEBTEDNESS.** The Business Loan Agreement dated February 20, 2007 and the Promissory Note dated July 14, 2006, in the original principal amount of $250,000.00, as amended by those certain Change In Terms Agreements dated February 20, 2007 and March 5, 2008, from International Manufacturing Group, Inc. to Lender.

**DESCRIPTION OF COLLATERAL.**

Irrevocable Letter of Credit, Number 5051, issued by Bank of Sacramento.

**DESCRIPTION OF CHANGE IN TERMS.**

1. The maturity date is hereby amended from March 5, 2008 to March 5, 2009

2. A Stand-by Letter of Credit Subline in the amount of $250,000.00, is hereby deleted in its entirety

3. A Letter of Credit Subline in the amount of $250,000.00, is hereby added to Loan. See Letter of Credit Subline Exhibit attached to this agreement and made part of this agreement

4. The Note is subject to the terms and conditions of that Business Loan Agreement executed by Borrower in favor of Lender, as amended and restate on March 5, 2008

All other terms and conditions shall remain the same.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the presentation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released / it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its Indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**LETTER OF CREDIT SUBLINE EXHIBIT.** An exhibit, titled "Letter of Credit Subline Exhibit," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

**PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THE AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.**

**BORROWER:**

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal      Wannakuwatte,  President/CEO  of
International Manufacturing Group, Inc.

---

LASER PRO Lending, Ver. 5.39.00.006  Copr. Harland Financial Solutions, Inc. 1997, 2008.  All Rights Reserved.  - CA  L:\CFI\LPL\D20C.FC  TR-17463  PR-1

# EXHIBIT G-1

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| 2,000,000.00 | 02-01-2006 | 01-31-2007 | 912500015023 | | | 68631 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

RENEWED

**Principal Amount: $2,000,000.00**      **Initial Rate: 8.000%**      **Date of Note: February 1, 2006**

**PROMISE TO PAY.** International Manufacturing Group, Inc. ("Borrower") promises to pay to California Bank & Trust ("Lender"), or order, in lawful money of the United States of America, the principal amount of Two Million & 00/100 Dollars ($2,000,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on January 31, 2007. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning February 28, 2006, with all subsequent interest payments to be due on the last day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. The annual interest rate for this Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an index which is the rate of interest set from time to time by Bank as its Prime Rate. California Bank & Trust Prime Rate is determined by Bank as a means of pricing credit extensions to some customers and is neither tied to any external rate of interest or index nor is it necessarily the lowest rate of interest charged by Bank at any given time for any particular class of customers or credit extensions (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current index rate upon Borrower's request. The interest rate change will not occur more often than each Day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 7.500%. The interest rate to be applied to the unpaid principal balance of this Note will be at a rate of 0.500 percentage points over the Index, resulting in an initial rate of 8.000%. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**PREPAYMENT; MINIMUM INTEREST CHARGE.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a minimum interest charge of $200.00. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: California Bank & Trust, Central Valley Sacramento Region Corporate Banking, 1331 Broadway, Sacramento, CA 95818.

**LATE CHARGE.** If a payment is 15 days or more late, Borrower will be charged 6.000% of the regularly scheduled payment or $500.00, whichever is less.

**INTEREST AFTER DEFAULT.** Upon default, the variable interest rate on this Note shall immediately increase to 5.500 percentage points over the Index, if permitted under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Exhibit G-1, Page 000122

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness

Case 16-02090

**PROMISSORY NOTE**
(Continued)

Loan No: 9125000150-3                                                                                                                          Page 2

evidenced by this Note. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance on this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** To the extent permitted by applicable law, Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento County, State of California.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instrument listed herein:  a letter of credit described in a Commercial Pledge Agreement dated February 1, 2006.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following persons currently are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of their authority:  Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.; and Betsy Wannakuwatte, Secretary.  Borrower agrees to be liable for all sums either:  (A)  advanced in accordance with the instructions of an authorized person or  (B)  credited to any of Borrower's accounts with Lender.  The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.  Lender will have no obligation to advance funds under this Note if:  (A)  Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note;  (B)  Borrower or any guarantor ceases doing business or is insolvent;  (C)  any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender;  (D)  Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or  (E)  Lender in good faith believes itself insecure.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors.  Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns.  The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned.  The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future.  The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**TERMINATION OF AUTOMATIC PAYMENTS.** If at any time and for any reason, Borrower or Lender terminates the Automatic Payment feature of this Note, Lender may increase the variable interest rate applied to the unpaid balance of said Note by an additional one-half percentage point.

**BUSINESS LOAN AGREEMENT.** The Note is subject to the terms and conditions of that Business Loan Agreement executed by Borrower in favor of Lender on February 1, 2006, as amended from time to time.

**LETTER OF CREDIT SUBLINE EXHIBIT.** An exhibit, titled "Letter of Credit Subline Exhibit," is attached to this Note and by this reference is made a part of this Note just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Note.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability.  All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone.  All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made.  The obligations under this Note are joint and several.

**PROMISSORY NOTE**
(Continued)

Loan No: 9125000150-3                                                                                          Page 3

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal   Wannakuwatte,   President/CEO   of
International Manufacturing Group, Inc.

LASER PRO Lending, Ver. 5.33.10.001  Copr. Harland Financial Solutions, Inc. 1997, 2006.  All Rights Reserved.  - CA  L:\CFI\LPL\D30.FC  TR-30063  PR-1

# EXHIBIT G-2

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,000,000.00 | 01-08-2007 | 01-31-2008 | 9163000288-3 | | | 68631 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

**Principal Amount: $2,000,000.00** **Initial Rate: 8.750%** **Date of Note: January 8, 2007**

PROMISE TO PAY. International Manufacturing Group, Inc. ("Borrower") promises to pay to California Bank & Trust ("Lender"), or order, in lawful money of the United States of America, the principal amount of Two Million & 00/100 Dollars ($2,000,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

PAYMENT. Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on January 31, 2008. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning January 31, 2007, with all subsequent interest payments to be due on the last day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. The annual interest rate for this Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

VARIABLE INTEREST RATE. The interest rate on this Note is subject to change from time to time based on changes in an index which is the rate of interest set from time to time by Bank as its Prime Rate. California Bank & Trust Prime Rate is determined by Bank as a means of pricing credit extensions to some customers and is neither tied to any external rate of interest or index nor is it necessarily the lowest rate of interest charged by Bank at any given time for any particular class of customers or credit extensions (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each Day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 8.250%. The interest rate to be applied to the unpaid principal balance during this Note will be at a rate of 0.500 percentage points over the Index, resulting in an initial rate of 8.750%. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

PREPAYMENT; MINIMUM INTEREST CHARGE. Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the ate of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required y law. In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a minimum interest charge of $200.00. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: California Bank & Trust, Central Valley Sacramento Region Corporate Banking, 1331 Broadway, Sacramento, CA 95818.

LATE CHARGE. If a payment is 15 days or more late, Borrower will be charged 6.000% of the regularly scheduled payment or $500.00, whichever is less.

INTEREST AFTER DEFAULT. Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by adding a 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.

DEFAULT. Each of the following shall constitute an event of default ("Event of Default") under this Note:

Payment Default. Borrower fails to make any payment when due under this Note.

Other Defaults. Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

Default in Favor of Third Parties. Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

False Statements. Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

Insolvency. The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

Creditor or Forfeiture Proceedings. Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Events Affecting Guarantor. Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any

# PROMISSORY NOTE
## (Continued)

Loan No: 9163000288-3                                                                                          Page 2

Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** To the extent permitted by applicable law, Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento County, State of California.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instrument listed herein: a letter of credit described in a Commercial Pledge Agreement dated January 8, 2007.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following persons currently are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of their authority: **Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.; and Betsy Wannakuwatte, Secretary of International Manufacturing Group, Inc.** Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**TERMINATION OF AUTOMATIC PAYMENTS.** If at any time and for any reason, Borrower or Lender terminates the Automatic Payment feature of this Note, Lender may increase the variable interest rate applied to the unpaid balance of said Note by an additional one-half percentage point.

**BUSINESS LOAN AGREEMENT.** This note is subject to the terms and conditions of the Business Loan Agreement executed by the Borrower in favor of Lender on July 14, 2006.

**LETTER OF CREDIT SUBLINE EXHIBIT.** An exhibit, titled "Letter of Credit Subline Exhibit," is attached to this Note and by this reference is made a part of this Note just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Note.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PROMISSORY NOTE**
(Continued)

Loan No: 9163000288-3                                                                                    Page 3

---

RIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____          By: _____
Deepal      Wannakuwatte,      President/CEO      of          Botsy   Wannakuwatte,   Secretary   of   International
International Manufacturing Group, Inc.                             Manufacturing Group, Inc.

---

LASER PRO Lending, Ver. 5.33.00.004 Copr. Harland Financial Solutions, Inc. 1997, 2007. All Rights Reserved. - CA L:\CFI\LPL\D20.FC TR-23733 PR-1

Exhibit G-2, Page 000128

# EXHIBIT G-3

# CHANGE IN TERMS AGREEMENT

| Principal $2,000,000.00 | Loan Date 02-20-2007 | Maturity 01-31-2008 | Loan No 9163000288-3 | Call / Coll | Account | Officer 22171 | Initials |
|---|---|---|---|---|---|---|---|

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**  International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA  95605

**Lender:**  California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA  9581B

---

**Principal Amount: $2,000,000.00**      **Initial Rate: 8.750%**      **Date of Agreement: February 20, 2007**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**

The Business Loan Agreement dated July 14, 2006 and the Promissory Note dated January 8, 2007, in the original principal amount of $2,000,000.00, from International Manufacturing Group, Inc. to Lender.

**DESCRIPTION OF COLLATERAL.**

Irrevocable Letter of Credit, Number 145/06, dated November 2, 2006, issued by American Security Bank.

**DESCRIPTION OF CHANGE IN TERMS.**

1) The Note is subject to the terms and conditions of that Business Loan Agreement executed by Borrower in favor of Lender, as amended and restated on February 20, 2007.

All other terms and conditions shall remain the same.

**CONTINUING VALIDITY.**  Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect.  Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms.  Nothing in this Agreement will constitute a satisfaction of the obligation(s).  It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing.  Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement.  If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it.  This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**FINANCIAL STATEMENT CERTIFICATIONS.**  The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors.  Financial Information includes, but is not limited to all Business Financial statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns.  The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned.  The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future.  The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**DEPOSIT AGREEMENT SECURITY.**  Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its Indebtedness hereunder.  This includes all deposit accounts Borrower holds jointly with someone else.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT.  BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

**BORROWER:**

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal    Wannakuwatte,    President/CEO    of
International Manufacturing Group, Inc.

LASER PRO Lending, Ver. 5.34.00.002 Copr. Harland Financial Solutions, Inc. 1997, 2007.  All Rights Reserved.  - CA  L:\CFI\LPL\D70C.FC  TR-24123  PR-1

Exhibit G-3, Page 000130

# EXHIBIT G-4

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No. | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|----------|-------------|---------|---------|----------|
| 2,000,000.00 | 01-22-2008 | 01-31-2008 | 0181803-0003 | | | 08728 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F. Street, Suite 120
West Sacramento, CA 95605

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

---

**Principal Amount: $2,000,000.00**     **Initial Rate: 7.750%**     **Date of Agreement: January 22, 2008**

**DESCRIPTION OF EXISTING INDEBTEDNESS.** The Business Loan Agreement dated December 12, 2007 and the Promissory Note dated January 9, 2007, in the original principal amount of $2,000,000.00, as amended by that certain Change In Terms Agreement dated February 20, 2007, from International Manufacturing Group, Inc. to Lender.

**DESCRIPTION OF COLLATERAL.**

Irrevocable Letter of Credit, Number 145/06, dated November 2, 2006, issued by American Security Bank.

**DESCRIPTION OF CHANGE IN TERMS.**

1. The Irrevocable Letter of Credit, Number 145/06, dated November 2, 2006, issued by American Security Bank, is hereby deleted as collateral

2. Money Market Account Number 1250098679, in the name of International Manufacturing Group, Inc., with Lender, with an approximate balance of $2,000,000.00, is hereby added as collateral.

All other terms and conditions shall remain the same.

**CONTINUING VALIDITY.** Except es expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its Indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal    Wannakuwatte,    President/CEO    of
International Manufacturing Group, Inc.

---

LASER PRO Lending, Ver. 5.33.00.008 Copr. Harland Financial Solutions, Inc. 1997, 2008. All Rights Reserved. - CA L:\CFI\LPL\D20C.FC TR-27521 PR-1

# EXHIBIT G-5

Case 16-02090

### CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,122,346.00 | 02-22-2008 | 01-18-2009 | 0181803-0003 | | | 07163 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing " * * * * " has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.      **Lender:** California Bank & Trust
879 F Street, Suite 120                                           Central Valley Sacramento Region Corporate Banking
West Sacramento, CA 95605                               1331 Broadway
                                                                       Sacramento, CA 95818

---

**Principal Amount: $2,122,346.00**      **Initial Rate: 6.500%**      **Date of Agreement: February 22, 2008**

**DESCRIPTION OF EXISTING INDEBTEDNESS.** The Business Loan Agreement dated December 12, 2007 and the Promissory Note dated January 8, 2007, in the original amount of $2,000,000.00, as amended by those certain Change In Terms Agreements dated February 20, 2007 and January 22, 2008, from International Manufacturing Group, Inc. to Lender.

**DESCRIPTION OF COLLATERAL.**

Money Market Account Number 1250098679.

**DESCRIPTION OF CHANGE IN TERMS.**

1) The Maturity date is hereby amended from January 31, 2008 to January 18, 2009.

2) The Letter of Credit Subline is hereby amended. See Letter of Credit Subline Exhibit attached.

3) The Revolving Line of Credit amount is hereby increased from $2,000,000.00 to $2,122,346.00.

4) Money Market Account Number 1250098679, in hereby deleted as collateral.

5) Irrevocable Standby Letter of Credit Number S171596, issued February 20, 2008, By ABN Amro Bank, in the amount of $2,122,346.00, is hereby added as collateral.

The Note is hereby amended and restated as follows.

**PROMISE TO PAY.** International Manufacturing Group, Inc. ("Borrower") promises to pay to California Bank & Trust ("Lender"), or order, in lawful money of the United States of America, the principal amount of Two Million One Hundred Twenty-two Thousand Three Hundred Forty-six & 00/100 Dollars ($2,122,346.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on January 18, 2009. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning March 31, 2008, ith all subsequent interest payments to be due on the last day of each month after that. Unless otherwise agreed or required by applicable w, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. Interest on this loan is computed on a 365/360 simple interest basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this loan is subject to change from time to time based on changes in an index which is the rate of interest set from time to time by Bank as its Prime Rate. California Bank & Trust Prime Rate is determined by Bank as a means of pricing credit extensions to some customers and is neither tied to any external rate of interest or index nor is it necessarily the lowest rate of interest charged by Bank at any given time for any particular class of customers or credit extensions (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each Day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 6.000% per annum. The interest rate to be applied to the unpaid principal balance during this loan will be at a rate of 0.500 percentage points over the Index, resulting in an initial rate of 6.500% per annum. NOTICE: Under no circumstances will the interest rate on this loan be more than the maximum rate allowed by applicable law.

**PREPAYMENT; MINIMUM INTEREST CHARGE.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. In any event, even upon full prepayment of this Agreement, Borrower understands that Lender is entitled to a minimum interest charge of $200.00. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: California Bank & Trust, Central Valley Sacramento Region Corporate Banking, 1331 Broadway, Sacramento, CA 95818.

**LATE CHARGE.** If a payment is 15 days or more late, Borrower will be charged 6.000% of the regularly scheduled payment or $500.00, whichever is less.

**INTEREST AFTER DEFAULT.** Upon default, the interest rate on this loan shall, if permitted under applicable law, immediately increase by adding a 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

Payment Default. Borrower fails to make any payment when due under the Indebtedness.

Other Defaults. Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

Default In Favor of Third Parties. Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement,

Exhibit G-5, Page 000134

or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or ability to perform Borrower's obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the Indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness evidenced by this Note.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Agreement and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Agreement if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento County, State of California.

**COLLATERAL.** Borrower acknowledges this Agreement is secured by the following collateral described in the security instrument listed herein: Irrevocable Letter of Credit Number S171596, issued February 20, 2008, By ABN Amro Bank, in the amount of $2,122,346.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**LINE OF CREDIT.** This Agreement evidences a revolving line of credit. Advances under this Agreement may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Agreement at any time may be evidenced by endorsements on this Agreement or by Lender's internal records, including daily computer print-outs.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its Indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**JURY WAIVER; JUDICIAL REFERENCE.** Borrower and Lender each waive their respective rights to a trial before a jury in connection with any

CHANGE IN TERMS AGREEMENT
(Continued)

Loan No: 0181803-0003                                                                                                      Page 3

disputes related to this Note, the loan evidenced hereby and any other loan documents in connection herewith and therewith. Such disputes include without limitation any claim by Borrower or Lender, claims brought by Borrower as a class representative on behalf of others, and claims by a class representative on Borrower's behalf as a class member (so-called "class action" suits). This provision shall not apply if, at the time an action is brought, Borrower's loan is funded or maintained in a state where this jury trial waiver is not permitted by law.

If a jury trial waiver is not permitted by applicable law and a dispute arises between Borrower and Lender with respect to this Note, its enforcement or the transactions contemplated by the related loan documents, either of Borrower or Lender may require that it be resolved by judicial reference in accordance with California Code of Civil Procedure, Sections 638, et seq., including without limitation whether the dispute is subject to a judicial reference proceeding. The referee shall be a retired judge, agreed upon by the parties, from either the American Arbitration Association (AAA) or Judicial Arbitration and Mediation Service, Inc. (JAMS). If the parties cannot agree on the referee, the party who initially selected the reference procedure shall request a panel of ten retired judges from either AAA or JAMS, and the court shall select the referee from that panel. The referee shall be appointed to sit with all of the powers provided by law. The parties agree that time is of the essence in conducting the judicial reference proceeding set forth herein. The costs of the judicial reference proceeding, including the fee for the court reporter, shall be borne equally by the parties as the costs are incurred, unless otherwise awarded by the referee. The referee shall hear all pre-trial and post-trial matters (including without limitation requests for equitable relief), prepare an award with written findings of fact and conclusions of law and apportion costs as appropriate. The referee shall be empowered to enter equitable relief as well as legal relief, provide all temporary or provisional remedies, enter equitable orders that are binding on the parties and rule on any motion that would be authorized in a trial, including without limitation motions for summary judgment or summary adjudication. Judgment upon the award shall be entered in the court in which such proceeding was commenced and all parties shall have full rights of appeal. This provision will not be deemed to limit or constrain Lender's right of offset, to obtain provisional or ancillary remedies, to interplead funds in the event of a dispute, to exercise any security interest or lien Lender may hold in property or to comply with legal process involving Borrower's accounts or other property.

**LETTER OF CREDIT SUBLINE EXHIBIT.** An exhibit, titled "Letter of Credit Subline Exhibit," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

**REAFFIRMATION OF GUARANTY OBLIGATIONS.** An exhibit, titled "REAFFIRMATION OF GUARANTY OBLIGATIONS," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

**SUCCESSORS AND ASSIGNS.** Subject to any limitations stated in this Agreement on transfer of Borrower's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Borrower, Lender, without notice to Borrower, may deal with Borrower's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Borrower from the obligations of this Agreement or liability under the Indebtedness.

**MISCELLANEOUS PROVISIONS.** If any part of this Agreement cannot be enforced, this fact will not affect the rest of the Agreement. Lender may delay or forgo enforcing any of its rights or remedies under this Agreement without losing them. Borrower and any other person who signs, guarantees or endorses this Agreement, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, no arty who signs this Agreement, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Agreement are joint and several.

**PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.**

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal    Wannakuwatte,    President/CEO    of
International Manufacturing Group, Inc.

LASER PRO Lending, Ver. 5.39.00.002 Copr. Harland Financial Solutions, Inc. 1997, 2008. All Rights Reserved. - CA L:\CFI\LPL\D30C.FC TR-27612 PR-1

# EXHIBIT G-6

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $1,948,710.55 | 01-05-2009 | 01-18-2010 | 0181803-0003 | | | 08728 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

**Principal Amount: $1,948,710.55** **Date of Agreement: January 5, 2009**

DESCRIPTION OF EXISTING INDEBTEDNESS.

The Business Loan Agreement dated March 5, 2008 and the Promissory Note dated January 8, 2007, in the original principal amount of $2,000,000.00, as amended by those certain Change In Terms Agreements dated February 20, 2007, January 22, 2008 and February 22, 2008 from International Manufacturing Group, Inc. to Lender.

DESCRIPTION OF COLLATERAL.

Irrevocable Stand-By Letter of Credit Number S171596, issued February 20, 2006, By ABN Amro Bank, in the amount of $2,122,346.00.

DESCRIPTION OF CHANGE IN TERMS.

1) The Maturity Date is hereby extended from January 18, 2009 to January 18, 2010.

2) The Revolving Line of Credit is hereby decreased from $2,122,346.00 to $1,948,710.55.

3) The Irrevocable Stand-By Letter of Credit Number S171596, issued February 20, 2008, By ABN Amro Bank, in the amount of $2,122,346.00, is hereby deleted as collateral.

4) CD Account Number 1250004923 with Lender, in the name of JTS Communities, Inc. is hereby added as collateral.

5) Under no circumstances will the interest rate on the Note be less than 5.000% per annum or more than the maximum rate allowed by applicable law.

6) The Letter of Credit Subline is hereby deleted in its entirey.

7) The Note is subject to the terms and conditions of that Business Loan Agreement executed by Borrower in favor of Lender, as amended and restated on November 11, 2008.

The Note is hereby amended and restated as follows:.

**ROMISE TO PAY. International Manufacturing Group, Inc. ("Borrower") promises to pay to California Bank & Trust ("Lender"), or order, in .wful money of the United States of America, the principal amount of One Million Nine Hundred Forty-eight Thousand Seven Hundred Ten & 55/100 Dollars ($1,948,710.55) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.**

**PAYMENT. Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on January 18, 2010. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning January 18, 2009, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.**

VARIABLE INTEREST RATE. The interest rate on this loan is subject to change from time to time based on changes in an index which is the Lender's Prime Rate. Lender's "Prime Rate" means the variable rate of interest per annum, as adjusted from time to time, established by Lender as Lender's prime rate. The Prime Rate is a reference rate that serves as the basis upon which effective rates of interest are calculated for loans making reference to the Prime Rate. The Prime Rate is only one of Lender's reference rates (some of which other reference rates may determine prime on another basis) and may not be the lowest or best of Lender's reference rates or other rates of interest. (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day; the interest rate on this Note will change on the date of changes in the Index. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 3.250% per annum.** The interest rate to be applied to the unpaid principal balance of this loan will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 0.500 percentage points over the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 5.000%. NOTICE: Under no circumstances will the interest rate on this loan be less than 5.000% per annum or more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD. Interest on this loan is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this loan is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in the loan documents.**

PREPAYMENT; MINIMUM INTEREST CHARGE. Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. In any event, even upon full prepayment of this Agreement, Borrower understands that Lender is entitled to a minimum interest charge of $200.00. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it hout losing any of Lender's rights under this Agreement, and Borrower will remain obligated to pay any further amount owed to Lender. All ten communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment ..istitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: California Bank & Trust, Central Valley Sacramento Region Corporate Banking, 1331 Broadway, Sacramento, CA 95818.

LATE CHARGE. If a payment is 15 days or more late, Borrower will be charged 6.000% of the regularly scheduled payment or $500.00,

# CHANGE IN TERMS AGREEMENT
## (Continued)

Loan No: 0181803-0003                                                                                          Page 2

---

whichever is less.

**INTEREST AFTER DEFAULT.** Upon default, the interest rate on this loan shall, if permitted under applicable law, immediately increase by adding a 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Any guarantor or Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or Borrower's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness evidenced by this Note.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Agreement and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Agreement if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento County, State of California.

**COLLATERAL.** Borrower acknowledges this Agreement is secured by the following collateral described in the security instrument listed herein: certificates of deposit described in an Assignment of Deposit Account dated January 5, 2009.

**LINE OF CREDIT.** This Agreement evidences a revolving line of credit. Advances under this Agreement may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.; and Betsy Wannakuwatte, Secretary of International Manufacturing Group, Inc. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Agreement at any time may be evidenced by endorsements on this Agreement or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Agreement if: (A) Borrower or any guarantor is in default under the terms of this Agreement or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Agreement; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Agreement it; (D) Borrower has applied funds provided pursuant to this Agreement for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in obligation(s). Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and

**CHANGE IN TERMS AGREEMEN**
**(Continued)**

Loan No: 0181803-0003                                                                                                      Page 3

═══════════════════════════════════════════════════════════════════════════

endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

FINANCIAL STATEMENT CERTIFICATIONS. The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

DEPOSIT AGREEMENT SECURITY. Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its Indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

JURY WAIVER; JUDICIAL REFERENCE. Borrower and Lender each waive their respective rights to a trial before a jury in connection with any disputes related to this Note, the loan evidenced hereby and any other loan documents in connection herewith and therewith. Such disputes include without limitation any claim by Borrower or Lender, claims brought by Borrower as a class representative on behalf of others, and claims by a class representative on Borrower's behalf as a class member (so-called "class action" suits). This provision shall not apply if, at the time an action is brought, Borrower's loan is funded or maintained in a state where this jury trial waiver is not permitted by law.

If a jury trial waiver is not permitted by applicable law and a dispute arises between Borrower and Lender with respect to this Note, its enforcement or the transactions contemplated by the related loan documents, either of Borrower or Lender may require that it be resolved by judicial reference in accordance with California Code of Civil Procedure, Sections 638, et seq., including without limitation whether the dispute is subject to a judicial reference proceeding. The referee shall be a retired judge, agreed upon by the parties, from either the American Arbitration Association (AAA) or Judicial Arbitration and Mediation Service, Inc. (JAMS). If the parties cannot agree on the referee, the party who initially selected the reference procedure shall request a panel of ten retired judges from either AAA or JAMS, and the court shall select the referee from that panel. The referee shall be appointed to sit with all of the powers provided by law. The parties agree that time is of the essence in conducting the judicial reference proceeding set forth herein. The costs of the judicial reference proceeding, including the fee for the court reporter, shall be borne equally by the parties as the costs are incurred, unless otherwise awarded by the referee. The referee shall hear all pre-trial and post-trial matters (including without limitation requests for equitable relief), prepare an award with written findings of fact and conclusions of law and apportion costs as appropriate. The referee shall be empowered to enter equitable relief as well as legal relief, provide all temporary or provisional remedies, enter equitable orders that are binding on the parties and rule on any motion that would be authorized in a ial, including without limitation motions for summary judgment or summary adjudication. Judgment upon the award shall be entered in the court in which such proceeding was commenced and all parties shall have full rights of appeal. This provision will not be deemed to limit or constrain Lender's right of offset, to obtain provisional or ancillary remedies, to interplead funds in the event of a dispute, to exercise any security interest or lien Lender may hold in property or to comply with legal process involving Borrower's accounts or other property.

REAFFIRMATION OF GUARANTY OBLIGATIONS. An exhibit, titled "REAFFIRMATION OF GUARANTY OBLIGATIONS," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

SUCCESSORS AND ASSIGNS. Subject to any limitations stated in this Agreement on transfer of Borrower's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Borrower, Lender, without notice to Borrower, may deal with Borrower's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Borrower from the obligations of this Agreement or liability under the Indebtedness.

MISCELLANEOUS PROVISIONS. If any part of this Agreement cannot be enforced, this fact will not affect the rest of the Agreement. Lender may delay or forgo enforcing any of its rights or remedies under this Agreement without losing them. Borrower and any other person who signs, guarantees or endorses this Agreement, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, no party who signs this Agreement, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Agreement are joint and several.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By:_____
Deepal Wannakuwatte, President/CEO of
International Manufacturing Group, Inc.

═══════════════════════════════════════════════════════════════════════════

LASER PRO Lending, Ver. 5.42.00.004  Copr. Harland Financial Solutions, Inc. 1997, 2003.  All Rights Reserved.  - CA  L:\KF\LPL\D20C.FC  TR-20462  PR-3

# EXHIBIT G-7

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $1,948,710.55 | 03-12-2009 | 01-18-2010 | 0181803-0003 | | | 09728 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**  International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:**  California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

---

THIS BUSINESS LOAN AGREEMENT dated March 12, 2009, is made and executed between International Manufacturing Group, Inc. ("Borrower") and California Bank & Trust ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of March 12, 2009, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY.** The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.; and Betsy Wannakuwatte, Secretary of International Manufacturing Group, Inc.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) guaranties; (6) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 879 F Street, Suite 120, West Sacramento, CA 95605. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing stat

**BUSINESS LOAN AGREEMENT**
**(Continued)**

relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than ONE HUNDRED EIGHTY (180) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, compiled by a certified public accountant satisfactory to Lender.

**Interim Statements.** As soon as available, but in no event later than sixty (60) days after the end of each Half-year, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower.

**Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

**Additional Requirements.**

**Guarantor Financial Information.** Borrower covenants and agrees with Lender that, while this Agreement is in effect, Borrower will furnish Lender with Guarantor's personal financial statement, on California Bank & Trust form, as soon as available, but in no event later than November 30th, on an annual basis and; a signed copy of Guarantor's filed Federal Income Tax Return, as soon as available, but in no event later than thirty (30) days from date of filing on an annual basis.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, incl stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insu policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omis default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a s interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require. 

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured;

# USINESS LOAN AGREEMENT
## (Continued)

Loan No: 0181803-0003                                                                                          Page 3

amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Deepal Wannakuwatte | $21,409,271.00 |
| Betsy Wannakuwatte | $21,409,271.00 |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**'GATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without t' r written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplate this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, a' pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) se' recourse any of Borrower's accounts, except to Lender.

Exhibit G-7, Page 000144

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently e

(2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) pay any dividends on Borrower's stock (other than dividends payable in its stock), provided, however that notwithstanding the foregoing, but only so long as no Event of Default has occurred and is continuing or would result from the payment of dividends, if Borrower is a "Subchapter S Corporation" (as defined in the Internal Revenue Code of 1986, as amended), Borrower may pay cash dividends on its stock to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated income tax payments to satisfy their liabilities under federal and state law which arise solely from their status as Shareholders of a Subchapter S Corporation because of their ownership of shares of Borrower's stock, or purchase or retire any of Borrower's outstanding shares or alter or amend Borrower's capital structure.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Borrower will not enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies ovided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's ghts and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not xclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**DEPOSIT ACCOUNT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure the Indebtedness. This includes all deposit accounts Borrower holds jointly with someone else.

**JURY WAIVER; JUDICIAL REFERENCE.** Borrower and Lender each waive their respective rights to a trial before a jury in connection with any disputes related to this Agreement, any of the Related Documents and the transactions contemplated hereby and thereby. Such disputes include without limitation any claim by Borrower or Lender, claims brought by Borrower as a class representative on behalf of others, and claims by a class representative on Borrower's behalf as a class member (so-called "class action" suits). This provision shall not apply if, at the time an action is brought, Borrower's loan is funded or maintained in a state where this jury trial waiver is not permitted by law.

If a jury trial waiver is not permitted by applicable law and a dispute arises between Borrower and Lender with respect to this Agreement, any of the Related Documents, the enforcement hereof or thereof or the transactions contemplated hereby or thereby, either of Borrower or Lender may require that it be resolved by judicial reference in accordance with California Code of Civil Procedure, Sections 638, et seq., including without limitation whether the dispute is subject to a judicial reference proceeding. The referee shall be a retired judge, agreed upon by the parties, from either the American Arbitration Association (AAA) or Judicial Arbitration and Mediation Service, Inc. (JAMS). If the parties cannot agree on the referee, the party who initially selected the reference procedure shall request a panel of ten retired judges from either AAA or JAMS, and the court shall select the referee from that panel. The referee shall be appointed to sit with all of the powers provided by law. The parties agree that time is of the essence in conducting the judicial reference proceeding set forth herein. The costs of the judicial reference proceeding, including the fee for the court reporter, shall be borne equally by the parties as the costs are incurred, unless otherwise awarded by the referee. The referee shall hear all pre-trial and post-trial matters (including without limitation requests for equitable relief), prepare an award with written findings of fact and conclusions of law and apportion costs as appropriate. The referee shall be empowered to enter equitable relief as well as legal relief, provide all temporary or provisional remedies, enter equitable orders that are binding on the parties and rule on any motion that would be authorized in a trial, including without limitation motions for summary judgment or summary adjudication. Judgment upon the award shall be entered in the court in which such proceeding was commenced and all parties shall have full rights of appeal. This provision will not be deemed to limit or constrain Lender's right of offset, to obtain provisional or ancillary remedies, to interplead funds in the event of a dispute, to exercise any security interest or lien Lender may hold in property or to comply with legal process involving Borrower's accounts or other property.

**INCREASED COSTS.** If any change in a law, rule or regulation, or the interpretation or application thereof, or Lender's compliance with any request, guideline or directive (whether or not having the force of law) of any governmental authority (collectively, a "Change in Law") shall (i) impose, modify or deem applicable any reserve, special deposit or similar requirement against or with respect to the assets of, deposits with or for the account of or credit extended by Lender or (ii) impose on Lender any other condition affecting this Agreement or the loans hereunder or any letter of credit or participation therein and the result of any of the foregoing shall be to increase the cost to Lender of making or maintaining any loan (or its commitment to make any such loan) or to increase the cost to Lender of issuing or maintaining any letter of credit or to reduce the amount of any sum received or receivable by Lender hereunder, then Borrower will pay to Lender such additional amount as will compensate Lender for such additional costs or reduction.If Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on the capital of Lender or Lender's holding company from this Agreement or the loans or letters of credit made or issued by Lender to a level below that which Lender or Lender's holding company could have achieved but for such Change in Law (taking into consideration Lender's policies and the policies of Lender's holding company with respect to capital adequacy), then from time to time Borrower will pay to Lender such additional amount as will compensate Lender or Lender's holding company for any such reduction, as set orth in a certificate of Lender describing in reasonable detail the amount or amounts necessary to compensate Lender or its holding company. .he amounts and description in such certificate shall be conclusive absent manifest error, and Borrower agrees to pay to Lender the amount shown in such certificate within ten (10) business days after receipt thereof.Failure or delay on the part of Lender to demand compensation pursuant to this section shall not constitute a waiver of Lender's right to demand such compensation.

**BUSINESS LOAN AGREEMENT.** THIS BUSINESS LOAN AGREEMENT AMENDS AND RESTATES THE PRIOR BUSINESS LOAN AGREEMENT DATED NOVEMBER 11, 2008, AS AMENDED FROM TIME TO TIME.

**ADDITIONAL INFORMATION.** In addition to the covenants and agreements of Borrower set forth under "AFFIRMATIVE COVENANTS" above, Borrower further covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower shall continuously maintain in full force and effect an irrevocable standby letter of credit (the "L/C") with a major bank or financial institution ("L/C Issuer") with a term expiring no later than the maturity of the Note in an amount at least equal to the amount of the Note, plus one year's anticipated interest on such amount, if any (unless otherwise agreed to by Lender), and in a form and on any other necessary or appropriate terms, all as are acceptable to Lender in its sole discretion and which shall name Lender as the beneficiary for the purpose of securing the Indebtedness and Borrower's other obligations hereunder and under the Related Documents. Lender's receipt of any notice of L/C Issuer's election not to extend or renew the L/C or as to the termination of the L/C for any other reason, or L/C Issuer's dishonor of any draw by Lender under the L/C, shall constitute an Event of Default. Borrower covenants and agrees to immediately notify Lender upon its receipt of any notice of non-extension, non-renewal or termination of the L/C. Notwithstanding anything to the contrary herein, Borrower shall not be entitled to a right to cure under the section entitled "DEFAULT - Right to Cure" hereunder with respect to any Event of Default under this section, unless agreed to by Lender in its sole discretion.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower

further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento County, State of California.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means International Manufacturing Group, Inc. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

Exhibit G-7, Page 000147

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means California Bank & Trust, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note executed by International Manufacturing Group, Inc. in the original principal amount of $2,000,000.00 dated January 8, 2007, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the Note or Credit Agreement or any other subsequent Notes evidencing further indebtedness.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED MARCH 12, 2009.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal   Wannakuwatte,   President/CEO   of
International Manufacturing Group, Inc.

LENDER:

CALIFORNIA BANK & TRUST

By: _____
Authorized Signer   Dawn Satow
Vice President & Commercial Lending Officer

LASER PRO Lending, Ver. 5.42.00.003  Copr. Harland Financial Solutions, Inc. 1997, 2009.  All Rights Reserved.  - CA  L:\CFI\LPL\C40.FC  TR-31423  PR-4

# EXHIBIT G-8

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No. | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $1,948,710.55 | 03-12-2009 | 01-18-2010 | 0181803-0003 | | | 08728 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

---

### Principal Amount: $1,948,710.55

### Date of Agreement: March 12, 2009

**DESCRIPTION OF EXISTING INDEBTEDNESS.** The Business Loan Agreement dated November 11, 2008 and the Promissory Note dated January 8, 2007, in the original amount of $2,000,000.00, as amended by those certain Change In Terms Agreements dated February 20, 2007, January 22, 2008, February 22, 2008 and January 5, 2009, from International Manufacturing Group, Inc. to Lender.

**DESCRIPTION OF COLLATERAL.**
CD Account Number 1250004923 with Lender.

**DESCRIPTION OF CHANGE IN TERMS.**

1. CD Number 1250004923 with Lender is hereby deleted as collateral.

2. Irrevocable Stand-By Letter of Credit Number 3098675 issued by Bank of America is hereby added as collateral.

3. This Note is subject to the terms and conditions of that Business Loan Agreement executed by Borrower in favor of Lender, as amended and restated on March 12, 2009.

All other terms and conditions shall remain the same.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**DEPOSIT ACCOUNT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its Indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal   Wannakuwatte,   President/CEO   of
International Manufacturing Group, Inc.

---

# EXHIBIT H-1

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $300,000.00 | 01-17-2007 | 12-04-2007 | 9163000288-2 | | | 22171 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

**Principal Amount: $300,000.00** **Initial Rate: 8.750%** **Date of Note: January 17, 2007**

PROMISE TO PAY. International Manufacturing Group, Inc. ("Borrower") promises to pay to California Bank & Trust ("Lender"), or order, in lawful money of the United States of America, the principal amount of Three Hundred Thousand & 00/100 Dollars ($300,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

PAYMENT. Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on December 4, 2007. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning January 31, 2007, with all subsequent interest payments to be due on the last day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. The annual interest rate for this Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

VARIABLE INTEREST RATE. The interest rate on this Note is subject to change from time to time based on changes in an index which is the rate of interest set from time to time by Bank as its Prime Rate. California Bank & Trust Prime Rate is determined by Bank as a means of pricing credit extensions to some customers and is neither tied to any external rate of interest or index nor is it necessarily the lowest rate of interest charged by Bank at any given time for any particular class of customers or credit extensions (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each Day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 8.250%. The interest rate to be applied to the unpaid principal balance during this Note will be at a rate of 0.500 percentage points over the Index, resulting in an initial rate of 8.750%. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

PREPAYMENT; MINIMUM INTEREST CHARGE. Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a minimum interest charge of $200.00. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: California Bank & Trust, Central Valley Sacramento Region Corporate Banking, 1331 Broadway, Sacramento, CA 95818.

LATE CHARGE. If a payment is 15 days or more late, Borrower will be charged 6.000% of the regularly scheduled payment or $500.00, whichever is less.

INTEREST AFTER DEFAULT. Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by adding a 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.

DEFAULT. Each of the following shall constitute an event of default ("Event of Default") under this Note:

Payment Default. Borrower fails to make any payment when due under this Note.

Other Defaults. Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

Default in Favor of Third Parties. Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

False Statements. Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

Insolvency. The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

Creditor or Forfeiture Proceedings. Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Events Affecting Guarantor. Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any

# PROMISSORY NOTE
## (Continued)

Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento County, State of California.

**COLLATERAL.** Borrower acknowledges this Note is secured by a Irrevocable Standby Letter of Credit No. ZSB801853, dated January 10, 2007, in the amount of $100,000.00, issued by Zions Bank, with an expiration of date of December 5, 2007 or any automatically extended date.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following persons currently are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of their authority: Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.; and Betsy Wannakuwatte, Secretary. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned further covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**JURY WAIVER; JUDICIAL REFERENCE.** Borrower and Lender each waive their respective rights to a trial before a jury in connection with any disputes related to this Note, the loan evidenced hereby and any other loan documents in connection herewith and therewith. Such disputes include without limitation any claim by Borrower or Lender, claims brought by Borrower as a class representative on behalf of others, and claims by a class representative on Borrower's behalf as a class member (so-called "class action" suits). This provision shall not apply if, at the time an action is brought, Borrower's loan is funded or maintained in a state where this jury trial waiver is not permitted by law.

If a jury trial waiver is not permitted by applicable law and a dispute arises between Borrower and Lender with respect to this Note, its enforcement or the transactions contemplated by the related loan documents, either of Borrower or Lender may require that it be resolved by judicial reference in accordance with California Code of Civil Procedure, Sections 638, et seq., including without limitation whether the dispute is subject to a judicial reference proceeding. The referee shall be a retired judge, agreed upon by the parties, from either the American Arbitration Association (AAA) or Judicial Arbitration and Mediation Service, Inc. (JAMS). If the parties cannot agree on the referee, the party who initially selected the reference procedure shall request a panel of ten retired judges from either AAA or JAMS, and the court shall select the referee from that panel. The referee shall be appointed to sit with all of the powers provided by law. The parties agree that time is of the essence in conducting the judicial reference proceeding set forth herein. The costs of the judicial reference proceeding, including the fee for the court reporter, shall be borne equally by the parties as the costs are incurred, unless otherwise awarded by the referee. The referee shall hear all pre-trial and post-trial matters (including without limitation requests for equitable relief), prepare an award with written findings of fact and conclusions of law and apportion costs as appropriate. The referee shall be empowered to enter equitable relief as well as legal relief, provide all temporary or provisional remedies, enter equitable orders that are binding on the parties and rule on any motion that would be authorized in a trial, including without limitation motions for summary judgment or summary adjudication. Judgment upon the award shall be entered in the court in which such proceeding was commenced and all parties shall have full rights of appeal. This provision will not be deemed to limit or constrain Lender's right of offset, to obtain provisional or ancillary remedies, to interplead funds in the event of a dispute, to exercise any security interest or lien Lender may hold in property or to comply with legal process involving Borrower's accounts or other property.

**LOAN AGREEMENT.** The Note is subject to the terms and conditions of that Business Loan Agreement executed by Borrower in favor of Lender, as amended and restated on January 17, 2007.

Exhibit H-1, Page 000153

**STAND-BY LETTER OF CREDIT SUBLINE.** An exhibit, titled "Stand-By Letter of Credit Subline," is attached to this Note and by this reference is

**PROMISSORY NOTE**
(Continued)

Loan No: 9163000288-3                                                                                     Page 3

de a part of this Note just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Note.

SUCCESSOR INTERESTS. The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

GENERAL PROVISIONS. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal Wannakuwatte, President/CEO of
International Manufacturing Group, Inc.

# EXHIBIT H-2

## CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No. | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| 300,000.00 | 02-20-2007 | 12-04-2007 | 9163000288-4 | | | 22171 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing " * * * * " has been omitted due to text length limitations.

Borrower: International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

Lender: California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

Principal Amount: $300,000.00    Initial Rate: 8.750%    Date of Agreement: February 20, 2007

**DESCRIPTION OF EXISTING INDEBTEDNESS.**

The Business Loan Agreement dated and Promissory Note each dated January 17, 2007, in the original principal amount of $300,000.00, from International Manufacturing Group, Inc. to Lender.

**DESCRIPTION OF COLLATERAL.**

1) CD Account Number 1250003753, with Lender with an approximate balance of $100,000.00.

2) Irrevocable Stand-By Letter of Credit, Number ZSB801853, dated January 10, 2007, issued by Zions Bank.

3) An Assignment of Advantage Line in the amount of $100,000.00.

**DESCRIPTION OF CHANGE IN TERMS.**

1) The Note is subject to the terms and conditions of that Business Loan Agreement executed by Borrower in favor of Lender, as amended and restated on February 20, 2007.

All other terms and conditions shall remain the same.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its Indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal Wannakuwatte, President/CEO of
International Manufacturing Group, Inc.

LASER PRO Lending, Ver. 5.34.00.002 Copr. Harland Financial Solutions, Inc. 1997, 2007. All Rights Reserved. - CA L:\CFI\LPL\D20C.FC TR-24125 PR-1

# EXHIBIT H-3

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No. | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|----------|-------------|---------|---------|----------|
| 300,000.00 | 12-12-2007 | 12-04-2008 | 0181803-0004 | | | 08303 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

Borrower:  International Manufacturing Group, Inc.
           879 F Street, Suite 120
           West Sacramento, CA 95605

Lender:  California Bank & Trust
         Central Valley Sacramento Region Corporate Banking
         1331 Broadway
         Sacramento, CA 95818

Principal Amount: $300,000.00        Initial Rate: 7.750%        Date of Agreement: December 12, 2007

**DESCRIPTION OF EXISTING INDEBTEDNESS.**

The Business Loan Agreement and Promissory Note each dated January 17, 2007, in the original amount of $300,000.00, as amended by that certain Change in Terms Agreement dated February 20, 2007, from International Manufacturing Group, Inc. to Lender.

**DESCRIPTION OF COLLATERAL.**

1) CD Account Number 1250003753 with Lender, with an approximate balance of $100,000.00, in the name of Glenn Schussman.

2) Irrevocable Stand-By Letter of Credit Number ZSB801853, dated January 10, 2007, issued by Zions Bank.

3) An Assignment of Advantage Line in the amount of $100,000.00.

**DESCRIPTION OF CHANGE IN TERMS.**

1) The maturity date is hereby amended from December 4, 2007 to December 4, 2008.

2) The Stand-By Letter of Credit subline is hereby amended as described in the attached "STAND-BY LETTER OF CREDIT SUBLINE."

3) The Note is subject to the terms and conditions of that Business Loan Agreement executed by Borrower in favor of Lender, as amended and restated on December 12, 2007.

All other terms and conditions shall remain the same.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its Indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**STAND-BY LETTER OF CREDIT SUBLINE.** An exhibit, titled "Stand-By Letter of Credit Subline," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

**REAFFIRMATION OF GUARANTOR.** An exhibit, titled "REAFFIRMATION OF GUARANTY OBLIGATIONS," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____

Deepal Wannakuwatte, President/CEO of
International Manufacturing Group, Inc.

LaserPro, Ver. 5.38.10 Copr. Harland Financial Solutions, Inc. 1997, 2007. All Rights Reserved. - CA L:\CFI\LPL\D20C.FC TR-27503 PR-1

Exhibit H-3, Page 000158

# EXHIBIT H-4

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No. | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|----------|-------------|---------|---------|----------|
| 300,000.00 | 12-16-2008 | 12-04-2009 | 0181803-0004 | | | 08303 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

| | |
|---|---|
| **Borrower:** International Manufacturing Group, Inc.<br>879 F Street, Suite 120<br>West Sacramento, CA 95605 | **Lender:** California Bank & Trust<br>Central Valley Sacramento Region Corporate Banking<br>1331 Broadway<br>Sacramento, CA 95818 |

---

**THIS BUSINESS LOAN AGREEMENT** dated December 16, 2008, is made and executed between International Manufacturing Group, Inc. ("Borrower") and California Bank & Trust ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of December 16, 2008, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY.** The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.; and Betsy Wannakuwatte, Secretary of International Manufacturing Group, Inc.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) guaranties; (3) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 879 F Street, Suite 120, West Sacramento, CA 95605. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

# BUSINESS LOAN AGREEMENT
Loan No: 0181803-0004 (Continued) Page 2

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than one-hundred-eighty (180) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, compiled by a certified public accountant satisfactory to Lender.

**Interim Statements.** As soon as available, but in no event later than sixty (60) days after the end of each Half-year, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower.

**Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

# BUSINESS LOAN AGREEMENT
## (Continued)

| Names of Guarantors | Amounts |
|---|---|
| Deepal Wannakuwatte | $21,409,271.00 |
| Betsy Wannakuwatte | $21,409,271.00 |
| Glenn Schussman | $300,000.00 |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) pay any dividends on Borrower's stock (other than dividends payable in its stock), provided, however that notwithstanding the foregoing, but only so long as no Event of Default has occurred and is continuing or would result from the payment of dividends, if Borrower is a "Subchapter S Corporation" (as defined in the Internal Revenue Code of 1986, as amended), Borrower may pay cash dividends on its stock to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated income tax payments to satisfy their liabilities under federal and state law which

# BUSINESS LOAN AGREEMENT
## (Continued)

arise solely from their status as Shareholders of a Subchapter S Corporation because of their ownership of shares of Borrower's stock, or purchase or retire any of Borrower's outstanding shares or alter or amend Borrower's capital structure.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Borrower will not enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure the Indebtedness. This includes all deposit accounts Borrower holds jointly with someone else.

**JURY WAIVER; JUDICIAL REFERENCE.** Borrower and Lender each waive their respective rights to a trial before a jury in connection with any disputes related to this Agreement, any of the Related Documents and the transactions contemplated hereby and thereby. Such disputes include without limitation any claim by Borrower or Lender, claims brought by Borrower as a class representative on behalf of others, and claims by a class representative on Borrower's behalf as a class member (so-called "class action" suits). This provision shall not apply if, at the time an action is brought, Borrower's loan is funded or maintained in a state where this jury trial waiver is not permitted by law.

Exhibit 4, Page 000163

# BUSINESS LOAN AGREEMENT
(Continued)

Loan No: 0181803-0004                                                                 Page 5

n jury trial waiver is not permitted by applicable law and a dispute arises between Borrower and Lender with respect to this Agreement, any of : Related Documents, the enforcement hereof or thereof or the transactions contemplated hereby or thereby, either of Borrower or Lender .ay require that it be resolved by judicial reference in accordance with California Code of Civil Procedure, Sections 638, et seq., including without limitation whether the dispute is subject to a judicial reference proceeding. The referee shall be a retired judge, agreed upon by the parties, from either the American Arbitration Association (AAA) or Judicial Arbitration and Mediation Service, Inc. (JAMS). If the parties cannot agree on the referee, the party who initially selected the reference procedure shall request a panel of ten retired judges from either AAA or JAMS, and the court shall select the referee from that panel. The referee shall be appointed to sit with all of the powers provided by law. The parties agree that time is of the essence in conducting the judicial reference proceeding set forth herein. The costs of the judicial reference proceeding, including the fee for the court reporter, shall be borne equally by the parties as the costs are incurred, unless otherwise awarded by the referee. The referee shall hear all pre-trial and post-trial matters (including without limitation requests for equitable relief), prepare an award with written findings of fact and conclusions of law and apportion costs as appropriate. The referee shall be empowered to enter equitable relief as well as legal relief, provide all temporary or provisional remedies, enter equitable orders that are binding on the parties and rule on any motion that would be authorized in a trial, including without limitation motions for summary judgment or summary adjudication. Judgment upon the award shall be entered in the court in which such proceeding was commenced and all parties shall have full rights of appeal. This provision will not be deemed to limit or constrain Lender's right of offset, to obtain provisional or ancillary remedies, to interplead funds in the event of a dispute, to exercise any security interest or lien Lender may hold in property or to comply with legal process involving Borrower's accounts or other property.

**INCREASED COSTS.** If any change in a law, rule or regulation, or the interpretation or application thereof, or Lender's compliance with any request, guideline or directive (whether or not having the force of law) of any governmental authority (collectively, a "Change in Law") shall (i) impose, modify or deem applicable any reserve, special deposit or similar requirement against or with respect to the assets of, deposits with or for the account of or credit extended by Lender or (ii) impose on Lender any other condition affecting this Agreement or the loans hereunder or any letter of credit or participation therein and the result of any of the foregoing shall be to increase the cost to Lender of making or maintaining any loan (or its commitment to make any such loan) or to increase the cost to Lender of issuing or maintaining any letter of credit or to reduce the amount of any sum received or receivable by Lender hereunder, then Borrower will pay to Lender such additional amount as will compensate Lender for such additional costs or reduction.If Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on the capital of Lender or Lender's holding company from this Agreement or the loans or letters of credit made or issued by Lender to a level below that which Lender or Lender's holding company could have achieved but for such Change in Law (taking into consideration Lender's policies and the policies of Lender's holding company with respect to capital adequacy), then from time to time Borrower will pay to Lender such additional amount as will compensate Lender or Lender's holding company for any such reduction, as set forth in a certificate of Lender describing in reasonable detail the amount or amounts necessary to compensate Lender or its holding company. The amounts and description in such certificate shall be conclusive absent manifest error, and Borrower agrees to pay to Lender the amount shown in such certificate within ten (10) business days after receipt thereof.Failure or delay on the part of Lender to demand compensation pursuant to this section shall not constitute a waiver of Lender's right to demand such compensation.

GUARANTOR FINANCIAL INFORMATION. Borrower covenants and agrees with Lender that, while this Agreement is in effect, Borrower will .ish Lender with Deepal Wannakuwatte and Betsy Wannakuwatte personal financial statements, on California Bank & Trust form, as soon as .ilable, but no later than November 30th, on an annual basis and; a signed copy of Deepal Wannakuwatte and Betsy Wannakuwatte filed Federal Income Tax Returns, as soon as available, but in no event later than thirty (30) days from date of filing on an annual basis.

**ADDITIONAL INFORMATION.** In addition to the covenants and agreements of Borrower set forth under "AFFIRMATIVE COVENANTS" above, Borrower further covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower shall continuously maintain in full force and effect an irrevocable standby letter of credit (the "L/C") with a major bank or financial institution ("L/C Issuer") with a term expiring no later than the maturity of the Note in an amount at least equal to the amount of the Note, plus one year's anticipated interest on such amount, if any (unless otherwise agreed to by Lender), and in a form and on any other necessary or appropriate terms, all as are acceptable to Lender in its sole discretion and which shall name Lender as the beneficiary for the purpose of securing the Indebtedness and Borrower's other obligations hereunder and under the Related Documents. Lender's receipt of any notice of L/C Issuer's election not to extend or renew the L/C or as to the termination of the L/C for any other reason, or L/C Issuer's dishonor of any draw by Lender under the L/C, shall constitute an Event of Default. Borrower covenants and agrees to immediately notify Lender upon its receipt of any notice of non-extension, non-renewal or termination of the L/C. Notwithstanding anything to the contrary herein, Borrower shall not be entitled to a right to cure under the section entitled "DEFAULT - Right to Cure" hereunder with respect to any Event of Default under this section, unless agreed to by Lender in its sole discretion.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

Exhibit H-4, Page 000164

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the

laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento County, State of California.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means International Manufacturing Group, Inc. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

Exhibit H-4, Page 000165

# BUSINESS LOAN AGREEMENT
## (Continued)

Loan No: 0181803-0004                        Page 7

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means California Bank & Trust, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note executed by International Manufacturing Group, Inc. in the original principal amount of $300,000.00 dated January 17, 2007, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the Note or Credit Agreement or any other subsequent Notes evidencing further Indebtedness.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED DECEMBER 16, 2008.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal Wannakuwatte, President/CEO of
International Manufacturing Group, Inc.

LENDER:

CALIFORNIA BANK & TRUST

By: _____
Authorized Signer    D. Satow for Jun Enkoji
**Vice President & Commercial Banking Officer**

LASER PRO Lending, Ver. 5.43.00.004 Copr. Harland Financial Solutions, Inc. 1997, 2008. All Rights Reserved. - CA L:\CFI\LPL\C43.FC TR-30022 PR-1

# EXHIBIT H-5

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No. | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|----------|-------------|---------|---------|----------|
| 300,000.00 | 12-16-2008 | 12-04-2009 | 0181803-0004 | | | 08303 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing " * * * " has been omitted due to text length limitations.

| | |
|---|---|
| Borrower: International Manufacturing Group, Inc.<br>879 F Street, Suite 120<br>West Sacramento, CA 95605 | Lender: California Bank & Trust<br>Central Valley Sacramento Region Corporate Banking<br>1331 Broadway<br>Sacramento, CA 95818 |

**Principal Amount: $300,000.00**                              **Date of Agreement: December 16, 2008**

DESCRIPTION OF EXISTING INDEBTEDNESS. The Business Loan Agreement dated December 12, 2007 and the Promissory Note dated January 17, 2007, in the original amount of $300,000.00, as amended by those certain Change in Terms Agreements dated February 20, 2007 and December 12, 2007, from International Manufacturing Group, Inc. to Lender.

DESCRIPTION OF COLLATERAL.

1. CD Account Number 1250003753 with Lender.

2. Irrevocable Stand-By Letter of Credit Number ZSB801853, dated January 10, 2007, issued by Zions Bank.

3. An Assigment of Advantage Line in the amount of $100,000.00.

DESCRIPTION OF CHANGE IN TERMS.

1. The maturity date is hereby amended from December 4, 2008 to December 4, 2009.

2. This Note is subject to the terms and conditions of that Business Loan Agreement executed by Borrower in favor of Lender, as amended and restated on December 16, 2008.

3. The Standby Letter of Credit Subline is hereby deleted in its entirety.

All other terms and conditions shall remain the same.

CONTINUING VALIDITY. Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced by or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

FINANCIAL STATEMENT CERTIFICATIONS. The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

DEPOSIT AGREEMENT SECURITY. Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

REAFFIRMATION OF GUARANTY OBLIGATIONS. An exhibit, titled "REAFFIRMATION OF GUARANTY OBLIGATIONS," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal    Wannakuwatte,    President/CEO    of
International Manufacturing Group, Inc.

LASER PRO Lending, Ver. 5.42.00.004, Copr. Harland Financial Solutions, Inc. 1997, 2008.    All Rights Reserved.    - CA  L:\CFI\LPL\D20C.FC  TR-20622 PR-1

# EXHIBIT I-1

Exhibit I-1, Page 000169

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| 600,000.00 | 09-12-2007 | 09-05-2008 | 0181803-9001 | | | 08728 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

---

**Principal Amount: $600,000.00**          **Initial Rate: 8.750%**          **Date of Note: September 12, 2007**

**PROMISE TO PAY.** International Manufacturing Group, Inc. ("Borrower") promises to pay to California Bank & Trust ("Lender"), or order, in lawful money of the United States of America, the principal amount of Six Hundred Thousand & 00/100 Dollars ($600,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on September 5, 2008. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning October 5, 2007, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. The annual interest rate for this Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an index which is the rate of interest set from time to time by Bank as its Prime Rate. California Bank & Trust Prime Rate is determined by Bank as a means of pricing credit extensions to some customers and is neither tied to any external rate of interest or index nor is it necessarily the lowest rate of interest charged by Bank at any given time for any particular class of customers or credit extensions (the "Index"). The index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current index rate upon Borrower's request. The interest rate change will not occur more often than each Day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 8.250%. The interest rate to be applied to the unpaid principal balance during this Note will be at a rate of 0.500 percentage points over the Index, resulting in an initial rate of 8.750%. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**REPAYMENT; MINIMUM INTEREST CHARGE.** In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a minimum interest charge of $200.00. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: California Bank & Trust, Central Valley Sacramento Region Corporate Banking, 1331 Broadway, Sacramento, CA 95818.

**LATE CHARGE.** If a payment is 15 days or more late, Borrower will be charged 6.000% of the regularly scheduled payment or $500.00, whichever is less.

**INTEREST AFTER DEFAULT.** Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by adding a 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to

Exhibit 1 Page 000310

**PROMISSORY NOTE**
**(Continued)**

Loan No: 0181803-9001                                                                                          Page 2

assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender; and, in doing so, cure any Event of Default.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento County, State of California.

**COLLATERAL.** Borrower acknowledges this Note is secured by an Irrevocable Letter of Credit, Number STB-65463, Dated 09-07-2007, Issued by Washington Mutual Bank.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following persons currently are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of their authority: **Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.; and Betsy Wannakuwatte, Secretary.** Borrower agrees to be liable for all sums either: (A) advanced in accordance with the structions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this ote at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its Indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**JURY WAIVER; JUDICIAL REFERENCE.** Borrower and Lender each waive their respective rights to a trial before a jury in connection with any disputes related to this Note, the loan evidenced hereby and any other loan documents in connection herewith and therewith. Such disputes include without limitation any claim by Borrower or Lender, claims brought by Borrower as a class representative on behalf of others, and claims by a class representative on Borrower's behalf as a class member (so-called "class action" suits). This provision shall not apply if, at the time an action is brought, Borrower's loan is funded or maintained in a state where this jury waiver is not permitted by law.

If a jury trial waiver is not permitted by applicable law and a dispute arises between Borrower and Lender with respect to this Note, its enforcement or the transactions contemplated by the related loan documents, either of Borrower or Lender may require that it be resolved by judicial reference in accordance with California Code of Civil Procedure, Sections 638, et seq., including without limitation whether the dispute is subject to a judicial reference proceeding. The referee shall be a retired judge, agreed upon by the parties, from either the American Arbitration Association (AAA) or Judicial Arbitration and Mediation Service, Inc. (JAMS). If the parties cannot agree on the referee, the party who initially selected the reference procedure shall request a panel of ten retired judges from either AAA or JAMS, and the court shall select the referee from that panel. The referee shall be appointed to sit with all of the powers provided by law. The parties agree that time is of the essence in conducting the judicial reference proceeding set forth herein. The costs of the judicial reference proceeding, including the fee for the court reporter, shall be borne equally by the parties as the costs are incurred, unless otherwise awarded by the referee. The referee shall hear all pre-trial and post-trial matters (including without limitation requests for equitable relief), prepare an award with written findings of fact and conclusions of law and apportion costs as appropriate. The referee shall be empowered to enter equitable relief as well as legal relief, provide all temporary or provisional remedies, enter equitable orders that are binding on the parties and rule on any motion that would be authorized in a trial, including without limitation motions for summary judgment or summary adjudication. Judgment upon the award shall be entered in the court in which such proceeding was commenced and all parties shall have full rights of appeal. This provision will not be deemed to limit or instrain Lender's right of offset, to obtain provisional or ancillary remedies, to interpleard funds in the event of a dispute, to exercise any curity interest or lien Lender may hold in property or to comply with legal process involving Borrower's accounts or other property.

USINESS LOAN AGREEMENT. THE NOTE IS SUBJECT TO THE TERMS AND CONDITIONS OF THAT BUSINESS LOAN AGREEMENT EXECUTED BY BORROWER IN FAVOR OF LENDER ON SEPTEMBER 12, 2007, AS AMENDED FROM TIME TO TIME.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.          Exhibit I-1, Page 000171

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses

# PROMISSORY NOTE
## (Continued)

his Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability.  All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone.  All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made.  The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS.  BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____ Date 09/30/07
Deepal    Wannakuwatte,    President/CEO    of
International Manufacturing Group, Inc.

LASER PRO Lending, Ver. 5.30.00.004  Copr. Harland Financial Solutions, Inc. 1997, 2007.  All Rights Reserved.   - CA  L:\CFI\LPL\D20.FC  TR-14239  PR-1

Exhibit I-1, Page 000172

# EXHIBIT I-2

Exhibit I-2, Page 000173

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $600,000.00 | 09-12-2007 | 09-05-2008 | 0181803-9001 | | | 08728 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

| | |
|---|---|
| Borrower: International Manufacturing Group, Inc.<br>879 F Street, Suite 120<br>West Sacramento, CA 95605 | Lender: California Bank & Trust<br>Central Valley Sacramento Region Corporate Banking<br>1331 Broadway<br>Sacramento, CA 95818 |

THIS BUSINESS LOAN AGREEMENT dated September 12, 2007, is made and executed between International Manufacturing Group, Inc. ("Borrower") and California Bank & Trust ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement ("Loan"). Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

TERM. This Agreement shall be effective as of September 12, 2007, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

ADVANCE AUTHORITY. The following persons currently are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of their authority: Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.; and Betsy Wannakuwatte, Secretary.

CONDITIONS PRECEDENT TO EACH ADVANCE. Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

    Loan Documents. Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) guaranties; (3) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

    Borrower's Authorization. Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

    Payment of Fees and Expenses. Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

    Representations and Warranties. The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

    No Event of Default. There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

REPRESENTATIONS AND WARRANTIES. Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

    Organization. Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 879 F Street, Suite 120, West Sacramento, CA 95605. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

    Assumed Business Names. Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

    Authorization. Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

    Financial Information. Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

    Legal Effect. This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

    Properties. Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

Exhibit I-2, Page 000174

CBT 20246

# BUSINESS LOAN AGREEMENT
## (Continued)

Loan No: 0181803-9001                                                                                     Page 2

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than one-hundred-eighty (180) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, compiled by a certified public accountant satisfactory to Lender.

**Interim Statements.** As soon as available, but in no event later than sixty (60) days after the end of each Half-year, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower.

**Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

**Additional Requirements.**

**Guarantor Financial Information.** Borrower covenants and agrees with Lender that, while this Agreement is in effect, Borrower will furnish Lender with Guarantor's personal financial statement, on California Bank & Trust form, for the period ending October 31st, as soon as available, but in no event later than November 30th, on an annual basis and; a signed copy of Guarantor's filed Federal Income Tax Return, as soon as available, on an annual basis.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

Exhibit I-2, Page 000175

CBT 20247

## BUSINESS LOAN AGREEMENT
### (Continued)

Loan No: 0181803-9001                                                                                     Page 3

---

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Deepal Wannakuwatte | $13,047,000.00 |
| Betsy Wannakuwatte | $13,047,000.00 |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) pay any dividends on Borrower's stock (other than dividends payable in its stock), provided, however that notwithstanding the foregoing, but only so long as no Event of Default has occurred and is continuing or would result from the payment of dividends, if Borrower is a "Subchapter S Corporation" (as defined in the Internal Revenue Code of 1986, as amended), Borrower may pay cash dividends on its stock to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated income tax payments to satisfy their liabilities under federal and state law which arise solely from their status as Shareholders of a Subchapter S Corporation because of their ownership of shares of Borrower's stock, or

Exhibit I-2, Page 000176

**CBT 20248**

# BUSINESS LOAN AGREEMENT
## (Continued)

purchase or retire any of Borrower's outstanding shares or alter or amend Borrower's capital structure.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Borrower will not enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**DEPOSIT AGREEMENT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure the Indebtedness. This includes all deposit accounts Borrower holds jointly with someone else.

**JURY WAIVER; JUDICIAL REFERENCE.** Borrower and Lender each waive their respective rights to a trial before a jury in connection with any disputes related to this Agreement, any of the Related Documents and the transactions contemplated hereby and thereby. Such disputes include without limitation any claim by Borrower or Lender, claims brought by Borrower as a class representative on behalf of others, and claims by a class representative on Borrower's behalf as a class member (so-called "class action" suits). This provision shall not apply if, at the time an action is brought. Borrower's loan is funded or maintained in a state where this jury trial waiver is not permitted by law.

Exhibit I-2, Page 000177

CBT 20249

# BUSINESS LOAN AGREEMENT
(Continued)

If a jury trial waiver is not permitted by applicable law and a dispute arises between Borrower and Lender with respect to this Agreement, any of the Related Documents, the enforcement hereof or thereof or the transactions contemplated hereby or thereby, either of Borrower or Lender may require that it be resolved by judicial reference in accordance with California Code of Civil Procedure, Sections 638, et seq., including without limitation whether the dispute is subject to a judicial reference proceeding. The referee shall be a retired judge, agreed upon by the parties, from either the American Arbitration Association (AAA) or Judicial Arbitration and Mediation Service, Inc. (JAMS). If the parties cannot agree on the referee, the party who initially selected the reference procedure shall request a panel of ten retired judges from either AAA or JAMS, and the court shall select the referee from that panel. The referee shall be appointed to sit with all of the powers provided by law. The parties agree that time is of the essence in conducting the judicial reference proceeding set forth herein. The costs of the judicial reference proceeding, including the fee for the court reporter, shall be borne equally by the parties as the costs are incurred, unless otherwise awarded by the referee. The referee shall hear all pre-trial and post-trial matters (including without limitation requests for equitable relief), prepare an award with written findings of fact and conclusions of law and apportion costs as appropriate. The referee shall be empowered to enter equitable relief as well as legal relief, provide all temporary or provisional remedies, enter equitable orders that are binding on the parties and rule on any motion that would be authorized in a trial, including without limitation motions for summary judgment or summary adjudication. Judgment upon the award shall be entered in the court in which such proceeding was commenced and all parties shall have full rights of appeal. This provision will not be deemed to limit or constrain Lender's right of offset, to obtain provisional or ancillary remedies, to interpleaded funds in the event of a dispute, to exercise any security interest or lien Lender may hold in property or to comply with legal process involving Borrower's accounts or other property.

**INCREASED COSTS.** If any change in a law, rule or regulation, or the interpretation or application thereof, or Lender's compliance with any request, guideline or directive (whether or not having the force of law) of any governmental authority (collectively, a "Change in Law") shall (i) impose, modify or deem applicable any reserve, special deposit or similar requirement against or with respect to the assets of, deposits with or for the account of or credit extended by Lender or (ii) impose on Lender any other condition affecting this Agreement or the loans hereunder or any letter of credit or participation therein and the result of any of the foregoing shall be to increase the cost to Lender of making or maintaining any loan (or its commitment to make any such loan) or to increase the cost to Lender of issuing or maintaining any letter of credit or to reduce the amount of any sum received or receivable by Lender hereunder, then Borrower will pay to Lender such additional amount as will compensate Lender for such additional costs or reduction.If Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on the capital of Lender or Lender's holding company from this Agreement or the loans or letters of credit made or issued by Lender to a level below that which Lender or Lender's holding company could have achieved but for such Change in Law (taking into consideration Lender's policies and the policies of Lender's holding company with respect to capital adequacy), then from time to time Borrower will pay to Lender such additional amount as will compensate Lender or Lender's holding company for any such reduction, as set forth in a certificate of Lender describing in reasonable detail the amount or amounts necessary to compensate Lender or its holding company. The amounts and description in such certificate shall be conclusive absent manifest error, and Borrower agrees to pay to Lender the amount shown in such certificate within ten (10) business days after receipt thereof.Failure or delay on the part of Lender to demand compensation pursuant to this section shall not constitute a waiver of Lender's right to demand such compensation.

**ADDITIONAL PROVISION.** In addition to the covenants and agreements of Borrower set forth under "AFFIRMATIVE COVENANTS" above, Borrower further covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower shall continuously maintain in full force and effect an irrevocable standby letter of credit (the "L/C") with a major bank or financial institution ("L/C Issuer") with a term expiring no later then the maturity of the Note in an amount at least equal to the amount of the Note, plus one year's anticipated interest on such amount, if any (unless otherwise agreed to by Lender), and in a form and on any other necessary or appropriate terms, all as are acceptable to Lender in its sole discretion and which shall name Lender as the beneficiary for the purpose of securing the Indebtedness and Borrower's other obligations hereunder and under the Related Documents. Upon Lender's receipt of any notice of L/C Issuer's election not to extend or renew the L/C or as to the termination of the L/C for any other reason, or L/C Issuer's dishonor of any draw by Lender under the L/C, shall constitute an Event of Default. Borrower covenants and agrees to immediately notify Lender upon its receipt of any notice of non-extension, non-renewal or termination of the L/C. Notwithstanding anything to the contrary herein, Borrower shall not be entitled to a right to cure under the section entitled "DEFAULT - Right to Cure" with respect to any Event of Default under this section, unless agreed to by Lender in its sole discretion.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. **This Agreement has been accepted by Lender in the State of California.**

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Sacramento

Exhibit I-2, Page 000178

CBT 20250

Loan No: 0181803-9001

## BUSINESS LOAN AGREEMENT
### (Continued)

Page 6

County, State of California.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context or any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means International Manufacturing Group, Inc. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

Exhibit I-2, Page 000179
CBT 20251

## BUSINESS LOAN AGREEMENT
(Continued)

Loan No: 0181803-9001      Page 7

chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means California Bank & Trust, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note executed by International Manufacturing Group, Inc. in the original principal amount of $600,000.00 dated September 12, 2007, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the Note or Credit Agreement or any other subsequent Notes evidencing further Indebtedness.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED SEPTEMBER 12, 2007.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____ 09/30/07
Deepal Wannakuwatte, President/CEO of
International Manufacturing Group, Inc.

LENDER:

CALIFORNIA BANK & TRUST

By: _____
Authorized Signer   Dawn Satow for June Enkoji
Vice President & Commercial Banking Officer

Exhibit I-2, Page 000180
CBT 20252

# EXHIBIT I-3

Exhibit I-3, Page 000181

CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No. | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|----------|-------------|---------|---------|----------|
| $600,000.00 | 09-15-2008 | 09-05-2009 | 0181803-9001 | | | 83030 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "* * *" has been omitted due to text length limitations.

**Borrower:**  International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95605

**Lender:**  California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

---

Principal Amount: $600,000.00                                  Date of Agreement: September 15, 2008

DESCRIPTION OF EXISTING INDEBTEDNESS.

The Business Loan Agreement dated June 13, 2008 and the Promissory Note dated September 12, 2007, in the original principal amount of $600,000.00, from International Manufacturing Group, Inc. to Lender.

DESCRIPTION OF COLLATERAL.

Irrevocable Stand-By Letter of Credit, Number STB-65463, Dated 09-07-2007, Issued by Washington Mutual Bank.

DESCRIPTION OF CHANGE IN TERMS.

1) The Maturity Date is hereby extended from September 5, 2008 to September 5, 2009.

2) The Note is subject to the terms and conditions of that Business Loan Agreement executed by Borrower in favor of Lender, as amended and restated on June 13, 2008.

All other terms and conditions shall remain the same.

CONTINUING VALIDITY.  Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

FINANCIAL STATEMENT CERTIFICATIONS. The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information "Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors.  Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

DEPOSIT AGREEMENT SECURITY. Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its Indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

REAFFIRMATION OF GUARANTY OBLIGATIONS.  An exhibit, titled "REAFFIRMATION OF GUARANTY OBLIGATIONS," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT.  BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal Wannakuwatte, President/CEO of International Manufacturing Group, Inc.

---

LASER PRO Lending, Ver. 5.41.00.004  Copr. Harland Financial Solutions, Inc. 1997, 2008.  All Rights Reserved.  - CA  L:\CFI\LPL\D20C.FC  TR-25789  PR-5

Exhibit I-3, Page 000182

# EXHIBIT I-4

Exhibit I-4, Page 000183

# ...NGE IN TERMS AGREEME...

| Principal<br>$600,000.00 | Loan Date<br>09-09-2009 | Maturity<br>09-05-2010 | Loan No<br>0181803-9001 | Call / Coll | Account | Officer<br>08303 | Initials |
|---|---|---|---|---|---|---|---|

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**  International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA  95606

**Lender:**  California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA  95818

**Principal Amount:  $600,000.00**                                    **Date of Agreement:  September 9, 2009**

**DESCRIPTION OF EXISTING INDEBTEDNESS.** The Business Loan Agreement dated March 12, 2009 and the Promissory Note dated September 12, 2007, in the original amount of $600,000.00 as amended by that certain Change In Terms Agreement dated September 15, 2008 from International Manufacturing Group, Inc. to Lender.

**DESCRIPTION OF COLLATERAL.**

Irrevocable Stand-By Letter of Credit, Number STB-65463, dated 09-07-2007, Issued by Washington Mutual Bank.

**DESCRIPTION OF CHANGE IN TERMS.**

1. The maturity date is hereby extended from September 5, 2009 to September 5, 2010.

2. Under no circumstances will the interest rate on this loan be less than 5.000% per annum or more than the maximum rate allowed by applicable law.

3. The payment schedule is hereby modified as follows:

Subject to any payment changes resulting from changes in the Index, Borrower will pay this loan in 11 consecutive monthly principal payments of $10,000.00 each. Borrower's first principal payment is due October 5, 2009, and all subsequent principal payments are due on the same day of each month after that. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date. Borrower's first interest payment is due October 5, 2009 and all subsequent interest payments are due on the same day of each payment date after that. Borrower's final payment due September 5, 2010 will be for all principal and accrued interest not yet paid.

4. Borrower covenants and agrees with Lender that, while this Agreement is in effect, Borrower to revolve line of credit a minimum of 25% during renewal term.

All other terms and conditions shall remain the same.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all ...ments evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does ...ive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in ...is Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**FINANCIAL STATEMENT CERTIFICATIONS.** The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

**DEPOSIT ACCOUNT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

**REAFFIRMATION OF GUARANTY OBLIGATIONS.** An exhibit, titled "REAFFIRMATION OF GUARANTY OBLIGATIONS," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully ...et forth in this Agreement.

...RIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT.  BORROWER ...GREES TO THE TERMS OF THE AGREEMENT.

...ORROWER:

...TERNATIONAL MANUFACTURING GROUP, INC.

De____ Wannakuwatte,  President/CEO  of
Inter...ional Manufacturing Group, Inc.

Exhibit I-4, Page 000184

LASERPRO Lending, Ver. 5.45.00.004, Copr. Harland Financial Solutions, Inc. 1997, 2009.  All Rights Reserved.  - CA  F:\CFI\LPL\D20C.FC  TR-33171  PR-4

# EXHIBIT I-5

Exhibit I-5, Page 000185

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No. | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|----------|-------------|---------|---------|----------|
| $485,000.00 | 09-13-2010 | 11-05-2010 | 0181803-9001 | | | 08303 | W |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** International Manufacturing Group, Inc.
879 F Street, Suite 120
West Sacramento, CA 95606

**Lender:** California Bank & Trust
Central Valley Sacramento Region Corporate Banking
1331 Broadway
Sacramento, CA 95818

**Principal Amount: $485,000.00**                                **Date of Agreement: September 13, 2010**

DESCRIPTION OF EXISTING INDEBTEDNESS.

The Business Loan Agreement dated March 12, 2009 and the Promissory Note dated September 12, 2007, in the original amount of $600,000.00 as amended by those certain Change In Terms Agreement dated September 15, 2008 and September 9, 2009 from International Manufacturing Group, Inc. to Lender.

DESCRIPTION OF COLLATERAL.

Irrevocable Stand-By Letter of Credit Number STB-65463, originally issued by Washing Mutual Bank and revised to JPMorgan Chase Bank, N.A.

DESCRIPTION OF CHANGE IN TERMS.

1) The maturity date is hereby extended from September 5, 2010 to November 5, 2010.

2) The Revolving Line of Credit amount is hereby decreased from $600,000.00 to $485,000.00.

3) The Note is no longer subject to the terms and conditions of that Business Loan Agreement executed by Borrower dated March 12, 2009 in favor of Lender.

All other terms and conditions shall remain the same.

CONTINUING VALIDITY. Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given, conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

FINANCIAL STATEMENT CERTIFICATIONS. The undersigned hereby certifies to California Bank & Trust ("Bank") that all financial information ("Information") submitted to Bank now and at all times during the terms of this loan does, and will, fairly and accurately represent the financial condition of the undersigned, all Borrowers and Guarantors. Financial Information includes, but is not limited to all Business Financial Statements (including Interim and Year-End financial statements that are company prepared and/or CPA-prepared), Business Income Tax Returns, Borrowing Base Certificates, Accounts Receivable and Accounts Payable Agings, Personal Financial Statements and Personal Income Tax Returns. The undersigned understands that the Bank will rely on all financial information, whenever provided, and that such information is a material inducement to Bank to make, to continue to make, or otherwise extend credit accommodations to the undersigned. The undersigned covenants and agrees to notify Bank of any adverse material changes in her/his/its financial condition in the future. The undersigned further understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

DEPOSIT ACCOUNT SECURITY. Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure its Indebtedness hereunder. This includes all deposit accounts Borrower holds jointly with someone else.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

INTERNATIONAL MANUFACTURING GROUP, INC.

By: _____
Deepal   Wannakuwatte,   President/CEO   of
International Manufacturing Group, Inc.

LaserPro Lending, Ver. 5.52.50.002  Copr. Harland Financial Solutions, Inc. 1997, 2010.  All Rights Reserved.  - CA  L:\CFI\LPL\D20G.FC  TR-30500  PR-1

Exhibit I-5, Page 000186

# EXHIBIT J

PROGRAM CLY2001 REPORTS 1

CUSTOMER: 0160068   LOAN: 0001   SELECTION FROM: 1-01-09 TO: 12-31-00   BANK: 140 BRANCH:
NAME: INTERNATIONAL

| ROC DTE | EFF DTE | INT-RATE | TR CD | A C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|---------|---------|----------|-------|-----|-----------|---------------|-----------|----------|--------------|
| 1-22-08 | 1-22-08 | 7.000 | 39 | | MAINT | AUTO-PRIME | .00 | .00 | 890,240.94 |
| 1-30-08 | 1-30-08 | 6.500 | 29 | | MAINT | AUTO-PRIME | .00 | .00 | 890,240.94 |
| 1-31-00 | 1-31-08 | 6.500 | 30 | R | PAYMENT | *GEN* | .00 | 5,941.12 | 890,240.94 |
| 3-26-08 | 3-05-08 | 5.750 | 82 | | RENEWAL | NY01505432 | .00 | .00 | 890,240.94 |
| 3-18-08 | 3-18-08 | 5.750 | 29 | | MAINT | AUTO-PRIME | .00 | .00 | 890,240.94 |
| 3-26-08 | 3-26-08 | 5.750 | 30 | A | PAYMENT | DDA | .00 | 5,285.81 | 890,240.94 |
| 4-16-08 | 4-16-08 | 5.750 | 30 | | PAYMENT | *GEN* | .00 | 3,696.97 | 890,240.94 |
| 4-16-08 | 4-16-08 | 5.750 | 36 | L | REVERSAL | | .00 | 221.82 | 890,240.94 |
| 4-30-08 | 4-30-08 | 5.500 | 29 | | MAINT | AUTO-PRIME | .00 | .00 | 890,240.94 |
| 4-30-08 | 4-30-08 | 5.500 | 30 | R | PAYMENT | *GEN* | .00 | 4,265.74 | 890,240.94 |
| 4-30-08 | 4-30-08 | 5.500 | 30 | A | PAYMENT | *GEN* | 3,918.79 | .00 | 886,322.15 |
| 5-30-08 | 5-31-08 | 5.500 | 30 | R | PAYMENT | *GEN* | .00 | 4,197.72 | 886,322.15 |
| 6-30-08 | 6-30-08 | 5.500 | 30 | R | PAYMENT | *GEN* | .00 | 4,062.31 | 886,322.15 |
| 7-31-08 | 7-31-08 | 5.500 | 30 | R | PAYMENT | *GEN* | .00 | 4,197.72 | 886,322.15 |
| 8-29-08 | 8-31-08 | 5.500 | 30 | R | PAYMENT | *GEN* | .00 | 4,062.31 | 886,322.15 |
| 9-30-08 | 9-31-08 | 5.500 | 30 | R | PAYMENT | *GEN* | .00 | .00 | 886,322.15 |
| 10-09-08 | 10-09-08 | 5.000 | 29 | | MAINT | AUTO-PRIME | .00 | .00 | 886,322.15 |
| 10-30-08 | 10-30-08 | 4.500 | 29 | | MAINT | AUTO-PRIME | .00 | 3,926.90 | 886,322.15 |
| 10-31-08 | 10-31-08 | 4.500 | 30 | R | PAYMENT | *GEN* | .00 | 3,311.40 | 886,322.15 |
| 11-28-08 | 11-30-08 | 4.500 | 30 | R | PAYMENT | *GEN* | .00 | .00 | 886,322.15 |
| 12-17-08 | 12-17-08 | 3.750 | 29 | | MAINT | AUTO-PRIME | .00 | 3,434.50 | 886,322.15 |
| 12-31-08 | 12-31-08 | 3.750 | 30 | R | PAYMENT | *GEN* | .00 | | 886,322.15 |

2008

768 - 0232

Exhibit J, Page 000188

CBT 20699

PROGRAM CLYE001N REPORT# 1

CUSTOMER: 0168068  LOAN:  0001        SELECTION FROM:  1-01-09  TO:  12-31-09      BANK:  140  BRANCH:  07125
NAME:  INTERNATIONAL

| ROC DTE | EFF DTE | INT-RATE | TR CD | A C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|---|---|
| 1-30-09 | 1-31-09 | 3.750 | 30 | R | PAYMENT | *GEN* | | .00 | 2,603.57 | 886,322.15 |
| 2-25-09 | 2-17-09 | 5.000 | 82 | | RENEWAL | MY01505432 | | .00 | .00 | 886,322.15 |
| 2-25-09 | 2-25-09 | 5.000 | 30 | A | PAYMENT | DDA | | .00 | 1,569.53 | 986,322.15 |
| 2-27-09 | 2-28-09 | 5.000 | 30 | | PAYMENT | *GEN* | | .00 | 1,354.10 | 886,322.15 |
| 3-31-09 | 3-31-09 | 5.000 | 30 | R | PAYMENT | *GEN* | | .00 | 3,816.11 | 886,322.15 |
| 4-30-09 | 4-30-09 | 5.000 | 30 | R | PAYMENT | *GEN* | | .00 | 3,693.01 | 886,322.15 |
| 5-29-09 | 5-31-09 | 5.000 | 30 | R | PAYMENT | *GEN* | | .00 | 3,816.11 | 886,322.15 |
| 6-04-09 | 5-31-09 | 5.000 | 46 | R | PYMT REV | *GEN* | | .00 | 3,816.11 | 886,322.15 |
| 6-16-09 | 6-16-09 | 5.000 | 30 | | PAYMENT | *GEN* | | .00 | 3,816.11 | 886,322.15 |
| 6-30-09 | 6-30-09 | 5.000 | 30 | R | PAYMENT | *GEN* | | .00 | 3,693.00 | 886,322.15 |
| 7-31-09 | 7-31-09 | 5.000 | 30 | R | PAYMENT | *GEN* | | .00 | 3,816.11 | 886,322.15 |
| 8-31-09 | 8-31-09 | 5.000 | 30 | R | PAYMENT | *GEN* | | .00 | 3,816.11 | 886,322.15 |
| 9-30-09 | 9-30-09 | 5.000 | 30 | R | PAYMENT | *GEN* | | .00 | 3,693.01 | 886,322.15 |
| 10-30-09 | 10-31-09 | 5.000 | 30 | R | PAYMENT | *GEN* | | .00 | 3,016.11 | 886,322.15 |
| 11-30-09 | 11-30-09 | 5.000 | 30 | R | PAYMENT | *GEN* | | .00 | 3,693.01 | 886,322.15 |
| 12-31-09 | 12-31-09 | 5.000 | 30 | R | PAYMENT | *GEN* | | .00 | 3,816.11 | 886,322.15 |

2009

Exhibit J, Page 000189

CBT 20704

PROGRAM CLY2001N REPORT# 1
SELECTION FROM: 1-01-10 TO: 12-31-10   BANK: 140  BRANCH: 07125

CUSTOMER: 0160068  LOAN: 0001
NAME: INTERNATIONAL

| PROC DTE | EFF DTE | INT-RATE | TR CD | A C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|---|
| 1-29-10 | 1-31-10 | 5.000 | 30 | R | PAYMENT | *GEN* | .00 | 3,816.11 | 886,322.15 |
| 2-04-10 | 1-31-10 | 5.000 | 46 | R | PYMT REV | *GEN* | .00 | 3,816.11 | 886,322.15 |
| 2-17-10 | 2-17-10 | 5.000 | 30 | | PAYMENT | *GEN* | .00 | 3,816.11 | 886,322.15 |
| 2-22-10 | 2-22-10 | 5.000 | 30 | A | PAYMENT | | .00 | 984.80 | 886,322.15 |
| 3-31-10 | 3-31-10 | 5.000 | 30 | R | PAYMENT | *GEN* | .00 | 6,278.12 | 886,322.15 |
| 4-30-10 | 4-30-10 | 5.000 | 30 | R | PAYMENT | *GEN* | .00 | 3,693.01 | 886,322.15 |
| 5-06-10 | 4-30-10 | 5.000 | 46 | R | PYMT REV | *GEN* | .00 | 3,693.01 | 886,322.15 |
| 5-18-10 | 5-18-10 | 5.000 | 30 | L | PAYMENT | 1250007631 | .00 | 221.58 | 886,322.15 |
| 5-18-10 | 5-18-10 | 5.000 | 30 | | PAYMENT | *GEN* | .00 | 3,693.01 | 886,322.15 |
| 5-28-10 | 5-31-10 | 5.000 | 30 | R | PAYMENT | *GEN* | .00 | 3,816.11 | 886,322.15 |
| 6-04-10 | 5-31-10 | 5.000 | 46 | R | PYMT REV | *GEN* | .00 | 3,816.11 | 886,322.15 |
| 6-18-10 | 6-18-10 | 5.000 | 30 | | PAYMENT | | .00 | 3,816.11 | 886,322.15 |
| 6-30-10 | 6-30-10 | 5.000 | 30 | R | PAYMENT | *GEN* | .00 | 3,693.00 | 886,322.15 |
| 7-07-10 | 6-30-10 | 5.000 | 46 | R | PYMT REV | *GEN* | .00 | 3,693.00 | 886,322.15 |
| 7-14-10 | 7-14-10 | 5.000 | 30 | | PAYMENT | *GEN* | .00 | 1,231.01 | 886,322.15 |
| 7-14-10 | 7-14-10 | 5.000 | 30 | | PAYMENT | *GEN* | .00 | 7.39 | 886,322.15 |
| 7-14-10 | 7-14-10 | 5.000 | 30 | L | PAYMENT | *GEN* | .00 | 221.50 | 886,322.15 |
| 7-14-10 | 7-14-10 | 5.000 | 30 | L | PAYMENT | *GEN* | .00 | 228.97 | 886,322.15 |
| 7-14-10 | 7-14-10 | 5.000 | 30 | R | PAYMENT | *GEN* | .00 | 2,585.10 | 886,322.15 |
| 7-30-10 | 7-31-10 | 5.000 | 30 | R | PAYMENT | *GEN* | .00 | 2,585.10 | 886,322.15 |
| 8-05-10 | 7-31-10 | 5.000 | 46 | R | PYMT REV | *GEN* | .00 | 2,585.10 | 886,322.15 |
| 8-19-10 | 8-18-10 | 5.000 | 30 | | PAYMENT | *GEN* | .00 | 155.11 | 886,322.15 |
| 8-19-10 | 8-18-10 | 5.000 | 30 | L | PAYMENT | DDA | .00 | 3,816.11 | 886,322.15 |
| 8-31-10 | 8-31-10 | 5.000 | 30 | | PAYMENT | *GEN* | .00 | 3,816.11 | 886,322.15 |
| 9-07-10 | 8-31-10 | 5.000 | 46 | R | PYMT REV | *GEN* | .00 | 228.97 | 886,322.15 |
| 9-21-10 | 9-21-10 | 5.000 | 30 | L | PAYMENT | DDA | .00 | 3,816.11 | 886,322.15 |
| 9-21-10 | 9-21-10 | 5.000 | 30 | | PAYMENT | *GEN* | .00 | 3,693.01 | 886,322.15 |
| 9-30-10 | 9-30-10 | 5.000 | 30 | R | PAYMENT | *GEN* | .00 | 3,693.01 | 886,322.15 |
| 10-06-10 | 9-30-10 | 5.000 | 46 | R | PYMT REV | *GEN* | .00 | 3,693.01 | 886,322.15 |
| 10-28-10 | 10-28-10 | 5.000 | 30 | | PAYMENT | *GEN* | .00 | 3,816.11 | 885,970.08 |
| 11-10-10 | 11-18-10 | 5.000 | 30 | | PAYMENT | *GEN* | .00 | 228.97 | 886,322.15 |
| 11-18-10 | 11-18-10 | 5.000 | 30 | L | PAYMENT | DDA | .00 | 3,693.01 | 886,322.15 |
| 11-19-10 | 11-17-10 | 5.000 | 30 | | PAYMENT | *GEN* | .00 | .00 | 885,970.08 |
| 11-19-10 | 11-17-10 | 5.000 | 30 | A | PAYMENT | *GEN* | 352.07 | .00 | 882,277.07 |
| 11-30-10 | 11-30-10 | 5.000 | 30 | A | PAYMENT | *GEN* | 3,693.01 | | 882,277.07 |
| 12-31-10 | 12-31-10 | 5.000 | 30 | R | PAYMENT | *GEN* | .00 | 3,798.06 | 882,277.07 |

2010

Exhibit J, Page 000190

CBT 20709

COMMERCIAL LOANS                                                PAGE

PROGRAM CL72030N REPORT# 1

CUSTOMER: 0166068   LOAN:  0001     SELECTION FROM:  1-01-11  TO: 12-31-11     BANK: 140 BRANCH:  17121
        NAME: INTERNATIONAL

| PROC<br>DTE | EFF<br>DTE | INT-RATE | DR A<br>CD C | TRAN<br>TYPE | TRAN<br>DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|
| 1-06-11 | 12-31-10 | 5.000 | 48 R | PYMT REV | 'GEN' | .00 | 3,798.06 | 382,277.07 |
| 1-20-11 | 1-20-11 | 5.000 | 30 | PAYMENT | 'GEN' | .00 | 3,798.06 | 382,277.07 |
| 1-20-11 | 1-20-11 | 5.000 | 30 | PAYMENT | 'GEN' | .00 | 1,225.38 | 382,277.07 |
| 2-14-11 | 2-14-11 | 5.000 | 30 A | PAYMENT | PAYOFF/DDA | 382,277.07 | 4,289.85 | .00 |

Exhibit J, Page 000191

CBT 21572

TRANSACTION HISTORY
PROGRAM CLYB001 REPORT# 1

CUSTOMER: C168068  LOAN: C004    SELECTION FROM: 1-01-08 TO: 12-31-08    BANK: 140 BRANCH:
NAME: INTERNATIONAL

| PROC DTE | EFF DTE | INT-RATE | TRA CD C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|
| 1-22-08 | 1-22-08 | 7.000 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 7,645,703.00 |
| 1-30-08 | 1-30-08 | 6.500 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 7,645,703.00 |
| 1-31-08 | 1-31-08 | 6.500 | 30 R | PAYMENT | 'GEN' | .00 | 51,024.45 | 7,645,703.00 |
| 2-01-08 | 2-01-08 | 6.500 | 40 | DISBURSE | DDA | 262,548.00 | .00 | 7,908,251.00 |
| 2-29-08 | 2-29-08 | 6.500 | 30 R | PAYMENT | 'GEN' | .00 | 39,821.32 | 7,908,251.00 |
| 3-18-08 | 3-18-08 | 5.750 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 7,908,251.00 |
| 3-31-08 | 3-31-08 | 5.750 | 30 R | PAYMENT | 'GEN' | .00 | 42,122.42 | 7,908,251.00 |
| 4-23-08 | 4-22-08 | 5.750 | 40 | DISBURSE | DDA | 405,900.00 | .00 | 8,314,151.00 |
| 4-30-08 | 4-30-08 | 5.500 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 8,314,151.00 |
| 4-30-08 | 4-30-08 | 5.500 | 30 R | PAYMENT | 'GEN' | .00 | 37,892.70 | 8,314,151.00 |
| 6-09-08 | 5-23-08 | 5.500 | 30 | PAYMENT | 1250087631 | .00 | 29,733.65 | 8,314,151.00 |
| 6-06-08 | 5-23-08 | 5.500 | 82 | RENEWAL | NY01505432 | .00 | .00 | 8,314,151.00 |
| 6-30-08 | 6-30-08 | 5.500 | 30 R | PAYMENT | 'GEN' | .00 | 43,268.27 | 8,314,151.00 |
| 7-31-08 | 7-31-08 | 5.500 | 30 R | PAYMENT | 'GEN' | .00 | 39,376.74 | 8,314,151.00 |
| 8-29-08 | 8-31-08 | 5.500 | 30 R | PAYMENT | 'GEN' | .00 | 39,376.75 | 8,314,151.00 |
| 9-30-08 | 9-30-08 | 5.500 | 30 R | PAYMENT | 'GEN' | .00 | 38,106.52 | 8,314,151.00 |
| 10-09-08 | 10-09-08 | 5.000 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 8,314,151.00 |
| 10-30-08 | 10-30-08 | 4.500 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 8,314,151.00 |
| 10-31-08 | 10-31-08 | 4.500 | 30 R | PAYMENT | 'GEN' | .00 | 36,836.31 | 8,314,151.00 |
| 11-26-08 | 11-30-08 | 4.500 | 30 R | PAYMENT | 'GEN' | .00 | 31,062.59 | 8,314,151.00 |
| 12-17-08 | 12-17-08 | 3.750 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 8,314,151.00 |
| 12-31-08 | 12-31-08 | 3.750 | 30 R | PAYMENT | 'GEN' | .00 | 29,792.38 | 8,314,151.00 |

CBT 21580

TRANSACTION HISTORY-POSTING DATE
PROGRAM CLY3000IN REPORT# 1

CUSTOMER: 0168068    LOAN:   0004        SELECTION FROM:   1-01-09  TO:  12-31-09       BANK:  140  BRANCH:   07163
NAME: INTERNATIONAL

| PROC DTE | EFF DTE | INT-RATE | TR A CD C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|
| 1-07-09 | 12-31-08 | 3.750 | 46 R | PYMT REV | 'GEN' | .00 | 29,792.38 | 8,314,151.00 |
| 1-22-09 | 1-21-09 | 3.750 | 30 | PAYMENT | 'GEN' | .00 | 29,792.38 | 8,314,151.00 |
| 1-30-09 | 1-30-09 | 3.750 | 30 A | PAYMENT | OR DDA | 230,000.00 | .00 | 8,084,151.00 |
| 1-30-09 | 1-31-09 | 3.750 | 30 | PAYMENT | 'GEN' | .00 | 26,847.77 | 8,084,151.00 |
| 1-30-09 | 1-31-09 | 3.750 | 30 L | PAYMENT | 'GEN' | .00 | 500.00 | 8,084,151.00 |
| 2-27-09 | 2-26-09 | 3.750 | 30 R | PAYMENT | 'GEN' | .00 | 23,554.82 | 8,084,151.00 |
| 3-31-09 | 3-31-09 | 3.750 | 30 R | PAYMENT | 'GEN' | .00 | 26,105.07 | 8,084,151.00 |
| 4-30-09 | 4-30-09 | 3.750 | 30 R | PAYMENT | 'GEN' | .00 | 25,262.97 | 8,084,151.00 |
| 5-29-09 | 5-15-09 | 5.000 | 82 | RENEWAL | NY01505432 | .00 | .00 | 8,084,151.00 |
| 6-09-09 | 6-09-09 | 5.000 | 30 I | PAYMENT | DDA | .00 | 500.00 | 8,084,151.00 |
| 6-09-09 | 6-09-09 | 5.000 | 30 | PAYMENT | 'GEN' | .00 | 14,315.69 | 8,084,151.00 |
| 6-30-09 | 6-30-09 | 5.000 | 30 R | PAYMENT | 'GEN' | .00 | 49,964.54 | 8,084,151.00 |
| 7-31-09 | 7-31-09 | 5.000 | 30 R | PAYMENT | 'GEN' | .00 | 34,806.76 | 8,084,151.00 |
| 8-11-09 | 8-06-09 | 5.000 | 40 | DISBURSE | LC 0029013 | 878,605.40 | .00 | 8,962,756.40 |
| 8-26-09 | 8-21-09 | 5.000 | 30 A | PAYMENT | LC 0029014 | 8,962,756.40 | 21,674.72 | .00 |
| 8-28-09 | 8-27-09 | 5.000 | 30 A | PAYMENT | LC 0029017 | .00 | 3,734.48 | .00 |

Exhibit J, Page 000193

CBT 21581

TRANSACTION HISTORY
PROGRAM CDY2001 REPORT4 ]

CUSTOMER: 0168060   LOAN: 9001     SELECTION FROM: 1-01-08 TO: 12-31-08     BANK: 140 BRANCH:
NAME: INTERNATIONAL

| PROC DTE | EFF DTE | INT-RATE | TR A CO C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|
| 4-07-08 | 4-02-08 | 5.750 | 22 | NEW LOAN | NY01905432 | .00 | .00 | .00 |
| 4-07-08 | 4-07-08 | 5.750 | 40 | DISBURSE | CREDIT DDA | 2,137,228.16 | .00 | 2,230,358.16 |
| 4-09-08 | 4-09-08 | 5.750 | 40 | DISBURSE | DDA | 93,130.00 | .00 | 2,330,358.16 |
| 4-15-08 | 4-15-08 | 5.750 | 40 | DISBURSE | DDA | 100,000.00 | .00 | 2,680,358.16 |
| 4-21-08 | 4-21-08 | 5.750 | 40 | DISBURSE | DDA | 350,000.00 | .00 | 2,836,358.16 |
| 4-29-08 | 4-29-08 | 5.750 | 40 | DISBURSE | DDA | 150,000.00 | .00 | 2,836,358.16 |
| 4-30-08 | 4-30-08 | 5.500 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 2,836,358.16 |
| 5-01-08 | 5-01-08 | 5.500 | 30 R | PAYMENT | 'GEN' | .00 | 8,775.51 | 3,055,358.16 |
| 5-20-08 | 5-20-08 | 5.500 | 40 | DISBURSE | DDA | 225,000.00 | .00 | 3,055,358.16 |
| 6-01-08 | 6-01-08 | 5.500 | 30 R | PAYMENT | 'GEN' | .00 | 14,404.66 | 3,055,358.16 |
| 7-01-08 | 7-01-08 | 5.500 | 30 R | PAYMENT | 'GEN' | .00 | 14,003.73 | 3,055,358.16 |
| 8-01-08 | 8-01-08 | 5.500 | 30 R | PAYMENT | 'GEN' | .00 | 14,470.51 | 3,055,358.16 |
| 9-01-08 | 9-01-08 | 5.500 | 30 R | PAYMENT | 'GEN' | .00 | 14,470.52 | 3,055,358.16 |
| 9-01-08 | 9-02-08 | 5.500 | 40 | DISBURSE | DDA | 175,000.00 | .00 | 3,230,358.16 |
| 10-01-08 | 10-01-08 | 5.500 | 30 R | PAYMENT | 'GEN' | .00 | 14,779.07 | 3,230,358.16 |
| 10-07-08 | 10-01-08 | 5.500 | 46 R | PYMT REV | 'GEN' | .00 | 14,779.07 | 3,230,358.16 |
| 10-09-08 | 10-09-08 | 5.000 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 3,230,358.16 |
| 10-20-08 | 10-20-08 | 5.000 | 30 | PAYMENT | 'GEN' | .00 | 14,779.07 | 3,230,358.16 |
| 10-21-08 | 10-21-08 | 5.000 | 36 Q | REVERSAL | | .00 | 500.00 | 3,230,358.16 |
| 10-30-08 | 10-30-08 | 4.500 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 3,230,358.16 |
| 11-01-08 | 11-01-08 | 4.500 | 30 R | PAYMENT | 'GEN' | .00 | 14,267.42 | 3,230,358.16 |
| 12-01-08 | 12-01-08 | 4.500 | 30 R | PAYMENT | 'GEN' | .00 | 12,024.11 | 3,230,358.16 |
| 7-08 | 12-17-08 | 3.750 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 3,230,358.16 |

Exhibit J, Page 000194

CBT 21582

TRANSACTION HISTORY-POSTING DATE
PROGRAM CLYZ001N REPORT# 1

CUSTOMER: 0163066  LOAN: 9001     SELECTION FROM: 1-01-09 TO: 12-31-09     BANK: 140 BRANCH: 01163
NAME: INTERNATIONAL

| PROC DTE | EFF DTE | INT-RATE | TP CD | A C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|---|
| 1-01-09 | 1-01-09 | 3.750 | 30 | R | PAYMENT | 'GEN' | .00 | 11,508.15 | 3,230,358.16 |
| 2-01-09 | 2-01-09 | 3.750 | 30 | R | PAYMENT | 'GEN' | .00 | 10,431.36 | 3,230,358.16 |
| 2-06-09 | 2-01-09 | 3.750 | 46 | R | PYMT REV | 'GEN' | .00 | 10,431.36 | 3,230,358.16 |
| 2-19-09 | 2-19-09 | 3.750 | 30 | | PAYMENT | 'GEN' | .00 | 10,431.36 | 3,230,358.16 |
| 3-01-09 | 3-01-09 | 3.750 | 30 | R | PAYMENT | 'GEN' | .00 | 9,421.88 | 3,230,358.16 |
| 3-01-09 | 3-01-09 | 3.750 | 30 | L | PAYMENT | 'GEN' | 00 | 500.00 | 3,230,358.16 |
| 3-06-09 | 3-01-09 | 3.750 | 46 | R | PYMT REV | 'GEN' | 00 | 9,421.88 | 3,230,358.16 |
| 3-06-09 | 3-01-09 | 3.750 | 46 | L | PYMT REV | 'GEN' | .00 | 500.00 | 3,230,358.16 |
| 3-11-09 | 3-11-09 | 3.750 | 30 | | PAYMENT | 'GEN' | .00 | 9,421.88 | 3,230,358.16 |
| 3-11-09 | 3-11-09 | 3.750 | 30 | L | PAYMENT | DDA | .00 | 500.00 | 3,230,358.16 |
| 4-27-09 | 4-07-09 | 5.000 | 82 | | RENEWAL | FY01505432 | .00 | 00 | 3,230,358.16 |
| 4-28-09 | 4-28-09 | 5.000 | 30 | A | PAYMENT | DDA | .00 | 12,450.34 | 3,230,358.16 |
| 5-01-09 | 5-01-09 | 5.000 | 30 | | PAYMENT | 'GEN' | .00 | 10,767.86 | 3,230,358.16 |
| 6-01-09 | 6-01-09 | 5.000 | 30 | R | PAYMENT | 'GEN' | .00 | 13,908.49 | 3,230,358.16 |
| 6-05-09 | 6-01-09 | 5.000 | 46 | R | PYMT REV | 'GEN' | .00 | 13,908.49 | 3,230,358.16 |
| 6-16-09 | 6-16-09 | 5.000 | 30 | | PAYMENT | 'GEN' | .00 | 13,908.49 | 3,230,358.16 |
| 7-01-09 | 7-01-09 | 5.000 | 30 | R | PAYMENT | 'GEN' | .00 | 13,459.82 | 3,230,358.16 |
| 8-01-09 | 8-01-09 | 5.000 | 30 | R | PAYMENT | 'GEN' | .00 | 13,908.49 | 3,230,358.16 |
| 9-01-09 | 9-01-09 | 5.000 | 30 | R | PAYMENT | 'GEN' | .00 | 13,908.48 | 3,230,358.16 |
| 9-08-09 | 9-01-09 | 5.000 | 46 | R | PYMT REV | 'GEN' | .00 | 13,908.48 | 3,230,358.16 |
| 9-21-09 | 9-21-09 | 5.000 | 30 | L | PAYMENT | DDA | .00 | 500.00 | 3,230,358.16 |
| 9-21-09 | 9-21-09 | 5.000 | 30 | | PAYMENT | 'GEN' | .00 | 13,908.48 | 3,230,358.16 |
| 01-09 | 10-01-09 | 5.000 | 30 | R | PAYMENT | 'GEN' | .00 | 13,459.83 | 3,230,358.16 |
| 7-09 | 10-01-09 | 5.000 | 46 | R | PYMT REV | 'GEN' | .00 | 13,459.83 | 3,230,358.16 |
| 10-15-09 | 10-15-09 | 5.000 | 30 | | PAYMENT | 'GEN' | .00 | 13,908.49 | 3,230,358.16 |
| 11-01-09 | 11-01-09 | 5.000 | 30 | R | PAYMENT | 'GEN' | .00 | 13,459.82 | 3,230,358.16 |
| 12-01-09 | 12-01-09 | 5.000 | 30 | R | PAYMENT | 'GEN' | .00 | 13,459.82 | 3,230,358.16 |
| 12-07-09 | 12-01-09 | 5.000 | 46 | R | PYMT REV | 'GEN' | .00 | 13,459.82 | 3,230,358.16 |
| 12-17-09 | 12-17-09 | 5.000 | 30 | | PAYMENT | 'GEN' | .00 | 13,459.82 | 3,230,358.16 |
| 12-28-09 | 12-28-09 | 5.000 | 36 | O | REVERSAL | | .00 | 500.00 | 3,230,358.16 |

Exhibit J, Page 000195

CBT 21583

TRANSACTION HISTORY-POSTING DATE
PROGRAM CLYZ001N REPORT# 1

CUSTOMER: 0168068   LOAN: 9001      SELECTION FROM: 1-01-10 TO: 12-31-10      BANK: 140 BRANCH: 0?16?
NAME: INTERNATIONAL

| PROC DTE | EFF DTE | INT-RATE | TR CD | A C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|---|
| 1-01-10 | 1-01-10 | 5.000 | 30 | R | PAYMENT | 'GEN' | .00 | 13,908.49 | 3,230,358.16 |
| 1-08-10 | 1-01-10 | 5.000 | 46 | R | PYMT REV | 'GEN' | .00 | 13,908.49 | 3,230,358.16 |
| 1-21-10 | 1-21-10 | 5.000 | 30 | | PAYMENT | 'GEN' | .00 | 13,908.49 | 3,230,358.16 |
| 1-21-10 | 1-21-10 | 5.000 | 30 | L | PAYMENT | DDA | .00 | 500.00 | 3,230,358.16 |
| 2-01-10 | 2-01-10 | 5.000 | 30 | R | PAYMENT | 'GEN' | .00 | 13,908.49 | 3,230,358.16 |
| 2-05-10 | 2-01-10 | 5.000 | 46 | R | PYMT REV | 'GEN' | .00 | 13,908.49 | 3,230,358.16 |
| 2-17-10 | 2-17-10 | 5.000 | 30 | | PAYMENT | 'GEN' | .00 | 13,908.49 | 3,230,358.16 |
| 3-01-10 | 3-01-10 | 5.000 | 30 | R | PAYMENT | 'GEN' | .00 | 12,562.50 | 3,230,358.16 |
| 3-05-10 | 3-01-10 | 5.000 | 46 | R | PYMT REV | 'GEN' | .00 | 12,562.50 | 3,230,358.16 |
| 3-16-10 | 3-15-10 | 5.000 | 30 | A | PAYMENT | PAYOFF | 3,230,358.16 | 18,843.75 | .00 |
| 3-16-10 | 3-16-10 | 5.000 | 36 | O | REVERSAL | | .00 | 500.00 | .00 |

Exhibit J, Page 000196

CBT 21584

TRANSACTION HISTORY
PROGRAM CLYIO001 REPORT# 1

CUSTOMER: 0166060   LOAN:  9002      SELECTION FROM:  1-01-08  TO:  12-31-08      BANK: 140  BRANCH:
NAME: INTERNATIONAL

| PROC DTE | EFF DTE | INT-RATE | TR A CD C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|
| 6-25-08 | 6-13-08 | 5.500 | 22 | NEW LOAN | NY01505432 | .00 | .00 | .00 |
| 6-25-08 | 6-25-08 | 5.500 | 40 | DISBURSE | LC#0029905 | 200,000.00 | .00 | 200,000.00 |
| 6-30-08 | 6-30-08 | 5.500 | 30 R | PAYMENT | *GEN* | .00 | 213.89 | 200,000.00 |
| 6-30-08 | 6-30-08 | 5.500 | 40 | DISBURSE | DDA | 575,000.00 | .00 | 775,000.00 |
| 7-01-08 | 7-01-08 | 5.500 | 40 | DISBURSE | DDA | 475,000.00 | .00 | 1,250,000.00 |
| 7-14-08 | 7-14-08 | 5.500 | 40 | DISBURSE | DDA | 175,000.00 | .00 | 1,425,000.00 |
| 7-31-08 | 7-31-08 | 5.500 | 30 R | PAYMENT | *GEN* | .00 | 6,302.08 | 1,425,000.00 |
| 8-06-08 | 8-06-08 | 5.500 | 40 | DISBURSE | DDA | 200,000.00 | .00 | 1,625,000.00 |
| 8-20-08 | 8-20-08 | 5.500 | 40 | DISBURSE | DDA | 260,000.00 | .00 | 1,885,000.00 |
| 8-29-08 | 8-31-08 | 5.500 | 30 R | PAYMENT | *GEN* | .00 | 7,349.79 | 1,885,000.00 |
| 9-01-08 | 9-02-08 | 5.500 | 40 | DISBURSE | DDA | 225,000.00 | .00 | 2,110,000.00 |
| 9-30-08 | 9-30-08 | 5.500 | 30 R | PAYMENT | *GEN* | .00 | 9,602.09 | 2,110,000.00 |
| 10-09-08 | 10-09-08 | 5.000 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 2,110,000.00 |
| 10-21-08 | 10-21-08 | 5.000 | 40 | DISBURSE | DDA | 200,000.00 | -.00 | 2,310,000.00 |
| 10-30-08 | 10-30-08 | 4.500 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 2,310,000.00 |
| 10-31-08 | 10-31-08 | 4.500 | 30 R | PAYMENT | *GEN* | .00 | 9,343.47 | 2,310,000.00 |
| 11-01-08 | 11-03-08 | 4.500 | 40 | DISBURSE | DDA | 300,000.00 | .00 | 2,610,000.00 |
| 11-12-08 | 11-12-08 | 4.500 | 40 | DISBURSE | DDA | 75,000.00 | .00 | 2,685,000.00 |
| 11-28-08 | 11-30-08 | 4.500 | 30 R | PAYMENT | *GEN* | .00 | 10,093.44 | 2,685,000.00 |
| 12-17-08 | 12-17-08 | 3.750 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 2,685,000.00 |
| 12-31-08 | 12-31-08 | 3.750 | 30 R | PAYMENT | *GEN* | .00 | 9,621.25 | 2,685,000.00 |

TRANSACTION HISTORY PRINTING INFO
PROGRAM CLYZ801N REPORT# 1

CUSTOMER: 0168068   LOAN: 9002   SELECTION FROM: 1-01-09 TO: 12-31-09   BANK: 140   BRANCH: 00163
NAME: INTERNATIONAL

| PROC DTE | EFF DTE | INT-RATE | TR CD | A C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|---|
| 1-06-09 | 1-06-09 | 3.750 | 40 | | DISBURSE | DDA | 125,000.00 | .00 | 2,810,000.00 |
| 1-30-09 | 1-31-09 | 3.750 | 30 | R | PAYMENT | *GEN* | .00 | 8,095.84 | 2,810,000.00 |
| 2-26-09 | 2-26-09 | 3.750 | 40 | | DISBURSE | DDA | 100,000.00 | .00 | 2,910,000.00 |
| 2-27-09 | 2-28-09 | 3.750 | 30 | R | PAYMENT | *GEN* | .00 | 8,135.83 | 2,910,000.00 |
| 3-27-09 | 3-27-09 | 3.750 | 40 | | DISBURSE | DDA | 25,000.00 | .00 | 2,935,000.00 |
| 3-31-09 | 3-31-09 | 3.750 | 30 | R | PAYMENT | *GEN* | .00 | 9,417.71 | 2,935,000.00 |
| 4-30-09 | 4-30-09 | 3.750 | 30 | R | PAYMENT | *GEN* | .00 | 9,182.29 | 2,935,000.00 |
| 5-29-09 | 5-15-09 | 5.000 | 82 | | RENEWAL | NY01305432 | .00 | .00 | 2,935,000.00 |
| 6-01-09 | 5-31-09 | 5.000 | 30 | R | PAYMENT | *GEN* | .00 | 2,445.83 | 2,935,000.00 |
| 6-01-09 | 5-31-09 | 5.000 | 30 | R | PAYMENT | *GEN* | .00 | 3,662.33 | 2,935,000.00 |
| 6-05-09 | 5-31-09 | 5.000 | 46 | R | PYMT REV | *GEN* | .00 | 2,445.83 | 2,935,000.00 |
| 6-05-09 | 5-31-09 | 5.000 | 46 | R | PYMT REV | *GEN* | .00 | 3,662.33 | 2,935,000.00 |
| 6-09-09 | 6-09-09 | 5.000 | 30 | | PAYMENT | *GEN* | .00 | 2,445.83 | 2,935,000.00 |
| 6-15-09 | 6-16-09 | 5.000 | 30 | | PAYMENT | *GEN* | .00 | 3,662.33 | 2,935,000.00 |
| 6-30-09 | 6-30-09 | 5.000 | 30 | R | PAYMENT | *GEN* | .00 | 12,229.17 | 2,935,000.00 |
| 7-31-09 | 7-31-09 | 5.000 | 30 | R | PAYMENT | *GEN* | .00 | 12,636.80 | 2,935,000.00 |
| 8-31-09 | 8-31-09 | 5.000 | 30 | R | PAYMENT | *GEN* | .00 | 12,636.81 | 2,935,000.00 |
| 9-04-09 | 8-31-09 | 5.000 | 46 | R | PYMT REV | *GEN* | .00 | 12,636.81 | 2,935,000.00 |
| 9-21-09 | 9-21-09 | 5.000 | 30 | L | PAYMENT | DDA | .00 | 500.00 | 2,935,000.00 |
| 9-21-09 | 9-21-09 | 5.000 | 30 | | PAYMENT | *GEN* | .00 | 12,636.81 | 2,935,000.00 |
| 9-30-09 | 9-30-09 | 5.000 | 30 | R | PAYMENT | *GEN* | .00 | 12,229.16 | 2,935,000.00 |
| 10-06-09 | 9-30-09 | 5.000 | 46 | R | PYMT REV | *GEN* | .00 | 12,229.16 | 2,935,000.00 |
| 10-15-09 | 10-15-09 | 5.000 | 30 | L | PAYMENT | DDA | .00 | 500.00 | 2,935,000.00 |
| 10-15-09 | 10-15-09 | 5.000 | 30 | | PAYMENT | *GEN* | .00 | 12,229.16 | 2,935,000.00 |
| 10-09 | 10-31-09 | 5.000 | 30 | R | PAYMENT | *GEN* | .00 | 12,636.81 | 2,935,000.00 |
| 11-30-09 | 11-30-09 | 5.000 | 30 | R | PAYMENT | *GEN* | .00 | 12,229.17 | 2,935,000.00 |
| 12-04-09 | 11-30-09 | 5.000 | 46 | R | PYMT REV | *GEN* | .00 | 12,229.17 | 2,935,000.00 |
| 12-17-09 | 12-17-09 | 5.000 | 30 | | PAYMENT | *GEN* | .00 | 500.00 | 2,935,000.00 |
| 12-28-09 | 12-28-09 | 5.000 | 36 | O | REVERSAL | | .00 | 12,636.80 | 2,935,000.00 |
| 12-31-09 | 12-31-09 | 5.000 | 30 | R | PAYMENT | *GEN* | .00 | 12,636.80 | 2,935,000.00 |

Exhibit J, Page 000198

CBT 21586

TRANSACTION HISTORY-PROMISE DATE
PROGRAM CLYZ0018 REPORT# 1

CUSTOMER: C165068   LOAN: 9002      SELECTION FROM:  1-01-10  TO:  12-31-10      BANK: 140  BRANCH: 33163
NAME: INTERNATIONAL

| PROC DTE | EFF DTE | INT-RATE | TR CD | A C | TRAN TYPE | TRAN DESCRIP | PRINCIPAL | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|---|
| 1-29-10 | 1-31-10 | 5.000 | 30 | R | PAYMENT | 'GEN' | .00 | 12,636.81 | 2,935,000.00 |
| 2-04-10 | 1-31-10 | 5.000 | 46 | R | PYMT REV | 'GEN' | .00 | 12,636.81 | 2,935,000.00 |
| 2-23-10 | 2-22-10 | 5.000 | 30 |  | PAYMENT | 'GEN' | .00 | 12,636.81 | 2,935,000.00 |
| 2-23-10 | 2-22-10 | 5.000 | 36 | O | REVERSAL |  | .00 | 500.50 | 2,935,000.00 |
| 2-26-10 | 2-26-10 | 5.000 | 30 | R | PAYMENT | 'GEN' | .00 | 11,413.89 | 2,935,000.00 |
| 3-04-10 | 2-26-10 | 5.000 | 46 | R | PYMT REV | 'GEN' | .00 | 11,413.89 | 1,935,000.00 |
| 3-23-10 | 3-23-10 | 5.000 | 30 |  | PAYMENT | 'GEN' | .00 | 11,413.89 | 2,935,000.00 |
| 3-23-10 | 3-23-10 | 5.000 | 30 | L | PAYMENT | DR DDA | .00 | 500.00 | 2,935,000.00 |
| 3-31-10 | 3-31-10 | 5.000 | 30 | R | PAYMENT | 'GEN' | .00 | 12,636.30 | 2,935,000.00 |
| 4-06-10 | 3-31-10 | 5.000 | 46 | R | PYMT REV | 'GEN' | .00 | 12,636.30 | 2,935,000.00 |
| 4-13-10 | 4-13-10 | 5.000 | 30 |  | PAYMENT | 'GEN' | .00 | 12,636.30 | 2,935,000.00 |
| 4-27-10 | 4-27-10 | 5.000 | 30 | A | PAYMENT | DDA | 1,464,355.00 | .00 | 1,470,645.00 |
| 4-30-10 | 4-30-10 | 5.000 | 30 | R | PAYMENT | 'GEN' | .00 | 12,229.17 | 1,470,645.00 |
| 5-04-10 | 5-04-10 | 5.000 | 30 | A | PAYMENT | DDA | 1,470,645.00 | 206.88 | .00 |

Exhibit J, Page 000199

CBT 21587

TRANSACTION HISTORY
PROGRAM CLYD001 REPORT# 1
CUSTOMER:  0169069  LOAN:  9003    SELECTION FROM:  1-01-08  TO:  12-31-08    BANK:  140  BRANCH:
NAME:  INTERNATIONAL

| PROC DTE | EFF DTE | INT-RATE | TR CD | A C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|---|
| 11-05-08 | 10-29-08 | 5.000 | 22 | | NEW LOAN | NY01505432 | .00 | .00 | .00 |
| 11-05-08 | 10-30-08 | 4.500 | 29 | | MAINT | | .00 | .00 | .00 |
| 11-06-08 | 11-06-08 | 4.500 | 40 | | DISBURSE DDA | | 200,000.00 | .00 | 200,000.00 |
| 11-10-08 | 11-10-08 | 4.500 | 40 | | DISBURSE DDA | | 150,000.00 | .00 | 350,000.00 |
| 11-19-08 | 11-19-08 | 4.500 | 40 | | DISBURSE DDA | | 825,000.00 | .00 | 1,175,000.00 |
| 12-05-08 | 12-05-08 | 4.500 | 30 | R | PAYMENT | 'GEN' | .00 | 2,643.75 | 1,175,000.00 |
| 12-08-08 | 12-09-08 | 4.500 | 40 | | DISBURSE CR DDA | | 600,000.00 | .00 | 1,775,000.00 |
| 12-17-08 | 12-17-08 | 3.750 | 29 | | MAINT | AUTO-PRIME | .00 | .00 | 1,775,000.00 |

Exhibit J, Page 000200

CBT 21588

TRANSACTION HISTORY POSTING DATA
PROGRAM CK7250IN REPORT# 1

CUSTOMER: 0169068   LOAN: 9003   SELECTION FROM: 1-01-09 TO: 12-31-09   BANK: 140 BRANCH: 07163
NAME: INTERNATIONAL

| PROC DTE | EFF DTE | INT-RATE | TR CD | A C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|---|
| 1-05-09 | 1-05-09 | 3.750 | 30 | R | PAYMENT | *GEN* | .00 | 5,950.52 | 1,775,000.00 |
| 2-05-09 | 2-05-09 | 3.750 | 30 | R | PAYMENT | *GEN* | .00 | 5,731.77 | 1,775,000.00 |
| 2-11-09 | 2-05-09 | 3.750 | 46 | R | PYMT REV | *GEN* | .00 | 5,731.77 | 1,775,000.00 |
| 2-17-09 | 2-17-09 | 3.750 | 40 | | DISBURSE | DDA | 150,000.00 | .00 | 1,925,000.00 |
| 2-18-09 | 2-18-09 | 3.750 | 30 | | PAYMENT | *GEN* | .00 | 5,731.77 | 1,925,000.00 |
| 3-05-09 | 3-05-09 | 3.750 | 30 | R | PAYMENT | *GEN* | .00 | 5,427.08 | 1,925,000.00 |
| 3-27-09 | 3-27-09 | 3.750 | 40 | | DISBURSE | DDA | 50,000.00 | .00 | 1,975,000.00 |
| 4-03-09 | 4-05-09 | 3.750 | 30 | R | PAYMENT | *GEN* | .00 | 6,216.15 | 1,975,000.00 |
| 4-09-09 | 4-05-09 | 3.750 | 46 | R | PYMT REV | *GEN* | .00 | 6,216.15 | 1,975,000.00 |
| 4-23-09 | 4-23-09 | 3.750 | 30 | | PAYMENT | *GEN* | .00 | 6,216.15 | 1,975,000.00 |
| 4-23-09 | 4-23-09 | 3.750 | 30 | L | PAYMENT | DDA | .00 | 372.97 | 1,975,000.00 |
| 5-05-09 | 5-05-09 | 3.750 | 30 | R | PAYMENT | *GEN* | .00 | 6,218.75 | 1,975,000.00 |
| 5-11-09 | 5-05-09 | 3.750 | 46 | R | PYMT REV | *GEN* | .00 | 6,218.75 | 1,975,000.00 |
| 6-05-09 | 6-05-09 | 3.750 | 30 | R | PAYMENT | *GEN* | .00 | 6,218.75 | 1,975,000.00 |
| 6-05-09 | 6-05-09 | 3.750 | 30 | R | PAYMENT | *GEN* | .00 | 158.85 | 1,975,000.00 |
| 6-11-09 | 6-05-09 | 3.750 | 46 | R | PYMT REV | *GEN* | .00 | 6,218.75 | 1,975,000.00 |
| 6-11-09 | 6-05-09 | 3.750 | 46 | R | PYMT REV | *GEN* | .00 | 158.85 | 1,975,000.00 |
| 6-16-09 | 6-16-09 | 3.750 | 20 | L | PAYMENT | DDA | .00 | 373.13 | 1,975,000.00 |
| 6-16-09 | 6-16-09 | 3.750 | 30 | | PAYMENT | *GEN* | .00 | 6,218.75 | 1,975,000.00 |
| 6-23-09 | 6-23-09 | 3.750 | 30 | L | PAYMENT | DDA | .00 | 382.66 | 1,975,000.00 |
| 6-23-09 | 6-23-09 | 3.750 | 30 | | PAYMENT | *GEN* | .00 | 6,377.60 | 1,975,000.00 |
| 7-05-09 | 7-05-09 | 3.750 | 30 | R | PAYMENT | *GEN* | .00 | 6,171.88 | 1,975,000.00 |
| 8-05-09 | 8-05-09 | 3.750 | 30 | R | PAYMENT | *GEN* | .00 | 6,377.60 | 1,975,000.00 |
| 9-05-09 | 9-05-09 | 3.750 | 30 | R | PAYMENT | *GEN* | .00 | 6,377.61 | 1,975,000.00 |
| 9-11-09 | 9-05-09 | 3.750 | 46 | R | PYMT REV | *GEN* | .00 | 6,377.61 | 1,975,000.00 |
| 9-21-09 | 9-21-09 | 3.750 | 30 | | PAYMENT | *GEN* | .00 | 6,377.61 | 1,975,000.00 |
| 9-21-09 | 9-21-09 | 3.750 | 36 | O | REVERSAL | | .00 | 382.66 | 1,975,000.00 |
| 10-05-09 | 10-05-09 | 3.750 | 30 | R | PAYMENT | *GEN* | .00 | 6,171.87 | 1,975,000.00 |
| 11-04-09 | 11-04-09 | 3.750 | 30 | A | PAYMENT | DDA | 1,975,000.00 | 6,171.88 | .00 |

Exhibit J, Page 000201

CBT 21589

PROGRAM CMX3001 REPORT# 1

CUSTOMER: 0181803  LOAN: 0001   SELECTION FROM: 1-01-08 TO: 12-31-08   BANK: 140 BRANCH:
NAME: INTERNATIONAL

| PROC DTE | EFF DTE | INT-RATE | TR A CD C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|
| 1-04-08 | 1-05-08 | 7.750 | 30 R | PAYMENT | *GEN* | .00 | 1,275.31 | 198,000.00 |
| 1-18-08 | 1-18-08 | 7.750 | 40 | DISBURSE | DDA | 11,000.00 | .00 | 245,000.00 |
| 1-22-08 | 1-22-08 | 7.000 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 245,000.00 |
| 1-30-08 | 1-30-08 | 6.500 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 245,000.00 |
| 2-05-08 | 2-05-08 | 6.500 | 30 R | PAYMENT | *GEN* | .00 | 1,409.65 | 245,000.00 |
| 3-26-08 | 3-05-08 | 5.750 | 82 | RENEWAL | NY01505432 | .00 | .00 | 245,000.00 |
| 3-18-08 | 3-18-08 | 5.750 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 245,000.00 |
| 3-26-08 | 3-26-08 | 5.750 | 30 | PAYMENT | *GEN* | .00 | 1,262.43 | 245,000.00 |
| 4-21-08 | 4-21-08 | 5.750 | 30 | PAYMENT | *GEN* | .00 | 1,213.09 | 245,000.00 |
| 4-30-08 | 4-30-08 | 5.500 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 245,000.00 |
| 5-05-08 | 5-05-08 | 5.500 | 30 R | PAYMENT | *GEN* | .00 | 1,173.36 | 245,000.00 |
| 6-05-08 | 6-05-08 | 5.500 | 30 R | PAYMENT | *GEN* | .00 | 1,151.84 | 245,000.00 |
| 7-03-08 | 7-05-08 | 5.500 | 30 R | PAYMENT | *GEN* | .00 | 1,122.91 | 245,000.00 |
| 8-05-08 | 8-05-08 | 5.500 | 30 R | PAYMENT | *GEN* | .00 | 1,160.35 | 245,000.00 |
| 9-05-08 | 9-05-08 | 5.500 | 30 R | PAYMENT | *GEN* | .00 | 1,160.35 | 245,000.00 |
| 10-03-08 | 10-05-08 | 5.500 | 30 R | PAYMENT | *GEN* | .00 | 1,122.92 | 245,000.00 |
| 10-09-08 | 10-05-08 | 5.500 | 46 R | PYMT REV | *GEN* | .00 | 1,122.92 | 245,000.00 |
| 10-09-08 | 10-09-08 | 5.000 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 245,000.00 |
| 10-20-08 | 10-20-08 | 5.000 | 30 | PAYMENT | *GEN* | .00 | 1,122.92 | 245,000.00 |
| 10-30-08 | 10-30-08 | 4.500 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 245,000.00 |
| 11-05-08 | 11-05-08 | 4.500 | 30 R | PAYMENT | *GEN* | .00 | 1,068.47 | 245,000.00 |
| 12-05-08 | 12-05-08 | 4.500 | 30 R | PAYMENT | *GEN* | .00 | 693.33 | 245,000.00 |
| 12-17-08 | 12-17-08 | 3.750 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 245,000.00 |

Exhibit J, Page 000202

CBT 21597

PROGRAM CLTLOAN REPORT# 1

CUSTOMER: J181303   LOAN:  0001      SELECTION FROM:  1-01-09  TO:  12-31-09      BANK:  140  BRANCH:  17163
NAME:  INTERNATIONAL

| PROC DTE | EFF DTE | INT-RATE | TR CD | A C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|---|
| 1-05-09 | 1-05-09 | 3.750 | 30 | P | PAYMENT | *GEN* | .00 | 952.40 | 245,000.00 |
| 2-05-09 | 2-05-09 | 3.750 | 30 | F | PAYMENT | *GEN* | .00 | 791.14 | 245,000.00 |
| 2-17-09 | 2-17-09 | 3.750 | 30 | A | PAYMENT | PDA | 245,000.00 | 306.25 | .00 |

Exhibit J, Page 000203

CBT 21598

PROGRAM CUTOUT REPORT: 1

CUSTOMER: 0161903  LOAN:  0003    SELECTION FROM:  1-01-08  TO:  12-31-08    BANK: 140  BRANCH:
NAME: INTERNATIONAL

| PROC DTE | EFF DTE | INT-RATE | TR CD | A C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|---|
| 1-22-08 | 1-22-08 | 7.000 | 29 | | MAINT | AUTO-PRIME | .00 | .00 | 1,991,933.69 |
| 1-30-08 | 1-30-08 | 6.500 | 29 | | MAINT | AUTO-PRIME | .00 | .00 | 1,991,933.69 |
| 2-28-08 | 2-22-08 | 6.500 | 82 | | RENEWAL | NY01505432 | .00 | .00 | 1,991,933.69 |
| 2-29-05 | 2-29-08 | 6.500 | 30 | | PAYMENT | LC 0012175 | .00 | 20,904.64 | 1,991,933.69 |
| 3-18-08 | 3-18-08 | 5.750 | 29 | | MAINT | AUTO-PRIME | .00 | .00 | 1,991,933.69 |
| 3-31-08 | 3-31-08 | 5.750 | 30 R | | PAYMENT | 'GEN' | .00 | 13,127.39 | 1,991,933.69 |
| 3-31-08 | 3-31-08 | 5.750 | 40 | | DISBURSE | DDA | 93,387.83 | .00 | 2,085,321.52 |
| 4-30-08 | 4-30-08 | 5.500 | 29 | | MAINT | AUTO-PRIME | .00 | .00 | 2,085,321.52 |
| 4-30-08 | 4-30-08 | 5.500 | 30 R | | PAYMENT | 'GEN' | .00 | 9,992.17 | 2,085,321.52 |
| 5-30-08 | 5-31-08 | 5.500 | 30 R | | PAYMENT | 'GEN' | .00 | 9,876.31 | 2,085,321.52 |
| 6-30-08 | 6-30-08 | 5.500 | 30 R | | PAYMENT | 'GEN' | .00 | 9,557.73 | 2,085,321.52 |
| 7-31-08 | 7-31-08 | 5.500 | 30 R | | PAYMENT | 'GEN' | .00 | 9,876.31 | 2,085,321.52 |
| 8-29-08 | 8-31-08 | 5.500 | 30 R | | PAYMENT | 'GEN' | .00 | 9,876.31 | 2,085,321.52 |
| 9-30-08 | 9-30-08 | 5.500 | 30 R | | PAYMENT | 'GEN' | .00 | 9,557.73 | 2,085,321.52 |
| 10-09-08 | 10-09-08 | 5.000 | 29 | | MAINT | AUTO-PRIME | .00 | .00 | 2,085,321.52 |
| 10-30-08 | 10-30-08 | 4.500 | 29 | | MAINT | AUTO-PRIME | .00 | .00 | 2,085,321.52 |
| 10-31-08 | 10-31-08 | 4.500 | 30 R | | PAYMENT | 'GEN' | .00 | 9,239.13 | 2,085,321.52 |
| 11-29-08 | 11-30-08 | 4.500 | 30 R | | PAYMENT | 'GEN' | .00 | 7,791.00 | 2,085,321.52 |
| 12-17-08 | 12-17-08 | 3.750 | 29 | | MAINT | AUTO-PRIME | .00 | .00 | 2,085,321.52 |
| 12-29-08 | 12-29-08 | 3.750 | 30 A | | PAYMENT | DDA | 136,610.97 | .00 | 1,948,710.55 |
| 12-31-08 | 12-31-08 | 3.750 | 30 R | | PAYMENT | 'GEN' | .00 | 7,472.40 | 1,948,710.55 |

Exhibit J, Page 000204

CBT 21604

COMMERCIAL LOANS

PROGRAM CLYS0001W REPORT# 1

CUSTOMER: 0191803   LOAN:  0003      SELECTION FROM:  1-01-09  TO:  12-31-09      BANK:  140  BRANCH:  07153
NAME:  INTERNATIONAL

| PROC DTE | EFF DTE | INT-RATE | TR A CD C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|
| 1-13-09 | 1-05-09 | 5.000 | 62 | RENEWAL | NY01585432 | .00 | .00 | 1,948,710.55 |
| 2-01-09 | 2-02-09 | 5.000 | 30 | PAYMENT | 'GEN' | .00 | 4,505.00 | 1,948,710.55 |
| 2-18-09 | 2-18-09 | 5.000 | 30 R PAYMENT | | 'GEN' | .00 | 8,390.28 | 1,948,710.55 |
| 2-24-09 | 2-18-09 | 5.000 | 46 R PYMT REV | | 'GEN' | .00 | 8,390.28 | 1,948,710.55 |
| 3-05-09 | 3-03-09 | 5.000 | 30 | PAYMENT | 'GEN' | .00 | 8,390.28 | 1,948,710.55 |
| 3-18-09 | 3-18-09 | 5.000 | 30 R PAYMENT | | 'GEN' | .00 | 7,578.32 | 1,948,710.55 |
| 4-17-09 | 4-18-09 | 5.000 | 30 R PAYMENT | | 'GEN' | .00 | 8,390.28 | 1,948,710.55 |
| 4-23-09 | 4-18-09 | 5.000 | 46 R PYMT REV | | 'GEN' | .00 | 8,390.28 | 1,948,710.55 |
| 5-13-09 | 5-13-09 | 5.000 | 30 L PAYMENT | | DDA | .00 | 500.00 | 1,948,710.55 |
| 5-13-09 | 5-13-09 | 5.000 | 30 | PAYMENT | 'GEN' | .00 | 8,390.28 | 1,948,710.55 |
| 5-18-09 | 5-18-09 | 5.000 | 30 R PAYMENT | | 'GEN' | .00 | 8,119.62 | 1,948,710.55 |
| 6-13-09 | 6-18-09 | 5.000 | 30 R PAYMENT | | 'GEN' | .00 | 8,390.29 | 1,948,710.55 |
| 7-17-09 | 7-18-09 | 5.000 | 30 R PAYMENT | | 'GEN' | .00 | 8,119.62 | 1,948,710.55 |
| 8-18-09 | 8-18-09 | 5.000 | 30 R PAYMENT | | 'GEN' | .00 | 8,390.28 | 1,948,710.55 |
| 9-18-09 | 9-18-09 | 5.000 | 30 R PAYMENT | | 'GEN' | .00 | 8,390.29 | 1,948,710.55 |
| 10-16-09 | 10-18-09 | 5.000 | 30 R PAYMENT | | 'GEN' | .00 | 8,119.62 | 1,948,710.55 |
| 10-22-09 | 10-18-09 | 5.000 | 46 R PYMT REV | | 'GEN' | .00 | 8,119.62 | 1,948,710.55 |
| 11-04-09 | 11-03-09 | 5.000 | 30 | PAYMENT | 'GEN' | .00 | 8,119.62 | 1,948,710.55 |
| 11-13-09 | 11-18-09 | 5.000 | 30 R PAYMENT | | 'GEN' | .00 | 8,390.28 | 1,948,710.55 |
| 11-24-09 | 11-18-09 | 5.000 | 46 R PYMT REV | | 'GEN' | .00 | 8,390.28 | 1,948,710.55 |
| 12-11-09 | 12-11-09 | 5.000 | 36 O REVERSAL | | LC/WAIVED | .00 | 500.00 | 1,948,710.55 |
| 12-15-09 | 12-14-09 | 5.000 | 30 | PAYMENT | 'GEN' | .00 | 8,390.28 | 1,948,710.55 |
| 12-17-09 | 12-17-09 | 5.000 | 30 | PAYMENT | 'GEN' | .00 | 8,119.63 | 1,948,710.55 |
| -8-09 | 12-18-09 | 5.000 | 30 L PAYMENT | | 'GEN' | .00 | 487.18 | 1,948,710.55 |
| 18-09 | 12-18-09 | 5.000 | 30 A PAYMENT | | 'GEN' | 7,632.45 | .00 | 1,941,078.10 |

Exhibit J, Page 000205

CBT 21605

PROGRAM CLYIOO1A REPORT# 1

CUSTOMER: 0121305  LOAN:  9003    SELECTION  FROM:  1-01-10  TO:  12-31-10    BANK:  140  BRANCH:  00163
             NAME:  INTERNATIONAL

| PROC DTE | EFF DTE | INT-RATE | TR CD | A C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|----------|---------|----------|-------|-----|-----------|---------------|-----------|----------|--------------|
| 1-26-10 | 1-26-10 | 5.000 | 30 | A | PAYMENT | DDA | 1,341,678.10 | 10,514.17 | 00 |

Exhibit J, Page 000206

CBT 21606

PROGRAM CLY2001 REPORT# 1

CUSTOMER: 9181903   LOAN:  0004    SELECTION FROM: 1-01-08 TO: 12-31-08    BANK: 140  BRANCH:
NAME: INTERNATIONAL

| PROC DTE | EFF DTE | INT-RATE | TR A CD C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|
| 1-18-08 | 1-18-08 | 7.750 | 40 | DISBURSE | DDA | 15,000.00 | .00 | 295,000.00 |
| 1-22-08 | 1-22-08 | 7.000 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 295,000.00 |
| 1-30-08 | 1-30-08 | 6.500 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 295,000.00 |
| 1-31-08 | 1-31-08 | 6.500 | 30 R | PAYMENT | 'GEN' | .00 | 1,908.64 | 295,000.00 |
| 2-29-08 | 2-29-08 | 6.500 | 30 R | PAYMENT | 'GEN' | .00 | 1,485.24 | 295,000.00 |
| 3-18-08 | 3-18-08 | 5.750 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 295,000.00 |
| 3-31-08 | 3-31-08 | 5.750 | 30 R | PAYMENT | 'GEN' | .00 | 1,571.29 | 295,000.00 |
| 4-30-08 | 4-30-08 | 5.500 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 295,000.00 |
| 4-30-08 | 4-30-08 | 5.500 | 30 R | PAYMENT | 'GEN' | .00 | 1,413.54 | 295,000.00 |
| 5-30-08 | 5-31-08 | 5.500 | 30 R | PAYMENT | 'GEN' | .00 | 1,397.15 | 295,000.00 |
| 6-30-08 | 6-30-08 | 5.500 | 30 R | PAYMENT | 'GEN' | .00 | 1,352.08 | 295,000.00 |
| 7-31-08 | 7-31-08 | 5.500 | 30 R | PAYMENT | 'GEN' | .00 | 1,397.16 | 295,000.00 |
| 8-29-08 | 8-31-08 | 5.500 | 30 R | PAYMENT | 'GEN' | .00 | 1,397.15 | 295,000.00 |
| 9-30-08 | 9-30-08 | 5.500 | 30 R | PAYMENT | 'GEN' | .00 | 1,352.08 | 295,000.00 |
| 10-09-08 | 10-09-08 | 5.000 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 295,000.00 |
| 10-30-08 | 10-30-08 | 4.500 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 295,000.00 |
| 10-31-08 | 10-31-08 | 4.500 | 30 R | PAYMENT | 'GEN' | .00 | 1,307.02 | 295,000.00 |
| 11-30-08 | 11-30-08 | 4.500 | 30 R | PAYMENT | 'GEN' | .00 | 1,102.15 | 295,000.00 |
| 12-29-08 | 12-16-08 | 4.500 | 32 | RENEWAL | NY01505432 | .00 | .00 | 295,000.00 |
| 12-17-08 | 12-17-08 | 3.750 | 29 | MAINT | AUTO-PRIME | .00 | .00 | -295,000.00 |
| 12-29-08 | 12-17-08 | 3.750 | 29 | MAINT | | .00 | .00 | 295,000.00 |
| 12-29-08 | 12-17-08 | 3.750 | 29 | MAINT | | .00 | .00 | 295,000.00 |
| 12-29-08 | 12-26-08 | 3.750 | 30 A | PAYMENT | DDA | .00 | 590.00 | 295,000.00 |
| 31-08 | 12-31-08 | 3.750 | 30 R | PAYMENT | 'GEN' | .00 | 467.08 | 295,000.00 |

Exhibit J, Page 000207

CBT 21613

PROGRAM CLYBODIN REPORTS

CUSTOMER: 0181803  LOAN: 0004    SELECTION FROM: 1-01-09 TO: 12-31-09    BANK: 140 BRANCH: 07.63
NAME: INTERNATIONAL

| PROC DTE | EFF DTE | INT-RATE | TR A CD C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|
| 1-30-09 | 1-31-09 | 3.750 | 30 R | PAYMENT | 'GEN' | .00 | 952.61 | 295,000.00 |
| 2-27-09 | 2-28-09 | 3.750 | 30 R | PAYMENT | 'GEN' | .00 | 860.41 | 295,000.00 |
| 3-31-09 | 3-31-09 | 3.750 | 30 R | PAYMENT | 'GEN' | .00 | 952.61 | 295,000.00 |
| 4-30-09 | 4-30-09 | 3.750 | 30 R | PAYMENT | 'GEN' | .00 | 921.87 | 295,000.00 |
| 5-29-09 | 5-31-09 | 3.750 | 30 R | PAYMENT | 'GEN' | .00 | 952.61 | 295,000.00 |
| 6-30-09 | 6-30-09 | 3.750 | 30 R | PAYMENT | 'GEN' | .00 | 921.87 | 295,000.00 |
| 7-31-09 | 7-31-09 | 3.750 | 30 R | PAYMENT | 'GEN' | .00 | 952.61 | 295,000.00 |
| 8-31-09 | 8-31-09 | 3.750 | 30 R | PAYMENT | 'GEN' | .00 | 952.60 | 295,000.00 |
| 9-30-09 | 9-30-09 | 3.750 | 30 R | PAYMENT | 'GEN' | .00 | 921.88 | 295,000.00 |
| 10-30-09 | 10-31-09 | 3.750 | 30 R | PAYMENT | 'GEN' | .00 | 952.60 | 295,000.00 |
| 11-30-09 | 11-30-09 | 3.750 | 30 R | PAYMENT | 'GEN' | .00 | 921.88 | 295,000.00 |
| 12-17-09 | 12-17-09 | 3.750 | 30 A | PAYMENT | DDA | 295,000.00 | 522.39 | .00 |

Exhibit J, Page 000208

CBT 21614

PROGRAM CLV5001 REPORT5 1

CUSTOMER: 0191603   LOAN: 9601   SELECTION FROM: 1-01-08 TO: 12-31-08   BANK: 140 BRANCH:
NAME: INTERNATIONAL

| PROC DTE | EFF DTE | INT-RATE | TR A CD C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|
| 1-04-08 | 1-05-08 | 7.750 | 30 R | PAYMENT | 'GEN' | .00 | 3,693.41 | 550,000.00 |
| 1-18-08 | 1-18-08 | 7.750 | 40 | DISBURSE | DOA | 45,000.00 | .00 | 595,000.00 |
| 1-22-08 | 1-22-08 | 7.000 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 595,000.00 |
| 1-30-08 | 1-30-08 | 6.500 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 595,000.00 |
| 2-05-08 | 2-05-08 | 6.500 | 30 R | PAYMENT | 'GEN' | .00 | 3,571.32 | 595,000.00 |
| 3-05-08 | 3-05-08 | 6.500 | 30 R | PAYMENT | 'GEN' | .00 | 3,065.90 | 595,000.00 |
| 3-18-08 | 3-18-08 | 5.750 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 595,000.00 |
| 4-04-08 | 4-05-08 | 5.750 | 30 R | PAYMENT | 'GEN' | .00 | 3,107.22 | 595,000.00 |
| 4-30-08 | 4-30-08 | 5.500 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 595,000.00 |
| 5-05-08 | 5-05-08 | 5.500 | 30 R | PAYMENT | 'GEN' | .00 | 2,851.04 | 595,000.00 |
| 6-05-08 | 6-05-08 | 5.500 | 30 R | PAYMENT | 'GEN' | .00 | 2,797.53 | 595,000.00 |
| 7-03-08 | 7-05-08 | 5.500 | 30 R | PAYMENT | 'GEN' | .00 | 2,727.08 | 595,000.00 |
| 8-05-08 | 8-05-08 | 5.500 | 30 R | PAYMENT | 'GEN' | .00 | 2,817.99 | 595,000.00 |
| 9-30-08 | 9-15-08 | 5.500 | 30 A | PAYMENT | 1250087631 | .00 | 3,727.01 | 595,000.00 |
| 9-30-08 | 9-15-08 | 5.500 | 82 | RENEWAL | NY01505432 | .00 | .00 | 595,000.00 |
| 10-09-08 | 10-09-08 | 5.000 | 29 | MAINT | AUTO-PRIME | .00 | 2,727.09 | 595,000.00 |
| 10-29-08 | 10-29-08 | 5.000 | 30 | PAYMENT | 'GEN' | .00 | .00 | 595,000.00 |
| 10-30-08 | 10-30-08 | 4.500 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 595,000.00 |
| 11-05-08 | 11-05-08 | 4.500 | 30 R | PAYMENT | 'GEN' | .00 | 1,585.83 | 595,000.00 |
| 12-05-08 | 12-05-08 | 4.500 | 30 R | PAYMENT | 'GEN' | .00 | 2,181.67 | 595,000.00 |
| 12-17-08 | 12-17-08 | 3.750 | 29 | MAINT | AUTO-PRIME | .00 | .00 | 595,000.00 |

Exhibit J, Page 000209

CBT 21616

PROGRAM CL730011N REPORT# 1
CUSTOMER: 0181603  LOAN: 3001   SELECTION FROM:  1-01-09  TO: 12-31-09   BANK: 140  BRANCH: 07163
NAME: INTERNATIONAL

| PROC DTE | EFF DTE | INT-RATE | TR CD | A C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|---|
| 1-05-09 | 1-05-09 | 3.750 | 30 | R | PAYMENT | 'GEN' | .00 | 2,570.16 | 595,000.00 |
| 2-05-09 | 2-05-09 | 3.750 | 30 | R | PAYMENT | 'GEN' | .00 | 1,921.35 | 595,000.00 |
| 3-05-09 | 3-05-09 | 3.750 | 30 | R | PAYMENT | 'GEN' | .00 | 1,735.42 | 595,000.00 |
| 4-03-09 | 4-05-09 | 3.750 | 30 | R | PAYMENT | 'GEN' | .00 | 1,921.35 | 595,000.00 |
| 5-05-09 | 5-05-09 | 3.750 | 30 | R | PAYMENT | 'GEN' | .00 | 1,859.38 | 595,000.00 |
| 5-11-09 | 5-05-09 | 3.750 | 46 | R | PYMT REV | 'GEN' | .00 | 1,859.38 | 595,000.00 |
| 5-19-09 | 5-19-09 | 3.750 | 30 |  | PAYMENT | 'GEN' | .00 | 1,859.38 | 595,000.00 |
| 6-05-09 | 6-05-09 | 3.750 | 30 | R | PAYMENT | 'GEN' | .00 | 1,921.35 | 595,000.00 |
| 7-03-09 | 7-05-09 | 3.750 | 30 | R | PAYMENT | 'GEN' | .00 | 1,859.38 | 595,000.00 |
| 8-05-09 | 8-05-09 | 3.750 | 30 | R | PAYMENT | 'GEN' | .00 | 1,921.35 | 595,000.00 |
| 9-09-09 | 9-09-09 | 5.900 | 82 |  | RENEWAL | N701505432 | .00 | .00 | 595,000.00 |
| 9-30-09 | 9-30-09 | 5.900 | 30 |  | PAYMENT | 'GEN' | .00 | 1,921.36 | 595,000.00 |
| 9-30-09 | 9-30-09 | 5.000 | 30 |  | PAYMENT | 'GEN' | .00 | 247.91 | 595,000.00 |
| 10-05-09 | 10-05-09 | 5.000 | 30 |  | PAYMENT | 'GEN' | .00 | 2,148.62 | 595,000.00 |
| 10-05-09 | 10-05-09 | 5.000 | 30 |  | PAYMENT | 'GEN' | 10,000.00 | .00 | 585,000.00 |
| 10-13-09 | 10-05-09 | 5.000 | 16 |  | PYMT REV | 'GEN' | .00 | 2,148.62 | 585,000.00 |
| 10-13-09 | 10-05-09 | 5.000 | 46 | R | PYMT REV | 'GEN' | 10,000.00 | .00 | 595,000.00 |
| 10-19-09 | 10-19-09 | 5.000 | 30 |  | PAYMENT | 'GEN' | .00 | 2,148.62 | 595,000.00 |
| 10-19-09 | 10-19-09 | 5.000 | 30 |  | PAYMENT | 'GEN' | 10,000.00 | .00 | 585,000.00 |
| 11-05-09 | 11-05-09 | 6.000 | 30 | R | PAYMENT | 'GEN' | .00 | 2,538.19 | 585,000.00 |
| 11-05-09 | 11-05-09 | 5.000 | 30 | R | PAYMENT | 'GEN' | 10,000.00 | .00 | 575,000.00 |
| 11-12-09 | 11-05-09 | 5.000 | 46 | R | PYMT REV | 'GEN' | .00 | 2,538.19 | 585,000.00 |
| 11-12-09 | 11-05-09 | 5.000 | 46 | R | PYMT REV | 'GEN' | 10,000.00 | .00 | 585,000.00 |
| 7-09 | 11-17-09 | 5.000 | 30 |  | PAYMENT | 'GEN' | .00 | 2,538.19 | 585,000.00 |
| 17-09 | 11-17-09 | 5.000 | 30 |  | PAYMENT | 'GEN' | 10,000.00 | .00 | 575,000.00 |
| 12-04-09 | 12-05-09 | 5.000 | 30 | R | PAYMENT | 'GEN' | .00 | 2,412.50 | 575,000.00 |
| 12-04-09 | 12-05-09 | 5.000 | 30 | R | PAYMENT | 'GEN' | 10,000.00 | .00 | 565,000.00 |
| 12-10-09 | 12-05-09 | 5.000 | 46 | R | PYMT REV | 'GEN' | .00 | 2,412.50 | 565,000.00 |
| 12-10-09 | 12-05-09 | 5.000 | 46 | R | PYMT REV | 'GEN' | 10,000.00 | .00 | 575,000.00 |
| 12-17-09 | 12-17-09 | 5.000 | 30 |  | PAYMENT | 'GEN' | .00 | 2,412.50 | 575,000.00 |
| 12-17-09 | 12-17-09 | 5.000 | 30 |  | PAYMENT | 'GEN' | 10,000.00 | .00 | 565,000.00 |

PROGRAM CLYDOUIN REPORT# J

CUSTOMER: 0181803  LOAN: 9001    SELECTION FROM: 1-01-10 TO: 12-31-10     BANK: 149 BRANCH: 07163
NAME: INTERNATIONAL

| PROC DTE | EFF DTE | INT-RATE | TR A CD C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|
| 1-05-10 | 1-05-10 | 5.000 | 30 R | PAYMENT | 'GEN' | .00 | 2,449.31 | 565,000.00 |
| 1-05-10 | 1-05-10 | 5.000 | 30 R | PAYMENT | 'GEN' | 10,000.00 | .00 | 555,000.00 |
| 1-21-10 | 1-05-10 | 5.000 | 46 R | PYMT REV | 'GEN' | .00 | 2,449.31 | 555,000.00 |
| 1-11-10 | 1-05-10 | 5.000 | 46 R | PYMT REV | 'GEN' | 10,000.00 | .00 | 565,000.00 |
| 1-21-10 | 1-21-10 | 5.000 | 30 L | PAYMENT | DDA | .00 | 500.00 | 565,000.00 |
| 1-21-10 | 1-21-10 | 5.000 | 30 | PAYMENT | 'GEN' | .00 | 2,449.31 | 565,000.00 |
| 1-21-10 | 1-21-10 | 5.000 | 30 | PAYMENT | 'GEN' | 10,000.00 | .00 | 555,000.00 |
| 2-05-10 | 2-05-10 | 5.000 | 30 R | PAYMENT | 'GEN' | .00 | 2,411.80 | 555,000.00 |
| 2-05-10 | 2-05-10 | 5.000 | 30 R | PAYMENT | 'GEN' | 10,000.00 | .00 | 545,000.00 |
| 2-11-10 | 2-05-10 | 5.000 | 46 R | PYMT REV | 'GEN' | .00 | 2,411.80 | 545,000.00 |
| 2-11-10 | 2-05-10 | 5.000 | 46 R | PYMT REV | 'GEN' | 10,000.00 | .00 | 555,000.00 |
| 2-17-10 | 2-17-10 | 5.000 | 30 | PAYMENT | 'GEN' | .00 | 2,411.80 | 555,000.00 |
| 2-17-10 | 2-17-10 | 5.000 | 30 | PAYMENT | 'GEN' | 10,000.00 | .00 | 545,000.00 |
| 3-05-10 | 3-05-10 | 5.000 | 30 R | PAYMENT | 'GEN' | .00 | 2,136.11 | 545,000.00 |
| 3-05-10 | 3-05-10 | 5.000 | 30 R | PAYMENT | 'GEN' | 10,000.00 | .00 | 535,000.00 |
| 3-11-10 | 3-05-10 | 5.000 | 46 R | PYMT REV | 'GEN' | .00 | 2,136.11 | 535,000.00 |
| 3-11-10 | 3-05-10 | 5.000 | 46 R | PYMT REV | 'GEN' | 10,000.00 | .00 | 545,000.00 |
| 3-23-10 | 3-23-10 | 5.000 | 30 | PAYMENT | 'GEN' | .00 | 2,136.11 | 545,000.00 |
| 3-23-10 | 3-23-10 | 5.000 | 30 | PAYMENT | 'GEN' | 10,000.00 | .00 | 535,000.00 |
| 3-23-10 | 3-23-10 | 5.000 | 30 L | PAYMENT | DR DDA | .00 | 500.00 | 535,000.00 |
| 4-05-10 | 4-05-10 | 5.000 | 30 R | PAYMENT | 'GEN' | .00 | 2,328.47 | 535,000.00 |
| 4-05-10 | 4-05-10 | 5.000 | 30 R | PAYMENT | 'GEN' | 10,000.00 | .00 | 525,000.00 |
| 4-09 | 4-05-10 | 5.000 | 46 R | PYMT REV | 'GEN' | .00 | 2,328.47 | 525,000.00 |
| 4-10 | 4-05-10 | 5.000 | 46 R | PYMT REV | 'GEN' | 10,000.00 | .00 | 535,000.00 |
| 4-21-10 | 4-21-10 | 5.000 | 30 L | PAYMENT | DDA | .00 | 500.00 | 535,000.00 |
| 4-21-10 | 4-21-10 | 5.000 | 30 | PAYMENT | 'GEN' | .00 | 2,328.47 | 535,000.00 |
| 4-21-10 | 4-21-10 | 5.000 | 30 | PAYMENT | 'GEN' | 10,000.00 | .00 | 525,000.00 |
| 5-05-10 | 5-05-10 | 5.000 | 30 R | PAYMENT | 'GEN' | .00 | 2,209.73 | 525,000.00 |
| 5-05-10 | 5-05-10 | 5.000 | 30 R | PAYMENT | 'GEN' | 10,000.00 | .00 | 515,000.00 |
| 6-04-10 | 6-05-10 | 5.000 | 30 R | PAYMENT | 'GEN' | .00 | 2,217.36 | 515,000.00 |
| 6-04-10 | 6-05-10 | 5.000 | 30 R | PAYMENT | 'GEN' | 10,000.00 | .00 | 505,000.00 |
| 6-10-10 | 6-05-10 | 5.000 | 46 R | PYMT REV | 'GEN' | .00 | 2,217.36 | 505,000.00 |
| 6-10-10 | 6-05-10 | 5.000 | 46 R | PYMT REV | 'GEN' | 10,000.00 | .00 | 515,000.00 |
| 6-22-10 | 6-22-10 | 5.000 | 30 L | PAYMENT | DDA | .00 | 500.00 | 515,000.00 |
| 6-22-10 | 6-22-10 | 5.000 | 30 | PAYMENT | 'GEN' | .00 | 2,217.36 | 515,000.00 |
| 6-22-10 | 6-22-10 | 5.000 | 30 | PAYMENT | 'GEN' | 10,000.00 | .00 | 505,000.00 |
| 7-02-10 | 7-05-10 | 5.000 | 30 R | PAYMENT | 'GEN' | .00 | 2,127.78 | 505,000.00 |
| 7-02-10 | 7-05-10 | 5.000 | 30 R | PAYMENT | 'GEN' | 10,000.00 | .00 | 495,000.00 |
| 7-09-10 | 7-05-10 | 5.000 | 46 R | PYMT REV | 'GEN' | .00 | 2,127.78 | 495,000.00 |
| 7-09-10 | 7-05-10 | 5.000 | 46 R | PYMT REV | 'GEN' | 10,000.00 | .00 | 505,000.00 |
| 7-16-10 | 7-16-10 | 5.000 | 30 | PAYMENT | 'GEN' | .00 | 2,127.78 | 505,000.00 |
| 7-16-10 | 7-16-10 | 5.000 | 30 | PAYMENT | 'GEN' | 10,000.00 | .00 | 495,000.00 |
| 8-05-10 | 8-05-10 | 5.000 | 30 R | PAYMENT | 'GEN' | .00 | 2,146.52 | 495,000.00 |
| 8-05-10 | 8-05-10 | 5.000 | 30 R | PAYMENT | 'GEN' | 10,000.00 | .00 | 485,000.00 |
| 8-11-10 | 8-05-10 | 5.000 | 46 R | PYMT REV | 'GEN' | .00 | 2,146.52 | 485,000.00 |

```
                              PROGRAM CLY2001N REPORTS 1
CUSTOMER: 0181803  LOAN: 9001        SELECTION FROM: 1-01-10 TO: 12-31-10    BANK: 140 BRANCH:  07163
          NAME: INTERNATIONAL
```

| PROC DTE | EFF DTE | INT-RATE | TR CD | A C | TRAN TYPE | TRAN DESCRIPT | PRINCIPAL | INTEREST | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|---|
| 9-11-10 | 9-05-10 | 5.000 | 46 | R | PYMT REV | *GEN* | 10,000.00 | .00 | 495,000.00 |
| 9-18-10 | 9-18-10 | 5.000 | 30 | | PAYMENT | *GEN* | .00 | 2,146.52 | 495,000.00 |
| 9-18-10 | 9-18-10 | 5.000 | 30 | | PAYMENT | *GEN* | 10,000.00 | .00 | 485,000.00 |
| 9-21-10 | 9-13-10 | 5.000 | 82 | | RENEWAL | NY01505432 | .00 | .00 | 485,000.00 |
| 9-21-10 | 9-21-10 | 5.000 | 30 | | PAYMENT | *GEN* | .00 | 2,106.25 | 485,000.00 |
| 10-05-10 | 10-05-10 | 5.000 | 30 | R | PAYMENT | *GEN* | .00 | 2,020.84 | 485,000.00 |
| 10-05-10 | 10-05-10 | 5.000 | 30 | R | PAYMENT | *GEN* | 10,000.00 | .00 | 475,000.00 |
| 10-12-10 | 10-05-10 | 5.000 | 46 | R | PYMT REV | *GEN* | .00 | 2,020.84 | 475,000.00 |
| 10-12-10 | 10-05-10 | 5.000 | 46 | R | PYMT REV | *GEN* | 10,000.00 | .00 | 485,000.00 |
| 11-17-10 | 11-17-10 | 5.000 | 30 | L | PAYMENT | 1250087631 | .00 | 500.00 | 485,000.00 |
| 11-17-10 | 11-17-10 | 5.000 | 30 | A | PAYMENT | 1250087631 | 485,000.00 | 4,917.36 | .00 |

Exhibit J, Page 000212

CBT 21619

# EXHIBIT K

**Statement of Accounts**
Page 1 of 2
This Statement: January 31, 2008
Last Statement: December 31, 2007

Account    7631

**DIRECT INQUIRIES TO:**
Customer Service  1 (800) 400-6080

0029509          4031-06-0230-CBT-PG0019-C0008

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA  95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $132,246.04 | |

## ANALYSIS CHECKING    7631                                                   103    B

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 1,322.70 | 2,887,573.37 | 2,666,177.78 | 90,472.25 | 132,246.04 |

### 17  DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 01/02 | 65,000.00 | DEPOSIT 5111018685 |
| 01/03 | 15,000.00 | DEPOSIT 5111007301 |
| 01/03 | 6,000.00 | INTERNET XFER FROM DDA ***5811 ID: 003080014 2302400222 |
| 01/04 | 50,000.00 | DEPOSIT 5111024215 |
| 01/08 | 1,700.00 | INTERNET XFER FROM DDA ***5811 ID: 008082902 2302600274 |
| 01/09 | 2,000.00 | INTERNET XFER FROM DDA ***5811 ID: 009074411 2302100196 |
| 01/10 | 20,000.00 | INTERNET XFER FROM DDA ***5811 ID: 010073934 2302400234 |
| 01/10 | 2,500.00 | DEPOSIT 5111008528 |
| 01/16 | 23,500.00 | DEPOSIT 5112020829 |
| 01/17 | 2,122,346.00 | WIRE/IN-200801701217;ORG Bristol INSURANCE COMPANY;REF 00660 1301301587 |
| 01/18 | 55,000.00 | LOAN ADVANCE ID: 018085414 2302200456 |
| 01/18 | 45,000.00 | LOAN ADVANCE ID: 018085651 2302200466 |
| 01/18 | 15,000.00 | LOAN ADVANCE ID: 018085731 2302200468 |
| 01/18 | 15,000.00 | DEPOSIT 5112002048 |
| 01/23 | 399,527.37 | DIRECT BA/IM-104463(IB21142) ID: 023123113 2302101478 |
| 01/25 | 25,000.00 | DEPOSIT 5112015861 |
| 01/28 | 25,000.00 | DEPOSIT 5112018734 |

### 20  CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 01/02 | 51,608.49 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680004 2502300106 |
| 01/02 | 13,445.56 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030003 2502300140 |
| 01/02 | 6,009.13 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680001 2502300105 |
| 01/02 | 1,145.28 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004 2502300141 |
| 01/07 | 3,693.41 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818039001 2502400162 |
| 01/07 | 1,275.91 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030001 2502400161 |
| 01/08 | 48,000.00 | INTERNET XFER TO DDA ***5811 ID: 007225225 2302600021 |
| 01/17 | 2,000,000.00 | DEBIT MEMO 5112027669 |
| 01/18 | 100,000.00 | INTERNET XFER TO DDA ***5811 ID: 017231305 2302200041 |
| 01/18 | 87,000.00 | INTERNET XFER TO DDA ***5811 ID: 018123641 2302201597 |
| 01/18 | 24,000.00 | INTERNET XFER TO DDA ***5811 ID: 018085235 2302200431 |
| 01/18 | 15,000.00 | WIRE/OUT-200801801804;BNF IMG INC 1300902308 |
| 01/22 | 26,000.00 | INTERNET XFER TO DDA ***5811 ID: 019105059 2302300223 |

Exhibit K, Page 000214

EQUAL HOUSING LENDER  MEMBER FDIC

0029509-0000001-0037390

## An Easy Approach To Balancing Your Account

To reconcile your checkbook balance to your statement balance: Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | | CHECKBOOK BALANCE | | |
|---|---|---|---|---|
| Check Number | Check Amount | 1. LIST your checkbook balance. | | |
| | | 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | | |
| | | 3. SUBTOTAL: | | |
| | | 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc.). | | |
| | | 5. ADJUSTED CHECKBOOK BALANCE: | | |
| | | *This balance should agree with line 10, below.* | | |
| | | STATEMENT BALANCE | | |
| | | 6. LIST your current statement balance as shown on the front of this statement. | | |
| | | 7. ADD deposits made, but not shown on this statement. | | |
| | | 8. SUBTOTAL: | | |
| | | 9. SUBTRACT total from "Checks Outstanding." | | |
| TOTAL: | | 10. ADJUSTED STATEMENT BALANCE: | | |
| *Transfer to Line 9.* | | *This balance should agree with line 5, above.* | | |

### IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT

You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS

If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

### FOR PERSONAL CREDIT LINE ACCOUNTS:

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE

*(This is a Summary of Your Billing Rights).*

If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

### PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION

*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance Charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Page 2 of 3
January 31, 2008
INTERNATIONAL MANUFACTURING GROUP INC
7631

Continued ...

| Date | Amount | Description |
|------|--------|-------------|
| 01/23 | 50,000.00 | INTERNET XFER TO DDA ***5811 ID: 023130426 2302101599 |
| 01/23 | 1,500.00 | INTERNET XFER TO DDA ***4841 ID: 022225858 2302100035 |
| 01/24 | 30,000.00 | INTERNET XFER TO DDA ***0181 ID: 023230536 2302300023 |
| 01/24 | 25,000.00 | INTERNET XFER TO DDA ***5811 ID: 023230625 2302300025 |
| 01/25 | 100,000.00 | INTERNET XFER TO DDA ***4841 ID: 024235131 2302100057 |
| 01/25 | 2,500.00 | AMERICAN EXPRESS ELEC R *******511545REF # 031201466721037 1101532259 |
| 01/28 | 80,000.00 | INTERNET XFER TO DDA ***4841 ID: 028205254 2302203769 |

## 7 CHECKS PROCESSED

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|--------|------|--------|--------|------|--------|--------|------|--------|
| 2343 | 01/09 | 20,000.00 | 2347 | 01/23 | 14,345.44 | 2349 | 01/03 | 13,750.00 |
| 2345* | 01/16 | 25,000.00 | 2348 | 01/23 | 8,713.69 | 2350 | 01/30 | 3,750.00 |
| 2346 | 01/28 | 4,913.12 | | | | | | |

* Not in check sequence

## DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 01/02 | -5,865.76 | 01/10 | 4,594.92 | 01/23 | 328,409.16 |
| 01/03 | 1,364.24 | 01/16 | 3,094.92 | 01/24 | 273,409.16 |
| 01/04 | 51,364.24 | 01/17 | 125,440.92 | 01/25 | 195,909.16 |
| 01/07 | 46,394.92 | 01/18 | 29,440.92 | 01/28 | 135,996.04 |
| 01/08 | 94.92 | 01/22 | 3,440.92 | 01/30 | 132,246.04 |
| 01/09 | -17,905.08 | | | | |

Exhibit K, Page 000216

0029509-0000002-0037391

EQUAL HOUSING LENDER    MEMBER FDIC

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1.  LIST your checkbook balance. | |
| 2.  ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3.  SUBTOTAL: | |
| 4.  SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5.  ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6.  LIST your current statement balance as shown on the front of this statement. | |
| 7.  ADD deposits made, but not shown on this statement. | |
| 8.  SUBTOTAL: | |
| 9.  SUBTRACT total from "Checks Outstanding." | |
| 10.  ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1.   Tell us your name and account number.
2.   Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.   Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights.)*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.
1.   Your name and account number.
2.   The dollar amount of the suspected error.
3.   Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

**Statement of Accounts**

Page 1 of 2
This Statement: February 29, 2008
Last Statement: January 31, 2008

Account    7631

DIRECT INQUIRIES TO:
Customer Service 1 (800) 400-6080

0029356     4061-06-0200-CBT-PC0019-00016

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $8,634.33 | |

### ANALYSIS CHECKING    7631      103   10

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 132,246.04 | 440,048.00 | 412,003.18 | 151,656.53 | 8,634.33 |

### 8 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 02/01 | 262,548.00 | LOAN ADVANCE ID: 032104043 2302101210 |
| 02/04 | 40,000.00 | DEPOSIT 5112026966 |
| 02/05 | 15,000.00 | DEPOSIT 5112013408 |
| 02/06 | 50,000.00 | DEPOSIT 5113031428 |
| 02/08 | 30,000.00 | DEPOSIT 5113029462 |
| 02/08 | 10,000.00 | INTERNET XFER FROM DDA ***0181 ID: 039074345 2302100326 |
| 02/26 | 25,000.00 | INTERNET XFER FROM DDA ***0181 ID: 057084106 2302300336 |
| 02/28 | 7,500.00 | INTERNET XFER FROM DDA ***4841 ID: 059205207 2302203100 |

### 11 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 02/01 | 262,548.00 | L/C IM-104242 2701901426 |
| 02/01 | 51,024.45 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680004 2502200111 |
| 02/01 | 5,941.12 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680001 2502200110 |
| 02/01 | 1,908.64 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004 2502200142 |
| 02/04 | 55,000.00 | INTERNET XFER TO DDA ***5811 ID: 035202220 2302404131 |
| 02/04 | 10,000.00 | INTERNET XFER TO DDA ***4841 ID: 034211634 2302401111 |
| 02/04 | 5,000.00 | INTERNET XFER TO DDA ***4841 ID: 035202357 2302404135 |
| 02/06 | 15,000.00 | INTERNET XFER TO DDA ***5811 ID: 036224905 2302200035 |
| 02/06 | 3,671.32 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818039001 2502300097 |
| 02/06 | 1,409.65 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030001 2502300096 |
| 02/29 | 500.00 | LOAN FEE #0181803-0003 ID: 060101017 2302100953 |

### 16 CHECKS PROCESSED

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|---|---|---|
| 2351 | 02/05 | 7,217.50 | 2360 | 02/11 | 15,317.49 | 2365 | 02/08 | 10,000.00 |
| 2352 | 02/04 | 19,102.33 | 2361 | 02/07 | 6,573.92 | 2366 | 02/07 | 1,583.93 |
| 2353 | 02/04 | 1,077.51 | 2362 | 02/11 | 6,593.92 | 2367 | 02/14 | 2,427.84 |
| 2357* | 02/29 | 4,000.00 | 2363 | 02/22 | 2,000.00 | 2369* | 02/19 | 4,004.00 |
| 2358 | 02/22 | 2,339.17 | 2364 | 02/07 | 45,000.00 | 2370 | 02/25 | 21,500.00 |
| 2359 | 02/21 | 2,918.92 | | | | | | |

Exhibit K, Page 000218


MEMBER FDIC      

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | | CHECKBOOK BALANCE | |
|---|---|---|---|
| Check Number | Check Amount | 1. LIST your checkbook balance. | |
| | | 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| | | 3. SUBTOTAL: | |
| | | 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| | | 5. ADJUSTED CHECKBOOK BALANCE: | |
| | | *This balance should agree with line 10, below.* | |
| | | STATEMENT BALANCE | |
| | | 6. LIST your current statement balance as shown on the front of this statement. | |
| | | 7. ADD deposits made, but not shown on this statement. | |
| | | 8. SUBTOTAL: | |
| | | 9. SUBTRACT total from "Checks Outstanding." | |
| TOTAL: | | 10. ADJUSTED STATEMENT BALANCE: | |
| *Transfer to Line 9.* | | *This balance should agree with line 5, above.* | |

### IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT

You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS

If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

### FOR PERSONAL CREDIT LINE ACCOUNTS:

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE

*(This is a Summary of Your Billing Rights.)*

If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the pans of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

### PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION

*How Finance Charge (If Any) is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**Please notify us if we report any inaccurate information about your account(s) to a credit bureau.** Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

February 29, 2008
INTERNATIONAL MANUFACTURING GROUP INC
7631

Continued ...
Number..............Date............................Amount      Number..............Date............................Amount      Number..............Date............................Amount
* Not in check sequence

**DAILY BALANCES**

| Date | Balance | | Date | Balance | | Date | Balance |
|------|---------|---|------|---------|---|------|---------|
| 02/01 | 73,371.83 | | 02/08 | 37,735.67 | | 02/22 | 2,134.33 |
| 02/04 | 23,191.99 | | 02/11 | 15,824.26 | | 02/25 | -19,365.67 |
| 02/05 | 30,974.49 | | 02/14 | 13,396.42 | | 02/26 | 5,634.33 |
| 02/06 | 60,893.52 | | 02/19 | 9,392.42 | | 02/28 | 13,134.33 |
| 02/07 | 7,735.67 | | 02/21 | 6,473.50 | | 02/29 | 8,634.33 |

EQUAL HOUSING LENDER   MEMBER FDIC   0029356-0000002-0036735

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

Transfer to Line 9.

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 60 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate for each statement (loan) period to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Statement of Accounts
Page 1 of 2
This Statement: March 31, 2008
Last Statement: February 29, 2008

Account        7631

DIRECT INQUIRIES TO:
Customer Service 1 (800) 400-6080

0051203        4092-06-1000-CBT-PG0019-00028

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $13,159.36 | |

### ANALYSIS CHECKING        7631                                            103    28

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 8,634.33 | 1,297,749.73 | 935,551.94 | 357,672.76 | 13,159.36 |

### 19 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 02/29 | 20,000.00 | PAY SEQ # 005113003191 Y2008.MD0229.S51130.S03191  5113003191 |
| 03/03 | 200,000.00 | UFT CREDIT 5113021280 |
| 03/03 | 1,550.96 | DEPOSIT 5113021306 |
| 03/04 | 100,000.00 | UFT CREDIT 5113004838 |
| 03/06 | 50,000.00 | UFT CREDIT 5112008223 |
| 03/06 | 10,000.00 | INTERNET XFER FROM DDA ***4841 ID: 066073533  2302200212 |
| 03/07 | 20,000.00 | DEPOSIT 5111031780 |
| 03/10 | 50,000.00 | UFT CREDIT 5111022195 |
| 03/11 | 200,000.00 | UFT CREDIT 5111013762 |
| 03/12 | 30,000.00 | DEPOSIT 5111003683 |
| 03/17 | 100,000.00 | UFT CREDIT 5111023791 |
| 03/19 | 250,310.94 | WIRE/IN-200807901313;ORG LAWYERS TITLE OF AZ  1301301723 |
| 03/21 | 75,000.00 | TELEPHONE TRANSFER CREDIT 5111002424 |
| 03/25 | 40,000.00 | TELEPHONE TRANSFER CREDIT 5111012648 |
| 03/25 | 20,000.00 | DEPOSIT 5111012644 |
| 03/26 | 5,000.00 | DEPOSIT 5111011380 |
| 03/28 | 25,000.00 | TELEPHONE TRANSFER CREDIT 5111015854 |
| 03/28 | 7,500.00 | INTERNET XFER FROM DDA ***4841 ID: 088074307  2302100276 |
| 03/31 | 93,387.83 | LOAN ADVANCE ID: 091103603  2302301970 |

### 40 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 03/03 | 65,000.00 | INTERNET XFER TO DDA ***5811 ID: 063200029  2302404915 |
| 03/03 | 39,821.32 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680004  2502500110 |
| 03/03 | 30,000.00 | INTERNET XFER TO DDA ***4841 ID: 063195944  2302404913 |
| 03/03 | 1,485.24 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004  2502500144 |
| 03/04 | 20,804.64 | DEBIT MEMO 5113014856 |
| 03/04 | 330.00 | L/C ESB-800145  2702001278 |
| 03/05 | 95,000.00 | INTERNET XFER TO DDA ***5811 ID: 064233329  2302100059 |
| 03/05 | 25,000.00 | INTERNET XFER TO DDA ***4841 ID: 064233427  2302100063 |
| 03/05 | 16,500.00 | INTERNET XFER TO DDA ***5811 ID: 065200212  2302103147 |
| 03/07 | 3,065.90 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818039001  2502300079 |
| 03/10 | 15,000.00 | INTERNET XFER TO DDA ***5811 ID: 068082922  2302300139 |

Exhibit K, Page 000222


MEMBER FDIC

0051203-0000001-0059-411

## An Easy Approach To Balancing Your Account

To reconcile your checkbook balance to your statement balance: Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | | CHECKBOOK BALANCE | |
|---|---|---|---|
| Check Number | Check Amount | 1.  LIST your checkbook balance. | |
| | | 2.  ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| | | 3.  SUBTOTAL: | |
| | | 4.  SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| | | 5.  ADJUSTED CHECKBOOK BALANCE: | |
| | | *This balance should agree with line 10, below.* | |
| | | STATEMENT BALANCE | |
| | | 6.  LIST your current statement balance as shown on the front of this statement. | |
| | | 7.  ADD deposits made, but not shown on this statement. | |
| | | 8.  SUBTOTAL: | |
| | | 9.  SUBTRACT total from "Checks Outstanding." | |
| TOTAL: | | 10.  ADJUSTED STATEMENT BALANCE: | |
| *Transfer to Line 9.* | | *This balance should agree with line 5, above.* | |

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**

You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**

If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE** *(This is a Summary of Your Billing Rights).*

If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**

*How Finance Charge (If Any) is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during the billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Page 2 of 3
March 31, 2008
INTERNATIONAL MANUFACTURING GROUP INC
7631

Continued ...

| Date | Amount | Description |
|---|---|---|
| 03/11 | 25,000.00 | INTERNET XFER TO DDA ***5811 ID: 071071626  2302100165 |
| 03/11 | 15,000.00 | INTERNET XFER TO DDA ***4841 ID: 071071710  2302100167 |
| 03/12 | 60,000.00 | INTERNET XFER TO DDA ***5811 ID: 072210638  2302203013 |
| 03/12 | 15,000.00 | INTERNET XFER TO DDA ***4841 ID: 072074354  2302200247 |
| 03/12 | 10,000.00 | INTERNET XFER TO DDA ***4841 ID: 072210827  2302203019 |
| 03/14 | 2,500.00 | INTERNET XFER TO DDA ***5811 ID: 074084515  2302200463 |
| 03/14 | 2,500.00 | INTERNET XFER TO DDA ***4841 ID: 074084613  2302200469 |
| 03/17 | 3,500.00 | INTERNET XFER TO DDA ***5811 ID: 075161206  2302300573 |
| 03/17 | 150.00 | L/C IM-104538  2702001465 |
| 03/18 | 15,000.00 | INTERNET XFER TO DDA ***5811 ID: 078082118  2302400277 |
| 03/18 | 15,000.00 | INTERNET XFER TO DDA ***4841 ID: 078082219  2302400285 |
| 03/19 | 25,000.00 | INTERNET XFER TO DDA ***5811 ID: 079084148  2302300289 |
| 03/19 | 10,000.00 | INTERNET XFER TO DDA ***4841 ID: 079084332  2302200299 |
| 03/20 | 60,000.00 | INTERNET XFER TO DDA ***4841 ID: 079233515  2302200055 |
| 03/20 | 15,000.00 | INTERNET XFER TO DDA ***5811 ID: 079233605  2302200057 |
| 03/20 | 5,458.77 | PAYBYPHONE-PYMT PHONE P **** REF # 091409686970372  1101510093 |
| 03/20 | 5,000.00 | AMERICAN EXPRESS ELEC R ******512288REF # 031201465155741  1101526380 |
| 03/21 | 200,000.00 | WIRE/OUT-200808100651;BNF JAMES CHANDLER IN TRUST OF SRI  1300900874 |
| 03/24 | 10,000.00 | INTERNET XFER TO DDA ***4841 ID: 084213638  2302503707 |
| 03/24 | 5,000.00 | INTERNET XFER TO DDA ***5811 ID: 084213722  2302503709 |
| 03/25 | 15,000.00 | INTERNET XFER TO DDA ***5811 ID: 085211820  2302202889 |
| 03/25 | 5,000.00 | DEBIT MEMO 5111011809 |
| 03/26 | 5,285.81 | LOAN PAYMENT ID: 086130451  2302201477 |
| 03/26 | 1,262.43 | LOAN PAYMENT ID: 086121310  2302201241 |
| 03/26 | 250.00 | DEBIT MEMO 5338078090 |
| 03/26 | 250.00 | DEBIT MEMO 5338078092 |
| 03/27 | 4,000.00 | INTERNET XFER TO DDA ***5811 ID: 087082504  2302000303 |
| 03/28 | 93,130.00 | L/C IM-104538  2701901728 |
| 03/28 | 257.83 | L/C IM-104538  2701901726 |

## 24 CHECKS PROCESSED

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|---|---|---|
| 2354 | 03/03 | 2,500.00 | 2378* | 03/12 | 2,000.00 | 2386 | 03/17 | 54.13 |
| 2355 | 03/31 | 1,500.00 | 2379 | 03/17 | 2,500.00 | 2387 | 03/20 | 19,195.00 |
| 2356 | 03/17 | 1,000.00 | 2380 | 03/17 | 2,839.17 | 2389* | 03/11 | 45,000.00 |
| 2371* | 03/05 | 50,000.00 | 2381 | 03/17 | 2,621.71 | 2390 | 03/11 | 25,000.00 |
| 2372 | 03/06 | 30,000.00 | 2382 | 03/12 | 15,317.49 | 2391 | 03/20 | 22,000.00 |
| 2373 | 03/10 | 12,500.00 | 2383 | 03/12 | 6,593.92 | 2393* | 03/25 | 50,000.00 |
| 2374 | 03/07 | 1,583.93 | 2384 | 03/12 | 38,884.74 | 2394 | 03/27 | 10,000.00 |
| 2375 | 03/31 | 2,500.00 | 2385 | 03/12 | 2,850.67 | 2395 | 03/28 | 11,232.00 |

* Not in check sequence

## DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 03/03 | 91,378.73 | 03/12 | 18,108.27 | 03/24 | 21,939.60 |
| 03/04 | 170,244.09 | 03/14 | 13,108.27 | 03/25 | 11,939.60 |
| 03/05 | -16,255.91 | 03/17 | 103,282.43 | 03/26 | 9,891.36 |
| 03/06 | 13,744.09 | 03/18 | 73,282.43 | 03/27 | -4,108.64 |
| 03/07 | 29,094.26 | 03/19 | 288,593.37 | 03/28 | -76,228.47 |
| 03/10 | 51,594.26 | 03/20 | 161,939.60 | 03/31 | 13,159.36 |
| 03/11 | 141,594.26 | 03/21 | 36,939.60 | | |

MEMBER FDIC
EQUAL HOUSING LENDER

Exhibit K, Page 000224

0051203-0000002-0059412

## An Easy Approach To Balancing Your Account

To reconcile your checkbook balance to your statement balance: Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

Transfer to Line 9.

| CHECKBOOK BALANCE | |
|---|---|
| 1.  LIST your checkbook balance. | |
| 2.  ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3.  SUBTOTAL: | |
| 4.  SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5.  ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6.  LIST your current statement balance as shown on the front of this statement. | |
| 7.  ADD deposits made, but not shown on this statement. | |
| 8.  SUBTOTAL: | |
| 9.  SUBTRACT total from "Checks Outstanding." | |
| 10.  ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
(This is a Summary of Your Billing Rights).
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
How Finance Charge (If Any) is Calculated: If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during this billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000225

0051203-0000002-0059412

Statement of Accounts
Page 1 of 2
This Statement: April 30, 2008
Last Statement: March 31, 2008

Account 7631

DIRECT INQUIRIES TO:
Customer Service 1 (800) 400-6080

0029224     4122-06-1000-CBT-PC0019-00022

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $77,097.31 | |

## ANALYSIS CHECKING    7631         103   22

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 13,159.36 | 4,458,758.16 | 3,749,096.54 | 645,723.67 | 77,097.31 |

### 16 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 04/01 | 125,000.00 | TELEPHONE TRANSFER CREDIT 5111031323 |
| 04/01 | 75,000.00 | DEPOSIT 5111031321 |
| 04/02 | 35,000.00 | DEPOSIT 5111002080 |
| 04/07 | 2,137,228.16 | INTERN'L MANFCTRNG GROUP LN#0168068-9001ID: 098125320 2302302772 |
| 04/07 | 300,000.00 | TELEPHONE TRANSFER CREDIT 5111022887 |
| 04/09 | 325,000.00 | WIRE/IN-200810001036;ORG CEMO FAMILY CHARITABLE FOUNDATION 1301301339 |
| 04/09 | 93,130.00 | LOAN ADVANCE ID: 100103334 2302200750 |
| 04/11 | 180,000.00 | TELEPHONE TRANSFER CREDIT 5111018006 |
| 04/15 | 100,000.00 | LOAN ADVANCE ID: 106082623 2302400412 |
| 04/15 | 55,000.00 | TELEPHONE TRANSFER CREDIT 5113003420 |
| 04/21 | 350,000.00 | LOAN ADVANCE ID: 112152126 2302503060 |
| 04/23 | 405,900.00 | LOAN ADVANCE ID: 114103020 2302300700 |
| 04/24 | 45,000.00 | TELEPHONE TRANSFER CREDIT 5111012289 |
| 04/29 | 150,000.00 | LOAN ADVANCE ID: 120124618 2302201754 |
| 04/30 | 42,500.00 | DEPOSIT 5111013730 |
| 04/30 | 40,000.00 | TELEPHONE TRANSFER CREDIT 5111013728 |

### 26 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 04/01 | 42,122.42 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680004 2502300097 |
| 04/01 | 13,127.39 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030003 2502300131 |
| 04/01 | 1,571.29 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004 2502300132 |
| 04/02 | 12,000.00 | INTERNET XFER TO DDA ***5811 ID: 092224914 2302600055 |
| 04/04 | 10,000.00 | INTERNET XFER TO DDA ***4841 ID: 094222143 2302200015 |
| 04/04 | 2,500.00 | INTERNET XFER TO DDA ***5811 ID: 094222229 2302200019 |
| 04/07 | 2,137,228.16 | WIRE/OUT-200809801573;BNF ATTENTION BETTY LETTERMAN;OBI MEDI 1301002030 |
| 04/07 | 3,107.22 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818039001 2502400120 |
| 04/07 | 500.00 | INTERN'L MANFCTRNG GROUP LN#0168068-9001ID: 098132246 2302302869 |
| 04/09 | 200,000.00 | TELEPHONE TRANSFER DEBIT 5111021151 |

Exhibit K, Page 000226

MEMBER FDIC

0029224-0000001-0038605

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

Transfer to Line 9.

| CHECKBOOK BALANCE | |
|---|---|
| 1.  LIST your checkbook balance. | |
| 2.  ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3.  SUBTOTAL: | |
| 4.  SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5.  ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6.  LIST your current statement balance as shown on the front of this statement. | |
| 7.  ADD deposits made, but not shown on this statement. | |
| 8.  SUBTOTAL: | |
| 9.  SUBTRACT total from "Checks Outstanding." | |
| 10.  ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This Is a Summary of Your Billing Rights.)*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.
1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance Charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000227

002922.4-0000001-0038605

April 30, 2008
INTERNATIONAL MANUFACTURING GROUP INC
7631

Continued ...

| Date | Amount | Description |
|------|--------|-------------|
| 04/09 | 93,130.00 | WIRE/OUT-200810001307;BNF ENCOMPASS MEDICAL SUPPLIES INC  1301301640 |
| 04/10 | 125,000.00 | INTERNET XFER TO DDA ***5811 ID: 100225024 2302400039 |
| 04/10 | 5,000.00 | INTERNET XFER TO DDA ***4841 ID: 100225112 2302400041 |
| 04/15 | 55,000.00 | INTERNET XFER TO DDA ***5811 ID: 106110419 2302401279 |
| 04/16 | 45,000.00 | INTERNET XFER TO DDA ***5811 ID: 107214937 2302503057 |
| 04/16 | 35,000.00 | INTERNET XFER TO DDA ***4841 ID: 107000929 2302500085 |
| 04/16 | 3,696.97 | LOAN PAYMENT ID: 107104932 2302501005 |
| 04/21 | 120,000.00 | INTERNET XFER TO DDA ***5811 ID: 112204151 2302503967 |
| 04/21 | 50,000.00 | INTERNET XFER TO DDA ***4841 ID: 112204233 2302503969 |
| 04/21 | 1,213.09 | LOAN PAYMENT ID: 112165559 2302503521 |
| 04/22 | 405,900.00 | L/C IM-104463  2702001366 |
| 04/22 | 180,000.00 | INTERNET XFER TO DDA ***5811 ID: 113154146 2302201983 |
| 04/24 | 45,000.00 | INTERNET XFER TO DDA ***4841 ID: 115135244 2302001623 |
| 04/30 | 105,000.00 | INTERNET XFER TO DDA ***5811 ID: 120231532 2302100053 |
| 04/30 | 43,000.00 | INTERNET XFER TO DDA ***5811 ID: 121213537 2302103447 |
| 04/30 | 15,000.00 | INTERNET XFER TO DDA ***4841 ID: 121075711 2302100365 |

## 21 CHECKS PROCESSED

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|--------|------|--------|--------|------|--------|--------|------|--------|
| 2376 | 04/07 | 2,500.00 | 2415 | 04/01 | 58,500.00 | 2422 | 04/07 | 5,000.00 |
| 2377 | 04/07 | 1,000.00 | 2416 | 04/03 | 50,000.00 | 2426* | 04/08 | 2,130.27 |
| 2401* | 04/11 | 175,000.00 | 2417 | 04/01 | 25,000.00 | 2427 | 04/07 | 55,000.00 |
| 2402 | 04/15 | 11,232.00 | 2418 | 04/07 | 101,514.93 | 2428 | 04/07 | 20,000.00 |
| 2406* | 04/23 | 2,339.17 | 2419 | 04/07 | 75,671.93 | 2430* | 04/07 | 10,000.00 |
| 2407 | 04/25 | 2,000.00 | 2420 | 04/07 | 15,317.49 | 2431 | 04/09 | 1,583.93 |
| 2414* | 04/01 | 25,000.00 | 2421 | 04/07 | 6,593.92 | 2432 | 04/10 | 340.03 |

* Not in check sequence

## DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 04/01 | 47,838.26 | 04/09 | 133,418.57 | 04/22 | -393,963.52 |
| 04/02 | 70,838.26 | 04/10 | 3,078.54 | 04/23 | 9,597.31 |
| 04/03 | 20,838.26 | 04/11 | 8,078.54 | 04/24 | 9,597.31 |
| 04/04 | 8,338.26 | 04/15 | 96,846.54 | 04/25 | 7,597.31 |
| 04/07 | 12,132.77 | 04/16 | 13,149.57 | 04/29 | 157,597.31 |
| 04/08 | 10,002.50 | 04/21 | 191,936.48 | 04/30 | 77,097.31 |

EQUAL HOUSING LENDER    MEMBER FDIC

0029224-0000002-0038606

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | | 
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

Transfer to Line 9.

| CHECKBOOK BALANCE | | |
|---|---|---|
| 1. LIST your checkbook balance. | | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | | |
| 3. SUBTOTAL: | | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | | |
| 5. ADJUSTED CHECKBOOK BALANCE: | | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | | |
|---|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | | |
| 7. ADD deposits made, but not shown on this statement. | | |
| 8. SUBTOTAL: | | |
| 9. SUBTRACT total from "Checks Outstanding." | | |
| 10. ADJUSTED STATEMENT BALANCE: | | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone us or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000229

0029224-0000002-0038606

**Statement of Accounts**
Page 1 of 2
This Statement: May 30, 2008
Last Statement: April 30, 2008

Account     7631

DIRECT INQUIRIES TO:
Customer Service  1 (800) 400-6080

0029122          4152-06-1000-CBT-PG0019-00006

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA  95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $2,566.50 | |

## ANALYSIS CHECKING     7631                                                                 103    8

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 77,097.31 | 797,397.05 | 834,784.45 | 37,143.41 | 2,566.50 |

### 8 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 05/02 | 357,397.05 | DEPOSIT 5111016451 |
| 05/06 | 65,000.00 | TELEPHONE TRANSFER CREDIT 5111012922 |
| 05/07 | 60,000.00 | TELEPHONE TRANSFER CREDIT 5111014009 |
| 05/07 | 5,000.00 | DEPOSIT 5111013983 |
| 05/14 | 40,000.00 | TELEPHONE TRANSFER CREDIT 5111011584 |
| 05/19 | 30,000.00 | DEPOSIT 5111018377 |
| 05/20 | 225,000.00 | LOAN ADVANCE ID: 141114007  2302301142 |
| 05/30 | 15,000.00 | INTERNET XFER FROM DDA ***4841 ID: 151080228  2302400454 |

### 24 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 05/01 | 37,893.70 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680004  2502400109 |
| 05/01 | 9,992.17 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030003  2502400143 |
| 05/01 | 8,184.53 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680001  2502400108 |
| 05/01 | 1,413.54 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004  2502400144 |
| 05/02 | 8,775.51 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689001  2502401451 |
| 05/05 | 175,000.00 | TELEPHONE TRANSFER DEBIT 5111008930 |
| 05/05 | 50,000.00 | INTERNET XFER TO DDA ***5811 ID: 126075330  2302501457 |
| 05/06 | 90,000.00 | INTERNET XFER TO DDA ***5811 ID: 126230011  2302100051 |
| 05/06 | 45,000.00 | INTERNET XFER TO DDA ***5811 ID: 127204138  2302102819 |
| 05/06 | 25,000.00 | INTERNET XFER TO DDA ***4841 ID: 126225933  2302100049 |
| 05/06 | 7,500.00 | INTERNET XFER TO DDA ***4841 ID: 127204226  2302102823 |
| 05/06 | 4,000.00 | INTERNET XFER TO DDA ***5811 ID: 127074635  2302100211 |
| 05/06 | 2,851.04 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818039001  2502200090 |
| 05/06 | 1,173.96 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030001  2502200089 |
| 05/08 | 42,500.00 | INTERNET XFER TO DDA ***5811 ID: 128220107  2302300005 |
| 05/08 | 10,000.00 | INTERNET XFER TO DDA ***4841 ID: 128220145  2302300007 |
| 05/13 | 10,000.00 | INTERNET XFER TO DDA ***5811 ID: 133223143  2302200041 |
| 05/16 | 15,000.00 | INTERNET XFER TO DDA ***5811 ID: 137073507  2302300309 |
| 05/19 | 23,000.00 | INTERNET XFER TO DDA ***5811 ID: 140213051  2302503839 |
| 05/21 | 205,000.00 | INTERNET XFER TO DDA ***5811 ID: 141220452  2302300005 |
| 05/21 | 15,000.00 | INTERNET XFER TO DDA ***4841 ID: 141220528  2302300007 |

Exhibit K, Page 000230


MEMBER FDIC

0029122-0000001-0038109

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1.  LIST your checkbook balance. | |
| 2.  ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3.  SUBTOTAL: | |
| 4.  SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5.  ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6.  LIST your current statement balance as shown on the front of this statement. | |
| 7.  ADD deposits made, but not shown on this statement. | |
| 8.  SUBTOTAL: | |
| 9.  SUBTRACT total from "Checks Outstanding." | |
| 10.  ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights.)*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000231

0029122-0000001-0038109



**CALIFORNIA BANK**
**T R U S T**

P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**
Page 1 of 2
This Statement: July 31, 2009
Last Statement: June 30, 2009

Account     7631

**DIRECT INQUIRIES TO:**
Customer Service 1 (800) 400-6080

0032623     4213-06-1000-CBT-PC0019-00000

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

---

In compliance with the prohibitions of the Unlawful Internet Gambling Act, and implementing regulations, California Bank & Trust will not process transactions derived from Internet bets or wagers.

California Bank & Trust has elected to not offer accounts to organizations that offer or sponsor Internet gambling. Commercial accounts receiving or processing Internet gambling transactions are subject to closure.

---

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $1,234.66 | |

---

## ANALYSIS CHECKING    7631                 103   0

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 642,653.94 | 0.00 | 641,419.28 | 0.00 | 1,234.66 |

**0 DEPOSITS/CREDITS**

There were no transactions this period.

**15 CHARGES/DEBITS**

| Date | Amount | Description |
|---|---|---|
| 07/01 | 30,000.00 | INTERNET XFER TO DDA ***5811 ID: 182012633 2302500129 |
| 07/01 | 175,000.00 | INTERNET XFER TO DDA ***4841 ID: 182012552 2302500127 |
| 07/01 | 921.87 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004 2501300203 |
| 07/01 | 3,693.00 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680001 2501300166 |
| 07/01 | 12,229.17 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689002 2501300168 |
| 07/01 | 49,964.54 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680004 2501300167 |
| 07/02 | 10,000.00 | INTERNET XFER TO DDA ***4841 ID: 183015958 2302400141 |
| 07/02 | 25,000.00 | INTERNET XFER TO DDA ***5811 ID: 183020042 2302400143 |
| 07/02 | 13,459.82 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689001 2501201684 |
| 07/06 | 150,000.00 | INTERNET XFER TO DDA ***4841 ID: 187021243 2302701253 |
| 07/06 | 1,859.38 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818039001 2501300150 |
| 07/06 | 6,171.88 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689003 2501300100 |
| 07/08 | 100,000.00 | INTERNET XFER TO DDA ***4841 ID: 189003629 2302300085 |
| 07/15 | 55,000.00 | INTERNET XFER TO DDA ***5811 ID: 196000844 2302200083 |
| 07/20 | 8,119.62 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030003 2501000070 |

**0 CHECKS PROCESSED**

There were no transactions this period.



MEMBER FDIC

Exhibit K, Page 000284

0032623-0000001-0054587

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**Please notify us if we report any inaccurate information about your account(s) to a credit bureau.** Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000285

0032623-0000001-0054587

# CALIFORNIA BANK

### C|B TRUST

#### TRUST

P.O. Box 489, Lawndale, CA  90260-0489

Page 2 of 2
July 31, 2009
INTERNATIONAL MANUFACTURING GROUP INC
7631

**DAILY BALANCES**

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 07/01 | 370,845.36 | 07/06 | 164,354.28 | 07/15 | 9,354.28 |
| 07/02 | 322,385.54 | 07/08 | 64,354.28 | 07/20 | 1,234.66 |

EQUAL HOUSING LENDER    MEMBER FDIC

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1.  LIST your checkbook balance. | |
| 2.  ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3.  SUBTOTAL: | |
| 4.  SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5.  ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6.  LIST your current statement balance as shown on the front of this statement. | |
| 7.  ADD deposits made, but not shown on this statement. | |
| 8.  SUBTOTAL: | |
| 9.  SUBTRACT total from "Checks Outstanding." | |
| 10.  ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000287

0032623-0000002-0054588



**CALIFORNIA BANK & TRUST**

P.O. Box 489, Lawndale, CA 90260-0489

Statement of Accounts
Page 1 of 1
This Statement: August 31, 2009
Last Statement: July 31, 2009

Account     7631

DIRECT INQUIRIES TO:
Customer Service 1 (800) 400-6080

0032339          4244-06-1000-CBT-PG0019-00001

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $7,131.62 | |

## ANALYSIS CHECKING      7631                                                    103   1

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 1,234.66 | 100,000.00 | 94,103.04 | 0.00 | 7,131.62 |

### 2 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 08/03 | 75,000.00 | INTERNET XFER FROM DDA ***4841 ID: 213024411 2302400076 |
| 08/19 | 25,000.00 | INTERNET XFER FROM DDA ***4841 ID: 231145247 2302002222 |

### 9 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 08/03 | 952.61 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004 2501100134 |
| 08/03 | 3,816.11 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT #01680680001 2501100100 |
| 08/03 | 12,636.80 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT #01680689002 2501100102 |
| 08/03 | 34,806.76 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT #01680680004 2501100101 |
| 08/04 | 13,908.49 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT #01680689001 2501001731 |
| 08/06 | 1,921.35 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT #01818039001 2500900072 |
| 08/06 | 6,377.60 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT #01680689003 2500900027 |
| 08/19 | 8,390.28 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT #01818030003 2501000011 |
| 08/25 | 11,293.04 | DEBIT MEMO 5112007755 |

### 0 CHECKS PROCESSED

There were no transactions this period.

### DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 08/03 | 24,022.38 | 08/06 | 1,814.94 | 08/25 | 7,131.62 |
| 08/04 | 10,113.89 | 08/19 | 18,424.66 | | |



MEMBER FDIC

Exhibit K, Page 000288

0032339-0000001-0047451

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

Transfer to Line 9.

| CHECKBOOK BALANCE | |
|---|---|
| 1.  LIST your checkbook balance. | |
| 2.  ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3.  SUBTOTAL: | |
| 4.  SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5.  ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6.  LIST your current statement balance as shown on the front of this statement. | |
| 7.  ADD deposits made, but not shown on this statement. | |
| 8.  SUBTOTAL: | |
| 9.  SUBTRACT total from "Checks Outstanding." | |
| 10.  ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

### IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT

You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS

If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

### FOR PERSONAL CREDIT LINE ACCOUNTS:

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

### PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION

*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000289

0032339-0000001-0047451

# CALIFORNIA BANK & TRUST

C|B
TRUST

P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**
Page 1 of 1
This Statement: September 30, 2009
Last Statement: August 31, 2009

Account          7631

**DIRECT INQUIRIES TO:**
Customer Service  1 (800) 400-6080

0053839                    4274-06-1000-CBT-PCQ019-00002

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA  95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $12,130.45 | |

## ANALYSIS CHECKING      7631                                               103   2

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 7,131.62 | 55,000.00 | 50,001.17 | 0.00 | 12,130.45 |

### 2 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 09/18 | 40,000.00 | INTERNET XFER FROM DDA ***4841 ID: 000002810  2302702628 |
| 09/29 | 15,000.00 | INTERNET XFER FROM DDA ***4841 ID: 000001525  2302900344 |

### 8 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 09/01 | 952.60 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004  2501100115 |
| 09/01 | 3,816.11 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680001  2501100085 |
| 09/21 | 6,377.61 | LOAN PAYMENT ID: 264104322  2302302389 |
| 09/21 | 13,136.81 | LOAN PAYMENT ID: 264110459  2302302525 |
| 09/21 | 14,408.48 | LOAN PAYMENT ID: 264110643  2302302533 |
| 09/21 | 8,390.29 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030003  2502500006 |
| 09/30 | 750.00 | DEBIT MEMO  5370036850 |
| 09/30 | 2,169.27 | DEBIT MEMO  5370036760 |

### 0 CHECKS PROCESSED

There were no transactions this period.

### DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 09/01 | 2,362.91 | 09/21 | 49.72 | 09/30 | 12,130.45 |
| 09/18 | 42,362.91 | 09/29 | 15,049.72 | | |

Exhibit K, Page 000290

EQUAL HOUSING LENDER     MEMBER FDIC                    0053839-0000001-0069572

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

Transfer to Line 9.

| CHECKBOOK BALANCE | |
|---|---|
| 1.  LIST your checkbook balance. | |
| 2.  ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3.  SUBTOTAL: | |
| 4.  SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5.  ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6.  LIST your current statement balance as shown on the front of this statement. | |
| 7.  ADD deposits made, but not shown on this statement. | |
| 8.  SUBTOTAL: | |
| 9.  SUBTRACT total from "Checks Outstanding." | |
| 10.  ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you, no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.
1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Statement of Accounts
Page 1 of 1
This Statement: October 30, 2009
Last Statement: September 30, 2009

Account    7631

## CALIFORNIA BANK & TRUST
P.O. Box 489, Lawndale, CA 90260-0489

DIRECT INQUIRIES TO:
Customer Service 1 (800) 400-6080

0047179    4304-06-1Q00-CBT-PC0019-00000
INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $8,006.08 | |

## ANALYSIS CHECKING  7631                                       103    0

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 12,130.45 | 45,000.00 | 49,124.37 | 0.00 | 8,006.08 |

### 1 DEPOSIT/CREDIT
| Date | Amount | Description |
|---|---|---|
| 10/15 | 45,000.00 | INTERNET XFER FROM DDA ***4841 ID: 000001543  2303300460 |

### 6 CHARGES/DEBITS
| Date | Amount | Description |
|---|---|---|
| 10/01 | 921.88 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004  2501100124 |
| 10/01 | 3,693.01 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680001  2501100087 |
| 10/06 | 6,171.87 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689003  2501100023 |
| 10/15 | 12,729.16 | LOAN PAYMENT ID: 288111336  2303301571 |
| 10/15 | 13,459.83 | LOAN PAYMENT ID: 288111449  2303301583 |
| 10/19 | 12,148.62 | LOAN PAYMENT ID: 292121056  2303603025 |

### 0 CHECKS PROCESSED
There were no transactions this period.

### DAILY BALANCES
| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 10/01 | 7,515.56 | 10/15 | 20,154.70 | 10/19 | 8,006.08 |
| 10/06 | 1,343.69 | | | | |

 MEMBER FDIC

Exhibit K, Page 000292

0047179-0000001-0071085

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

### CHECKBOOK BALANCE

1. LIST your checkbook balance.

2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits).

3. SUBTOTAL:

4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc).

5. ADJUSTED CHECKBOOK BALANCE:

*This balance should agree with line 10, below.*

### STATEMENT BALANCE

6. LIST your current statement balance as shown on the front of this statement.

7. ADD deposits made, but not shown on this statement.

8. SUBTOTAL:

9. SUBTRACT total from "Checks Outstanding."

10. ADJUSTED STATEMENT BALANCE:

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**

You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**

If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**

*(This is a Summary of Your Billing Rights).*

If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**

*How Finance Charge (If Any) is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other details on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.



**CALIFORNIA BANK**
T R U S T

P.O. Box 489, Lawndale, CA 90260-0489

Statement of Accounts
Page 1 of 1
This Statement: November 30, 2009
Last Statement: October 30, 2009

Account        7631

DIRECT INQUIRIES TO:
Customer Service  1 (800) 400-6080

0045205        433S-06-1000-CBT-PG0019-00000

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $4,862.38 | |

## ANALYSIS CHECKING        7631                                        103    0

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 8,006.08 | 2,030,000.00 | 2,033,143.70 | 0.00 | 4,862.38 |

### 2 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 11/04 | 2,025,000.00 | INTERNET XFER FROM DDA ***4841 ID: 000001948 2303101514 |
| 11/18 | 5,000.00 | INTERNET XFER FROM DDA ***4841 ID: 000001205 2302700360 |

### 7 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 11/02 | 952.60 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004 2501300197 |
| 11/02 | 3,816.11 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680001 2501300166 |
| 11/04 | 8,119.62 | LOAN PAYMENT ID: 308144244 2303102497 |
| 11/04 | 1,981,171.88 | LOAN PAYMENT ID: 308144054 2303102487 |
| 11/04 | 12,636.81 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689002 2501300167 |
| 11/04 | 13,908.49 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689001 2501401754 |
| 11/17 | 12,538.19 | LOAN PAYMENT ID: 321145144 2303302477 |

### 0 CHECKS PROCESSED

There were no transactions this period.

### DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 11/02 | 3,237.37 | 11/17 | -137.62 | 11/18 | 4,862.38 |
| 11/04 | 12,400.57 | | | | |


MEMBER FDIC

Exhibit K, Page 000294

0045205-0000001-0069914

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

Transfer to Line 9.

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
(This is a Summary of Your Billing Rights.)
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
How Finance Charge (If Any) Is Calculated: If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance Charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

**CALIFORNIA BANK**
**TRUST**
P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**
Page 1 of 1
This Statement: December 31, 2009
Last Statement: November 30, 2009

Account          7631

**DIRECT INQUIRIES TO:**
Customer Service 1 (800) 400-6080

0070274                    4001-06-1030-CBT-PG0019-00000

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $16,994.07 | |

## ANALYSIS CHECKING    7631                                                                     103    0

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 4,862.38 | 410,000.00 | 397,868.31 | 0.00 | 16,994.07 |

### 3 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 12/15 | 10,000.00 | INTERNET XFER FROM DDA ***4841 ID: 000001211 2303000542 |
| 12/16 | 350,000.00 | TELLER XFER FROM DDA ***8679 ID: 000000150 2303003866 |
| 12/17 | 50,000.00 | INTERNET XFER FROM DDA ***4841 ID: 000001632 2302700356 |

### 10 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 12/01 | 921.88 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004 2501100132 |
| 12/01 | 3,693.01 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680001 2501100099 |
| 12/15 | 8,390.28 | LOAN PAYMENT ID: 349082403 2303000563 |
| 12/17 | 8,119.63 | LOAN PAYMENT ID: 351110402 2302701443 |
| 12/17 | 12,229.17 | LOAN PAYMENT ID: 351110601 2302701469 |
| 12/17 | 12,412.50 | LOAN PAYMENT ID: 351111407 2302701511 |
| 12/17 | 13,459.82 | LOAN PAYMENT ID: 351110521 2302701463 |
| 12/17 | 295,522.39 | LOAN PAYMENT ID: 351110854 2302701491 |
| 12/17 | 35,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000001543 2302700353 |
| 12/21 | 8,119.63 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030003 2501300011 |

### 0 CHECKS PROCESSED

There were no transactions this period.

### DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 12/01 | 247.49 | 12/16 | 351,857.21 | 12/21 | 16,994.07 |
| 12/15 | 1,857.21 | 12/17 | 25,113.70 | | |

MEMBER FDIC

Exhibit K, Page 000296

0070274-0000001-0098195

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**Please notify us if we report any inaccurate information about your account(s) to a credit bureau.** Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

**CALIFORNIA BANK & TRUST**

P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**
Page 1 of 1
This Statement: January 29, 2010
Last Statement: December 31, 2009

Account          7631

DIRECT INQUIRIES TO:
Customer Service  1 (800) 400-6080

0045091                    4030-06-0200-CBT-PG0019-00000

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA  95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $3,591.09 | |

## ANALYSIS CHECKING    7631                                                        103    0

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 16,994.07 | 1,982,000.00 | 1,995,402.98 | 0.00 | 3,591.09 |

### 2  DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 01/21 | 30,000.00 | INTERNET XFER FROM DDA ***4841 ID: 000001563  2303000270 |
| 01/26 | 1,952,000.00 | DEPOSIT 5160102140 |

### 5  CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 01/04 | 3,816.11 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680001  2501200077 |
| 01/04 | 12,636.80 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689002  2501200078 |
| 01/21 | 12,949.31 | LOAN PAYMENT ID: 021101620  2303000857 |
| 01/21 | 14,408.49 | LOAN PAYMENT ID: 021101852  2303000863 |
| 01/26 | 1,951,592.27 | LOAN PAYMENT ID: 026133019  2303002395 |

### 0  CHECKS PROCESSED

There were no transactions this period.

### INSUFFICIENT FUNDS (NSF) & OVERDRAFT (OD) FEE TOTALS

| | This Statement Period | Year-to-Date |
|---|---|---|
| Total OD & NSF - Items Pd | $0.00 | $0.00 |
| Total NSF- Items Rt | $0.00 | $0.00 |

### DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 01/04 | 541.16 | 01/21 | 3,183.36 | 01/26 | 3,591.09 |

MEMBER FDIC

Exhibit K, Page 000298

0045091-0000001-0006125

# An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

Transfer to Line 9.

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement, or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25767, Salt Lake City, UT 84125-0767.

Case 16-04690

**Statement of Accounts**
Page 1 of 1
This Statement: February 26, 2010
Last Statement: January 29, 2010

Account        7631

**CALIFORNIA BANK**
**TRUST**
P.O. Box 489, Lawndale, CA 90260-0489

**DIRECT INQUIRIES TO:**
Customer Service 1 (800) 400-6080

0045507        4058-06-0200-CBT-PC0019-00000

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $1,833.08 | |

## ANALYSIS CHECKING    7631                                            103    0

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 3,591.09 | 42,000.00 | 43,758.01 | 0.00 | 1,833.08 |

### 2 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 02/17 | 30,000.00 | INTERNET XFER FROM DDA ***4841 ID: 000002695 2302900282 |
| 02/22 | 12,000.00 | TELLER XFER FROM DDA ***4841 ID: 000003033 2302504646 |

### 5 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 02/17 | 3,816.11 | LOAN PAYMENT ID: 048114341 2302901783 |
| 02/17 | 12,411.80 | LOAN PAYMENT ID: 048114303 2302901781 |
| 02/17 | 13,908.49 | LOAN PAYMENT ID: 048114418 2302901785 |
| 02/23 | 12,636.81 | LOAN PAYMENT ID: 054082833 2303100369 |
| 02/23 | 984.80 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680001 2501000013 |

### 0 CHECKS PROCESSED

There were no transactions this period.

### INSUFFICIENT FUNDS (NSF) & OVERDRAFT (OD) FEE TOTALS

| | This Statement Period | Year-to-Date |
|---|---|---|
| Total OD & NSF - Items Pd | $0.00 | $0.00 |
| Total NSF- Items Rt | $0.00 | $0.00 |

### DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 02/17 | 3,454.69 | 02/22 | 15,454.69 | 02/23 | 1,833.08 |

MEMBER FDIC

Exhibit K, Page 000300

0045507-0000001-0005811

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

### IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT

You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS

If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

### FOR PERSONAL CREDIT LINE ACCOUNTS:

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE

*(This is a Summary of Your Billing Rights).*

If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

### PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION

*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance Charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000301

0045507-0000001-0065811

Case 16-02290

```
 CB   CALIFORNIA  BANK
 TRUST          T R U S T

        P.O. Box 489, Lawndale, CA 90260-0489
```

**Statement of Accounts**
Page 1 of 1
This Statement: March 31, 2010
Last Statement: February 26, 2010

Account          7631

**DIRECT INQUIRIES TO:**
Customer Service 1 (800) 400-6080

0069036                    4091-06-0200-CBT-PG0019-00000

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $7,283.08 | |

## ANALYSIS CHECKING    7631                                                                103   0

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 1,833.08 | 30,000.00 | 24,550.00 | 0.00 | 7,283.08 |

**1 DEPOSIT/CREDIT**

| Date | Amount | Description |
|---|---|---|
| 03/23 | 30,000.00 | INTERNET XFER FROM DDA ***4841 ID: 000002424 2302602804 |

**2 CHARGES/DEBITS**

| Date | Amount | Description |
|---|---|---|
| 03/23 | 11,913.89 | LOAN PAYMENT ID: 082165805 2302603163 |
| 03/23 | 12,636.11 | LOAN PAYMENT ID: 082170113 2302603183 |

**0 CHECKS PROCESSED**

There were no transactions this period.

**INSUFFICIENT FUNDS (NSF) & OVERDRAFT (OD) FEE TOTALS**

| | This Statement Period | Year-to-Date |
|---|---|---|
| Total OD & NSF - Items Pd | $0.00 | $0.00 |
| Total NSF- Items Rt | $0.00 | $0.00 |

**DAILY BALANCES**

| Date | Balance |
|---|---|
| 03/23 | 7,283.08 |

EQUAL HOUSING LENDER   MEMBER FDIC

Exhibit K, Page 000302

0069036-0000001-0131754

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us, based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information:

1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

CALIFORNIA BANK
& TRUST

P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**
Page 1 of 1
This Statement: April 30, 2010
Last Statement: March 31, 2010

Account        7631

**DIRECT INQUIRIES TO:**
Customer Service  1 (800) 400-6080

0045362            4121-06-0200-CBT-PC0019-00001
INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $2,184.69 | |

## ANALYSIS CHECKING    7631                                              103    1

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 7,283.08 | 1,526,000.00 | 1,531,098.39 | 0.00 | 2,184.69 |

### 3 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 04/13 | 15,000.00 | INTERNET XFER FROM DDA ***4841 ID: 000002498 2302700464 |
| 04/21 | 11,000.00 | INTERNET XFER FROM DDA WANNAS ENTER ID: 000001690 2302901666 |
| 04/27 | 1,500,000.00 | TELLER XFER FROM DDA ***8679 ID: 000005497 2302901254 |

### 6 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 04/01 | 6,278.12 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680001 2501100080 |
| 04/13 | 12,636.80 | DEBIT MEMO  5370041430 |
| 04/21 | 12,828.47 | LOAN PAYMENT ID: 111135547 2302902427 |
| 04/27 | 1,464,355.00 | LOAN PAYMENT ID: 117154504 2302902939 |
| 04/29 | 10,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000001608 2302200539 |
| 04/29 | 25,000.00 | INTERNET XFER TO DDA ***4841 ID: 000001877 2302200535 |

### 0 CHECKS PROCESSED

There were no transactions this period.

### INSUFFICIENT FUNDS (NSF) & OVERDRAFT (OD) FEE TOTALS

| | This Statement Period | Year-to-Date |
|---|---|---|
| Total OD & NSF - Items Pd | $0.00 | $0.00 |
| Total NSF- Items Rt | $0.00 | $0.00 |

### DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 04/01 | 1,004.96 | 04/21 | 1,539.69 | 04/29 | 2,184.69 |
| 04/13 | 3,368.16 | 04/27 | 37,184.69 | | |

Exhibit K, Page 000304

MEMBER FDIC

0045362-0000001-0080298

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: . | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone us or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide that by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.



**CALIFORNIA BANK**

T R U S T

P.O. Box 489, Lawndale, CA  90260-0489

**Statement of Accounts**
Page 1 of 1
This Statement: May 28, 2010
Last Statement: April 30, 2010

Account        7631

**DIRECT INQUIRIES TO:**
Customer Service  1 (800) 400-6080

0044277              4149-06-0030-CBT-PG0019-00002

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA  95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $3,331.20 | |

## ANALYSIS CHECKING        7631

103    2

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 2,184.69 | 29,500.00 | 28,353.49 | 0.00 | 3,331.20 |

**3  DEPOSITS/CREDITS**

| Date | Amount | Description |
|---|---|---|
| 05/07 | 13,000.00 | TELLER XFER FROM DDA ***4841 ID: 000007054  2302504298 |
| 05/10 | 12,000.00 | INTERNET XFER FROM DDA ***4841 ID: 000001133  2303100216 |
| 05/18 | 4,500.00 | INTERNET XFER FROM DDA ***4841 ID: 000001454  2302803338 |

**3  CHARGES/DEBITS**

| Date | Amount | Description |
|---|---|---|
| 05/07 | 12,229.17 | DEBIT MEMO  5370303580 |
| 05/07 | 12,209.73 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818039001  2501200070 |
| 05/18 | 3,914.59 | DEBIT MEMO  5380830260 |

**0  CHECKS PROCESSED**

There were no transactions this period.

**INSUFFICIENT FUNDS (NSF) & OVERDRAFT (OD) FEE TOTALS**

| | This Statement Period | Year-to-Date |
|---|---|---|
| Total OD & NSF - Items Pd | $0.00 | $0.00 |
| Total NSF- Items Rt | $0.00 | $0.00 |

**DAILY BALANCES**

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 05/07 | -9,254.21 | 05/10 | 2,745.79 | 05/18 | 3,331.20 |

Exhibit K, Page 000306

0044277-0000001-0074327

EQUAL HOUSING LENDER    MEMBER FDIC

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1.  LIST your checkbook balance. | |
| 2.  ADD deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3.  SUBTOTAL: | |
| 4.  SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5.  ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6.  LIST your current statement balance as shown on the front of this statement. | |
| 7.  ADD deposits made, but not shown on this statement. | |
| 8.  SUBTOTAL: | |
| 9.  SUBTRACT total from "Checks Outstanding." | |
| 10.  ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method.  The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance Charge."  Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0767.

Exhibit K, Page 000307

0044277-0000001-0074327

# CALIFORNIA BANK & TRUST

P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**
Page 1 of 1
This Statement: June 30, 2010
Last Statement: May 28, 2010

Account    7631

DIRECT INQUIRIES TO:
Customer Service 1 (800) 400-6080

0068244      4182-06-0000-CBT-PG0019-00000

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $1,297.73 | |

## ANALYSIS CHECKING    7631                                        103   0

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 3,331.20 | 14,500.00 | 16,533.47 | 0.00 | 1,297.73 |

### 2 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 06/18 | 12,500.00 | INTERNET XFER FROM DDA ***4841 ID: 000001762 2302100554 |
| 06/21 | 2,000.00 | INTERNET XFER FROM DDA ***4841 ID: 000001908 2303106096 |

### 2 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 06/18 | 3,816.11 | LOAN PAYMENT ID: 169155550 2302103121 |
| 06/22 | 12,717.36 | LOAN PAYMENT ID: 173104017 2302901253 |

### 0 CHECKS PROCESSED

There were no transactions this period.

### INSUFFICIENT FUNDS (NSF) & OVERDRAFT (OD) FEE TOTALS

| | This Statement Period | Year-to-Date |
|---|---|---|
| Total OD & NSF - Items Pd | $0.00 | $0.00 |
| Total NSF- Items Rt | $0.00 | $0.00 |

### DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 06/18 | 12,015.09 | 06/21 | 14,015.09 | 06/22 | 1,297.73 |

MEMBER FDIC

Exhibit K, Page 000308

0068244-0000001-0103325

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

Transfer to Line 9.

### CHECKBOOK BALANCE

1. LIST your checkbook balance.

2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits).

3. SUBTOTAL:

4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc).

5. ADJUSTED CHECKBOOK BALANCE:

*This balance should agree with line 10, below.*

### STATEMENT BALANCE

6. LIST your current statement balance as shown on the front of this statement.

7. ADD deposits made, but not shown on this statement.

8. SUBTOTAL:

9. SUBTRACT total from "Checks Outstanding."

10. ADJUSTED STATEMENT BALANCE:

*This balance should agree with line 5, above.*

**IN CASE OF ERRORS IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or on a receipt or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR MONEY RESERVE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR MONEY RESERVE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. You must notify us in writing. You can telephone us, but doing so will not preserve your rights. Contact us at California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

**MONEY RESERVE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance Charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**Please notify us if we report any inaccurate information about your account(s) to a credit bureau.** Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000309

0068244-0000001-0103325

CALIFORNIA BANK & TRUST
P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**
Page 1 of 1
This Statement: July 30, 2010
Last Statement: June 30, 2010

Account        7631

**DIRECT INQUIRIES TO:**
Customer Service  1 (800) 400-6080

0044522              4212-06-0230-CBT-PG0019-00000

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA  95622-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $1,288.00 | |

## ANALYSIS CHECKING        7631                                                                103    0

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 1,297.73 | 17,500.00 | 17,509.73 | 0.00 | 1,288.00 |

### 2 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 07/14 | 14,000.00 | INTERNET XFER FROM DDA ***4841 ID: 000002836  2302800434 |
| 07/16 | 3,500.00 | INTERNET XFER FROM DDA ***4841 ID: 000001322  2302800646 |

### 3 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 07/14 | 457.94 | INT MFG GROUP INC LN#0168068-0001 LT CHGID: 195151830  2302803213 |
| 07/14 | 4,924.01 | INT MFG GROUP INC LN#0168068-0001 INT ID: 195145508  2302803101 |
| 07/16 | 12,127.78 | LOAN PAYMENT ID: 197105559  2302801695 |

### 0 CHECKS PROCESSED

There were no transactions this period.

### INSUFFICIENT FUNDS (NSF) & OVERDRAFT (OD) FEE TOTALS

| | This Statement Period | Year-to-Date |
|---|---|---|
| Total OD & NSF - Items Pd | $0.00 | $0.00 |
| Total NSF- Items Rt | $0.00 | $0.00 |

### DAILY BALANCES

| Date | Balance | Date | Balance |
|---|---|---|---|
| 07/14 | 9,915.78 | 07/16 | 1,288.00 |

EQUAL HOUSING LENDER    MEMBER FDIC

Exhibit K, Page 000310

0044522-0000001-0075187

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | | CHECKBOOK BALANCE | |
|---|---|---|---|
| Check Number | Check Amount | 1. LIST your checkbook balance. | |
| | | 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| | | 3. SUBTOTAL: | |
| | | 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| | | 5. ADJUSTED CHECKBOOK BALANCE: | |
| | | | *This balance should agree with line 10, below.* |
| | | STATEMENT BALANCE | |
| | | 6. LIST your current statement balance as shown on the front of this statement. | |
| | | 7. ADD deposits made, but not shown on this statement. | |
| | | 8. SUBTOTAL: | |
| | | 9. SUBTRACT total from "Checks Outstanding." | |
| TOTAL: | | 10. ADJUSTED STATEMENT BALANCE: | |
| *Transfer to Line 9.* | | | *This balance should agree with line 5, above.* |

**IN CASE OF ERRORS IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR MONEY RESERVE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR MONEY RESERVE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. You must notify us in writing. You can telephone us, but doing so will not preserve your rights. Contact us at California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

**MONEY RESERVE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

# CALIFORNIA BANK
## TRUST
CB TRUST

P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**
Page 1 of 1
This Statement: August 31, 2010
Last Statement: July 30, 2010

Account       7631

**DIRECT INQUIRIES TO:**
Customer Service  1 (800) 400-6080

0043863          4244-06-0200-CBT-PC0019-00000

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA  95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $1,401.27 | |

## ANALYSIS CHECKING       7631                                                               103   0

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 1,288.00 | 15,000.00 | 14,886.73 | 0.00 | 1,401.27 |

**1 DEPOSIT/CREDIT**

| Date | Amount | Description |
|---|---|---|
| 08/18 | 15,000.00 | TELLER XFER FROM DDA ***4841 ID: 000000610  2302403598 |

**2 CHARGES/DEBITS**

| Date | Amount | Description |
|---|---|---|
| 08/19 | 2,740.21 | LOAN PAYMENT ID: 231083157  2302800573 |
| 08/19 | 12,146.52 | LOAN PAYMENT ID: 231083319  2302800575 |

**0 CHECKS PROCESSED**

There were no transactions this period.

**INSUFFICIENT FUNDS (NSF) & OVERDRAFT (OD) FEE TOTALS**

| | This Statement Period | Year-to-Date |
|---|---|---|
| Total OD & NSF - Items Pd | $0.00 | $0.00 |
| Total NSF- Items Rt | $0.00 | $0.00 |

**DAILY BALANCES**

| Date | Balance | Date | Balance |
|---|---|---|---|
| 08/18 | 16,288.00 | 08/19 | 1,401.27 |

MEMBER FDIC
EQUAL HOUSING LENDER

Exhibit K, Page 000312

0043863-0000001-0076204

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1.  LIST your checkbook balance. | |
| 2.  ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3.  SUBTOTAL: | |
| 4.  SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5.  ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6.  LIST your current statement balance as shown on the front of this statement. | |
| 7.  ADD deposits made, but not shown on this statement. | |
| 8.  SUBTOTAL: | |
| 9.  SUBTRACT total from "Checks Outstanding." | |
| 10.  ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

### IN CASE OF ERRORS IDENTIFIED ON THIS STATEMENT

You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR MONEY RESERVE TRANSACTIONS

If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. The provisions in this paragraph do not apply to business or other non-personal accounts. The owners of those accounts must settle all unauthorized transactions or errors within 24 hours of receipt of the item posting in order to be returned.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

### FOR MONEY RESERVE ACCOUNTS:

#### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE
*(This is a Summary of Your Billing Rights).*

If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. You must notify us in writing. You can telephone us, but doing so will not preserve your rights. Contact us at California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

**Balance Subject to Interest Rate:** We use the method called "average daily balance", (including current transactions) to calculate the daily balance. If you have any further questions about the method and how resulting interest charges are determined, please feel free to contact us at 1-800-400-6060.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**Please notify us** if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000313

0043863-0000001-0076204

# CALIFORNIA BANK
### T R U S T
C|B  T R U S T

P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**
Page 1 of 1
This Statement: September 30, 2010
Last Statement: August 31, 2010

Account          7631

**DIRECT INQUIRIES TO:**
Customer Service  1 (800) 400-6080

0067592          4274-06-0200-CBT-PC0019-00000

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA  95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $1,999.94 | |

## ANALYSIS CHECKING       7631                                                                 103    0

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 1,401.27 | 7,000.00 | 6,401.33 | 0.00 | 1,999.94 |

**1  DEPOSIT/CREDIT**

| Date | Amount | Description |
|---|---|---|
| 09/21 | 7,000.00 | INTERNET XFER FROM DDA ***4841 ID: 000001879  2302500038 |

**3  CHARGES/DEBITS**

| Date | Amount | Description |
|---|---|---|
| 09/21 | 2,106.25 | LOAN PAYMENT ID: 264102216  2302501161 |
| 09/21 | 4,045.08 | LOAN PAYMENT ID: 264102327  2302501169 |
| 09/21 | 250.00 | INT'L MFG GROUP INC LN#0181803-9001 FEE ID: 264144825  2302502917 |

**0  CHECKS PROCESSED**

There were no transactions this period.

## INSUFFICIENT FUNDS (NSF) & OVERDRAFT (OD) FEE TOTALS

| | This Statement Period | Year-to-Date |
|---|---|---|
| Total OD & NSF - Items Pd | $0.00 | $0.00 |
| Total NSF- Items Rt | $0.00 | $0.00 |

## DAILY BALANCES

| Date | Balance |
|---|---|
| 09/21 | 1,999.94 |

MEMBER FDIC

Exhibit K, Page 000314

0067592-0000001-0100675

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

Transfer to Line 9.

**CHECKBOOK BALANCE**

1. LIST your checkbook balance.

2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits).

3. SUBTOTAL:

4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc).

5. ADJUSTED CHECKBOOK BALANCE:

*This balance should agree with line 10, below.*

**STATEMENT BALANCE**

6. LIST your current statement balance as shown on the front of this statement.

7. ADD deposits made, but not shown on this statement.

8. SUBTOTAL:

9. SUBTRACT total from "Checks Outstanding."

10. ADJUSTED STATEMENT BALANCE:

*This balance should agree with line 5, above.*

**IN CASE OF ERRORS INDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges. .

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR MONEY RESERVE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. The provisions in this paragraph do not apply to business or other non-personal accounts. The owners of those accounts must settle all unauthorized transactions or errors within 24 hours of receipt of the item posting in order to be returned.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR MONEY RESERVE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. You must notify us in writing. You can telephone us, but doing so will not preserve your rights. Contact us at California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

**Balance Subject to Interest Rate:** We use the method called "average daily balance", (including current transactions) to calculate the daily balance. If you have any further questions about the method and how resulting interest charges are determined, please feel free to contact us at 1-800-400-6080.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**Please notify us if we report any inaccurate information about your account(s) to a credit bureau.** Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000315

0067592-0000001-0100675

**CALIFORNIA BANK & TRUST**

P.O. Box 489, Lawndale, CA 90260-0489

Statement of Accounts
Page 1 of 1
This Statement: October 29, 2010
Last Statement: September 30, 2010

Account       7631

DIRECT INQUIRIES TO:
Customer Service 1 (800) 400-6080

0022734          4303-06-0234-CBT-PG0021-00000
INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $2,306.93 | |

## ANALYSIS CHECKING     7631                                    103    0

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 1,999.94 | 4,000.00 | 3,693.01 | 0.00 | 2,306.93 |

### 1 DEPOSIT/CREDIT

| Date | Amount | Description |
|---|---|---|
| 10/27 | 4,000.00 | INTERNET XFER FROM DDA ***4841 ID: 000002230 2303003922 |

### 1 CHARGE/DEBIT

| Date | Amount | Description |
|---|---|---|
| 10/28 | 3,693.01 | LOAN PAYMENT ID: 301094623 2302301003 |

### 0 CHECKS PROCESSED
There were no transactions this period.

### AGGREGATE OVERDRAFT AND RETURNED ITEM FEES

| | Total for This Period | Total Year-to-Date |
|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 |

### DAILY BALANCES

| Date | Balance | Date | Balance |
|---|---|---|---|
| 10/27 | 5,999.94 | 10/28 | 2,306.93 |

MEMBER FDIC

Exhibit K, Page 000316

0022734-0000001-0031541

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1.  LIST your checkbook balance. | |
| 2.  ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3.  SUBTOTAL: | |
| 4.  SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5.  ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6.  LIST your current statement balance as shown on the front of this statement. | |
| 7.  ADD deposits made, but not shown on this statement. | |
| 8.  SUBTOTAL: | |
| 9.  SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF ERRORS INDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR MONEY RESERVE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us.  Please use the telephone number or address listed on the front of this statement to contact us as you can.  We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.  The provisions in this paragraph do not apply to business or other non-personal accounts.   The owners of those accounts must settle all unauthorized transactions or errors within 24 hours of receipt of the item posting in order to be returned.

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR MONEY RESERVE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. You must notify us in writing. You can telephone us, but doing so will not preserve your rights. Contact us at California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

**Balance Subject to Interest Rate:** We use the method called "average daily balance", (including current transactions) to calculate the daily balance.  If you have any further questions about the method and how resulting interest charges are determined, please feel free to contact us at 1-800-400-6080.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be rejected in your credit report.

**Please notify us if we report any inaccurate information about your account(s) to a credit bureau.** Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000317

0022734-0000001-0031541

# CALIFORNIA BANK
### T R U S T
P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**
Page 1 of 1
This Statement: November 30, 2010
Last Statement: October 29, 2010

Account        7631

**DIRECT INQUIRIES TO:**
Customer Service 1 (800) 400-6080

0022991             4335-06-0200-CBT-PG0021-00000
INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $6,044.49 | |

## ANALYSIS CHECKING        7631                                         103    0

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 2,306.93 | 500,000.00 | 496,262.44 | 0.00 | 6,044.49 |

### 1 DEPOSIT/CREDIT

| Date | Amount | Description |
|---|---|---|
| 11/17 | 500,000.00 | INTERNET XFER FROM DDA ***4841 ID: 000001911 2302903520 |

### 3 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 11/04 | 1,800.00 | INTERNET XFER TO DDA ***4841 ID: 000002916 2302600073 |
| 11/17 | 490,417.36 | 0181803-9001 BATCH 696 ID: 321174133 2302904077 |
| 11/18 | 4,045.08 | LOAN PAYMENT ID: 322122015 2302501997 |

### 0 CHECKS PROCESSED

There were no transactions this period.

### AGGREGATE OVERDRAFT AND RETURNED ITEM FEES

| | Total for This Period | Total Year-to-Date |
|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 |

### DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 11/04 | 506.93 | 11/17 | 10,089.57 | 11/18 | 6,044.49 |

MEMBER FDIC   EQUAL HOUSING LENDER

Exhibit K, Page 000318

0022991-0000001-0032266

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1.  LIST your checkbook balance. | |
| 2.  ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3.  SUBTOTAL: | |
| 4.  SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5.  ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6.  LIST your current statement balance as shown on the front of this statement. | |
| 7.  ADD deposits made, but not shown on this statement. | |
| 8.  SUBTOTAL: | |
| 9.  SUBTRACT total from "Checks Outstanding." | |
| 10.  ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

### IN CASE OF ERRORS INDENTIFIED ON THIS STATEMENT

You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR MONEY RESERVE TRANSACTIONS

If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us.  Please use the telephone number or address listed on the front of this statement to contact us as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. The provisions in this paragraph do not apply to business or other non-personal accounts.  The owners of those accounts must settle all unauthorized transactions or errors within 24 hours of receipt of the item posting in order to be returned.

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

### FOR MONEY RESERVE ACCOUNTS:

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE
*(This is a Summary of Your Billing Rights).*

If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. You must notify us in writing. You can telephone us, but doing so will not preserve your rights. Contact us at California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

**Balance Subject to Interest Rate:** We use the method called "average daily balance", (including current transactions) to calculate the daily balance.  If you have any further questions about the method and how resulting interest charges are determined, please feel free to contact us at 1-800-400-6080.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**Please notify us if we report any inaccurate information about your account(s) to a credit bureau.** Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

# C|B CALIFORNIA | BANK
### T R U S T   T R U S T

P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**
Page 1 of 1
This Statement: December 31, 2010
Last Statement: November 30, 2010

Account        7631

**DIRECT INQUIRIES TO:**
Customer Service 1 (800) 400-6080

0044709          4001-06-0200-CBT-PG0021-00000

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

---

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $2,351.48 | |

---

## ANALYSIS CHECKING        7631                                    103    0

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 6,044.49 | 2,000,000.00 | 2,003,693.01 | 0.00 | 2,351.48 |

**1  DEPOSIT/CREDIT**

| Date | Amount | Description |
|---|---|---|
| 12/27 | 2,000,000.00 | INTERNET XFER FROM DDA ***4841 ID: 000001857  2302402146 |

**2  CHARGES/DEBITS**

| Date | Amount | Description |
|---|---|---|
| 12/01 | 3,693.01 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680001  2501000106 |
| 12/27 | 2,000,000.00 | WIRE/OUT-2010122700003044;BNF CIMG JV, LLC  1301100918 |

**0  CHECKS PROCESSED**

There were no transactions this period.

**AGGREGATE OVERDRAFT AND RETURNED ITEM FEES**

| | Total for This Period | Total Year-to-Date |
|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 |

**DAILY BALANCES**

| Date | Balance | Date | Balance |
|---|---|---|---|
| 12/01 | 2,351.48 | 12/27 | 2,351.48 |

---

MEMBER FDIC
EQUAL HOUSING LENDER

Exhibit K, Page 000320

0044709-0000001-0055729

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

| CHECKBOOK BALANCE | |
|---|---|
| 1.  LIST your checkbook balance. | |
| 2.  ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3.  SUBTOTAL: | |
| 4.  SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5.  ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6.  LIST your current statement balance as shown on the front of this statement. | |
| 7.  ADD deposits made, but not shown on this statement. | |
| 8.  SUBTOTAL: | |
| 9.  SUBTRACT total from "Checks Outstanding." | |
| 10.  ADJUSTED STATEMENT BALANCE: | |

*Transfer to Line 9.*

*This balance should agree with line 5, above.*

**IN CASE OF ERRORS INDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR MONEY RESERVE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. The provisions in this paragraph do not apply to business or other non-personal accounts. The owners of those accounts must settle all unauthorized transactions or errors within 24 hours of receipt of the item posting in order to be returned.

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR MONEY RESERVE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. You must notify us in writing. You can telephone us, but doing so will not preserve your rights. Contact us at California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

**Balance Subject to Interest Rate:** We use the method called "average daily balance", (including current transactions) to calculate the daily balance. If you have any further questions about the method and how resulting interest charges are determined, please feel free to contact us at 1-800-400-6080.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**Please** notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

# CALIFORNIA BANK
### C|B TRUST
### T R U S T

P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**
Page 1 of 1
This Statement: January 31, 2011
Last Statement: December 31, 2010

Account        7631

**DIRECT INQUIRIES TO:**
Customer Service  1 (800) 400-6080

0022276                    4032-06-0200-CBT-PG0021-00000

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $2,328.04 | |

## ANALYSIS CHECKING      7631                                     103    0

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 2,351.48 | 5,000.00 | 5,023.44 | 0.00 | 2,328.04 |

### 1 DEPOSIT/CREDIT

| Date | Amount | Description |
|---|---|---|
| 01/20 | 5,000.00 | INTERNET XFER FROM DDA ***4841 ID: 000001328  2302100388 |

### 1 CHARGE/DEBIT

| Date | Amount | Description |
|---|---|---|
| 01/20 | 5,023.44 | LOAN PAYMENT ID: 020160023  2302103465 |

### 0 CHECKS PROCESSED

There were no transactions this period.

### AGGREGATE OVERDRAFT AND RETURNED ITEM FEES

| | Total for This Period | Total Year-to-Date |
|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 |

### DAILY BALANCES

| Date.........................Balance |
|---|
| 01/20          2,328.04 |

MEMBER FDIC

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1.  LIST your checkbook balance. | |
| 2.  ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3.  SUBTOTAL: | |
| 4.  SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5.  ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6.  LIST your current statement balance as shown on the front of this statement. | |
| 7.  ADD deposits made, but not shown on this statement. | |
| 8.  SUBTOTAL: | |
| 9.  SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF ERRORS INDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR MONEY RESERVE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. The provisions in this paragraph do not apply to business or other non-personal accounts. The owners of those accounts must settle all unauthorized transactions or errors within 24 hours of receipt of the item posting in order to be returned.

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR MONEY RESERVE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights.)*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.
1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. You must notify us in writing. You can telephone us, but doing so will not preserve your rights. Contact us at California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

**Balance Subject to Interest Rate:** We use the method called "average daily balance", (including current transactions) to calculate the daily balance.  If you have any further questions about the method and how resulting interest charges are determined, please feel free to contact us at 1-800-400-5080.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected on your credit report.

**Please notify us if we report any inaccurate information about your account(s) to a credit bureau.** Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.



**CALIFORNIA BANK**

**T R U S T**

P.O. Box 489, Lawndale, CA 90260-0489

DIRECT INQUIRIES TO:
Customer Service 1 (800) 400-6080

0022454              4060-06-0200-CBT-PG0021-00000

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

---

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $2,762.12 | |

---

## ANALYSIS CHECKING        7631                                                                 103    0

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 2,328.04 | 887,000.00 | 886,565.92 | 0.00 | 2,762.12 |

### 1 DEPOSIT/CREDIT

| Date | Amount | Description |
|---|---|---|
| 02/14 | 887,000.00 | INTERNET XFER FROM DDA ***8679 ID: 000002840 2303003908 |

### 1 CHARGE/DEBIT

| Date | Amount | Description |
|---|---|---|
| 02/14 | 886,565.92 | LOAN PAYOFF #168068-1 ID: 045154202 2303005687 |

### 0 CHECKS PROCESSED

There were no transactions this period.

### AGGREGATE OVERDRAFT AND RETURNED ITEM FEES

| | Total for This Period | Total Year-to-Date |
|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 |

### DAILY BALANCES

| Date | Balance |
|---|---|
| 02/14 | 2,762.12 |

MEMBER FDIC
EQUAL HOUSING LENDER

Exhibit K, Page 000324

0022454-0000001-0030468

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF ERRORS INDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR MONEY RESERVE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. The provisions in this paragraph do not apply to business or other non-personal accounts. The owners of those accounts must settle all unauthorized transactions or errors within 24 hours of receipt of the item posting in order to be returned.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR MONEY RESERVE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or if you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. You must notify us in writing. You can telephone us, but doing so will not preserve your rights. Contact us at California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

**Balance Subject to Interest Rate:** We use the method called "average daily balance", (including current transactions) to calculate the daily balance. If you have any further questions about the method and how resulting interest charges are determined, please feel free to contact us at 1-800-400-6080.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**Please notify us if we report any inaccurate information about your account(s) to a credit bureau.** Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 94125-0787.

Case 16-02090

## CALIFORNIA BANK & TRUST

P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**
Page 1 of 2
This Statement: March 31, 2010
Last Statement: February 26, 2010

Account         4841

**DIRECT INQUIRIES TO:**
Customer Service 1 (800) 400-6080

0069840          4091-06-0200-CBT-PG0020-00089

INTERNATIONAL MANUFACTURING GROUP INC
WHOLESALE ACCT
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 4841 | $28,368.91 | |

## ANALYSIS CHECKING    4841

103    89-

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 2,474,764.36 | 3,277,727.40 | 964,742.46 | 4,759,380.39 | 28,368.91 |

**10 DEPOSITS/CREDITS**

| Date | Amount | Description |
|---|---|---|
| 03/05 | 1,758,184.85 | WIRE/IN-201003050004073;ORG JTS COMMUNITIES INC 1301401390 |
| 03/09 | 100,000.00 | TELLER XFER FROM DDA ***8679 ID: 000004064 2302603122 |
| 03/09 | 86,432.15 | WIRE/IN-201003090000473;ORG CEMO DEEPAL HOLDINGS LLC;OBI BI 1301301139 |
| 03/10 | 50,000.00 | TELLER XFER FROM DDA ***8679 ID: 000003389 2303003654 |
| 03/15 | 100,000.00 | DEPOSIT 5160167420 |
| 03/16 | 60,000.00 | DEPOSIT 5160114160 |
| 03/17 | 60,000.00 | DEPOSIT 5160082370 |
| 03/22 | 963,110.40 | WIRE/IN-201003220003885;ORG JTS COMMUNITIES INC 1301301211 |
| 03/30 | 50,000.00 | TELLER XFER FROM DDA ***8679 ID: 000004230 2303103932 |
| 03/31 | 50,000.00 | TELLER XFER FROM DDA ***8679 ID: 000005172 2302304472 |

**19 CHARGES/DEBITS**

| Date | Amount | Description |
|---|---|---|
| 03/01 | 5,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000000242 2302803027 |
| 03/02 | 40,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000002320 2303000009 |
| 03/03 | 50,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000001416 2302500133 |
| 03/05 | 6,059.89 | AMERICAN EXPRESS ELEC R 10030405209914REF # 010063008835192 1101226594 |
| 03/05 | 8,191.84 | AMERICAN EXPRESS ELEC R *******521094REF # 010063008834816 1101226363 |
| 03/10 | 45,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000001562 2303000435 |
| 03/10 | 250,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000000230 2303000017 |
| 03/11 | 10,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000002589 2302400535 |
| 03/15 | 18,843.75 | DEBIT MEMO 5160162760 |
| 03/16 | 10,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000002342 2302900375 |
| 03/17 | 15,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000001540 2302600067 |
| 03/18 | 15,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000002669 2302800033 |
| 03/23 | 30,000.00 | INTERNET XFER TO DDA ***7631 ID: 000002424 2302602805 |
| 03/25 | 10,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000001869 2302900015 |

MEMBER FDIC

0069840-0000001-0133038

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

Transfer to Line 9.

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which this error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (if Any) is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Filed 09/21/16                                 Case 16-02090                                                    Doc 93

**C|B** **CALIFORNIA | BANK**
 **TRUST**
 **TRUST**

P.O. Box 489, Lawndale, CA 90260-0489

Page 2 of 2
March 31, 2010
INTERNATIONAL MANUFACTURING GROUP INC
4841

Continued ...

| Date | Amount | Description |
|------|--------|-------------|
| 03/26 | 350,000.00 | TELLER XFER TO DDA ***8679 ID: 000004095 2302204051 |
| 03/26 | 30,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000002299 2302204197 |
| 03/26 | 50,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000002371 2302200013 |
| 03/29 | 9,179.55 | AMERICAN EXPRESS ELEC R *******529973REF # 010088006897133 1101614020 |
| 03/29 | 12,467.43 | AMERICAN EXPRESS ELEC R 100326052988660REF # 010088006897585 1101614398 |

**88 CHECKS PROCESSED**

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|--------|------|--------|--------|------|--------|--------|------|--------|
| 0 | 03/02 | 2,200,000.00 | 3382 | 03/22 | 4,166.66 | 3413 | 03/23 | 2,708.00 |
| 0* | 03/08 | 2,000.00 | 3383 | 03/09 | 1,068.95 | 3414 | 03/23 | 5,000.00 |
| 0* | 03/08 | 30,000.00 | 3384 | 03/09 | 15,317.49 | 3415 | 03/22 | 1,062.50 |
| 0* | 03/08 | 125,000.00 | 3385 | 03/08 | 52,342.06 | 3416 | 03/25 | 3,750.00 |
| 0* | 03/08 | 1,100,000.00 | 3386 | 03/05 | 243,546.07 | 3417 | 03/23 | 2,187.00 |
| 0* | 03/26 | 6,418.75 | 3387 | 03/05 | 5,099.99 | 3418 | 03/22 | 4,166.66 |
| 3305* | 03/08 | 625.00 | 3388 | 03/08 | 1,835.01 | 3419 | 03/23 | 2,500.00 |
| 3352* | 03/02 | 5,000.00 | 3389 | 03/11 | 12,245.44 | 3420 | 03/22 | 4,585.00 |
| 3356* | 03/02 | 6,582.00 | 3390 | 03/11 | 4,368.02 | 3421 | 03/22 | 5,000.00 |
| 3359* | 03/01 | 5,593.16 | 3391 | 03/15 | 10,000.00 | 3422 | 03/25 | 5,791.66 |
| 3362* | 03/01 | 4,000.00 | 3393* | 03/11 | 12,709.38 | 3423 | 03/24 | 11,342.00 |
| 3363 | 03/01 | 3,400.00 | 3395* | 03/23 | 12,813.00 | 3425* | 03/25 | 6,582.00 |
| 3364 | 03/02 | 3,167.00 | 3396 | 03/17 | 17,500.00 | 3426 | 03/24 | 219,677.24 |
| 3365 | 03/02 | 3,266.29 | 3397 | 03/16 | 12,500.00 | 3427 | 03/25 | 35,410.65 |
| 3366 | 03/02 | 3,266.29 | 3398 | 03/12 | 6,801.99 | 3428 | 03/25 | 4,000.00 |
| 3367 | 03/01 | 311.68 | 3399 | 03/12 | 5,154.00 | 3431* | 03/29 | 3,400.00 |
| 3368 | 03/01 | 735.41 | 3400 | 03/08 | 2,000.00 | 3435* | 03/26 | 10,613.94 |
| 3369 | 03/01 | 833.33 | 3401 | 03/12 | 35,972.23 | 3443* | 03/30 | 5,495.01 |
| 3370 | 03/03 | 5,154.00 | 3402 | 03/25 | 5,154.00 | 3444 | 03/30 | 10,924.61 |
| 3371 | 03/01 | 35,000.00 | 3403 | 03/18 | 30,000.00 | 3445 | 03/29 | 3,925.65 |
| 3372 | 03/03 | 4,666.66 | 3404 | 03/19 | 15,883.65 | 3446 | 03/29 | 7,803.30 |
| 3373 | 03/03 | 3,583.00 | 3405 | 03/19 | 6,418.75 | 3450* | 03/31 | 4,851.00 |
| 3374 | 03/04 | 53,974.92 | 3406 | 03/22 | 11,840.70 | 3452* | 03/29 | 4,175.59 |
| 3375 | 03/09 | 17,107.08 | 3407 | 03/19 | 2,594.19 | 3452* | 03/30 | 33,393.36 |
| 3376 | 03/09 | 1,560.47 | 3408 | 03/19 | 1,625.00 | 3453 | 03/31 | 47,664.22 |
| 3377 | 03/08 | 7,217.50 | 3409 | 03/30 | 1,785.00 | 3455* | 03/30 | 21,321.88 |
| 3378 | 03/08 | 625.00 | 3410 | 03/23 | 1,250.00 | 3456 | 03/30 | 19,379.80 |
| 3379 | 03/09 | 9,486.00 | 3411 | 03/19 | 5,625.00 | 3457 | 03/29 | 25,000.00 |
| 3380 | 03/09 | 10,020.87 | 3412 | 03/19 | 625.00 | 125009* | 15 | 55,000.00 |
| 3381 | 03/11 | 5,833.33 | | | | | | |

* Not in check sequence

**INSUFFICIENT FUNDS (NSF) & OVERDRAFT (OD) FEE TOTALS**

| | This Statement Period | Year-to-Date |
|---|---|---|
| Total OD & NSF - Items Pd | $0.00 | $0.00 |
| Total NSF- Items Rt | $0.00 | $0.00 |

**DAILY BALANCES**

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 03/01 | 2,419,890.78 | 03/11 | 56,588.23 | 03/23 | 887,875.55 |
| 03/02 | 158,609.20 | 03/12 | 8,660.01 | 03/24 | 656,856.31 |
| 03/03 | 95,205.54 | 03/15 | 24,816.26 | 03/25 | 586,168.00 |
| 03/04 | 41,230.62 | 03/16 | 62,316.26 | 03/26 | 139,135.31 |
| 03/05 | 1,521,200.19 | 03/17 | 89,816.26 | 03/29 | 73,183.79 |
| 03/08 | 199,555.62 | 03/18 | 44,816.26 | 03/30 | 30,884.13 |
| 03/09 | 346,744.40 | 03/19 | 12,044.67 | 03/31 | 28,368.91 |
| 03/10 | 101,744.40 | 03/22 | 944,333.55 | | |

Exhibit K, Page 000328

MEMBER FDIC

0069840-0000002-0133039

## An Easy Approach To Balancing Your Account

To reconcile your checkbook balance to your statement balance: Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**

You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**

If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*

If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**

*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25767, Salt Lake City, UT 84125-0787.

Filed 09/21/16

Case 16-02090

# CALIFORNIA BANK
## TRUST

P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**
Page 1 of 2
This Statement: May 28, 2010
Last Statement: April 30, 2010

Account     4841

**DIRECT INQUIRIES TO:**
Customer Service  1 (800) 400-6080

0045094         4149-06-0030-CBT-PC0020-00087

INTERNATIONAL MANUFACTURING GROUP INC
WHOLESALE ACCT
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 4841 | $902,056.71 | |

## ANALYSIS CHECKING     4841                                                                 103   87

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 161,530.17 | 4,944,338.70 | 2,712,143.09 | 1,491,669.07 | 902,056.71 |

### 15 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 05/03 | 75,000.00 | TELLER XFER FROM DDA ***8679 ID: 000005829 2302406700 |
| 05/04 | 125,000.00 | TELLER XFER FROM DDA ***8679 ID: 000006733 2302801248 |
| 05/04 | 600,000.00 | DEPOSIT 5160084640 |
| 05/04 | 985,845.60 | WIRE/IN-2010050400003957;ORG JTS COMMUNITIES INC;OBI BID 11 1301401284 |
| 05/05 | 125,000.00 | TELLER XFER FROM DDA ***8679 ID: 000006876 2302504206 |
| 05/07 | 250,000.00 | TELLER XFER FROM DDA ***8679 ID: 000001883 2302503676 |
| 05/10 | 125,000.00 | TELLER XFER FROM DDA ***8679 ID: 000007177 2303105644 |
| 05/11 | 125,000.00 | TELLER XFER FROM DDA ***8679 ID: 000007229 2302403736 |
| 05/12 | 10,000.00 | INTERNET XFER FROM DDA WANNAS ENTER ID: 000001572 2302900530 |
| 05/12 | 158,705.10 | WIRE/IN-2010051200004002;ORG CEMO DEEPAL HOLDINGS LLC;OBI BI 1301301345 |
| 05/14 | 975,744.10 | WIRE/IN-2010051400001844;ORG JTS COMMUNITIES INC;OBI SHORT T 1301100594 |
| 05/21 | 200,000.00 | TELLER XFER FROM DDA ***8679 ID: 000007653 2302303324 |
| 05/24 | 75,000.00 | TELLER XFER FROM DDA ***8679 ID: 000007737 2302705352 |
| 05/25 | 984,644.46 | WIRE/IN-2010052500002884;ORG JTS COMMUNITIES INC;OBI BID 13 1301300876 |
| 05/27 | 129,399.44 | DEPOSIT 5160003340 |

### 19 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 05/04 | 1,470,851.88 | 0168068-9002 ID: 124154347 2302803427 |
| 05/04 | 20,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000001739 2302800305 |
| 05/05 | 90,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000001789 2302504409 |
| 05/07 | 13,000.00 | TELLER XFER TO DDA ***7631 ID: 000007054 2302504299 |
| 05/10 | 5,743.34 | AMERICAN EXPRESS ELEC R ******535237REF # 010130003730524 1101755189 |
| 05/10 | 8,490.77 | AMERICAN EXPRESS ELEC R 100509053519130REF # 010130003730568 1101755365 |
| 05/10 | 12,000.00 | INTERNET XFER TO DDA ***7631 ID: 000001133 2303100217 |
| 05/11 | 3,945.30 | CITICARDS PYMT PHONE PY **** REF # 010130003984653 1101715135 |
| 05/11 | 25,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000001623 2302400077 |
| 05/12 | 24,498.80 | WIRE/OUT-2010051200005737;BNF COMFORT RUBBER GLOVES 1301301979 |
| 05/12 | 35,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000001196 2302904185 |
| 05/17 | 900,000.00 | TELLER XFER TO DDA ***8679 ID: 000007463 2302705309 |
| 05/18 | 4,500.00 | INTERNET XFER TO DDA ***7631 ID: 000001454 2302803339 |

Exhibit K, Page 000330

MEMBER FDIC

0045094-0000001-0075625

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | | CHECKBOOK BALANCE | |
|---|---|---|---|
| Check Number | Check Amount | 1. LIST your checkbook balance. | |
| | | 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| | | 3. SUBTOTAL | |
| | | 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| | | 5. ADJUSTED CHECKBOOK BALANCE: | |
| | | *This balance should agree with line 10, below.* | |
| | | **STATEMENT BALANCE** | |
| | | 6. LIST your current statement balance as shown on the front of this statement. | |
| | | 7. ADD deposits made, but not shown on this statement. | |
| | | 8. SUBTOTAL: | |
| | | 9. SUBTRACT total from "Checks Outstanding." | |
| TOTAL: | | 10. ADJUSTED STATEMENT BALANCE: | |

*Transfer to Line 9.*                          *This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone us or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25767, Salt Lake City, UT 84125-0787.

Case 16-02090

Page 2 of 2
May 28, 2010
INTERNATIONAL MANUFACTURING GROUP INC
4841

## CALIFORNIA BANK & TRUST
P.O. Box 489, Lawndale, CA 90260-0489

Continued ...

| Date | Amount | Description |
|------|--------|-------------|
| 05/18 | 10,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000000286 2302800367 |
| 05/20 | 10,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000001100 2302500555 |
| 05/21 | 10,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000002666 2302303749 |
| 05/25 | 5,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000001755 2302300027 |
| 05/26 | 49,113.00 | WIRE/OUT-2010052600006610;BNF JIANGSU UNIVERSAL GLOVE CO LTD 1301202118 |
| 05/28 | 15,000.00 | INTERNET XFER TO DDA WANNAS ENTER ID: 000001477 2302200605 |

## 87 CHECKS PROCESSED

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|--------|------|--------|--------|------|--------|--------|------|--------|
| 0 | 05/04 | 45,000.00 | 3562 | 05/06 | 6,281.05 | 3594 | 05/21 | 2,594.19 |
| 3523* | 05/05 | 5,000.00 | 3563 | 05/07 | 211,792.11 | 3595 | 05/25 | 1,625.00 |
| 3528* | 05/03 | 5,833.33 | 3564 | 05/10 | 44,251.69 | 3596 | 05/19 | 5,625.00 |
| 3530* | 05/03 | 10,924.61 | 3565 | 05/10 | 11,141.32 | 3597 | 05/19 | 625.00 |
| 3532* | 05/03 | 127,472.88 | 3566 | 05/10 | 9,510.74 | 3598 | 05/28 | 2,708.00 |
| 3533 | 05/03 | 3,925.65 | 3567 | 05/11 | 3,750.00 | 3599 | 05/26 | 1,250.00 |
| 3534 | 05/03 | 7,803.30 | 3568 | 05/11 | 878.00 | 3600 | 05/25 | 6,000.00 |
| 3538* | 05/03 | 8,260.00 | 3569 | 05/11 | 5,833.33 | 3601 | 05/21 | 1,062.50 |
| 3539 | 05/03 | 4,500.00 | 3570 | 05/19 | 4,166.66 | 3602 | 05/26 | 3,750.00 |
| 3540 | 05/03 | 3,400.00 | 3571 | 05/12 | 5,000.00 | 3603 | 05/20 | 4,166.66 |
| 3541 | 05/05 | 3,266.29 | 3572 | 05/12 | 1,068.95 | 3604 | 05/21 | 4,585.00 |
| 3542 | 05/05 | 3,266.29 | 3573 | 05/12 | 549.10 | 3606* | 05/21 | 170,922.97 |
| 3543 | 05/10 | 3,167.00 | 3575* | 05/11 | 80,000.00 | 3607 | 05/25 | 5,154.00 |
| 3545* | 05/04 | 42,833.60 | 3576 | 05/11 | 4,687.00 | 3608 | 05/24 | 2,187.00 |
| 3546 | 05/05 | 5,154.00 | 3577 | 05/13 | 4,687.00 | 3609 | 05/21 | 2,500.00 |
| 3547 | 05/05 | 6,801.99 | 3579* | 05/12 | 27,025.41 | 3611* | 05/28 | 5,154.00 |
| 3548 | 05/12 | 2,718.00 | 3580 | 05/13 | 2,969.92 | 3612 | 05/26 | 2,775.00 |
| 3549 | 05/03 | 10,000.00 | 3581 | 05/13 | 1,875.00 | 3615* | 05/26 | 10,613.94 |
| 3550 | 05/03 | 7,500.00 | 3582 | 05/12 | 4,600.00 | 3617* | 05/26 | 4,851.00 |
| 3551 | 05/04 | 125,000.00 | 3583 | 05/10 | 100.00 | 3618 | 05/26 | 11,342.00 |
| 3552 | 05/07 | 4,666.66 | 3584 | 05/11 | 20,000.00 | 3620* | 05/26 | 10,924.61 |
| 3553 | 05/07 | 3,583.00 | 3585 | 05/21 | 9,274.66 | 3621 | 05/26 | 5,495.92 |
| 3554 | 05/07 | 5,911.14 | 3586 | 05/17 | 1,966.08 | 3622 | 05/26 | 5,791.66 |
| 3555 | 05/07 | 4,728.91 | 3587 | 05/18 | 5,154.00 | 3623 | 05/25 | 6,582.00 |
| 3556 | 05/10 | 1,939.64 | 3588 | 05/19 | 5,154.00 | 3627* | 05/26 | 27,335.67 |
| 3557 | 05/10 | 11,399.53 | 3589 | 05/18 | 21,243.09 | 3628 | 05/26 | 12,810.00 |
| 3558 | 05/11 | 1,134.21 | 3590 | 05/18 | 6,418.75 | 3629 | 05/26 | 85,415.62 |
| 3560* | 05/06 | 15,317.49 | 3592* | 05/20 | 30,000.00 | 3631* | 05/25 | 26,041.03 |
| 3561 | 05/10 | 12,485.27 | 3593 | 05/20 | 35,410.65 | 3636* | 05/27 | 4,000.00 |

* Not in check sequence

## INSUFFICIENT FUNDS (NSF) & OVERDRAFT (OD) FEE TOTALS

| | This Statement Period | Year-to-Date |
|------|------|------|
| Total OD & NSF - Items Pd | $0.00 | $0.00 |
| Total NSF- Items Rt | $0.00 | $0.00 |

## DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 05/03 | 46,910.40 | 05/12 | 103,089.29 | 05/21 | 23,932.26 |
| 05/04 | 54,070.52 | 05/13 | 93,557.37 | 05/24 | 96,745.26 |
| 05/05 | 65,581.95 | 05/14 | 1,069,301.47 | 05/25 | 1,030,987.69 |
| 05/06 | 43,983.41 | 05/17 | 167,335.39 | 05/26 | 799,519.27 |
| 05/07 | 50,301.59 | 05/18 | 120,019.55 | 05/27 | 924,918.71 |
| 05/10 | 55,072.29 | 05/19 | 104,448.89 | 05/28 | 902,056.71 |
| 05/11 | 34,844.45 | 05/20 | 24,871.58 | | |

MEMBER FDIC

0045094-0000002-0075626

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | | CHECKBOOK BALANCE | |
|---|---|---|---|
| Check Number | Check Amount | | |
| | | 1. LIST your checkbook balance. | |
| | | 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| | | 3. SUBTOTAL: | |
| | | 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| | | 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| | | STATEMENT BALANCE | |
|---|---|---|---|
| | | 6. LIST your current statement balance as shown on the front of this statement. | |
| | | 7. ADD deposits made, but not shown on this statement. | |
| | | 8. SUBTOTAL: | |
| | | 9. SUBTRACT total from "Checks Outstanding." | |
| TOTAL: | | 10. ADJUSTED STATEMENT BALANCE: | |

*Transfer to Line 9.*    *This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**

You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or on a receipt, please telephone or write us within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**

If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*

If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**

*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

THE SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA BARBARA

TENTATIVE RULING

**Judge Colleen Sterne**
**Department 5 SB-Anacapa**
**1100 Anacapa Street P.O. Box 21107 Santa Barbara, CA 93121-1107**

CONSERVATORSHIP

| Consevatorship of Rosemary Free Leahy | |
|---|---|
| **Case No:** | 18PR00576 |
| **Hearing Date:** | Thu Sep 26, 2019 9:00 |
| **Nature of Proceedings:** Petition for Attorney Fees | |

This matter is on calendar for hearing of a Petition for Attorney Fees, filed by attorney Channe Coles, Esq. relating to her claimed representation of Rosemary Free Leahy. The court has reviewed the Petition and the opposing briefs, and the record and file in the action to date. The court concludes that the bills of attorney Coles reflect a significant quantity of legal services that Ms. Coles in fact provided. However, the court also concludes that these services were provided at the behest of Patrick Leahy, and were directed by him. While not undertaken in bad faith, the services were provided under circumstances where it appears Ms. Coles was was not fully informed about the web of relationships surrounding Rosemary Leahy nor all of the pertinent history, circumstances that due diligence would have revealed. Although Ms. Coles may in fact be entitled to payment for her fees, the payor is more properly identified as Patrick Leahy, to whose primary benefit the legal services were undertaken, not the conservatorship estate of Rosemary Leahy. Petition denied.

Case 16-02090                Page 2 of 2
                             May 30, 2008
                             INTERNATIONAL MANUFACTURING GROUP INC
                             7631

Continued ...

| Date | Amount | Description |
|---|---|---|
| 05/27 | 22,500.00 | INTERNET XFER TO DDA ***5811 ID: 148211428  2302504449 |
| 05/27 | 10,000.00 | INTERNET XFER TO DDA ***4841 ID: 148211344  2302504447 |
| 05/30 | 15,000.00 | AMERICAN EXPRESS ELEC R ******513062REF # 031201467204867  1101643176 |

........................................................................................................................................................

**5  CHECKS PROCESSED**

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|---|---|---|
| 2400 | 05/15 | 11,232.00 | 2424 | 05/05 | 2,000.00 | 2436 | 05/06 | 6,593.92 |
| 2423* | 05/05 | 2,000.00 | 2435* | 05/06 | 15,317.49 | | | |

* Not in check sequence

........................................................................................................................................................

**DAILY BALANCES**

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 05/01 | 19,613.37 | 05/08 | 19,298.50 | 05/19 | 30,066.50 |
| 05/02 | 368,234.91 | 05/13 | 9,298.50 | 05/20 | 255,066.50 |
| 05/05 | 139,234.91 | 05/14 | 49,298.50 | 05/21 | 35,066.50 |
| 05/06 | 6,798.50 | 05/15 | 38,066.50 | 05/27 | 2,566.50 |
| 05/07 | 71,798.50 | 05/16 | 23,066.50 | 05/30 | 2,566.50 |

MEMBER FDIC

## An Easy Approach To Balancing Your Account

To reconcile your checkbook balance to your statement balance: Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1.  LIST your checkbook balance. | |
| 2.  ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3.  SUBTOTAL: | |
| 4.  SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5.  ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6.  LIST your current statement balance as shown on the front of this statement. | |
| 7.  ADD deposits made, but not shown on this statement. | |
| 8.  SUBTOTAL: | |
| 9.  SUBTRACT total from "Checks Outstanding." | |
| 10.  ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**Please notify us if we report any inaccurate information about your account(s) to a credit bureau.** Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000233

0029122-0000002-0038110

Statement of Accounts
Page 1 of 2
This Statement: June 30, 2008
Last Statement: May 30, 2008

Account      7631

DIRECT INQUIRIES TO:
Customer Service  1 (800) 400-6080

0050637          4183-06-0030-CBT-PG0019-00005

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $587,096.41 | |

## ANALYSIS CHECKING      7631                                                                 103    5

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 2,566.50 | 922,500.00 | 262,558.68 | 75,411.41 | 587,096.41 |

### 8 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 06/02 | 65,000.00 | DEPOSIT 5111021082 |
| 06/04 | 10,000.00 | INTERNET XFER FROM DDA ***4841 ID: 156080018 2302400272 |
| 06/06 | 25,000.00 | DEPOSIT 5111001617 |
| 06/09 | 25,000.00 | DEPOSIT 5111020101 |
| 06/19 | 7,500.00 | INTERNET XFER FROM DDA ***4841 ID: 171083610 2302400330 |
| 06/20 | 15,000.00 | INTERNET XFER FROM DDA ***4841 ID: 172074116 2302300302 |
| 06/23 | 200,000.00 | CREDIT MEMO 5111013812 |
| 06/30 | 575,000.00 | LOAN ADVANCE ID: 182164359 2302604126 |

### 16 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 06/02 | 1,397.15 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004 2502500220 |
| 06/03 | 40,000.00 | INTERNET XFER TO DDA ***5811 ID: 155213855 2302503101 |
| 06/03 | 14,404.68 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689001 2502601598 |
| 06/03 | 9,876.31 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680030003 2502500219 |
| 06/03 | 4,197.72 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680001 2502500189 |
| 06/06 | 2,797.33 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818039001 2502400080 |
| 06/06 | 1,151.84 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030001 2502400079 |
| 06/09 | 30,983.65 | DEBIT MEMO 5338162586 |
| 06/09 | 10,000.00 | INTERNET XFER TO DDA ***4841 ID: 159102355 2302400239 |
| 06/10 | 5,000.00 | INTERNET XFER TO DDA ***5811 ID: 162075819 2302400263 |
| 06/17 | 2,500.00 | INTERNET XFER TO DDA ***5811 ID: 169080022 2302500249 |
| 06/18 | 4,000.00 | INTERNET XFER TO DDA ***5811 ID: 170081918 2302600309 |
| 06/24 | 100,000.00 | INTERNET XFER TO DDA ***5811 ID: 176082339 2302500243 |
| 06/25 | 25,000.00 | INTERNET XFER TO DDA ***4841 ID: 177080419 2302400291 |
| 06/25 | 1,250.00 | 0168068-9002/INTERNATIONAL MFTG G/LN FEEID: 177165429 2302402667 |
| 06/30 | 10,000.00 | INTERNET XFER TO DDA ***5811 ID: 182100043 2302602101 |

Exhibit K, Page 000234


MEMBER FDIC

0050637-0000001-0058843

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

Transfer to Line 9.

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

### IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT

You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS

If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone us or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

### FOR PERSONAL CREDIT LINE ACCOUNTS:

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE

*(This is a Summary of Your Billing Rights).*

If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

### PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION

*How Finance Charge (If Any) is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**Please notify us if we report any inaccurate information about your account(s) to a credit bureau.** Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000235

0050637-0000001-0058843

**4  CHECKS PROCESSED**

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|---|---|---|
| 2438 | 06/19 | 15,317.49 | 2440 | 06/23 | 52,000.00 | 2445* | 06/25 | 1,500.00 |
| 2439 | 06/18 | 6,593.92 | | | | | | |

* Not in check sequence

**DAILY BALANCES**

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 06/02 | 66,169.35 | 06/10 | 7,757.82 | 06/23 | 149,846.41 |
| 06/03 | -2,309.36 | 06/17 | 5,257.82 | 06/24 | 49,846.41 |
| 06/04 | 7,690.64 | 06/18 | -5,336.10 | 06/25 | 22,096.41 |
| 06/06 | 28,741.47 | 06/19 | -13,153.59 | 06/30 | 587,096.41 |
| 06/09 | 12,757.82 | 06/20 | 1,846.41 | | |

EQUAL HOUSING LENDER   MEMBER FDIC

Exhibit K, Page 000236

0050637-0000002-0058844

## An Easy Approach To Balancing Your Account

To reconcile your checkbook balance to your statement balance: Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

Transfer to Line 9.

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance", we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance Charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000237

0050637-0000002-00588-44

Filed 09/21/16                          Case 16-02090                                         Doc 92

**Statement of Accounts**
Page 1 of 2
This Statement: July 31, 2008
Last Statement: June 30, 2008

Account          7631

**DIRECT INQUIRIES TO:**
Customer Service  1 (800) 400-6080

0029294                4214-06-0200-CBT-PG0019-00003

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $2,072.28 | |

## ANALYSIS CHECKING    7631                                                          103    3

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 587,096.41 | 667,000.00 | 1,229,362.72 | 22,661.41 | 2,072.28 |

### 5 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 07/01 | 475,000.00 | LOAN ADVANCE ID: 183105215 2302401212 |
| 07/08 | 5,000.00 | INTERNET XFER FROM DDA ***0181 ID: 190014950 2302300084 |
| 07/08 | 2,000.00 | INTERNET XFER FROM DDA ***4841 ID: 190102506 2302300804 |
| 07/14 | 175,000.00 | LOAN ADVANCE ID: 196153615 2302403758 |
| 07/17 | 10,000.00 | INTERNET XFER FROM DDA ***5811 ID: 199084616 2302300380 |

### 21 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 07/01 | 300,000.00 | INTERNET XFER TO DDA ***0181 ID: 183103456 2302401065 |
| 07/01 | 48,268.27 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680004 2502500107 |
| 07/01 | 35,000.00 | INTERNET XFER TO DDA ***5811 ID: 183102933 2302401043 |
| 07/01 | 15,000.00 | INTERNET XFER TO DDA ***4841 ID: 183103020 2302401049 |
| 07/01 | 9,557.73 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030003 2502500141 |
| 07/01 | 4,062.31 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680001 2502500106 |
| 07/01 | 1,352.08 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004 2502500142 |
| 07/01 | 213.89 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689002 2502500108 |
| 07/02 | 325,000.00 | INTERNET XFER TO DDA ***5811 ID: 184014741 2302400129 |
| 07/02 | 14,003.73 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689001 2502501600 |
| 07/03 | 20,000.00 | INTERNET XFER TO DDA ***5811 ID: 185105258 2302301115 |
| 07/07 | 250,000.00 | INTERNET XFER TO DDA ***4841 ID: 186124508 2302400427 |
| 07/07 | 27,500.00 | INTERNET XFER TO DDA ***4841 ID: 188225456 2302401727 |
| 07/07 | 4,304.72 | PAYBYPHONE-PYMT PHONE P **** REF # 091409688918148 1101853978 |
| 07/07 | 2,727.08 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818039001 2502500166 |
| 07/07 | 2,500.00 | CHASE EPAY 557563054 REF # 021000024755646 1101822146 |
| 07/07 | 1,122.91 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030001 2502500165 |
| 07/07 | 750.00 | CHASE EPAY 557562725 REF # 021000024756765 1101822147 |
| 07/15 | 150,000.00 | INTERNET XFER TO DDA ***5811 ID: 197080248 2302300355 |
| 07/15 | 15,000.00 | INTERNET XFER TO DDA ***5811 ID: 197205838 2302503505 |
| 07/23 | 3,000.00 | INTERNET XFER TO DDA ***5811 ID: 205082525 2302800307 |

MEMBER FDIC

0029294-0000001-0037134

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights.)*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**Please notify us if we report any inaccurate information about your account(s) to a credit bureau.** Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Filed 09/21/16     Case 2:17-cv-01123-WBS-DB   Document 42   Filed 10/15/19   Page 438 of 481        Doc 92
Case 16-02090
Page 2 of 2
July 31, 2008
INTERNATIONAL MANUFACTURING GROUP INC
7631

**3  CHECKS PROCESSED**

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|---|---|---|
| 2441 | 07/02 | 6,593.92 | 2442 | 07/16 | 15,317.49 | 2452* | 07/29 | 750.00 |

\* Not in check sequence

**DAILY BALANCES**

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 07/01 | 648,642.13 | 07/08 | 1,139.77 | 07/17 | 5,822.28 |
| 07/02 | 303,044.48 | 07/14 | 176,139.77 | 07/23 | 2,822.28 |
| 07/03 | 283,044.48 | 07/15 | 11,139.77 | 07/29 | 2,072.28 |
| 07/07 | -5,860.23 | 07/16 | -4,177.72 | | |

EQUAL HOUSING LENDER     MEMBER FDIC

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

| CHECKBOOK BALANCE | |
|---|---|
| 1.  LIST your checkbook balance. | |
| 2.  ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3.  SUBTOTAL: | |
| 4.  SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5.  ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6.  LIST your current statement balance as shown on the front of this statement. | |
| 7.  ADD deposits made, but not shown on this statement. | |
| 8.  SUBTOTAL: | |
| 9.  SUBTRACT total from "Checks Outstanding." | |
| 10.  ADJUSTED STATEMENT BALANCE: | |

*Transfer to Line 9.*

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper changes identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the proscribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method.  The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance.  Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance.  Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle.  This gives us the "Average Daily Balance" or "Balance Subject to Finance charge."  Payments received during regular banking hours at all of our full service offices will be credited on the same banking day.  Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000241

0029294-0000002-0037135

Case 16-02690

**Statement of Accounts**
Page 1 of 2
This Statement: August 29, 2008
Last Statement: July 31, 2008

Account        7631

**DIRECT INQUIRIES TO:**
Customer Service 1 (800) 400-6080

0029167        4243-06-0030-CBT-PC0019-00006

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $5,603.41 | |

## ANALYSIS CHECKING        7631                                                      103    6

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 2,072.28 | 580,000.00 | 280,098.86 | 296,370.01 | 5,603.41 |

### 6 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 08/01 | 65,000.00 | DEPOSIT 5111019231 |
| 08/05 | 30,000.00 | INTERNET XFER FROM DDA ***0181 ID: 218080146  2302800284 |
| 08/06 | 200,000.00 | LOAN ADVANCE ID: 219133434  2302801614 |
| 08/20 | 260,000.00 | LOAN ADVANCE ID: 233121717  2302901334 |
| 08/20 | 20,000.00 | INTERNET XFER FROM DDA ***0181 ID: 233072525  2302900180 |
| 08/22 | 5,000.00 | DEPOSIT 5111008487 |

### 15 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 08/01 | 1,397.16 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004  2501800126 |
| 08/04 | 39,376.74 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680004  2501800093 |
| 08/04 | 14,470.51 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689001  2502601624 |
| 08/04 | 9,876.31 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030003  2501800125 |
| 08/04 | 6,302.08 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689002  2501800094 |
| 08/04 | 4,197.72 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680001  2501800092 |
| 08/06 | 60,000.00 | INTERNET XFER TO DDA ***5811 ID: 219214416  2302802771 |
| 08/06 | 20,000.00 | INTERNET XFER TO DDA ***4841 ID: 219215255  2302802781 |
| 08/06 | 2,817.99 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818039001  2502900083 |
| 08/06 | 1,160.35 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030001  2502900082 |
| 08/07 | 100,000.00 | INTERNET XFER TO DDA ***4841 ID: 220075720  2302900201 |
| 08/13 | 10,000.00 | INTERNET XFER TO DDA ***5811 ID: 226011410  2302700109 |
| 08/22 | 2,500.00 | INTERNET XFER TO DDA ***4841 ID: 235073816  2302700279 |
| 08/25 | 1,000.00 | CHASE EPAY 580913276 REF # 021000025238529  1101930330 |
| 08/29 | 7,000.00 | INTERNET XFER TO DDA ***5811 ID: 242074534  2302700385 |

### 6 CHECKS PROCESSED

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|---|---|---|
| 2443 | 08/19 | 1,934.60 | 2455* | 08/19 | 15,317.49 | 2457 | 08/04 | 13,724.00 |
| 2444 | 08/01 | 5,000.00 | 2456 | 08/19 | 6,593.92 | 2463* | 08/21 | 253,800.00 |

* Not in check sequence

Exhibit K, Page 000242


MEMBER FDIC

0029167-0000001-0036547

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

Transfer to Line 9.

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance Charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000243

0029167-0000001-0036547

Page 2 of 2
August 29, 2008
INTERNATIONAL MANUFACTURING GROUP INC
7631

**DAILY BALANCES**

| Date | Balance | | Date | Balance | | Date | Balance |
|------|---------|---|------|---------|---|------|---------|
| 08/01 | 60,675.12 | | 08/07 | 18,749.42 | | 08/21 | 11,103.41 |
| 08/04 | -27,272.24 | | 08/13 | 8,749.42 | | 08/22 | 13,603.41 |
| 08/05 | 2,727.76 | | 08/19 | -15,096.59 | | 08/25 | 12,603.41 |
| 08/06 | 118,749.42 | | 08/20 | 264,903.41 | | 08/29 | 5,603.41 |

Exhibit K, Page 000244

0029167-0000002-0036548

EQUAL HOUSING
LENDER    MEMBER FDIC

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights.)*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**Please notify us if we report any inaccurate information about your account(s) to a credit bureau.** Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000245

0029167-0000002-0036548

## CALIFORNIA BANK & TRUST

P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**
Page 1 of 2
This Statement: September 30, 2008
Last Statement: August 29, 2008

Account       7631

**DIRECT INQUIRIES TO:**
Customer Service 1 (800) 400-6080

0050743          4275-06-1000-CBT-PG0019-00015

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | -$1,292.85 | |

## ANALYSIS CHECKING       7631

103   15

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 5,603.41 | 804,000.00 | 177,905.60 | 632,990.66 | -1,292.85 |

### 10 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 09/02 | 225,000.00 | LOAN ADVANCE ID: 246142142 2302604352 |
| 09/02 | 175,000.00 | LOAN ADVANCE ID: 246142222 2302604356 |
| 09/02 | 65,000.00 | DEPOSIT 5111024151 |
| 09/04 | 40,000.00 | DEPOSIT 5111017162 |
| 09/05 | 20,000.00 | DEPOSIT 5113032735 |
| 09/11 | 80,000.00 | INTERNET XFER FROM DDA ***4841 ID: 255002119 2303000062 |
| 09/18 | 24,000.00 | INTERNET XFER FROM DDA ***5811 ID: 262081200 2302700260 |
| 09/22 | 100,000.00 | INTERNET XFER FROM DDA ***4841 ID: 265204319 2302901130 |
| 09/23 | 50,000.00 | INTERNET XFER FROM DDA ***4841 ID: 267215717 2302902760 |
| 09/23 | 25,000.00 | INTERNET XFER FROM DDA ***5811 ID: 267215625 2302902758 |

### 13 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 09/02 | 39,376.75 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680004 2502800207 |
| 09/02 | 9,876.31 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030003 2502800237 |
| 09/02 | 7,949.79 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689002 2502800208 |
| 09/02 | 4,197.72 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680686001 2502800206 |
| 09/02 | 1,397.15 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004 2502800238 |
| 09/03 | 70,000.00 | INTERNET XFER TO DDA ***5811 ID: 247074122 2302800313 |
| 09/03 | 14,470.52 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689001 2502901674 |
| 09/05 | 10,000.00 | AMERICAN EXPRESS ELEC R ******517465REF # 031201467383169 1102040836 |
| 09/05 | 10,000.00 | INTERNET XFER TO DDA ***4841 ID: 249085013 2302700499 |
| 09/08 | 1,160.35 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030001 2501500076 |
| 09/24 | 5,000.00 | INTERNET XFER TO DDA ***4841 ID: 268074331 2302800221 |
| 09/30 | 3,727.01 | DEBIT MEMO 5338115101 |
| 09/30 | 750.00 | DEBIT MEMO 5338115091 |

MEMBER FDIC

Exhibit K, Page 000246

0050743-0000001-0058968

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **TOTAL:** | |

Transfer to Line 9.

| CHECKBOOK BALANCE | |
|---|---|
| 1.  LIST your checkbook balance. | |
| 2.  ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3.  SUBTOTAL: | |
| 4.  SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5.  ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6.  LIST your current statement balance as shown on the front of this statement. | |
| 7.  ADD deposits made, but not shown on this statement. | |
| 8.  SUBTOTAL: | |
| 9.  SUBTRACT total from "Checks Outstanding." | |
| 10.  ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:** ·

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights.)*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.
1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000247

0050743-0000001-0058968



CALIFORNIA BANK
& TRUST

P.O. Box 489, Lawndale, CA  90260-0489

Page 2 of 2
September 30, 2008
INTERNATIONAL MANUFACTURING GROUP INC
7631

## 13  CHECKS PROCESSED

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|--------|------|--------|--------|------|--------|--------|------|--------|
| 2458 | 09/05 | 145,928.16 | 2464* | 09/02 | 65,000.00 | 2468 | 09/17 | 50,000.00 |
| 2459 | 09/03 | 72,964.38 | 2465 | 09/04 | 30,000.00 | 2469 | 09/22 | 20,000.00 |
| 2460 | 09/03 | 4,141.48 | 2466 | 09/05 | 30,000.00 | 2472* | 09/22 | 55,000.00 |
| 2461 | 09/17 | 15,317.49 | 2467 | 09/11 | 41,907.96 | 2473 | 09/23 | 91,995.79 |
| 2462 | 09/03 | 10,735.40 | | | | | | |

* Not in check sequence

## DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 09/02 | 342,805.69 | 09/08 | 3,405.40 | 09/22 | 25,179.95 |
| 09/03 | 170,493.91 | 09/11 | 41,497.44 | 09/23 | 8,184.16 |
| 09/04 | 180,493.91 | 09/17 | -23,820.05 | 09/24 | 3,184.16 |
| 09/05 | 4,565.75 | 09/18 | 179.95 | 09/30 | -1,292.85 |

0050743-0000002-0058969

MEMBER FDIC

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **TOTAL:** | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights.)*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

## CALIFORNIA BANK
### TRUST
P.O. Box 489, Lawndale, CA 90260-0489

DIRECT INQUIRIES TO:
Customer Service  1 (800) 400-6080

0029406          4306-06-0030-CBT-PC0019-00003

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

---

### SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $3,165.34 | |

### ANALYSIS CHECKING        7631                                                    103    3

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| -1,292.85 | 368,052.89 | 266,309.81 | 97,284.89 | 3,165.34 |

### 9  DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 10/01 | 5,000.00 | INTERNET XFER FROM DDA ***4841 ID: 275075135 2302700456 |
| 10/02 | 60,000.00 | INTERNET XFER FROM DDA ***4841 ID: 275220756 2303000006 |
| 10/14 | 15,000.00 | INTERNET XFER FROM DDA ***4841 ID: 288215122 2302805888 |
| 10/20 | 25,000.00 | INTERNET XFER FROM DDA ***4841 ID: 292094954 2302900200 |
| 10/20 | 15,317.49 | RETURN SEQ # 005113000389 Serial Number = 0000002475 1700800453 |
| 10/20 | 10,735.40 | RETURN SEQ # 005113000390 Serial Number = 0000002478 1700800454 |
| 10/20 | 2,000.00 | INTERNET XFER FROM DDA ***4841 ID: 294214732 2302904004 |
| 10/21 | 200,000.00 | LOAN ADVANCE ID: 295120128 2302801286 |
| 10/22 | 35,000.00 | INTERNET XFER FROM DDA ***4841 ID: 296074933 2302800214 |

### 15  CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 10/01 | 38,106.52 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680004 2502100096 |
| 10/01 | 9,602.09 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689002 2502100097 |
| 10/01 | 9,557.73 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030003 2502100132 |
| 10/01 | 4,062.31 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680001 2502100095 |
| 10/01 | 1,352.08 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004 2502100133 |
| 10/20 | 14,779.07 | DEBIT MEMO  5338149294 |
| 10/20 | 2,727.09 | LOAN PAYMENT ID: 294161616 2302903417 |
| 10/20 | 1,122.92 | LOAN PAYMENT ID: 294160930 2302903403 |
| 10/21 | 5,000.00 | INTERNET XFER TO DDA ***4841 ID: 295075537 2302800273 |
| 10/21 | 5,000.00 | INTERNET XFER TO DDA ***5811 ID: 295075745 2302800277 |
| 10/21 | 3,000.00 | INTERNET XFER TO DDA ***5811 ID: 295080424 2302800295 |
| 10/22 | 100,000.00 | INTERNET XFER TO DDA ***4841 ID: 295225203 2302800037 |
| 10/22 | 60,000.00 | INTERNET XFER TO DDA ***0181 ID: 295225245 2302800041 |
| 10/22 | 10,000.00 | INTERNET XFER TO DDA ***5811 ID: 295225335 2302800043 |
| 10/27 | 2,000.00 | INTERNET XFER TO DDA ***5811 ID: 299155039 2303100599 |

MEMBER FDIC

0029406-0000001-0037603

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | | CHECKBOOK BALANCE | |
|---|---|---|---|
| Check Number | Check Amount | | |
| | | 1. LIST your checkbook balance. | |
| | | 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| | | 3. SUBTOTAL: | |
| | | 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| | | 5. ADJUSTED CHECKBOOK BALANCE: | |
| | | *This balance should agree with line 10, below.* | |

| | | STATEMENT BALANCE | |
|---|---|---|---|
| | | 6. LIST your current statement balance as shown on the front of this statement. | |
| | | 7. ADD deposits made, but not shown on this statement. | |
| | | 8. SUBTOTAL: | |
| | | 9. SUBTRACT total from "Checks Outstanding." | |
| TOTAL: | | 10. ADJUSTED STATEMENT BALANCE: | |
| *Transfer to Line 9.* | | *This balance should agree with line 5, above.* | |

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the pans of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at al of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.



CALIFORNIA BANK
& TRUST

P.O. Box 489, Lawndale, CA  90260-0489

Page 2 of 2
October 31, 2008
INTERNATIONAL MANUFACTURING GROUP INC
7631

**4 CHECKS PROCESSED**

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|---|---|---|
| 2474 | 10/16 | 11,232.00 | 2478* | 10/17 | 10,735.40 | 2480* | 10/21 | 60,000.00 |
| 2475 | 10/17 | 15,317.49 | | | | | | |
| * Not in check sequence | | | | | | | | |

**DAILY BALANCES**

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 10/01 | -58,973.58 | 10/16 | 4,794.42 | 10/21 | 140,165.34 |
| 10/02 | 1,026.42 | 10/17 | -21,258.47 | 10/22 | 5,165.34 |
| 10/14 | 16,026.42 | 10/20 | 13,165.34 | 10/27 | 3,165.34 |

MEMBER FDIC

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **TOTAL:** | |

Transfer to Line 9.

**CHECKBOOK BALANCE**

1. LIST your checkbook balance.
2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits).
3. SUBTOTAL:
4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc).
5. ADJUSTED CHECKBOOK BALANCE:

*This balance should agree with line 10, below.*

**STATEMENT BALANCE**

6. LIST your current statement balance as shown on the front of this statement.
7. ADD deposits made, but not shown on this statement.
8. SUBTOTAL:
9. SUBTRACT total from "Checks Outstanding."
10. ADJUSTED STATEMENT BALANCE:

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

CB | CALIFORNIA BANK
C|B | TRUST

P.O. Box 489, Lawndale, CA 90260-0489

Statement of Accounts
Page 1 of 2
This Statement: November 28, 2008
Last Statement: October 31, 2008

Account          7631

DIRECT INQUIRIES TO:
Customer Service  1 (800) 400-6080

0050926          4334-06-0200-CBT-PG0019-00007

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $43,736.46 | |

## ANALYSIS CHECKING     7631                                                              103    7

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 3,165.34 | 1,765,000.00 | 1,577,179.55 | 147,249.33 | 43,736.46 |

### 11 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 11/03 | 300,000.00 | LOAN ADVANCE ID: 308143143  2303103908 |
| 11/06 | 200,000.00 | LOAN ADVANCE ID: 311132059  2302801752 |
| 11/10 | 150,000.00 | LOAN ADVANCE ID: 315131746  2302902960 |
| 11/12 | 75,000.00 | LOAN ADVANCE ID: 317150147  2302703648 |
| 11/18 | 60,000.00 | UFT CREDIT 5112023837 |
| 11/18 | 10,000.00 | INTERNET XFER FROM DDA ***0181 ID: 323100140  2302900722 |
| 11/18 | 10,000.00 | UFT CREDIT 5112012161 |
| 11/19 | 825,000.00 | LOAN ADVANCE ID: 324145459  2302901928 |
| 11/20 | 50,000.00 | UFT CREDIT 5112006757 |
| 11/25 | 60,000.00 | UFT CREDIT 5112009080 |
| 11/26 | 25,000.00 | DEPOSIT 5113021984 |

### 34 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 11/03 | 65,000.00 | INTERNET XFER TO DDA ***5811 ID: 308210433  2303105071 |
| 11/03 | 55,000.00 | INTERNET XFER TO DDA ***4841 ID: 308210520  2303105073 |
| 11/03 | 36,836.31 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680004  2502200106 |
| 11/03 | 9,348.47 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689002  2502200107 |
| 11/03 | 9,239.13 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030003  2502200137 |
| 11/03 | 3,926.90 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680001  2502200105 |
| 11/03 | 1,307.02 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004  2502200138 |
| 11/04 | 90,000.00 | INTERNET XFER TO DDA ***0181 ID: 309081742  2303100371 |
| 11/04 | 14,267.42 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689001  2502301587 |
| 11/05 | 5,000.00 | INTERNET XFER TO DDA ***4841 ID: 310073841  2302900257 |
| 11/06 | 1,685.83 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818039001  2502300069 |
| 11/06 | 1,068.47 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030001  2502300068 |
| 11/06 | 1,000.00 | LOAN FEE ID: 311100633  2302800691 |
| 11/07 | 50,000.00 | INTERNET XFER TO DDA ***4841 ID: 311225419  2302700045 |
| 11/07 | 50,000.00 | INTERNET XFER TO DDA ***5811 ID: 311225458  2302700047 |
| 11/10 | 50,000.00 | INTERNET XFER TO DDA ***4841 ID: 315083016  2302901551 |
| 11/10 | 50,000.00 | INTERNET XFER TO DDA ***4841 ID: 315215841  2302904313 |
| 11/10 | 10,000.00 | INTERNET XFER TO DDA ***5811 ID: 315215917  2302904315 |

EQUAL HOUSING LENDER    MEMBER FDIC

0050926-0000001-0070687

## An Easy Approach To Balancing Your Account

To reconcile your checkbook balance to your statement balance: Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | | CHECKBOOK BALANCE | |
|---|---|---|---|
| Check Number | Check Amount | 1. LIST your checkbook balance. | |
| | | 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| | | 3. SUBTOTAL: | |
| | | 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| | | 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| | | STATEMENT BALANCE | |
|---|---|---|---|
| | | 6. LIST your current statement balance as shown on the front of this statement. | |
| | | 7. ADD deposits made, but not shown on this statement. | |
| | | 8. SUBTOTAL: | |
| | | 9. SUBTRACT total from "Checks Outstanding." | |
| TOTAL: | | 10. ADJUSTED STATEMENT BALANCE: | |

*Transfer to Line 9.*       *This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.
1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.



CALIFORNIA BANK
TRUST

P.O. Box 489, Lawndale, CA 90260-0489

Page 2 of 2
November 28, 2008
INTERNATIONAL MANUFACTURING GROUP INC
7631

Continued ...

| Date | Amount | Description |
|---|---|---|
| 11/12 | 40,000.00 | INTERNET XFER TO DDA ***5811 ID: 316080156  2302700213 |
| 11/13 | 20,000.00 | INTERNET XFER TO DDA ***5811 ID: 317222757  2302900015 |
| 11/18 | 50,000.00 | INTERNET XFER TO DDA ***5811 ID: 323074227  2302900251 |
| 11/18 | 25,000.00 | INTERNET XFER TO DDA ***5811 ID: 323214246  2302903031 |
| 11/18 | 15,000.00 | INTERNET XFER TO DDA ***4841 ID: 323214202  2302903029 |
| 11/18 | 10,000.00 | INTERNET XFER TO DDA ***0181 ID: 323214342  2302903033 |
| 11/18 | 7,500.00 | INTERNET XFER TO DDA ***4841 ID: 323074305  2302900253 |
| 11/19 | 70,000.00 | INTERNET XFER TO DDA ***4841 ID: 324203223  2302902773 |
| 11/19 | 10,000.00 | INTERNET XFER TO DDA ***5811 ID: 324203313  2302902775 |
| 11/19 | 1,000.00 | CHASE EPAY 618984311 REF # 021000027837990  1102024654 |
| 11/20 | 750,000.00 | WIRE/OUT-200832501219;BNF INTERNATIONAL MFG GROUP INC  1301601656 |
| 11/26 | 25,000.00 | INTERNET XFER TO DDA ***5811 ID: 331081711  2302800391 |
| 11/26 | 15,000.00 | INTERNET XFER TO DDA ***4841 ID: 331081628  2302800389 |
| 11/28 | 20,000.00 | INTERNET XFER TO DDA ***4841 ID: 333094724  2302801055 |
| 11/28 | 10,000.00 | AMERICAN EXPRESS ELEC R ******525189REF # 031201464528391  1101829727 |
| 11/28 | 5,000.00 | INTERNET XFER TO DDA ***5811 ID: 333094819  2302801061 |

## 7  CHECKS PROCESSED

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|---|---|---|
| 2481 | 11/06 | 10,733.40 | 2484 | 11/12 | 45,000.00 | 2486 | 11/18 | 19,015.93 |
| 2482 | 11/10 | 40,000.00 | 2485 | 11/17 | 5,000.00 | 2487 | 11/25 | 25,000.00 |
| 2483 | 11/10 | 2,500.00 | | | | | | |

## DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 11/03 | 122,507.51 | 11/10 | 96,252.39 | 11/19 | 758,736.46 |
| 11/04 | 18,240.09 | 11/12 | 86,252.39 | 11/20 | 58,736.46 |
| 11/05 | 13,240.09 | 11/13 | 66,252.39 | 11/25 | 93,736.46 |
| 11/06 | 198,752.39 | 11/17 | 61,252.39 | 11/26 | 78,736.46 |
| 11/07 | 98,752.39 | 11/18 | 14,736.46 | 11/28 | 43,736.46 |

MEMBER FDIC

## An Easy Approach To Balancing Your Account

To reconcile your checkbook balance to your statement balance: Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
| --- | --- |
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

Transfer to Line 9.

| CHECKBOOK BALANCE | | |
| --- | --- | --- |
| 1. LIST your checkbook balance. | | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | | |
| 3. SUBTOTAL: | | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | | |
| 5. ADJUSTED CHECKBOOK BALANCE: | | |

This balance should agree with line 10, below.

| STATEMENT BALANCE | | |
| --- | --- | --- |
| 6. LIST your current statement balance as shown on the front of this statement. | | |
| 7. ADD deposits made, but not shown on this statement. | | |
| 8. SUBTOTAL: | | |
| 9. SUBTRACT total from "Checks Outstanding." | | |
| 10. ADJUSTED STATEMENT BALANCE: | | |

This balance should agree with line 5, above.

### IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT

You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS

If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

### FOR PERSONAL CREDIT LINE ACCOUNTS:

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE
(This is a Summary of Your Billing Rights.)

If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

### PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION

How Finance Charge (If Any) Is Calculated: If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

## CALIFORNIA BANK
### TRUST
P.O. Box 489, Lawndale, CA 90260-0489

**DIRECT INQUIRIES TO:**
Customer Service  1 (800) 400-6080

0050462        4001-06-0030-CBT-PC0019-00004

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA  95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $7,231.05 | |

## ANALYSIS CHECKING     7631                                              103    4

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 43,736.46 | 1,210,000.00 | 1,221,505.41 | 25,000.00 | 7,231.05 |

### 7 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 12/01 | 125,000.00 | UFT CREDIT 5112018311 |
| 12/02 | 200,000.00 | UFT CREDIT 5112016695 |
| 12/03 | 25,000.00 | UFT CREDIT 5112003119 |
| 12/03 | 120,000.00 | UFT CREDIT 5112010531 |
| 12/08 | 600,000.00 | LOAN ADVANCE ID: 343111440 2302802340 |
| 12/29 | 10,000.00 | INTERNET XFER FROM DDA ***0181 ID: 364145829 2302803448 |
| 12/29 | 130,000.00 | INTERNET XFER FROM DDA ***4841 ID: 364145913 2302803456 |

### 25 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 12/01 | 1,102.15 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004 2502600238 |
| 12/01 | 3,311.40 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680001 2502600201 |
| 12/02 | 15,000.00 | INTERNET XFER TO DDA ***4841 ID: 336233342 2303100097 |
| 12/02 | 25,000.00 | INTERNET XFER TO DDA ***5811 ID: 336233300 2303100095 |
| 12/02 | 7,791.00 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030003 2502600237 |
| 12/02 | 10,089.44 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689002 2502600203 |
| 12/02 | 12,024.11 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689001 2502001709 |
| 12/02 | 31,062.59 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680004 2502600202 |
| 12/03 | 8,500.00 | INTERNET XFER TO DDA ***4841 ID: 338074245 2302600277 |
| 12/03 | 35,000.00 | INTERNET XFER TO DDA ***5811 ID: 338215338 2302603051 |
| 12/03 | 40,000.00 | INTERNET XFER TO DDA ***4841 ID: 338215251 2302603049 |
| 12/03 | 253,000.00 | INTERNET XFER TO DDA ***5811 ID: 338074128 2302600271 |
| 12/04 | 30,000.00 | TELEPHONE TRANSFER DEBIT 5112013319 |
| 12/08 | 450,000.00 | TELEPHONE TRANSFER DEBIT 5112004243 |
| 12/08 | 3,000.00 | INTERNET XFER TO DDA ***5811 ID: 343080439 2302801593 |
| 12/08 | 898.33 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030001 2502600073 |
| 12/08 | 2,181.67 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818039001 2502600074 |
| 12/08 | 2,843.75 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689003 2502600021 |
| 12/09 | 15,000.00 | INTERNET XFER TO DDA ***5811 ID: 343225619 2303000039 |
| 12/09 | 130,000.00 | INTERNET XFER TO DDA ***4841 ID: 343225524 2303000037 |

MEMBER FDIC

0050462-0000001-0060432

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1.  LIST your checkbook balance. | |
| 2.  ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3.  SUBTOTAL: | |
| 4.  SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5.  ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6.  LIST your current statement balance as shown on the front of this statement. | |
| 7.  ADD deposits made, but not shown on this statement. | |
| 8.  SUBTOTAL: | |
| 9.  SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**

You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**

If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*

If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**

*How Finance Charge (If Any) is Calculated:* If this statement includes billing information regarding a personal credit line finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours as of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

0060462-0000001-0060432

**CALIFORNIA BANK**
**TRUST**

P.O. Box 489, Lawndale, CA 90260-0489

Page 2 of 2
December 31, 2008
INTERNATIONAL MANUFACTURING GROUP INC
7631

Continued ...

| Date | Amount | Description |
|------|--------|-------------|
| 12/16 | 5,000.00 | INTERNET XFER TO DDA ***5811 ID: 351083016 2302900335 |
| 12/24 | 3,000.00 | INTERNET XFER TO DDA ***5811 ID: 359100822 2302800665 |
| 12/29 | 500.00 | DEBIT MEMO 5338130225 |
| 12/29 | 590.00 | LOAN PAYMENT ID: 364125421 2302802931 |
| 12/29 | 136,610.97 | LOAN PAYMENT ID: 364162021 2302803929 |

**1 CHECK PROCESSED**

| Number | Date | Amount |
|--------|------|--------|
| 2488 | 12/03 | 25,000.00 |

**DAILY BALANCES**

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 12/01 | 164,322.91 | 12/04 | 16,855.77 | 12/16 | 7,932.02 |
| 12/02 | 263,355.77 | 12/08 | 157,932.02 | 12/24 | 4,932.02 |
| 12/03 | 46,855.77 | 12/09 | 12,932.02 | 12/29 | 7,231.05 |

MEMBER FDIC
EQUAL HOUSING LENDER

Exhibit K, Page 000260

0050462-0000002-0060433

---

# An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

### CHECKS OUTSTANDING

| Check Number | Check Amount |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| TOTAL: |  |

*Transfer to Line 9.*

### CHECKBOOK BALANCE

1. LIST your checkbook balance.

2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits).

3. SUBTOTAL:

4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc).

5. ADJUSTED CHECKBOOK BALANCE:

*This balance should agree with line 10, below.*

### STATEMENT BALANCE

6. LIST your current statement balance as shown on the front of this statement.

7. ADD deposits made, but not shown on this statement.

8. SUBTOTAL:

9. SUBTRACT total from "Checks Outstanding."

10. ADJUSTED STATEMENT BALANCE:

*This balance should agree with line 5, above.*

---

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**

You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**

If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*

If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about. ·

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**

*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance Charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**Please notify us** if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000261

0050462-0000002-0050433

CALIFORNIA BANK
T R U S T
P.O. Box 489, Lawndale, CA  90260-0489

**Statement of Accounts**
Page 1 of 2
This Statement: January 30, 2009
Last Statement: December 31, 2008

Account        7631

**DIRECT INQUIRIES TO:**
Customer Service  1 (800) 400-6080

0029115                  4031-06-0230-CBT-PG0019-00000

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $6,062.27 | |

## ANALYSIS CHECKING        7631                                                                  103    0

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 7,231.05 | 437,500.00 | 438,668.78 | 0.00 | 6,062.27 |

### 6 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 01/06 | 125,000.00 | LOAN ADVANCE ID: 006152105  2303002176 |
| 01/06 | 20,000.00 | UFT CREDIT 5113027657 |
| 01/07 | 12,500.00 | INTERNET XFER FROM DDA ***5811 ID: 007082652  2302800270 |
| 01/07 | 15,000.00 | INTERNET XFER FROM DDA ***4841 ID: 007082732  2302800276 |
| 01/21 | 35,000.00 | UFT CREDIT 5111012161 |
| 01/30 | 230,000.00 | UFT CREDIT 5113022663 |

### 13 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 01/02 | 467.08 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004  2501300141 |
| 01/02 | 3,434.50 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689001  2501300106 |
| 01/06 | 135,000.00 | INTERNET XFER TO DDA ***4841 ID: 006192351  2303002831 |
| 01/06 | 852.40 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030001  2502400078 |
| 01/06 | 2,070.10 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818039001  2502400079 |
| 01/06 | 5,950.52 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689003  2502400028 |
| 01/06 | 7,472.40 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030003  2501300140 |
| 01/06 | 9,621.25 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689002  2501300108 |
| 01/06 | 11,508.15 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689001  2502401629 |
| 01/14 | 500.00 | LOAN FEE ID: 014100235  2303000695 |
| 01/20 | 2,000.00 | CHASE EPAY 645875096 REF # 021000025939627  1102036418 |
| 01/22 | 29,792.38 | LOAN PAYMENT ID: 022090257  2302900395 |
| 01/30 | 230,000.00 | PRINCIPAL PAYDOWN ID: 030174935  2302803797 |

### 0 CHECKS PROCESSED

There were no transactions this period.


MEMBER FDIC

Exhibit K, Page 000262

0029115-0000001-0037621

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | | CHECKBOOK BALANCE | |
|---|---|---|---|
| Check Number | Check Amount | 1.  LIST your checkbook balance. | |
| | | 2.  ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| | | 3.  SUBTOTAL: | |
| | | 4.  SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| | | 5.  ADJUSTED CHECKBOOK BALANCE: | |
| | | | *This balance should agree with line 10, below.* |
| | | STATEMENT BALANCE | |
| | | 6.  LIST your current statement balance as shown on the front of this statement. | |
| | | 7.  ADD deposits made, but not shown on this statement. | |
| | | 8.  SUBTOTAL: | |
| | | 9.  SUBTRACT total from "Checks Outstanding." | |
| TOTAL: | | 10.  ADJUSTED STATEMENT BALANCE: | |
| *Transfer to Line 9.* | | | *This balance should agree with line 5, above.* |

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance Charge." Payments received during regular banking hours as at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84126-0787.

Exhibit K, Page 000263

0029115-0000001-0037621



CALIFORNIA BANK
TRUST

P.O. Box 489, Lawndale, CA  90260-0489

Page 2 of 2
January 30, 2009
INTERNATIONAL MANUFACTURING GROUP INC
7631

**DAILY BALANCES**

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 01/02 | 3,329.47 | 01/14 | 2,854.65 | 01/22 | 6,062.27 |
| 01/06 | -24,145.35 | 01/20 | 854.65 | 01/30 | 6,062.27 |
| 01/07 | 3,354.65 | 01/21 | 35,854.65 | | |

Exhibit K, Page 000264

0029115-0000002-0037622

MEMBER FDIC

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**

You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**

If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights.)*

If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**

*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance Charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

# CALIFORNIA BANK & TRUST

P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**
Page 1 of 2
This Statement: February 27, 2009
Last Statement: January 30, 2009

Account          7631

**DIRECT INQUIRIES TO:**
Customer Service  1 (800) 400-6080

0029165                      4059-06-0200-CBT-PC0019-00002

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $4,765.18 | |

## ANALYSIS CHECKING          7631                                                          103    2

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 6,062.27 | 566,359.10 | 554,656.19 | 13,000.00 | 4,765.18 |

### 6 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 02/02 | 55,000.00 | INTERNET XFER FROM DDA ***4841 ID: 033205753 |
| 02/17 | 150,000.00 | LOAN ADVANCE ID: 048154013 |
| 02/17 | 100,000.00 | INTERNET XFER FROM DDA ***4841 ID: 048133418 |
| 02/17 | 151,359.10 | DEPOSIT |
| 02/19 | 10,000.00 | INTERNET XFER FROM DDA ***0181 ID: 050075718 |
| 02/26 | 100,000.00 | LOAN ADVANCE ID: 057163556 |

### 17 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 02/02 | 4,505.00 | LOAN PAYMENT ID: 033112856 |
| 02/02 | 952.61 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004 |
| 02/02 | 2,603.57 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680001 |
| 02/02 | 8,995.84 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689002 |
| 02/02 | 27,347.77 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680004 |
| 02/03 | 12,000.00 | INTERNET XFER TO DDA ***5811 ID: 034202216 |
| 02/06 | 791.14 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030001 |
| 02/06 | 1,921.35 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818039001 |
| 02/17 | 245,306.25 | LOAN PAYMENT ID: 048154846 |
| 02/18 | 5,731.77 | LOAN PAYMENT ID: 049110342 |
| 02/18 | 10,431.36 | LOAN PAYMENT ID: 049110300 |
| 02/18 | 7,500.00 | INTERNET XFER TO DDA ***5811 ID: 049183950 |
| 02/18 | 30,000.00 | INTERNET XFER TO DDA ***4841 ID: 049184035 |
| 02/18 | 35,000.00 | INTERNET XFER TO DDA ***4841 ID: 049080106 |
| 02/18 | 65,000.00 | INTERNET XFER TO DDA ***5811 ID: 049080436 |
| 02/25 | 1,569.53 | LOAN PAYMENT ID: 056163110 |
| 02/26 | 95,000.00 | INTERNET XFER TO DDA ***4841 ID: 057212724 |

### 2 CHECKS PROCESSED

| Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|
| 1250 | 02/25 | 500.00 | 2489* | 02/18 | 12,500.00 |

* Not in check sequence

Exhibit K, Page 000266



MEMBER FDIC                                                                          0029165-0000001-0036904

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

Transfer to Line 9.

**CHECKBOOK BALANCE**

1. LIST your checkbook balance.

2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits).

3. SUBTOTAL:

4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc).

5. ADJUSTED CHECKBOOK BALANCE:

*This balance should agree with line 10, below.*

**STATEMENT BALANCE**

6. LIST your current statement balance as shown on the front of this statement.

7. ADD deposits made, but not shown on this statement.

8. SUBTOTAL:

9. SUBTRACT total from "Checks Outstanding."

10. ADJUSTED STATEMENT BALANCE:

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**

You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**

If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone us or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*

If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**

*How Finance Charge (If Any) is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25767, Salt Lake City, UT 84125-0767.

Exhibit K, Page 000267

0029165-0000001-0036904

Filed 09/21/16     Case 16-02690                                    Doc 92



CALIFORNIA BANK
TRUST

P.O. Box 489, Lawndale, CA  90260-0489

Page 2 of 2
February 27, 2009
INTERNATIONAL MANUFACTURING GROUP INC
7631

**DAILY BALANCES**

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 02/02 | 16,657.48 | 02/17 | 157,997.84 | 02/25 | 265.18 |
| 02/03 | 4,657.48 | 02/18 | -8,165.29 | 02/25 | 4,765.18 |
| 02/06 | 1,944.99 | 02/19 | 1,834.71 | | |

MEMBER FDIC

Exhibit K, Page 000268

0029165-0000002-0036905

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

Transfer to Line 9.

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

### IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT

You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 60 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS

If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

### FOR PERSONAL CREDIT LINE ACCOUNTS:

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE

*(This is a Summary of Your Billing Rights).*

If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

### PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION

*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance Charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

0029165-G000002-0036905

## CALIFORNIA BANK TRUST
P.O. Box 489, Lawndale, CA 90260-0489

**DIRECT INQUIRIES TO:**
Customer Service 1 (800) 400-6080

0050464          4091-06-0000-CBT-PC0019-00002

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

---

We have reprinted our Deposit Account Agreement and Disclosure. The terms of this document govern your account(s) with CB&T. Feel free to ask for a copy of the Agreement on your next visit to a CB&T branch.

---

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $51,247.04 | |

## ANALYSIS CHECKING       7631                                                                 103    2

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 4,765.18 | 920,000.00 | 873,518.14 | 0.00 | 51,247.04 |

### 9 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 03/02 | 125,000.00 | UFT CREDIT 5113019935 |
| 03/10 | 100,000.00 | CREDIT MEMO 5113002357 |
| 03/10 | 350,000.00 | UFT CREDIT 5113013990 |
| 03/16 | 150,000.00 | UFT CREDIT 5112004133 |
| 03/17 | 60,000.00 | UFT CREDIT 5112011501 |
| 03/19 | 10,000.00 | INTERNET XFER FROM DDA ***4841 ID: 077230504  2302900038 |
| 03/27 | 25,000.00 | LOAN ADVANCE ID: 086165051  2302802718 |
| 03/27 | 50,000.00 | LOAN ADVANCE ID: 086165023  2302802716 |
| 03/31 | 50,000.00 | DEPOSIT 5112012465 |

### 30 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 03/02 | 30,000.00 | INTERNET XFER TO DDA ***5811 ID: 061200902  2302905513 |
| 03/02 | 40,000.00 | INTERNET XFER TO DDA ***4841 ID: 061200949  2302905515 |
| 03/02 | 860.41 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004  2502400217 |
| 03/02 | 1,354.10 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680001  2502400175 |
| 03/02 | 8,195.83 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689002  2502400177 |
| 03/02 | 23,554.82 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680004  2502400176 |
| 03/03 | 8,390.28 | LOAN PAYMENT ID: 062121251  2303001513 |
| 03/03 | 15,000.00 | INTERNET XFER TO DDA ***4841 ID: 062214706  2303003453 |
| 03/06 | 1,735.42 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818039001  2502200073 |
| 03/10 | 15,000.00 | DEBIT MEMO 5113013995 |
| 03/10 | 15,000.00 | TELEPHONE TRANSFER DEBIT 5113002360 |
| 03/10 | 5,427.08 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689003  2502200023 |
| 03/11 | 9,921.88 | LOAN PAYMENT ID: 070134618  2303002057 |
| 03/11 | 75,000.00 | INTERNET XFER TO DDA ***5811 ID: 069231129  2303000053 |
| 03/11 | 200,000.00 | INTERNET XFER TO DDA ***4841 ID: 069231212  2303000055 |

Exhibit K, Page 000270

MEMBER FDIC

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1.  LIST your checkbook balance. | |
| 2.  ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3.  SUBTOTAL: | |
| 4.  SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5.  ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6.  LIST your current statement balance as shown on the front of this statement. | |
| 7.  ADD deposits made, but not shown on this statement. | |
| 8.  SUBTOTAL: | |
| 9.  SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

California Bank & Trust

P.O. Box 489, Lawndale, CA  90260-0489

Page 2 of 2
March 31, 2009
INTERNATIONAL MANUFACTURING GROUP INC
7631

Continued ...

| Date | Amount | Description |
|---|---|---|
| 03/12 | 60,000.00 | INTERNET XFER TO DDA ***4841 ID: 071093325  2302800607 |
| 03/16 | 65,000.00 | INTERNET XFER TO DDA ***4841 ID: 075075041  2303501809 |
| 03/16 | 100,000.00 | INTERNET XFER TO DDA ***4841 ID: 075112713  2303502791 |
| 03/17 | 10,000.00 | INTERNET XFER TO DDA ***5811 ID: 075231157  2302900053 |
| 03/17 | 20,000.00 | INTERNET XFER TO DDA ***5811 ID: 076210000  2302903039 |
| 03/17 | 40,000.00 | INTERNET XFER TO DDA ***4841 ID: 075231236  2302900055 |
| 03/18 | 25,000.00 | INTERNET XFER TO DDA ***4841 ID: 077075449  2302800253 |
| 03/19 | 7,578.32 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030003  2502400014 |
| 03/20 | 2,000.00 | CHASE EPAY 675656603 REF # 021000028952839  1101515537 |
| 03/23 | 10,000.00 | INTERNET XFER TO DDA ***5811 ID: 080081326  2302900145 |
| 03/26 | 7,500.00 | INTERNET XFER TO DDA ***5811 ID: 084232415  2302900055 |
| 03/30 | 15,000.00 | INTERNET XFER TO DDA ***4841 ID: 087094333  2302800287 |
| 03/30 | 15,000.00 | INTERNET XFER TO DDA ***5811 ID: 087094410  2302800291 |
| 03/31 | 7,000.00 | INTERNET XFER TO DDA ***5811 ID: 089221714  2302900015 |
| 03/31 | 40,000.00 | INTERNET XFER TO DDA ***4841 ID: 089221456  2302900011 |

**0  CHECKS PROCESSED**

There were no transactions this period.

**DAILY BALANCES**

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 03/02 | 25,800.02 | 03/16 | 55,325.36 | 03/23 | 10,747.04 |
| 03/03 | 2,409.74 | 03/17 | 45,325.36 | 03/26 | 3,247.04 |
| 03/06 | 674.32 | 03/18 | 20,325.36 | 03/27 | 78,247.04 |
| 03/10 | 415,247.24 | 03/19 | 22,747.04 | 03/30 | 48,247.04 |
| 03/11 | 130,325.36 | 03/20 | 20,747.04 | 03/31 | 51,247.04 |
| 03/12 | 70,325.36 | | | | |

MEMBER FDIC

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | | CHECKBOOK BALANCE | |
|---|---|---|---|
| Check Number | Check Amount | 1. LIST your checkbook balance. | |
| | | 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| | | 3. SUBTOTAL: | |
| | | 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| | | 5. ADJUSTED CHECKBOOK BALANCE: | |
| | | *This balance should agree with line 10, below.* | |
| | | STATEMENT BALANCE | |
| | | 6. LIST your current statement balance as shown on the front of this statement. | |
| | | 7. ADD deposits made, but not shown on this statement. | |
| | | 8. SUBTOTAL: | |
| | | 9. SUBTRACT total from "Checks Outstanding." | |
| TOTAL: | | 10. ADJUSTED STATEMENT BALANCE: | |
| *Transfer to Line 9.* | | *This balance should agree with line 5, above.* | |

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**

You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**

If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights)*

If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**

*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance Charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000273

0050464-0000002-0062882

# CALIFORNIA BANK & TRUST

P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**
Page 1 of 1
This Statement: April 30, 2009
Last Statement: March 31, 2009

Account        7631

**DIRECT INQUIRIES TO:**
Customer Service  1 (800) 400-6080

0029588            4121-06-0030-CBT-PC0019-00000

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $994.73 | |

## ANALYSIS CHECKING    7631                                      103   0

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 51,247.04 | 27,500.00 | 77,752.31 | 0.00 | 994.73 |

### 3 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 04/02 | 7,500.00 | INTERNET XFER FROM DDA ***4841 ID: 092082746 2303100362 |
| 04/22 | 7,500.00 | INTERNET XFER FROM DDA ***4841 ID: 112170310 2302902602 |
| 04/27 | 12,500.00 | INTERNET XFER FROM DDA ***4841 ID: 117191151 2303104196 |

### 10 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 04/01 | 15,000.00 | INTERNET XFER TO DDA ***4841 ID: 091075651 2303000531 |
| 04/01 | 952.61 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004 2502400140 |
| 04/01 | 3,816.11 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680001 2502400104 |
| 04/01 | 9,417.71 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689002 2502400106 |
| 04/01 | 26,105.07 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680004 2502400105 |
| 04/06 | 1,921.35 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818039001 2502600150 |
| 04/17 | 1,000.00 | INTERNET XFER TO DDA ***5811 ID: 107103813 2303001055 |
| 04/23 | 6,589.12 | LOAN PAYMENT ID: 113103052 2302800793 |
| 04/28 | 12,450.34 | 0168068-9001 INT PMNT #582 ID: 118101231 2303000815 |
| 04/29 | 500.00 | 0168068-9001 LN FEE #582 ID: 119114814 2302801385 |

### 0 CHECKS PROCESSED

There were no transactions this period.

### DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 04/01 | -4,044.46 | 04/17 | 534.19 | 04/27 | 13,945.07 |
| 04/02 | 3,455.54 | 04/22 | 8,034.19 | 04/28 | 1,494.73 |
| 04/06 | 1,534.19 | 04/23 | 1,445.07 | 04/29 | 994.73 |

MEMBER FDIC

Exhibit K, Page 000274

0029588-0000001-0038573

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **TOTAL:** | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance", we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

## CALIFORNIA BANK & TRUST
P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**
Page 1 of 2
This Statement: May 29, 2009
Last Statement: April 30, 2009

Account          7631

**DIRECT INQUIRIES TO:**
Customer Service  1 (800) 400-6080

0029384                4150-06-1000-CBT-PG0019-00000

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $1,547.45 | |

## ANALYSIS CHECKING     7631                                        103    0

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 994.73 | 211,500.00 | 210,947.28 | 0.00 | 1,547.45 |

### 4 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 05/04 | 50,000.00 | INTERNET XFER FROM DDA ***4841 ID: 124080531 2303201734 |
| 05/13 | 9,000.00 | INTERNET XFER FROM DDA ***5811 ID: 133111718 2302901198 |
| 05/18 | 2,500.00 | UFT CREDIT 5112019675 |
| 05/20 | 150,000.00 | CREDIT MEMO 5112001899 |

### 13 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 05/01 | 921.87 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004 2502500149 |
| 05/04 | 3,693.01 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680001 2502500108 |
| 05/04 | 9,182.29 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689002 2502500110 |
| 05/04 | 10,767.86 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680689001 2502601654 |
| 05/04 | 25,262.97 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01680680004 2502500109 |
| 05/06 | 1,000.00 | CHASE EPAY 702532704 REF # 021000025819623  1102709996 |
| 05/13 | 8,890.28 | LOAN PAYMENT ID: 133120426 2302901467 |
| 05/19 | 1,859.38 | LOAN PAYMENT ID: 139102912 2302800931 |
| 05/21 | 8,119.62 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030003 2502200025 |
| 05/22 | 30,000.00 | INTERNET XFER TO DDA ***5811 ID: 142074847 2302700415 |
| 05/22 | 100,000.00 | INTERNET XFER TO DDA ***4841 ID: 142074803 2302700413 |
| 05/29 | 1,250.00 | LOAN FEE ID: 149181401 2302803973 |
| 05/29 | 10,000.00 | INTERNET XFER TO DDA ***5811 ID: 149091826 2302800789 |

### 0 CHECKS PROCESSED

There were no transactions this period.


EQUAL HOUSING LENDER    MEMBER FDIC

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

### IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT

You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS

If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

### FOR PERSONAL CREDIT LINE ACCOUNTS:

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE
*(This is a Summary of Your Billing Rights).*

If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information:

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

### PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION

*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance Charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.



**CALIFORNIA BANK**

& TRUST

P.O. Box 489, Lawndale, CA  90260-0489

Page 2 of 2
May 29, 2009
INTERNATIONAL MANUFACTURING GROUP INC
7631

**DAILY BALANCES**

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 05/01 | 72.86 | 05/18 | 2,776.45 | 05/21 | 142,797.45 |
| 05/04 | 1,166.73 | 05/19 | 917.07 | 05/22 | 12,797.45 |
| 05/06 | 166.73 | 05/20 | 150,917.07 | 05/29 | 1,547.45 |
| 05/13 | 276.45 | | | | |

EQUAL HOUSING LENDER    MEMBER FDIC

Exhibit K, Page 000278

0029384-0000002-0038030

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

Transfer to Line 9.            *This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000279

0029384-0000002-0038010

## CALIFORNIA BANK TRUST
P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**
Page 1 of 2
This Statement: June 30, 2009
Last Statement: May 29, 2009

Account        7631

**DIRECT INQUIRIES TO:**
Customer Service 1 (800) 400-6080

0054158            4182-06-1000-CBT-PG0019-00000

INTERNATIONAL MANUFACTURING GROUP INC
5231 PLEASANT DR
SACRAMENTO CA 95822-2541

Arden Way
1800 Arden Way
Sacramento, CA 95815-5002
(916) 929-3200

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Analysis Checking | 7631 | $642,653.94 | |

### ANALYSIS CHECKING   7631                                    103   0

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 1,547.45 | 927,871.33 | 286,764.84 | 0.00 | 642,653.94 |

### 3 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 06/09 | 20,000.00 | INTERNET XFER FROM DDA ***4841 ID: 160090118 2302900442 |
| 06/16 | 33,000.00 | INTERNET XFER FROM DDA ***4841 ID: 167081844 2302900358 |
| 06/22 | 874,871.33 | IMP/IM-105072(IB22111) ID: 173141833 2303103392 |

### 15 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 06/01 | 952.61 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030004 2503100257 |
| 06/09 | 2,445.83 | LOAN PAYMENT ID: 160115924 2302901329 |
| 06/09 | 14,815.69 | LOAN PAYMENT ID: 160110628 2302901057 |
| 06/09 | 1,921.35 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818039001 2502100077 |
| 06/16 | 3,816.11 | LOAN PAYMENT ID: 167132320 2302902193 |
| 06/16 | 6,591.88 | LOAN PAYMENT ID: 167132056 2302902161 |
| 06/16 | 8,662.33 | LOAN PAYMENT ID: 167132143 2302902171 |
| 06/16 | 13,908.49 | LOAN PAYMENT ID: 167132229 2302902185 |
| 06/19 | 1,000.00 | CHASE EPAY 738216791 REF # 021000023137415 1102113293 |
| 06/22 | 8,390.29 | AUTO-DEDUCT PAYMENT TO COMMERCIAL LOAN ACCT # 01818030003 2501500008 |
| 06/23 | 6,760.26 | LOAN PAYMENT ID: 174104828 2303001015 |
| 06/23 | 50,000.00 | INTERNET XFER TO DDA ***5811 ID: 174125301 2303001747 |
| 06/23 | 150,000.00 | INTERNET XFER TO DDA ***4841 ID: 174125216 2303001741 |
| 06/30 | 7,500.00 | INTERNET XFER TO DDA ***5811 ID: 181121523 2302801975 |
| 06/30 | 10,000.00 | INTERNET XFER TO DDA ***4841 ID: 181094424 2302800903 |

### 0 CHECKS PROCESSED

There were no transactions this period.


MEMBER FDIC

Exhibit K, Page 000280

0054158-0000001-0069981

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**
You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**
If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**
*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.



**CALIFORNIA BANK**

*TRUST*

P.O. Box 489, Lawndale, CA 90260-0489

Page 2 of 2
June 30, 2009
INTERNATIONAL MANUFACTURING GROUP INC
7631

**DAILY BALANCES**

| Date | Balance | | Date | Balance | | Date | Balance |
|------|---------|---|------|---------|---|------|---------|
| 06/01 | 594.84 | | 06/19 | 433.16 | | 06/23 | 660,153.94 |
| 06/09 | 1,411.97 | | 06/22 | 866,914.20 | | 06/30 | 642,653.94 |
| 06/16 | 1,433.16 | | | | | | |

Exhibit K, Page 000282

00S4158-0000002-0069982

MEMBER FDIC

## An Easy Approach To Balancing Your Account

To reconcile your checkbook balance to your statement balance: Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

| CHECKBOOK BALANCE | |
|---|---|
| 1. LIST your checkbook balance. | |
| 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3. SUBTOTAL: | |
| 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6. LIST your current statement balance as shown on the front of this statement. | |
| 7. ADD deposits made, but not shown on this statement. | |
| 8. SUBTOTAL: | |
| 9. SUBTRACT total from "Checks Outstanding." | |
| 10. ADJUSTED STATEMENT BALANCE: | |

*Transfer to Line 9.*  *This balance should agree with line 5, above.*

**IN CASE OF IRREGULARITIES IDENTIFIED ON THIS STATEMENT**

You must notify us within 30 days of the date we mailed or made this statement available to you of any unauthorized or missing signature or alteration on a check or other improper charges identified on this statement or within 60 days in the case of unauthorized or missing endorsement. Failure to notify us within the prescribed time periods or to commence action against us within 90 days after notice to us will preclude you from asserting claims against us based on such checks or charges.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR PERSONAL CREDIT LINE TRANSACTIONS**

If you think your statement or receipt is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone us or write us. Please use the telephone number or address listed on the front of this statement to contact us as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR PERSONAL CREDIT LINE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. If you have authorized us to pay your minimum monthly payment automatically by charging your deposit account with us, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**PERSONAL CREDIT LINE FINANCE CHARGE CALCULATION**

*How Finance Charge (If Any) Is Calculated:* If this statement includes billing information regarding a personal credit line the finance charge for each statement (loan) period is calculated by applying the Average Daily Balance Method. The finance charge on your credit line is calculated by applying the daily periodic rate to the "Average Daily Balance" of your account, including current transactions, multiplied by the number of days in the billing cycle. To get the "Average Daily Balance," we take the beginning balance of your account each day, add any new advances, advance fees, and annual fees, and then subtract any payments or credits. This gives us the daily balance. Any late fees or unpaid finance charges incurred during that billing period are not included in the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "Average Daily Balance" or "Balance Subject to Finance Charge." Payments received during regular banking hours at all of our full service offices will be credited on the same banking day. Payments received after regular banking hours will be credited on the next banking day.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Please notify us if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

Exhibit K, Page 000283

0054158-0000002-0069982